FILED

UNITED STATES DISTRICT COURT   DEC 17  P 12: 52
DISTRICT OF CONNECTICUT

US DISTRICT COURT
HARTFORD CT

| | |
|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON,  ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES, INC.,<br>Plaintiffs, | )<br>)<br>)<br>)<br>) |
| v. | ) CIVIL ACTION NO.<br>) 3:03 CV 00644 (CFD)<br>) |
| NATIONAL UNION FIRE INSURANCE<br>     COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC.,<br>Defendants | )<br>)<br>)<br>)<br>) |
| | ) DECEMBER 12, 2003 |

## AMENDED COMPLAINT

Plaintiffs, bring this action against the Defendants for breach of their obligations under a policy of insurance it issued and for the Defendants' bad faith failure to defend and failure to defend properly the Plaintiffs and certain related parties under that policy.  For their Amended Complaint, served as of right under Rule 15(a) F.R.C.P., the Plaintiffs state the following:

**PARTIES**:

1.     Plaintiff Bruce Charles Ryan ("Ryan")  is an individual residing in Connecticut.

2.     Plaintiff Russell William Newton ("Newton") is an individual residing in Connecticut.

-1-

3.     Plaintiff Robert Fitzpatrick ("Fitzpatrick") is an individual residing in Connecticut.

4.     Merit Capital Associates, Inc., ("Merit") is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Westport, Connecticut.

5.     The Defendant, National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") is an insurance company organized under the laws of the Commonwealth of Pennsylvania and has its principal place of business at 175 Water Street, New York, NY 10038.

6.     The Defendant, AIG Technical Services, Inc. ("AIGTS"), on information and belief is a corporation organized under the laws of the state of Delaware and has its principal place of business at 175 Water Street, New York, NY 10038.  Both National Union and AIGTS are owned or controlled by the American International Group, Inc., also based at 175 Water Street, New York, NY 10038.

**JURISDICTION**:

7.     This Court has jurisdiction over the matter pursuant to 28 U.S.C. §1332(a)(1) in that the Plaintiffs and Defendants are residents of different states and the amount in controversy exceeds the sum of $75,000 as to each defendant, exclusive of interest and costs.

8.     Venue is proper in the District of Connecticut under 28 U.S.C. § 1391, as Plaintiffs are all residents of Connecticut, on information and belief the Defendants are authorized to engage in insurance business in this state, and the dispute arises from a contract of insurance

-2-

made and to be performed, at least in part, in Connecticut.

**FACTS COMMON TO ALL CLAIMS**:

9.      Merit at all relevant times was a securities broker/dealer, registered with the National Association of Securities Dealers ("NASD"), with its home office in Westport, Connecticut. Merit had operations in various other states including Arizona.

10.      Ryan was the President and a shareholder of Merit. Ryan was also registered with the NASD as a principal of Merit and remains registered as a general securities representative with NASD. Ryan is registered as a securities salesman in the states of Connecticut, Arizona, New Jersey, New York, California, New Mexico, Florida, Massachusetts, Minnesota, New Hampshire, Ohio, Oklahoma, Texas, Virginia and Vermont.

11.      Newton  was the Chairman, Chief Financial Officer and a shareholder of Merit. Newton was also registered with the NASD as a principal of Merit and remains registered as a general securities representative with NASD.  Newton is registered as a securities salesman in the states of Connecticut, Arizona, New York, Illinois, Colorado, Pennsylvania, New Jersey, Rhode Island, California, Florida, Massachusetts, North Carolina, New Mexico and Virginia.

12.      Fitzpatrick is an attorney licensed to practice in New York and served as a Compliance Officer and General Counsel of Merit. Fitzpatrick was registered with the NASD as a principal of Merit and remains registered as general securities representative with the NASD in Connecticut.

13.      From at least 1998, David W. Gwynn ("Gwynn") was licensed by the NASD to

sell securities and at relevant times, Gwynn, acting as an independent contractor, worked in part for Merit, and in that role, Gwynn functioned as a Registered Representative of Merit primarily in the state of Arizona.     Gwynn is a resident of Arizona, and is married to Raquel Gwynn.

14.     Gwynn also worked from time to time as a certified financial planner through a company he owns and controls known as, Gwynn Financial Resources, Inc., a Delaware corporation ("GFS") and GFS has its principal place of business in Arizona.  Plaintiffs, Merit, Ryan, Newton, and Fitzpatrick have no interest in or affiliation with GFS.

15.     National Union issued a Securities Broker/Dealer's Professional Liability Insurance Policy to Merit and said policy No. 473-36-20 was effective for the period from August 23, 2000 to August 23, 2001 (the "Policy").  A copy of the Policy is attached hereto as Exhibit A.

16.     The Policy covers Merit as the insured "Broker/Dealer," but also includes within the definition of "insured" Ryan, Newton, and Fitzpatrick in their capacity as directors, officers, employees and "Registered Representatives" of Merit.

17.     The Policy also includes Gwynn as an insured in his capacity as a "Registered Representative" in that he was registered with the NASD and was compensated to render "Professional Services" on behalf of Merit.

18.     Merit paid National Union SEVENTY TWO THOUSAND FIVE HUNDRED ($72,500.00) Dollars in premiums for the Policy and has at all relevant times complied with all the terms of the Policy.  The Policy applies to claims within the definition of coverage which are made within the policy period.

-4-

19.    Under the terms of the Policy, National Union:

> **shall have the right and duty to defend,** subject to and as part of the Limits of Liability, any Claim made against an insured during the policy Period or discovery Period ( if applicable) and reported in writing to the insurer pursuant to the terms of this policy **for any actual or alleged Wrongful Act** for which coverage is afforded by this policy, **even if any of the allegations of the Claim are groundless, false or fraudulent.**
> (Emphasis supplied).

20.    Michael A. Sowell ("Sowell") is an individual residing in Chandler, Arizona, who has made claims against Merit, Ryan, Newton, and Fitzpatrick, and Gwynn, GFS and Raquel Gwynn, for which the Plaintiffs have sought coverage and defense benefits under the Policy.

21.    Sowell has known Gwynn since approximately 1992 and had maintained a business and personal relationship with him, including the prior maintenance of a securities account at Fox & Company, a securities dealer totally unrelated to and unaffiliated with Merit, Ryan, Newton, and Fitzpatrick.

22.    In early 1998, Sowell claimed to have contacted Gwynn about setting up a retirement plan.

23.    In 1998, Sowell claimed to have loaned approximately $150,000 to a company in which Gwynn was involved, Novation Financial Corporation ("Novation").

24.    During the period from November 1999 to July 2000, Sowell claimed to have loaned $75,000 to Charter Financial Network, Inc., l/k/a Charter 3, Inc., ("Charter").

25.    Gwynn was a minority shareholder in Novation and Charter, and Sowell claimed

-5-

that he made these loans as a result of his dealings with Gwynn.

26.    In 1998, Sowell provided certain securities or funds to Gwynn for deposit into a securities account at Merit, under account number LFW-00053-A5.

27.    In the next several years, there were extensive trades in Sowell's Merit account but Sowell never complained to Merit about how Gwynn was handling his account, despite repeated letters of inquiry about account activity that Merit and Fitzpatrick sent to Sowell from August 1999 to June 2001.

28.    In October 2000, Sowell acknowledged in a letter addressed to Merit and Fitzpatrick that he was aware of significant activity in his account number LFW-000053-0A5 and that he had approved all trades that occurred in the account.

29.    On or about September 4, 2001, Sowell commenced an NASD arbitration against Merit and Gwynn, by a filing a Statement of Claim (the "Original Claim") dated August 31, 2001, and as part of this Original Claim, Sowell also asserted claims against Gwynn's wife, Raquel Gwynn, GFS, and against Ryan, Newton, and Fitzpatrick, and their wives.

30.    The first notice of the claim that Merit, Ryan, Newton, and Fitzpatrick, had was the receipt of service of the Original Claim at Merit's Connecticut Office.

31.    Sowell's Original Claim concerned the trading activity in Sowell's account number LFW-00053-A5 at Merit and his loans to Novation and Charter. Sowell accused Gwynn of churning his account, advising him improperly, making inappropriate trades, and also claimed fraud and various statutory and regulatory violation arising from Gwynn's conduct including Sowell's

-6-

loans to Novation and Charter.

32.    Sowell's claim sought to hold Merit, Ryan, Newton, and Fitzpatrick liable primarily on theories of *respondeat superior*, failure to supervise Gwynn, and on their alleged responsibilities as control persons of Merit.

33.    Prior to September 21, 2001, Merit, Ryan, Newton, and Fitzpatrick tendered the defense of the Original Claim to National Union.

34.    By letter dated October 3, 2001, AIGTS working with and acting for National Union acknowledged receipt of Sowell's Original Claim and sought to investigate coverage for Merit, Ryan, Newton, and Fitzpatrick under the Policy.

35.    Since October 3, 2001, National Union has always acted by and through AIGTS with respect to the claims made by Sowell and the coverage available to Merit, Ryan, Newton, Fitzpatrick and Gwynn under the Policy.

36.    Sowell's Original Claim included an allegation that one of Sowell's accounts with Merit was a "discretionary" account, but also included claims which were not predicated on that allegation.

37.    In early October 2001, AIGTS on behalf of National Union, retained Renaud, Cook & Drury, P.A., of Phoenix, Arizona, to represent Merit, and Ryan, Newton, and Fitzpatrick and their wives. In early November 2001, attorneys for that firm appeared in the NASD arbitration proceeding for Merit, Ryan, Newton, and Fitzpatrick. Because the NASD had no jurisdiction over their wives, since they had no affiliation with a Broker Dealer and were not

-7-

otherwise subject to NASD regulation, no appearance was necessary or appropriate for the wives of Ryan, Newton, and Fitzpatrick.

38.     Thereafter, AIGTS on behalf of National Union, retained Mariscal, Weeks, McIntyre & Friedlander, P.A., of Phoenix, Arizona, to represent Gwynn, Gwynn's wife, Raquel Gwynn, and GFS. Notwithstanding that the NASD had no jurisdiction over Raquel Gwynn, since she had no affiliation with a Broker Dealer and was not otherwise subject to NASD regulation, counsel appointed by AIGTS filed an appearance and an answer on behalf of Gwynn, GFS, and Raquel Gwynn on or about November 20, 2001.

39.     By appearing and answering for Raquel Gwynn, counsel appointed to defend Gwynn, GFS and Raquel Gwynn by AIGTS consented to and created jurisdiction over Raquel Gwynn.

40.     Through the end of 2001, Merit, Ryan, Newton, and Fitzpatrick cooperated fully with AIGTS and National Union and provided all information requested.

41.     After AIGTS' inquiry, Merit, Ryan, Newton, and Fitzpatrick supplied information that revealed that Sowell had provided a power of attorney to Gwynn in March of 1998, the power of attorney had been intended for use only in emergencies, and the power of attorney had never been used. Merit, Ryan, Newton, and Fitzpatrick also provided AIGTS with information which showed that Sowell's account had never been a discretionary account.

42.     In November 2001, Merit, Ryan, Newton, and Fitzpatrick provided a copy of the power of attorney that Sowell had provided to Gwynn to AIGTS, and that power of attorney was

-8-

not notarized and hence was not effective under Arizona law, where both Sowell and Gwynn

resided and where Sowell made his investments with Merit.

43.     In early 2002, AIGTS and National Union advised Merit, Ryan, Newton, and

Fitzpatrick, and Gwynn, GFS and Raquel Gwynn, that based on the power of attorney, AIGTS

had determined the account was discretionary and therefore AIGTS and National Union denied

both their coverage and defense obligations under the Policy.

44.     Thereafter, AIGTS notified the counsel it had appointed for Merit, Ryan, Newton,

and Fitzpatrick and the counsel it had appointed for Gwynn, GFS and Raquel Gwynn that AIGTS

and National Union would no longer pay for the defense of the Sowell arbitration claims.

45.     Merit, Ryan, Newton, and Fitzpatrick initially made arrangements to hire Renaud,

Cook & Drury, P.A., directly, but during the summer of 2002, that firm raised concerns about a

possible dispute between Merit, Ryan, Newton, and Fitzpatrick and AIGTS and withdrew from

the representation of Merit, Ryan, Newton, and Fitzpatrick on or about August 13, 2002.

46.     Merit, Ryan, Newton, and Fitzpatrick subsequently retained attorney William B

Federman of Federman & Sherwood, Oklahoma City, Oklahoma to continue their defense.

47.     In May 2002, while AIGTS and National Union were refusing to defend Merit,

Ryan, Newton, and Fitzpatrick and Gwynn, GFS and Raquel Gwyn, Sowell filed an amended

claim in which he named Source Capital Group, Inc., ("Source") as a successor to Merit.   Merit,

Ryan, Newton, and Fitzpatrick were obligated to incur significant costs to defend Source and

ultimately negotiated a stay of the proceedings against Source pending the outcome of Sowell's

original claims against Merit.

48.     Following AIGTS' withdrawal from its duty to defend, counsel for Gwynn, GFS and Raquel Gwynn, the firm of Mariscal, Weeks, McIntyre & Friedlander, P.A., withdrew from their representation on or about March 4, 2002 and then reappeared on or about May 13, 2002 when Gwynn made some arrangement to pay them privately. Mariscal, Weeks, McIntyre & Friedlander, P.A., withdrew again from the representation of Gwynn, GFS and Raquel Gwynn on or about September 9, 2002 when Gwynn was unable to sustain the costs of their defense.

49.     The hearing on the Sowell's arbitration claim was originally scheduled to proceed from October 15, 2002 through October 23, 2002. That hearing was postponed by Gwynn because, without defense coverage from AIGTS and National Union, Gwynn was unable to afford counsel to defend himself, GFS and his wife Raquel Gwynn. The hearing was re-scheduled to commence on January 7, 2003. As a result of this postponement, Gwynn incurred a postponement fee of $1,200.00.

50.     By letter dated October 24, 2002, Sowell's counsel advised Attorney William Federman, Gwynn, and AIGTS' claims analyst Brian T. Conlin, that Sowell had acknowledged in writing to Merit, after the date he signed the power of attorney, that his Merit account at issue was not governed by a power of attorney to anyone including his broker. At the same time Sowell's counsel made a "policy limits" demand to settle the arbitration and noted that Sowell would be seeking damages in excess of policy limits if the arbitration proceeded.

51.     After receiving the letter from Sowell's counsel confirming that the power of

-10-

attorney was not operative as to the Merit account, AIGTS and National Union neglected, failed and refused to re-assume the defense of Merit, Ryan, Newton, and Fitzpatrick and Gwynn, GFS and Raquel Gwynn and refused to respond to the settlement demand of Sowell.

52.     On information and belief, during this period Sowell would have accepted a settlement for an amount less than $500,000 or half of the limits of the Policy, but AIGTS and National Union refused to negotiate with Sowell and his counsel.

53.     Throughout the end of 2002, Gwynn remained unable to afford to retain counsel to defend himself, GFS and his wife Raquel Gwynn.

54.     In December 2002, Gwynn sought a further postponement of the hearing on Sowell's arbitration claims, based on his in ability to retain counsel as a result of AIGTS and National Union's breach of their defense obligations under the Policy.

55.     In early 2003, Sowell through his counsel, opposed the request for the postponement and the request was denied by the arbitration panel, leaving the hearing scheduled to proceed on January 7, 2003.

56.     On January 3, 2003, Gwynn, through counsel retained to represent his interest on the Policy issues, advised AIGTS and National Union of the various facts in the record that established that Sowell's account had not been discretionary, that the power of attorney had been revoked, and that Sowell retained all power and control over all of his accounts with Merit. Gwynn through counsel made a demand on AIGTS and National Union to settle Sowell's claim within the policy limits.

-11-

57.    On January 6, 2003, Brian T. Conlin on behalf of AIGTS and National Union acknowledge receipt of Gwynn's demand and indicated AIGTS would evaluate it as quickly as possible.

58.    Gwynn, through counsel, responded that day to AIGTS, noting that the power of attorney relied upon by AIGTS to deny its defense and coverage obligations under the policy was unenforceable under Arizona law and that some of the claims involved investments made by Sowell that did not involve the power of attorney. Gwynn, through counsel, again noted the arbitration was scheduled to proceed the following day, January 7, 2003 at 9:00 am and that because AIGTS was not defending Gwynn, he would have to proceed *pro se*. Gwynn again demanded coverage, a settlement within the Policy limits, and an immediate resumption of the defense by AIGTS and National Union.

59.    AIGTS and National Union failed or neglected to respond to the January 6, 2003 letter from Gwynn's counsel, and Gwynn and GFS proceeded to the commencement of the arbitration hearing on January 7, 2003 without counsel. As a result of the conduct of AIGTS and National Union, Raquel Gwynn was unrepresented at the arbitration hearing and, on information and belief, did not even know she needed to attend the hearing to defend her interests.

60.    Although Merit, Ryan, Newton, and Fitzpatrick had retained private counsel to represent them in the arbitration, because AIGTS and National Union were breaching their defense obligations and because of their resultant monetary constraints, Merit, Ryan, Newton, and Fitzpatrick were unable to fully prepare their defense and were unable to retain an expert witness

-12-

to present their position.  Further the decision on the members of the arbitration panel were all made by prior counsel selected by AIGTS, these selections could not be changed once Plaintiffs had retained attorney Federman, and the Plaintiffs did not receive competent advice on the selection of the panel by the counsel selected by AIGTS' selected counsel.

61.    Gwynn purported to represent himself and GFS *pro se* at the arbitration on January 7, 8, and 9, 2003 and during these three days Raquel Gwynn was unrepresented.

62.    Gwynn's defense during the first three days of the arbitration hearing was ineffective in that:

a.    Gwynn failed to prepare and file a list of exhibits he intended to offer at the hearing and was therefore limited in the rights he had to offer written evidence at the hearing.

b.    Gwynn offered an opening statement that was improper in form and was repeatedly admonished by the arbitration panel.

c.    Gwynn was never prepared for and did not understand how to respond to the examination of him by Sowell's counsel.

d.    Gwynn was unable to properly cross examine witnesses at the hearing.

e.    Gwynn repeatedly revealed to the panel that the reason he was proceeding *pro se* was that the insurers had refused to provide him a defense and that he was not financially able to hire his own defense attorney.

f.    Gwynn produced documents in an untimely and disorganized fashion and in blatant disregard of prior orders from the arbitration panel.

63.    The defense of Merit, Ryan, Newton, and Fitzpatrick was compromised by Gwynn's *pro se* defense, in that

a..    questioning was not undertaken in a uniform and logical manner consistent with the defense offered by Merit;

b.    during the first three hearing days, time was wasted on procedural issues raised as a result Gwynn's appearance without counsel which limited the

-13-

rights of Merit, Ryan, Newton, and Fitzpatrick to offer their own evidence;

c.    Gwynn created the impression that because of his own financial problems, and the refusal of his insurers to defend him, Sowell would be deprived of    a recovery unless the arbitration panel held Merit, Ryan, Newton, and    Fitzpatrick liable for Gwynn's conduct;

d.    Because of his clumsy and unprepared defense, Gwynn alienated the panel and created an overall impression that Merit's operations were unprofessional and that Gwynn had not been properly supervised;

e.    Gwynn, by his efforts to delay the arbitration to permit him to try to obtain counsel, created the impression to the panel that all of the respondents, including Merit, Ryan, Newton and Fitzpatrick, were delaying the proceeding.

64.    On January 10, 2003, AIGTS admitted it had a duty to defend Merit, Ryan, Newton, and Fitzpatrick and Gwynn, GFS and Raquel Gwynn, when it determined that National Union would resume providing a defense to all of these parties based on the evidence that Sowell never had a discretionary account at Merit and that his power of attorney had not been used and was not even operative under Arizona law.

65.    On January 10, 2003, AIGTS notified attorney Federman that it was then offering to pay the reasonable defense costs for Merit, Ryan, Newton, and Fitzpatrick and on that same day AIGTS again retained Attorney Maxine Polomski of Mariscal, Weeks, McIntyre & Friedlander, P.A., to represent Gwynn, GFS and Raquel Gwynn.

66.    By letter dated January 10, 2003 to Gwynn's attorney, Sowell's attorney confirmed that the evidence at the hearing had rebutted the assertion that Sowell's account with Merit had been discretionary or managed pursuant to a power of attorney given by Sowell to Gwynn. Sowell's counsel stated the "bottom line from our perspective is that Sowell's account was not a discretionary trading account." Sowell's counsel also noted therein that

-14-

> Based on the evidence summarized below, we strongly believe that
> [Gwynn] faces an adverse judgment in the case that exceeds policy limits,
> which we understand to be $1 million. We further believe that AIG's
> refusal to provide him a defense plays a role in that exposure.

Sowell's counsel ended with a formal demand to settle the proceeding for $950,000. A copy of

that letter is attached hereto as Exhibit B. On information and belief, that letter was forwarded to

counsel retained by AIGTS for Gwynn and to AIGTS on or about January 11, 2003.

    67.    AIGTS and National Union did not respond to Sowell's settlement overture and

instead attempted to proceed with the defense of the arbitration claims.

    68.    Because the NASD requires that recordings of all tapes of arbitration hearings be

sent to Chicago for transcription and the audio tapes of the hearing had not yet been requested by

Gwynn, neither transcripts nor tapes were available and therefore Attorney Polomski was unable

to adequately prepare for the continuation of the hearing on January 13, 2003 and she had to rely

in part on a status letter from Sowell's counsel dated January 11, 2003. A copy of that letter is

attached as Exhibit C.

    69.    On information and belief, Attorney Polomski was retained by AIGTS primarily

because of her low billing rate and Attorney Polomski had minimal NASD arbitration and trial

experience.

    70.    Upon her entry into the case on January 13, 2003, Attorney Polomski moved for

a continuance of arbitration proceeding based on her recent entry into the case and her lack of

time to prepare, but the arbitration panel denied that request based on the circumstances and the

-15-

prior delay by Gwynn that had occurred in October 2002.

71.    Because of AIGTS' belated decision to resume the defense of the Sowell arbitration, none of the respondents, including the Plaintiffs in this action, had an adequate opportunity to retain an expert witness and accordingly Sowell's expert testimony went largely unrebutted.

72.    The Sowell arbitration hearing ended on January 14, 2003, and the parties filed proposed findings of fact and conclusions of law on January 15, 2003.  On January 15, 2003, Attorney Polomski filed a supplemental brief in an effort to dismiss the claims against Raquel Gwynn.   Sowell's counsel argued in response that when Attorney Polomski had answered Sowell's statement of claim in the arbitration, she had neither raised lack of jurisdiction as a special defense nor otherwise challenged jurisdiction as to Raquel Gwynn.

73.    By letter dated January 16, 2003, Attorney Federman advised coverage counsel for AIGTS and National Union, that prior to the commencement of the arbitration he thought a settlement might have been negotiated for approximately $240,000.  Attorney Federman pointed out that Sowell had presented evidence of damages in excess of  $909,000 together with claims for interest, attorneys fees, and arbitration costs and punitive damages of 500,000 which put a potential award well in excess of the Policy limit and that he expected an award to enter against Merit, Ryan, Newton, and Fitzpatrick as well as Gwynn.  Attorney Federman also noted  that such an award would negatively effect on the ability of Ryan, Newton, and Fitzpatrick to continue to work in the securities industry as well as effecting their NASD licenses and in the case of

-16-

Fitzpatrick his license to practice law in New York. A copy of that letter is attached hereto as Exhibit D.

74.     Notwithstanding all the indications that the arbitration hearing had not gone well, AIGTS and National Union did nothing to attempt to settle the claims before an award was entered by the arbitration panel.

75.     On February 25, 2003, the NASD arbitration panel entered an award against Gwynn, GFS, Raquel Gwynn, and Merit, Ryan, Newton, and Fitzpatrick, jointly and severally, in the amount of $1,125,000 (the "Award"). A copy of the Award is attached as Exhibit E. In addition the panel found Gwynn, GFS, Raquel Gwynn, and Merit, Ryan, Newton, and Fitzpatrick, jointly and severally, liable for $17,500 in arbitration fees.

76.     The Award is based in part on the failure of Merit, Ryan, Newton, and Fitzpatrick to supervise Gwynn.

77.     The Award is also based on a finding that Merit, Ryan, Newton, and Fitzpatrick were jointly and severally liable for selling unsuitable investments, selling unregistered securities, acting negligently, making negligent misrepresentations, breaching their fiduciary duties, breaching their contractual obligations, engaging in conduct falling below the securities industry standard of care, showing an overall reckless indifference to Sowell's interests and churning Sowell's accounts. Because Merit, Ryan, Newton, and Fitzpatrick had little direct involvement with Sowell personally or his account, the findings against Merit, Ryan, Newton, and Fitzpatrick must be based on theories of *respondeat superior,* failure to supervise or control Gwynn's conduct, and for their

-17-

alleged status as control persons of Broker/Dealer.

78.     Nothing in the Award is predicated on or even refers to any claim or evidence that Sowell's account was discretionary or managed through a power of attorney, and in fact, the Award notes specifically that Respondents had asserted "Sowell exercised control over his account at Merit."

79.     Following the entry of the Award, AIGTS and National Union failed to fulfill their obligations under the Policy, in that they have failed to actively manage the defense of Merit, Ryan, Newton, and Fitzpatrick, and Gwynn, GFS and Raquel Gwynn, failed to indemnify the insureds under the Policy, failed to direct efforts to settle with Sowell, and failed to maintain active contact and communications with defense counsel.

80.     After the entry of the Award, AIGTS and National Union failed to pay defense counsel and, for a period of several weeks, failed to authorize defense counsel to pursue an appeal of the Award.

81.     After the entry of the Award, AIGTS and National Union neglected, failed or refused to confer with Merit, Ryan, Newton, and Fitzpatrick about their rights under the Policy and how the Award should be handled.

82.     The Policy provides for alternative dispute resolution in the event of any dispute between National Union and the insureds, and provides that the insured Broker Dealer may select either binding arbitration or mediation.

83.     On March 25, 2003,  Merit, Ryan, Newton, and Fitzpatrick, demanded mediation

-18-

in Connecticut as provided for by the Policy, but AIGTS and National Union neglected failed or refused to respond to that demand.

84.     Despite an agreement by AIGTS and National Union on January 10, 2003 to resume the payment of defense costs, AIGTS and National Union failed and neglected to pay any of the defense costs Merit, Ryan, Newton, and Fitzpatrick were incurring for many months after January 10, 2003.

85.     Despite numerous requests on behalf of Merit, Ryan, Newton, and Fitzpatrick, AIGTS and National Union failed and neglected to respond.

86.     In order to protect their rights on April 9, 2003, Merit, Ryan, Newton, and Fitzpatrick, commenced this action.

87.     Thereafter, AIGTS still refused to resume control of and give direction to the defense of Merit, Ryan, Newton, and Fitzpatrick, and Sowell moved to confirm the arbitration award before the courts of Arizona.

88.     After Sowell had moved to confirm the arbitration award and primarily because Merit, Ryan, Newton, and Fitzpatrick had commenced this action, AIGTS and National Union, negotiated with and in August 2003 funded settlement with Sowell, with the result that by agreement the arbitration award was vacated in exchange for a payment to Sowell of $1,000,000.

89.     Notwithstanding the settlement and the vacating of the arbitration award, Merit, Ryan, Newton, and Fitzpatrick remain obligated to report the nature of the arbitration award in various NASD filings and remain obligated to disclose the arbitration award to various

-19-

state and federal regulators.

90.    Notwithstanding the settlement and the vacating of the arbitration award,

Merit, Ryan, Newton, and Fitzpatrick, continue to be subjected to regulatory investigations as a

result of the arbitration award.

## First Count (Breach of Duty to Defend)

91.    Plaintiffs repeat paragraphs 1 through 90 as paragraph 90 of this the First Count.

92.    Under Connecticut law, National Union and its agent and affiliate company

AIGTS had  an implied duty of good faith and fair dealing under the Policy.

93.    Under the Policy,  National Union and its agent and affiliate company AIGTS had

a duty to defend Merit, Ryan, Newton, Fitzpatrick, and Gwynn, and assumed the duty to defend

GFS and Raquel Gwynn when they authorized counsel to appear for them in the arbitration with

Sowell.

94.    AIGTS and National Union acknowledged that the claims made by Sowell in the

arbitration were claims within the scope of their duty to defend under the Policy, when, after

AIGTS and National Union had received a copy of Sowell's Arbitration Claim, they initially

retained counsel of their choice and authorized them to appear for Merit, Ryan, Newton, and

Fitzpatrick, and Gwynn, GFS and Raquel Gwynn.

95.    AIGTS and National Union reconfirmed  that the claims made by Sowell in the

arbitration were claims within the scope of their duty to defend under the Policy on or about

January 10, 2003, when they agreed, again, to fund the defense for Merit, Ryan, Newton, and

-20-

Fitzpatrick, and authorized counsel of their selection to reappear for Gwynn, GFS and Raquel

Gwynn.

96.    AIGTS and National Union breached their duty to defend when they:

a.    refused to provide or pay for the defense of Merit, Ryan, Newton, and Fitzpatrick, during the period from January 2002 through January 9, 2003.

b.    refused to provide or pay for the defense of Gwynn, GFS and Raquel Gwynn, during the period from January 2002 through January 9, 2003.

c.    failed to direct or pay for the proper preparation for the defense of Merit, Ryan, Newton, and Fitzpatrick, and Gwynn, GFS and Raquel Gwynn in the Sowell arbitration from its initiation through the arbitration hearing which proceeded on January 7, 8 , 9, 13, 14, and 15, 2003, including the failure to assist the insureds under the Policy in retaining an appropriate expert witness(es) for the arbitration to respond to Sowell's disclosed expert.

d.    forced Gwynn and GFS to appear without counsel during the first three days of the arbitration.

e.    caused Raquel Gwynn to appear and admit jurisdiction before the NASD, even though they knew or should have known that the NASD had no jurisdiction over Raquel Gwynn.

f.    retained counsel for Gwynn, GFS and Raquel Gwynn who, on information and belief, lacked sufficient trial or arbitration experience to effectively represent these parties in a claim of the potential magnitude and complexity of the Sowell claim.

g.    failed to assist Gwynn in reviewing and timely responding to Sowell's requests for documents in the arbitration.

h.    failed to properly communicate with Gwynn, GFS and Raquel Gwynn.

i.    failed to have counsel initially retained to represent Merit, Ryan, Newton, and Fitzpatrick, properly advise them on the arbitration process and failed to counsel them on the proper selection of the panel for the arbitration.

j.    failed to direct counsel after the arbitration and failed to immediately authorize defense counsel to move to vacate or appeal the arbitration award.

k.    restricted the defense of the insureds under various policies and procedures designed to reduce the defendants' costs without regard to the necessities of the defense that was required in the Sowell arbitration.

98.    As a result of the breach of the duty to defend by AIGTS and National Union,

Merit, Ryan, Newton, and Fitzpatrick suffered a an adverse award in the arbitration.

-21-

99.    As a result of the breach of the duty to defend by AIGTS and National Union, Plaintiffs have suffered economic injury and damages including the following:

    a.    The Plaintiffs have incurred expenses in connection with their defense including legal fees, filing fees and other related costs associated with the Sowell arbitration and the defense of Source, which amounts should have been paid by AIGTS and National Union.

    b.    The Plaintiffs were forced to incur the cost of commencing this action to enforce their policy rights including their right to a defense in the Sowell arbitration.

100.    As a further result of the Defendants' conduct in breach of their duty to defend, Plaintiffs will continue to suffer damages and costs in connection with regulatory proceedings which will result from the entry of the Sowell arbitration award.

101.    As a further result of the Defendants' conduct in breach of their duty to defend Plaintiffs Ryan, Newton and Fitzpatrick will have a permanent record with NASD and other regulatory agencies which will impair the ability of these plaintiffs to conduct business and obtain necessary licenses for their businesses.

102.    As a further result of the Defendants' conduct in breach of their duty to defend, Plaintiffs Ryan, Newton and Fitzpatrick have experienced damage to their reputation and injury to their present and future earning potential.

**Second Count (Breach of Duty to Indemnify)**

103.    Plaintiffs repeat paragraphs 1 through 90 as paragraphs 103 of this the Second Count.

104.    Under the Policy, National Union and its agent and affiliate company AIGTS

-22-

promised to indemnify and to pay for Loss, including damages, judgments, settlements, and Defense Costs, incurred by the insureds.

105.    AIGTS and National Union have breached their duty to indemnify and pay for Loss under the Policy by:

a.    failing to explore settlement with Sowell prior to the commencement of the Sowell arbitration hearing, when Sowell was making demands to settle well within the limits of the Policy.

b.    refusing to settle the Sowell claims before the completion of the Sowell arbitration hearing, despite Sowell's expressed willingness to settle the claim within the limits of the Policy.

c.    allowing an award to enter in excess of the limits of the Policy when AIGTS and National Union should have properly defended to defeat those claims, or should have settled to avoid the entry of an award above the limits of the Policy.

d.    failing to timely pay the award after its entry by the NASD and before Plaintiffs were required to commence this action.

106.    As a result of the breach of the obligation of AIGTS and National Union to indemnify and  pay for Loss, Plaintiffs have suffered economic injury and damages including the following:

a.    The Plaintiffs have incurred expenses in connection with their defense including legal fees, filing fees and other related costs associated with the Sowell arbitration and the defense of Source, which amounts would not have been incurred had AIGTS and National Union paid the Loss.

b.    The Plaintiffs were forced to incur the cost of commencing this action to enforce their policy rights including their rights to indemnity and payment for Loss in the Sowell arbitration.

107.    As a further result of the Defendants' conduct in breach of their obligation to pay Loss, Plaintiffs will continue to suffer damages and costs in connection with regulatory proceedings which will result from the entry of the Sowell arbitration award.

108.    As a further result of the Defendants' conduct in breach of their obligation to pay Loss, Plaintiffs Ryan, Newton and Fitzpatrick will have a permanent record with NASD and other regulatory agencies which will impair the ability of these plaintiffs to conduct business and obtain necessary licenses for their businesses.

109.    As a further result of the Defendants' conduct in breach of their obligation to pay Loss, Plaintiffs Ryan, Newton and Fitzpatrick have experienced damage to their reputation and injury to their present and future earning potential.

**Third Count (Bad Faith)**

110.    Plaintiffs repeat paragraphs 1 through 109  as paragraph 110 of this the Third Count.

111.    Defendants' actions, in failing to defend Plaintiffs and the other insureds under the Policy, in failing timely to indemnify the insureds or pay Loss under the Policy, and in refusing to mediate this dispute with the Plaintiffs despite a demand for mediation under the Policy, were motivated by the self interest of AIGTS and National Union and their conscious and willful disregard of the Plaintiffs' interests.

112.    On information and belief, the above described conduct of the Defendants AIGTS and National Union was based on an evil motive and an intent to harm or disadvantage the Plaintiffs for the monetary gain of the Defendants.

113.    The above described conduct of the Defendants AIGTS and National Union was

-24-

undertaken in breach of the covenant of good faith and fair dealing implied into the Policy under Connecticut law.

114.    As a result of the bad faith conduct of AIGTS and National Union, Plaintiffs have suffered economic injury and damages including the following:

a.    The Plaintiffs have incurred expenses in connection with their defense including legal fees, filing fees and other related costs associated with the Sowell arbitration and the defense of Source, which amounts would not have been incurred had AIGTS and National Union properly defend the Sowell claim, indemnified the Plaintiffs and/or paid the Loss.

b.    The Plaintiffs were forced to incur the cost of commencing this action to enforce their policy rights including their rights to a defense, to indemnity and to payment for Loss in the Sowell arbitration.

115.    As a further result of the Defendants' bad faith conduct, Plaintiffs will continue to suffer damages and costs in connection with regulatory proceedings which will result from the entry of the Sowell arbitration award.

116.    As a further result of the Defendants' bad faith conduct in breach of their duty to defend, indemnify, and pay loss Plaintiffs Merit, Ryan, Newton and Fitzpatrick will have a permanent record with NASD and other regulatory agencies which will impair the ability of the Plaintiffs to conduct business and obtain necessary licenses for their businesses.

117.    As a further result of the Defendants' bad faith conduct, Plaintiffs Ryan, Newton and Fitzpatrick have experienced damage to their reputation and injury to their present and future earning potential.

**Fourth Count (CUTPA/CUIPA Claims)**

-25-

118.    Plaintiffs repeat paragraphs 1 through 117 as paragraph 118 of this the Fourth Count.

119.    At all times relevant hereto, AIGTS and National Union were engaged in the conduct of trade or commerce as that term is defined by Connecticut General Statutes Section 42-110a, in that they sell and adjust policies of insurance within Connecticut to entities based in or doing business in Connecticut.

120.    The above described conduct of AIGTS and National Union including failing to defend Plaintiffs and the other insureds under the Policy, failing to indemnify the insureds or pay Loss under the Policy, and refusing to mediate the dispute with the Plaintiffs despite a demand for mediation under the Policy, had direct adverse impacts on the business activities of the Plaintiffs, Ryan, Newton and Fitzpatrick.

121.    The conduct of AIGTS and National Union constitutes unfair methods of competition and/or unfair or deceptive practices in the conduct of trade or commerce.

122.    The conduct of AIGTS and National Union was immoral, unethical, oppressive and/or unscrupulous, in that it was based on an evil motive and an intent to harm or disadvantage the Plaintiffs for the monetary gain of the Defendants.

123.    The conduct of AIGTS and National Union violated established public policy of the State of Connecticut in that it violates the Connecticut Unfair Insurance Practices Act, Connecticut General Statutes Section 38-816(6) ("CUIPA"), in that they:

a.    failed to acknowledge and act with reasonable promptness upon communication

-26-

with respect to claims arising under insurance policies.

b.    refused to pay claims without conducting a reasonable investigation based upon all available information.

c.    failed to affirm or deny coverage of claims within a reasonable time after proof of loss forms had been completed.

d.    did not attempt in good faith to effectuate prompt, fair, and equitable settlement of claims in which liability had become reasonably clear.

124.    The conduct of AIGTS and National Union constitutes intentional or wanton violation of the rights of Merit, Ryan, Newton and Fitzpatrick and other businesses and insurance consumers and was done with reckless indifference to those rights.

125.    The conduct of AIGTS and National Union constitutes a violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes Section 42-110a et seq ("CUTPA").

126.    As a result of the violation of CUTPA by AIGTS and National Union, Merit, Ryan, Newton and Fitzpatrick have suffered and will continue to suffer ascertainable losses and damages.

127.    As a result of the conduct of AIGTS and National Union in violation of CUTPA, Plaintiffs have suffered economic injury and damages including the following:

a.    The Plaintiffs have incurred expenses in connection with their defense including legal fees, filing fees and other related costs associated with the Sowell arbitration and the defense of Source, which amounts would not have been incurred had AIGTS and National Union properly defended, indemnified Plaintiffs, and/or paid the Loss.

b.    The Plaintiffs were forced to incur the cost of commencing this action to enforce their policy rights including their rights to a defense, to indemnity and payment for Loss in the Sowell arbitration.

128.    As a further result of the Defendants' violation of CUTPA, Plaintiffs will continue to suffer damages and costs in connection with regulatory proceedings which will result form the entry of the Sowell arbitration award.

129.    As a further result of the Defendants' conduct in violation of CUTPA Plaintiffs Ryan, Newton and Fitzpatrick will have a permanent record with NASD and other regulatory agencies which will impair the ability of these plaintiffs to conduct business and obtain necessary licenses for their businesses.

130.    As a further result of the Defendants' violation of CUTPA, Plaintiffs Ryan, Newton and Fitzpatrick have experienced damage to their reputation and injury to their present and future earning potential.

## DEMAND FOR RELIEF

Wherefore Plaintiffs claim:

A.    Compensatory Damages of not less than $10,000,000.00.

B.    Punitive and or Exemplary Damages under the common law.

C.    Punitive Damages under CUTPA.

D.    Attorneys' fees under CUTPA and the common law.

E.    Interest and costs as may be provided by law.

F.    Such other and further relief as may be available in law or equity.

**Plaintiffs hereby demand a jury trial for all counts on which it is available.**

**PLAINTIFFS, BRUCE CHARLES RYAN,
RUSSELL WILLIAM NEWTON, ROBERT
FITZPATRICK, and MERIT CAPITAL
ASSOCIATES INC.,**

By _____

Peter M. Nolin (ct06223)
Jay H. Sandak (ct06703)
**Sandak Hennessey & Greco LLP**
970 Summer Street
Stamford, CT 06905
(203) 425-4200
(203) 325-8608 (fax)
pnolin@shglaw.com

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was sent by regular first class mail postage prepaid, on December 12, 20003, to the following counsel:

James R. Hawkins, II, Esq.
Finn Dixon & Herling, LLP
One Landmark Square, Suite 1400
Stamford, CT 06901-2689

Mario DiNatale
Silver Golub & Teitell LLP
184 Atlantic Street
P.O.Box 389
Stamford CT 06904-0389

Peter M. Nolin

-30-