UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------X
BRUCE CHARLES RYAN, RUSSELL WILLIAM :
NEWTON, ROBERT FITZPATRICK, and MERIT :   CASE NUMBER:
CAPITAL ASSOCIATES, INC.,                :   3:03 CV 00644(CFD)

        Plaintiffs,

vs.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA., and
AIG TECHNICAL SERVICES, INC.,

        Defendants.
-------------------------------------------------------------X   January 26, 2004

### NOTICE OF MANUAL FILING

Please take notice that defendants, National Union Fire Insurance Company of Pittsburgh, P.A., and AIG Technical Services, Inc. have manually filed the following document or thing:

1. Defendants' Memorandum of Law in Support of Their Motion to Dismiss The Amended Complaint.

This document has not been filed electronically because

( )    the document or thing cannot be converted to an electronic format
(X)    the electronic file size of the document exceeds 1.5. megabytes
(     the document or thing is filed under seal pursuant to Local Rule of Civil Procedure 5(d) or Local Rule of Criminal Procedure 57(b)
( )    Plaintiff/ Defendant is excused from filing this document or thing by Court order.

The document or thing has been manually served on all parties.

Respectfully submitted,

By: _____
James R. Hawkins (ct00128)
Finn Dixon & Herling LLP
One Landmark Square, Suite 1400
Stamford, CT 060901
Phone: 203-325-5000
Fax: 203-348-5777
E-mail: jhawkins@fdh.com

{00058597; 1; 0040-3}

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 JAN 27  A 10: 18

U.S. DISTRICT COURT
HARTFORD, CT.

-----------------------------------------------------------X
BRUCE CHARLES RYAN, RUSSELL WILLIAM :
NEWTON, ROBERT FITZPATRICK, and MERIT :
CAPITAL ASSOCIATES, INC.,

          Plaintiffs,

  vs.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA., and
AIG TECHNICAL SERVICES, INC.,

          Defendants.
-----------------------------------------------------------X

CASE NUMBER:
3:03 CV 00644(CFD)

January 26, 2004

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION TO DISMISS THE AMENDED COMPLAINT**

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendants National Union Fire Insurance Company of Pittsburgh, P.A. and AIG Technical Services, Inc. (hereinafter referred to collectively as "National Union"), respectfully submit this Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint of Plaintiffs Bruce Charles Ryan, Russell William Newton, Robert Fitzpatrick, and Merit Capital Associates, Inc. (the "Plaintiffs"), dated December 12, 2003, for failure to state a claim upon which relief can be granted.

**PRELIMINARY STATEMENT**

The Court should dismiss this case because National Union owes no obligation to Plaintiffs that has not been honored. In a prior action, Plaintiffs were accused by their customer of numerous violations of the securities laws. Plaintiffs made a demand that National Union, as

their insurer, settle these claims. National Union has effected a full and complete settlement, which Plaintiffs themselves admit. *See* Amend. Compl. at ¶ 88. There are no third-party claims against Plaintiffs and there is no unpaid request for payment or reimbursement. In short, the Amended Complaint protests loudly about breach of duties, breach of covenants, bad faith and other unfairness, but all claims presented to National Union by Plaintiffs have been fully and completely resolved, and no further claims are outstanding. Plaintiffs are therefore unable to state any claim for relief, and the Amended Complaint should be dismissed accordingly.

## STATEMENT OF FACTS

Plaintiffs Bruce Charles Ryan, Russell William Newton and Robert Fitzpatrick were officers of Plaintiff Merit Capital Associates, Inc. ("Merit"), a NASD registered broker/dealer. Amend. Compl. at ¶¶ 9 – 12. At all relevant times, David W. Gwynn ("Gwynn") worked for Plaintiffs and acted on Merit's behalf as a Registered Representative. Amend. Compl. at ¶ 13. Gwynn was securities broker licensed by the National Association of Securities Dealers (the "NASD") and a Certified Financial Planner. Amend. Compl. at ¶¶ 13, 14.

One of Gwynn's customers at Merit was Michael A. Sowell ("Sowell"), who made various loans and investments through Gwynn, and entrusted securities and funds to Gwynn's care through an account at Merit. Amend. Compl. at ¶¶ 20 - 26. On September 4, 2001, Sowell filed a Statement of Claim seeking arbitration before the NASD against Plaintiffs, Gwynn and others, accusing Gwynn of misconduct including, but not limited to, "churning his account, advising him improperly, making inappropriate trades, [as well as] fraud and various statutory and regulatory violations arising from Gwynn's conduct." Amend. Compl. at ¶¶ 29, 31.

{00058398; 1; 0040-3}

*See also* Statement of Claim, *Sowell v. Merit Capital Assocs., Inc., et al.*, NASD Arbitration No. 01-04731, dated August 31, 2001 (the "Sowell Complaint"), attached hereto as Exhibit A.[1]

Defendants, National Union Fire Insurance Company of Pittsburgh, P.A. and AIG Technical Services, Inc., are subsidiaries of the American International Group, Inc. National Union provided professional liability coverage to Merit Capital Associates, Inc., through a Securities Broker/Dealer's Professional Liability Insurance Policy from August 23, 2000 to August 23, 2001, #473-36-20 (the "Policy"). Amend. Compl. at ¶ 15; *see also* Amend. Compl., Ex. A. (the "Policy"), attached hereto as Exhibit B.[2] National Union acted through AIG Technical Services in the handling of the claims in this case.

The Policy provided in part that National Union would provide a defense and pay a loss arising from a claim up to the specific limits, all as defined by the terms of the Policy. While National Union was investigating whether Sowell's claims were covered under the Policy,

---

[1] Although Plaintiffs have failed to attach Exhibit A to their Amended Complaint, the court may consider it in assessing National Union's motion to dismiss because it is referred to in the Amended Complaint (*see*, e.g., Amend. Compl. at ¶ 25), and it is a document in Plaintiffs' possession, of which Plaintiffs' have knowledge, was relied upon by Plaintiffs in framing their Amended Complaint, and is integral to their claims. The Court may consider exhibits attached to the Amended Complaint in its consideration of this Motion to Dismiss. *See O'Connell v. Kenney*, No. 3:03CV0845 (DJS), 2003 WL 22991732, at *1 (D. Conn. Dec. 15, 2003) (upon 12(b)(6) motion to dismiss, "court may consider 'only the facts alleged in the pleadings, documents attached as exhibits, or incorporated by reference in the pleadings and matter of which judicial notice may be taken'"); *In re Gordon*, 231 B.R. 459, 463 (D. Conn. 1999) (*citing Samuels v. Air Transport Local 504*, 992 F.2d 12, 15 (2d Cir. 1993)). In addition, "the court may also consider documents (1) in the plaintiff's possession, (2) of which the plaintiff had knowledge and relied on in bringing suit, or (3) that are integral to the plaintiff's claim, but which the plaintiff chose not to attach to the complaint or incorporate by reference. *In re Gordon*, 231 B.R. at 463 (*citing Cortec Indus. Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d. Cir. 1991).

[2] The Court may consider exhibits attached to the Amended Complaint in its consideration of this Motion to Dismiss. *See* note 1, *supra*.

-3-

it retained counsel to defend Plaintiffs and a separate firm to represent the plaintiffs in the companion action. Amend. Compl. at ¶ 37 – 38.

The Policy, however, specifically excludes claims "alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets." Exhibit B, Policy at ¶ 4(s) ("Exclusions"). Sowell's Complaint alleged just that—it alleged that Sowell's account was discretionary based on Sowell's grant of power of attorney to Gwynn. *See* Exhibit A, Sowell Complaint at ¶¶ 26, 27, and 87. The complaint stated in pertinent part:

> 26. When Mr. Sowell opened his account, he signed a power of attorney giving Respondents *discretionary control* of the account. Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell. As it turned out, Mr. Gwynn *did not consult* with Mr. Sowell before making trading decisions.
>
> 27. Mr. Gwynn . . . . treated his *discretionary* power as a license to churn.
>
> 87. Mr. Sowell's account was a *discretionary* account and was *unquestionably controlled* by Mr. Gwynn.

Exhibit A, Sowell Complaint at ¶¶ 26, 27, and 87 (emphasis added). Despite these unambiguous allegations, Plaintiffs assert that they "supplied information" that the power of attorney was only for "emergencies" and "never used," and that the account "had never been discretionary." Amend. Compl. at ¶ 41. Plaintiffs also claim that they provided an unnotarized copy of the power of attorney to National Union, and conclude in their Amended Complaint that the power of attorney was not effective (Amend. Compl. at ¶ 42). But Plaintiffs do not allege that they ever demonstrated to National Union that the power of attorney was expressly revoked. Based on the unambiguous language of the Sowell Complaint and the power of attorney, National Union

-4-

believed that Gwynn held discretionary authority over Sowell's account, and advised Plaintiffs in early 2002 that Sowell's claims were not covered under the Policy. Amend. Compl. at ¶ 43.

Approximately one year passed, and then, by letter dated Friday, January 3, 2003, Plaintiffs allege that Gwynn's lawyer advised National Union "of the various facts in the record that established Sowell's account had not been discretionary, that the power of attorney had been revoked, and that Sowell retained all discretion over his accounts with Merit." Amend. Compl. at ¶ 56. In that letter, Gwynn demanded National Union resume its defense of Plaintiffs and settle Sowell's claims within policy limits. Amend. Compl. at ¶ 56. Nowhere in the Amended Complaint do Plaintiffs allege that they made any demand upon National Union to resume its defense at any time prior to January 3, 2003, nor that they made any effort to convince National Union to provide coverage between the time it was suspended and the January 2003 letter.

Plaintiffs do assert that *Sowell's attorney* made a within "policy limits" settlement demand upon National Union by letter dated October 24, 2002, and in that letter claimed Sowell admitted in writing that the account was not governed by a power of attorney. Amend. Compl. at ¶ 50. There is no allegation that Sowell ever amended his original Statement of Claim to indicate that the account was not discretionary. Sowell only downplayed Gwynn's discretionary power in his settlement demand on National Union.

On Monday, January 6, 2003, National Union acknowledged receipt of Plaintiffs' January 3, 2003 demand and responded that National Union "would evaluate the information contained therein as quickly as possible." Amend. Compl. at ¶ 57. Within days, on January 10, 2003, National Union resumed its defense of Plaintiffs against Sowell's claims, and again retained counsel to represent Plaintiffs and the plaintiffs in the companion action. Amend. Compl. at ¶ 64, 65.

On February 24, 2003, the NASD arbitration panel awarded Sowell $1,125,000, as well as arbitration fees of $17,250, against Plaintiffs and their co-defendants, jointly and severally. *See* Amend. Compl. at ¶ 75; Amend. Compl., Ex. E (the "Sowell Award"), attached hereto as Exhibit C.[3] The Award found:

> Merit, Ryan, Newton, and Fitzpatrick . . . jointly and severally liable for selling unsuitable investments, selling unregistered securities, acting negligently, making negligent misrepresentations, breaching their fiduciary duties, breaching their contractual obligations, engaging in conduct falling below the securities industry standard of care, showing an overall reckless indifference to Sowell's interests and churning Sowell's accounts.

Amend. Compl. at ¶ 77. Plaintiffs were also held liable for their "failure . . . to supervise Gwynn." Amend. Compl. at ¶ 76.

National Union, on behalf of Plaintiffs and with their consent, settled with Sowell in August 2003 in exchange for Plaintiffs' full release from the arbitration award. Amend. Compl. at ¶ 88. As a result of the settlement, the arbitration award was vacated. Amend. Compl. at ¶ 88. Plaintiffs do not allege that they have made any request for payment or reimbursement beyond their demand for settlement, and do not assert that any claims remain against them after settlement was made.

## ARGUMENT

The allegations of Plaintiffs' Amended Complaint are legally insufficient as a matter of law to state any claim under their four asserted causes of action. Under the notice pleading standards of the Federal Rules of Civil Procedure, "[a] motion to dismiss is designed to test the legal sufficiency of the complaint . . . . Accordingly, we must accept as true all well-

---

[3] *See note 1, supra.*

pleaded factual allegations in the Complaint and view them in the light most favorable to Plaintiffs." *De Jesus v. Sears, Roebuck & Co.*, 87 F.3d 65, 69-70 (2d. Cir. 1996) (dismissing pleadings that were "devoid of *any* specific facts or circumstances supporting" plaintiff's claim) (internal citations omitted) (emphasis original). Yet even under these liberal rules, the courts of this Circuit will not accept "conclusory allegations or legal conclusions masquerading as factual conclusions," which "will not suffice to prevent a motion to dismiss." *Id.* "A complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *Id.* See also *In re Xerox Corp. Sec. Litig.*, 165 F.Supp.2d 208, 213 (D. Conn. 2001) (holding that "[w]hile the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice . . . conclusory statements [are no] substitute for minimally sufficient factual allegations."); *Russo v. Glasser*, 279 F.Supp.2d 136, 145 (D. Conn. 2003) (finding that "plaintiffs may not circumvent dismissal by disguising conclusory allegations or legal conclusions as facts"). Furthermore, a Rule 12(b)(6) motion to dismiss in federal court tests the sufficiency of the allegations in much the same way as a motion to strike in Connecticut state actions. *Armstead v. Stop & Shop Cos.*, No. 3:01CV1489(JBA), 2003 WL 1343245, at * 3 (D. Conn. Mar. 17, 2003) (a "motion to dismiss . . . pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure . . . is similar to our motion to strike [which] permits a court to dismiss the complaint for failure to state a claim upon which relief can be granted") (*citing DeLaurentis v. City of New Haven*, 220 Conn. 225, 239-240 (1991)).

In this case, Plaintiffs' Amended Complaint is an amalgam of bald legal conclusions, and is not notable as much for what it says as *what it does not say*. Plaintiffs four-count, 130-paragraph Amended Complaint asserts essentially the same causes of action as their Original Complaint. The key difference, however, is that Plaintiffs' Original Complaint sought

compensatory damages of "not less than" sixty (60) million dollars. Plaintiffs' Original Complaint (the "Original Complaint"), dated April 8, 2003, at 26. The amended demand for damages is for ten (10) million dollars. Amend. Compl. at 29. Despite taking the opportunity to amend, Plaintiffs are still unable to allege any more facts in support of their claims. It comes as no surprise, therefore, that fifty (50) million dollars of purported liability has evaporated along with any exposure or liability that Plaintiffs may have had.

I. **THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THIS MATTER BECAUSE PLAINTIFFS HAVE FAILED TO ALLEGE A PROPER ARTICLE III CASE OR CONTROVERSY**

Plaintiffs bring this action in federal court as a diversity action pursuant to 28 U.S.C. § 1332 and Article III of the Constitution. The fact that this is a case between citizens of different states, however, does not alone satisfy the jurisdictional tests of Article III. This Court lacks subject matter jurisdiction over Plaintiffs' principal claims because they do not state a justiciable case or controversy under Article III.

### A. Plaintiffs' Principal Claims Are Moot

Article III conditions the exercise of this Court's jurisdiction upon the existence of a proper case or controversy. *U.S. Const. art. III, § 2; North Carolina v. Rice*, 404 U.S 244, 246 (1971). A case or controversy, however, is moot

> when the issues presented are no longer 'live' or the parties 'lack a legally cognizable interest in the outcome.'" When this occurs, the Constitution's case or controversy requirement, U.S. Const. Art. III, § 2, is not satisfied and a federal court lacks subject matter jurisdiction over the action. A moot action therefore must be dismissed, even if the case was live at the outset but later events rendered it moot on appeal.

*New York City Employees' Retirement Sys. v. Dole Food Co.*, 969 F.2d 1430, 1433 (2d. Cir.

-8-

1992) (internal citations omitted). Mootness implicates this Court's jurisdiction "because the Court 'is not empowered to decide moot questions or abstract propositions . . . . Even in cases arising in the state courts, the question of mootness is a federal one which a federal court must resolve before it assumes jurisdiction." *Rice*, 404 U.S at 246. Before this Court asserts subject matter jurisdiction over this matter, the Court must test the existence of a case or controversy, even as to the state law-based contract and tort causes of action asserted in this case. And as the courts of this district have said before, "[t]he hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Lebron v. Armstrong*, No. 3:01CV 241CFD, 2003 WL 22283809, at * 4 (D. Conn. Sept. 29, 2003) (citing *Martin-Trigona v. Shiff*, 702 F.2d 380, 386 (2d. Cir. 1983)).

Plaintiffs' principal case or controversy evaporated when National Union settled Sowell's claims and the arbitration award was vacated. In particular, Plaintiffs First (Bad Faith), Second (Breach of the Duty to Defend) and Third (Breach of the Duty to Indemnify) counts are mooted by National Union's settlement of the Sowell arbitration award. Plaintiffs allege that at one time, prior to the filing of the Amended Complaint, they were liable for the $1,125,000 Sowell arbitration award in excess of the policy limits. Amend. Compl. at ¶ 75 – 77. Yet while that may have been true, that liability has been extinguished by National Union's settlement with Sowell. Amend. Compl. at ¶ 88. Plaintiffs also allege that at one time, prior to the filing of the Amended Complaint, coverage was suspended and National Union declined to pay defense costs for a certain period. Amend. Compl. at ¶ 43 – 44. National Union later resumed its defense of Plaintiffs, and ultimately secured a settlement with Sowell. Amend. Compl. at ¶¶ 64, 65, 88. In light of these facts, Plaintiffs' first three counts have all been mooted by National Union's complete performance of its obligations under the Policy.

{00058398; 1; 0040-3}

### B.   Plaintiffs' Claims Are Also Not Ripe

To the extent Plaintiffs seek damages beyond satisfaction of Sowell's claims, these claims do not state a proper case or controversy under Article III because they are not ripe for review. "The ripeness doctrine is invoked to determine whether a dispute has matured to the point that warrants a judicial determination. The doctrine is rested . . . upon the 'case or controversy' requirement of Article III . . . ." *Tsombanidis v. City of West Haven*, 129 F.Supp.2d 136, 159 (2001). Courts are divested of jurisdiction on ripeness grounds where "uncertain or contingent future events" may act to "render a judicial determination unnecessary." The "basic rationale" behind the doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Id. See also In re Drexel Burnham Lambert Group Inc.*, 995 F.2d 1138, 1146 (2d. Cir. 1993).

The Second Circuit employs a two-part test for ripeness, which involves "first, [an] examination of] the fitness of the issue for review, and second . . . the hardship to the parties of withholding consideration. *In re Drexel*, 995 F.2d at 1146. The Second Circuit "resolve[s] this two step inquiry pragmatically." *Id.* In *Drexel*, the plaintiffs sought to prevent the SEC's distribution of a disgorgement fund, even before the SEC had presented a plan for distribution and well before such a plan been approved by a court, as required. Once action was taken upon the funds, the Court reasoned, the Plaintiff would have the opportunity to take action and object, if necessary. *Id.*

Applying the Second Circuit's test for ripeness, it becomes evident that the Court need not address these claims at this time because it is not even certain that there is a live dispute as to Plaintiffs' alleged costs beyond settlement of Sowell's claims. First, National Union should have the opportunity consider Plaintiffs' properly presented demand for costs or reimbursement

-10-

before being haled into court. Plaintiffs claim that as a result of National Union's various alleged failures to provide and direct counsel in their defense (Amend. Compl. at ¶ 96(a)-(k)), Plaintiffs suffered an "adverse award" (Amend. Compl. at ¶ 98) and "incurred expenses in connection with their defense including legal fees, filing fees and other related costs" (Amend. Compl. at ¶ 99(a)). Plaintiffs do not allege, however, that they have made any pre-lawsuit effort to collect these costs, that there is any dispute as to their validity, or that they have even notified National Union of such costs pursuant to the terms of the policy. Paragraph 8 of the Policy provides in pertinent part:

> 8. **NOTICE/CLAIM REPORTING PROVISIONS.**
>
> **Notice hereunder shall be given in writing to the Insurer . . .**
>
> (a) The Broker/Dealer or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of a Claim made against an Insured during the Policy Period *as soon as practicable* and either
>
> > (1) anytime during the Policy Period or during the Discovery Period (if applicable); or
> >
> > (2) within 30 days after the end of the Policy Period or the Discovery Period (if applicable), as long as such Claim(s) is reported no later than 30 days after the date such Claim was first made against an Insured.

Exhibit B, Policy at ¶ 8 (emphasis original).

There are no third-party claims that remain unresolved, and no first-party requests for payment or reimbursement that have been refused or remain unpaid. Plaintiffs do not assert that they have presented any bill, invoice, statement, receipt, accounting or any other written demand for payment to National Union, nor that they have notified National Union of such

claims in writing as required by the Policy. In short, like the fund in *In re Drexel*, no action has been taken as to the amounts in question. Until action has been taken thereon, and if and when a dispute arises as to those amounts, that dispute may be adjudicated in a proper forum.

Secondly, Plaintiffs will suffer no hardship if their claims are dismissed and they are made to present a proper demand for costs from National Union. Even if this action were continued, they would have to collect and organize proof of their costs and present it to the Court. They would have to answer National Union's discovery regarding those costs, yet no discovery from National Union would assist them is assessing their own costs and damages. The costs of counsel, moreover, would continue to mount if this action proceeded to resolve a dispute that may or may not exist. Hardship to Plaintiffs may actually result from maintenance of this action, as opposed to a dismissal at this stage to allow the parties to discuss costs and reimbursement that have not yet even been broached.

## II. PLAINTIFFS' AMENDED COMPLAINT FAILS TO STATE ANY CLAIM FOR "BAD FAITH" (THIRD COUNT)

Plaintiffs' basic, essential claim is that National Union allegedly acted in "bad faith" (Third Count) in its defense and settlement of Sowell's claims. Indeed, Plaintiffs' claims for violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b ("CUTPA") (Fourth Count), flow from Plaintiffs' story of National Union's alleged bad faith. In order to state a claim for bad faith, the "plaintiff must duly plead" the following:

> First, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing the acts . . . the defendant was acting in bad faith.

-12-

*Tarabek v. Hartford Ins. Co.*, No. 561153, 2002 WL 31172957, at * 2 (Conn. Super. Ct. Aug. 26, 2002). Plaintiffs fail, however, to properly plead these necessary elements.

### A.  Plaintiffs Fail To Plead Bad Faith

Plaintiffs' accusations of bad faith are wholly without merit and support. While insurance contracts carry an implied covenant of good faith and fair dealing, the Connecticut Supreme Court has shown no patience for allegations devoid of any facts suggesting of bad faith. *Verrastro v. Middlesex Ins. Co.*, 207 Conn. 179, 191 (1988) (affirming trial court's finding of no bad faith). Connecticut Superior Courts have followed *Verrastro*'s lead by granting defendants' motions to strike claims for bad faith insurance practices in several recent cases. See *Stevens v. Allstate Ins.*, No. CV00071957S, 2002 WL 237330, at * 2 (Conn. Super. Ct. Jan. 24, 2002) ("plaintiff has failed to allege any bad faith or facts supporting an inference of bad faith, a necessary element to such a claim."); *Tarabek*, 2002 WL 31172957, at * 2 (internal quotations omitted) ("complaint does not set forth sufficient facts to support a claim for bad faith"); *Liquore v. Assurance Co. of Am.*, No. X04CV010124151S, 2002 WL 521334, at *2 (Conn. Super. Ct. Mar. 19, 2002) (finding "no claims that the defendant acted in bad faith"); *Ryan v. Allstate Indem. Co.*, No. CV950142573, 1998 WL 689767, at * 3 (Conn. Super. Ct. Sept. 22, 1998) (striking bad faith claim because it "merely concludes that '[t]he defendant . . . has acted in bad faith, and with a dishonest purpose,' without alleging facts to support that conclusion."). See also *Corriveau v. Aetna Cas. & Sur. Co.*, No. CV910388036S, 1996 WL 156109, at * 3 (Conn. Super. Ct. Mar. 15, 1996) (granting summary judgment for lack of evidence from which bad faith "could be inferred"); *Janicki v. Mass. Cas. Ins. Co.*, No. 530774, 1996 WL 694590, at * 3 (Conn. Super. Ct. Nov. 15, 1996) ("[A legal] conclusion, unsupported by any factual allegations, is insufficient to sustain a claim of bad faith"). Similarly, where bad faith is pled in the federal

context, "the Rule 12(b)(6) sufficiency of the amended complaint still turns of its particular allegations of wrongdoing." *Grossman v. Citrus Assocs. of the New York Cotton Exch., Inc.,* 706 F.Supp. 221, 229 (S.D.N.Y. 1989) (dismissing "conclusory allegations of bad faith"), *cited in De Jesus,* 87 F.3d at 70.

> In order to duly plead bad faith, Plaintiffs must show
>
>> a design to mislead or deceive one another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . . Bad faith . . . involves a dishonest purpose . . . . Bad faith is not simply bad judgment or negligence, but rather . . . moral obliquity . . . it contemplates a state of mind affirmatively operating with a furtive design or ill will.

*Tarabek,* 2002 WL 31172957, at * 2. The court in *Tarabek* struck the bad faith claim because the plaintiff failed to allege that the defendant "acted with dishonest purpose, moral obliquity or sinister motive. Rather, the plaintiff alleges that the defendant failed to honor its contract of insurance in a reasonable and timely manner." *Id.*

Plaintiffs' Amended Complaint does not make any substantive charges of bad faith through one hundred nine (109) paragraphs of its Amended Complaint. Indeed, after lodging over fifty (50) pages of allegations in the Original and Amended Complaints, Plaintiffs remain unable to point to any specific facts of bad faith. To be sure, Plaintiffs complain of National Union's "neglec[t], fail[ure] and refus[al]" to defend them during its suspension of coverage (*see,* e.g., Amend. Compl. at ¶ 51), and decry National Union's other alleged "failures" and neglect under the Policy (*see,* e.g., Amend. Compl. at ¶ 79 – 81, 83 – 85). Connecticut courts have rejected these very kinds of allegations as insufficient allegations of bad faith. *See Tarabek,* 2002 WL 31172957, at * 2 ("a claim for bad faith must . . . set forth facts beyond a mere claim that the carrier failed to pay or failed to honor the claim for benefits"); *Liquore,* 2002

-14-

WL 521334, at *2 ("The alleged failure to act with reasonable promptness, failure to explain the basis of its failure to cover the claim under the policy and failure to defend and indemnify are simply claims that the defendant denied the plaintiff's claim for benefits under the policy. Such allegations are insufficient to sustain a claim of bad faith."); *Corriveau*, 1996 WL 156109, at * 3 ("mere delay, without more, is insufficient to support a claim of bad faith") (internal citations omitted); *Deleonardo v. Metro. Property & Cas. Co.*, No. CV950142770S, 1996 WL 533597, at * 1 (Conn. Super. Ct. Sept. 10, 1996) (allegations that defendant did not act in a "fair and reasonable manner" were insufficient to state bad faith claim"); *Waugh v. Nationwide Mut. Ins. Co.*, No. 0244326, 1995 WL 9481, at * 2 (Conn. Super. Ct. Jan. 5, 1995) (allegations of "extreme indifference to its obligations owed to the plaintiff and in bad faith" held insufficient as a "conclusion, unsupported by any factual allegations.").

When Plaintiffs do get around to accusing National Union of malice, they baldly allege that National Union acted in "conscious and willful disregard of the Plaintiffs' interests" (Amend. Compl. at ¶ 111), and harbored an "evil motive and an intent to harm or disadvantage the Plaintiffs" (Amend. Compl. at ¶ 112). Yet Plaintiffs scarcely make mention of even "bad faith" after the opening paragraph. Neither does the Amended Complaint present any facts demonstrating dishonest purpose, no facts showing sinister motive, and no stronger statement of moral obliquity than these few weak and unsupported conclusions.

### B. National Union Did Not Fail To Settle In Bad Faith

In the absence of any real facts implying bad faith, Plaintiffs appear to base their bad faith claims upon allegations that National Union failed to capitalize on purported early opportunities to settle with Sowell. *See* Amend. Compl. at ¶¶ 50 (Sowell made a "'policy limits' demand to settle"); 52 ("Sowell would have accepted a settlement for an amount less than

$500,000); 58 ("Gwynn . . . demanded . . . a settlement within the Policy limits"); 66 ("Sowell's counsel [made] a formal demand to settle . . . for $950,000); and 73 ("settlement might have been negotiated for approximately $240,000). In short, Plaintiffs charge National Union with bad faith failure to settle because it did not settle sooner. These allegations regarding the mere existence of settlement *opportunities*, however, again do not plead any facts suggesting bad faith.

The Connecticut Supreme Court has long held that a insurer's duty to settle is judged according to the following standard:

> [The insurer must observe] a requirement of good faith and honest judgment on the part of the insurer or one that the insurer should use that care and diligence which a person of ordinary prudence would exercise in the management of his own business.

*Hoyt v. Factory Mut. Liab. Ins. Co. of Am.*, 179 A. 842, 843 (Conn. 1935). *See also Gen. Accident Corp. v. Gagliardi*, 593 F.Supp. 1080, 1088 (D. Conn. 1984) ("As the insurer has the sole right to settle claims, within the limits of the policy, it is obliged to exercise that right in a reasonable and prudent manner") (*citing Bartlett v. Travelers Ins. Co.*, 167 A. 180, 183 (Conn. 1933) (internal citations omitted) (adopting "ordinary prudence" standard, and adding that a refusal to settle "must be made in good faith and upon reasonable grounds for the belief that the amount required to effect a settlement is excessive)); *Bourget v. Gov't Employees Ins. Co.*, 456 F.2d 282, 285 (2d. Cir. 1972) (explaining reasons behind application of "good faith" standard to settlement opportunities, i.e., because insurer has control over settlement process and may have interests adverse to insured); *Farm Bureau Mut. Auto. Ins. Co. v. Violano*, 123 F.2d 692, 696 (2d. Cir. 1941) (construing Vermont law: "so long as [the insurer] acts in good faith, considering the interests of the insured as well as its own interest, and not capriciously, an insurer cannot be required to settle a case rather than to litigate a doubtful issue.") As a Connecticut court said,

{00058398; 1; 0040-3}