"[t]he mere fact that the case could have been, but was not, settled within policy limits would not impose liability on the defendant . . . . [Otherwise,] [n]o one would dare defend." *Knudsen v. Hartford Accident & Indem. Co.,* 26 Conn.Supp. 325, 327 (1966) (overruling demurrer on other grounds).

In this case, Plaintiffs simply do not plead any specific facts from which to infer National Union's alleged bad faith in assessing any of the purported settlement opportunities alleged in the Amended Complaint. Plaintiffs' utter failure to so plead is fatal to their claim of bad faith in failing to settle, and should be dismissed.

### C.    Plaintiffs' Bad Faith Claim Is Extinguished As A Matter Of Law

Additionally, courts generally find that bad faith failure to settle claims are extinguished when the underlying liability is removed. Employing reasoning similar to the mootness analysis at Section I(A), above, a majority of courts honor the mootness-like principle that where the plaintiff insured's liability has been extinguished or does not exist—once the insured is off the hook to the third party—the insured cannot assert a bad faith claim against the defendant insurer *as a matter of law*. The bad faith claim is effectively moot.

For example, the United States Court of Appeals for the Eleventh Circuit held that under Florida law "if an insured is no longer exposed to any loss in excess of the limits of his liability insurance policy, he no longer has any claim he might previously have had against his insurance company for bad faith failure to settle within policy limits." *Clement v. Prudential Property & Cas. Ins. Co.,* 790 F.2d 1545, 1548 (11th Cir. 1986). In *Clement,* the defendant insurance company paid the policy limits to a third party to settle her claims. Though the settlement was negotiated by the plaintiff insured, and the settlement called for an amount in excess of the policy, the settlement agreement expressly provided that the insured was not liable

-17-

{00058398; 1; 0040-3}

for the excess amount. The Court found, naturally, that since plaintiff was not liable for anything at all, no bad faith claim lay against the defendant insurer. The Eleventh Circuit reminded the plaintiff that "[a]s has been said many times before, one cannot both have his cake and eat it too." *See also Wiacek v. Safeco Ins. Co.*, No. 329601, 1998 WL 161378, at *2-3 (Conn. Super. Ct. March 31, 1998) (striking bad faith claim from complaint because no excess judgment had yet been entered).

Other jurisdictions follow the similar so-called accrual rule where bad faith is alleged for failure to settle claims covered by insurance policies. In these cases, the bad faith claim is not even considered to have *accrued* unless and until the insured is subjected to liability from a judgment in excess of the insurance policy. *See Allstate Ins. Co. v. Campbell*, 334 Md. 381, 397 (1994); *Jarvis v. Farms. Ins. Exch.*, 948 P.2d 898, 902 (Wyo. 1997) (bad faith claim did not accrue because there was no excess judgment at all); *Evans v. Mut. Assurance, Inc.*, 727 So.2d 66, 68 (Ala. 1999) (judgment on the pleadings for insurer because it settled the case and insured was never subject to liability); *Taylor v. State Farm Mut. Auto. Ins. Co.*, 185 Ariz. 175, 178 (1996) (following "accrual" rule for bad faith claim). *But see Zamary v. Allstate Ins. Co.*, No CV 97058618S, 1998 WL 323432, at *2 (Conn. Super. Ct. June 10, 1998) (allowing bad faith claim to proceed although underlying ability had not been established.)

These cases share a similar logic to mootness considerations. By bringing a bad faith action, a plaintiff insured generally seeks relief from an excess judgment to a third party. If liability for an excess judgment never existed, or ceases to exist, the insured has already been relieved of liability. There is nothing more for a court to do. Once National Union settled the Sowell matter, it exculpated Plaintiffs from liability to Sowell and accorded them the very relief that they would be due under the policy. In fact, Plaintiffs' admit that the NASD arbitration

-18-

{00058398; 1; 0040-3}

award was settled and later *vacated* on September 9, 2003, as if it never existed at all. Amend. Compl. at ¶ 88. Plaintiffs have simply no basis upon which to complain.

### D.  Plaintiffs Fail to Plead Any Injury To Their Rights Under The Policy

Finally, as noted above, the plaintiff asserting bad faith must "duly plead . . . that the defendant engaged in conduct that *injured* the plaintiff's right to receive some or all of those benefits." *Tarabek*, 2002 WL 31172957, at * 2 (internal citations omitted) (emphasis added). The essential benefit of an insurance contract is the insurance itself, the indemnification of the insured against covered claims. Plaintiffs admit that the Sowell arbitration award has been settled by National Union. Amend. Compl. at ¶ 88. There are no third-party claims that remain unresolved, and no first-party requests for payment or reimbursement that have been refused or remain unpaid. Without any further exposure at all to Mr. Sowell and the claims covered by the policy, Plaintiffs predictably struggle to state any claim at all, much less a claim for bad faith.

### III.  PLAINTIFFS STATE NO CLAIM FOR BREACH OF NATIONAL UNION'S ALLEGED DUTY TO DEFEND (FIRST COUNT)

Plaintiffs' claim for breach of National Union's alleged duty to defend is not easy to decipher, but it appears to contain two elements. First, Plaintiffs seem to complain that they suffered damages as a result of the suspension of coverage. Amend. Compl. ¶ 96 – 98. In connection with the discussion at Section I(B), above, these claims are not ripe for review because Plaintiffs do not allege any claims or requests for payment that have been refused or remain unpaid. Secondly, Plaintiffs' claim seems to assert that the suspension was undertaken in contravention of the "implied duty of good faith and faith dealing." Amend. Compl. at ¶ 92. To the extent that Plaintiffs assert a bad faith breach of the duty to defend, Plaintiffs fail to plead any facts at all to support any such purported cause of action.

-19-

A.  **National Union Properly Suspended Coverage Based Upon The Allegations Of The Sowell Complaint**

In accordance with its duties under law, National Union suspended coverage based on the allegations of the Sowell Complaint. Plaintiffs do not allege any facts or improper motive to impugn the good faith of that decision. The duty to defend depends upon the allegations of the third-party (i.e., Sowell) complaint: "If the [third-party] complaint . . . alleges a liability which the policy does not cover, the insurer is not required to defend." *Schilberg Integrated Metals Corp. v. Continental Cas. Co.*, 263 Conn. 245, 256 (2003). Indeed, the focus of the duty to defend inquiry are the specific factual allegations of the underlying third-party complaint:

> [A]n insurer's duty to defend [is] much broader in scope and application than its duty to indemnify . . . . The obligation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within coverage.

*Nationwide Mut. Ins. Co. v. Mortensen*, 222 F.Supp.2d 173, 180-181 (D. Conn. 2002) (finding no duty to defend based on the allegations of the complaints at issue) (*citing Springdale Donuts, Inc. v. Aetna Cas. & Sur. Co. of Illinois*, 247 Conn. 801, 807 (1999)). *See also Community Action for Greater Middlesex County, Inc. v. Am. Alliance Ins. Co.*, 254 Conn. 387, 398 (2000).

In *Mortensen*, although the complaints indicated a "lack of coverage," the insureds alleged that the insurer possessed "extrinsic information" that established coverage and therefore required the insurer to defend. The court was not convinced:

> The existence of a duty to defend is determined on the basis of what is found within the four corners of the complaint; it is 'not affected by facts disclosed by independent investigation, including those that undermine or contradict the injured party's claim.'

-20-

*Mortensen,* 222 F.Supp.2d at 181 (*citing Stamford Wallpaper Co. v. TIG Ins.,* 138 F.3d 75, 79 (2d. Cir. 1998)). The Second Circuit has endorsed the "four corners" rule:

> We do not look beyond the four corners of a pleading even to take account of demonstrable circumstances that might defeat coverage: by the same token, we will not hypothesize or imagine episodes or events that cannot be found among the allegations, and cannot reasonably be deduced from them.

*Stamford Wallpaper,* 138 F.3d 75 at 79 (dismissing claim pursuant to Rule 12(b)(6)).[4]

The policy specifically excludes such claims that "alleg[e], aris[e] out of, [or are] based upon or attributable to an Insured exercising *discretionary authority or control* with regard to management or disposition of assets." Exhibit B, Policy at ¶ 4(s) ("Exclusions") (emphasis added). Looking within the four corners of the Sowell Complaint, discretionary control is precisely what Sowell alleged:

> 26.   When Mr. Sowell opened his account, he signed a power of attorney giving Respondents *discretionary control* of the account. Mr. Gwynn told Mr. Sowell to sign the

---

[4] To the extent that *Mortensen* suggests that Connecticut "may" recognize a "temporary duty to defend," no such duty or breach thereof is alleged in this case. *Mortensen,* 222 F.Supp.2d at 187. The court in *Mortensen* found the concept in the decision of the Second Circuit in *Hugo Boss Fashions, Inc. v. Fed. Ins. Co.,* 252 F.3d 608 (2d. Cir. 2001). In that case, the Second Circuit applied New York state law to find such a duty where the question of coverage is ambiguous. The coverage issues in this case are not ambiguous; the Sowell Complaint alleges "*discretionary control*" as a basis for its claims (Exhibit A, Sowell Complaint at ¶¶ 26, 27, and 87 (emphasis added)), and the Policy expressly excludes, in the very same language, claims based on "*discretionary authority or control*" of assets (Exhibit B, Policy, at ¶ 4(s) ("Exclusions") (emphasis added)). Further, any such temporary duty lasts only until the issues of coverage are resolved. *Mortensen,* 222 F.Supp.2d at 188 (finding that the temporary duty lasted until the declaratory judgment action determined coverage). *Cf. Hugo Boss,* 252 F.3d 620 (requiring that coverage be established "with certainty" before the temporary duty expires). Here, National Union retained counsel in November 2001 to represent Plaintiffs while National Union assessed Sowell's claims and *before* it suspended coverage. Amend. Compl. at ¶ 30. National Union, therefore, fulfilled any purported temporary duty to defend Plaintiffs during the pendency of its investigation of coverage. It was only in early 2002, after their review of the unambiguous allegations of the Sowell Complaint, that National Union suspended coverage.

-21-

> power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell. As it turned out, Mr. Gwynn *did not consult* with Mr. Sowell before making trading decisions.
>
> 27. Mr. Gwynn . . . . treated his *discretionary* power as a license to churn.
>
> 87. Mr. Sowell's account was a *discretionary* account and was *unquestionably controlled* by Mr. Gwynn.

Exhibit A, Sowell Complaint at ¶¶ 26, 27, and 87 (emphasis added). Indeed, Sowell's claims depend on Sowell's grant of discretionary control to Gwynn. For example, Sowell's allegations of churning and excessive trading require, by their very nature, discretionary control. *See Rocco v. Painewebber, Inc.*, 739 F.Supp. 83, 86 (D. Conn. 1990) (to state a churning claim, plaintiff must allege the broker's "control" over the account); *Lesavoy v. Lane,* No. 02 Civ. 10162 RWS, 2004 WL 99815, at * 8 (S.D.N.Y. Jan. 22, 2004) (same). Plaintiffs protest that the award is not "predicated" on discretionary control or the power of attorney (Amend. Compl. at ¶ 78), but such control is implicit in the arbitration panel's finding of "churning" and "excessive trading." Exhibit C, Sowell Award at ¶¶ 2, 8.

Notwithstanding the "four corners" rule, Plaintiffs assert that they represented and "supplied information" that the power of attorney was only for "emergencies" and "never used," and that the account "had never been discretionary." Amend. Compl. at ¶ 41. They also allege that they provided National Union with an unnotarized copy of the power of attorney. Amend. Compl. at ¶ 42. These alleged facts are irrelevant. National Union had no duty to use such representations to "hypothesize or imagine" that the power of attorney was ineffective or revoked. *Stamford Wallpaper,* 138 F.3d at 79. The Amended Complaint does not allege that Sowell's complaint was amended to eliminate the allegations of discretionary control. Based on the repeated allegations in the Sowell Complaint that the account was discretionary, it "could not

-22-

reasonably be deduced" from the allegations that the Sowell Complaint did not mean what it said. *Id.* Because Plaintiffs do not allege any relevant facts to suggest that National Union did anything less than the law demands—by relying on the allegations within the four corners of the Sowell Complaint—Plaintiffs cannot state any claim for bad faith and breach of the duty to defend.

### B. Plaintiffs Failed To Reestablish Coverage In A Timely Manner

Once National Union determined that Sowell's claims were excluded from coverage, the burden shifted to Plaintiffs to prove that they were entitled to an exception under the Policy. Again, in *Schilberg*, the insurance policy excluded claims for pollution. The plaintiff, a scrap metal processor, was subjected to an administrative action brought by a state environmental regulatory agency for unlawful contamination, and the defendant insurer accordingly declined to provide a defense. The policy exclusion did contain, however, an exception: to cover pollution claims if the discharge was "sudden and accidental." The Connecticut Supreme Court found that the burden was on the plaintiff insured to establish that the sudden and accidental exception was applicable; in other words, once the insurer had properly determined that coverage was excluded, the insured bore the burden of proving an exception:

> Once an insurer has satisfied the burden of establishing that the underlying complaint . . . satisfie[s] the basic requirement for application of the [coverage exclusion], the burden shifts to the insured to demonstrate a reasonable interpretation of the underlying complaint potentially bringing the claims within coverage, or to show that extrinsic evidence exists that [proves an exception].

-23-

{00058398; 1; 0040-3}

*Schilberg*, 263 Conn. at 259 (*quoting Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 552 (2002) (affirming finding upon summary judgment that Plaintiff failed to establish coverage after it was denied)). The court further explains:

> [s]hifting the burden to establish the exception conforms with an insured's general duty to establish coverage where it would not otherwise exist . . . and appropriately places the burden of proof on the party having the better and earlier access to the actual facts and circumstances surrounding [the entitlement to coverage].

*Id.* at 255.

Plaintiffs do not assert any facts to suggest that they even attempted to carry that burden until Gwynn's attorney, John Nicgorski, sent a letter dated January 3, 2003 to National Union demanding a resumption of their defense. Amend. Compl. at ¶ 56. The letter was sent approximately one (1) year after coverage was suspended. Plaintiffs only assert that *prior to the period of suspension* they had "supplied information" that the power of attorney was only for "emergencies" and "never used," and that the account "had never been discretionary." Amend. Compl. at ¶ 41. They also allege they provided National Union with an unnotarized copy of the power of attorney. Amend. Compl. at ¶ 42. The "facts", however, are immaterial; they do not demonstrate that Sowell's power of attorney was in fact revoked or ineffective, nor do they establish an exception to the Policy's exclusion of discretionary accounts.

Much is made in the Amended Complaint of prior disclosures asserting that the account was non-discretionary, such as an alleged October 24, 2002, letter from *Sowell's lawyer* to National Union urging a "policy limits" settlement and representing that, despite the unambiguous allegations of the Sowell Complaint, the power of attorney was ineffective. Amend. Compl. at ¶ 50. What Sowell's lawyers did is irrelevant; Plaintiffs do not allege that they did anything to show an exception to the Policy exclusion until January 3, 2003. Sowell's

-24-

lawyers, furthermore, waited approximately (10) months after the suspension of coverage to make their claim that the power of attorney was ineffective, and did so only while making a demand for settlement.

When Gwynn's attorney did finally make an effort carry the burden to establish coverage by letter dated January 3, 2003, National Union resumed its defense within days, for Gwynn as well as Plaintiffs, on January 10, 2003.[5]  But during the period of suspension, National Union properly relied in good faith upon the allegations of the third party complaint in determining coverage, which is precisely what Connecticut law demands.  *Mortensen*, 222 F.Supp.2d at 181.  For their own delay and default, Plaintiffs must be estopped from blaming National Union for the suspension of coverage that is, ultimately, irrelevant because of National Union's settlement of Sowell's claims and the vacating of the arbitration award.

## IV. NATIONAL UNION HAS NOT BREACHED ITS ALLEGED DUTY TO INDEMNIFY (COUNT TWO)

Plaintiffs claim of breach of National Union's alleged duty to indemnify (Count Two) is also mooted by National Union's settlement of the arbitration award.  The duty to indemnify is only triggered by the entry of a judgment or award:

> In contrast to the duty to defend, the duty to indemnify . . . depends upon the facts established at trial and the theory under which judgment is actually [rendered] in this case.

*Schilberg*, 263 Conn. at 257 (internal citations omitted).  After entry of the arbitration award, National Union settled the matter and the award was vacated.  Notwithstanding that fact,

---

[5] Plaintiffs claim that National Union "admitted" that it had a duty to defend Plaintiffs. Amend. Compl. at ¶ 64.  Other than this conclusory statement, the facts alleged only support the conclusion that National Union resumed its defense of Plaintiffs on January 10, 2003 without any specific determination that the claims were covered and that a defense was improperly withheld.  Amend. Compl. at ¶ 64 – 65.

-25-

Plaintiffs claim that National Union breached this alleged duty by failing to take advantage of purported settlement opportunities *before the award was entered.* This is nonsensical; an alleged failure to settle before an award is entered is not a breach of the duty to indemnify. No claim is stated, therefore, because National Union's duty to indemnify was not triggered by the conduct of which Plaintiffs complain.

## V. PLAINTIFFS' CLAIMS FOR VIOLATIONS OF CUTPA ARE BASELESS

Plaintiffs' claim for violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b (Count Four) is the kind of baseless, throw-in claim that this court should not countenance. The proper pleading of a CUPTA claim is governed by strict pleading requirements that Plaintiffs do not even come close to satisfying and do not even attempt to plead. The CUTPA claim is lodged only in an attempt to scrape together any possible recovery after the evaporation of their basic underlying claim for bad faith, and should be dismissed as an allegation that does no more than inflame.

### A. Plaintiffs State No Claim Under CUTPA

Plaintiffs' claim under CUTPA is baseless. Plaintiffs style their claim as a "CUTPA/CUIPA" claim, ostensibly borrowing public policy standards from the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn. Gen. Stat. § 38a-816(6), which sets out the prohibited forms of unfair trade practice in the business of insurance.[6] Connecticut courts have said, however, that such CUTPA claims, by way of CUIPA, are based on allegations of repetitive practice.

---

[6] The majority of Connecticut courts hold that there is no private right of action under CUIPA. *See Hotak v. Barth Ins. Agency Inc.*, No. CV010075027S, 2003 WL 23149917, at * 2 (Conn. Super. Ct. Dec. 12, 2003).

> [A] CUPTA claim based on an alleged unfair claim settlement practice prohibited by § 38a-816(6) require[s] proof, as under CUIPA, that the unfair settlement practice had been committed or performed by the defendant *with such frequency as to indicate a general business practice.* An insurance company's "alleged improper conduct in the handling of a single insurance claim, without *any evidence of misconduct . . . in the processing of any other claim*, does not rise to the level of a 'general business practice' as required by §38a-816(6).

*Charter Oak Fire Ins. Co. v. Blue Sky Partnership, et al.*, No. CV000596646, 2001 WL 1178318, at * 3 (Conn. Super. Ct. Aug. 30, 2001) (emphasis added). *Accord Mead v. Burns*, 199 Conn. 651, 664-666 (1986) (affirming, under prior CUIPA statute, grant of a motion to strike CUTPA/CUIPA claim for failure to plead more than a single alleged unfair act); *Quimby v. Kimberly Clark Corp.*, 28 Conn.App. 660, 669 (1992); *Delorge v. United States Fire Ins. Co.*, No. 116794, 2002 WL 31125484, at * 2 (Conn. Super. Ct. Aug. 15, 2002). In *Charter Oak Fire*, the court granted the defendant insurer's motion to strike because the plaintiff made "unsubstantiated allegations" that "cannot possibly satisfy the requirement . . . that the [plaintiff] must show a "general business practice." *Charter Oak Fire*, 2001 WL 1178318, at * 3. As another Connecticut court held, "the plaintiff must allege more than a singular failure to settle a plaintiff's claim fairly. The plaintiff must allege that the defendant has committed the alleged wrongful acts with such frequency as to indicate a general business practice." *Delorge*, 2002 WL 31125484, at * 2.

Plaintiffs' sole allegation of business practice is that "the conduct of AIGTS and National Union constitutes intentional or wanton violation of the rights of [Plaintiffs] and other businesses and insurance consumers . . . ." Amend. Compl. at ¶ 124. These are bald legal conclusions, completely unsupported by Plaintiffs' recitation of the facts. Plaintiffs have not alleged any facts to support a general business practice; in fact, Plaintiffs do not plead a single

-27-

instance where National Union acted in the same alleged way toward another insured, although they claim that National Union was "immoral, unethical, oppressive and/or unscrupulous . . . based on an evil motive and intent to harm . . . for the monetary gain of [National Union]. Amend. Compl. at ¶ 108.

## VI. PLAINTIFFS CANNOT RECOVER FOR ALLEGED INJURIES THAT ARE THE NATURAL CONSEQUENCE OF THEIR OWN MISCONDUCT

Finally, Plaintiffs fail to demonstrate that their alleged sufferings are anything more than the product of their own intentional and negligent actions in the conduct of their business. As one commentator further noted, "[i]ndeed, such sufferings are inherent in being sued and found liable. Insurance cannot preclude liability against a policyholder; it only funds a portion of the financial consequences of being found liable." Anderson, David, *No Harm, No Foul: Why A Bad Faith Claim Should Fail When An Insurer Pays The Excess Verdict*, 33 Tort & Ins. L.J. 1001, 1007 (1998).

Plaintiffs claim that they suffered reputational and professional damages, harm to earning potential and regulatory scrutiny. *See,* e.g., Amend. Compl. at ¶¶ 100 – 101, 107 - 108, 115 – 116, 128 – 129 ( "regulatory proceedings"); 102, 109, 117, 130 ("reputation," "present and future earning potential"). Plaintiffs fail to account, however, for the findings of the NASD arbitration panel that originally found Plaintiffs and Gwynn guilty of the following:

> 1. . . . . [J]ointly and severally liable to claimant for selling unsuitable investments, selling unregistered securities, acting negligently, making negligent misrepresentations, breaching their fiduciary duties to claimant, breaching their contractual obligations to claimant, engaging in conduct falling below the securities industry standard of care, and showing an overall reckless indifference to claimant's interests.
>
> 2. . . . . [J]ointly and severally liable for churning claimant's account . . . .

-28-

> 5. In reaching its decision, the panel makes the following findings of fact concerning David Gwynn . . . .
>
> 7. . . . . excessive trading . . . .
>
> 10. . . . . engaged in a variety of inappropriate activities, including:
>
>> i. Soliciting Claimant (his client) to raise large sums of money for highly speculative venture capital propositions;
>>
>> iii. Failing to disclose serious conflicts of interest with Claimant . . . . including [Gwynn's] own personal stake in the . . . . propositions.

Exhibit C, Sowell Award at 6-8; *see also* Amend. Compl. at ¶ 77. Specifically, Plaintiffs were held liable for their "failure . . . to supervise Gwynn." Amend. Compl. at ¶ 76.

There can be no surprise that Plaintiffs' conduct has resulted in lawsuits by aggrieved parties, attention from and investigations by regulators, adverse publicity, long term impairment of professional reputation, and loss of market trust and business prospects. National Union, as insurer, can only defend Plaintiffs against financial liability for the way they did business. They should not be charged with soothing the inevitable wounds from doing business in that way. If Plaintiffs were truly concerned about their reputation, it does not seem logical that they would seek to relitigate these issues here.

## CONCLUSION

Plaintiffs demanded that National Union settle within the policy limits. National Union settled, securing a complete release of Plaintiffs and a vacating of the arbitration award. For this and the other foregoing reasons, the Court should grant Defendants' Motion to Dismiss the Amended Complaint.

        DEFENDANTS NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A. and AIG TECHNICAL SERVICES, INC.

By: _____
    James R. Hawkins, II(ct00128)
    Finn Dixon & Herling LLP
    One Landmark Square, Suite 1400
    Stamford, CT 06901-2689
    Tel: (203) 325-5000
    Fax: (203) 348-5777
    Email: jhawkins@fdh.com

CERTIFICATION

I hereby certify that a true and correct copy of the foregoing was mailed, United States mail, first class, postage prepaid to the following on this the 26th day of January, 2004:

Mario DiNatale, Esq.
Silver, Golub and Teitell
184 Atlantic Street
P.O. Box 389
Stamford, CT 06904

Peter M. Nolin, Esq.
Sandak Hennessey & Greco
970 Summer Street
Stamford, CT 06905

James R. Hawkins II

{00058398; 1; 0040-3}