<u>UNITED STATES DISTRICT COURT</u>

<u>DISTRICT OF CONNECTICUT</u>

_____

| | |
|---|---|
| **BRUCE CHARLES RYAN, RUSSELL WILLIAM** | ) |
| **NEWTON, ROBERT FITZPATRICK, and** | ) |
| **MERIT CAPITAL ASSOCIATES, INC.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) **CIVIL ACTION NO.** |
| **v.** | ) **3:03 CV 00644 (CFD)** |
| | ) |
| **NATIONAL UNION FIRE INSURANCE** | ) |
| **COMPANY OF PITTSBURGH, PA., and** | ) |
| **AIG TECHNICAL SERVICES, INC.,** | ) |
| | ) |
| **Defendants** | ) |

_____) **FEBRUARY 17, 2004**

**PLAINTIFFS' MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS THE
AMENDED COMPLAINT UNDER RULE 12(b)(6)**

Plaintiffs Bruce Charles Ryan, Russell William Newton, Robert Fitzpatrick, ( the

"Individual Plaintiffs") and Merit Capital Associates, Inc. (with the Individual Plaintiffs the

"Merit Plaintiffs") submit this memorandum of law in opposition  to the Motion to Dismiss

and supporting memorandum filed on January 27, 2004, submitted by the Defendants

National Union Fire Insurance Company of Pittsburg, PA ("National Union") and AIG

Technical Services Inc. ("AIGTS") (collectively the "NU Defendants").   The Motion to

Dismiss should be denied because the NU Defendants cannot show under Rule 12(b)(6) that

the Merit Plaintiffs' well pleaded complaint fails to state proper claims.  Indeed, the NU

Defendants ignore the allegations of the Merit Plaintiffs' complaint and instead construct a

"straw man" argument  based on a distorted and incomplete view of the allegations and

various documents which are not within the allegations of the Amended Complaint.

## APPLICABLE LEGAL STANDARD

As the Supreme Court emphasized recently in reversing a Rule 12(b)(6) dismissal of

a plaintiff's complaint, the "simplified notice pleading standard [of the Federal Rules] relies

on liberal discovery rules and summary judgment motions to define disputed facts and issues

and to dispose of unmeritorious claims." *See Ure v. Fineline Industries, Inc*., 2004 WL

213171 (D. Conn. Jan 29, 2004) quoting, *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512

(2002).  As this Court has recently noted in *Coleman v. Aztec Lighting*, 2004 WL 213031

(D. Conn., Jan. 28, 2004:

> When considering a Rule 12(b)(6) motion to dismiss, the Court
> accepts as true all factual allegations in the complaint and draws inferences
> from these allegations in the light most favorable to the plaintiff. *See Scheuer
> v. Rhodes,* 416 U.S. 232, 236 (1974), *overruled on other grounds, Davis v.
> Scherer,* 468 U.S. 183 (1984); *Easton v. Sundram,* 947 F.2d 1011, 1014-15
> (2d Cir.1991), *cert. denied,* 504 U.S. 911 (1992). Dismissal is warranted only
> if, under any set of facts that the plaintiff can prove consistent with the
> allegations, it is clear that no relief can be granted. *See Hishon v. King &
> Spalding,* 467 U.S. 69, 73 (1984); *Frasier v. General Elec, Co.,* 930 F.2d
> 1004, 1007 (2d Cir.1991). "The issue on a motion to dismiss is not whether
> the plaintiff will prevail, but whether the plaintiff is entitled to offer evidence
> to support his or her claims." *United States v. Yale-New Haven Hosp.,* 727
> F.Supp. 784, 786 (D.Conn.1990) (citing *Scheuer,* 416 U.S. at 232). Thus, a
> motion to dismiss under 12(b)(6) should not be granted "unless it appears
> beyond doubt that the plaintiff can prove no set of facts in support of his
> claim which would entitle him to relief." *Sheppard v. Beerman,* 18 F.3d 147,

150 (2d Cir.1994) (citations and internal quotations omitted), *cert. denied,* 513 U.S. 816 (1994). In its review of a 12(b)(6) motion to dismiss, the Court may consider "only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken." *Samuels v. Air Transport Local 504,* 992 F.2d 12, 15 (2d Cir.1993).

Under this standard it is clear that the NU Defendants cannot justify dismissal under Rule 12(b)(6).  The NU Defendant have ignored or mischaracterized the Merit Plaintiffs' allegations and they have tried to present facts and documents well beyond the allegations and documents attached to the Merit Plaintiffs' Amended Complaint and the exhibits attached thereto.[1]  The Merit Plaintiffs have alleged in detail four causes of action: (1) Breach of the duty to defend under the applicable insurance policy; (2) Breach of the duty indemnify; (3) Breach of the covenant of good faith and fair dealing implied into the insurance policy under Connecticut law; and (4) Violation by the Defendants of the Connecticut Unfair Trade Practices Act, 42 Conn. Gen. Stat. § 42-110a et seq., ("CUTPA"). The claims are well pled and supported by more than sufficiently detailed allegations. Accepting as it should that for purposes of this motion the Merit Plaintiffs' allegations are true, the Court should find that the NU Defendants have not even remotely met their burden to demonstrate that "under any set of facts that the plaintiff can prove consistent with the allegations, it is clear that no relief can be granted."

---

[1]  The Merit Plaintiffs attached exhibits A through E to the Original Complaint filed with this Court.  When the Amended Complaint was filed on December12, 2003 the same exhibits were referenced again but where not re-filed with the Court.  The NU Defendants have attempted to raise facts and documents outside the scope of the pleadings but have not submitted an affidavit  to try to convert this to a Rule 56 motion for Summary Judgment.

## FACTS AS ALLEGED

Plaintiffs' 29 page, 132 paragraph, and four count, Amended Complaint, dated December 12, 2003, (hereinafter "AComp. at ¶")  presents detailed allegations of the claimed breaches of the NU Defendants' contractual and common law duties to the Merit Plaintiffs and their co-insureds.  The Merit Plaintiffs have alleged that they were insured under a policy of insurance provided by National Union and that the NU Defendants failed to defend, failed to properly defend, and failed to indemnify the Merit Plaintiffs and their co-insureds, with the result  that an award in excess of the policy limits entered in a National Association of Security Dealers ("NASD") arbitration proceeding commenced by a client of Merit and the co-insured David W. Gwynn ("Gwynn").  The Plaintiffs have alleged that the conduct of the NU Defendants resulted from and constituted bad faith and that Merit, the Individual Plaintiffs and the co-insureds have all suffered damages as a result of the contractual breaches, bad faith, and violations of CUTPA committed by the NU Defendants. The Merit Plaintiffs have specifically alleged that they have each suffered and continue to suffer actual damages as a result of the NU Defendants' conduct despite the fact that in August 2003, months after this action was commenced, the NU Defendants paid the underlying claimant to settle the arbitration award before it became an enforceable state court judgment. *See* AComp. at ¶¶89, 90, 99, 100, 101, 102, 106, 107, 108, 109, 114, 115, 116, 117, 126, 127, 128, 129,  and 130.  The underlying facts are as follows:

Merit at all relevant times was a securities broker/dealer, registered with the NASD, with its home office in Westport, Connecticut.  Merit had operations in various other states including Arizona.  *See* AComp. at ¶ 9.  The Individual Plaintiffs were all high level officers of Merit and each had extensive experience in the securities industry.  *See* AComp. at ¶¶ 10,

11, & 12.  At an expense of $72,500, Merit acquired securities insurance coverage from NU, which  issued a Securities Broker/Dealer's Professional Liability Insurance Policy to Merit and said policy No. 473-36-20 was effective for the period from August 23, 2000 to August 23, 2001 (the "Policy").  *See* AComp. at ¶¶ 15 & 18.  The Policy covers Merit as the insured "Broker/Dealer," but also includes within the definition of "insured" each of the Individual Plaintiffs in their capacity as directors, officers,  employees and "Registered Representatives" of Merit.  *See* AComp. at ¶ 16.  The Policy provides for $1,000,000 in coverage and defense costs for each occurrence.

Gwynn was a resident of Arizona, and was married to Raquel Gwynn.  Gwynn was licensed by the NASD to sell securities and at relevant times, Gwynn, acting as an independent contractor, worked in part for Merit, and in that role, Gwynn functioned as a Registered Representative of Merit primarily in the state of Arizona.  In addition, Gwynn also worked from time to time as a certified financial planner through a company he owned and controlled known as, Gwynn Financial Resources, Inc., a Delaware corporation ("GFS") and GFS also had its principal place of business in Arizona.  *See* AComp. at ¶¶ 13 & 14. The Policy also included Gwynn as an insured in his capacity as a "Registered Representative" in that he was registered with the NASD and was compensated to render "Professional Services" on behalf of Merit.  *See* AComp. at ¶ 17.

Michael A. Sowell ("Sowell") was a resident of Chandler, Arizona, who had done business with Gwynn since 1992, long before Gwynn became affiliated with Merit.  On or about September 4, 2001, Sowell commenced an NASD arbitration against Merit and Gwynn, by a filing a Statement of Claim (the "Original Claim") dated August 31, 2001, and

as part of this Original Claim, Sowell also asserted claims against Gwynn's wife, Raquel

Gwynn, GFS, (with Gwynn the "Gwynn Parties") and against Ryan, Newton, and

Fitzpatrick, and their wives.  Sowell's Original Claim concerned the trading activity by

Gwynn in Sowell's account at Merit and made various other allegations against Gwynn

concerning loans and other transactions between them.  Sowell's claim sought to hold Merit,

Ryan, Newton, and Fitzpatrick liable primarily on theories of *respondeat superior*, failure to

supervise Gwynn, and on their alleged responsibilities as control persons of Merit. *See*

AComp. at ¶¶ 20-32.

In September 2001, the Merit Plaintiffs tendered the Sowell claim to the NU

Defendants.  *See* AComp. at ¶ 33.  Based on the face of the complaint and before it had

investigated, the NU Defendants in November 2001 appointed counsel to appear for and

defend the Merit Plaintiffs and their wives, and thereafter appointed separate counsel to

appear for and defend Gwynn, Raquel Gwynn and GFS.  *See* AComp. at ¶¶  37 & 38.[2]  The

NU Defendants provided for the defense notwithstanding that Sowell's Original Claim

included, among others, an allegation that one of Sowell's accounts with Merit was a

"discretionary" account.  *See* AComp. at ¶ 36.  Through the end of 2001, the Merit Plaintiffs

cooperated fully with the NU Defendants and provided all information requested.  *See*

---

[2] Because the NASD had no jurisdiction over their wives, since they had no affiliation with a Broker Dealer and were not otherwise subject to NASD regulation, no appearance was necessary or appropriate for the wives of Ryan, Newton, and Fitzpatrick.  Counsel appointed by the NU Defendants was about to appear for the wives but was prevented from doing so by the Merit Plaintiffs.  Accordingly these wives did not become parties to the arbitration. Notwithstanding that the NASD had no jurisdiction over Raquel Gwynn, since she also had no affiliation with a Broker Dealer and was not otherwise subject to NASD regulation, counsel appointed by AIGTS filed an appearance and an answer on behalf of Raquel Gwynn  By appearing and answering for Raquel Gwynn, counsel appointed to defend Gwynn, GFS and Raquel Gwynn by the NU Defendants  unnecessarily consented to and created jurisdiction over Raquel Gwynn.  *See* AComp. at ¶¶  37-39.

AComp. at ¶ 40.  After Defendants inquired,  the Merit Plaintiffs supplied information that revealed that Sowell had provided a power of attorney to Gwynn in March of 1998, the power of attorney had been intended for use only in emergencies, and the power of attorney had never been used.  The Merit Plaintiffs also provided information which showed that Sowell's account had never been a discretionary account. *See* AComp. at ¶ 41.

      In early 2002, the NU Defendants advised the Merit Plaintiffs and Gwynn, GFS and Raquel Gwynn, that based on the power of attorney, they had determined Sowell's account was discretionary and therefore the NU Defendants asserted that they had no duty to continue to defend or indemnify the Merit Plaintiffs and Gwynn, GFS and Raquel Gwynn under the Policy.  Thereafter, the NU Defendants notified the counsels they had appointed respectively for the Merit Plaintiffs and for Gwynn, GFS and Raquel Gwynn that the NU Defendants would no longer pay for the defense of Sowell's arbitration claims.  *See* AComp. at ¶¶ 43 & 44.   As a result of the NU Defendants' withdrawal of its defense, counsel hired by the NU Defendants for the Merit Plaintiffs refused to continue as counsel. Thereafter, the Merit Plaintiffs were forced to hire new counsel to defend their interests.   Moreover because they could not fully afford their defense, the Merit Plaintiffs were unable to properly defend themselves and were not in a position to retain any expert witness in their own defense. *See* AComp. at ¶¶ 45-47 & 60.   The Gwynn Parties also had economic difficulty in retaining counsel once the NU Defendants withdrew their defense.  Eventually by September 2002, Gwynn began to represent himself, his wife, and GFS on a *pro se* basis. *See* AComp. at ¶ 48.  As a result of the fact he had no counsel Gwynn, asked for and was granted postponement of the arbitration to January 7, 2003. *See* AComp. at ¶ 49.

When the arbitration hearing commenced on January 7, 2003, the Gwynn Parties were still not represented by counsel and Gwynn attempted to represent himself and GFS at the hearing for the first three days. *See* AComp. at ¶ 61. Mrs. Gwynn did not even know she need to appear and was wholly unrepresented during the first three days of the hearing. *See* AComp. at ¶ 59. The Merit Plaintiffs have specifically alleged in detail that by allowing Gwynn to proceed to the arbitration hearing without counsel, the NU Defendants damaged the defense of the Gwynn Parties and the Merit Plaintiffs. *See* AComp. at ¶¶ 62 & 63. On January 10, 2003 the NU Defendants, which now claim they had no duty to defend based on the face of the Sowell's Original Claim, reversed position and reassumed the defense of the Gwynn Parties and agreed to the resume paying the cost of the continued defense of the Merit Plaintiffs. The Merit Plaintiffs have alleged that this conduct constitutes an admission that the NU Plaintiffs had a duty to defend the Sowell claim. *See* AComp. at ¶¶ 64 & 65. Although the NU Defendants purported to reassume their defense obligations the Merit Plaintiffs have alleged that the defense was harmed because it was still too late to hire an expert witness to defend the interests of the Gwynn parties and the Merit Plaintiffs and because counsel who re-entered the action for the Gwynn Parties was too inexperienced to competently handle the defense and further did not have time or resources to become fully apprised of what had happened in the first three days of the arbitration. *See* AComp. at ¶¶ 69-71.

The Merit Plaintiffs further allege that the arbitration could have been settled for less than $500,000 in the fall of 2002, but the NU Defendants refused to discuss settlement with Sowell and his attorneys. *See* AComp. at ¶ 52. Further Sowell offered to settle for $950,000 on January 10, 2003 but the NU Defendants did nothing to try to settle the claim at that time.

*See* AComp. at ¶ 66.  Each of these offers was within the  $1,000,000 Policy limit.  Despite the universal view that the arbitration had gone poorly for the Merit Plaintiffs and the Gwynn Parties, the NU Defendants still would not offer anything to settle the claim and refused to negotiate with Sowell.  *See* AComp. at ¶ 74.  On February 25, 2003 the NASD arbitration panel entered an award against Gwynn, GFS, Raquel Gwynn, and Merit, Ryan, Newton, and Fitzpatrick, jointly and severally, in the amount of $1,125,000 (the "Award").  In addition the panel found Gwynn, GFS, Raquel Gwynn, and Merit, Ryan, Newton, and Fitzpatrick, jointly and severally, liable for $17,500 in arbitration fees.  *See* AComp. at ¶ 75.

The NU Defendants continued to breach their duties after the Award entered. They refused to respond to the Merit Plaintiffs, they failed and refused to settle the case with Sowell, they failed to timely pay Merit's defense counsel  and they refused to direct and control the continued defense of the Sowell matter.  *See* AComp. at ¶¶ 84-87.  Although the Policy contained an express requirement for mediation, the NU Defendants did not respond to the request for mediation made by the Merit Plaintiffs on March 25, 2003.  Accordingly the Merit Plaintiffs commenced this action on April 9, 2003.  After Sowell had moved to confirm the arbitration Award and primarily because the Merit Plaintiffs had commenced this action,  the NU Defendants negotiated with and in August 2003 funded a settlement with Sowell, with the result that by agreement the arbitration Award was vacated in exchange for a payment to Sowell of $1,000,000.  *See* AComp. at ¶ 75. Notwithstanding the settlement and the vacating of the  Award, the Merit Plaintiffs remain obligated to report the nature of the Award in various NASD filings and remain obligated to disclose the Award to various state and federal regulators.  Further, notwithstanding the settlement and the

vacating of the Award, the Merit Plaintiffs continue to be subjected to regulatory investigations as a result of the Award.  *See* AComp. at ¶¶89 & 90.

## ARGUMENT

## I.  PLAINTIFFS' CLAIMS ARE NEITHER MOOT NOR UNRIPE.

The Merit Plaintiffs have expressly and specifically alleged that by failing to defend and defend properly and by failing to try to settle the Sowell claim within policy limits before the Award entered, the NU Defendants have caused the Merit Plaintiffs to suffer damages.   The Merit Plaintiffs have alleged that these damages are separate and distinct from the Award itself, and include fees and expenses which have not been paid that relate to the defense of the Sowell case, the costs of initiating this action to force the NU Defendants to settle with Sowell, costs and expenses related to regulatory proceedings which flow from the entry of the Award, impairment of the Individual Plaintiffs'  business and licensing in the Securities industry and harm to the Individual Plaintiffs' reputations and  present and future earnings.  *See* AComp. at ¶¶89, 90, 99, 100, 101, 102, 106, 107, 108, 109, 114, 115, 116, 117, 126, 127, 128, 129,  and 130.  In complete disregard of these allegations, which this Court must take as being true for purposes of this motion, the NU Defendants now try to argue that by paying the Award this Court is deprived of jurisdiction because the claims are moot or not ripe.  The Defendants self-serving position is of course inconsistent and simply makes no sense given the Merit Plaintiffs' allegations.  A case is not moot or unripe merely because the defendants chose to pay to resolve **some, but not all**, of the plaintiffs' claims.

As the NU Defendants assert the "hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed."  *Lebron v. Armstrong,* 2003

WL 22283809, at 4 (No. 3:01CV241(CFD))(D.Conn. Sept29, 2003). The NU Defendants have not shown that on the claims of breach of contract, bad faith and violation of CUTPA that the Merit Plaintiffs cannot recover their unpaid defense costs and expenses which should have been covered by the Policy, for the damage to the individual reputations, for the losses to their business, and for the costs and attorneys fees of commencing this action.[3] Similarly Defendants have failed to show why the Merit Plaintiffs may not recover punitive damages under the common law and CUTPA. All of these damages are alleged to flow directly from the NU Defendants' conduct which precluded a proper defense or early settlement of the Sowell claim and resulted in the damaging entry of the Award. Further, Defendants have failed to make any showing why the Merit Plaintiffs do no have the need or deserve these damages just because the NU Defendants paid to settle the Award and belatedly paid some defense costs.

The claim of lack of ripeness is equally ludicrous. The Merit Plaintiffs have expressly alleged they have and will continue to suffer damages. The NU Defendants have never offered to pay for the harm to the Individual Defendants' reputation and business which has and continues to occur as a result of the Award even after the Award was vacated. Nor have these Defendants ever agreed to pay for the punitive damages which flow from their bad faith and violations of CUTPA. On the face of the Amended Complaint, it is clear that the Merit Plaintiffs have alleged proper contract and tort claims, that they have and continue to suffer damages, and that these damages result proximately from the improper conduct of the NU Defendants.

---

[3] Under Connecticut law when an insurer breaches the duty to defend, it becomes liable for attorneys fees incurred in both the underlying action and in the action brought to enforce that duty. *See City of West Haven v. Liberty Mutual Insurance Co.*, 639 F. Supp. 1012 ( D. Conn. 1986).

Moreover, it is hardly credible for the NU Defendants to assert that the Merit Plaintiffs' claims are not ripe because they were not presented for payment under the Policy. First the allegations of the Amended Complaint assert claims flowing from the Defendants' breach of the Policy, the Defendants bad faith, and the Defendants violation of CUTPA. These are not Policy claims but claims brought under Connecticut law arising from the NU Defendants improper conduct. Further, it is ironic that these Plaintiffs did try to present their claims under the Policy. As alleged in the Amended Complaint, after the NU Defendants breached their duties and allowed, if not caused, the highly damaging Award to enter, the Merit Plaintiffs attempted to follow the Policy requirements before commencing suit by demanding a mediation under the Policy. The NU Defendants in a further display of bad faith and a further breach of their duties under the Policy simply ignored the demand for mediation and never responded to it. *See* AComp. at ¶ 83.

## II.  PLAINTIFFS HAVE PROPERLY ALLEGED BAD FAITH

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Gupta v. New Britain General Hospital*, 239 Conn. 574, 598 (1996)(Internal quotation marks omitted). Specifically, the Connecticut Supreme Court has extended the implied covenant of good faith and fair dealing to insurance contracts. *See Verrastro v. Middlesex Ins. Co*.,  207 Conn. 179, 190  (1988). The violation of this implied covenant is subject to tort liability. *See L.F. Pace & Sons, Inc. v. Travelers Indemnity Co.,* 9 Conn.App. 30, 46, cert. denied, 201 Conn. 811  (1986); *Black v. Goodwin, Loomis &*

*Britton, Inc.*,  judicial district of New London, Docket No. 519101 (Super. Ct. April 19, 1995, Hendel, J.) (13 Conn. L. Rptr. 574, 576), aff'd, 239 Conn. 144,  (1996).

Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive ... Bad faith means more than mere negligence; it involves a dishonest purpose." *Habetz v. Condon,* 224 Conn. 231, 237 (1992)(Citation omitted; internal quotation marks omitted).  Although no appellate court has specified the elements necessary to prove such a claim,  many Connecticut  trial courts have adopt those set forth by Judge Sheldon in *ShareAmerica, Inc. v. Ernst & Young*; judicial district of Waterbury, Docket No. 150132 (July 2, 1999, Sheldon, J.): first, that the plaintiff and the defendant were parties to a contract under which the plaintiff reasonably expected to receive certain benefits; second, that the defendant engaged in conduct that injured the plaintiff's right to receive some or all of those benefits; and third, that when committing the acts by which it injured the plaintiff's right to receive benefits it reasonably expected to receive under the contract, the defendant was acting in bad faith. *See e.g., Ehsan v. Ericson Agency inc.,* 2003 WL 21716345 at n.14 ( Super. Ct. July 3, 2003)( citing several case).

Here the Merit Plaintiffs allege in detail in the first two counts of the Amended Complaint  the facts supporting their claims that the NU Defendants breached their contractual duties to defend and indemnify the Merit Plaintiffs. *See* AComp. at ¶¶ 1-109. Thus, Plaintiffs have alleged they were owed a duty of defense and indemnification under the Policy and that they were injured by the breach of those duties by the NU Defendants. In the Third Count which alleges bad faith, the Merit Plaintiffs expressly allege that:

> Defendants' actions, in failing to defend Plaintiffs and the other insureds under the Policy, in failing timely to indemnify the insureds or pay Loss under the Policy, and in refusing to mediate this dispute with the Plaintiffs despite a demand for mediation under the Policy, were motivated by the self interest of AIGTS and National Union and their conscious and willful disregard of the Plaintiffs' interests.
>
> On information and belief, the above described conduct of the Defendants AIGTS and National Union was based on an evil motive and an intent to harm or disadvantage the Plaintiffs for the monetary gain of the Defendants.
>
> The above described conduct of the Defendants AIGTS and National Union was undertaken in breach of the covenant of good faith and fair dealing implied into the Policy under Connecticut law.

*See* AComp. at ¶¶ 111-113.  Plaintiffs also allege that the way their defense in the Sowell arbitration was conducted under various policies and procedures were designed to reduce the NU Defendants' costs without regard to the necessities of the defense that was required for the Merit Plaintiffs and the Gwynn parties in the Sowell arbitration.   *See* AComp. at ¶ 97(k).  While the NU Defendants simply dismiss or ignore these allegations, for purposes of this motion the Court must take these allegations as true.  Coupled with the detailed allegations of the breaches of duty to defend and indemnify by these Defendants, which are set forth in first two counts of the Amended Complaint, the Plaintiffs have more than adequately pled bad faith.  *See e.g., Bates v. Utica Mutual Insurance Company*, 2003 WL 21327656 (Super. Ct. May 29, 20030 (six specific allegations of misconduct in the claim sufficient to allege bad faith where if proven the claims could establish dishonest or sinister purpose).

The NU Defendants final argument is that the Merit Plaintiffs' bad faith claim is extinguished as a matter of law.  For this proposition the NU Defendants cite no controlling or apposite Connecticut case law and cite no applicable law from any other jurisdiction. The few cases cited by the NU Defendants such as *Clement v. Prudential Property & Casualty*

*Inc. Co.*, 790 F.2d 1545 (11th Cir. 1986)( Florida law applied), *Allstate Insurance Co. v.*

*Campbell*, 334 MD. 381, 639 A.2d 652 (1994)( Maryland Law), and *Wiacek v. Safeco Ins.*

*Co.* 1998 WL 161378 (Conn. Super. Ct . March 31, 1998)(Connecticut law of uninsured

motorist insurance), are distinguishable and do not establish any board rule of law which

would affect this case.  In most of these cases the argument for bad faith was limited to a

breach of a duty to settle not as in this case both a fundamental breach of the duty to defend

which is alleged to have resulted in an improper Award against the insured and a breach of

the indemnification duty.  Moreover, in these cases the insurer never allowed an award to

enter in excess of the policy limits.  Thus in *Wiacek* the Court simply held that an uninsured

motorist could not sue in bad faith for the insurer's failure to settle directly with the insured

before there was a determination of the amount of liability to the tortfeasor who was

uninsured or underinsured.  In *Clement* the plaintiff settled with the tortfeasor on terms that

said the insured could only be liable for $10,000 of the $75,000 judgment to which he

stipulated.  The Court held that the insurer could have no greater liability  than the insured

actual had.   In none of the cases cited by the NU Defendants was it alleged that the entry of

the Award had caused additional damages as are alleged in this case.

In this case the Court must look to the fact that this is special professional liability

policy designed to protect  those involved in the securities industry.  The Merit Plaintiffs

have specifically alleged that by failing to defend and defend properly, and thereby allowing

an Award to enter (which Award was more than $125,000 in excess of the Policy coverage),

the NU Defendants caused permanent harm to the Merit Plaintiffs beyond the amount of the

Award.  Here the Merit Plaintiffs have specifically alleged that by merely allowing the

NASD arbitration panel to enter the Award they will suffer long term injury beyond the

amount which became due and owing to Sowell. *See* AComp. at ¶¶ 115-117.  These injuries include additional and expensive regulatory proceedings, a permanent record with NASD and other regulatory agencies which will impair the ability of the Plaintiffs to conduct business and obtain necessary licenses for their businesses, and damages to their business reputations which harms their present and future earning potential.  All of these damages are alleged to have occurred and continue notwithstanding the fact that after and as a result of the commencement of this action, the NU Defendants settled Sowell's claim in August 2003.  Given these factual allegations and the fact that this is being reviewed under the standards of a 12(b)(6) motion to dismiss, the Court should find that Plaintiffs have properly alleged a cognizable bad faith claim.

### III.  PLAINTIFFS PROPERLY ALLEGE BREACH OF THE DUTY TO DEFEND

The NU Defendants concede as they must that the duty to defend is broader than the duty to indemnify. If an allegation of the complaint falls "*even possibly*" within the coverage, then the insurance company must defend the insured.  *Schillberg Integrated Metals Corp. v Continental Cas. Co.*, 263 Conn. 245 (2003) *citing, Community Action for Greater Middlesex County. Inc. v. American Alliance Ins. Co.,* 254 Conn. 387, 399 (2000). The NU defendants also properly acknowledge that the test for the duty to defend in Connecticut is determined by the allegations in the underlying complaint, which here would be Sowell's Original Claim for arbitration.  From here however, the NU Defendants attempt a factual analysis of whether the allegations made by Sowell fell outside the scope of the policy.  Indeed, the NU Defendants even ask the Court to engage in an "implicit " reading of

the Award to determine that it was predicated on discretion or the existence of a discretionary account. *Memorandum In Support of Motion to Dismiss* at 21-22. This approach is improper at this stage of the proceedings.

First Sowell's Original Claim is not before the Court on this motion to dismiss because it was not an exhibit to the Amend Complaint. It has been attached, without an Affidavit to Defendants Motion and therefore is not before the Court as evidence. Further as the alleged by the Merit Plaintiffs, even if the Court looks to Sowell's Original Claim not all of the claims against Gwynn and the Merit Plaintiffs are predicated on the existence of a discretionary account. *See* AComp. at ¶ 36. Indeed, as to the Merit Plaintiffs the claims were predicated entirely on theories of respondeat superior and failure to supervise Gwynn in his various activities including activities that had no relationship to the alleged discretionary account.

Most importantly however, is the fact that on the four corners of the Sowell Claim, the NU Defendants decided to defend and actually appeared for the Merit Plaintiffs and the Gwynn Parties. It is undisputed as alleged by Plaintiffs that the NU Defendants hired counsel and appeared for the Merit Plaintiffs and the Gwynn Parties in the Fall of 2001. It was only months later and predicated on a claimed investigation of the underlying facts beyond those alleged in the Original Claim that the NU Defendants withdrew there defense. *See* AComp. at ¶¶ 37-44.

Moreover if the NU Defendants concede that the duty to defend is measured by the four corners rule, why did they then resume the defense halfway through the arbitration hearing? In other words this Court should look to the conduct of the NU Defendants in assessing whether their claim that they never had a duty to defend has even facial merit.

17

The conduct of the NU Defendants directly rebuts this assertion. As alleged by the Merit Plaintiffs the conduct of the NU Defendants of defending the arbitration for several months and then reappearing in the middle of the hearing constituted admissions that they had a duty to defend based on the allegations of Sowell's claim. *See* AComp. at ¶¶ 64 & 94-95 [4] Having appeared, reappeared and completely botched the defense, the NU Defendants should not now be heard to argue that they never had a duty to defend at all.[5]

## IV.  DEFENDANTS BREACHED THEIR THE DUTY TO INDEMNIFY

The Merit Plaintiffs have alleged that the NU Defendants have breached their duty to indemnify and pay "Loss" under the Policy in that:

a.  failing to explore settlement with Sowell prior to the commencement of the Sowell arbitration hearing, when Sowell was making demands to settle well within the limits of the Policy.

b.  refusing to settle the Sowell claims before the completion of the Sowell arbitration hearing, despite Sowell's expressed willingness to settle the claim within the limits of the Policy.

c.  allowing an award to enter in excess of the limits of the Policy when AIGTS and National Union should have properly defended to defeat those claims, or should have settled to avoid the entry of an award above the limits of the Policy.

d.  failing to timely pay the award after its entry by the NASD and before Plaintiffs were required to commence this action.

*See* AComp. at ¶ 105. Without addressing the unique facts and circumstance of this case as alleged by the Merit Plaintiffs, the NU Defendants simply state that this claim is nonsensical. The NU Defendants have not met their burden to show beyond doubt that the

---

[4] The Policy makes clear that National Union only had a right to defend if it had a duty to defend. *See* AComp. at ¶ 19 quoting the Policy

[5] The NU Defendants argument that *Schilberg* created a duty on the insureds to prove to National Union that it had a continuing duty to defend after it wrongfully terminated the defense in early 2002 is complete mischaracterization of that case. *Schilberg* was a summary judgment case limited to the interpretation of the so called pollution exclusion and has only to do who has the burden of proof on the evidence with insure proves the existence of a clear policy exclusion then it is the insureds burden to prove the facts to establish an exception to that exclusion.  Moreover in *Schilberg* the insurer never admitted it had a duty to defend, by first commencing a defense then withdrawing and then resuming the defense in the middle of the underlying trial.

Plaintiffs can prove no set of facts in support of his claim which would entitle them to relief. Here the Court can look to the fact that the NU Defendants ultimately paid the Sowell claim as an admission that there was coverage and a duty to defend and indemnify. Given this admission, then the NU Defendants had a duty to at least explore the possibility of settling prior to the entry of an Award that has caused significant collateral damage to the Merit Plaintiffs and the Gwynn Parties. The Merit Plaintiffs have alleged that the NU Defendants ignored and did not even consider the possibility of settling the action in 2002 for something in the range of $240,000 to $500,000. *See* AComp. at ¶¶ 52 & 73. The Merit Plaintiffs also allege it was obvious that after the NU Defendants resumed the defense, that the hearing as presented had been a disaster and should have been settled before the Award entered, but that the NU Defendants continued to ignore reasonable settlement overtures within policy limits. *See* AComp. at ¶¶ 73 & 74. Finally the NU Defendants did nothing to resolve the matter, including refusing to mediate, until this action was commenced and after the Merit Plaintiffs incurred additional damages and expenses to compel performance under the Policy. *See* AComp. at ¶¶ 81-88. Such facts properly state a contract claim for breach of the NU Defendants' duty under the Policy to indemnify and pay losses, which should be allowed to proceed to a factual hearing.

## V. PLAINTIFFS' CUTPA CLAIMS ARE PROPERLY ALLEGED.

Plaintiff has stated a broad claim for violation of CUTPA under Connecticut law incorporating all its prior allegations of breach of duty and bad faith. The NU Defendants attempt to defeat that claim by mischaracterizing it as a claim simply brought under the

Connecticut Unfair Insurance Practices Act ("CUIPA") Conn. Gen. Stat. §38a-816(6). While the Merit Plaintiff do incorporate a CUIPA allegation as one element of their CUTPA claim, they do not limit the CUTPA claim to that allegation.

To establish its CUTPA claim against these Defendants, the Merit Plaintiffs must allege and then prove by a fair preponderance of the evidence that the Defendants engaged in at least one unfair or deceptive act or practice in the conduct of their business, in violation of Conn. Gen. Stat. § 42- 110b, and that as a result of such unfair or deceptive act or practice, Plaintiffs suffered an "ascertainable loss of money." *See Levin v. Fireman's Fund Ins. Co.,* 2003 WL 21716465 (Conn. Super., July 7, 2003); *Francis T. Zappon Co. v. Plymouth Commons Realty Corp.,* 2004 WL 238308 (Conn. Super., Jan. 22, 2004). The Connecticut Supreme Court has held that the wording of CUTPA is broad enough to address a single act if the conduct otherwise meets the requirements of what has come to be known as the "cigarette rule." See e.g., *Jacobs v. Healey Ford-Subaru, Inc.,* 231 Conn. 707, 725 (1995). Here the Merit Plaintiffs have alleged that the conduct of the NU Defendants meet all the requirements of that rule.

To prove that a defendant's business acts or practices were "unfair," within the meaning of CUTPA, a plaintiff must show under the"Cigarette Rule," that: (1) the act or practice, even if not unlawful, violates public policy as it has been established by statutes, the common law, or otherwise; (2) it is immoral, unethical, oppressive or unscrupulous; and (3) it causes substantial injury to consumers, competitors or other business persons. See, e.g., *Toshiba America Med. Syst., Inc. v. Mobile Medical Systems, Inc.,* 53 Conn.App. 484, cert. denied, 249 Conn. 930(1999); *Ancona v. Manafort Bros., Inc.,* 56 Conn.App. 701, cert. denied, 252 Conn. 954, (2000). An act or practice need not be shown to satisfy all three of

the "Cigarette Rule" criteria if the plaintiff can make an especially strong showing of unfairness under at least one of them. *Cheshire Mortgage Service, Inc. v. Montes,* 223 Conn. 80, 112, (1992). An act or practice is "deceptive," within the meaning of CUTPA, when it involves a representation, omission or other act likely to mislead the plaintiff, the plaintiff interpreted that act, omission or statement reasonably under the circumstances, and the act, omission or statement was material, that is likely to affect the plaintiff's decisions or conduct. See *Caldor, Inc. v. Heslin,* 215 Conn. 590, 597, (1990). To establish that an unfair or deceptive act or practice has resulted in an "ascertainable loss of money," the plaintiff need not plead or prove that it has suffered a loss in any particular amount. *Johnson Electric Co. v. Salce Contracting Associates, Inc .,* 72 Conn.App. 342, 254-55, , cert. denied, 262 Conn. 922, (2002). Instead, it must establish a "loss"--that is a "deprivation, detriment or injury"--that is "ascertainable" in the sense that it is "capable of being discovered, observed or established." *Hinchliffe v. American Motors Corporation,* 184 Conn. 607, 613, (1984). Hence, "[w]henever a consumer has received something other than what he bargained for, he has suffered a loss of money or property." *Id.* at 614. Similarly, whenever a person loses substantial rights or benefits under a contract, either due to another's breach of that contract once it is entered into or another's wrongful failure or refusal to enter into it in the first place, he is deemed to have suffered an ascertainable loss. *Johnson Electric Co.* 72 Conn.App. at 355.  On the face of the pleadings in the Fourth Count of the Amended Complaint, it is clear that the Merit Plaintiffs have alleged each and every component of a CUTPA claim and have expressly invoked all of the element of the cigarette rule.

       The Merit Plaintiffs have included as one element of their CUTPA claim that the NU Defendants have violated public policy as stated in CUIPA.  The Merit Plaintiffs

acknowledge that under the current state of the law they will have to prove that at trial that the NU Defendants engaged in these practices with sufficient frequency to indicate a general business practice, but for now this part of Plaintiffs' claim should be judged simply on the sufficiency of the allegations. The Merit plaintiffs have met his element by alleging the "conduct of AIGTS and National Union constitutes intentional or wanton violation of the rights of Merit, Ryan, Newton and Fitzpatrick and other businesses and insurance consumers and was done with reckless indifference to those rights." *See* AComp. at ¶ 124. *See Levin v. Fireman's Fund Ins. Co.,* 2003 WL 21716465, (Conn. Super., Jul 07, 2003)(because plaintiff alleged conduct in violation of CUIPA was general business practice motion to strike denied). As alleged, the Merit Plaintiffs' CUTPA claim is proper and the motion to dismiss it should be denied.

## VI. DEFENDANTS ALLEGATION OF PLAINTIFFS' MISCONDUCT IS A DEFENSE WHICH IS NOT PROPER ON THIS MOTION

The NU Defendants final argument is wholly improper in a motion to dismiss. Defendants contend that they can defeat all of the Merit Plaintiffs claims because the NASD arbitration panel entered the Award against them. This contention makes no sense either factually or procedurally.

First from a factual perspective, the Merit Plaintiffs have alleged and continue to believe they will prove at trial that they did nothing wrong and were only found liable in the arbitration as a result of the utterly flawed proceeding that resulted from the NU Defendants failing to afford them and the Gwynn Parties a proper defense. If the insurers had honored their duty of defense and hired expert witness for the Merit Plaintiffs and the

Gwynn Parties then the panel would have seen it was improper to hold the Merit Plaintiffs liable on any of the indirect theories of liability, such as respondeat superior, failure to supervise, etc., that the panel adopted. Indeed, had Gwynn been defended during the months leading up to the hearing and during the first three days of the hearing the panel would have had a different view of his conduct, and may well have exonerated all of the Merit Plaintiffs and the Gwynn Parties.

Procedurally, of course, this argument is really a contributory negligence claim based on the theory that the Plaintiffs were in fact liable not withstanding that they were not properly defended at the arbitration hearing. Such an argument is not proper on motion to dismiss under Rule 12(b)(6) where all of Plaintiffs allegations must be taken as true for purposes of the motion. This argument should be rejected so that the Plaintiffs can offer the evidence of the witnesses who were at the hearing and cant testify as to how the defense was mangled by the NU Defendants.

**CONCLUSION**

For all of the foregoing reason this Court should deny the NU Defendants" Motion to Dismiss.

**PLAINTIFFS, BRUCE CHARLES RYAN,
RUSSELL WILLIAM NEWTON, ROBERT
FITZPATRICK, and MERIT CAPITAL
ASSOCIATES INC.,**

By_____/S/_____
       Peter M. Nolin (ct06223)
       **Sandak Hennessey & Greco LLP**
       970 Summer Street
       Stamford, CT  06905
       (203) 425-4200
       (203) 325-8608 (fax)
       pnolin@shglaw.com

## **CERTIFICATION**

I hereby certify that a copy of the foregoing was sent by federal express, on February 17 2004, to the following counsel:

James R. Hawkins, II, Esq.
Finn Dixon & Herling, LLP
One Landmark Square, Suite 1400
Stamford, CT 06901-2689

Mario DiNatale
Silver Golub & Teitell LLP
184 Atlantic Street
P.O.Box 389
Stamford CT 06904-0389

_____**/S/**_____
Peter M. Nolin