UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., <br><br> Defendants. | CASE NUMBER: <br> 3:03 CV 00644 (CFD) <br><br><br><br><br><br><br><br> April 26, 2004 |

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

Pursuant to Rules 12(b)(6) and D. Conn. L. Civ. R. 7(d) of the Federal Rules of Civil Procedure, Defendants National Union Fire Insurance Company of Pittsburgh, P.A. and AIG Technical Services, Inc. (hereinafter referred to collectively as "National Union"), respectfully submit this reply (the "Reply") to Plaintiffs' Opposition to Defendants' Motion to Dismiss the Amended Complaint (the "Motion to Dismiss") of Plaintiffs Bruce Charles Ryan, Russell William Newton, Robert Fitzpatrick, and Merit Capital Associates, Inc. (the "Plaintiffs"), dated February 17, 2004 (the "Opposition," "Opp."). This Court should dismiss Plaintiffs' Amended Complaint ("Amend. Compl.") because National Union has fully performed its contractual obligations, and for the reasons set forth more fully below.

**I.  NATIONAL UNION HAS PERFORMED UNDER THE POLICY AND OWE NO FURTHER DUTY TO PLAINTIFFS**

Fed. R. Civ. P. 12(b)(6) was adopted to deal with cases just like this. Plaintiffs assert that they allege "proper contract and tort claims . . . and that [their] damages result proximately from [National Union's alleged] improper conduct." Opp. at 11. On the contrary,

Plaintiffs merely complain of collateral effects from Michael Sowell's securities fraud claims against them and the resulting NASD arbitration that are not attributable to National Union, Plaintiffs' insurer. Plaintiffs therefore state no claim for which relief may be granted.

Plaintiffs purchased an insurance policy, the contract at issue, to protect themselves against certain potential liabilities, but excluding liabilities related to discretionary accounts. *See* Securities Broker/Dealer's Professional Liability Insurance Policy, No. 473-36-20, attached to Plaintiffs' Motion to Dismiss as Exhibit A (the "Policy"). The Policy obligated National Union to defend Plaintiffs against covered claims, and in the event Plaintiffs were found liable for any such claims, National Union was obligated to pay up to $1 million for covered liabilities. In accord with those obligations, National Union paid a settlement substantially less than the NASD arbitration award and the award was vacated. *See* Opp. at 9. National Union's settlement extinguished Plaintiffs' liability to their client, Sowell, and therefore it should extinguish National Union's liability to Plaintiffs. National Union has not failed to fully pay or satisfy a single fee, expense, bill, invoice, or claim submitted to National Union. There can be no doubt that National Union fully met its obligations.

Plaintiffs received the entire benefit of their bargain, but they would have preferred if National Union had done it differently. Plaintiffs would have this Court scrutinize the details of an insurer's obligations to its insureds even though any liability against the insured is extinguished. Under such a regime, every act in performance of a contract could be subject to subjective and qualitative reevaluation *ex post* even though the parties have fully and materially performed. As National Union demonstrated in its Motion to Dismiss, Connecticut courts have been clear that they will not second guess insurers' reasonable actions in settling claims. *See* Motion to Dismiss at 16; *see also, e.g., Knudsen v. Hartford Accident & Indem. Co.*, 26

{00067903; 4; 0040-3}

Conn.Supp. 325, 327 (1966) ("[t]he mere fact that the case could have been, but was not, settled within policy limits would not impose liability on the defendant . . . . [Otherwise,] [n]o one would dare defend.") (overruling demurrer on other grounds).

Plaintiffs complain, furthermore, that National Union should have settled this case sooner than it did, and cite alleged opportunities to settle Sowell's claims for less than the policy limits. *See* Opp. at 8. The exact time and manner in which National Union actually settled is immaterial. Whether Sowell's case could have been settled earlier or later or for less, Plaintiffs stand in same position as they would have if the case was settled at a different time and for a different amount; they owe nothing to Sowell. Plaintiffs appear to be confident, however, that they "will prove at trial that they did nothing wrong and were only found liable in the arbitration as a result of" National Union's conduct of their defense. Opp. at 22. If Plaintiffs are confident they did nothing wrong, it is not clear why Plaintiffs demanded over and over again that National Union settle in advance, during and after the NASD arbitration, or how they can allege National Union breached a duty to settle sooner.

## II.   PLAINTIFFS FAIL TO PROPERLY ALLEGE BAD FAITH

Plaintiffs' bad faith allegations are utterly deficient. Plaintiffs accurately cite the standard for a Fed. R. Civ. P. 12(b)(6) motion to dismiss: "the Court accepts as true all *factual* allegations in the complaint and draws inferences from these allegations in the light most favorable to the plaintiff." Opp. at 2 (internal citations omitted) (emphasis added). The key word in this standard is *factual*, and real substantive facts are what is missing. To plead bad faith, Plaintiffs appear to agree that the following facts must be pled:

> a design to mislead or deceive one another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive . . . . [or]

-3-

> dishonest purpose . . . . Bad faith is not simply bad
> judgment or negligence, but rather . . . moral obliquity . . .

*Tarabek v. Hartford Ins. Co.*, No. 561153, 2002 WL 31172957, at * 2 (Conn. Super. Ct. Aug. 26, 2002). *See* Opp. at 13 (quoting similar language). Bad faith is a weighty charge, and Connecticut courts have cautioned that plaintiffs must allege sufficient facts to support such a claim. *See* Motion to Dismiss at 13 – 14. *See also, e.g., Ryan v. Allstate Indem. Co.*, No. CV950142573, 1998 WL 689767, at * 3 (Conn. Super. Ct. Sept. 22, 1998) (striking bad faith claim because it "merely concludes that '[t]he defendant . . . has acted in bad faith, and with a dishonest purpose,' without alleging facts to support that conclusion.").

In a vain attempt to show that their allegations pass muster, Plaintiffs quote their allegations in their Opposition, but a close inspection of the language actually proves National Union's point: these are conclusory allegations completely devoid of substantive facts of bad faith. *See* Opp. at 14. Plaintiffs allege that National Union "fail[ed] to defend," "fail[ed] to indemnify," and "refus[ed] to mediate." *Id.* These allegations are of course untrue, as National Union has fully performed under the Policy. But even if, *arguendo*, National Union did fail to defend, indemnify or mediate, such allegations do not state a claim for bad faith. Such allegations may show that National Union changed its mind, that there was a difference of opinion as to coverage, and at worst a mistake was made, but there are no facts of bad faith.

Plaintiffs go on to chant the magic words of bad faith as if they had some talismanic significance: "the . . . conduct of Defendants . . . was based on an evil motive and an intent to harm or disadvantage the Plaintiffs for . . . monetary gain." *Id.* They also claim that National Union acted in "conscious and willful disregard of the Plaintiffs' interests." *Id.* This just is not enough; Plaintiffs cannot just slap the bad faith label on innocuous facts that do not suggest anything more than a change of mind or a difference of opinion as to coverage. Yet this

-4-

is precisely what Plaintiffs ask the Court to accept here. Plaintiffs do not offer any substantive factual allegations regarding the "evil motive" or facts suggesting "intent to harm or disadvantage." They do not allege facts that would suggest that National Union had any animus towards its Plaintiff insureds, nor any reason to try to harm or disadvantage them. Nor are there any allegations to suggest "conscious and willful disregard" of Plaintiffs' business or reputation. Plaintiffs give no reason why National Union would have such intentions against Plaintiffs, its customers, except for the unremarkable allegation that National Union pursued "monetary gain." *Cf. In re Loral Space & Comm. Ltd. Sec. Litig.*, No. 01 Civ. 4388 (JGK), 2004 WL 376442, at * 6 (S.D.N.Y. Feb. 27, 2004) (generalized allegations of profit motive are insufficient to establish scienter in securities fraud context because such motives "could be imputed to any publicly-owned, for-profit endeavor") (internal citations omitted).

To the extent Plaintiffs do allege facts, Plaintiffs' allegations boil down to these essential facts: National Union suspended coverage and discontinued payment of Plaintiffs' defense against Sowell's claims during 2002, after initially providing coverage and later resuming the defense. *See* Opp. at 7. National Union does not dispute these facts for the purposes of this motion. But Plaintiffs characterization of the suspension as driven by "bad faith," "evil motive" and an "intent to harm or disadvantage" the Plaintiffs is not supported by the facts alleged. *See* Opp. at 12, 14. National Union's decision to defend Plaintiffs at first, after they submitted the Sowell claim to National Union, was actually made with the utmost *good faith*. National Union, in an abundance of caution and with concern for Plaintiffs' potential exposure, decided to defend Plaintiffs while they conducted their investigation. National Union had no duty under the Policy to provide a defense that it did not believe was warranted, but National Union went the proverbial extra mile to protect Plaintiffs. Contrary to Plaintiffs'

{00067903; 4; 0040-3}

assertions, National Union's initial defense was not an admission of coverage, but rather a thoughtful, precautionary measure to ensure that Plaintiffs were defended from potential liability while National Union analyzed Sowell's claims. To decry such acts as bad faith is absurd.

After reviewing the allegations of the Sowell Complaint that his account was discretionary, seeking information and documents to determine whether coverage was warranted, and finding no credible facts that the account was not discretionary, National Union determined in good faith that Sowell's claims were not covered. Plaintiffs claim that they "supplied information" that the power of attorney was not discretionary, with scant details. *See* Opp. at 7. Plaintiffs assert only that they supplied National Union with an unnotarized copy of the power of attorney. Amend. Compl. at 42. This Court should not permit Plaintiffs to pass off an unnotarized copy of the power of attorney as conclusive evidence that the account was not discretionary. Plaintiffs also rely upon the representations in an October 24, 2002 letter from Sowell's lawyer—who had an obvious interest for National Union to provide coverage under the Policy—that the account was not discretionary. *See* Amend. Compl. at 50. But if indeed Sowell's position changed so dramatically, Plaintiffs do not allege that Sowell's lawyer amended Sowell's complaint to reflect this change in advance of the arbitration hearing, which did not commence until months later on January 7, 2003. *See* Opp. at 8. Plaintiffs pervert what was essentially an honest difference of opinion over coverage, and at worst a mistake, into allegations that National Union acted with the kind of "willful disregard" of Plaintiffs' interest that sink to the level of bad faith.

Plaintiffs claim that as a result of the suspension of coverage they suffered largely unspecified damages that can be summarized as follows:

> (1) that they face unspecified "regulatory investigations as a result of" the NASD arbitration award (Opp. at 10);

(2) that they have suffered unspecified harm to Plaintiffs' "licensing in the securities industry," their "reputation and business," and "present and future earnings" (Opp. at 10);

(3) that the quality of David and Raquel Gwynn's legal representation was deficient and that Gwynn had to represent them (*see* Opp. at 8).

Such alleged harm cannot be charged to National Union, however, because:

(1) Plaintiffs have not alleged a single fact in any of their pleadings or submissions describing the nature of the regulatory investigations they face, or that such investigations are related to Sowell's claims. NASD Rule 3070 requires that Plaintiffs and Gwynn report that Sowell sued them. NASD Rule 3070, NASD Manual, *available at* *http://cchwallstreet.com/NASD*.[1] Plaintiffs cannot blame National Union for such disclosures, as National Union did not even know of Sowell's claim until Plaintiffs provided it to National Union. Further, the NASD website provides registration data for Merit Capital Management, Inc., of Westport, Connecticut, doing business as Source Capital Management, whose "control persons" are listed as Plaintiffs Ryan and Newton. Form ADV, Uniform Application for Investment Adviser Registration, *available at http://adviserinfo.sec.gov*. This form asks: "[H]ave you, any *advisory affiliate*, or any *management person* been the subject of, an arbitration claim alleging damages in excess of $2,500, involving any of the following: (1) any investment or an *investment-related* business or activity? . . . . 5) dishonest, unfair, or unethical practices?" *Id.* at Part IA, Disciplinary Information.

(2) Plaintiffs do not specify the harm that they have allegedly suffered to their business, reputation and licensing, nor do they allege why National Union should be responsible

---

[1] NASD Rule 3070 provides in pertinent part: "Each member shall promptly report . . . whenever such member . . . (2) is the subject of any written customer complaint . . . ; (3) is named as a defendant or respondent in any proceeding brought by a regulatory . . . body . . . ."

for that harm. Contrary to Plaintiffs assertions, there is nothing inappropriate or "wholly improper" in National Union's argument *that it was Plaintiffs' own conduct, and not National Union's conduct, that is the proximate cause of their alleged damages.* Nowhere in their Amended Complaint and their submissions to this Court do Plaintiffs deny a single factual allegation of the Sowell Complaint or the NASD award.

(3) Finally, if Plaintiffs were unsatisfied with Gwynn's defense, they should have provided counsel on his behalf and hired the expert counsel they allege he lacked (*see* Opp. at 7). Plaintiffs themselves were represented by counsel throughout the arbitration (*see* Amend. Compl. at ¶ 60). Gwynn worked for Plaintiffs from at least 1998 through February, 2004 (according to the NASD website). *See* Amend. Compl. at ¶ 13; NASD Broker Check, *available at http://pdpi.nasdr.com/PDPI.* The NASD arbitration award found that while working for Plaintiffs, Gwynn made approximately 1,600 trades over 37 months and 80% of Gwynn's gross income was derived from Sowell. *See* Motion to Dismiss, Ex. C at 7. Plaintiffs knew they could face vicarious liability for Gwynn's misconduct. Still, with Gwynn allegedly floundering in his own defense and allegedly causing harm to Plaintiffs' defense—and their business and reputation allegedly at risk—Plaintiffs do not allege they did anything to mitigate their alleged damages.

Further, Plaintiffs should direct their alleged complaints about Gwynn's counsel to the law firm that represented him. National Union retained qualified legal counsel by hiring the law firm of Mariscal, Weeks, McIntyre & Friedlander, P.A., of Phoenix, AZ. *See* Amend. Compl. at 7. Plaintiffs do not allege that National Union assigned Gwynn's lawyer to him, or that Mariscal Weeks was not licensed or disqualified from practicing before the NASD, or that Plaintiffs ever complained about Gwynn's counsel during the arbitration.

{00067903; 4; 0040-3}

## III. PLAINTIFFS' CUTPA CLAIM IS BASELESS

Plaintiffs' CUTPA allegations plead legal conclusions, not facts. Plaintiffs allege that the "conduct of AIGTS and National Union constitutes intentional or wanton violations of the rights of [Plaintiffs] . . . with reckless indifference to those rights." Opp. at 22. Plaintiffs do not explain how National Union's defense of Plaintiffs in the NASD arbitration, and its temporary suspension of coverage, constitute unfair trade practices of such an extreme degree. Plaintiffs again recite severe words like "wanton" and "reckless indifference" as if they have some magical power to give rise to unfair trade practices. Webster's II New College Dictionary defines wanton as "1. Immoral or promiscuous . . . . 2. a. Cruel and merciless. b. Marked by malicious cruelty." WEBSTERS II NEW COLLEGE DICTIONARY (1st ed. 1995). Plaintiffs allege no facts to suggest that National Union was somehow cruel, merciless or malicious. Further, Plaintiffs do not allege how National Union's good faith conduct in initially providing a defense, later relying on Sowell's complaint to suspend coverage, and then resuming coverage rises to the level of "reckless indifference." Such conduct actually demonstrates National Union's concern regarding Plaintiffs' defense. Upon suspending coverage, National Union requested further information; later, upon receipt of new information supporting Plaintiffs' claim of coverage, National Union resumed its defense within days. Amend. Compl. at ¶¶ 56, 64.

## IV. THIS ACTION CONTINUES BECAUSE PLAINTIFFS INDICATE NO WILLINGNESS TO RESOLVE THIS DISPUTE

Plaintiffs repeatedly claim that National Union "continued to ignore reasonable settlement overtures." Opp. at 19. It is Plaintiffs, however, who now continue to ignore National Union's attempts to resolve this dispute. National Union's payment of $1 million to settle and vacate the NASD arbitration award was conducted with Plaintiffs' full participation; they evaluated and approved every step, and every document, in the settlement process. It is

{00067903; 4; 0040-3}

simply implausible to suggest that National Union ignored or refused to talk to Plaintiffs while settling Sowell's claim with their participation. The Policy provides that claims under the policy must be submitted to National Union in writing. Policy at ¶ 8. After all this time, Plaintiffs do not allege that they have presented any legal bill, invoices detailing any costs or expenses connected to the Sowell litigation, or any other written statement seeking reimbursement that has not been paid in full.

## CONCLUSION

After stripping away Plaintiffs' conclusory allegations, it becomes clear why Plaintiffs continue to hide behind their thinly constructed veneer of bad faith: they seek punitive damages. Plaintiffs hope their CUTPA claim will stick, and they might seek punitive damages that would turn their lack of actionable damages into a windfall. Plaintiffs seek to recoup their business losses as a result of their misconduct in handling Sowell's account. This Court should not permit Plaintiffs to use this Court to generate revenue and recoup losses, especially when National Union has already paid. For this and the other foregoing reasons, the Court should grant Defendants' Motion to Dismiss the Amended Complaint.

DEFENDANTS NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A. and AIG TECHNICAL SERVICES, INC.

By: _____
James R. Hawkins, II (ct00128)
Finn Dixon & Herling LLP
One Landmark Square, Suite 1400
Stamford, CT 06901-2689
Tel: (203) 325-5000
Fax: (203) 348-5777
Email: jhawkins@fdh.com

-10-

CERTIFICATION

I hereby certify that a true and correct copy of the foregoing was mailed, United States mail, first class, postage prepaid to the following on this the 26th day of April, 2004:

Mario DiNatale, Esq.
Silver, Golub and Teitell
184 Atlantic Street
P.O. Box 389
Stamford, CT 06904

Peter M. Nolin, Esq.
Sandak Hennessey & Greco
970 Summer Street
Stamford, CT 06905

_____
James R. Hawkins II

{00067903; 4; 0040-3}