

FILED

2004 APR 13  A 9: 30

U.S. DISTRICT COURT
HARTFORD, CT.

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID W. GWYNN, RAQUEL GWYNN AND GWYNN FINANCIAL SERVICES, INC. | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) CIVIL ACTION NO. ) 3:03 CV 01154 (CFD) ) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., | ) ) ) ) |
| Defendants | ) ) |
| | ) APRIL 12, 2004 |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

### INTRODUCTION

Plaintiffs David W. Gwynn, Raquel Gwynn, and Gwynn Financial Services, Inc.

(collectively, "the Gwynn plaintiffs"or "plaintiffs") respectfully submit this memorandum of law

in opposition to the January 27, 2004 Motion to Dismiss the Amended Complaint and

accompanying memorandum of law submitted by defendants National Union Fire Insurance

Company of Pittsburgh, PA ("NU") and AIG Technical Services Inc. ("AIGTS") (collectively,

"defendants").

Plaintiffs filed an Amended Complaint which properly pleads all the necessary elements of the six causes of action listed therein. The defendants undoubtedly recognize this. Their Memorandum of Law inaccurately characterizes or conveniently ignores the nature and allegations of the Amended Complaint, and presents a host of factual and legal arguments that are neither reasonable nor persuasive, and not appropriate to a Motion to Dismiss.

Thus, the defendants have failed to sustain their burden pursuant to Fed. R. Civ. P. 12(b)(6), and their Motion should be denied.

## FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT

The Gwynn plaintiffs filed their six-count Amended Complaint on September 29, 2003. It alleges specific, detailed allegations of the defendants' legal and contractual obligations to the Gwynn plaintiffs, and the defendants' bad faith breaches of those duties. [1]

The Gwynn plaintiffs have alleged that they were insured under a policy of insurance provided by NU and that the defendants failed to defend, failed to properly defend, and failed to indemnify the Gwynn plaintiffs and their co-plaintiffs, with the result that an award in excess of

---

[1] This matter has been consolidated with an action filed by Merit Capitol Associates, Inc. ("Merit"), Bruce C. Ryan, Russell W. Newton and Robert Fitzpatrick (hereafter collectively, "the Merit plaintiffs" or "co-plaintiffs"). Counsel to the Merit Plaintiffs filed a memorandum in opposition to defendants' motion on February 17, 2004. The Gwynn plaintiffs adopt all the arguments contained in co-plaintiff's memorandum.

policy limits entered in a National Association of Securities Dealers ("NASD") arbitration proceeding. The plaintiffs have alleged that the conduct of the defendants in breaching their contractual obligations constituted bad faith and a violation of CUTPA, and that all plaintiffs have suffered damages as a result of the contractual breaches, bad faith, and violations of CUTPA committed by the defendants' conduct, despite the fact that the defendants eventually paid the underlying claimant to settle the arbitration award before it became an enforceable state court judgment. They also claim the intentional and negligent infliction of emotional distress.

David and Raquel Gwynn are married, and are residents of Arizona. David Gwynn was a Certified Financial Planner designee, and a securities broker/dealer, registered with the NASD. He was also a principal of plaintiff Gwynn Financial Services, Inc. ("GFS"), a corporation with its principal place of business in Arizona. Raquel Gwynn was a schoolteacher. David Gwynn served as Merit's registered representative in Arizona. AC at ¶¶ 2, 8, 10.[2]

National Union insured Merit under a policy of insurance which included David Gwynn as an insured because of his status as Merit's "Registered Representative". David Gwynn paid a portion of the premium for this policy. AC at ¶¶ 12-14.

On or about September 4, 2001, Michael Sowell, a resident of Arizona, commenced an

---

[2]References in from the "AC at ¶___" are to the plaintiffs' September 29, 2003 Amended Complaint.

arbitration with the NASD by filing a Statement of Claim. He asserted claims against the Gwynn plaintiffs as well as the Merit plaintiffs concerning his account with Merit, as well as loans he made to companies in which David Gwynn was involved. AC at ¶¶ 25-26.

By September 21, 2001, the Gwynn plaintiffs had provided NU with notice of this claim, which included an allegation that one of Sowell's accounts with Merit was a "discretionary" account. Nonetheless, NU acted by and through AIGTS to provide a defense to the plaintiffs. See Merit plaintiffs' Amended Complaint at ¶ 36. In October 2001, AIGTS retained the Arizona firms of Mariscal, Weeks, McIntyre & Friedlander, P.A. ("Mariscal, Weeks") to represent the Gwynn plaintiffs, and Renaud, Cook & Drury, P.A. ("Renaud, Cook") to represent the Merit plaintiffs.[3] AC at ¶¶ 27-30.

The Gwynn plaintiffs and the Merit plaintiffs fully cooperated with AIGTS and retained counsel, and provided all information requested. This included evidence that there had never been trading by Sowell in a discretionary account. In particular, by November 2001, the defendants were given a copy of a power of attorney which had never been used and had not been notarized, and thus, was not effective under Arizona law. AC at ¶¶ 32-34.

---

[3]The NASD had no jurisdiction over Raquel Gwynn, as she was a schoolteacher who was not a registered broker/dealer, nor had any association with a broker/dealer. Nonetheless, Mariscal, Weeks entered an appearance on behalf of Raquel Gwynn, thereby consenting to and creating jurisdiction over her. AC at ¶¶ 30-31.

In early 2002, the defendants advised the Gwynn and Merit plaintiffs that *based on the power of attorney*, AIGTS had determined that the account was discretionary, and that the defendants would deny both their coverage and defense obligations under the policy. Thereafter, AIGTS notified Mariscal, Weeks and Renaud, Cook that it would no longer pay for the defense of Sowell's claims. Mariscal, Weeks withdrew from their representation of the Gwynn plaintiffs on March 4, 2002. AC at ¶¶ 35-38.

Plaintiffs thereafter paid Mariscal, Weeks from their own funds, and Mariscal, Weeks reappeared in defense of the claims on or about May 13, 2002. However, plaintiffs lacked the financial ability to continue to pay legal fees, and as a result, Mariscal, Weeks, again withdrew from the NASD proceedings on or about September 9, 2002.[4] AC at ¶¶ 39-40.

By letter dated October 24, 2002, *Sowell's counsel* advised Gwynn, Merit's counsel and Brian T. Conlin ("Conlin"), the claims analyst for AIGTS, that Sowell had acknowledged in writing to Merit, after he had signed the power of attorney, that his Merit account was not governed by a power of attorney to anyone.[5] That same letter made a "policy limits demand" to

---

[4]The Gwynn plaintiffs were never reimbursed for the legal fees they incurred. This amount remains one of their damages claims against defendants.

[5]The arbitration was initially scheduled to commence on October 15, 2002, but was continued at David Gwynn's request to January 7, 2003, because he was unable to afford counsel. Mr. Gwynn incurred a fee of $1,200 to postpone the arbitration, which was not reimbursed. It is now part of his damages claim. AC at ¶43.

settle the arbitration and advised that Sowell would seek damages in excess of the policy limits. Nonetheless, despite receipt of this letter, the defendants failed to resume the plaintiffs' defense, or to negotiate with Sowell's counsel, who, upon information and belief, would have accepted settlement in an amount of less than $500,000, or half of the policy limits. AC at ¶¶ 44-46.

In December 2002, David Gwynn sought a further postponement of the hearing on Sowell's claims, based on his inability to afford counsel. The request was denied by the arbitration panel, leaving the hearing scheduled to proceed on January 7, 2003. AC at ¶¶ 48-49

Gwynn retained Attorney John Nicgorski to represent him in negotiating with AIGTS concerning policy coverage issues. AC at ¶ 50. On January 3, 2003, Attorney Nicgorski advised the defendants of the various facts in the record which established that Sowell's account had not been discretionary, that the power of attorney had been revoked, and that Sowell retained all discretion over all of his accounts with Merit. He also demanded that they resume the plaintiffs' defense and settle Sowell's claim within the policy limits. On January 6, 2003, Conlin acknowledged receipt of this letter and indicated that AIGTS would evaluate the information contained therein. AC at ¶¶ 51-52. However the Gwynn plaintiffs proceeded to the commencement of the arbitration hearing on January 7, 2003. AC at ¶ 54.

As a result of the defendants' refusal to tender a defense, David Gwynn, who had no legal training or experience, was compelled to attempt to represent himself against Sowell's

6

experienced trial counsel. Moreover, Raquel Gwynn was unrepresented at the arbitration hearing. Because Gwynn was not a lawyer, he was unable to prepare a competent defense. For example, he was limited in his ability to offer documentary evidence at the hearing; was admonished by the arbitration panel for presenting an opening statement that was improper in form; lacked the experience to prepare for and understand how to respond to his examination by Sowell's counsel; and was unable to effectively cross examine witnesses or present witnesses on his own behalf. Moreover he could not afford to retain an expert witness to present his position, or to rebut the testimony of the expert witness retained by Sowell. AC at ¶¶ 55-56, 59.

On January 10, 2003, after 3 full days of testimony at the arbitration, and after Sowell's counsel had concluded his extensive examination of Gwynn and the Merit plaintiffs, AIGTS acknowledged a duty to defend and agreed to resume a defense based on the evidence that Sowell never had a discretionary account at Merit, and that his power of attorney had not been used and was not operative under Arizona law. On January 10, 2003, AIGTS retained attorney Maxine Polomski of Mariscal, Weeks to represent the Gwynn plaintiffs. AC at ¶¶ 60-1.

By letter dated January 10, 2003 Sowell's attorney confirmed that "Sowell's account was not a discretionary trading account." Sowell's counsel also noted therein that:

> Based on the evidence summarized below, we strongly believe that [Gwynn] faces an adverse judgment in the case that exceeds policy limits, which we understand to be $1 million. We further believe that AIG's refusal to provide him a defense

plays a role in that exposure.

Sowell's counsel ended with a formal demand to settle the proceeding for $950,000, and warned that "should AIG continue to refuse to settle within policy limits, it continues to expose its insureds to an excess judgment." That letter was forwarded to AIGTS on or about January 11, 2003. AIGTS and National Union did not respond to Sowell's settlement overture and instead proceeded with its belated and ineffective defense of the arbitration claims. AC at ¶¶ 62-63.

Because AIGTS did not authorize Mariscal, Weeks to resume the defense of Sowell's claims until three days of testimony had been taken, attorney Polomski was unable to adequately prepare for the continuation of the hearing on January 13, 2003 and had to rely in part on a status letter from Sowell's counsel dated January 11, 2003. In that letter, counsel to Sowell described, in detail, the evidence that had been adduced at the hearing, as well as the likelihood that said evidence would result in the arbitrators rendering an award in excess of the policy limits. It further advised that AIG's failure to provide Gwynn with a defense caused him "substantial prejudice," and expressed "concern" for "the significant emotional stress Mr. Gwynn seemed to be under as he attempted to represent himself at the hearing." AC at ¶¶ 64-65. [6]

---

[6]Attorney Polomski had minimal arbitration and trial experience. Although other, more experienced attorneys practiced at Mariscal, Weeks, Attorney Polomski was retained by AIGTS primarily because of her low billing rate. AC at ¶ 66.

8

Because of AIGTS' belated decision to resume the defense of the Sowell arbitration, the Gwynn plaintiffs did not have adequate opportunity to retain an expert witness, and accordingly Sowell's expert testimony went largely unrebutted. AC at ¶ 68.

By letter dated January 16, 2003, counsel to the Merit Plaintiffs advised counsel to defendants that, prior to the commencement of the arbitration, a settlement might have been negotiated for approximately $240,000. He also pointed out that Sowell had presented evidence of damages in excess of $900,000 together with claims for interest, attorneys fees, and arbitration costs and punitive damages of $500,000, which put a potential award well in excess of the policy limit, and that he expected an award to enter against the Gwynn and Merit plaintiffs. Despite all the indications that the arbitration hearing had not gone well, AIGTS and National Union did nothing to attempt to settle the claims before an award was entered by the panel. AC at ¶¶ 70-71.

On February 25, 2003, the arbitration panel entered an award against all plaintiffs, jointly and severally, in the amount of $1,125,000. In addition, the panel found them jointly and severally liable for $17,500 in arbitration fees. AC at ¶ 72.

The defendants continued to breach their duties even after the Award entered. They refused to settle with Sowell, they failed to timely pay Merit's defense counsel and they refused to direct and control the continued defense of the Sowell matter. AC at ¶¶ 84-87. Although the policy contained an express requirement for mediation, the defendants did not respond to the

9

request for mediation made by the Merit plaintiffs on March 25, 2003. AC at ¶ 76. Accordingly the Merit plaintiffs commenced this action on April 9, 2003. The Gwynn plaintiffs commenced their action on July 2, 2003. Thereafter the defendants negotiated with and funded a settlement with Sowell in August, 2003. AC at ¶ 75. However, plaintiffs remain obligated to report the nature of the Award in various NASD filings and remain obligated to disclose the Award to various state and federal regulators. Further, they continue to be subjected to regulatory investigations as a result of the Award.

## **LEGAL ARGUMENT**

## I. **LEGAL STANDARD FOR MOTION TO DISMISS.**

In considering a Motion to Dismiss pursuant to Rule 12(b)(6), the Court should construe the Complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002) (*citing Gregory v. Daly,* 243 F.3d 687, 691 (2d Cir.2001)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir.1995) (*quoting Scheuer v. Rhodes,* 416 U.S. 232, 235-236 (1974)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or

her to relief." *Sweet v. Sheahan,* 235 F.3d 80, 83 (2d Cir.2000).

## II.    PLAINTIFFS HAVE PROPERLY PLEADED AN ARTICLE III CASE OR CONTROVERSY, AND ACCORDINGLY, THIS COURT HAS SUBJECT MATTER JURISDICTION OVER THIS CLAIM.

Defendants assert that the Complaint must be dismissed, in its entirety, because this Court

purportedly lacks subject matter jurisdiction.  This argument, however, lacks merit.

### A.  Plaintiffs' Claims are not Moot.

Defendants ask this Court to dismiss the Complaint as moot.  Specifically, they assert that

"[p]laintiffs' principal case or controversy evaporated when NU settled Sowell's claims and the

arbitration award was vacated." Memo at p. 8.[7]  This argument assumes, however, that plaintiffs'

damages claims are limited to the defendants' failure to pay Sowell the amount of the arbitration

Award.  The Complaint in this case, however, asserts much more.

Defendants' argument ignores plaintiffs' claims that their failure to properly defend is

what caused the entry of the Award in the first instance.  This, in turn, created a host of

consequences for plaintiffs, including the costs of paying for a defense which defendants would

---

[7]References in the form of "Memo at p. __" are to the defendants' January 26, 2004 Memorandum of Law.

not provide, AC at ¶ 85a. and 85b, "damage to David Gwynn's reputation and injury to his present and future earning potential," AC at ¶ 87, "severe emotional distress, severe anxiety, depression and the physical effects thereof," AC at ¶ 120, and punitive damages under CUTPA. While defendants would no doubt choose to ignore these damages, the fact remains that plaintiffs certainly have "a legally cognizable interest in the outcome" of this case. *New York City Employees' Retirement System v Dole Food Co.,* 969 F.2d 1430, 1433 (2d Cir. 1992)(internal citations omitted).

        As defendants note, "[t]he hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed." *Lebron v Armstrong,* No. 3:01 CV 241CFD, 2003 WL 22283809, at *4 (D. Conn. Sept. 29, 2002).[8] Here, however, plaintiffs seek relief which the law permits and which defendants are clearly able to provide. Accordingly, this case is not moot.

**B.  Defendants Have Failed to Show that Plaintiffs' Claims are not Ripe.**

        Defendants also assert that the Complaint should be dismissed because it is not "ripe" for review. This argument, too, is makeweight.

---

        [8]Copies of all unpublished opinions cited herein were previously included as exhibits to defendants' Memorandum.

"The basic rationale underlying the doctrine of ripeness 'is to prevent the courts, *through avoidance of premature adjudication,* from entangling themselves in *abstract disagreements'*... The doctrine turns on whether there are *nebulous future events so contingent in nature* that there is no certainty they will ever occur."  *In Re Drexel Burnham Lambert Group Inc.,* 995 F.2d 1138, 1146 (1993)(internal citations omitted) (emphasis supplied).

Defendants, however, fail to allege what the "abstract disagreement" might be between these parties.  More importantly, they have not asserted any plausible "contingent future event" that might obviate the necessity for this Court to determine these claims.

Defendants claim that, pursuant to the policy at issue, plaintiffs were obligated to provide notice of claim.  Memo at p. 10.  There is no dispute here that National Union *was* provided with notice of Sowell's claims.  Thereafter, plaintiffs allege, defendants failed to indemnify and defend.  Defendants, however, would now have this Court fashion a rule that before plaintiffs can commence a lawsuit for the damages caused by this failure, there is some *additional* notice requirement obligating them to quantify their damages.  This argument is flawed, however.  Defendants, once again, would have this Court believe that their dispute with plaintiffs is limited to the costs of defense.  However, plaintiffs' damages claims go far beyond such costs.  See p. 12, *supra.*  These damages claims are not policy claims, but rather, claims brought under applicable Connecticut law arising from the defendants' improper conduct, for which the law

13

requires no "notice" provision. These are not "abstract disagreements" between the parties but serious claims that cannot be resolved without litigation. Thus, there is no question that the issues in this case are fit for review. *In re Drexel*, 995 F. 2d at 1146.

Similarly, there would be great hardship to plaintiffs if the Court were to "withhold [its] consideration of these issues." Id. Plaintiffs have already sustained irreparable damage by defendants' conduct in the Sowell arbitration. For this Court to dismiss this action on ripeness grounds would only prolong their inability to obtain the relief to which they are entitled.

Defendants' reliance on *In re Drexel* is misplaced. The Second Circuit dismissed that case on ripeness grounds for fear that it might "inadvertently foreclose or undermine a decision properly made by the SEC...[M]ore importantly, the District Court [had] issued no order" for the Court to review. *In re Drexel*, 995 F.2d at 1146. Here, of course, there is no third party, such as the SEC, that will consider this matter. Accordingly, there is no possible chance for this Court to be acting prematurely.

In *Zamary v Allstate Insurance Company*, 1998 WL 323432, at *2 (Conn. Super. Ct. June 10, 1998), plaintiff filed a Complaint in three counts against her insurer. The first two counts were to obtain uninsured motorist benefits. The third count alleged bad faith for the insurer's refusal to settle the claim. Defendant moved to dismiss the third count as "premature as it does not accrue until the underlying issue of liability has been resolved." The Court, however, denied

14

the Motion, arguing that "liberal procedural practice should permit such a bad faith claim even though the claim for uninsured motorists benefits has not been resolved." See also, *Khanthavong v Allstate-Insurance Co.,* 18 Conn.L.Rptr. 304, 306 (Conn. Super. Ct. 1997). This case is even more compelling. The claims in the Sowell arbitration have now been resolved. The claims presented herein, which are based on the defendants' bad faith breaches of their duties to defend and indemnify in connection with that claim, are ripe for review.

## III    PLAINTIFFS HAVE PROPERLY PLEADED BAD FAITH

Defendants concede that Connecticut law imposed upon them the duty to act in good faith when investigating Sowell's claims. Nonetheless, they ask the Court to dismiss the plaintiffs' allegations of bad faith in this case for several reasons, all of which lack merit.

Defendants assert that the Amended Complaint contains nothing more than bald conclusions unsupported by specific factual allegations. Thus, they treat this Complaint as though plaintiffs alleged nothing more than a failure to promptly pay a disputed claim. They also repeat their previous argument that by settling Sowell's claims, defendants extinguished any rights plaintiffs have to bring this claim, thereby rendering this case moot.

Defendants, however, are mistaken. The factual allegations in this Complaint more than suffice to properly plead bad faith.

15

### A.  Connecticut Law Creates a Duty for Defendant Insurers to act in Good Faith.

Connecticut courts have consistently found that all insurance contracts include an implied

covenant of good faith and fair dealing.  See, e.g., *Buckman v People Express, Inc.,* 205 Conn.

166, 170 (1987).  Thus, "[w]hen the insurer unreasonably and in bad faith withholds payment of

the claim of its insured, it is subject to liability in tort." *L.F. Pace and Sons, Inc. v Travelers*

*Indemnity Co.,* 9 Conn. App. 30, 46, cert. denied, 201 Conn. 811 (1986).

The duty of good faith has been defined as:

> an attitude or state of mind denoting honesty of purpose, freedom from intention to
> defraud and generally speaking means faith to one's duty or obligation... [b]ad faith is...
> the opposite of good faith, generally implying a... neglect or refusal to fulfill some duty or
> some contractual obligation not prompted by an honest mistake as to one's rights or
> duties.

*Buckman, supra.,* 205 Conn. at 171 (internal quotation marks omitted).   "[T]he examination of

good faith and fair dealing in the settling of an insurance claim requires a case-by-case analysis."

*Verrastro v Middlesex Insurance Co.,* 207 Conn. 179, 190 (1988).


### B.  Plaintiffs Have Properly Pleaded Bad Faith in Their Amended Complaint.

The defendants incorrectly categorize plaintiffs' bad faith claims as nothing more than a

failure to take advantage of settlement opportunities, or to settle Sowell's claims more promptly.

Indeed, defendants *must* misconstrue plaintiffs' claims in this fashion in order for their Motion to

16

Dismiss to have any hope of succeeding. A fair reading of the Amended Complaint, however, illustrates that plaintiffs' allegations of bad faith go well beyond a mere failure to settle.

Thus, plaintiffs allege that they promptly advised NU of Sowell's claims. The Complaint included an allegation of discretionary trading. Thereafter, notwithstanding this allegation - an allegation which defendants now claim sufficed in and of itself to deny coverage-defendants retained Mariscal, Weeks to represent the Gwynn plaintiffs. AC at ¶¶ 25-30.

By November 2001, plaintiffs had submitted evidence to defendants that Sowell's allegations of trading in a discretionary account were unfounded; specifically, they were provided with a copy of the power of attorney which was not notarized, and had never been used, and thus, not effective under Arizona law. In early 2002, *based on the very documents plaintiffs submitted to defendants demonstrating that Sowell's claim lacked merit,* the defendants advised plaintiffs that they had determined that the account was discretionary, and would accordingly deny both their coverage and defense obligations under the policy. AC at ¶¶ 32-38.

By letter dated October 24, 2002, more than two months before the arbitration was scheduled to commence, *Sowell's counsel* advised AIGTS' claims analyst that Sowell had acknowledged that his account with Merit was not governed by a power of attorney to anyone. In that same letter, counsel made a policy limits demand, and warned that Sowell would seek an award in excess of policy limits at the arbitration. AC at ¶¶ 44-48. Nonetheless, AIGTS refused

to negotiate with Sowell's counsel at that time, or to resume the defense of the claim.

It was not until January 10, 2003, after three full days of testimony, that defendants resumed the defense of these claims. By then the damage had been done. Even then, however, plaintiffs allege that they retained inexperienced counsel to represent the Gwynn plaintiffs, instead of more experienced counsel at the same firm. AC at ¶¶ 60-61, 66.

Plaintiffs further allege that defendants permitted the arbitrators to enter an Award, rather than negotiate in good faith after the hearing. And further, even *after* the Award was entered, defendants did not negotiate until the eve of a hearing to confirm the arbitration Award.

Finally, there is no explanation or justification for defendants' failure to defend and indemnify Raquel Gwynn. She was a schoolteacher, who was never involved in the securities industry. She remained in the case for no reason other than the fact that Mariscal, Weeks entered an appearance on her behalf, thereby conferring jurisdiction. The defendants' decision to deny a defense even to her is, alone, evidence of their bad faith.

Defendants would no doubt like the Court to ignore these specific allegations of bad faith. But they are clearly wrong to assert, as they do, that "[p]laintiffs' amended complaint does not make any substantive charges of bad faith." These allegations are specific and not conclusory. They unquestionably demonstrate "a neglect or refusal to fulfill" defendants' contractual

obligations to plaintiffs "not prompted by an honest mistake." *Buckman,* 205 Conn. at 271.[9]

### C. Defendants' Subsequent Payment of Sowell's Claims Extinguish the Bad Faith Claim.

Defendants also reprise claims that were previously addressed, namely, that by settling

with Sowell, however belatedly, it has given plaintiffs all the rights to which they are entitled

---

[9]Defendants cite to numerous cases where courts have dismissed bad faith claims. Memo at pp. 12-14. These cases are all readily distinguishable, however, as they involve nothing more than allegations of disputes or disagreements with insurance carriers that do not rise to the level of bad faith. *Stevens v Allstate Insurance,* 2002 WL 237330 (Conn. Super. Ct. Jan. 24, 2002) alleged the failure to promptly pay property damage after a tree fell on plaintiff's property; *Tarabek v Hartford Insurance Co.,* 2002 WL 31172957 (Conn. Super. Ct. Aug. 26, 2002) alleged a six month delay in processing a claim in an uninsured motorist case; *Liquore v Assurance Company of America,* 2002 WL 521334 (Conn. Super. Ct. March 19, 2002) was a case where defendants denied plaintiff's claims under the policy and did not act with "reasonable promptness." In *Ryan v Allstate Indemnity Co.,* 1998 WL 689767 (Conn. Super. Ct. Sept. 22, 1998) the Court granted a motion to strike a bad faith claim seeking uninsured motorist benefits where the plaintiff alleged nothing more than defendant's refusal to pay plaintiff's claims under the policy; in *Corriveau v Aetna Casualty & Surety Co.,* 1996 WL 156109 (Conn. Super. Ct. March 15, 1996), the Court granted summary judgment in a property damage case where defendant disputed the amount of plaintiff's loss and plaintiff failed to allege facts from which it could be inferred that defendant acted in bad faith; in *Janicki v Massachusetts Casualty Insurance Co.,* 1996 WL 694590 (Conn. Super. Ct. Nov. 15, 1996), the Court struck a bad faith claim from a Complaint alleging wrongful termination of disability benefits, where plaintiff merely alleged that defendant denied a claim for benefits without any factual allegations demonstrating bad faith; *Waugh v Nationwide Mutual Insurance Co.,* 1995 WL 9481 (Conn. Super. Ct. Jan. 5 1995) was a case where the only allegation of defendant's bad faith was its "refusal to pay policy limits" in an underinsured motorist case. None of these cases even approach the level of specific facts pleaded in this case to demonstrate defendant's bad faith. Nor do they accuse defendants of the type of misconduct alleged herein.

19

under the terms of the insurance contract. In other words, despite their continued bad faith in handling these claims, defendants continue to allege that plaintiffs have not been damaged.[10]

Defendants' argument is simply not supported by law or logic. If carried to its logical conclusion, there would never be a cause of action for bad faith. A defendant could act in bad faith for months or years in handling a claim, completely ignore the effect this would have on its insureds, and then absolve itself of any bad faith claim by paying the disputed claim after its insureds sued to protect their rights. That, of course, is precisely what happened here. The original Complaint in this case was filed on July 2, 2003, only after the arbitration Award had entered, defendants continued to refuse to negotiate, and Sowell's counsel began a suit in the state courts of Arizona to enforce the award. Surely, defendants' bad faith up to that point is actionable because defendants "unreasonably and in bad faith [withheld] payment of the claim of its insureds." *L.F. Pace and Sons,* 9 Conn. App. at 46.

Finally, defendants' arguments assume that plaintiffs' damages are limited to compensating Sowell for the arbitrators' Award. However, plaintiffs' damages are separate and distinct from the actual monies received by Sowell. See p. 21. supra. Defendants have provided no support for the notion that plaintiffs are not entitled to compensation for these injuries.

---

[10]To support this theory, they cite to cases from other jurisdictions, and one Connecticut Superior Court case that is not on point. Counsel to co-plaintiffs sufficiently distinguished these cases, at pp. 14-15 of their Memorandum, and those arguments will not be repeated here.

## IV.   PLAINTIFFS HAVE PROPERLY PLEADED THE DEFENDANTS' BREACH OF THEIR DUTY TO DEFEND.

### A.  Defendants Improperly Violated their Obligation to Defend Plaintiffs.

The defendants correctly cite to the applicable law in Connecticut: the insurers'

obligation to defend depends on the allegations of the Complaint against its insureds.  Those

cases, however, involve instances in which the defendant insurance companies promptly declined

to defend from the outset.  Thus, in *Springdale Donuts, Inc. v Aetna Casualty & Surety Co.*, 247

Conn. 801, 804 (1999), plaintiff was sued by former employees who alleged sexual harassment.

When plaintiff provided defendant insurer with notice of these claims, defendant denied

coverage, and refused to indemnify or defend plaintiff on the grounds that the policy at issue

specifically excluded coverage for claims of that type.   Similarly, in *Schillberg Integrated*

*Metals Corp. v Continental Casualty Co.*, 263 Conn. 245, 248 (2003), the defendant insurer

refused to provide coverage for claims made by a Pennsylvania regulatory agency which fell

beyond the policy provisions.  In each of these cases the critical element is the *prompt*

notification to the insured of the refusal to defend or indemnify from the outset of the claim.

Defendants here, of course, acted in precisely the opposite fashion.  They claim that

Sowell's allegation of trading in a discretionary account is not covered by the policy.

Theoretically, if defendants' argument is correct, they could have and should have notified

21

plaintiffs of their decision to decline coverage. Instead, they provided a defense, retained counsel, and began their investigation of Sowell's claims.

Plaintiffs relied on the insurers' decision to provide coverage and cooperated with counsel. By no later than November 2001, defendants were provided with information and documents demonstrating that Sowell's allegations of discretionary trading were simply wrong. AC at ¶ 34. It was not until two months later that defendants notified plaintiffs that it would no longer defend or indemnify. This decision was *not* predicated on Sowell's allegations, but rather, *on AIGTS' determination that the account was discretionary.* AC at ¶ 35.

Thus, having chosen to look beyond the "four corners" of the complaint filed by Sowell to provide a defense, defendants cannot then use those allegations to justify a subsequent decision to decline to defend based on extraneous information they received from their own insureds. At that point, the failure to defend constitutes bad faith.

## B. Plaintiffs Sustained Their Burden of Proving That a Policy Exclusion Applied.

Defendants also assert that, once they determined that Sowell's claims fell outside the scope of covered acts under the policy, plaintiffs had the burden of proving an exception applied to the exclusion. They further assert that plaintiffs failed to carry their burden.

22

This claim is specious at best, and must be placed in context. Defendants apparently concede that, if plaintiffs can prove that an exception applies, defendants had the duty to defend. Defendants also apparently concede that, on January 3, 2003, they were supplied with information that Sowell's account with Merit was not discretionary, and that this constituted an exception which triggered their obligation to defend. Memo at pp. 23- 24. Defendants, however, then distort plaintiffs' allegations by suggesting that the January 3, 2003 letter was the *first* attempt by plaintiffs to show that an exception applied.

However, in October and November 2001, within months of Sowell's filing his claim, plaintiffs provided information and documentary evidence that there was no discretionary trading in this account. AC at ¶ 32-34. Thereafter, on October 24, 2002, Sowell's counsel sent a letter to AIGTS' claims analyst acknowledging that Sowell's account was not covered by a power of attorney to anyone. Id., at ¶ 44. Thus, on at least two occasions prior to January 3, 2003, plaintiffs had advised defendants of facts which defendants later conceded created an exception.

Defendants, of course, dismiss the import of these communications. They allege that the earlier communications do not "establish an exception to the policy's exclusion of discretionary accounts." Memo at p. 24. However, they do not allege any substantive difference between the earlier communications referenced above, and those on January 3, 2003, which they concede prove the existence of an exception; that is because there is no difference.

23

Even more remarkable, they dismiss the communications from Sowell's counsel as "irrelevant; Plaintiffs do not allege that *they* did anything to show an exception to the Policy exclusion until January 3, 2003." Id. (emphasis supplied). They cite to no law to support this notion. Moreover, the notion itself is ludicrous. The October 24, 2002 letter was sent to plaintiffs *and* AIGTS. Thus, defendants had knowledge of precisely the evidence plaintiffs had regarding the applicability of the exception.

Defendants go so far as to assert that "[t]he 'facts' are immaterial[.]" Memo at p. 24. Defendants are wrong, however. The facts alleged by plaintiffs clearly show that plaintiffs had supplied information to defendants to satisfy their burden. These allegations are more than sufficient to withstand a Motion to Dismiss.


**V.    PLAINTIFFS HAVE PROPERLY PLEADED DEFENDANTS' BREACH OF THEIR DUTY TO INDEMNIFY.**

The Amended Complaint alleges that defendants breached their duty to indemnify. It alleges, more specifically, that defendants "promised to pay for Loss, including damages, judgments, settlements and Defense Costs, incurred by the insureds." It further alleges that defendants breached this duty by failing to explore settlement with Sowell prior to the commencement of the arbitration, refusing to settle the claims prior to the completion of the

24

arbitration hearing, and allowing an award to enter. AC at ¶ 90- 91(a)- (c).

Defendants do not contest that there was a duty. However, they posit that the duty to indemnify is limited to the amount of any award, and apparently does not obligate them to engage in settlement negotiations short of the entry of an award.

This argument ignores the obvious. The breach of the duty to indemnify is part and parcel of the duty to defend. This is not a case where an insurer thought a claim was defensible, and prepared a vigorous and zealous defense of its insured. Under such circumstances, defendants could rightfully argue that their obligation to indemnify is limited to the amount of the award. Here, of course, defendants settled Sowell's claims only after doing nothing to defend against them and only as a result of this lawsuit. By failing to negotiate in good faith, and permitting an award to enter, plaintiffs have sustained significant collateral damages.

Defendants dismiss this claim as "nonsensical." Rather, it is the defendants' argument that must bear that description. Defendants would have this Court fashion a rule, in essence, that would permit insurers to act in bad faith by withdrawing a defense, refusing to negotiate with a claimant, ignoring clear evidence that an award in excess of policy limits was likely to enter, and thereafter absolving itself of any liability to its insureds by settling after a claim has been entered. Such a result should not be countenanced.

25

## VI.    PLAINTIFFS HAVE PROPERLY PLEADED A CAUSE OF ACTION FOR CUTPA.

Defendants ask this Court to deny plaintiffs' CUTPA claim on the basis that they have failed to make "allegations of repetitive practice" or a "general business practice." Memo at pp. 26, 27.  Defendants, however are mistaken, both with respect to the nature of plaintiffs' allegations, and the proof necessary to sustain them.

While one of the allegations of plaintiffs' CUTPA claim is the defendants' violation of CUIPA, it is not the only basis for the claim. For example, plaintiffs allege that defendants' conduct "constitute[d] unfair methods of competition and/or unfair or deceptive practices in the conduct of trade or commerce." AC at ¶ 107.  The CUTPA claim, in fact, incorporates all of plaintiffs' prior allegations of bad faith.

To establish its CUTPA claim against these defendants, the plaintiffs must allege and prove by a fair preponderance of the evidence that the defendants engaged in at least one unfair or deceptive act or practice in the conduct of their business, in violation of Conn. Gen. Stat. § 42-110b, and that as a result of such unfair or deceptive act or practice, plaintiffs suffered an "ascertainable loss of money." *See Levin v. Fireman's Fund Ins. Co.,* 2003 WL 21716465 (Conn. Super., July 7, 2003); *Francis T. Zappon Co. v. Plymouth Commons Realty Corp.,* 2004 WL 238308 (Conn. Super., Jan. 22, 2004).  The Connecticut Supreme Court has held that the

wording of CUTPA is broad enough to address a single act if the conduct otherwise meets the

requirement of what has come to be known as the "cigarette rule." See e.g., *Jacobs v. Healey*

*Ford-Suburban, Inc.,* 231 Conn. 707, 725 (1995). Here the Plaintiffs have alleged that conduct

of the NU Defendants meet all the requirements of that rule:

> (1) [W]hether the practice, without necessarily having been previously considered
> unlawful, offends public policy as it has been established by statutes, the common law, or
> otherwise-whether, in other words, it is within at least the penumbra of some common
> law, statutory, or other established concept of unfairness; (2) whether it is immoral,
> unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to
> consumers [competitors or other businessmen].
>
> All three criteria do not need to be satisfied to support a finding of unfairness. . . Thus a
> violation of CUTPA may be established by showing either an actual deceptive practice. . .
> or a practice amounting to a violation of public policy.

*Jacobs v. Healey Ford Subaru, Inc.,* 231 Conn. 707, 726 (1995) (internal citations omitted).

The plaintiffs have included as one element of their CUTPA claim that the defendants

violated public policy as stated in CUIPA. The plaintiffs acknowledge that under the current

state of the law they will have to prove that at trial that the defendants engaged in these practices

with sufficient frequency to indicate a general business practice, but for now this part of

plaintiffs' claim should be judged simply on the sufficiency of the allegations. The plaintiffs

have met this element by alleging the "conduct of AIGTS and National Union constitutes

intentional or wanton violation of the rights of [plaintiffs] and other businesses and insurance

consumers and was done with reckless indifference to those rights." AC at ¶ 110.  *See Levin*

*Fireman's Fund Ins. Co.,* 2003 WL 21716465, (Conn. Super., Jul 7, 2003)(because plaintiff

alleged conduct in violation of CUIPA was general business practice, motion to strike denied);

*Hotak v. Barton Insurance Agency, Inc.,* 2003 WL 23149917 (Conn. Super., Dec. 12, 2003) ("[a]

single unfair insurance practice may constitute a CUIPA violation per § 38a-816(8), and this

violation can become the basis for a valid CUTPA claim"). As alleged, the Plaintiffs' CUTPA

claim is proper and the Motion to Dismiss should be denied.


**VII.     PLAINTIFFS HAVE PROPERLY PLEADED NEGLIGENT INFLICTION OF
EMOTIONAL DISTRESS.**

The Complaint alleges that the defendants negligently inflicted emotional distress.  The

claim is that the defendants' conduct, as described throughout the Complaint, created an

unreasonable risk of causing David and Raquel Gwynn emotional distress, and that it was

"foreseeable" to defendants that their conduct would cause this harm. AC at ¶¶ 122, 123.

There is no doubt that this claim is properly pleaded.  Plaintiffs are required to allege only

that "the defendant should have realized that its conduct involved an unreasonable risk of causing

emotional distress and that that distress, if it were caused, might result in illness or bodily harm."

Memo at p. 29; *Ancona v Manafort Bros., Inc.,* 56 Conn. App. 701, 713 (2000).

Defendants' response to these allegations is to assert that their "good faith" is "fatal" to this claim. Memo at p. 30. Obviously, plaintiffs refute that they acted in good faith. That issue, however, is ultimately left to the jury.

Moreover, it is ludicrous to assert, as defendants do, that they "could not reasonably have anticipated" that "sophisticated securities traders and analysts like Plaintiffs" would suffer any emotional harm from the Sowell arbitration. Raquel Gwynn, for example, is a schoolteacher, who has never been employed in the securities industry. Moreover, it is not the arbitration *per se* that caused emotional harm to plaintiffs; rather, it was the fact that they were unrepresented, with no legal training or skills, financially unable to retain expert witnesses, facing well-prepared and experienced counsel when their insurance carrier has denied their obligation to indemnify them for losses potentially exceeding $1,000,000. Under such circumstances, not only is the emotional harm reasonably foreseeable, it is entirely probable.

Defendants, of course, reserve their right to make such arguments to the trier of fact. It does not alter the fact, however, that this claim is properly pleaded.

## VIII.   PLAINTIFFS HAVE PROPERLY PLEADED INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

Defendants' argument that plaintiffs have not properly pleaded the intentional infliction of emotional distress is equally unavailing.

Plaintiffs agree with defendants that, a claim for intentional infliction of emotional distress must make the following allegations:

> (1) that the actor intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.

*Carrol v Allstate Insurance Co.,* 262 Conn. 433, 443 (2003). *Accord, Delorge v United States Fire Insurance Co.,* 2002 WL 31125484 (Conn. Super. Aug. 15, 2002). Defendants do not contest plaintiffs' allegations that the emotional distress they sustained was severe. They do, however, argue that the other three elements are not sufficiently pleaded.

Defendants' position is that there is "no showing of intent to inflict emotional distress." Plaintiffs, however, have pleaded, consistent with *Carrol,* that defendants "knew or should have known" that emotional distress was the likely result of their conduct. AC at ¶ 118. Plaintiffs have previously addressed this element, <u>supra.</u> at p.29, and will not repeat that discussion here.

The real thrust of defendants' argument is their insistence that plaintiffs charge extreme and outrageous conduct against the defendants "without offering any facts in support of such conduct." Memo at p. 28. This argument, again, conveniently ignores the well-pleaded, specific allegations of misconduct on the part of defendants.

Defendants' conduct in this case was indeed "extreme and outrageous." They provided a defense, then withdrew it, then re-asserted it well into an arbitration hearing, without providing counsel adequate time to prepare a defense. The purported basis for denying a defense, that Sowell's account was discretionary, was proven to be false before defendants abdicated the defense. When they did they belatedly re-enter the case, they retained inexperienced counsel to save money. Even assuming, *arguendo,* that the allegations in Sowell's complaint entitled them to claim a policy exclusion, they have no explanation or reason for denying a defense to Raquel Gwynn, a school teacher, once they had initially agreed to represent her by causing an appearance to be filed, conferring jurisdiction upon her where none had previously existed.

Defendants' "extreme and outrageous" conduct continued well after the conclusion of the arbitration. They refused to negotiate in good faith with Sowell's counsel prior to the award being issued, and thereafter. It was not until this lawsuit was filed that defendants made any good faith attempt to resolve these claims.

31

While defendants reserve the right to persuade a jury that this conduct is entirely appropriate, there is no question that these allegations, if accepted, are more than sufficient to properly allege "extreme and outrageous conduct." See, *Carrol,* 262 Conn. at 445, 447 (jury was entitled to find intentional infliction of emotional distress where defendants' arson investigation was "hasty, incomplete and ill-reasoned," improperly motivated, and "possibly influenced by racial stereotypes"); *Delorge,* 2002 WL 31125484 at *4 (claim of intentional infliction of emotional distress sufficiently pleaded where plaintiffs allege that defendants violated federal and state law by preparing transcripts from unlawfully recorded tapes, then using the tapes to "force and extort a settlement").

Finally, defendants dispute that it was their conduct which caused plaintiffs' injuries. This, of course, is a factual dispute. Plaintiffs have properly pleaded that the defendants caused their injuries. This suffices to defeat defendants' motion.

## IX.    DEFENDANTS' ALLEGATIONS OF PLAINTIFFS' NEGLIGENCE ARE INAPPROPRIATE FOR A MOTION TO DISMISS.

The defendants' final argument is to attribute plaintiffs' injuries to their own intentional and negligent actions in the conduct of their business. Memo at p. 30.

32

This last argument, assuming that it has any merit at all, is in the nature of a defense. Defendants point to no law that such a defense can serve as a basis to dismiss the Complaint. Here, the Court must look only to the allegations of the pleadings, and must take them to be true. The Complaint clearly alleges that plaintiffs' injuries were caused by defendants' breaches of their obligations and continued bad faith over a period of more than a year. Any defense to those claims must be left to the trier of fact, and has nothing to do with the sufficiency of the pleadings.

However, apart from the procedural issues, this last argument has no substantive merit either. The insurance policy at issue was a contract between plaintiffs and defendants. Plaintiffs bargained for, and paid money for, the right and expectation that their insurers would defend vigorously against precisely the types of claims brought by Sowell, engage in meaningful settlement negotiations, and indemnify Sowell if necessary. Defendants did none of those things. As a result, plaintiffs were left with no defense, no experts to rebut Sowell's experts, and were required to appear pro se. David Gwynn was examined for three days, without counsel to assist him. Only then did defendants re-enter the case. Even then, rather than retain experienced trial counsel, defendants sought to save a few dollars by retaining inexperienced counsel. To absolutely no one's surprise under these circumstances, the arbitration panel came back with an Award in excess of the policy limits.

33

Plaintiffs assert that the result in arbitration was the product of defendants' failure to defend and settle, and that they had legitimate defenses to Sowell's claim, which were never properly presented because of the defendants' conduct. Defendants, of course, deny this. Ultimately, the trier of fact will resolve that dispute. Significantly, however, defendants admit that, as a result of the Sowell matter, plaintiffs have suffered damages in the form of "attention from and investigations by regulators, adverse publicity, long term impairment of professional reputation, loss of market trust and business prospects, and the emotional distress resulting from accusations of this kind." Memo at p. 32. Thus, defendants concede the fact and nature of plaintiffs' injuries though they dispute the cause. Such a dispute, however, is not appropriate for a Motion to Dismiss the Complaint.

## CONCLUSION

Accordingly, for all the reasons stated herein, defendants' Motion to Dismiss the Complaint should be denied in its entirety.

34

PLAINTIFFS, DAVID GWYNN, RAQUEL
GWYNN AND GWYNN FINANCIAL
SERVICES, INC.


By _____
          Jonathan M. Levine (ct 07584)
          Silver Golub & Teitell, LLP
          184 Atlantic Street
          Stamford, CT 06904
          (203) 325-4491
          (203) 325-3769 (Fax)

35

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing was Sent via overnight mail on this

12th day of April, 2004, postage prepaid, to:

James R. Hawkins, II, Esq.
Finn Dixon & Herling LLP
One Landmark Square
Stamford CT 06901

Peter M. Nolin, Esq.
Sandak Hennessey & Greco LLP
970 Summer Street
Stamford, CT 06905

JONATHAN M. LEVINE

36