## NINTH AFFIRMATIVE DEFENSE
### (PROXIMATE CAUSE)

National Union's conduct is not the proximate cause of the *Ryan* Plaintiffs' alleged injuries or damages, if any; rather, the *Ryan* Plaintiffs' own misconduct is the proximate cause of their alleged injuries or damages, which include, *inter alia,* their actions as detailed in Sowell's Claims and the NASD Award and numerous other complaints, claims, litigations, and regulatory actions against them.

## TENTH AFFIRMATIVE DEFENSE
### (WAIVER AND ESTOPPEL)

The *Ryan* Plaintiffs are barred by the doctrines of waiver and estoppel from pursuing their claims in the Amended Complaint because of their own failures to act, including, *inter alia,* their failure to comply with the terms and procedures of the Policy, their failure to give timely notice of Sowell's Claims, and their failure to provide National Union with information in response to its requests during National Union's investigation of Sowell's Claims.

## ELEVENTH AFFIRMATIVE DEFENSE
### (FAILURE TO MITIGATE)

The *Ryan* Plaintiffs have failed to mitigate their damages, if any, as required by law.

{00149668; 4; 0040-3}

## DEFENDANTS' COUNTERCLAIMS

Pursuant to FED. R. CIV. P. 13(a), 13(b) and 13(c), Defendants and Counterclaim-Plaintiffs National Union Fire Insurance Company of Pittsburgh, Pa. and AIG Technical Services, Inc. (together, "National Union") assert the following Counterclaims against Plaintiffs and Counterclaim-Defendants Bruce Charles Ryan, Russell William Newton, Robert Fitzpatrick, and Merit Capital Associates, Inc. (together, the "*Ryan* Plaintiffs"), and state in support hereof:

### JURISDICTION AND VENUE

1.    This Court has jurisdiction over National Union's Counterclaims (the "Counterclaims") pursuant to 28 U.S.C. § 1367 because the Counterclaims arise out of the same transactions or occurrences that are the subject matter of the Amended Complaint in the above-captioned action (the "*Ryan* Amended Complaint").

2.    This Court also has jurisdiction over these Counterclaims under 28 U.S.C § 1332(a) because this action involves citizens of different states and the amount in controversy exceeds $75,000 as to each Plaintiff/Counterclaim-Defendant, exclusive of interest and costs.

3.    Venue is proper in the District of Connecticut pursuant to 28 U.S.C. § 1391 because all of the individual *Ryan* Plaintiffs reside in the State of Connecticut, the *Ryan* Plaintiffs have chosen this district to assert their claims, and the *Ryan* Plaintiffs allege that a majority of the acts and consequences took place in Connecticut. *Ryan* Plaintiff/Counterclaim-Defendant Merit Capital Associates, Inc. is a Connecticut corporation.

4.    As hereafter alleged, Defendants are each residents of states other than Connecticut.

## PARTIES

5.      Defendant/Counterclaim-Plaintiff National Union Fire Insurance Company of Pittsburgh, Pa. is an insurance company duly organized and validly existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at 70 Pine Street, New York, New York 10270.  National Union is an insurance company that provides, among other things, professional liability insurance to securities broker/dealers and Registered Representatives.

6.      Defendant/Counterclaim-Plaintiff AIG Technical Services, Inc., now known as AIG Domestic Claims, Inc., is a corporation duly organized and validly existing under the laws of the State of Delaware with its principal place of business at 70 Pine Street, New York, New York 10270.  AIG Technical Services, Inc. acted as agent for the National Union Fire Insurance Company of Pittsburgh, Pa. with respect to the claim at issue in this action.

7.      *Ryan* Plaintiff/Counterclaim-Defendant Merit Capital Associates, Inc. ("Merit") is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Westport, Connecticut.  Merit is a securities broker/dealer that engaged in securities brokerage and investment banking, among other things, prior to the sale of all or substantially all its assets in November 2001 to Source Capital Group, Inc. ("Source").  Upon information and belief, Source may be a successor in interest to Merit.

8.      *Ryan* Plaintiff/Counterclaim-Defendant Bruce Charles Ryan ("Ryan") is a fifty per cent (50%) shareholder in Merit and serves as its President.  He is also Vice Chairman of Source.  Ryan is a citizen of the State of Connecticut.

9.      *Ryan* Plaintiff/Counterclaim-Defendant Russell William Newton ("Newton") is a fifty per cent (50%) shareholder in Merit and serves as its Chairman and Chief Financial Officer.  He is also Chief Financial Officer of Source.  Newton is a citizen of the State of Connecticut.

{00149668; 4; 0040-3}

10.     *Ryan* Plaintiff/Counterclaim-Defendant Robert Fitzpatrick ("Fitzpatrick") was the General Counsel and Chief Compliance Officer of Merit at all relevant times prior to Merit's sale of all or substantially all its assets to Source.  At certain times, while still an officer and employee of Merit, Fitzpatrick was also an officer and employee of Source; Fitzpatrick performed certain of the acts complained of herein while working in that dual capacity. Fitzpatrick is now General Counsel and Chief Compliance Officer for Source.  Fitzpatrick is a citizen of the State of Connecticut.

11.     David W. Gwynn ("Gwynn") was a Senior Vice President and Registered Representative of Merit.  Gwynn acted both as a registered securities broker and an investment banker for Merit.  Gwynn, his wife Raquel Gwynn and Gwynn Financial Services, Inc. (hereinafter, the "*Gwynn* Plaintiffs"), are Plaintiffs in the companion action *Gwynn, et al.* v. *National Union, et al.*, 3:03 CV 1154 (CFD), consolidated herewith.  National Union filed a motion to dismiss in the *Gwynn* action on July 21, 2005, for lack of subject matter jurisdiction; that motion is pending as of the date of this Amended Answer, Affirmative Defenses and Counterclaims.

### FACTS

### SOWELL'S CLAIMS

12.     This action arises out of claims asserted by Michael A. Sowell ("Sowell"), a former customer of Merit, Gwynn and Gwynn Financial Services, Inc.

13.     During the period March 1998 to May 2001, Sowell invested through various securities accounts with Merit.  One of the accounts Sowell opened was a securities trading account identified by account number LFW-0053-A5 ( "Sowell's Trading Account").  Gwynn

22

{00149668; 4; 0040-3}

and Gwynn Financial Services, Inc. introduced Sowell to Merit, and managed Sowell's Trading Account.

14.    According to Sowell, although his account was profitable at times, Sowell's Trading Account lost virtually all of its value by May 2001. *See* Sowell's Statement of Claim (the "Statement of Claim") (excluding exhibits), a true copy of which is attached hereto as Exhibit 1. Through his lawyers, Sowell made a series of complaints and demands for information beginning in April 2001 regarding his investments and Sowell's Trading Account. Sowell's complaints and demands went largely unanswered.

15.    As a result, on or about August 31, 2001, Sowell filed a Statement of Claim with the National Association of Securities Dealers, Inc. ("NASD") against the *Ryan* Plaintiffs and the *Gwynn* Plaintiffs, as respondents, jointly and severally, in an arbitration styled *Sowell v. Merit Capital Associates, Inc., et al.*, NASD Arbitration No. 01-04731 (the "Sowell Arbitration"). In short, Sowell alleged the following:

> In late 1997, as a result of the death of his mother, Mr. Sowell inherited over $1.4 million. Today, as a result of Respondents conduct, Mr. Sowell's inheritance has disappeared. Had respondents reasonably managed Mr. Sowell's funds, this never would have happened.

*See id.* Sowell's allegations include multiple counts of fraud and misconduct in connection with the management of his investments. At Sowell's request, the NASD arbitration was to be held in Phoenix, Arizona.

16.    Among his many allegations, Sowell made at least seven (7) separate allegations that Gwynn held, and *exercised*, discretionary authority and control over his account. *See, e.g.,* Statement of Claim at ¶¶ 26, 27, 76, 83, 133, and Footnote 3. For example, the Statement of Claim alleged that:

{00149668; 4; 0040-3}

[w]hen Mr. Sowell opened his account, he signed a power of attorney giving Respondents discretionary control of the account. Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell. As it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading decisions.

Ex. 1, Statement of Claim at ¶ 26.

17.    In fact, Sowell executed at least three (3) *durable* powers of attorney in favor of Gwynn in March 1998. Each of these 3 powers of attorney provided that the authority provided thereunder would remain effective until the broker received "written notice" of "cancellation" or "revocation."

18.    National Union is not aware of any such written notice of cancellation or revocation of the powers of attorney, although it has repeatedly asked for any such documents.

19.    In his Statement of Claim, Sowell alleged that Gwynn "treated his discretionary authority as a license to churn" and excessively traded securities in Sowell's Trading Account without Sowell's knowledge or consent. Ex. 1, Statement of Claim at ¶ 27. According to an analysis performed by Charles Fath, Sowell's expert witness during the Sowell Arbitration, Sowell's Trading Account was excessively traded over a three (3) year period, resulting in:

a.    over 1,500 trades;

b.    more than $480,000 in commissions;

c.    $170,000 in margin interest charges;

d.    for a total of $650,000 in margin interest and commission charges alone, more than fifty per cent (50%) of the approximately $1.15 million Sowell originally deposited in the account.

20.    Furthermore, based on data collected by Fath, Sowell's Trading Account represented between an average of 76 - 87% of Gwynn's total gross commission on an annual basis for the years 1998 - 2001.

24

{00149668; 4; 0040-3}

21.    Sowell also alleged that his account was heavily and recklessly invested in speculative technology companies: "Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by excessive, in-and-out trading in technology stocks." Ex. 1, Statement of Claim at ¶ 27. Sowell alleged that many of these securities were unsuitable for an investor like him, who had very little experience investing in securities. *See Id.* at ¶ 15 (Sowell "did not graduate from college and he was, and still is, an unsophisticated investor").

22.    As a result, Sowell claimed that he suffered heavy trading losses in his Merit account of approximately $245,000, in addition to the fees charged by Gwynn and Merit for margin interest and commissions. *See Id.* at ¶ 27.

23.    Sowell also signed at least three (3) Options Client Information Forms and Agreements in May 1998 (the "Options Forms"). By their terms, these forms pertain to options trading only, and not trading in equities, bonds or other securities. The Options Forms also require that the client filling out the form indicate, in two (2) places, whether a power of attorney governs that account. The Options Forms signed by Sowell are inconsistent and incomplete. On one of the Options Forms, Sowell did not indicate whether or not there was a power of attorney at all. On a second Options Form, Sowell's response was incomplete as to the power of attorney. On the third Options Form, Sowell indicated that there was no power of attorney. None of these forms, by their language, purports or even attempts to revoke or cancel the powers of attorney that allegedly governed Sowell's Trading Account.

24.    Eight (8) months after filing his original Statement of Claim, Sowell filed an Amended Statement of Claim, dated May 1, 2002. Sowell's allegations concerning Gwynn's discretionary control of Sowell's Trading Account remain largely unchanged. Sowell again

alleged at least seven (7) separate times that Gwynn was granted, and *exercised*, discretionary authority and control over Sowell's Trading Account.

25.    Sowell never amended his Statement of Claim to indicate that Gwynn was not granted discretion; or that he did not exercise his discretion; or that the powers of attorney were cancelled or revoked; or that the powers of attorney were ineffective in any way.

26.    On top of the trading losses, commissions and margin interest fees, Sowell alleged that he was induced by Gwynn to invest in companies which Gwynn controlled. *See* Ex. 1, Statement of Claim, at ¶ 31, *et seq.*  These companies provided financial services to charter schools, and were known at different times as Novation Financial Corporation, Charter Financial Network, Inc., and Charter 3, Inc.  The companies are hereinafter referred to as the "Charter School Companies."

27.    Gwynn solicited Merit to act as a private placement agent and investment banker to raise capital for the Charter School Companies.  On behalf of Merit, Ryan agreed to do so.  In addition to Gwynn's work for Merit as a Registered Representative, Gwynn also engaged in investment banking activity and actively sought opportunities for Merit to provide services as an underwriter or private placement agent.

28.    Gwynn was also the founder, President and Chief Executive Officer of the Charter School Companies.  Gywnn's multiple roles as an owner and promoter of these Charter School Companies, and also as an investment banker, were approved by Ryan and Merit.

29.    Sowell alleged that Gwynn induced him to invest at least $175,000 in the Charter School Companies, using funds from Sowell's Trading Account. *See id.*  Although Sowell received stock certificates and promissory notes, Sowell claimed that he never received any

{00149668; 4; 0040-3}

meaningful return on those investments, and that those stock certificates and promissory notes were worthless at the time he filed his Statement of Claim. *See, e.g., id.* at ¶ 42, 54, and 63.

30.     The *Ryan* Plaintiffs have alleged that Gwynn was not authorized to sell securities in the Charter School Companies to his own clients, including Sowell.

31.     Although he originally deposited $1.15 million in his Merit account, Sowell alleged that the account lost virtually all its value by the time he closed it in May 2001. *See id* at ¶ 29.

32.     As a result, Sowell filed his Statement of Claim and Amended Statement of Claim alleging that the *Ryan* Plaintiffs and Gwynn churned his account, engaged in excessive trading, placed him in unsuitable investments, and failed to supervise Gwynn ("Sowell's Claims"). Sowell's also asserted claims for negligence, breach of fiduciary duty, breach of contract, and violations of NASD and NYSE rules. *See* Ex. 1, Statement of Claim.

33.     Sowell further alleged that the *Ryan* Plaintiffs and Gwynn intentionally and negligently defrauded him under various state securities fraud statutes and at common law, including:

      a.      Count I:  Violation of A.R.S. § 44-1841 (Unlawful Sale of Securities);

      b.      Count II:  Violation of A.R.S. § 44-1991 (Fraud in a Securities Transaction; Misrepresentation);

      c.      Count V:  Intentional Fraud and Fraud by Non-Disclosure;

      d.      Counts VI, VII:  Negligent Misrepresentation;

      e.      Count X:  Violation of A.R.S. § 44-3241 (Fraud in Investment Advisory Services); and

      f.      Count XI:  Violation of A.R.S. § 44-1522 (Fraud in the Sale of Merchandise).

*See id.*

THE POLICY

34.    National Union issued a Securities Broker/Dealer's Professional Liability Insurance Policy, Policy No. 473-36-20 (the "Policy"). The *Ryan* Plaintiffs and Gwynn are insureds under the Policy. A true copy of the Policy is attached to the *Ryan* Amended Complaint as Exhibit A.

35.    The Policy covered a "Claim" made against an insured during the Policy Period. A "Claim" against an insured "means the following brought by an Insured's customer or client in such capacity: (1) a written demand for monetary relief; or (2) a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by (i) service of a complaint or similar pleading; or (ii) receipt of filing of an arbitration demand or statement of claim." Policy at ¶ 2(c).

36.    The Policy covered claims, as defined therein, made during the period August 23, 2000 until August 23, 2001 (the "Policy Period"). Policy at Declarations, Items 2 and 6.

37.    In addition, the *Ryan* Plaintiffs sought a thirty-day (30) extension of the Policy in or about August 2001 (the "30 Day Extension"). National Union extended the Policy at the *Ryan* Plaintiffs' request by endorsement on or about August 23, 2001, extending the Policy Period by thirty (30) days from August 23, 2001 until September 23, 2001. *See* Policy at Endorsement No. 5.

38.    As a condition to coverage under the Policy for Sowell's Claims, the *Ryan* Plaintiffs were required to give timely notice thereof within the Policy Period. In the event a Claim was made, the Policy provides that "[t]he Broker/Dealer or the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the

28

{00149668; 4; 0040-3}

Insurer of a Claim made against an Insured during the Policy Period as soon as practicable . . . ." Policy at ¶ 8(a).

39.     The Policy also provides that notice may be given if a claim has not been filed but "the Broker/Dealer or the Insureds shall become aware of any circumstances which may reasonably be expected to give rise to a Claim being made against the Insureds." Policy at ¶ 8(c). In such a case, the Insureds "shall give written notice to the Insurer of the circumstances and the reasons for anticipating such a Claim, with full particulars as to dates, persons and entities involved." *Id.* If the Insureds provide such early notice, the notice of the claim will be deemed to have been given as of the date of early notice, even if the claim is filed later.

## THE *RYAN* PLAINTIFFS' FALSE STATEMENTS AND OMISSIONS

40.     Ryan gave notice of Sowell's Claims to his insurance broker on or about September 21, 2001. National Union first received notice on or about September 22, 2001.

41.     The *Ryan* Plaintiffs were actually aware of Sowell's Claims or the possibility thereof long before Ryan notified National Union. Instead of providing the prompt notice required by the terms of the Policy, the *Ryan* Plaintiffs chose to conceal the possibility and existence of Sowell's Claims. In fact, the *Ryan* Plaintiffs made the following false statements and material omissions concerning Sowell's Claims while, at the same time, seeking a renewal and extensions of the Policy.

42.     ***Sowell's April-June 2001 Demands.*** First, the *Ryan* Plaintiffs were aware that Sowell's lawyers made comprehensive demands for account documents and an accounting of Sowell's investments between April - June 2001 (hereinafter referred to as "Sowell's April - June 2001 Demands"). For example:

a.    more than four (4) months before Sowell filed his Statement of Claim, Alan Baskin, an attorney for Sowell, sent a letter to Merit on or about April 13, 2001, requesting documents concerning Sowell's Trading Account and his investments in the Charter School Companies;

b.    on or about April 16, 2001, Frank Moskowitz, also an attorney for Sowell, sent a letter to Gwynn in his capacity as President of Charter 3, Inc. (one of the Charter School Companies), demanding an accounting with respect to Sowell's investments in the Charter School Companies; and

c.    Moskowitz demanded that Gwynn personally appear for an inspection of books and records related to Sowell's investments in the Charter School companies. Although Moskowitz and Gwynn agreed to this inspection on June 6, 2001, Gwynn failed to show up.

43.    Although the *Ryan* Plaintiffs knew of Sowell's April - June 2001 Demands, they ignored the notice provisions of the Policy and did not notify National Union of the Sowell situation. In fact, although National Union later requested all documents and correspondence concerning Sowell's complaints, the letters described above, and other correspondence from Sowell's lawyers during April - June 2001, were not disclosed to National Union until discovery in this action.

44.    ***Gwynn's May 16, 2001 Letter.*** Second, on or about May 16, 2001, Gwynn sent a letter to Bruce Ryan, President of Merit, on May 16, 2001, to advise Ryan that

> I think there is a *significant chance* of one or more claims being filed against Merit and/or myself. As such, I think it is advisable to put the insurance carrier on notice of a possible claim and request that they retain counsel on my behalf.

45.    At or about the same time, Gwynn expressed these concerns to Ryan and Fitzpatrick by telephone and in other correspondence.

46.    Although the *Ryan* Plaintiffs knew of Sowell's April - June 2001 Demands, and that Gwynn thought there was a "significant chance" that Sowell would file claims against them, they ignored the notice provisions of the Policy and did not notify National Union of the Sowell situation. In fact, although National Union later requested all documents and correspondence

30

concerning Sowell's complaints, Gwynn's May 16, 2001 letter was not disclosed to National Union until discovery in this action.

47.    ***The July 10, 2001 Renewal Application.***  Third, on or about July 10, 2001, the *Ryan* Plaintiffs caused a completed Securities Broker/Dealer's Errors and Omissions Liability Insurance Renewal Application (the "Renewal Application") to be filed with National Union.

48.    The Renewal Application was signed by Ryan as President of Merit, and Fitzpatrick as its Director of Compliance.

49.    The Application states in part:

> The undersigned authorized officers of the Securities Broker/Dealer declare that the statements set forth herein are true.  The undersigned authorized officers agree that if the information supplied on this application changes between the date of this application and the effective date of the insurance, the (undersigned) will immediately notify the company of such changes; and the company may withdraw or modify any outstanding quotations and/or authorization or agreement to bind the insurance.

50.    In response to a question on the Renewal Application concerning notices, letters and complaints, the *Ryan* Plaintiffs gave the following response:

> "(a) Give number of notices, letters, and complaints received in the past three years by the Compliance Department: _25
>
> (b) How many unsettled after 60 days? None"

51.    Accordingly, although the *Ryan* Plaintiffs declared in the Renewal Application that their statements were true, in fact they were not: the *Ryan* Plaintiffs affirmatively misrepresented that they had no outstanding notices, letters or complaints that remained unsettled after 60 days.  In fact, Sowell's first letter to the *Ryan* Plaintiffs was dated April 13, 2001, well more than 60 days before the *Ryan* Plaintiffs submitted the Renewal Application, and it was unsettled at that time.  By submitting the Renewal Application in this form, the *Ryan* Plaintiffs

31

again ignored the notice provisions of the Policy and the Renewal Application and did not notify National Union of the Sowell situation.

52.    ***The 30 Day Extension.***    Fourth, the *Ryan* Plaintiffs requested the 30 Day Extension without notifying National Union of Sowell's April - June 2001 Demands or that Gwynn thought there was a "significant chance" that Sowell would file claims against them. As a result of the 30 Day Extension, the *Ryan* Plaintiffs were able to give National Union notice of Sowell's Claims during the Policy Period, *as extended*. The *Ryan* Plaintiffs' notice would not have been timely had National Union not granted the 30 Day Extension.

53.    ***Sowell's August 31, 2001 Statement of Claim.***    Fifth, the *Ryan* Plaintiffs failed to promptly notify National Union at or about the time Sowell filed his Statement of Claim with the NASD, dated August 31, 2001 and filed on or about September 4, 2001.

54.    ***Fitzpatrick's September 10, 2001 Letter to National Union - the "Warranty Letter."***    Sixth, the *Ryan* Plaintiffs attempted to obtain a ninety-day (90) extension of the Policy while actively concealing the Sowell situation.

55.    Specifically, on or about September 10, 2001, Fitzpatrick sent a letter to National Union requesting a further extension of the Policy for approximately ninety (90) days from September 22, 2001 until December 31, 2001 (the "Warranty Letter"). In this letter, Fitzpatrick represented himself as the General Counsel of Merit and stated that "We are not currently aware of any claims to be made against AIG." This type of letter is commonly known in the insurance industry as a "Warranty Letter" because it warrants that there are no outstanding claims to be made against the Policy.

56.    By September 10, 2001, however, the *Ryan* Plaintiffs were well aware of the Sowell situation. Months had passed since Sowell made his April - June 2001 Demands, and

32

also since Gwynn told Ryan that there was a "significant chance" that Sowell would file claims against them. A week had passed since Sowell filed his Statement of Claim. Notwithstanding these facts, the *Ryan* Plaintiffs falsely stated that they were not aware of any claims to be made against National Union in the Warranty Letter. The *Ryan* Plaintiffs never sent National Union a letter, or communicated with National Union in any way, to correct or amend the representations made in the Warranty Letter.

57.    ***Fitzpatrick's December 12, 2001 Letter to Conlin.*** Seventh, Fitzpatrick stated in a December 12, 2001 letter to Brian Conlin, Claims Analyst for AIG Technical Services, Inc. ("AIGTS"), that "Mr. Sowell never complained to Merit regarding the handling of his account. The first time we heard of this complaint was the filing of the arbitration. There is no correspondence with Mr. Sowell regarding complaints. There is no correspondence either to or from Merit Capital and Charter Financial Network, Novation Financial Corporation or Charter 3."

58.    Although the Ryan Plaintiffs knew of Sowell's April - June 2001 Demands, and that Gwynn thought there was a "significant chance" that Sowell would file claims against them—and they knew, in particular, of letters from Sowell's lawyers to Merit and the Charter School Companies—Fitzpatrick continued to conceal their existence *even while Conlin was evaluating coverage on behalf of National Union.*

59.    Finally, according to Gwynn, Ryan chose not to notify National Union about Sowell's claims at any time prior to September 21, 2001, for fear that Merit would lose its insurance coverage or that coverage would become more expensive.

## COVERAGE INVESTIGATION AND DETERMINATION

60.     On or about October 1, 2001—shortly after National Union finally received notice of Sowell's claims—AIGTS Claims Analyst Brian Conlin ("Conlin") sent a letter to Ryan seeking a copy of the Statement of Claim itself, correspondence concerning Sowell's prior complaints, and various other information.

61.     Conlin received the Statement of Claim on or about October 11, 2001, but did not receive the requested correspondence regarding Sowell's prior complaints.

62.     On or about October 15, 2001, Conlin sent another letter to Ryan indicating that AIGTS had assigned the law firm of Renaud, Cook & Drury, P.A. ("Renaud Cook") to represent the *Ryan* Plaintiffs, and the law firm of Mariscal, Weeks, McIntyre & Friedlander, P.A. ("Mariscal Weeks") to represent the *Gwynn* Plaintiffs in the Sowell Arbitration.

63.     Conlin also advised Ryan in his October 15, 2001 letter that the following provisions and exclusions could exclude coverage under the Policy:

a.     Coverage under the Policy would be provided subject to a $25,000 retention for losses incurred by the Broker/Dealer, as well as a $25,000 retention for losses by a Registered Representative;

b.     The Policy excluded coverage for wrongful or fraudulent conduct:

*The insurer shall not be liable for Loss in connection with any Claim made against an Insured:*

*a)     arising out of, based upon or attributable to the gaining in fact any profit or advantage to which the Insured was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts.*

*b)     arising out of, based upon or attributable to the committing in fact of: any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder.*

34

Policy at ¶ 4(a)-(b) (emphasis added).

c.    The Policy further excluded any wrongful conduct committed prior to the retroactive date:

> *The insurer shall not be liable for Loss in connection with any Claim made against an Insured....*
>
> *f) alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent Interrelated Wrongful Act.*

Policy at ¶ 4(f) (emphasis added).

d.    The Policy excluded any "Interrelated Wrongful Act" that arose from or continued such wrongful conduct that was committed prior to the retroactive date:

> *(g)  "Interrelated Wrongful Act(s)" means Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from the same, related or common nexus of facts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action.*

Policy at ¶ 2(g) (emphasis added).

e.    The Policy excluded claims related to investment banking:

> *The insurer shall not be liable for Loss in connection with any Claim made against an Insured....*
>
> *(i) alleging, arising out of, based upon or attributable to, in whole or in part, any Investment Banking Activity by an Insured, including but not limited to any disclosure requirements in connection with the foregoing; provided, however, that this exclusion shall not apply to Claims arising out of the sale by an Insured to a particular client or customer of an open-ended investment company or variable annuity which alleges that a client or customer of the Broker/Dealer was unsuitable for and wrongfully placed into such investment company or variable annuity.*

Policy at ¶ 4(i) (emphasis added).

35