f.    The Policy excluded unauthorized conduct that did not constitute a Covered Professional Service under the policy, which included conduct referred to in the securities industry as "selling away":

*The insurer shall not be liable for Loss in connection with any Claim made against an Insured....*

*(r) alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away."*

Policy at ¶ 4(r) (emphasis added).

    g.    Finally, Conlin advised Ryan that:

*Mr. Sowell alleged that Gwynn made trades without authorization and that he signed a Power of Attorney shortly after opening his account with Merit Capital Associates. In light of this allegation we refer you to exclusion (s) which provides that the Insurer shall not be liable for Loss in connection with any Claim made against an Insured:*

*s) alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-load investment company or variable annuities in which there is not initial or contingent sales charge or commission;*

*Please advise if any trading in this account was done pursuant to a written discretionary agreement or any other similar authority. If it is determined that discretionary trading occurred in this account there will be no coverage subject to the above restrictions.*

Policy at ¶ 4(s) (emphasis added).

    h.    In addition, although Conlin did not cite this exclusion in his October 15, 2001 letter, the Policy excluded claims:

*(m) alleging, arising out of, based upon or attributable to the purchase or sale of (or failure to purchase or sell) any of the following, or any advice in connection therewith:*

*(1) commodities, futures contracts, forwards contracts for any type of option or futures contract, or any similar investment or investment product.*

64. Because Sowell's Statement of Claim appeared to implicate the provisions and exclusions described above, Conlin requested that Ryan provide any additional information concerning Sowell's claims.

65. Conlin did not receive any documents directly from Ryan in response to his October 15, 2001 letter.

66. On or about November 7, 2001, Conlin requested further information from Gwynn concerning Sowell's claims. Conlin reiterated his requests again in a letter to Gwynn on or about November 26, 2001. Gwynn did not personally send any documents to Conlin in response to these requests at any time.

67. Conlin also requested further information from Fitzpatrick on or about November 26, 2001, seeking a power of attorney governing Sowell's Merit Trading Account and any correspondence regarding Sowell's complaints.

68. On or about December 12, 2001, Fitzpatrick sent Conlin a letter attaching a copy of a power of attorney signed by Sowell. Fitzpatrick did not send a written revocation or cancellation of that power of attorney at any time. As noted above in Paragraph 57, Fitzpatrick also stated that "Mr. Sowell never complained to Merit regarding the handling of his account. The first time we heard of this complaint was the filing of the arbitration. There is no correspondence with Mr. Sowell regarding complaints. There is no correspondence either to or from Merit Capital and Charter Financial Network, Novation Financial Corporation or Charter 3."

69. Fitzpatrick made his statements in his December 12, 2001 letter, on behalf of the *Ryan* Plaintiffs, knowing that they were untrue.

70. Furthermore, Mr. Sowell testified during the NASD arbitration hearing that he called Mr. Fitzpatrick at least twice in an effort to speak with him about losses in his account. Sowell testified that Fitzpatrick never called him back. What Mr. Sowell did receive, however, was a series of letters from Mr. Fitzpatrick known in the securities industry as "happiness letters." Fitzpatrick sent Sowell five (5) letters from August 1999 to June 2001, using substantially the same language, in which he informed Sowell that his account was actively traded. Fitzpatrick never contacted Sowell to follow up on these letters by phone, letter or email. Fitzpatrick knew or should have known that it was the position of the Securities and Exchange Commission that happiness letters were inadequate as a way of monitoring trading in customer accounts.

71. While Gwynn told Conlin that the powers of attorney signed by Sowell were only to be used in emergencies, the powers of attorney did not make any mention of emergency use. Gwynn never sent Conlin any documents to show that the powers of attorney were to be used only in emergencies, at any time.

72. Further, the Renewal Application submitted by the *Ryan* Plaintiffs indicated that Merit maintained discretionary accounts, and Fitzpatrick admitted in his December 12, 2001 letter that Merit did so.

73. On or about January 12 and 24, 2002, Conlin wrote separate letters to both Ryan and Gwynn advising them that coverage was not available under the Policy due to certain exclusions thereunder, including an exclusion related to discretionary accounts. Conlin invited Gwynn and the *Ryan* Plaintiffs to supply additional information: "[i]f you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same."

74. After Conlin sent his January 12 and 24, 2002 letters, National Union did not receive any further communications from the *Ryan* Plaintiffs until after National Union offered to defend the *Ryan* Plaintiffs in the Sowell Arbitration, approximately one year later.

75. On or about April 16, 2002, AIGTS closed its file concerning Sowell's claims, and advised Gwynn by letter.

76. On or about May 17, 2002, Gwynn sent a letter to Conlin in which he objected to the closure of the file. Gwynn claimed to have information response to Conlin's requests for information, and acknowledged that Conlin had requested this information months before. Notwithstanding, Gwynn claimed that because he was in the process of moving, he had not yet provided those documents to him. Gwynn claimed that he was gathering documents and would shortly produce documents to Conlin that would confirm that coverage was warranted against Sowell's Claims.

77. Conlin never received any documents directly from Gwynn, and did not receive any documents from Gwynn's lawyer until January 6, 2003, sixteen (16) months after Sowell filed his Statement of Claim.

POST-DECLINATION PERIOD

78. After National Union declined coverage, Mariscal Weeks withdrew as counsel for the *Gwynn* Plaintiffs in the Sowell Arbitration. Gwynn subsequently retained Mariscal Weeks again, paying a $4,000 retainer, which led to their reappearance in the Sowell Arbitration on May 14, 2002. By August 20, 2002, however, Mariscal Weeks informed Gwynn that his $4,000 retainer was exhausted, and withdrew again from their representation in the Sowell Arbitration.

79. On or about April 10, 2002, David McDowell of Renaud Cook sent a letter to the *Ryan* Plaintiffs concerning their engagement. McDowell indicated that because the *Ryan*

Plaintiffs refused to sign the firm's fee agreement personally, Renaud Cook would require a $10,000 retainer. The *Ryan* Plaintiffs did not pay that retainer. Renaud Cook withdrew from the Sowell Arbitration on or about June 14, 2002.

80. The *Ryan* Plaintiffs subsequently engaged William Federman, Esq. to represent them in the Sowell Arbitration in early August 2002. Federman had represented Merit and the *Ryan* Plaintiffs previously, including in several prior NASD arbitrations.

81. The *Ryan* Plaintiffs also engaged the law firm of Snell & Wilmer L.L.P. to defend Source in the Sowell Arbitration because Sowell, by his Amended Statement of Claim, named Source as a Respondent.

82. The *Ryan* Plaintiffs did not retain counsel for the *Gwynn* Plaintiffs in connection with the Sowell Arbitration at any time.

83. By at least December 3, 2002, Gwynn had retained another attorney, John Nicgorski, Esq. ("Nicgorski") of the law firm of Mohr, Hackett, Pederson, Blakley & Randolph, P.C. According to Nicgorski, Gwynn retained Nicgorski to represent him with respect to insurance coverage issues only. Gwynn did not retain Nicgorski to represent him in the NASD arbitration against Sowell. Nicgorski required a $1,500 retainer as a condition of his representation.

## NATIONAL UNION'S DEFENSE AND INDEMNIFICATION OF PLAINTIFFS

84. Nearly a year after National Union declined coverage, Nicgorski contacted Conlin for the first time. Late in the day on Friday, January 3, 2003—at least one month after he was retained—Nicgorski faxed a letter to Conlin demanding coverage for Gwynn under the Policy. Nicgorski claimed that he had not seen the power of attorney that governed the account. Nicgorski also asserted that Sowell's account was non-discretionary and provided two (2)

40

{00149668; 4; 0040-3}

additional documents in support of his claim that Gwynn had not previously provided to Conlin, including (1) an Option Client Information Form and Agreement, dated July 28, 1998, and (2) a Financial Planning/Advisory Disclosure Agreement, dated March 15, 2000.

85. The Financial Planning/Advisory Disclosure Agreement provided that the "Client will retain absolute discretion over all investment and implementation decisions." This Agreement did not purport to revoke or cancel the powers of attorney previously executed by Sowell. Indeed, this Agreement did not refer to any powers of attorney at all.

86. Further, although Nicgorski provided the July 28, 1998 Options Form, he did not provide the two (2) other Options Forms that were inconsistent with the July 28, 1998 version.

87. In his letter, Nicgorski complained that Conlin had not provided Gwynn with a copy of the power of attorney—implying that neither he nor Gwynn had a copy of the power of attorney or had reviewed them—despite the fact that:

    a. the powers of attorney were executed in favor of Gwynn, and ultimately must have come from him;

    b. one of the powers of attorney was sent to National Union a year before by Fitzpatrick; and

    c. Gwynn had never previously asked Conlin for a copy of the powers of attorney.

88. Nicgorski also indicated that Gwynn was considering settling with Sowell, or stipulating to a judgment, and thereafter assigning his claims, including his bad faith claims, to Sowell. Nicgorski also made a demand that National Union settle Sowell's Claims within policy limits.

89. Nicgorski further advised Conlin that the Sowell Arbitration was to begin on the following day, Tuesday, January 7, 2003.

90. Conlin received Nicgorski's January 3, 2003 letter on Monday, January 6, 2003. Conlin responded by facsimile that same day and indicated that he would review the additional information provided. Further, Conlin provided a copy of the durable power of attorney, dated March 7, 1998, that gave Gwynn discretionary authority and control over Sowell's account (the "March 1998 power of attorney").

91. Nicgorski responded to Conlin by facsimile later that day, January 6, 2003, and acknowledged receipt of the March 1998 power of attorney. Nicgorski claimed, on behalf of Gwynn, that the power of attorney was not effective nor enforceable under Arizona law because it was not notarized. Nicgorski's letter stated in part:

> the power of attorney you rely upon for your denial of coverage is not notarized . . . . [S]ince it is the requirement in Arizona [that it be notarized], it was never effective in Arizona in any event. *See* A.R.S. § 14-5501(D)(4).

Nicgorski also indicated in his January 6 letter that Gwynn was going to represent himself at the Sowell arbitration.

92. In their Amended Complaint, the *Ryan* Plaintiffs adopted Nicgorski's position that the March 1998 power of attorney was not notarized, and hence ineffective and unenforceable under Arizona law. *See Ryan* Plaintiffs' Amended Complaint at ¶ 42.

93. Nicgorski and the *Ryan* Plaintiffs have failed to disclose, however, that the Arizona requirement that powers of attorney be notarized *applies only to powers of attorney executed after August 1, 1998*. *See* A.R.S. § 14-550 (D). The March 1998 power of attorney at issue in this case was executed months before the effective date of the requirement that a power of attorney be "executed and attested ... by the principal and by an affidavit of the witness before a notary public and evidenced by the notary public's certificate, under official seal." A.R.S. § 14-5501(D)(4).

94. On January 6, 2003, however—the day before the arbitration hearing was to start—Conlin was not aware that the notarization requirement did not apply to the March 1998 power of attorney. Neither the July 28, 1998 Options Form nor the Financial Planning/Advisory Disclosure Agreement had been previously given to Conlin, although nearly a year had passed since National Union declined coverage. (And he learned, for the first time, that Gwynn was not represented by counsel as the arbitration hearing was about to begin.)

95. In an abundance of caution, Conlin took immediate action to review the information provided, to confer with his superiors, and to retain Arizona coverage counsel. Shortly thereafter, National Union offered to provide defense counsel to Plaintiffs in the Sowell Arbitration.

96. The *Ryan* Plaintiffs declined defense counsel, but National Union offered to and did pay the attorney's fees of William Federman, Esq., who had been retained by the *Ryan* Plaintiffs to represent them in the arbitration.

97. National Union authorized Mariscal Weeks to represent the *Gwynn* Plaintiffs, which firm reappeared for the *Gwynn* Plaintiffs on January 13, 2003, and represented them for the remainder of the Sowell Arbitration hearing.

98. On February 24, 2003, the arbitration panel found the *Ryan* Plaintiffs and the *Gwynn* Plaintiffs jointly and severally liable for "selling unsuitable investments, selling unregistered securities, acting negligently, making negligent misrepresentations, breaching their fiduciary duties to [Sowell], breaching their contractual obligations to [Sowell], engaging in conduct falling below the securities industry standard of care, and showing an overall reckless indifference to claimant's interests," and for "churning [Sowell's] account."

99. Further, the *Ryan* Plaintiffs were found jointly and severally liable for failing to supervise Gwynn.

100. As a result of its findings, the arbitration panel awarded Sowell $1,125,000, plus NASD arbitration fees of $17,250, against Plaintiffs, jointly and severally.

101. Sowell then filed an action to confirm the arbitration award in *Sowell v. Merit Capital Associates, Inc., et al.*, Cause No. CV03-0003960, Superior Court of the State of Arizona, County of Maricopa. The *Ryan* Plaintiffs and the *Gwynn* Plaintiffs jointly hired John Nicgorski to represent them in that action.

## SETTLEMENT AND VACATION OF THE AWARD

102. Following entry of the award, National Union worked closely with the *Ryan* Plaintiffs to indemnify them and to settle Sowell's claims.

103. In August 2003, on behalf of *Ryan* Plaintiffs, National Union paid Sowell an amount in excess of the Policy limits to settle all of Sowell's claims against them. The *Ryan* Plaintiffs received a full release from any liability to Sowell for all claims.

104. As a result of the settlement, the NASD arbitration award was vacated on September 9, 2003.

105. The action in Arizona state court to confirm the arbitration award was also dismissed with prejudice against Sowell.

## FIRST COUNTERCLAIM
### (INTENTIONAL FRAUD)

106. National Union hereby repeats and re-alleges the allegations contained in Paragraphs 1 through 105 of its Counterclaims as if fully restated herein.

107. The *Ryan* Plaintiffs made false statements and material omissions in order to wrongfully induce National Union to extend the Policy, to provide coverage, defense and indemnification to which they were not entitled, and to support their claims in this action.

108. By making the false statements and omissions described above, the *Ryan* Plaintiffs concealed and misrepresented facts and information material to National Union's determination whether to provide coverage, to renew the Policy, to provide the 30 Day Extension, and to provide a 90 day extension.

109. National Union was induced by fraud to grant the 30 Day Extension, and to provide coverage, defend and indemnify the *Ryan* Plaintiffs.

110. As a result of the *Ryan* Plaintiffs' false statements and material omissions, National Union has suffered damages, including, without limitation:

    a. providing coverage, defense and indemnification where it was not warranted, including defense counsel's fees and expenses;

    b. conducting unnecessary investigations into Sowell's claims;

    c. conducting unnecessary analyses of coverage issues, including coverage counsel's fees and expenses;

    d. settling with Sowell in excess of the Policy limits, as well as attorneys' fees and expenses related thereto; and

    e. incurring attorneys' fees and expenses in defending against these actions.

## SECOND COUNTERCLAIM
### (NEGLIGENT MISREPRESENTATION)

111. National Union hereby repeats and re-alleges the allegations contained in Paragraphs 1 through 105 of its Counterclaims as if fully restated herein.

112. The *Ryan* Plaintiffs made false statements and misrepresentations in the course of their business in order to wrongfully induce National Union to extend the Policy, to provide

45

coverage, defense and indemnification to which they were not entitled, and to support their claims in this action.

113.  National Union justifiably relied on false statements and misrepresentations because they were made, in large part, by counsel, including Fitzpatrick and Nicgorksi.

114.  National Union justifiably relied on these false statements and material omissions and was induced to grant the 30 Day Extension, and to provide coverage, defend and indemnify the *Ryan* Plaintiffs.

115.  As a result of its justifiable reliance, National Union suffered substantial damages including, without limitation:

   a.  providing coverage, defense and indemnification where it was not warranted, including defense counsel's fees and expenses;

   b.  conducting unnecessary investigations into Sowell's claims;

   c.  conducting unnecessary analyses of coverage issues, including coverage counsel's fees and expenses;

   d.  settling with Sowell in excess of the Policy limits, as well as attorneys' fees and expenses related thereto; and

   e.  incurring attorneys' fees and expenses in defending against these actions.

### THIRD COUNTERCLAIM
(BREACH OF CONTRACT)

116.  National Union hereby repeats and re-alleges the allegations contained in Paragraphs 1 through 105 of its Counterclaims as if fully restated herein.

117.  The Policy and Renewal Application were contracts between the *Ryan* Plaintiffs and National Union.  National Union expected that the *Ryan* Plaintiffs would honor their obligations under the Policy and the Renewal Application.

118.  Instead, the *Ryan* Plaintiffs breached the contract by failing to give timely notice of Sowell's Claims, making false statements and material omissions, acting in bad faith, and

acquiring an extension of the Policy, coverage, defense, and indemnification to which they were not entitled.

119.   By making the false statements and omissions described above, the *Ryan* Plaintiffs concealed and misrepresented facts and information material to National Union's determination whether to provide coverage, to renew the Policy, to provide the 30 Day Extension, and to provide a 90 day extension. National Union was induced by fraud to grant the 30 Day Extension, and to provide coverage, defend and indemnify the *Ryan* Plaintiffs.

120.   By such conduct, Defendants breached the contract and caused National Union substantial damages.

### FOURTH COUNTERCLAIM
(BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

121.   National Union hereby repeats and re-alleges the allegations contained in Paragraphs 1 through 105 of its Counterclaims as if fully restated herein.

122.   The Policy was a contract between the *Ryan* Plaintiffs and National Union. National Union expected that the *Ryan* Plaintiffs would honor their obligations under the Policy and do business with National Union with the good faith and fair treatment demanded by law.

123.   Instead, the *Ryan* Plaintiffs purposely harmed and disadvantaged National Union through a series of bad faith conduct, including making false statements and material omissions in order to wrongfully induce National Union to extend the Policy, to provide coverage, defense and indemnification to which they were not entitled, and to support their claims in this action.

124.   By making the false statements and omissions described above, the *Ryan* Plaintiffs concealed and misrepresented facts and information material to National Union's determination whether to provide coverage, to renew the Policy, to provide the 30 Day

47

{00149668; 4; 0040-3}

Extension, and to provide a 90 day extension. National Union was induced by fraud to grant the 30 Day Extension, and to provide coverage, defend and indemnify the *Ryan* Plaintiffs.

125.  By such bad faith misconduct, the *Ryan* Plaintiffs have wilfully and maliciously denied National Union the right to receive some or all of the benefits as set forth in the Policy, in total disregard of its interests. The *Ryan* Plaintiffs have prejudiced National Union's ability to rely on the coverage provisions therein, to provide coverage only for covered claims, to balance its risk, and to focus on and indemnify insureds with meritorious claims.

126.  The *Ryan* Plaintiffs' misconduct is the product of an improper motive and dishonest purpose to serve their own self-interest, and to wrongfully induce National Union to provide coverage, to defend them against Sowell's Claims, and to settle with Sowell for an amount in excess of the Policy limits.

127.  By their bad faith conduct, Defendants breached the implied covenant of good faith and fair dealing and caused National Union substantial damages.

### FIFTH COUNTERCLAIM
(UNJUST ENRICHMENT)

128.  National Union hereby repeats and re-alleges the allegations contained in Paragraphs 1 through 105 of its Counterclaims as if fully restated herein.

129.  The *Ryan* Plaintiffs were unjustly enriched at the expense of National Union through various acts of fraud and misconduct.

130.  First, despite the *Ryan* Plaintiffs' success in fraudulently inducing National Union to provide coverage, defend and indemnify them under the Policy, as a matter of fact, Sowell's Claims were expressly excluded under the Policy pursuant to several Policy exclusions.

131.   Second, the *Ryan* Plaintiffs made these false statements and material omissions in order to wrongfully induce National Union to extend the Policy, to provide coverage, defense and indemnification to which they were not entitled, and to support their claims in this action.

132.   By making the false statements and omissions described above, the *Ryan* Plaintiffs concealed and misrepresented facts and information material to National Union's determination whether to provide coverage, to renew the Policy, to provide the 30 Day Extension, and to provide a 90 day extension.

133.   National Union was induced by fraud to grant the 30 Day Extension, and to provide coverage, defend and indemnify the *Ryan* Plaintiffs.

134.   Third, the *Ryan* Plaintiffs benefited from Gwynn's efforts, though his counsel Nicgorski, to force National Union to provide coverage without a full opportunity to consider the additional information Nicgorski provided in his letters of January 3 and January 6, 2003. Conlin did not receive these letters until Monday, January 6, 2003. The arbitration was to set to proceed the next day, January 7, 2003. Conlin was put in the untenable position of providing coverage immediately to protect the insureds or to wait until he had an opportunity to fully consider the information and issues presented. Conlin chose to protect the insureds.

135.   Fourth, the *Ryan* Plaintiffs willfully and maliciously failed to mitigate their damages and exposed themselves unnecessarily to the adverse award in the Sowell Arbitration. After Conlin declined coverage in January 2002, the *Ryan* Plaintiffs hired William Federman, Esq., an experienced securities defense lawyer, to defend them in the Sowell Arbitration. The *Ryan* Plaintiffs hired yet another law firm, Snell & Wilmer L.L.P., to defend Source against Sowell's Claims. Despite the fact that the *Ryan* Plaintiffs allege that Sowell's Claims exposed them to great personal, financial and business risk—and that Gwynn's *pro se* representation

alienated the arbitration panel and caused substantial harm to their defense—the *Ryan* Plaintiffs elected not to hire counsel for the *Gwynn* Plaintiffs or to even meaningfully consider the possibility.

136. To the extent that the *Ryan* Plaintiffs claim a conflict of interest prevented them from engaging in a joint defense, or precluded the *Ryan* Plaintiffs from hiring a separate attorney for the *Gwynn* Plaintiffs, the *Gwynn* and *Ryan* Plaintiffs later hired John Nicgorski to defend them, jointly, in the action to confirm the arbitration award (*Sowell v. Merit Capital Associates, Inc., et al.*, Cause No. CV03-0003960, Superior Court of the State of Arizona, County of Maricopa). No conflict of interest appears to have precluded that joint representation, and the *Ryan* Plaintiffs have not produced any document to show that any alleged conflict of interest has been waived.

137. As a result of the conduct described above, the *Ryan* Plaintiffs wrongfully benefited from coverage, defense and indemnification for which they did not pay, and were therefore unjustly enriched to the detriment and injury of National Union. Such unjust enrichment includes, without limitation, National Union's efforts to:

  a. provide coverage, defense and indemnification where it was not warranted, including defense counsels' fees and expenses;

  b. conduct unnecessary investigations into Sowell's claims;

  c. conduct unnecessary analyses of coverage issues, including coverage counsel's fees and expenses;

  d. settle with Sowell in excess of the Policy limits, as well as attorneys' fees and expenses related thereto; and

  e. incur attorneys' fees and expenses in defending against these actions.

WHEREFORE, Defendants National Union Fire Insurance Company of Pittsburgh, Pa. and AIG Technical Services, Inc. respectfully request that the Court dismiss the *Ryan* Plaintiffs' Amended Complaint and award Defendants the following relief: (1) restitution of the amount paid by Defendants to settle with Sowell, which was in excess of the Policy limits, with interest thereupon; (2) all fees and expenses incurred by National Union to defend the *Ryan* Plaintiffs in the Sowell Arbitration, including all fees and expenses of defense counsel assigned by, or paid for by, National Union, with interest thereupon; (3) all reasonable costs and attorneys fees incurred by National Union in its defense against this action, with interest thereupon; (4) punitive damages; (5) and any such further relief as the Court deems just and proper.

DEFENDANTS NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, P.A. and AIG TECHNICAL SERVICES, INC.

By: _____
James R. Hawkins II (ct00128)
William M. Tong (ct25304)
Finn Dixon & Herling LLP
One Landmark Square, Suite 1400
Stamford, CT  06901-2689
Tel:  (203) 325-5000
Fax:  (203) 348-5777
Email:  jhawkins@fdh.com

## **CERTIFICATION**

This is to certify that a true and correct copy of the foregoing was delivered by United States mail, first class, postage prepaid to the following this 16th day of September, 2005:

>Peter M. Nolin, Esq.
>Jay H. Sandak, Esq.
>Sandak Hennessey & Greco LLP
>707 Summer Street
>Stamford, CT 06905
>(203) 425-4200
>
>Mario DiNatale, Esq.
>Jonathan M. Levine, Esq.
>Silver Golub & Teitell LLP
>184 Atlantic Street
>Stamford, CT 06904
>(203) 325-4491

_____
James R. Hawkins II