United States District Court
District of Connecticut
FILED AT    HARTFORD

By

Deputy Clerk

### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITOL ASSOCIATES, INC. | ) <br> ) CIVIL ACTION NO. <br> ) 3:03 CV 00644 (CFD) <br> ) |
| Plaintiffs, | ) <br> ) |
| vs. | ) <br> ) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., | ) <br> ) <br> ) <br> ) |
| Defendants | ) <br> ) |
| DAVID W. GWYNN, RAQUEL GWYNN AND GWYNN FINANCIAL SERVICES, INC. | ) <br> ) CIVIL ACTION NO. <br> ) 3:03 CV 01154 (CFD) |
| Plaintiffs, | ) <br> ) |
| vs. | ) <br> ) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., | ) <br> ) <br> ) <br> ) |
| Defendants | ) <br> ) AUGUST 11, 2005 |

### SECOND AMENDED COMPLAINT

Plaintiffs bring this action against the Defendants for breach of their obligations under a

policy of insurance they issued to and on behalf of the Plaintiffs and for the Defendants' bad faith

failure to defend and failure to defend properly the Plaintiffs and certain related parties under that

policy. For their Complaint the Plaintiffs state the following:

1.    Plaintiff David W. Gwynn ("Gwynn") is a resident of the State of Arizona.

2.    Plaintiff Raquel Gwynn is the wife of David W. Gwynn, and is a resident of the State of Arizona.  At all times relevant to this complaint, Raquel Gwynn has been employed as a teacher.

3.    Gwynn Financial Services, Inc. ("GFS"), is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Arizona.  David W. Gwynn is the owner of GFS.

4.    The Defendant, National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") is an insurance company organized under the laws of the Commonwealth of Pennsylvania and has its principal place of business at 175 Water Street, New York, NY 10038.

5.    The Defendant, AIG Technical Services, Inc. ("AIGTS"), on information and belief is a corporation organized under the laws of the State of Delaware and has its principal place of business at 175 Water Street, New York, NY 10038.  Both National Union and AIGTS are owned and controlled by the American International Group, also based at 175 Water Street, New York, NY 10038.

**JURISDICTION:**

6.    This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1332(a)(1) in

that the Plaintiffs and the Defendants are residents of different states and the amount in controversy exceeds the sum of $75,000 as to each defendant, exclusive of interest and costs.

7.     Venue is proper in the District of Connecticut under 28 U.S.C. § 1391, as Plaintiffs are all residents of Arizona, on information and belief the Defendants are authorized to and in fact engage in insurance business in the State of Connecticut, and the dispute arises from a contract of insurance made and to be performed, at least in part, in Connecticut.

## FACTS COMMON TO ALL CLAIMS:

8.     Merit Capital Associates, Inc., ("Merit") is a corporation organized and existing under the laws of the State of Connecticut, with its principal place of business in Westport, Connecticut.

9.     Merit at all relevant times was a securities broker/dealer, registered with the National Association of Securities Dealers ("NASD").  Merit had business operations in various other states, including Arizona.

10.     From at least 1986, Gwynn was licensed by the NASD to sell securities and at all relevant times, Gwynn functioned as a Registered Representative of Merit, primarily in the State of Arizona.

11.     Gwynn is also a Certified Financial Planner designee.

12.     National Union issued a Securities Broker/Dealer's Professional Liability Insurance Policy to Merit, and said policy No. 473-36-20 was effective for the period from

3

August 23, 2000 to August 23, 2001 (the "policy").  A copy of the Policy is attached hereto as Exhibit A.

13.     The policy covers Merit as the insured "Broker/Dealer", but also includes Gwynn within the definition of "insured" in his capacity as a "Registered Representative," in that he was registered with the NASD and was compensated by Merit to render "Professional Services" on behalf of Merit.

14.     Merit paid National Union SEVENTY-TWO THOUSAND FIVE HUNDRED ($72,500.00) Dollars in premiums for the Policy and has at all relevant times complied with all the terms of the Policy.  The Policy applies to claims within the definition of coverage which are made within the policy period.  Merit required that Gwynn pay a portion of the premiums for this policy, and Gwynn did in fact pay a portion of the premium.

15.     Under the terms of the Policy, National Union:

> **shall have the right and duty to defend,** subject to and as part of the Limits of Liability, any Claim made against an insured during the policy Period or discovery Period (if applicable) and reported in writing to the insurer pursuant to the terms of this policy **for any actual or alleged Wrongful Act** for which coverage is afforded by this policy, **even if any of the allegations of the Claim are groundless, false or fraudulent.**
> (Emphasis supplied).

16.     Michael A. Sowell ("Sowell") is an individual residing in Chandler, Arizona, who has made claims against Gwynn, GFS, Raquel Gwynn, and Merit, for which the Plaintiffs have sought coverage and defense benefits under the Policy.

4

17.     Sowell has also made claims against Bruce Charles Ryan ("Ryan"), the President and a shareholder of Merit; Russell William Newton ("Newton"), the Chairman, Chief Financial Officer and a shareholder of Merit; and Robert Fitzpatrick ("Fitzpatrick"), Merit's Compliance Officer and General Counsel.

18.     Sowell has known Gwynn since approximately 1992 and had maintained a business relationship with him since that time.

19.     In early 1998, Sowell claimed to have contacted Gwynn about setting up a retirement plan.

20.     In 1998, Sowell loaned approximately $150,000, in two separate payments of $75,000, to a company in which Gwynn was involved, Novation Financial Corporation ("Novation").

21.     During the period from November 1999 to July 2000, Sowell loaned $75,000 in three separate payments of $25,000 to Charter Financial Network, Inc., a/k/a Charter 3, Inc., ("Charter"), a successor company to Novation.

22.     In 1998, Sowell provided certain securities or funds to Gwynn for deposit into a securities account at Merit, under account number LFW-00053-A5.

23.     During the next several years, there were extensive trades in Sowell's Merit account. During this period, Sowell never complained to Merit about how Gwynn was handling his account, despite receiving monthly statements identifying all transactions concerning the

account, and despite repeated letters of inquiry about account activity that Merit and Fitzpatrick sent to Sowell from August 1999 to June 2001. In fact, during this period of time, Sowell referred other persons to Gwynn.

24.    In October 2000, Sowell acknowledged, in a letter addressed to Merit and Fitzpatrick, that he was aware of significant activity in his account number LFW-00053-A5 and that he had approved all trades that occurred in the account.

25.    On or about September 4, 2001, Sowell commenced an NASD arbitration by filing a Statement of Claim (the "Original Claim") dated August 31, 2001. As part of this Original Claim, Sowell asserted claims against Merit, Gwynn, GFS, and Raquel Gwynn and against Ryan, Newton, and Fitzpatrick, and their wives.

26.    Sowell's Original Claim concerned the trading activity in Sowell's account number LFW-00053-A5 at Merit and his loans to Novation and Charter. Sowell accused Gwynn of churning his account, advising him improperly, making inappropriate trades, and also claimed fraud and various statutory and regulatory violations arising from Gwynn's conduct, including Sowell's loans to Novation and Charter.

27.    Prior to September 21, 2001, Gwynn, Raquel Gwynn and GFS tendered the defense of the Original Claim to National Union.

28.    By letter dated October 3, 2001, National Union has always acted by and through AIGTS with respect to the claims made by Sowell and the coverage available to Gwynn, Raquel

Gwynn and GFS under the Policy.

29.    In early October 2001, AIGTS on behalf of National Union, retained Renaud, Cook & Drury, P.A., of Phoenix, Arizona, to represent Merit, and Ryan, Newton, and Fitzpatrick and their wives.  In early November 2001, attorneys for that firm appeared in the NASD arbitration proceeding for Merit, Ryan, Newton, and Fitzpatrick.  Because the NASD had no jurisdiction over their wives, since they had no affiliation with a Broker Dealer and were not otherwise subject to NASD regulation, no appearance was necessary or appropriate for the wives of Ryan, Newton, and Fitzpatrick.

30.    Thereafter, AIGTS on behalf of National Union, retained Mariscal, Weeks, McIntyre & Friedlander, P.A., of Phoenix, Arizona, ("Mariscal, Weeks"), to represent Gwynn, Raquel Gwynn and GFS.  Notwithstanding that the NASD had no jurisdiction over Raquel Gwynn, since she was not herself a Broker Dealer nor had any affiliation with a Broker Dealer, and was not otherwise subject to NASD regulation, Mariscal, Weeks filed an appearance and an answer on behalf of Gwynn, GFS, and Raquel Gwynn on or about November 20, 2001.

31.    By appearing and answering for Raquel Gwynn, Mariscal, Weeks, which had been appointed to defend Gwynn, GFS, and Raquel Gwynn by AIGTS, consented to and created jurisdiction over Raquel Gwynn.

32.    At all relevant times, Gwynn, Raquel Gwynn, and GFS cooperated fully with AIGTS and National Union and Mariscal, Weeks and provided all information requested.

33.    After AIGTS' inquiry, Merit, Gwynn, Ryan, Newton, and Fitzpatrick supplied information that revealed that Sowell had provided a power of attorney to Gwynn, in March of 1998; the power of attorney had been intended for use only in emergencies; and the power of attorney had never been used.  Merit, Gwynn, Newton, and Fitzpatrick also provided AIGTS with information which showed that Sowell's account had never been a discretionary account.

34.    In November 2001, Merit, Ryan, Newton, and Fitzpatrick provided AIGTS with a copy of the power of attorney that Sowell had provided to Gwynn.  That document, however, was not notarized and hence was not effective under Arizona law, where both Sowell and Gwynn resided, and where Sowell had made his investments with Merit.

35.    In early 2002, AIGTS and National Union advised Gwynn, Raquel Gwynn and GFS, as well as Merit, Ryan, Newton, and Fitzpatrick, that based on the power of attorney, AIGTS has determined the account was discretionary and therefore AIGTS and National Union denied both their coverage and defense obligations under the Policy.

36.    Thereafter, AIGTS notified Mariscal, Weeks that AIGTS and National Union would no longer pay for the defense of the Sowell arbitration claims against Gwynn, Raquel Gwynn, and GFS.

37.    At or about the same time, AIGTS notified Renaud Cook & Drury that AIGTS and National Union would no longer pay for the defense of the Sowell arbitration claims against Merit, Ryan, Newton, and Fitzpatrick.

38.    Following AIGTS' withdrawal from its duty to defend, Mariscal, Weeks, which had been acting as counsel to Gwynn, Raquel Gwynn and GFS, withdrew from their representation on or about March 4, 2002.

39.    Thereafter, following the withdrawal of Mariscal, Weeks, Gwynn and GFS made arrangements to pay the firm, with their own money, to continue its representation and defense. As a result of these arrangements, Mariscal, Weeks reappeared in defense of the claims on or about May 13, 2002.

40.    However, neither Gwynn, Raquel Gwynn, nor GFS had the financial ability to continue to pay Mariscal, Weeks for its legal fees and costs in connection with its defense of the claim. As a result, Mariscal, Weeks, again withdrew from its representation of Gwynn, Raquel Gwynn and GFS on or about September 9, 2002, and they were left without counsel to represent their interests in defending Sowell's claims.

41.    Merit, Ryan, Newton, and Fitzpatrick subsequently retained attorney William B. Federman of Federman & Sherwood, Oklahoma City, Oklahoma, to continue their defense.

42     In May 2002, while AIGTS and National Union were refusing to defend Gwynn, GFS and Raquel Gwynn, and Merit, Ryan, Newton, and Fitzpatrick, Sowell filed an amended claim in which he named Source Capitol Group, Inc., ("Source") as a successor to Merit. Merit, Ryan, Newton, and Fitzpatrick were obligated to incur significant costs to defend Source and ultimately negotiated a stay of the proceedings against Source, pending the outcome of Sowell's

9

original claims against Merit.

43.    The hearing on Sowell's arbitration claim was originally scheduled to proceed from October 15, 2002 through October 23, 2002. That hearing was postponed on Gwynn's request because, without defense coverage from AIGTS and National Union, Gwynn was unable to afford counsel to defend himself, GFS, and his wife, Raquel Gwynn. The hearing was re-scheduled to commence on January 7, 2003. As a result of this postponement, Gwynn incurred a postponement fee of $1,200.00, which he paid.

44.    By letter dated October 24, 2002, Sowell's counsel advised Gwynn, Attorney William Federman, and AIGTS' claim analyst Brian T. Conlin, that Sowell had acknowledged in writing to Merit, after the date he signed the power of attorney, that his Merit account at issue was not governed by a power of attorney to anyone, including his broker. At the same time Sowell's counsel made a "policy limits" demand to settle the arbitration and noted that Sowell would be seeking damages in excess of the policy limits if the arbitration proceeded.

45.    After receiving the letter from Sowell's counsel confirming that the power of attorney was not operative as to the Merit account, AIGTS and National Union neglected, failed and refused to re-assume the defense of Gwynn, Raquel Gwynn, GFS, Merit, Ryan, Newton, and Fitzpatrick, and refused to respond to the settlement demand of Sowell.

46.    On information and belief, during this period Sowell would have accepted a settlement for an amount less than $500,000, or half of the limits of the Policy, but AIGTS and

National Union refused to negotiate with Sowell and his counsel.

47.     Throughout the end of 2002, Gwynn remained unable to afford to retain counsel to defend himself, GFS and his wife Raquel Gwynn.

48.     In December 2002, Gwynn sought a further postponement of the hearing on Sowell's arbitration claims, based on his inability to be able to afford counsel to represent him as a result of AIGTS and National Union's breach of their defense obligations under the Policy.

49.     In early 2003, Sowell, through his counsel, opposed the request for the postponement, and the request was denied by the arbitration panel, leaving the hearing scheduled to proceed on January 7, 2003.

50.     During this period of time, Gwynn retained Attorney John J. Nicgorski, of the firm of Mohr, Hackett, Pederson, Blakley & Randolph, P.C., of Phoenix, Arizona, to represent him in negotiating with AIGTS concerning policy coverage issues.

51.     On January 3, 2003, Attorney Nicgorski advised AIGTS and National Union of the various facts in the record that established Sowell's account had not been discretionary, that the power of attorney had been revoked, and that Sowell retained all discretion over all of his accounts with Merit.  Gwynn, through counsel, made a demand on AIGTS and National Union to resume the defense of Gwynn, Raquel Gwynn, and GFS, and to settle Sowell's claim within the policy limits.

52.    On January 6, 2003, AIGTS' claim analyst Brian T. Conlin, on behalf of AIGTS and National Union, acknowledged receipt of Gwynn's demand and indicated AIGTS would evaluate the information contained therein as quickly as possible.

53.    Gwynn, through attorney Nicgorski, responded that day to AIGTS, noting that the power of attorney relied upon by AIGTS to deny its defense and coverage obligations under the policy was unenforceable under Arizona law and that some of the claims involved investments made by Sowell that did not involve the power of attorney.  Gwynn, through attorney Nicgorski, again noted the arbitration was scheduled to proceed the following day, January 7, 2003 at 9:00 a.m. and that because AIGTS was not defending Gwynn, he would have to proceed *pro se*. Gwynn again demanded coverage, a settlement within the policy limits, and an immediate resumption of the defense by AIGTS and National Union.

54.    AIGTS and National Union failed, neglected or refused to respond to the January 6, 2003 letter from Gwynn's counsel, and Gwynn, Raquel Gwynn, and GFS proceeded to the commencement of the arbitration hearing on January 7, 2003.

55.    As a result of the conduct of AIGTS and National Union in refusing to tender a defense to Gwynn, Raquel Gwynn and GFS, David Gwynn, who had no legal training or experience whatsoever, was compelled to attempt to represent himself and GFS against Sowell's experienced trial counsel.  Moreover, as a further result of the conduct of AIGTS and National Union in refusing to tender a defense, Raquel Gwynn was unrepresented at the arbitration

12

hearing, and did not even know she needed to attend the hearing to represent her interests.

56.    As a further result of the conduct of AIGTS and National Union in refusing to tender a defense, Gwynn was unable to fully and competently prepare a defense, and could not afford to retain an expert witness to present his position, or to rebut the testimony of the expert witness retained by Sowell.

57.    Although Merit, Ryan, Newton, and Fitzpatrick had retained private counsel to represent them in the arbitration, because AIGTS and National Union were breaching their defense obligations and, upon information and belief, because of their resultant monetary constraints, Merit, Ryan, Newton and Fitzpatrick were unable to fully prepare their defense and were unable to retain an expert witness to present their position.

58.    Gwynn was compelled to represent himself and GFS *pro se* at the arbitration on January 7, 8, and 9, 2003 and during these three days Raquel Gwynn was unrepresented.

59.    Because Gwynn was not a lawyer, had no legal training, and was inexperienced in the procedural rules governing NASD arbitrations, he was unable to prepare a competent defense. In particular, and by way of example, Gwynn failed to prepare and file a list of the exhibits he intended to offer at the hearing, and was therefore limited in the rights he had to offer documentary evidence at the hearing; was admonished by the arbitration panel for presenting an opening statement that was improper in form; lacked the experience to prepare for and understand how to respond to his examination by Sowell's counsel; and was unable to effectively

cross examine witnesses at the hearing, or present witnesses on his own behalf.

60.     On January 10, 2003, after 3 full days of testimony at the arbitration, and after Sowells' counsel had concluded his extensive examination of Gwynn, AIGTS admitted it had a duty to defend Gwynn, Raquel Gwynn, GFS, Merit, Ryan, Newton and Fitzpatrick when it determined that National Union would resume providing a defense to all of these parties based on the evidence that Sowell never had a discretionary account at Merit and that his power of attorney had not been used and was not even operative under Arizona law.

61.     On January 10, 2003, AIGTS again retained attorney Maxine Polomski of Mariscal, Weeks, to represent Gwynn, GFS and Raquel Gwynn.  On that same date, AIGTS notified attorney Federman that it was then offering to pay the reasonable defense costs for Merit, Ryan, Newton, and Fitzpatrick.

62.     By letter dated January 10, 2003 to Gwynn's attorney John Nicgorski, Sowell's attorney confirmed that the evidence at the hearing had rebutted the assertion that Sowell's account with Merit had been discretionary or managed pursuant to a power of attorney given by Sowell to Gwynn.  Sowell's counsel stated the "bottom line from our perspective is that Sowell's account was not a discretionary trading account."  Sowell's counsel also noted therein that:

> Based on the evidence summarized below, we strongly believe that [Gwynn] faces an adverse judgment in the case that exceeds policy limits, which we understand to be $1 million.  We further believe that AIG's refusal to provide him a defense plays a role in that exposure.

Sowell's counsel ended with a formal demand to settle the proceeding for $950,000, and warned

14

that "should AIG continue to refuse to settle within policy limits, it continues to expose its insureds to an excess judgment". A copy of that letter is attached hereto as Exhibit B. On information and belief, that letter was forwarded to Mariscal, Weeks and to AIGTS, on or about January 11, 2003.

63.    AIGTS and National Union did not respond to Sowell's settlement overture and instead attempted to proceed with its belated and ineffective defense of the arbitration claims.

64.    Because AIGTS did not authorize Mariscal, Weeks to resume the defense of Sowell's claims until three days of testimony had been taken, and because the NASD does not routinely transcribe arbitration hearings and the audio tapes of the hearing had not yet been requested by Gwynn, attorney Polomski was unable to adequately prepare for the continuation of the hearing on January 13, 2003, and had to rely in part on a status letter from Sowell's counsel dated January 11, 2003. A copy of that letter is attached as Exhibit C.

65.    In that letter, counsel to Sowell described, in detail, the evidence that had been adduced at the hearing, as well as the likelihood that said evidence would result in the arbitrators rendering an award in excess of the policy limits. It further advised that AIG's failure to provide Gwynn with a defense caused him "substantial prejudice," and further expressed "concern" for "the significant emotional stress Mr. Gwynn seemed to be under as he attempted to represent himself at the hearing."

66.     On information and belief, Attorney Polomski was not a partner at the Mariscal, Weeks firm, and had minimal arbitration and trial experience.  Although other, more experienced attorneys practiced at Mariscal, Weeks, on information and belief, Attorney Polomski was retained by AIGTS primarily because of her low billing rate.

67.     Upon her entry into the case on January 13, 2003, Attorney Polomski moved for a continuance of the arbitration proceeding, based on her recent entry into the case and her lack of time to prepare, but the arbitration panel denied that request.

68.     Because of AIGTS' belated decision to resume the defense of the Sowell arbitration, none of the respondents, including the plaintiffs in this action, had an adequate opportunity to retain an expert witness, and accordingly, Sowell's expert testimony went largely unrebutted.

69.     The Sowell arbitration hearing ended on January 14, 2003, and the parties filed proposed findings of fact and conclusions of law on January 15, 2003.  On January 15, 2003, Attorney Polomski filed a supplemental brief in an effort to dismiss the claims against Raquel Gwynn.  Sowell's counsel argued in response that when Attorney Polomski had answered Sowell's statement of claim in the arbitration, she had neither raised lack of jurisdiction as a special defense nor otherwise challenged jurisdiction as to Raquel Gwynn.

70.     By letter dated January 16, 2003, Attorney Federman advised coverage counsel for AIGTS and National Union that, prior to the commencement of the arbitration he thought a

settlement might have been negotiated for approximately $240,000. Attorney Federman pointed out that Sowell had presented evidence of damages in excess of $909,000 together with claims for interest, attorneys fees, and arbitration costs and punitive damages of $500,000, which put a potential award well in excess of the Policy limit, and that he expected an award to enter against Merit, Ryan, Newton, and Fitzpatrick as well as Gwynn. A copy of that letter is attached hereto as Exhibit D.

71.     Notwithstanding all the indications that the arbitration hearing had not gone well, AIGTS and National Union did nothing to attempt to settle the claims before an award was entered by the arbitration panel.

72.     On February 25, 2003, the NASD arbitration panel entered an award against Gwynn, GFS, and Raquel Gwynn, and Merit, Ryan, Newton, and Fitzpatrick, jointly and severally, in the amount of $1,125,000 (the "Award"). A copy of the Award is attached as Exhibit E. In addition, the panel found Gwynn, GFS, Raquel Gwynn, and Merit, Ryan, Newton, and Fitzpatrick, jointly and severally liable for $17,500 in arbitration fees.

73.     Nothing in the Award is predicated on or even refers to any claim or evidence that Sowell's account was discretionary or managed through a power of attorney, and in fact, the Award notes specifically that Respondents had asserted "Sowell exercised control over his account at Merit."

74.    Even following the entry of the Award, AIGTS and National Union continued for many months to fail to fulfill their obligations under the Policy.

75.    The Policy provides for alternative dispute resolution in the event of any dispute between National Union and the insureds, and provides that the insured Broker Dealer may select either binding arbitration or mediation.

76.    Upon information and belief, on March 25, 2003, Merit , Ryan, Newton and Fitzpatrick, demanded mediation in Connecticut as provided for by the Policy, but AIGTS and National Union have neglected, failed or refused to respond to that demand.

77.    In part due to AIGTS' continued refusal to settle the arbitration claims, despite entry of an award in Sowell's favor in excess of policy limits, Sowell has filed suit to confirm the arbitration award.  That action, <u>Sowell v Merit Capital Associates, et al.,</u> was filed in the Superior Court of the State of Arizona in and for the County of Maricopa (docket no. CV 2003-003960).

78.    For a long time after Sowell filed his action to confirm the arbitration award, AIGTS and National Union continued to fail to negotiate in good faith with Sowell's counsel. Finally, they did settle this claim, literally on the eve of oral argument in the Arizona court on Sowell's application to confirm the answer.


**First Count (Breach of Duty to Defend)**

79.    Plaintiffs repeat paragraphs 1 through 78 above.

80.    Under Connecticut law, National Union and its agent and affiliate company AIGTS had an implied duty of good faith and fair dealing under the Policy.

81.    Under the Policy, National Union and its agent and affiliate company AIGTS had a duty to defend Gwynn, Merit, Ryan, Newton, and Fitzpatrick, and assumed the duty to defend Raquel Gwynn when they authorized counsel to appear for them in the arbitration with Sowell.

82.    AIGTS and National Union acknowledged that the claims made by Sowell in the arbitration were claims within the scope of their duty to defend under the Policy, when, after AIGTS and National Union had received a copy of Sowell's Arbitration Claim, they initially retained counsel of their choice and authorized them to appear for Gwynn, GFS and Raquel Gwynn, and Merit, Ryan, Newton, and Fitzpatrick.

83.    AIGTS and National Union reconfirmed that the claims made by Sowell in the arbitration were claims within the scope of their duty to defend under the Policy on or about January 10, 2003, when they agreed, again, to fund the defense for Merit, Ryan, Newton, and Fitzpatrick, and authorized Mariscal, Weeks to reappear for Gwynn, GFS and Raquel Gwynn.

84.    AIGTS and National Union breached their duty to defend when they:

    a.    refused to provide or pay for the defense of Gwynn, and Raquel Gwynn, during the period from January 2002 through January 9, 2003.

    b.    refused to provide or pay for the defense of Merit, Ryan, Newton and Fitzpatrick, during the period from January 2002 through January 9, 2003.

    c.    failed to direct or pay for the proper preparation for the defense of Merit, Ryan, Newton and Fitzpatrick, and Gwynn, and Raquel Gwynn in the Sowell arbitration from its initiation through the arbitration hearing which proceeded on January 7, 8, 9, 13 ,14, and 15, 2003, including the failure to

19

        assist the insureds under the Policy in retaining an appropriate expert witness(es) for the arbitration to respond to Sowell's disclosed expert.

d.      forced Gwynn to appear without counsel for the first three days of the arbitration.

e.      caused Raquel Gwynn to appear and admit jurisdiction before the NASD, even though they knew or should have known that the NASD had no jurisdiction over Raquel Gwynn.

f.       retained counsel for Gwynn, and Raquel Gwynn who, on information and belief, lacked sufficient trial or arbitration experience to effectively represent these parties in a claim of the potential magnitude and complexity of the Sowell claim.

g.      failed to assist Gwynn in reviewing and timely responding to Sowell's requests for documents in the arbitration.

h.      failed to properly communicate with Gwynn, and Raquel Gwynn.

i.       failed to direct counsel after the arbitration and failed to immediately authorize defense counsel to move to vacate or appeal the arbitration award.

j.       restricted the defense of the insureds under various policies and procedures designed to reduce the defendants' cost without regard to the necessities of the defense that was required in the Sowell arbitration.

85.    As a result of the breach of the duty to defend by AIGTS and National Union,

Plaintiffs have suffered economic injury and damages including the following:

a.      The Plaintiffs have incurred expenses in connection with their defense including legal fees, filing fees and other related costs associated with the Sowell arbitration, which amounts should have been paid by AIGTS and National Union.

b.      The Plaintiffs were compelled to borrow money in order to obtain funds to present a defense to Sowell's claim.

86.    As a further result of the defendants' conduct in breach of their duty to defend,

Plaintiffs will continue to suffer damages and costs in connection with regulatory proceedings

which will result from the entry of the Sowell arbitration award.

87.    As a further result of the Defendants' conduct in breach of their duty to defend, Plaintiff David Gwynn has experienced damage to his reputation and injury to his present and future earning potential.

88.    As a further result of the Defendants' conduct in breach of their duty to defend, Plaintiff Raquel Gwynn has experienced damage to her reputation and injury to her present and future earning potential.

## Second Count (Breach of Duty to Indemnify)

89.    Plaintiffs repeat paragraphs 1 through 88 as paragraphs 89 of the Second Count.

90.    Under the Policy, National Union and its agent and affiliate company AIGTS promised to pay for Loss, including damages, judgments, settlements, and Defense Costs, incurred by the insureds.

91.    AIGTS and National Union have breached their duty to pay for Loss under the Policy by:

    a.    failing to explore settlement with Sowell prior to the commencement of the Sowell arbitration hearing, when Sowell was making demands to settle within the limits of the Policy.

    b.    refusing to settle the Sowell claims before the completion of the Sowell arbitration hearing, despite Sowell's expressed willingness to settle the claim within the limits of the Policy, and despite knowledge of the likelihood that an award would enter in excess of the policy limits.

    c.    allowing an award to enter in excess of the limits of the Policy when AIGTS and National Union should have properly defended to defeat those claims, or should have settled to avoid the entry of an award above the

21

limits of the Policy..

92.     As a result of the breach of the obligation of AIGTS and National Union to pay for Loss, Plaintiffs have suffered economic injury and damages including the following:

     a.    The Plaintiffs have incurred expenses in connection with their defense including legal fees, filing fees and other related costs associated with the Sowell arbitration, which amounts would not have been incurred had AIGTS and National Union timely resolved Sowell's claim.

     b.    The Plaintiffs were compelled to borrow money in order to obtain funds to present a defense to Sowell's claim.

93.     As a further result of the Defendants' conduct in breach of their obligation to pay Loss, Plaintiffs will continue to suffer damages and costs in connection with regulatory proceedings which will result from the entry of the Sowell arbitration award.

94.     As a further result of the Defendants' conduct in breach of their obligation to pay Loss, Plaintiff David Gwynn has experienced damage to his reputation and injury to his present and future earning potential.

95.     As a further result of the Defendants' conduct in breach of their duty to defend, plaintiff Raquel Gwynn has experienced damage to her reputation and injury to her present and future earning potential.

**Third Count (Bad Faith)**

96.     Plaintiffs repeat paragraphs 1 through 95 as paragraph 96 of this the Third Count.

97.    Defendants' actions, in failing to defend Plaintiffs and the other insureds under the Policy, in failing to timely indemnify the insureds or pay Loss under the Policy, and in refusing to mediate the dispute with the Plaintiffs despite a demand for mediation under the Policy, were motivated by the self interest of AIGTS and National Union and their conscious and willful disregard of the Plaintiffs' interests.

98.    On information and belief, the above described conduct of the Defendants AIGTS and National Union was based on evil motive and an intent to harm or disadvantage the Plaintiffs for the monetary gain of the Defendants.

99.    The above described conduct of the Defendants AIGTS and National Union was undertaken in breach of the covenant of good faith and fair dealing implied into the Policy under Connecticut law.

100.    As a result of the bad faith conduct of AIGTS and National Union, Plaintiffs have suffered economic injury and damages including the following:

  a.    The Plaintiffs have incurred expenses in connection with their defense including legal fees, filing fees and other related costs associated with the Sowell arbitration, which amounts would not have been incurred had AIGTS and National Union timely resolved Sowell's claim.
  b.    The Plaintiffs were compelled to borrow money in order to obtain funds to present a defense to Sowell's claim.

101.    As a further result of the Defendants' bad faith conduct, Plaintiffs will continue to suffer damages and costs in connection with regulatory proceedings which will result from the

23

entry of the Sowell arbitration award.

102.    As a further result of the Defendants' bad faith conduct, Plaintiff David Gwynn has experienced damage to his reputation and injury to his present and future earning potential.

103.    As a further result of the Defendants' bad faith conduct, Plaintiff Raquel Gwynn has experienced damage to her reputation and injury to her present and future earning potential.

## Fourth Count (CUTPA/CUIPA Claims)

104.    Plaintiffs repeat paragraphs 1 through 103 as paragraph 104 of this the Fourth Count.

105.    At all times relevant hereto, AIGTS and National Union were engaged in the conduct of trade or commerce as that term is defined by Connecticut General Statutes § 42-110a, in that they sell and adjust policies of insurance within Connecticut to entities based in or doing business in Connecticut.

106.    The above described conduct of AIGTS and National Union, including failing to defend Plaintiffs and the other insureds under the Policy, failing to timely indemnify the insureds or pay Loss under the Policy, and refusing to mediate the dispute with the Plaintiffs despite a demand for mediation under the Policy, had direct adverse impacts on the business activities of the Plaintiff David Gwynn.

107.    The conduct of AIGTS and National Union constitutes unfair methods of competition and/or unfair or deceptive practices n the conduct of trade or commerce.

24

108.    The conduct of AIGTS and National Union was immoral, unethical, oppressive and/or unscrupulous, in that it was based on an evil motive and an intent to harm or disadvantage the Plaintiffs for the monetary gain of the Defendants.

109.    The conduct of AIGTS and National Union violated established public policy of the State of Connecticut, in that it violates Connecticut General Statutes § 38-816(6)("CUIPA"), in that they:

      a.    failed to acknowledge and act with reasonable promptness upon communication with respect to claims arising under insurance policies.

      b.    refused to pay claims without conducting a reasonable investigation based upon all available information.

      c.    failed to affirm or deny coverage of claims within a reasonable time after proof of loss forms had been completed.

      d.    did not attempt in good faith to effectuate prompt, fair, and equitable settlement of claims in which liability had become reasonably clear.

110.    The conduct of AIGTS and National Union constitutes intentional or wanton violation of the rights of David Gwynn and Raquel Gwynn, and other businesses and insurance consumers and was done with reckless indifference to those rights.

111.    The conduct of AIGTS and National Union constitutes a violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes § 42-110a et seq ("CUTPA").

112.    As a result of the violation of CUTPA by AIGTS and National Union, David Gwynn and Raquel Gwynn have suffered and will continue to suffer ascertainable losses and damages.

113.    As a result of the conduct of AIGTS and National Union in violation of CUTPA,

Plaintiffs have suffered economic injury and damages including the following:

a.    The Plaintiffs have incurred expenses in connection with their defense
including legal fees, filing fees and other related costs associated with the
Sowell arbitration, which amounts would not have been incurred had
AIGTS and National Union timely resolved Sowell's claim.

b.    The Plaintiffs were compelled to borrow money in order to obtain funds to
present a defense to Sowell's claim.

114.    As a further result of the Defendants' violation of CUTPA, Plaintiffs will continue

to suffer damages and costs in connection with regulatory proceedings which will result from the

entry of the Sowell arbitration award.

115.    As a further result of the Defendants' violation of CUTPA, Plaintiff David Gwynn

has experienced damage to his reputation and injury to his present and future earning potential.

116.    As a further result of the Defendants' violation of CUTPA, Plaintiff Raquel

Gwynn has experienced damage to her reputation and injury to her present and future earning

potential.

## Fifth Count (Intentional Infliction of Emotional Distress)

117.    Plaintiffs repeat paragraphs 1 through 116 as paragraph 117 of this the Fifth

Count.

118.    AIGTS and National Union knew or should have known that emotional distress of

26

David Gwynn and Raquel Gwynn was the likely result of their conduct, including failing to defend Plaintiffs and the other insureds under the Policy, failing to indemnify the insureds or pay Loss under the Policy, and refusing to mediate the dispute with the Plaintiffs despite a demand for mediation under the Policy.

119.    The conduct of AIGTS and National Union was extreme and outrageous.

120.    The conduct of AIGTS and National Union caused Plaintiffs David Gwynn and Raquel Gwynn to suffer severe emotional distress, severe anxiety, depression and the physical effects thereof and will cause them to continue to suffer from those conditions perhaps permanently.

## Sixth Count (Negligent Infliction of Emotional Distress)

121.    Plaintiffs repeat paragraphs 1 through 120 as paragraph 121 of this the Sixth Count.

122.    The conduct of AIGTS and National Union, including failing to defend Plaintiffs and the other insureds under the Policy, failing to timely indemnify the insureds or pay Loss under the Policy, and refusing to mediate the dispute with the Plaintiffs despite a demand for mediation under the Policy, created an unreasonable risk of causing Plaintiffs David Gwynn and Raquel Gwynn emotional distress.

123.    It was foreseeable that the conduct of AIGTS and National Union would cause the distress to the Plaintiffs David Gwynn and Raquel Gwynn.

124.    The conduct of AIGTS and National Union, has caused Plaintiffs David Gwynn
and Raquel Gwynn to suffer severe emotional distress, severe anxiety, depression and the
physical effects thereof and will cause them to continue to suffer from those conditions perhaps
permanently.

**DEMAND FOR RELIEF**

Wherefore, Plaintiffs claim:

A.    Full satisfaction of all costs connected to the Sowell arbitration.
B.    Compensatory Damages of not less than $5,000,000.00.
C.    Punitive and or Exemplary Damages under the common law.
D.    Punitive Damages under CUTPA.
E.    Attorneys' fee under CUTPA.
F.    Interest and costs as may be provided by law.
G.    Such other and further relief as may be available in law or equity.

**Plaintiffs hereby demand a jury trial for all counts on which it is available.**

> **PLAINTIFFS, DAVID GWYNN AND
> RAQUEL GWYNN**
>
>
> By_____
>     Mario DiNatale (ct 12449)
>     Silver Golub & Teitell, LLP
>     184 Atlantic Street
>     Stamford, CT 06904
>     (203) 325-4491
>     (203) 325-3769 (Fax)
>     mdinatale@sgtlaw.com

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing was sent via U.S. Mail, postage prepaid on this 11th day of August, 2005, to:

James R. Hawkins, II, Esq.
Finn Dixon & Herling LLP
One Landmark Square
Stamford CT 06901

Peter M. Nolin, Esq.
Sandak Hennessey & Greco LLP
707 Summer Street
Stamford, CT 06905

_____
MARIO DiNATALE

29