**Exhibit C**

ROSHKA HEYMAN & DeWULF, PLC
ATTORNEYS AT LAW
ONE ARIZONA CENTER
400 EAST VAN BUREN STREET
SUITE 800
PHOENIX, ARIZONA 85004
TELEPHONE NO 602-256-6100
FACSIMILE 602-256-6800

January 11, 2003

**VIA FACSIMILE
& U.S. MAIL**

Maxine Polomski, Esq.
Mariscal, Weeks, McIntyre
 & Friedlander, P.A.
2901 N. Central, Suite 200
Phoenix, AZ 85012-2705

Re:    *Michael Sowell v. Merit Capital Associates, Inc., et al.*
       NASD Arbitration No. 01-4731

FOR SETTLEMENT PURPOSES ONLY, SUBJECT TO RULE 408 OF THE
ARIZONA AND FEDERAL RULES OF EVIDENCE

Dear Maxine:

This is a follow-up to our settlement letter that we sent to Mr. Nicgorski yesterday.

First, we erroneously referred to Mr. Sowell's account as Mr. Gwynn's account in the second paragraph of page 3.

Second, we wanted to let you and Mr. Nicgorski know our concern about the significant emotional stress Mr. Gwynn seemed to be under as he attempted to represent himself at the hearing. Even Mr. Federman has expressed concern that there were times during the hearing that we might lose Mr. Gwynn, who, with all due respect is a rather large man who does not seem to be holding up well.

Third, Mr. Gwynn did not file a list of exhibits and has attempted to insert a large number of documents into the case as the hearing has progressed. To say the least, this has not gone over well with the panel. This appears to have also caused a lot of stress on Mr. Gwynn who has told us he had to spend many hours after an already emotionally

Roshka Heyman & DeWulf

Maxine Polomski, Esq.
January 11, 2003
Page 2

spent day at the hearing attempting to get copies and exhibit notebooks made. Mr. Gwynn told the panel that he was hoping to review these documents with counsel before producing them, but since AIG refused to provide him a defense and he could not afford counsel to represent him in conjunction with the hearing, he was forced to try and deal with the issue as best he could last minute, under the gun and without the assistance of counsel. On Monday we will renew our motion to exclude Mr. Gwynn from introducing any exhibits, other than those that have already been admitted in evidence. Should we prevail, it would appear that AIG's failure to provide a defense for Mr. Gwynn will once again cause him substantial prejudice.

Fourth, we wanted to let you and Mr. Nicgorski know that Mr. Fath is also expected to testify that our client is entitled to the return of over $480,000 in commissions. This, coupled with the $700,000 in special damages we addressed in our prior letter, takes the special damages we are seeking to roughly $1.2 million. This of course does not include the general damages, interest, fees and costs we are seeking. It also does not include the punitive damages we are going to ask the panel to try award in this case due to the Respondents' reckless indifference to our client's account and the supervision of Mr. Gwynn. Regardless of whether these are covered losses, they expose AIG's insured to risk they can otherwise avoid by AIG settling within policy limits as per our prior letter.

Here is just a sprinkling of the clear and convincing evidence supporting an award of punitive damages:

1.  Merit's Director of Compliance, Vice President, and General Counsel, Mr. Fitzpatrick, has testified that he expunges his notes out of fear that they may be subpoenaed – this, he told us, is how he was trained as a lawyer;

2.  Mr. Fitzpatrick also testified that he chose not to call Mr. Sowell about his review of Mr. Sowell's account for fear of upsetting the client – God forbid the client should think something is wrong. So instead, Mr. Fitzpatrick wrote Mr. Sowell a letter thanking him for his business and letting him know that his account was active;

3.  All three of Merit's officers, Mr. Ryan (President), Mr. Newton (Chairman and CFO), and Mr. Fitzpatrick instructed Sandra Logay to conduct a compliance inspection of Mr. Gwynn's office and/or these gentleman approved her visit. Mr. Fitzpatrick testified that Ms. Logay was capable of doing a far better job than he could of inspecting Mr. Gwynn's office. Ms. Logay, however, was

ROSHKA HEYMAN & DEWULF

Maxine Polomski, Esq.
January 11, 2003
Page 3

precluded by order of the SEC from acting in any supervisory
capacity on behalf of any broker/dealer. Ms. Logay's visit to Mr.
Gwynn's office was the only compliance review of his office
during the time our client's account with Merit was open. Messrs.
Ryan, Newton, and Fitzpatrick were all aware of the SEC order
when they instructed her to visit Mr. Gwynn at his office and/or
approved the visit.

4.    We must pause to express our puzzlement at Merit's decision to
hire Ms. Logay in the first place. Prudential Securities had
previously employed Ms. Logay, and it was her conduct at
Prudential that led to the SEC proceedings against her. Prudential
terminated Ms. Logay prior to the initiation of the formal SEC
proceedings. According to Mr. Fitzpatrick he took comfort in
hiring Ms. Logay after he spoke with Prudential about the
circumstances surrounding her termination. Mr. Fitzpatrick
testified that Prudential had terminated Ms. Logay under duress.
In particular, the State of Missouri had threatened to revoke
Prudential's license to sell securities *in the entire state of Missouri*
if Prudential did not fire Ms. Logay. This apparently did not
concern Mr. Fitzpatrick, who testified that the State of Missouri's
conduct was actually motivated by a frustrated state employee who
was jealous that Ms. Logay made more money than her.
Incredible.

5.    Mr. Fitzpatrick testified that he instructed Ms. Logay to review Mr.
Sowell's customer file. Mr. Gwynn testified that he gave Ms.
Logay access to all customer files, including Mr. Sowell's and that
she spent the better part of a day reviewing those files. Mr. Gwynn
also testified that included in the materials for Ms. Logay to review
were records evidencing Mr. Sowell's investments and/or loans to
charter school finance companies with which both Mr. Gwynn and
Merit (as placement agent) were affiliated. Mr. Gwynn testified
that Mr. Sowell's investment and/or loans to those charter school
companies totaled $275,000. Mr. Fitzpatrick testified that Ms.
Logay never mentioned these investments to him. Mr. Gwynn,
however, testified that he had informed Merit about Mr. Sowell's
investments and/or loans in these charter school companies.
Moreover, Merit's own documents show that Mr. Gwynn made
repeated disclosures to Merit about his involvement in these
companies.

ROSHKA HEYMAN & DEWULF

Maxine Polomski, Esq.
January 11, 2003
Page 4

6.    Merit failed to disclose to the NASD that Mr. Gwynn was named
      as a Respondent in another arbitration that was filed in 1998.
      When questioned about this, Mr. Fitzpatrick testified that Mr.
      Gwynn did not tell him about the arbitration until after the panel
      issued its Award against Mr. Gwynn and others. The award,
      however, was not issued until December 26, 2001, over three years
      after the arbitration had been filed. Mr. Fitzpatrick did not
      terminate Mr. Gwynn or take any disciplinary action against him
      for this nondisclosure. When we asked Mr. Gwynn about this, he
      said that he told Merit about the potential that that arbitration may
      be filed against when interviewing to be hired by Merit and later
      told Merit about the arbitration once it was filed against him while
      he was working for Merit. Either way someone chose not to
      disclose this other arbitration for several years after it needed to be
      disclosed. We also have presented several other exhibits
      demonstrating Mr. Gwynn's non-disclosure, in other contexts, of
      this other arbitration.

7.    There is clear and convincing evidence that, with the exception of
      Mr. Gwynn, none of the Respondents have disclosed Mr. Sowell's
      arbitration on their CRDs.

8.    There is clear and convincing evidence that Merit disregarded its
      own internal policies and procedures with regard to supervision,
      such as failing to review and approve all of Mr. Gwynn's customer
      correspondence, including e-mails, Private Placement Memoranda,
      promissory notes, business plans, suitability documents and
      retirement plans. Moreover, there is no evidence that Merit
      reviewed *any* of these documents.

9.    There is clear and convincing evidence that Mr. Gwynn
      disregarded detailed suitability documents and a retirement plan he
      prepared as a result of his meetings with Mr. Sowell. These
      documents show that Mr. Sowell had extremely modest investment
      objectives.

# ROSHKA HEYMAN & DEWULF

Maxine Polomski, Esq.
January 11, 2003
Page 5


We hope this helps bring you up to speed on what has transpired and the likelihood of an excess judgment that the Respondents are facing in this arbitration.

Sincerely,

Alan Baskin
For the Firm


ASB/cim
cc:    Michael Sowell
       Frank W. Moskowitz
       William Federman
       John Nicgorski

sowell.merit/ltr/polomski03.doc

**Exhibit D**

# FEDERMAN & SHERWOOD

## (AN ASSOCIATION OF ATTORNEYS AND PROFESSIONAL CORPORATIONS)

2926 MAPLE AVENUE
SUITE 200
DALLAS, TEXAS 75201
214-696-1100
FACSIMILE: 214-740-0112

120 N. ROBINSON AVENUE
SUITE 2720
OKLAHOMA CITY, OKLAHOMA 73102
405-235-1560
FACSIMILE: 405-239-2112

REPLY TO:   OKLAHOMA CITY, OK

January 16, 2003

## CONFIDENTIAL

**VIA FACSIMILE (602) 263-0464**
Jeffrey A. King, Esq.
Law Offices of Struckmeyer and Wilson
910 E. Osborn
Phoenix, AZ 85014

Re:   *Michael A. Sowell v. Merit Capital Associates, et al.*
      NASD Arbitration No. 01-04731
      Policy No.:   473-36-20
      Claim No.:    297-012850
      Our File No.: 7032.004

Dear Jeffrey:

As you know, you authorized me to continue defending Merit Capital Associates, Inc. ("Merit"), Bruce Ryan ("Ryan"), Russell Newton ("Newton") and Robert Fitzpatrick ("Fitzpatrick") in the referenced arbitration proceeding. You confirmed to me by correspondence dated January 10, 2003 that AIG will pay the reasonable and necessary defense costs associated with such representation.

In your correspondence you state that I "indicated that . . . Sowell's [Michael Sowell] true damages are in the neighborhood of $240,000.00 and that an opening of $50,000 to $100,000 would be taken seriously by Sowell and his counsel." My comment was not that the "true damages" were in the neighborhood of $240,000.00 but, rather, I thought at that time a settlement could be negotiated in the $240,000.00 range. Since then, Sowell's attorneys have learned that AIG is providing a defense. Sowell's attorneys have expended a considerable amount of attorney time and expenses (including expert witness fees) in preparation for and conducting the arbitration hearing in this matter. I therefore do not believe that Sowell will accept, or even seriously any longer consider, a settlement proposal in the $240,000.00 range.

At the arbitration proceeding, Sowell presented the following alleged damages:

| | |
|---|---|
| $245,215.50 | Trading Losses |
| $170,859.07 | Margin Expense |
| $480,875.00 | Disgorgement of Commissions |
| $275,000.00 | Charter School Investments |
| $500,000.00 | Punitive Damages |

FEDERMAN & SHERWOOD

January 16, 2003
Page 2

| | |
|---|---|
| $_____ | Prejudgment Interests |
| $_____ | Attorney Fees (1/3 Contingency) |
| $12,662.50 | Expert Witness Fees |
| $_____ | Expenses (to be submitted to Arbitration Panel in a post-hearing submission) |

I firmly believe that an award will be entered against Merit for negligent supervision. If such an award is entered, it is likely that the Arbitration Panel will hold the individual Respondents Ryan, Newton and Fitzpatrick, jointly and severally liable for the Award with Merit and Gwynn. Sowell's attorneys effectively presented a case for negligence and negligent supervision by Merit (and potentially the individual Respondents Ryan, Newton and Fitzpatrick) as it relates to David Gwynn. I also believe, very strongly, that an award will be entered against Respondent David Gwynn, individually.

The mere entry of an award, no matter the dollar amount, can have a detrimental effect on the individual Respondents Ryan, Newton and Fitzpatrick's ability to continue in the securities industry and will negatively impact their securities licenses, as well as directly affect Robert Fitzpatrick's license to practice law in the State of New York.

As you know, although the NASD Arbitration Hearing is tape recorded, no stenographic transcript is made of the proceeding. A copy of the tapes can be requested from the NASD, and generally will take three to five weeks to obtain.

Please advise me if you would like us to obtain the hearing tapes or provide you with any exhibits or further information concerning the hearing in this matter. Also, please advise me if you want to be copied on our invoices for services provided in this matter.

Sincerely,

William B. Federman
FOR THE FIRM

WBF:elc

cc:    Brian T. Conlin, Claims Analyst/AIG

**Exhibit E**

**AWARD**
**NASD Dispute Resolution**

In the Matter of the Arbitration Between

Name of Claimant

Michael A. Sowell

  and

01-04731
Phoenix, Arizona

Name of Respondents

Merit Capital Associates, Inc.
Robert Fitzpatrick, Russell Newton,
Bruce C. Ryan, David Gwynn, Raquel Gwynn and
Gwynn Financial Services

## REPRESENTATION OF PARTIES

Michael A. Sowell ("**Claimant**") was represented by Frank W. Moskowitz, Esq., Berk & Moskowitz, P.C., Scottsdale, Arizona and Alan Baskin, Esq., Roshka Heyman & DeWulf, PLC, Phoenix, Arizona

Merit Capital Associates, Inc., Robert Fitzpatrick, Russell Newton and Bruce C. Ryan were represented by LeslieAnn Haacke, Esq., Renaud, Cook & Drury, P.A., Phoenix, Arizona until August 13, 2002. At the hearing these Respondents were represented by William B. Federman, Esq., Federman & Sherwood, Oklahoma City, Oklahoma.

David & Raquel Gwynn and Gwynn Financial Services were represented at various times during these proceedings by Timothy J. Thomason, Esq. and Maxine M. Polomski, Esq., Mariscal, Weeks, McIntyre & Friedlander, P.A., Phoenix, Arizona. Counsel's first withdrawal was on or about March 4, 2002. On or about May 14, 2002 these Respondents were again represented by counsel. Counsel withdrew from representation of these Respondents on or about September 9, 2002. Counsel was again retained on or before the second week of hearings sessions commencing on January 13, 2002.

## CASE INFORMATION

The Statement of Claim was filed on or about September 4, 2001. Motion for Leave to Amend Statement of Claim was filed on or about May 2, 2002. Amended Statement of Claim was filed on or about May 2, 2002. Claimant's Response to Source Capital Group's Brief in Opposition to Claimant's Motion for Leave to Amend and Motion to Strike was filed on or about May 28, 2002. Reply to Respondent Merit Capital Associates, Inc.'s Response to Motion for Leave to Amend Statement of Claim was filed on or about May 20, 2002. Submission Agreement of Claimant Michael A. Sowell was signed on August 31, 2001.

Response of Merit Capital Associates, Inc., Robert Fitzpatrick, Russell W. Newton, and Bruce C. Ryan was filed on or about November 14, 2001. Response to Claimant's Motion to Amend the Statement of Claim was filed on or about May 13, 2002. Submission Agreement of Merit Capital Associates, Inc. was signed on November 26, 2001 by Robert Fitzpatrick. Submission Agreement of Robert Fitzpatrick was signed on November 26, 2001. Submission Agreement of Russell W. Newton was signed on November 26, 2001. Submission Agreement of Bruce C. Ryan was signed on November 26, 2001.

Answer of David Gywnn, Raquel Gwynn and Gywnn Financial Services was filed on or about November 20, 2001. Joinder of David and Raquel Gwynn to Merit Capital's Response to Plaintiff's Motion to Amend Complaint was filed on or about May 21, 2002. Submission Agreement of David Gwynn was signed on December 17, 2001.

## CASE SUMMARY

Claimant submitted the following summary:

> Claimant alleges, among other things, that Respondents are jointly and severally liable to claimant for selling unsuitable investments, selling unregistered securities, violating Arizona's securities fraud statutes, violating Arizona's investment advisory statutes, acting negligently, making negligent misrepresentations, breaching their fiduciary duties to claimant, breaching their contractual obligations to claimant, engaging in conduct falling below the securities industry standard of care and in violation of industry rules, and showing an overall reckless indifference to claimant's interests. Claimant also alleges that Respondents are jointly and severally liable for churning his account. Claimant further alleges that Respondents Merit, Newton, Ryan and Fitzpatrick are jointly and severally liable for failing to supervise Respondent Gwynn. Claimant also alleges that Respondents Merit, Newton, Ryan and Fitzpatrick are jointly and severally liable for Mr. Gwynn's conduct as controlling persons and pursuant to the doctrine of respondeat superior.

In their Proposed Findings of Fact and Conclusions of Law, Respondents', Merit Capital Associates, Inc., Robert Fitzpatrick , Russell William Newton, and Bruce Charles Ryan stated:

1. During the same timeframe while Sowell maintained an account at Merit, Sowell also had accounts with four other brokerage firms, including individual accounts and retirement accounts. Sowell admits to opening, monitoring and selecting all trades through at least one online brokerage firm, Wit Capital Corporation, during the same timeframe he had his account at Merit.

2. In addition to his securities' accounts, Sowell loaned money to two separate corporations, Novation, as discussed in paragraph 1, above, and Charter Financial Network, Inc. l/k/a Charter 3, Inc. ("Charter"). Sowell loaned an aggregate of $75,000 (three loans of $25,000 each) to Charter on Nov. 11, 1999, April 25, 2000 and July 21, 2000, respectively. Sowell

negotiated on his own behalf in each of these loan transactions. Sowell negotiated better terms for himself in each subsequent transaction knowing that Charter was under financial distress. Sowell further knew that Charter had been unsuccessful in raising investor funds from any third parties, as he knew was originally planned. He also knew that Charter had not completed a final private placement memorandum nor signed an Underwriting Agreement with Merit.

3. Sowell advanced the loans to Novation and Charter without relying upon a final private placement memorandum or any other document from Merit or any information supplied by Ryan, Fitzpatrick or Newton.

4. Gwynn was a minority shareholder in Novation and Charter.

5. Sowell was intending to be, and in certain documents was listed as, either the COO or the CTO of Charter.

6. By letter dated July 24, 2000, Sowell acknowledged that he had knowledge and understanding of Charter and he relied solely on his own investigation and independent advisors. Sowell represented that he did not rely upon any other written materials or oral representations in making his loans or investments.

7. Sowell participated in the management of Charter, met with potential investors for Charter, received business information, including drafts of Charter's business plan, Charter's pro forma financial statements and met with Charter's accountant, Dan Kaplan, who, during the same timeframe, also performed services as Sowell's personal accountant. Sowell also met and conversed on numerous occasions with John Abram, Charter's CEO, about Charter's business plan, Charter's lack of success in fund raising and Charter's financial problems.

8. Although Sowell relied in part on recommendations made by Gwynn for securities investments, Sowell exercised control over his account at Merit. This is evidenced, in part, by his soliciting investment advice on certain securities from Gwynn, knowledge of the securities he invested in through his account at Merit and Wit Capital, knowledge of his Merit account status, communication flow to and from Gwynn concerning investment ideas, and on certain occasions accepting or rejecting Gwynn's investment recommendations, including the buying or selling of certain securities. Sowell also had available to him on a monthly basis account summaries in the form of account statements from Merit's clearing firm, periodic summaries from Gwynn analyzing the performance of his account showing profits and losses on trades in his account, confirmation slips from Merit's clearing firm on each trade disclosing buy or sell transactions, as well as Gwynn's commissions. Sowell reviewed his 1998 and 1999 tax returns disclosing the details of his securities activities. Since at least 1998, Sowell was aware of the volatility in his account and the particular volatility of the telecom and high-tech market segment in which he was investing and earning a living.

NASD Dispute Resolution, N...
Arbitration No. 01-04731
Award  Page 4 of 11
_____

In their proposed Findings of Fact and Conclusions of Law, Respondents David Gwynn, Raquel Gwynn and Gwynn Financial Services stated:

1. Mr. Gwynn and Mr. Sowell first met in 1992 when Mr. Sowell was a computer network engineer with WavePhore, Inc., a software company.

2. In February of 1998, Mr. Sowell again approached Mr. Gwynn about financial planning services. Mr. Sowell's mother had recently died, and had left him with an inheritance. Mr. Gwynn met with Mr. Sowell and his wife to prepare a retirement plan. At the time of the meeting with the Sowells, Mr. Gwynn advised the Sowells that they should consider their retirement goals and factor those goals into their plan.

3. Mr. Sowell and his wife informed Mr. Gwynn that their financial goal for retirement was to own a ranch. They then determined that they wanted to keep elk on the ranch, and, in an effort to make the elk into a revenue producer, they wanted to market and sell "elk velvet," an alternative healing remedy and aphrodisiac.

4. Mr. Sowell opened individual account LFW-00053-A5 with Merit in March 1998.

5. During the same timeframe while Sowell maintained an account at Merit, Sowell also had accounts with four other brokerage firms, including individual accounts and retirement accounts.

6. Mr. Sowell received information about his account. Mr. Sowell and Mr. Gwynn exchanged frequent phone calls and e-mails regarding his account. Mr. Sowell had access to current account information over the Internet, and could review the account at his discretion. Mr. Sowell also received monthly account statements. In addition, Merit sent Mr. Sowell several letters to Mr. Sowell regarding his account.

7. Mr. Gwynn never guaranteed Mr. Sowell's stock investments.

8. Mr. Sowell was interested in venture capital investments and investing in initial public offerings.

9. March 1998, Mr. Gwynn began forming a charter school venture ultimately named Novation Financial Corporation ("Novation"). Novation was created to act as an enabler for and on behalf of parent groups interested in forming charter schools by providing access to capital financing of such projects.

10. In February 1999, Charter Financial Network, Inc. ("Charter") was formed to take the place of Novation.

11. Sowell loaned money to both Novation and Charter.

12. Sowell advanced the loans to Novation and Charter without relying upon any private placement memorandum nor any other document containing Merit's name or the names of Ryan, Fitzpatrick or Newton.

13. Gwynn was a minority shareholder in Novation and Charter.

14. Sowell was intending to be, and in certain documents was listed as, either the COO or the CTO of Charter.

15. By letter dated July 24, 2000, Sowell acknowledged that he had knowledge and understanding of Charter and he relied solely on his on investigation and independent advisors. Mr. Sowell did not rely upon any other written materials or oral representations.

16. Sowell participated in the management of Charter, met with potential investors, received business information, including drafts of the Charter Business Plan, pro forma financial statements and often met with Charter's accountant, Dan Kaplan, who, during the same timeframe, also performed services as Sowell's personal accountant.

17. Although Sowell relied in part on recommendations made by Gwynn, he exercised control over his account at Merit as evidenced by his soliciting investment advice on certain securities, knowledge of his account's status, communication flow to and from Gwynn concerning investment ideas and on certain occasions, accepting or rejecting Gwynn's investment recommendations, including the buying or selling of certain securities.

## RELIEF REQUESTED

In the Statement of Claim, Claimant requested an award in the total amount of $1,671,949.50. In his submission of Proposed Findings of Fact and Conclusions of Law, Claimant requested an award as follows:

a. $245,215.50 for the trading losses in Mr. Sowell's account;
b. $170,859.07 for margin interest paid by Mr. Sowell;
c. $480,875 for disgorgement of commissions earned by Respondents as a result of churning Mr. Sowell's account;
d. $275,000 for Mr. Sowell's damages in connection with the charter school investments;
e. $500,000 in punitive damages;
f. pre-judgment interest;
g. reasonable attorneys' fees;
h. $12,662.50 in expert witness fees;
i. the costs associated with filing this arbitration, including all filing fees, pre-hearing deposits, forum fees, copying costs and other fees and expenses; and
j. post-judgment interest at the statutory rate.

NASD Dispute Resolution, Inc.
Arbitration No. 01-04731
Award  Page 6 of 11

Respondents, Merit Capital Associates, Inc., Robert Fitzpatrick , Russell William Newton, and Bruce
Charles Ryan requested that all claims set forth in the Statement of Claim against them be dismissed
in their entirety, and that the Panel enter an award in Respondents' favor and that Claimant take
nothing by way of his Statement of Claim against Respondents, that all forum fees and other costs be
assessed against the Claimant, and for such other and further relief as the Panel may deem
appropriate.

Respondents David Gwynn, Raquel Gwynn and Gwynn Financial Services requested the following
relief:

A.  That the Statement of Claim be dismissed, with prejudice and that Claimant take nothing
    thereby;
B.  For Respondents' costs, attorneys' fees and the costs of this arbitration, together with interest
    therein at the highest rate provided by law from the date of the award until paid; and
C.  For such other further relief as the panel deems just and proper.

## OTHER ISSUES CONSIDERED & DECIDED

By Order dated May 29, 2002, Claimant's Motion to Amend was granted.  Claimant was ordered to
serve Source Capital Group as soon as possible.

By Stipulation of the parties, the Arbitration Panel entered an Order to Stay proceedings as to Source
Capital Group, Inc. on or about August 19, 2002.

At the commencement of the hearing sessions on January 13, 2003, Maxine M. Polomski, Esq.
requested an adjournment of the hearing. The basis for the request was that she and her firm had just
been retained to again represent Respondents David Gywnn, Raquel Gwynn and Gywnn Financial
Services and needed time to prepare.  After considering the circumstances and the arguments
presented on behalf of the parties, the Arbitration Panel denied the request.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a
handwritten, signed Award may be entered.  In either case, the parties have agreed to receive
conformed copies of the award while the original(s) remain on file with the NASD Dispute
Resolution (the "NASD").

## AWARD

After considering the pleadings, the testimony, and the evidence presented at the hearing, the
undersigned arbitrators have decided in full and final resolution of the issues submitted for
determination as follows:

1.  The panel finds that Respondents Merit Capital Associates, Inc. Robert Fitzpatrick, Russell
    Newton, Bruce C. Ryan, David Gwynn, Raquel Gwynn and Gwynn Financial Services shall
    be and hereby are jointly and severally liable to claimant for selling unsuitable investments,

NASD Dispute Resolution, Inc.
Arbitration No. 01-04731
Award   Page 7 of 11

selling unregistered securities, acting negligently, making negligent misrepresentations, breaching their fiduciary duties to claimant, breaching their contractual obligations to claimant, engaging in conduct falling below the securities industry standard of care, and showing an overall reckless indifference to claimant's interests.

2. The panel also finds that Respondents, and each of them, are jointly and severally liable for churning claimant's account.

3. The panel further finds that Respondents Merit, Newton, Ryan and Fitzpatrick, and each of them, are jointly and severally liable for failing to supervise Respondent Gwynn. The panel specifically finds that Respondent Fitzpatrick failed to alert Claimant to the excessive and inappropriate trading activity in his account, specifically the excessive trading, the trading was not consistent with Claimant's investment objectives, the high commissions, and the heavy use of margin.

4. The panel awards damages to Claimant in the total sum of $1,125,000.00.

5. In reaching its decision, the panel makes the following findings of fact concerning Respondent David Gwynn:

6. Respondent engaged in excessive trading, approximately 1,596 trades in thirty-seven (37) months from May 1998 to May 2001, coupled with the fact that Respondent derived approximately 80% of his gross income from Claimant's account over the same period of time;

7. Respondent engaged in excessive trading of the same securities (in and out trading, high frequency of trades in the same securities);

8. Respondent engaged in the churning of Claimant's account, resulting in a Looper turnover of 8.5, and a cost maintenance factor of approximately 25%.

9. Respondent engaged in a pattern of unsuitable trading activity that was contrary to the stated investment objectives of Claimant, to wit: "long term growth."

10. Respondent, a registered representative, engaged in a variety of inappropriate activities including:

   i. Soliciting Claimant (his client) to raise large sums of money for highly speculative venture capital propositions;

   ii. Soliciting Claimant (his client) to purchase unregistered securities;

   iii. Failing to disclose serious conflicts of interest with Claimant when soliciting money for highly speculative venture capital propositions, including

Respondent's own personal stake in the venture capital propositions and the fact that large sums of money raised from Claimant were to be paid directly to Respondent.

    iv.  Respondent was not registered under the Investment Advisors Act of 1940 and was unable to verify that he was a "registered investment advisor" in the State of Arizona. Accordingly, Respondent's conduct in the preparation and dissemination of the documents identified as Claimant's Exhibits "32" and "33" raises serious questions of fraud and misrepresentation.

11. The panel also makes the following finding of fact concerning Respondents Merit, its principals Ryan and Newton, and its Compliance Director Fitzpatrick:

12. Each of said Respondents knowingly facilitated the apparent violation of the SEC order referred to in an SEC decision dated January 28, 2000 in SEC file No. 3-8969, identified as Claimant's Exhibit "113", by ordering Sandra Logay to "visit" Respondent David Gwynn in Scottsdale, Arizona on October 17, 2000.   The SEC decision concluded *"it is in the public interest to bar Logay from acting in a proprietary or supervisory capacity with any broker, dealer, or municipal securities dealer."* (Emphasis added) (See page 26, paragraph 3, of the SEC Decision)

13. Incidental to the above finding, the panel finds that Respondent Merit's employee, Sandra Logay's "visit" to Respondent David Gwynn in Scottsdale, Arizona on October 17, 2000 constituted supervisory activity in violation of an SEC decision dated January 28, 2000 in SEC file No. 3-8969, identified as Claimant's Exhibit "113".

14. That to the extent not specifically awarded or otherwise provided for above, all other claims and requests for relief by any party hereto are denied with prejudice.

15. Other than the Forum Fees noted below, the parties shall each bear all other costs and expenses incurred by them in connection with this proceeding, including but not limited to attorneys fees.

## FEES

Pursuant to the Code, the following fees are assessed:

### Filing Fees

NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

Initial claim filing fee                                        = $500.00

NASD Dispute Resolution, Inc.
Arbitration No. 01-04731
Award   Page 9 of 11

## Member Fees

Member fees are assessed to each member firm that is a party in these proceedings or to the member firm(s) that employed the associated person(s) at the time of the event(s) giving rise to the dispute. In this matter, the member firm is Merit Capital Associates, Inc.

| | |
|---|---|
| Member surcharge | = $2,500.00 |
| Pre-hearing process fee | = $  600.00 |
| Hearing process fee | = $4,500.00 |

## Adjournment Fees

Adjournments requested during these proceedings:

Hearing Date(s) October 15, 2002 through October 23, 2002, adjournment requested by Respondent David Gwynn.

= $1,200.00

## Forum Fees and Assessments

The Arbitration Panel assesses forum fees for each hearing session conducted.  A hearing session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with the arbitrator(s), that lasts four (4) hours or less.  Fees associated with these proceedings are:

One (1) Pre-hearing session(s) with a single arbitrator x $450.00                  = $   450.00
Pre-hearing conference(s):    December 30, 2002    1 session

Two (2) Pre-hearing session(s) with Panel x $1,200.00                              = $ 2,400.00
Pre-hearing conference(s):    March 25, 2002        1 session
                              May 29, 2002          1 session

Twelve (12) Hearing sessions x $1,200.00                                           = $14,400.00
Hearing Date(s):              January 7, 2003       2 sessions
                              January 8, 2003       2 sessions
                              January 9, 2003       3 sessions
                              January 13, 2003      2 sessions
                              January 14, 2003      2 sessions
                              January 15, 2003      1 session
Total Forum Fees                                                                   = $17,250.00

The Arbitration Panel has assessed $0.00 of the forum fees to Michael A. Sowell.

NASD Dispute Resolution, Inc.
Arbitration No. 01-04731
Award  Page 10 of 11

The Arbitration Panel has assessed $17,250.00 of the forum fees jointly and severally to Merit Capital Associates, Inc., Robert Fitzpatrick, Russell Newton and Bruce C. Ryan, David Gwynn, Raquel Gwynn and Gwynn Financial Services.

### Fee Summary

Claimant, Michael A. Sowell, shall be and hereby is liable for:

| | |
|---|---|
| Initial Filing Fee | = $ 500.00 |
| Forum Fees | = $ 0.00 |
| Total Fees | = $ 500.00 |
| Less payments | = $ 1,700.00 |
| Balance Due NASD Dispute Resolution | = $ 1,200.00 |

Respondent, Merit Capital Associates, Inc., shall be and hereby is liable for:

| | |
|---|---|
| Member Fees | = $ 7,600.00 |
| Forum Fees | = $ 0.00 |
| Total Fees | = $ 7,600.00 |
| Less payments | = $ 2,500.00 |
| Balance Due NASD Dispute Resolution | = $ 5,100.00 |

Respondent David Gwynn, shall be and hereby is liable for:

| | |
|---|---|
| Adjournment Fee | = $ 1,200.00 |
| Forum Fees | = $ 0.00 |
| Total Fees | = $ 1,200.00 |
| Less payments | = $ 0.00 |
| Balance Due NASD Dispute Resolution | = $ 1,200.00 |

Respondents, Merit Capital Associates, Inc., Robert Fitzpatrick, Russell Newton and Bruce C. Ryan , David Gwynn, Raquel Gwynn and Gwynn Financial Services, shall be and hereby are jointly and severally liable for:

| | |
|---|---|
| Forum Fees | = $17,250.00 |
| Balance Due NASD Dispute Resolution | = $17,250.00 |

**All balances are due to NASD Dispute Resolution**

NASD Dispute Resolution, Inc.
Arbitration No. 01-04731
Award   Page 11 of 11

## ARBITRATION PANEL

Howard Gaines - Public Arbitrator, Presiding Chair
Allan Fonfara - Public Arbitrator
Herschell Parent - Non-Public Arbitrator

Concurring Arbitrators:

**/s/ Howard Gaines**                               **February 25, 2003**
Howard Gaines                                       Signature Date
Public Arbitrator, Presiding Chair

**/s/ Allan Fonfara**                               **February 24, 2003**
Allan Fonfara                                       Signature Date
Public Arbitrator

**/s/ Herschell Parent**                            **February 24, 2003**
Herschell Parent                                    Signature Date
Non-Public Arbitrator

NASD Dispute Resolution, Inc.
Arbitration No. 01-04731
Award  Page 11 of 11

## ARBITRATION PANEL

Howard Gaines - Public Arbitrator, Presiding Chair
Allan Fonfara - Public Arbitrator
Herschell Parent - Non-Public Arbitrator

Concurring Arbitrators:

_____          2-25-03
Howard Gaines                       Signature Date
Public Arbitrator, Presiding Chair


_____          _____
Allan Fonfara                       Signature Date
Public Arbitrator


_____          _____
Herschell Parent                    Signature Date
Non-Public Arbitrator

NASD Dispute Resolution, Inc.
Arbitration No. 01-04731
Award   Page 11 of 11

### ARBITRATION PANEL

Howard Gaines - Public Arbitrator, Presiding Chair
Allan Fonfara - Public Arbitrator
Herschell Parent - Non-Public Arbitrator

Concurring Arbitrators:

_____
Howard Gaines
Public Arbitrator, Presiding Chair

_____
Allan Fonfara
Public Arbitrator

_____
Herschell Parent
Non-Public Arbitrator

_____
Signature Date

_____
2/24/03
Signature Date

_____
Signature Date

02/20/03  17:27 FAX 012 200 0203      OFFICE OF DISPUTE RES        Ø 018/018
TEL:602-596-6582        Feb 25 03   16:58 No.003 P.01
02/24/03  MON 15:29 FAX      NASD REGULATION        Ø 013

Case 3:03-cv-00644-CFD      Document 120-4      Filed 10/18/2005      Page 24 of 24

NASD Dispute Resolution, Inc.
Arbitration No. 01-04731
Award  Page 11 of 11

## ARBITRATION PANEL

Howard Gaines - Public Arbitrator, Presiding Chair
Allan Fonfara - Public Arbitrator
Herschell Parent - Non-Public Arbitrator

Concurring Arbitrators:

_____          _____
Howard Gaines                     Signature Date
Public Arbitrator, Presiding Chair

_____          _____
Allan Fonfara                     Signature Date
Public Arbitrator

*Herschell Parent*                2-24-03
Herschell Parent                  Signature Date
Non-Public Arbitrator