# Exhibit C

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
---------------------------------X
BRUCE CHARLES RYAN, ET AL         :
              Plaintiffs          :
         VS.                      :    NO. 3:03CV00644(CFD
NATIONAL UNION FIRE INS.,         :
ET AL                             :
              Defendants          :
---------------------------------X
DAVID W. GWYNN, ET AL             :
              Plaintiffs          :
         VS.                      :    NO. 3:03CV01154(CFD)
NATIONAL UNION FIRE INSURANCE     :
COMPANY OF PITTSBURGH, ET AL      :
              Defendants          :
---------------------------------X
```

D E P O S I T I O N


THE DEPOSITION OF ANTONIOS G.

DASKALAKIS, taken on behalf of the Plaintiffs,

pursuant to the Federal Rules of Civil

Procedure, before Melodie Ajello, Registered

Professional Reporter, Notary Public within the

State of Connecticut, on the 27th day of

October, 2005, at 10 a.m, at the offices of

SANDAK, HENNESSEY & GRECO, 707 Summer Street,

Stamford, Connecticut, 06901.


GOLDFARB AND AJELLO REPORTING SERVICES
24 East Avenue #1372
New Canaan, Connecticut  06840

092d6b64-1a78-4dfd-adaf-4bef04a51100

Page 26

1     notices? .
2         MR. DINATALE: That's correct. The
3     record should reflect, I guess I have
4     already said it, I have served a separate
5     notice for Mr. Daskalakis individually, and
6     Mr. Nolin filed a separate 30(b)(6) notice
7     with respect to different areas of
8     inquiries. There's three separate notices,
9     and I understand from the witness he's not
10    differentiating from one to the other for
11    this answer.
12    Q.    Who did you speak for?
13        MR. HAWKINS: I'm making sure your
14    question wasn't --
15        MR. DINATALE: That's fair.
16    Q.    With whom did you speak?
17    A.    I spoke to Brian Conlin, I spoke to Jonathan
18    Weber, I spoke to Ray DeCarlo, I spoke to Ray Tiburzi, I
19    spoke to Liz Wacik, I spoke to Abbe Darr, I spoke to Henry
20    Williams, I spoke to Kevin Koehler.
21        I think that's it.
22    Q.    Okay. Is Mr. Koehler still employed by
23    National Union?
24    A.    Yes.
25    Q.    The other individuals you mentioned, they

Page 27

1     are all still employed by AIG; is that correct?
2     A.    That's right.
3     Q.    Do you recall the substance of the
4     conversation with any of these persons that you've just
5     mentioned, I think you mentioned eight different people?
6     A.    Yes, I had the same conversation with each
7     of them.
8     Q.    What was the -- then let's start with
9     Mr. Conlin, what was the substance of your conversation
10    with Mr. Conlin?
11    A.    I asked him if he had any documents in his
12    possession, either paper or electronic or email, that he
13    had not already produced.
14    Q.    And what did Mr. Conlin say to you?
15    A.    No.
16    Q.    When did you have this conversation with
17    Mr. Conlin, approximately?
18    A.    I know I had it within the past two weeks,
19    but with respect to Brian Conlin, I believe I had spoken
20    to him on an earlier occasion and asked him a similar
21    question then, but I don't have a specific recollection of
22    where or when, but within the past two weeks or three
23    weeks I do have a specific recollection of speaking to him
24    and asking that question.
25    Q.    Let me go back to the first conversation you

Page 28

1     believe you might have had with Mr. Conlin. Can you give
2     me a rough time frame with respect to when it occurred?
3     A.    I think shortly after I was assigned to this
4     matter. I think I spoke to Brian, and I think I asked him
5     that.
6     Q.    Okay. With respect to that conversation
7     with Mr. Conlin, that first conversation with Mr. Conlin,
8     was it the same substance, in other words, requesting of
9     him whether he had any emails or documents?
10    A.    I don't know if I specifically used the word
11    "emails" at that time. I think I asked him if he had
12    anything that he hadn't given us already.
13    Q.    What did he say?
14    A.    No.
15    Q.    Did you inquire of -- let's stick with
16    Mr. Conlin, did you inquire of him whether or not he had
17    made any attempt to go to his computer, his -- any
18    programs that may exist in his computer to retrieve the
19    emails at any time?
20    A.    I didn't ask that question.
21    Q.    Did you -- do you know whether it was
22    possible as of the first conversation you had with
23    Mr. Conlin, to go back into any computer system or
24    programs that AIG has to determine whether or not any
25    emails he had were stored or preserved or retained?

Page 29

1     A.    Only his own computer.
2     Q.    Okay. And did you -- well, what about his
3     own computer?
4     A.    That would be the only place that an
5     electronic document could have been stored.
6     Q.    And how do you know that?
7     A.    I -- emails reside either in a person's
8     desktop computer or in an email server. Emails on the
9     email server have been saved since October of 2004. Prior
10    to that date, they were only saved for a few weeks, so
11    anything Brian would have had would have been on his
12    computer and would not have resided in any other place.
13    Q.    Do you know for a fact whether or not
14    anything resided, any emails or electronic communications
15    resided in Brian Conlin's computer the date you first
16    spoke with him?
17    A.    I didn't know.
18    Q.    Do you know whether or not any emails
19    resided or any other electronic data resided within Brian
20    Conlin's computer the second time you spoke to him, about
21    two weeks ago?
22    A.    At that time I did know.
23    Q.    And how did you come to know that?
24    A.    He told me he didn't have anything.
25    Q.    And specifically did he tell you that he had

Goldfarb & Ajello

092d6b64-1a78-4dfd-adaf-4bef04a51100

Page 30

1 checked his computer?
2    A.    I don't think he used those words.
3    Q.    All right. What words did he use, to the
4 best of your recollection?
5    A.    He looked, and he didn't have anything.
6    Q.    Okay. Just so I differentiate between the
7 second conversation and the first, he didn't tell you --
8 did he tell you that, in substance the same thing, the
9 first conversation?
10            MR. HAWKINS:  Objection to the form.
11    Q.    In other words, that he looked and didn't
12 have anything?
13    A.    I believe so.
14    Q.    How about the other persons you spoke with,
15 was the substance of the conversations identical with all
16 of them?
17    A.    I would quantify them as identical.
18    Q.    In other words, you asked each of the
19 persons, and for the record, Mr. Weber, Mr. DeCarlo,
20 Mr. Tiburzi, Ms. Bassick, Ms. Darr, Mr. Williams and
21 Mr. Koehler, you asked each of them whether they had
22 documents or electronic communications that had not been
23 previously produced?
24    A.    I asked them that, the answers were not
25 always the same.

Page 31

1    Q.    Let's take them individually one at a time,
2 then. What did Mr. Weber tell you with respect to that?
3    A.    He didn't have anything.
4    Q.    Mr. DeCarlo?
5    A.    He didn't have anything.
6    Q.    Mr. Tiburzi?
7    A.    He didn't have anything.
8    Q.    Ms. Darr?
9    A.    Ms. Darr had email.
10    Q.    Did she provide the email to you?
11    A.    She did.
12    Q.    Did you turn the email over to counsel from
13 Ms. Darr?
14    A.    I did.
15    Q.    How about Mr. Williams?
16    A.    He had nothing.
17    Q.    Mr. Koehler?
18    A.    He had nothing.
19    Q.    Ms. Wacik?
20    A.    She had and produced them directly to
21 counsel.
22    Q.    Rather than to you, you mean? Withdrawn.
23        Ms. Darr, did she give you the emails, and
24 you produced them to counsel?
25    A.    That's right.

Page 32

1    Q.    Are you saying Ms. Wacik took the emails and
2 produced them directly to counsel?
3    A.    I believe I had initially left a phone
4 message for Liz, and then when I spoke to her, she told me
5 she had gotten the message, and she had found something
6 and given it to counsel.
7    Q.    With respect to the men; Weber, DeCarlo,
8 Tiburzi, Williams and Koehler, am I correct that the first
9 inquiry you made of them, with respect to whether they had
10 any documents or electronic communication, occurred
11 approximately two weeks ago or within the past two weeks,
12 approximately?
13    A.    Two or three.
14    Q.    Two or three, that's fine. Within two or
15 three weeks. Did each of them tell you they had checked
16 their computers or other potential sources, desks, for
17 documents or electronic communications?
18    A.    They each said things to the effect that
19 they looked and they didn't have anything.
20    Q.    And as far as you know, nobody checked their
21 computers to determine whether or not there was anything
22 on them, correct?
23            MR. HAWKINS:  Objection to the form
24        of the question.
25    A.    I just know what they told me.

Page 33

1    Q.    Well, as far as you know, does anybody know
2 whether anybody checked their computers, anybody other
3 than these individuals themselves?
4            MR. HAWKINS:  Objection.
5    A.    You mean a third person?
6    Q.    Yes.
7    A.    Go into their computers?
8    Q.    Yes.
9    A.    To my knowledge, they did not.
10    Q.    You didn't do it?
11    A.    I did not.
12    Q.    We received approximately 1600 pages of
13 documents from AIG on or about February 1st, 2005. Did
14 you participate in the process of document production at
15 that time?
16    A.    I must have.
17    Q.    Okay. Was there anybody else other than you
18 within the coverage and litigation group who was assigned
19 to the claim?
20    A.    No.
21            MR. HAWKINS:  You mean at that time?
22    Q.    At that time, was there anybody else from
23 the coverage litigation group who participated in
24 producing documents to the plaintiffs on or about
25 February 1st, 2005?

Goldfarb & Ajello

092d6b64-1a78-4dfd-adaf-4bef04a51100

Page 34

1    A.    Not on or about February 1st, 2005.
2    Q.    Was any attempt made prior to production of
3  those documents to obtain electronic communications from
4  one or more of the eight individuals you've identified
5  here?
6    A.    I didn't speak to those individuals prior to
7  what I testified to.  But I will say that, to answer your
8  question, the coverage litigation group by practice and in
9  this case obtains a copy of the claim file -- not a copy,
10  obtains the original claim file.  The claim file is
11  supposed to have in it all the documents that are relevant
12  to the handling of the claim.  To the extent that that was
13  obtained and turned over to counsel I think would go to
14  your question as well.
15    Q.    Well, is it the practice at AIG that anytime
16  someone prepares an email communication with respect to
17  particular claim, that a hard copy of that email
18  communication be included within the claims file?
19    A.    No.
20    Q.    And I guess my question with respect to
21  producing documents on or about February 1, 2005, did you
22  undertake any efforts to inquire of any of the eight
23  people you've identified, or anybody else, whether or not
24  at that time they had any electronic data emails and the
25  like within their computers that might have been relevant

Page 35

1  to this claim?
2            MR. HAWKINS:  Objection to the form
3        of the question.
4    A.    No, I did not.
5    Q.    Did your efforts to obtain document
6  production consist merely of obtaining -- withdrawn.
7            Did your efforts to obtain document
8  production go beyond getting the original of the claims
9  file?
10            MR. HAWKINS:  Objection to the form
11        of the question.
12    A.    I did not get the original of the claims
13  file.  Why don't I just leave that there, I didn't get
14  that.
15    Q.    Who did?
16    A.    I believe my predecessor on the file did.
17    Q.    Who was that person?
18    A.    Liz Wacik.
19    Q.    And if I hear you correctly, you believe
20  that Ms. Wacik obtained the claim file?
21    A.    That's correct.
22    Q.    Do you also believe that she then
23  transferred or gave the claim file to counsel?
24    A.    I do.
25    Q.    Do you understand that she says that she

Page 36

1  then received the claim file back, the original back from
2  counsel after copies had been made?
3    A.    That's my understanding.
4    Q.    Did the original of the claim file go back
5  to her, to you or someone else?
6    A.    It went from -- it went back to her.  I
7  wasn't in the group at that time.
8    Q.    At the time the file came back from counsel?
9    A.    That's right.
10    Q.    Now, you also indicated that to prepare for
11  today, you reviewed documents, and I think you said looked
12  through the file; is that correct?
13    A.    That's correct.
14    Q.    Are there any particular documents that you
15  recall reviewing?
16    A.    Yeah, there are numerous documents that I
17  reviewed.
18    Q.    Okay.  Did you, when you say you looked
19  through the file, did you look through the documents that
20  were produced to the plaintiffs, or did you go through the
21  claims file itself?
22    A.    I went through the claims file, I went
23  through the document production, and I read deposition
24  transcripts, and I think that's it for documents.
25    Q.    When you say you went through the document

Page 37

1  production, are you saying that you went -- you have a
2  copy of the documents as they were produced to the
3  plaintiffs in this matter, in other words, with the Bates
4  stamp numbers?
5    A.    I think I do, yeah.
6    Q.    And you read deposition transcripts, you
7  said?
8    A.    I did.
9    Q.    Whose deposition transcripts did you read?
10    A.    I read the two deposition transcripts of
11  Conlin, Weber, Tiburzi, DeCarlo.
12    Q.    Anybody else?
13    A.    No.
14    Q.    Did you have available to you the deposition
15  transcripts of David Gwynn or Racquel Gwynn?
16    A.    I believe I did.
17    Q.    You did not review them, though?
18    A.    I did not.
19    Q.    Did you have available to you the deposition
20  transcripts of either Bruce Ryan, Robert Fitzpatrick or
21  Russell Newton?
22    A.    I think I did.
23    Q.    Did you review any of those transcripts?
24    A.    I did not.
25    Q.    Was there a reason why you chose not to

10 (Pages 34 to 37)

Goldfarb & Ajello

092d6b64-1a78-4dfd-adaf-4bef04a51100

Page 38

1  review the five transcripts of the five individual
2  plaintiffs who have testified to date?
3       A.   There's no specific reason.
4       Q.   Did you think that there might be --
5  withdrawn.
6            You understood, as you said to me, part of
7  this preparation was in connection with Mr. Nolin's Notice
8  of Deposition as well as mine; correct?
9       A.   That's right.
10      Q.   Did you think that there might be
11  information in any of those five transcripts that might
12  relate to either my areas of inquiry or Mr. Nolin's areas
13  of inquiry?
14      A.   No.
15      Q.   Okay.  Did you ever compare at any time the
16  documents as they were produced to the plaintiffs; in
17  other words, with the Bates stamp numbers to the original
18  file?
19      A.   No.
20      Q.   Okay.  Now, within the past two weeks, in
21  addition to electronic communications from either
22  Ms. Wacik or Ms. Darr or both, we also received various
23  transcripts of an arbitration hearing; did you have
24  anything to do with producing those documents?
25      A.   No.

Page 39

1       Q.   Did you ever read those documents?
2       A.   The transcript?
3       Q.   The transcript.
4       A.   No.
5       Q.   Also within the past two weeks, we received
6  prior to Ms. Wacik's deposition miscellaneous documents,
7  some of them correspondence, the actual cover of the
8  claims file, by way of example, things of that nature.
9  Did you have anything to do with the production of those
10  documents?
11      A.   I believe that I produced the cover of the
12  claim file, and I believe I produced to counsel, other
13  than some email from Abbe, from Ms. Darr, one or two other
14  documents.
15      Q.   How did you, when you first -- have you had
16  a chance to look at the original claims file?
17      A.   Yes.
18      Q.   And when you first reviewed the claims file,
19  did you find it to be in order?
20      A.   I don't know what you mean.
21      Q.   Well, is there a particular procedure by
22  which you understand people in the claims department
23  maintain the claims file?
24      A.   No.
25      Q.   For example, is the claims file separated

Page 40

1  into separate categories or folders, by way of example,
2  pleadings, correspondence, emails, insurance policies?
3            MR. HAWKINS:  You're talking about
4       this file?
5            MR. DINATALE:  No, just in general.
6       Q.   Is it your understanding --
7       A.   It doesn't have to be.
8            Someone may choose to organize it in that
9  fashion, but that would be on a file-by-file basis.
10  There's no -- nothing beyond that.
11      Q.   Is there any practice, as far as you know,
12  at AIG that if a piece of correspondence comes in, that it
13  be placed in the file in its entirety?
14      A.   If a piece of correspondence came in that
15  had to do with the claims file, it should be placed in the
16  claims file in its entirety, yes.
17      Q.   Is there any practice or procedure to file
18  correspondence chronologically?
19      A.   That would be a way of doing it and a
20  preferable way of doing it, but there's no procedure that
21  says that that has to be done.
22      Q.   Could you take a minute or two to explain to
23  me, when you opened this particular claims file for the
24  first time, what's the first document you saw?
25      A.   I have no recollection of that.

Page 41

1       Q.   Okay.  Was the claims file organized in any
2  manner that you could think of?
3       A.   Two-hole punched, and I don't know what
4  they're called.
5       Q.   Little clips?
6       A.   The clips that hold, right.  And I can't say
7  for certain that every document was two-hole punched, I
8  just don't recall, but that would be -- that is a way that
9  the documents are kept in the claim files, by two-hole
10  punch.
11      Q.   Other than that, by way of example, was the
12  correspondence all contained within one part of the file?
13      A.   I don't recall.
14      Q.   Was it one file or more than one file; in
15  other words, one expandable folder or more than one
16  expandable folder?
17      A.   I think it was one.
18      Q.   And was -- was it just every document
19  stacked on top of each other, were there any compartment
20  or little pockets within the file folder?
21      A.   No pockets.
22      Q.   So the first Bates-stamped document that was
23  provided to us was a copy of Mr. Conlin's Toolkit entries.
24  Is it your recollection that that was the first document
25  in the file when you first saw it?

11  (Pages 38 to 41)

Goldfarb & Ajello

092d6b64-1a78-4dfd-adaf-4bef04a51100

Page 42

1    A.    I don't have that recollection.
2    Q.    Did you review the file prior to your
3  deposition today, the original file?
4    A.    I reviewed the file, I reviewed part of the
5  file in preparation for my deposition today.
6    Q.    The original file?
7    A.    That's right.
8    Q.    In order to review the original file, you
9  had to physically have it in front of you?
10    A.    I did.
11    Q.    And you had to physically open it at some
12  point, correct?
13    A.    I -- no.  I didn't open it.  I have a folder
14  with the file with documents in it.  The part that flips
15  open, I didn't have that.
16    Q.    I'm not sure I understand.  You have a
17  folder, you said?
18    A.    The file is kept in a folder.
19    Q.    Right.
20    A.    Okay.  At some point this file was given to
21  like a paralegal to make neater, as we do with a lot of
22  our files, and I think at that point a second folder, not
23  one that opens but like a Redwell with no cover on it, was
24  created, and some documents were put in there, and it was
25  less bulky to fit on the shelf type of thing, so that

Page 43

1  second folder is what I looked at.
2    Q.    Was it you who directed a paralegal to make
3  the file neater, as you say?
4    A.    Yes.
5    Q.    And when did that direction occur, after the
6  documents were produced to the plaintiffs on or about
7  February 1, 2005?
8    A.    Yes, much later.
9    Q.    And do you recall why you requested that the
10  file be made neater?
11    A.    We have a new person, and I've been asking
12  them to do that.  As he finishes with one, I give him
13  another one just for my preference.
14    Q.    And once that person was done, what was the
15  difference in the way the file was organized?
16    A.    I believe the difference was that it is --
17  it had a second folder and was just neater.
18    Q.    Neater in what respect?
19    A.    I think I instructed him to put the policy
20  in one place, the correspondence in another, that type of
21  thing.
22    Q.    Let's go to specific areas of inquiry, let's
23  start with number one:  The efforts made by defendants to
24  retain and preserve documents relevant to this claim from
25  January 3rd, 2003 to the present, close quote.  Is there

Page 44

1  anything -- well, you've told us a number of things you
2  have done to prepare for this deposition; anything in
3  addition to what you've told me with respect to this
4  particular area of inquiry?
5        MR. HAWKINS:  I'm sorry, I don't
6  understand your question.
7    Q.    You told us about the things you did to
8  prepare for this deposition, correct?
9    A.    I did.
10    Q.    Okay.  Other than what you've already told
11  me, did you do anything else specifically with respect to
12  this first area of questioning?
13    A.    Not that I recall.
14    Q.    Let me show you what has previously been
15  marked as Exhibit 205, January 6th letter from
16  Mr. Conlin to Mr. Niegorski with an attachment.  Take a
17  look at that, please.
18        I can tell you that that document has never
19  been produced to the plaintiffs; do you have any
20  explanation as to why that would occur?
21    A.    I have no idea.
22    Q.    Did you ask Mr. Conlin?
23    A.    About this document?
24    Q.    This document.
25    A.    I did not.

Page 45

1    Q.    Did anyone point this document out to you?
2        I'll rephrase, did anybody specifically say
3  to you that this is a document that you should undertake
4  to determine whether it ever existed in the files of AIG?
5    A.    No.
6    Q.    Were you ever instructed to determine why
7  this document was either not in the file or in the file
8  and not produced to the plaintiffs?
9    A.    The file was turned over to counsel.
10  Whatever was in it at the time was in it at the time.  Why
11  this letter that was signed, why this letter by Brian
12  wasn't in there, I don't know.
13    Q.    And you haven't checked?
14    A.    I have not spoken to anyone about that.
15    Q.    And no one asked you to check, correct?
16    A.    I don't believe so.
17    Q.    This is the first time you've heard that
18  this particular document was not produced to the
19  plaintiffs, correct?
20    A.    I had heard that there were documents that
21  were allegedly missing from the file.
22    Q.    What did you do with respect to -- once you
23  heard that, can you tell me what you did to either
24  determine why those documents were not in the file, why
25  they were not produced to the plaintiff or what happened

12  (Pages 42 to 45)

Goldfarb & Ajello

Page 46

1  to those documents?
2      A.   I believe I had a discussion with counsel.
3      Q.   Other than that -- I don't want to ask you
4  about that. Other than that, did you ask the people at
5  AIG about documents that didn't exist, that weren't in the
6  file, that weren't produced to plaintiffs?
7      A.   No.
8      Q.   Exhibit 185, a letter to Mr. Conlin from
9  Mr. Nicgorski. Have you ever seen that document?
10     A.   I have.
11     Q.   And is that a document you reviewed prior to
12  testifying here today?
13     A.   It is.
14     Q.   If I represent to you that that was --
15  document was not produced to plaintiffs, are you aware of
16  that?
17     A.   I believe I was.
18     Q.   Okay. What efforts did you make to
19  determine why that document was not in the file or why it
20  was not produced to plaintiffs?
21     A.   I spoke to counsel.
22     Q.   Okay. Other than counsel, anybody else?
23     A.   Just counsel.
24     Q.   Did you ask Mr. Conlin?
25     A.   About this document?

Page 47

1      Q.   About this document.
2      A.   No, I did not.
3      Q.   How about the previous document?
4      A.   No.
5      Q.   How about any of the documents that you
6  understood to be missing from the file or not produced to
7  plaintiffs?
8      A.   I did not discuss them with Brian Conlin.
9      Q.   Did you even check to see whether or not the
10  documents were in fact in the AIG file?
11     A.   I discussed it with counsel.
12     Q.   Okay. Did you check the file itself, is
13  what I'm asking?
14     A.   I personally did not.
15     Q.   It's conceivable, for example, that the
16  'document is simply there, by human error was not produced
17  correct?
18     A.   I don't know.
19     Q.   And you haven't checked?
20     A.   I've discussed it with counsel.
21     Q.   Have you checked the file?
22     A.   No, I said no.
23     Q.   Next one, Exhibit 191, a January 10th
24  letter from Mr. King --
25         MR. HAWKINS: Can I have a minute?

Page 48

1          MR. DINATALE: Absolutely.
2      (RECESS)
3      Q.   Exhibit 191, which is a January 10th
4  letter from Mr. King to Mr. Nicgorski copied to
5  Mr. Conlin, it includes a one-page attachment. Have you
6  ever seen that letter before?
7      A.   I believe so.
8      Q.   Did you see that letter in the file of AIG
9  or in some other location?
10     A.   I believe I saw it in preparation for this
11  deposition.
12     Q.   Was it in the file of AIG, or was it in some
13  other location when you saw it?
14         MR. HAWKINS: Objection to the form
15         of the question.
16     A.   I believe it was in some other location.
17     Q.   Was it in counsel's office? Just yes or no.
18     A.   No.
19     Q.   Was it within the documents produced to
20  plaintiffs?
21     A.   I don't recall.
22     Q.   You indicated earlier, you have access to
23  the deposition transcripts. Do you have access to the
24  numbered deposition exhibits, or the copies of them, such
25  as the one in front of you?

Page 49

1      A.   Yes, I do.
2      Q.   Do you have a set of the exhibits with the
3  stickers?
4      A.   Yes, I do.
5      Q.   Did you see that document within that binder
6  or folder of deposition exhibits?
7      A.   I think I did. It's hard to remember a
8  specific document from one specific place.
9          And I did want to clarify something.
10     Q.   I'll let you clarify something, let me
11  finish with this document, and then I'll let you clarify
12  whatever you want.
13         Did you come to understand that that
14  document was not produced to plaintiffs by AIG?
15     A.   I came to know that there were certain
16  documents that it was alleged were not produced, and I
17  don't recall as I sit here if this January 10th, 2003
18  letter is one of them, but if this is one of them, I mean,
19  I'll accept that.
20     Q.   How many such letters did you understand,
21  three, ten, thirty, or did you -- was it not indicated to
22  you a particular number?
23     A.   I don't think I knew a particular number. I
24  think my understanding, and I don't know where it -- how I
25  came to understand this, but ten to twenty, fifteen,

Page 50

1  something in that ballpark.
2      Q.    Did you understand that there was, whether
3  there was any time, temporal connection for the documents
4  that were not produced? In other words, did you
5  understand that they began when the claim was first filed
6  in September of 2001, or did they begin at some subsequent
7  point in time?
8      A.    My understanding is that they were all in
9  the early part of 2003.
10     Q.    And did you understand whether there was any
11 significance either with respect to the plaintiffs' claims
12 or the defendants' counterclaims and special defenses with
13 the time period beginning January 3rd, 2003?
14            MR. HAWKINS: Objection to the form
15        of the question.
16     A.    I don't understand the question.
17     Q.    Was there any -- withdrawn.
18            You understood it was early in 2003,
19 correct?
20     A.    Correct.
21     Q.    What was going on with respect to this
22 claim?
23     A.    The arbitration and the events surrounding
24 it.
25     Q.    Did the event surrounding it include

Page 51

1  Mr. Gwynn retaining coverage counsel, is that your
2  understanding?
3      A.    I understood that he retained Nicgorski as
4  coverage counsel.
5      Q.    And did you under that once anything was
6  retained, that there was a series of correspondence from
7  that day forward between and among Mr. Nicgorski, an
8  attorney named Jeffrey King, Mr. Conlin; do you understand
9  that?
10     A.    Yes, I do.
11     Q.    And do you know who Jeffrey King is?
12     A.    He's a lawyer at the Struckmeyer firm.
13     Q.    Did you understand Mr. King was retained as
14 coverage counsel for AIG?
15            MR. HAWKINS: Objection to the form
16        of the question.
17     A.    Yes, I understood that.
18     Q.    And did you understand that the plaintiffs
19 claim at least that the correspondence that seemed to be
20 missing all appear to have been this correspondence
21 between and among Nicgorski, King and Conlin and
22 subsequently Bill Federman as well, beginning January 3,
23 2003?
24            MR. HAWKINS: Objection to the form
25        of the question.

Page 52

1      A.    I understand that that is what the
2  plaintiffs are maintaining.
3      Q.    Now, I apologize, you indicated you wanted
4  to make some clarification, and I went too long. What
5  clarification did you wish to make?
6      A.    You asked me if I did anything to try to
7  find why these documents were not filed or if they
8  existed.
9      Q.    Correct.
10     A.    And although I didn't have any specific
11 conversation with respect to specific dated documents, I
12 testified earlier that I did ask Brian if he had anything
13 else, any other documents that hadn't been produced after,
14 and -- the point of clarification is that that
15 conversation took place in the last couple of weeks, as I
16 testified, and it came after I learned that there -- that
17 there was an allegation that some documents were missing.
18     Q.    And Mr. Conlin said he had nothing else?
19     A.    That's correct.
20     Q.    And did you check with -- and everybody else
21 told you they had nothing else?
22     A.    That's right.
23     Q.    Did you ever take what you understood to be
24 any one of these pieces of correspondence that were
25 missing and ask him specifically about that particular

Page 53

1  piece of correspondence?
2      A.    I did not do that.
3      Q.    Let me show you some more, Exhibit 192,
4  January 10th letter from Mr. Nicgorski to Mr. King.
5  Attached to it is a January 10th letter from
6  Mr. Moscowitz to Mr. Nicgorski, and I can tell you that
7  the January 10th attachment was produced to us two weeks
8  ago, but the first two pages of this letter were not, and
9  I can also represent to you that Mr. Conlin testified at
10 deposition that he did in fact get a copy of this letter.
11     A.    Okay. Next one.
12     Q.    Next one I want to show you --
13     A.    Is there a question with this document?
14     Q.    What I'm going to do, show you all the
15 documents at this point and that I believe have not been
16 produced to plaintiffs, and Exhibit 22 -- you know what,
17 let me do it separately.
18            Can you shed any further light on why that
19 document was not produced other than what you've already
20 told me? And again, as I've said, we've gotten the
21 attachment, it's just the two, first two pages.
22     A.    I can shed no light on specifically why this
23 document wasn't produced, if in fact it was received by
24 Brian Conlin.
25     Q.    January 22nd -- excuse me, Exhibit 22, a

14 (Pages 50 to 53)

092d6b64-1a78-4dfd-adaf-4bef04a51100

Page 190

```
 1
 2
 3        I, ANTONIOS G. DASKALAKIS, have read the
 4   foregoing pages, and find the answers to the questions
 5   therein contained to be true and correct, with the
 6   exception of changes, if any, as may be noted on the
 7   Correction Page.
 8
 9
            _____
10   Dated            ANTONIOS G. DASKALAKIS
11        Subscribed and sworn to before me
12   this____day of_____.
13
14
15
16
17
18
            _____
19            Notary Public
20   My Commission Expires:
21
22
23
24
25
```

Page 191

```
 1            I N D E X
 2   WITNESS - ANTONIOS G. DASKALAKIS
 3   EXAMINATION BY MR. DINATALE: PG. 4
 4   EXAMINATION BY MR. NOLIN: PG. 96
 5
            E X H I B I T S
 6
     PLAINTIFF FOR IDENTIFICATION          PAGE
 7
     250  Notice of Deposition - 30(b)(6)      22
 8
     251  Three-page Document, Bates Numbers 0106
 9        through 0108                    73
10   252  Re-Notice of Deposition 10/5/05    118
11   253  Defendants Amended Answer, Affirmative
          Defense to Counterclaim to the Ryan
12        Amended Complaint              119
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 192

```
 1   STATE OF CONNECTICUT  )
                           ) Ss:  NEW CANAAN
 2   COUNTY OF FAIRFIELD   )
 3        I, Melodie Ajello, a Registered Professional
 4   Reporter and Notary Public within and for the State of
 5   Connecticut, do hereby certify that the within deposition
 6   of ANTONIOS G. DASKALAKIS was held before me on the 27th
 7   day of October, 2005.
 8        I further certify that the witness was first sworn
 9   by me to tell the truth, the whole truth and nothing but
10   the truth, and was examined by counsel, and his testimony
11   was recorded stenographically by me, it was reduced to
12   typewriting under my supervision, and I hereby submit that
13   the within contents of said deposition are true and
14   accurate to the best of my ability.
15        I further certify that I am not a relative of nor
16   an attorney for any of the parties connected with the
17   aforesaid examination, nor otherwise interested in the
18   testimony of the witness.
19        Dated at New Canaan, Connecticut, the 2nd day of
20   November, 2005.
21
22
            _____
            Melodie Ajello  License#SHR.20
23            Certified Court Reporter
24   (My Commission expires October 31, 2008.)
25
```

Page 193

```
 1            INSTRUCTION SHEET
 2   DATE SENT:  11/3/05
 3   DATE OF DEPOSITION:  10/27/05
 4   RE:  Ryan, et al vs. National Union, e al
 5   TO:  Antonios G. Daskalakis
 6        FINN DIXON & HERLING, LLP
          One Landmark Square
 7        Stamford, Connecticut, 06901-2689
          BY:  JAMES R. HAWKINS, II, ESQUIRE
 8
 9        Enclosed please find a Copy of the transcript of
10   your deposition.  Please read and sign the Jurat Page
11   before any Notary Public.
12        Enclosed is an Errata Sheet.  If you deem it
13   necessary
14   to make any corrections, please do so on this page, and
15   then sign the Errata Sheet before any Notary Public.  If
16   there are no corrections, please write "No Corrections"
17   and sign your name.
18        Finally, please send a copy of the Errata Sheet to
19   all counsel listed on the appearance page.
20        RETURN ORIGINAL SIGNED AND NOTARIZED JURAT PAGE AND
21   ERRATA SHEET FOR PROPER FILING WITHIN THIRTY (30) DAYS TO:
22
          SILVER, GOLUB & TEITELL
23          184 Atlantic Street
          P.O. Box 389
24          Stamford, Connecticut  06904
          BY:  MARIO DINATALE, ESQUIRE
25
```

49  (Pages 190 to 193)

Goldfarb & Ajello

092d6b64-1a78-4dfd-adaf-4bef04a51100