UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITOL ASSOCIATES, INC.<br>　　　　Plaintiffs<br><br>vs.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC.<br>　　　　Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)　CIVIL ACTION NO.<br>)　03-CV00644 (CFD)<br>)<br>)<br>)<br>)<br>)<br>)　FEBRUARY 6, 2006 |

**GWYNN PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR PROTECTIVE ORDER**

Plaintiffs, David Gwynn, Raquel Gwynn and Gwynn Financial Services, Inc. (hereafter "the Gywnn plaintiffs") respectfully submit this Memorandum in response and opposition to Defendants' January 17, 2006 Motion for Protective Order ("defendants' motion").

Defendants ask the court to reward their failure to produce relevant documents by directing that they be completely shielded from producing so much as *a single document* requested by the Ryan plaintiffs in their May 16, 2005 Production Requests ("the Ryan production requests").

The Ryan production requests concedly cover a wide range of topics and require production of several categories of documents. Defendants, however, responded by objecting to each and every request, and refusing to provide a single additional document. Plaintiffs' counsel sought, in good faith, to resolve at least some of the disputes. However, defendants refused to reconsider *any* of their blanket objections to the Ryan production requests. See, affidavit of Peter M. Nolin, Esq., appended as Exhibit A to defendants' motion, at ¶¶ 3-8. Instead, they filed the instant motion, and take the indefensible position that they be shielded from any further discovery.

The Ryan plaintiffs filed their objection to defendants' motion on January 30, 2006. The Gwynn plaintiffs respectfully join in that objection, and memorandum of law filed therewith. This Memorandum is limited to addressing the issue of what defendants' memorandum has designated as "Category Two" documents, namely, "documents relating to the Sowell claim and Sowell arbitration," i.e., requests 16-30-, 32 and 35-44.

In support of their motion, defendants assert that, in response to the Gwynn plaintiffs' October 2004 production requests ("the Gwynn production requests"), "[defendants] produced all responsive, relevant and privileged documents, **including the entire claims and underwriting files** for the Policy, as well as non-privileged correspondence." Defendants' memorandum at 4, 9 (emphasis in original). They also assert that "the Ryan Plaintiffs' Requests are unreasonably cumulative" of this production. Id, at 14. These statements are false. As defendants well know,

2

they have failed to produce, at a minimum, at least 12 pieces of correspondence which admittedly *should have been in their files.* Moreover, they have produced but a single email from any of the several persons who were involved in handling this claim. Other documents were produced in random fashion, in a manner inconsistent with the way they were kept in defendants' files in the normal course of business.

Defendants' motion would have this court reward their defalcations with respect to discovery by shielding them from further production. Defendants' motion, however, should be denied.

**RELEVANT PROCEDURAL HISTORY**

The Ryan plaintiffs filed their complaint in this matter in April 2003, three months after testimony in the arbitration that forms the basis of this lawsuit had been completed, and less than two months after the arbitrators issued their written decision.

It is undisputed that, when the Ryan plaintiffs filed suit, defendants were still in the process of adjusting this claim, which was not settled until August 2003. The Gwynn plaintiffs thereafter filed their complaint on July 2, 2003.

The Gwynn Plaintiffs filed their production requests in October 2004. Defendants filed their objections and responses on December 3, 2004. (Copies of defendants' responses are attached at Exhibit A.) As can be seen, the Gwynn plaintiffs narrowly defined the scope of their

production requests to include only 12 interrogatories and 4 document production requests, all of which are undoubtedly relevant to the claims in this case.

Equally obvious, defendants' responses to nearly all of the interrogatories was to refer plaintiffs to the documents they were producing. No attempt was made to *actually identify*, by way of example, all of defendant's employees who participated in the decision early in 2002 to deny a defense to plaintiffs (Interrogatory No. 5). While Fed. R. Civ. P. 33(d) permits a party the option of producing business records in response to an interrogatory, there must first be two preexisting conditions:

    a. "the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served"; and

    b. Such "specification shall be *in sufficient detail* to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained" (emphasis supplied).

Defendants have yet to demonstrate the "burden" that the Gwynn plaintiffs' interrogatories imposed on them. More troubling, however, is that defendants produced approximately 1600 pages of documents without any further "specification" as to which of the documents contained the answers to plaintiffs' reasonable and narrowly framed interrogatories.

Nonetheless, the plaintiffs proceeded with discovery, rather than expend time and energy litigating the deficiency of defendants' discovery.

During discovery, however, it soon became apparent that, at a minimum, twelve separate pieces of correspondence that defendants' various employees admitted *should* have been included in their claims file were not produced. Suspiciously, the correspondence that was not produced covers the period beginning January 3, 2003 and thereafter- *the exact time frame in which defendants belatedly decided to renew the defense of this claim after three days of arbitration testimony.* (Copies of this correspondence are at Exhibit B.) Several letters were sent to defendants' counsel requesting production of these documents, or an explanation for defendants' failure to produce this material. (These letters are compiled at Exhibit C.) However, there has never been any further production or explanation.

Equally disturbing is that defendants produced just *a single internal email* from and among their various employees concerning this claim. Many of the defendants' employees admitted at deposition that they were never asked to save or retrieve their emails.

Finally, it became clear that other documents produced by defendants were not consistent with their internal document retention policies. By way of example, the first page of a letter might be followed by the second page of a *different* letter or document. (Examples of this type of production are at Exhibit D.)

Plaintiffs' counsel came to the obvious conclusion that documents *must* have been removed from the file; that defendants *deliberately* failed to instruct key personnel to retain their emails; and that records were *purposely* produced to plaintiffs in a random fashion, and not at all

as the records were kept in the regular course of business.

## THE DEPOSITION OF ANTONIOS DASKALAKIS

When defendants were either unwilling or unable to produce answers to plaintiffs' concerns about document production, plaintiffs had no choice but to conduct depositions solely to ascertain defendants' diligence in retaining, searching for, and producing responsive documents. From August 18- 23, the Gwynn plaintiffs served three separate deposition notices to effectuate that end. (Exhibit E.)

One notice identified Antonios Daskalakis as the deponent, as he was the individual who verified defendants' responses to the Gwynn plaintiffs' interrogatories. The others were addressed to AIG's records custodian. Defendants chose to have Daskalakis testify in response to all three deposition notices. That deposition was conducted on October 27, 2005.[1]

The transcript of Daskalakis' testimony makes it very clear that defendants have failed in their discovery obligations to provide plaintiffs with all of the non-privileged documents in their underwriting and claims files concerning the Sowell arbitration.

---

[1] The Ryan plaintiffs also filed a notice of deposition on AIG, pursuant to Fed. R. Civ. P. 30(b)(6), on a variety of topics addressing defendants' answer, special defenses and counterclaims to their Second Amended Complaint. AIG chose Mr. Daskalakis to act as its corporate representative with respect to this deposition as well. It has not been concluded.

### A. Mr. Daskalakis' Background.

Antonios Daskalakis is a 1992 graduate of Brooklyn Law School. Upon graduation, he worked for a number of different law firms. His practice areas included, at various times, representing plaintiffs in personal injury actions, and representing defendants in insurance defense cases. These practice areas, naturally, required him to prepare document production requests and interrogatories, and take and defend depositions. See, deposition transcript of Antonios Daskalakis (Exhibit F) at 13-18.

Mr. Daskalakis began his employment with AIG in February 2003. On November 14 or 15, 2004, he was transferred to AIG's "coverage and litigation group," where his responsibilities consisted of "handl[ing] lawsuits against [AIG] arising out of any of the financial lines products," which includes the policy at issue in this case. He was assigned to monitor this litigation "in the latter part of November or the early part of December." (Exhibit F at 6, 8-9, 12, 75.)

### B. Mr. Daskalakis' Efforts in Responding to the Gwynn Plaintiffs' Interrogatories and Document Production Requests.

As noted above, defendants filed their interrogatory objections and responses, verified by Mr. Daskalakis, on December 3, 2004, less than 20 days after Mr. Daskalakis was assigned to monitor this litigation by AIG. Thereafter, on February 1, 2005, defendants produced what they now mistakenly claim is their "entire" claims and underwriting files.

Mr. Daskalakis testified that the effort he put into responding to the interrogatories consisted of looking at plaintiff's questions and the answers prepared by defense counsel; speaking to his "then manager in the coverage group," Abbe Darr, who was not assigned to the claim until after this litigation was filed; discussions with counsel providing a defense to he claim; and a review of the claims file. (Exhibit F at 74-76.)

In all, Mr. Daskalakis spent less than five hours performing these various tasks, which included reviewing a file that contained at least 1600 pages worth of documents, before asserting that the interrogatory responses were true. He did not even perform the most obvious task of speaking with Brian Conlin, the claims analyst who handled the underlying Sowell arbitration from its inception. (Exhibit F at 77.)

The interrogatory responses reflect this lack of effort. He was asked, for example, about his responses to Interrogatories 2 and 3, which, after ignoring defendants' boilerplate objections, indicate that the answer may be found in the claims file. When asked the basis for that conclusion, the response was "that's the source that [he] would have gone to" to respond. (Exhibit F at 78-79). He could not testify that the answer actually *was* in the claims file.

The response to Interrogatory No. 3 is particularly instructive. The interrogatory asks AIG to identify "*all* [of its employees], *including but not limited to claims adjustors,* who participated *to any extent* into conducting an investigation" of the Sowell claim (emphasis supplied). Mr. Daskalakis, despite being a litigator who himself participated in discovery,

testified that he interpreted that question to require disclosure of only one person- Brian Conlin, the claims analyst for this file. Accordingly, he never bothered to determine who else was responsible (Exhibit F at 79-80.)

He was also asked about Interrogatory No. 9. Rather than ask Mr. Conlin, or anyone else, about a response to that question, Mr. Daskalakis limited his inquiry to reviewing the file because "that is where the information is *supposed* to be," and "the file is *supposed* to be able to speak for itself." (Exhibit F at 83-84) (emphasis supplied).

Essentially, Mr. Daskalakis' answers to questions concerning his efforts spent collecting the answers to plaintiffs' interrogatories were identical for every single interrogatory. He did nothing more than review the file, which he knew or should have known was incomplete, and talk to counsel.

His reliance on the file is particularly troubling in that he admitted that the file is *not* complete, and certainly does not "speak for itself" for the reasons discussed below.

Brian Conlin kept notes of various matters pertaining to his handling of this claim. These notes were kept in electronic form, and were identified as "toolkit entries." Conlin's toolkit entries for this case end on January 13, within days of the conclusion of the arbitration testimony. See, Exhibit H. The Sowell matter was not settled until August 2003. Accordingly, plaintiffs naturally inquired as to the reasons why the toolkit entries ended so abruptly on January 13.

Needless to say, Mr. Daskalakis did not know why Conlin stopped making these entries, and apparently did not ask. (Exhibit F at 169-170.) During his deposition, Conlin testified that he surrendered custody of the file to the coverage department on January 13, 2003. Daskalakis, however, testified that Conlin was incorrect, and *that the coverage department did not receive the file until May 2003.* (Exhibit F at 101-102.) Thus, some four months of activity occurred on this file that were not recorded by the claims analyst assigned. AIG has been unable to offer any explanation for this failure to note what was happening with the file at a time when activity still continued. The conclusion is inescapable, however, that this file is far from complete.

### C. Defendants Have Failed to Produce Numerous Relevant Documents.

#### 1. Defendants' Failure to Produce Missing Correspondence, or Provide any Explanation for its Absence.

As discussed above, there are a minimum of 12 pieces of correspondence that defendants admit *should* have been in their files that were not. Daskalakis was deposed when attempts to receive explanations for the disappearance of these documents from counsel were unavailing. See, correspondence at Exhibit C. Indeed the Rule 30(b)(6) Notice for this deposition (Exhibit E) specifically identified three separate areas of inquiry addressed to this very topic.

Remarkably, Daskalakis was unable to provide any explanations for these missing documents. Perhaps more remarkably, it appears as though he barely made any effort to provide any answers. His preparation consisted of reviewing the claims file again, and reading the

deposition transcripts of some of the AIG employees who had been deposed. (Exhibit F at 36-38.)

Daskalakis admitted that the "practice" at AIG was that "if a piece of correspondence came in that had to do with the claims file, it should be placed in the claims file in its entirety." (Exhibit F at 40.) However, Daskalakis was shown ten separate pieces of correspondence that were never produced, but which must at some point have been in the claims file. (These letters are collected at Exhibit B.)

When asked if he had *any* explanation as to why these letters were not produced, his response was essentially always the same: "I have no idea." (Exhibit F at 44, 53-55.) Nor did he check. Mr. Daskalakis undertook no investigation concerning the location of these documents. He did not even bother to ask Conlin, or more basically, check the file itself:

>   A.   I heard that there were documents that were allegedly missing from the file.
>
>   Q.   What did you do with respect - - once you heard that, can you tell me what you did to either determine why those documents were not in the file, why they were not produced to the plaintiff or what happened to those documents?
>   A.   I believe I had a discussion with counsel.
>
>   Q.   Other than that - - I don't want to ask you about that. Other than that, did you ask the people at AIG about documents that didn't exist, that weren't in the file, that weren't produced to the plaintiffs?
>   A.   No.

11

Q. Exhibit 185, a letter to Mr. Conlin from Mr. Nicgorski. Have you ever seen that document?
A. I have.

\* \* \*

Q. Okay, what efforts did you make to determine why that document was not in the file or why it was not produced to the plaintiff?
A. I spoke to counsel.

Q. Okay. Other than counsel anybody else?
A. Just counsel.

Q. Did you ask Mr. Conlin?
A. About this document?

Q. About this document.
A. No, I did not.

Q. How about the previous document?
A. No.

Q. How about any of the documents that you understood to be missing from the file or nor produced to plaintiffs?
A. I did not discuss them with Brian Conlin.

Q. Did you even check to see whether or not the documents were in fact in the AIG file?
A. I discussed it with counsel.

Q. Okay. Did you check the file itself, is what I'm asking?
A. I personally did not.

Q. It's conceivable, for example, that the document is simply there, by human error was not produced; correct?
A. I don't know.

>   Q.   And you haven't checked?
>   A.   I've discussed it with counsel.
>
>   Q.   Have you checked the file?
>   A.   No, I said no.

(Exhibit F at 45-47.) Needless to say, Daskalakis did not attempt to ascertain whether there was a deliberate effort to keep these documents from being produced to plaintiffs. (Exhibit F at 56.)

The correspondence in question largely covers the period following January 13, 2003. As described above (p. 8, <u>supra</u>.), this is the date that Conlin, for whatever reason, stopped making entries in his toolkit notes (Exhibit H). Clearly, this is not coincidence or happenstance. The only reasonable inference to be drawn is that, beginning on or about January 13, 2003, defendants deliberately undertook efforts to deviate from their customary business practice with respect to making contemporaneous notes of significant events in handling this claim. In addition, they saw to it that relevant documents and correspondence did not make their way into the file or else removed them from the file.[2]

This conduct, at the very least, casts serious doubt on defendants' claim that they produced their entire claims file. More significantly, it demonstrates their refusal to take their discovery obligations seriously. This, of course, is particularly compelling in a case that alleges

---

[2]Daskalakis testified that the only persons who had custody of the claims file were Conlin, Liz Wacik (his predecessor in the coverage department), defense counsel, and himself. (Exhibit F at 98.) Conlin and Wacik were both deposed, and neither could offer any explanation why the correspondence in question did not make its way into the file either.

defendants acted in bad faith.[3]

### 2. Defendants' Failure to Produce Relevant and Responsive Emails.

Plaintiffs were also concerned about defendants' failure to produce emails. Again, efforts to obtain this material was first attempted by way of correspondence. When those efforts failed, the Gwynn plaintiffs filed their Rule 30 (b)(6) deposition notice. The fourth area of inquiry was specifically addressed to defendants' efforts "to locate, preserve and produce" emails and other electronic communications.

Daskalakis testified that, at the time the Ryan plaintiffs filed their claims in this case, AIG's policy was to direct the person handling the file (in this case, Brian Conlin) to be certain that the file was transferred to the coverage and litigation department, and to preserve electronic communications relevant to the case. (Exhibit F at 65, 66.) The "policy" at AIG was for Liz Wacik, Daskalakis' predecessor with respect to this file, to ask Conlin to preserve all of his electronic communications for litigation purposes. (Exhibit F at 67.)

At the time Daskalakis was deposed, defendants knew very well that one of plaintiffs' contentions concerned defendants' failure to preserve emails. And yet, remarkably, Daskalakis

---

[3]Defendants assert that Daskalakis' testimony "clearly and unequivocally.... details how a proper search did indeed occur in full compliance with the Federal Rules." Memorandum at 23, fn 10. Given the excerpts from this testimony as described above, one can only wonder how defendants can make this assertion.

never asked Conlin whether policy had been followed and he had been asked to preserve his emails. Nor did he ask Conlin if he ever deleted his emails. (Exhibit F at 67.)

Conlin testified that he was *never* asked to produce documents, or preserve his emails, and did not do so. See, transcript of testimony of Brian Conlin, Exhibit G, at 73, 286-87.

Daskalakis also testified that he spoke to Conlin about record production "shortly after" he was assigned to this matter in November 2004. He asked Conlin whether he had "anything" he hadn't already "given [AIG]." Conlin replied in the negative. However, Daskalakis never asked Conlin whether he had ever made any attempt to retrieve his emails. Nor did he know whether, at that time, Conlin had any emails or other electronic communications that he could retrieve. Apparently, he never asked. (Exhibit F at 27-29.)

Conlin, of course, was not the only AIG employee who had involvement in the Sowell claim. Daskalakis spoke to seven other such employees prior to his deposition. The very first time that Daskalakis asked *any* of these other persons whether they had retained any emails was about two to three weeks before his deposition (Exhibit F at 26, 32), which was more than two years after this action was first brought.

It is absurd to believe, in this day and age, at a company like AIG, which employs "approximately 92,000 employees in 75 countries" (See, January 17, 2006 affidavit of Antonios Daskalakis appended as Exhibit B to defendant's memorandum), that there would be only one email in its handling of a claim that stretched nearly two years, and in which a defense was

15

provided, then revoked, then provided again. The only conclusion to be drawn is that AIG deviated from its own policy when plaintiffs brought this claim, and failed to ask any of the persons involved in handling this matter to preserve emails.

### 3. Documents were Produced to Plaintiffs in Random Fashion, and Not as Kept in the Regular Course of Business.

Finally, some documents were produced to plaintiffs in a manner inconsistent with AIG's business practice. By way of example, a page of a multi-page letter may be followed by a page from a completely different document or letter. Examples of this sort of production are provided at Exhibits D.

Mr. Daskalakis was shown these documents. Consistent with his testimony concerning the other areas of document production discussed above, he could offer no explanation as to why the documents were produced in this fashion, and apparently did not take the time to attempt to learn why. (Exhibit F at 71-74.)

## CONCLUSION

The record developed in this case demonstrates the obvious fact that defendants have failed to produce documents and communications that are inarguably relevant, and which admittedly *must* have been in their files. Moreover, they have failed to provide an explanation for the missing documents, and produced a Rule 30(b)(6) witness to testify about these failures

who did little or nothing to properly prepare to provide answers as to why the documents were never produced.

Thus, defendants' motion must be viewed in this context. Predictably, they refused to resolve their disputes concerning the Ryan plaintiffs' production in good faith, and now want this court to believe that, somehow, every single document requested should be protected from disclosure under a number of different legal theories.

At this point, defendants' credibility with respect to document production must be viewed with more than a grain of salt. Indeed, this Court should be highly skeptical. Their self-serving statement that they have "produced...**the entire claims and underwriting files,**" defendants' memorandum at 4, 9 (emphasis in original) is fiction, as has been demonstrated.

Accordingly, for the reasons stated herein as well as those contained in the Ryan plaintiff's memorandum, defendants' motion should be denied, and they should be directed to produce all of the documents requested in the Ryan plaintiffs' production. At a bare minimum, as demonstrated above, they should be required to produce those documents they identify as "Category Two," namely requests 16-30, 32, and 35-44. Far from being "unreasonably cumulative" as defendants assert, memorandum at 14, these requests merely require defendants to produce what they should have produced long ago.

PLAINTIFFS, DAVID GWYNN, RAQUEL GWYNN AND GWYNN FINANCIAL SERVICES, INC.

By _____
Mario DiNatale (ct 12449)
Jonathan M. Levine (ct 07584)
Silver Golub & Teitell, LLP
184 Atlantic Street
Stamford, CT 06904
(203) 325-4491
(203) 325-3769 (Fax)
Email: MDinatale@sgtlaw.com
JLevine@sgtlaw.com

## CERTIFICATE OF SERVICE

THIS IS TO CERTIFY that a copy of the foregoing was sent via U.S. Mail, postage prepaid, on this 6th day of February, 2006, to:

Mark B. Seiger, Esq.
Charles F. Gfeller, Esq.
Edwards Angell Palmer & Dodge LLP
90 State House Square
Hartford, CT 06103

Peter M. Nolin, Esq.
Stephanie McLaughlin, Esq.
Sandak Hennessey & Greco LLP
707 Summer Street
Stamford, CT 06905

_____
MARIO DiNATALE