## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES, INC., Plaintiffs, | ) ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 3:03CV00644(CFD) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., Defendants. | ) ) ) ) ) | |
| DAVID W. GWYNN and RAQUEL GWYNN Plaintiffs, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 3:03CV01154(CFD) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., Defendants. | ) ) ) ) ) ) | AUGUST 3, 2006 |

## SECOND AMENDED COUNTERCLAIM AGAINST THE RYAN PLAINTIFFS

Pursuant to Fed. R. Civ. P. 13 and 15(a), Defendants, National Union Fire Insurance

Company of Pittsburgh, PA. and AIG Technical Services, Inc., now known as AIG Domestic

Claims, Inc. (collectively, "National Union" or "AIG" or "Defendants"), through their

undersigned attorneys, hereby set forth this Second Amended Counterclaim against Plaintiffs,

Bruce Charles Ryan, Russell William Newton, Robert Fitzpatrick and Merit Capital Associates,

Inc. (collectively, the "Ryan Plaintiffs").

## Parties

1.    Defendant/Counterplaintiff National Union is an insurance company duly organized under the laws of the Commonwealth of Pennsylvania with its principal place of business at 70 Pine Street, New York, NY 10270.

2.    Defendant/Counterplaintiff AIG is a corporation duly organized under the laws of the State of Delaware with its principal place of business at 70 Pine Street, New York, NY 10270.

3.    Upon information and belief, Merit Capital Associates, Inc. ("Merit") is a corporation organized under the laws of the State of Connecticut with its principal place of business in Westport, Connecticut.

4.    Upon information and belief, Plaintiff/Counterdefendant Bruce Charles Ryan is an individual residing in and a citizen of Connecticut.

5.    Upon information and belief, Plaintiff/Counterdefendant William Russell Newton is an individual residing in and a citizen of Arizona.

6.    Upon information and belief, Plaintiff/Counterdefendant Robert Fitzpatrick is an individual residing in and a citizen of Connecticut.

## Jurisdiction and Venue

7.    This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 because Defendants' Second Amended Counterclaim against the Ryan Plaintiffs is so related to the claims asserted in the Ryan Plaintiffs' Second Amended Complaint that they form part of the same case or controversy.

HFD_166925_1.DOC/SPALADINO

8.      This Court also has jurisdiction pursuant to 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(a).

<u>Material Facts Common To All Counts</u>

10.      National Union issued its Securities Broker/Dealer Professional Liability Insurance Policy No. 473-36-20 ("Policy"), to Merit, with an initial effective date of August 23, 2000 to August 22, 2001.

11.      An "Insured," pursuant to Paragraph 2(f) of the Policy, means Merit, its directors, officers, partners and employees, and its Registered Representatives.

12.      Upon information and belief, Bruce Charles Ryan ("Ryan") is a 50% shareholder in Merit and served as its President at all times relevant to this action.

13.      Upon information and belief, Russell William Newton ("Newton") is a 50% shareholder in Merit and served as its Chairman and Chief Financial Officer at all times relevant to this action.

14.      Upon information and belief, Robert Fitzpatrick ("Fitzpatrick") was the General Counsel and Chief Compliance Officer of Merit at all relevant times prior to Merit's sale of all or substantially all of its assets to Source Capital Group, Inc.

15.      Upon information and belief, David W. Gwynn was a Registered Representative of Merit.

16.      Accordingly, the Ryan Plaintiffs and David W. Gwynn and Raquel Gwynn (collectively, the "Gwynn Plaintiffs") are "Insureds" under the Policy.

HFD_166925_1.DOC/SPALADINO

17.    The Policy provides coverage for its Insureds in connection with Claims for "actual or alleged" Wrongful Acts.

18.    Paragraph 2(c) of the Policy defines a "Claim" as a written demand for monetary relief, or a civil or arbitration proceeding for monetary or non-monetary relief, brought by an Insured's customer or client.

19.    Paragraph 2(n) of the Policy defines a "Wrongful Act" as any act, error or omission by the Broker/Dealer, or by any director, officer, partner or employee thereof, or by any Registered Representative, in their respective capacities as such.

20.    The Policy thus provides coverage for certain "actual or alleged Wrongful Acts" by the Ryan Plaintiffs and Gwynn Plaintiffs.

21.    The Policy also provides coverage for a Claim made against the lawful spouse of an individual Insured for a Claim arising solely out of his or her status as the spouse of an individual Insured.  The Policy thus provides coverage for David Gwynn's wife, Raquel Gwynn, for Claims arising solely out of her status as Gwynn's spouse.

22.    Pursuant to Paragraph 4(f), the Policy *excludes* coverage for any Loss in connection with any Claim:

> alleging, arising out of, based upon **or** attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act;

(Emphasis supplied).

23.    The Retroactive Date stated in Item 6 of the Declarations is August 23, 1999.

HFD_166925_1.DOC/SPALADINO

24.     Accordingly, the Policy excludes coverage for any Claim alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to August 23, 1999, as well as any subsequent interrelated Wrongful Acts.

25.     In addition, the Policy excludes coverage for any Claim *alleging* any Wrongful Act occurring prior to August 23, 1999, as well as any subsequent interrelated Wrongful Acts.

26.     The Policy also excludes coverage for any Loss in connection with any Claim:

- alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-loan investment company or variable annuities in which there is no initial or contingent sales charge or commission; see Policy, ¶4(s) (emphasis supplied);

- alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims arising out [of] an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership; see Policy, ¶4(t) (emphasis supplied); and

- with respect to Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away"; see Policy, 4(r) (emphasis supplied);

27.     In this action, the Ryan Plaintiffs and the Gwynn Plaintiffs (collectively, "Plaintiffs") allege a bad faith denial of the duties to defend and indemnify in connection with the Statement of Claim and Amended Statement of Claim filed against them by Michael A. Sowell ("Sowell") in an NASD arbitration (the "Sowell Arbitration").

28.     In his Statement of Claim and Amended Statement of Claim, Sowell alleged the following: In late 1997, Sowell inherited his mother's assets, which he initially believed were worth a total of about $380,000. Sowell did not know how to manage his inheritance, which

HFD_166925_1.DOC/SPALADINO

included stock certificates, so he turned to David W. Gwynn ("Gwynn") for assistance. Gwynn offered to prepare a retirement plan for Sowell and to manage his portfolio. In early February 1998, Gwynn met with Sowell and his wife to gather information for the retirement plan. At the time of this meeting, Sowell believed that his inheritance was worth about $382,000. Gwynn prepared a retirement plan, dated February 20, 1998, that listed the Sowells' assets as $382,000, plus a residence worth $130,000. The plan emphasized that the Sowells needed to construct an "efficient, diversified portfolio."

29.    Sowell further alleged that he opened an account with Merit and signed a power of attorney giving Gwynn discretionary control over the Merit account so that Gwynn could manage the account on Sowell's behalf. In April 1998 Sowell provided Gwynn with certain stock certificates, which Gwynn deposited into the Merit account on May 1, 1998.

30.    Sowell claimed that at the time that he gave the stock to Gwynn, Sowell was unaware of its true value, which was in excess of $1 million. Gwynn never revised the Sowells' retirement plan to include this additional $1 million.

31.    Sowell claimed that Gwynn ignored his need to create an efficient, diversified portfolio, as described in the retirement plan, and instead engaged in the churning of the Merit account. Sowell claimed that Gwynn advised him improperly, and made inappropriate trades. Sowell alleged:

> When Mr. Sowell opened his account, he signed a power of attorney giving Respondents discretionary control of the account. Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell. As it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading decisions. . . .

> Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell and treated his discretionary power over

- 6 -

the account as a license to churn . . . Mr. Sowell's account was a discretionary account and was unquestionably controlled by Mr. Gwynn.

(Emphasis supplied).

32.    A report by Sowell's expert witness supported Sowell's allegations that Gwynn's misconduct and the Ryan Plaintiffs' failure to supervise began in May 1998.

33.    Sowell also alleged that he provided Gwynn with funds to invest on his behalf in Novation Financial Corporation ("Novation"), a predecessor to Charter Financial Network, Inc. ("Charter"), now known as Charter 3, Inc. ("C3"). Such funds included a $100,000 check, which Sowell drew against his Merit account on July 1, 1998. Sowell alleged that Gwynn had assured him that his investments in Novation/Charter/C3 were protected by promissory notes, but Sowell never received any money or stock in satisfaction of such notes.

34.    Sowell further alleged that Gwynn was, at all times relevant, a controlling shareholder, officer, and director of Novation, Charter, and C3.

35.    Sowell accused Gwynn of fraud and various statutory and regulatory violations in connection with both the Merit account and the Novation/Charter/C3 investments.

36.    Sowell alleged that Gwynn was Merit's Registered Representative, and claimed that the Ryan Plaintiffs were liable for the Gwynn Plaintiff's misconduct under theories of respondeat superior, failure to supervise, and as "control persons."

37.    Sowell included Raquel Gwynn in his Statement of Claim and Amended Statement of Claim because Arizona, where the Sowell Arbitration was filed, is a community property state.

38.    On or about May 16, 2001, Gwynn advised Merit that there was a "significant chance" that Sowell would file claims against Gwynn and Merit.

39.     Subsequently, the Ryan Plaintiffs requested an extension of the Policy.

40.     The Policy was extended until September 23, 2001 pursuant to Endorsement # 5.

41.     The Statement of Claim in the Sowell Arbitration, which is dated August 31, 2001 -- after the Policy's initial expiration date --was served on the Ryan Parties on or around September 17, 2001.

42.     The Ryan Plaintiffs gave notice under the Policy of Sowell's Claim on or around September 22, 2001.

## COUNT ONE
### (Declaratory Judgment)

Defendants/Counterplaintiffs incorporate the allegations set forth in paragraphs 1 through 42 of this Second Amended Counterclaim, as though fully set forth herein.

43.     There is a substantial controversy between the parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

44.     AIG seeks a Declaration:

- that any coverage for Sowell's Claims was excluded by Paragraphs 4 (f), (r), (s), and (t) of the Policy; and,

- that the Ryan Plaintiffs and the Gwynn Plaintiffs shall pay AIG all sums paid on their behalf in connection with the Sowell Claims, including all payments in connection with the Sowell Arbitration Award and Defense Costs.

## COUNT TWO
### (Unjust Enrichment)

Defendants/Counterplaintiffs incorporate the allegations set forth in paragraphs 1 through 42 of this Second Amended Counterclaim, as though fully set forth herein.

HFD_166925_1.DOC/SPALADINO

45.    Plaintiffs were benefited by AIG's payment of Defense Costs and the Sowell Arbitration award, where any coverage for Sowell's claims against Plaintiffs was excluded pursuant to Paragraphs 4 (f) (r), (s), and (t) of the Policy.

46.    Defendants have been injured by Plaintiffs' failure to reimburse them for the Defense Costs and the Sowell Arbitration award paid by Defendants.

PRAYER FOR RELIEF

WHEREFORE, Defendants/Counterplaintiffs respectfully request that the Court enter an Order:

1.  Declaring that any coverage for Sowell's Claims was excluded by Paragraphs 4 (f), (r), (s), and (t) of the Policy;

2.  Ordering the Ryan Plaintiffs to pay AIG all sums paid on their behalf in connection with the Sowell Claims, including all payments in connection with the Sowell Arbitration Award and Defense Costs; and

3.  Granting such other and further relief as the Court deems just, proper and equitable under the circumstances.

HFD_166925_1.DOC/SPALADINO

Respectfully Submitted,

DEFENDANTS/COUNTERPLAINTIFFS
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.
and AIG TECHNICAL SERVICES, INC.

BY THEIR ATTORNEYS,
Edwards Angell Palmer & Dodge LLP

By: _____
Mark B. Seiger
Fed. Bar No. ct05580
David S. Samuels
Fed. Bar. No. ct24460
90 State House Square
Hartford, CT  06103-2715
Tel:  (860) 525-5065
Fax: (860) 527-4198
Email: mseiger@eapdlaw.com
         dsamuels@eapdlaw.com

John D. Hughes
BBO # 243660
101 Federal Street
Boston, MA 02110
Tel:  (617) 439-4444
Fax:  (617) 439-4170
Email: jhughes@eapdlaw.com

Donna M. Greenspan
Florida Bar No.: 059110
One North Clematis Street
Suite 400
West Palm Beach, FL  33401
Tel: (561) 833-7700
Fax:  (561) 655-8719
Email: dgreenspan@eapdlaw.com

HFD_166925_1.DOC/SPALADINO

## CERTIFICATION

I hereby certify that on August 3, 2006, the foregoing Second Amended Counterlcaim Against The Gwynn Plaintiffs was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mailto anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this document through the court's CM/ECF System.

David S. Samuels

HFD_166925_1.DOC/SPALADINO