UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES, INC., | ) ) ) | CASE NUMBER: 3:03 CV 00644 (CFD) |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., | ) ) ) ) | |
| Defendants, | ) ) | |
| DAVID W. GWYNN and RAQUEL GWYNN, | ) ) | |
| Plaintiffs, | ) ) | CASE NUMBER: 3:03 CV 1154 (CFD) |
| v. | ) ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., | ) ) ) ) | |
| Defendants. | ) | August 17, 2006 |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS AND INCORPORATED MEMORANDUM OF LAW

Defendants, National Union Fire Insurance Company of Pittsburgh, PA. and AIG Technical Services, Inc. (collectively, "AIG" or "Defendants"), hereby submit this Motion with incorporated Memorandum of Law seeking Summary Judgment on All Counts against Plaintiffs, Bruce Charles Ryan ("Ryan"), Russell William Newton ("Newton"), Robert Fitzpatrick ("Fitzpatrick"), and Merit Capital Associates, Inc. ("Merit") (collectively, the "Ryan Plaintiffs"), and Plaintiffs David W. Gwynn ("Gwynn") and Raquel Gwynn (collectively, the "Gwynn

**ORAL ARGUMENT IS RESPECTFULLY REQUESTED**

Plaintiffs"). There are no genuine issues as to any material facts, and AIG is entitled to judgment as a matter of law.

## UNDISPUTED FACTS

### 1.    Introduction

In this action, the Ryan Plaintiffs and the Gwynn Plaintiffs (collectively, "Plaintiffs") seek damages under a Securities Broker/Dealer Professional Liability Insurance Policy ("Policy") issued to Merit.[1]  Plaintiffs claim that AIG breached its duty to defend and indemnify them with respect to the Statement of Claim and Amended Statement of Claim filed against them by Michael A. Sowell ("Sowell") in a National Association of Securities Dealers, Inc. ("NASD") arbitration ("Sowell Arbitration").[2]   Statement of Undisputed Material Facts ("SOF"), filed contemporaneously with this Motion, at ¶ 1.

On February 25, 2003, the panel in the Sowell Arbitration ("Panel") awarded $1,125,000 to Sowell, jointly and severally against each of the Ryan Plaintiffs, each of the Gwynn Plaintiffs, and Gwynn Financial Services, Inc. ("GFS").[3]  SOF at ¶ 91.  The Panel found that Plaintiffs had sold unregistered securities to Sowell and traded excessively in an account that Sowell had opened with Merit ("Merit Account").  SOF at ¶ 95.  Specifically, the Panel found that Gwynn had made approximately *1,596 trades in thirty-seven (37) months,* from May 1998 to May 2001, and that *80% of Gwynn's gross income* from that period derived from his trading in Sowell's

---

[1] Ryan was the President of Merit, and one of its two shareholders.  SOF at ¶ 4.  Newton was Merit's Chairman, Chief Financial Officer, and the other shareholder.  SOF at ¶ 5.  Fitzpatrick was Merit's Compliance Officer and General Counsel.  SOF at ¶ 6.  Gwynn functioned as Merit's Registered Representative.  SOF at ¶ 7.

[2] Sowell included Raquel Gwynn as a defendant in his Statement of Claim and Amended Statement of Claim because Arizona, where the Sowell Arbitration was filed, is a community property state.  SOF at ¶ 16.

[3] On March 24, 2006, the Court dismissed GFS as a party plaintiff in this action.  Order Granting Motion to Dismiss Gwynn Financial Services, Inc., Docket Entry # 171.  GFS is not an insured under the Policy.

Merit Account. SOF at ¶ 95. The Panel concluded that Plaintiffs had "churned" the Merit Account, and that the Ryan Plaintiffs had failed to properly supervise Gwynn. SOF at ¶ 95.

The allegations in Sowell's Statement of Claim and Amended Statement of Claim fell squarely within several of the Policy's exclusionary provisions, including exclusion (s), which precluded coverage for claims: "alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets." SOF at ¶ 13 (emphasis supplied). It is important to note that exclusion (s) did not require the *actual* exercise of discretionary authority or control to preclude coverage; rather, the *allegation* of discretionary authority or control was sufficient to trigger the exclusion.

In both his Statement of Claim and Amended Statement of Claim, Sowell alleged that Gwynn had not consulted with him before making trading decisions, that Gwynn "unquestionably controlled" his Merit Account, that Gwynn had "churned" the Merit Account, and that Sowell had signed a power of attorney giving Gwynn "discretionary control" over the Merit Account. SOF at ¶ 28-30. Thus, the allegations of the Statement of Claim and Amended Statement of Claim ("Sowell's Claims") *alone* were sufficient to trigger the Policy's exclusionary provisions and preclude coverage.

Accordingly, after initially providing a defense under a reservation of rights, AIG advised Plaintiffs, through its claims analyst, Brian T. Conlin ("Conlin"), that exclusion (s) of the Policy precluded coverage for Sowell's Claims. SOF at ¶¶ 40-43. Nevertheless, as explained below, Plaintiffs ultimately convinced AIG to pay both the costs of their defense and for the full and final adjudication of Sowell's Claims. AIG paid $1 million in settlement of the Arbitration Award, which was then vacated. SOF at ¶¶ 96-97.

Because AIG paid to defend and to settle Sowell's [uncovered] Claims, Plaintiffs received a "windfall" *in excess of one million dollars*. Not content with having convinced AIG to pay their uncovered claims, however, Plaintiffs want more. Plaintiffs claim that they are entitled to damages for AIG's "belated" resumption of their defense and because AIG did not settle Sowell's Claims *before* the Arbitration Award was entered against them.

When Conlin advised Plaintiffs that AIG was denying coverage under exclusion (s), he noted that Sowell had signed a power of attorney that gave Gwynn the "power to give an[d] place any and all orders." SOF at ¶ 46. Plaintiffs argue that the power of attorney was not valid and that exclusion (s) did not apply because of the invalidity of the power of attorney and because the Sowell Account was not established as a "discretionary" account. Plaintiffs' arguments are *irrelevant*, however, since the *allegations* in the Statement of Claim and Amended Statement of Claim *alone* were sufficient to trigger exclusion (s).

Plaintiffs' arguments are specious as well as irrelevant because Sowell *not only alleged that Plaintiffs had exercised "discretionary authority or control" over his Merit Account – **he ultimately proved it!*** Thus, regardless of whether the power of attorney was valid, or whether the Sowell Account was technically a "discretionary" account, the fact remains that Gwynn *did* exercise "authority or control" over the Merit Account, making ***1,596 trades in 37 months***, and generating *hundreds of thousands of dollars* in commissions. SOF ¶¶ 76, 78.

## 2.    The Policy's Exclusions

Section 4 of the Policy contains its exclusionary provisions. SOF at ¶ 13. Pursuant to Section 4 of the Policy:

> The insurer shall not be liable for Loss in connection with any Claim made against an Insured:

a) <u>arising out of, based upon or attributable to the gaining in fact any profit or advantage to which the Insured was not legally entitled</u>, including but not limited to any actual or alleged commingling of funds or accounts;

b) <u>arising out of, based upon or attributable to the committing in fact of: any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state</u>, territory, county, political division or municipality thereof, <u>or any rules or regulations promulgated thereunder</u>;

\*    \*    \*

f) <u>alleging, arising out of, based upon **or** attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act</u>;

\*    \*    \*

r) with respect to coverage provided under Coverage B only, <u>alleging, arising out of, based upon</u> or <u>attributable</u> to any activity of, or service provided by, the Registered Representative <u>other than a covered Professional Service</u>, including but not limited to "selling away";

s) <u>alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control</u> with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-loan investment company or variable annuities in which there is no initial or contingent sales charge or commission;

t) <u>alleging, arising out of, based upon</u> or <u>attributable</u> to, <u>or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer</u> including but not limited to limited or general partnerships, including but not limited to Claims arising out [of] an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership . . . .

SOF at ¶ 13 (emphasis supplied).

The "Retroactive Date stated in Item 6 of the Declarations," referenced above in exclusion (f), was <u>August 23, 1999</u>.  SOF at ¶ 10.

### 3.    Sowell's Allegations

In both his Statement of Claim and Amended Statement of Claim, Sowell alleged the following:  In late 1997, Sowell inherited his mother's assets, which he initially believed were worth a total of about $380,000.  SOF at ¶ 17.  Sowell did not know how to manage his inheritance, so he turned to Gwynn for assistance.  SOF at ¶ 18.  Gwynn offered to prepare a retirement plan for Sowell and to manage his portfolio.  SOF at ¶ 19.

In early February 1998, Gwynn met with Sowell and his wife to gather information for the retirement plan.  SOF at ¶ 20.  Gwynn prepared a retirement plan, dated February 20, 1998, that listed the Sowells' assets as $382,000, plus a residence worth $130,000.  SOF at ¶ 21.  The plan emphasized the Sowells' need for an "efficient, diversified portfolio," and stated that the Sowells needed to "actively rebalance [their] investments throughout the planning horizon." SOF at ¶ 22.

In April 1998, Sowell provided Gwynn with stock certificates that had been found in his late mother's desk.  SOF at ¶¶ 23-24.  At the time that he gave the stock to Gwynn, Sowell was unaware of its true value, which was in excess of $1 million.  SOF at ¶ 25.  Gwynn never revised the Sowells' retirement plan to reflect this additional $1 million.  SOF at ¶ 26.

Sowell alleged that when he opened the Merit Account (Account no. LFW-00053-A5), he:

> signed a power of attorney giving Respondents <u>discretionary control of the account</u>.  Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell.

SOF at ¶¶ 27-28 (emphasis supplied).  On May 1, 1998, Sowell deposited the stock certificates as his first deposit into the Merit Account.  SOF at ¶ 27.

PMB_304620_21/DGREENSPAN

Sowell alleged that Gwynn ignored his need to create an efficient, diversified portfolio, and instead advised Sowell improperly, made excessive and inappropriate trades, and exercised "control" over and "churned" the Merit Account. SOF at ¶¶ 28-30. Specifically, Sowell alleged:

- " . . . Mr. Gwynn <u>did not consult with Mr. Sowell</u> before making trading decisions."

- "Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell <u>and treated his discretionary power over the account as a license to churn</u>. Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by <u>excessive, in-and-out trading</u> in technology stocks. Mr. Gwynn also traded extensively on margin in Mr. Sowell's account. A review of Mr. Sowell's account statements reveals that Respondents utilized no meaningful investment strategy or plan. . . . ."

- "Mr. Sowell's account <u>was a discretionary account</u> and was <u>unquestionably controlled by Mr. Gwynn</u>."

SOF at ¶¶ 28-30 (emphasis supplied).

At Gwynn's request, Sowell made loans ("Charter School Investments") to Novation Financial Corporation ("Novation"), a predecessor to Charter Financial Network, Inc. ("Charter"), subsequently known as Charter 3, Inc. ("C3"). SOF at ¶¶ 31-32. Gwynn was, at all relevant times, a controlling shareholder, officer, and director of Novation, Charter, and C3. SOF at ¶ 33.

Sowell alleged that "[f]rom May 1998 through December 2000, Gwynn and the Ryan Plaintiffs made, participated in or induced the unlawful sale of securities [i.e., the Charter School Investments] to Mr. Sowell." SOF at ¶ 34. Specifically, "[o]n or about May 1, 1998, July 1, 1998, November 11, 1999, April 25, 2000 and July 21, 2000 Respondent Gwynn . . . issued Promissory Notes to Mr. Sowell." SOF at ¶ 35. Sowell alleged that Gwynn had assured him that his Charter School Investments were protected by the promissory notes, but Sowell never received any money or stock in satisfaction of such notes. SOF at ¶¶ 36-37.

Sowell alleged that the Ryan Plaintiffs were liable for Gwynn's wrongful acts under theories of respondeat superior, failure to supervise, and as "control persons" of Gwynn, Merit's Registered Representative. SOF at ¶ 39. Sowell alleged that as the result of Gwynn and the Ryan Plaintiffs' wrongful acts, his inheritance of over $1.4 million "disappeared." SOF at ¶ 38.

### 4.    AIG's Reservation of Rights and Denial of Coverage

On October 15, 2001, Conlin acknowledged receipt of Sowell's Statement of Claim and advised that AIG had retained separate law firms to represent Merit and Gwynn. SOF at ¶¶ 40-41. In his letter, Conlin indicated that several of the Policy's exclusions, including (a), (b), (f), (r), and (s), could potentially exclude coverage. SOF at ¶ 42. Conlin also stated:

> This letter is <u>not to be construed as a waiver of any policy provision</u>. [AIG] <u>reserves all rights and defenses under the Policy, and at law</u>, as to allegations which are not covered under the terms of the Policy. This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

SOF at ¶ 43 (emphasis supplied).

On January 24, 2002, Conlin advised both Gwynn and Ryan that exclusion (s) of the Policy precluded coverage for Sowell's Claims, and reiterated that AIG did not waive any policy provisions but reserved all rights and defenses in the event that it reevaluated the claim, stating:

> During our investigation of this matter we uncovered the fact that Mr. Sowell signed a power of attorney dated March 7, 1998 giving [Gwynn] the "power to give an[d] place any and all orders."

> Accordingly, <u>pursuant to exclusion (s) under your policy, coverage is not available for you in this matter</u>. Consequently, and as I advised Mr. Thomason, AIG would neither be indemnifying you nor paying for any defense costs incurred after January 12, 2002. . . .

> If you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same. <u>This letter is not to be construed as a waiver of any policy provisions. In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy</u>

<u>and at law as to allegations which are not covered under the terms of this policy
and/or may be excluded from coverage under the terms of the policy</u>. . . .

SOF at ¶¶ 44-49 (emphasis supplied).

On April 16, 2002, AIG advised that it had "closed the file" with regard to Sowell's

Claims. SOF at ¶¶ 50-51. In a letter dated May 17, 2002, Gwynn objected to closure of the file

and informed Conlin that he was still in the process of accumulating the information "requested

several months ago." SOF at ¶¶ 52-53. As of January 10, 2003, Gwynn still had not provided

AIG with the information requested in October 2001. SOF at ¶ 63.

### 5. Evidence at the Arbitration Hearing

On January 7, 2003, the Sowell Arbitration hearing ("Arbitration Hearing") commenced,

with Gwynn representing himself and the Ryan Plaintiffs represented by counsel that they had

retained themselves. SOF at ¶¶ 58-60. The evidence relevant to the instant action is discussed

below.

#### i. <u>Testimony of Securities Industry Expert Witness Fath</u>

At the Arbitration Hearing, Charles Abram Fath ("Fath"), a securities industry expert,

testified on Sowell's behalf. SOF at ¶ 73. Fath testified that there had been excessive and

unsuitable trading activity in the Merit Account:

| | |
|---|---|
| Fath. | The <u>excessive activity</u> that I saw in the account is <u>certainly unsuitable for an individual with a growth investment objective</u>. |
| Q. | Are there any particular months of activity in the account that you would like to highlight to the Panel as an example of the level of activity? |
| Fath. | Well, I mean, <u>there was consistent activity really throughout the account</u>. We . . . can start with December of '98 as an example. . . . <u>there's purchases and sales taking place . . . a number of which all take place on the same day, which, as I look at this, would give me pause to think, are these discretionary transactions? Did Mr.</u> |

> Gwynn talk to Mr. Sowell about each and every one of these
> transactions because obviously he's bunching orders …
>
> From a supervisory point of view, one of the first things you would
> look at when you see crunched orders like that is, you know, did
> the broker really talk with the customer about each one of these
> transactions.
>
> If you just go through these different months, you'll see repeatedly
> there's a whole slew of transactions on . . . different days.  On one
> day there will be a bunch of buys.  On another day there's be [sic]
> a bunch of sells. . . .
>
> At the end of the [month,] . . . according to this statement, there
> were purchases of $793,000 and there were sales of $520,000. . . .
>
> [O]n January 11th, [there was] a whole series of purchases . . .  On
> the 13th, there's a whole series of sales.  Then he buys back in
> some cases the various securities that he had sold earlier …
>
> [T]his pattern of trading certainly is not appropriate for a growth
> investment objective.  This is purely a trading account, just by
> looking at the number of buys and sales and the total cost of the
> purchases for each month.

SOF at ¶ 74 (emphasis supplied).

Fath presented a chart that showed the total number of "buy" and "sells" in the Merit
Account for each month from May 1998 through May 2001, as well as the commissions
generated by those trades.  SOF at ¶¶ 76, 78.  The chart shows that during the 37 months from
May 1998 through May 2001, Sowell made 793 "buys" and 803 "sells" for a total of *1,596
trades*, generating *total commissions of $480,875*.  SOF at ¶¶ 76, 78.

The chart also reflects Gwynn's commissions from the Merit Account as a percentage of
his *total* commissions.  The chart demonstrates that from May 1998 through May 2001, Gwynn
derived the *majority* of his total commissions *solely* from the Merit Account.  SOF at ¶ 78.  For
example, in May 1998, *the first month that the Merit Account was opened*, Gwynn received
$3,927 in commissions from the account, and these commissions accounted for *85%* of his total

gross commissions for the month. SOF at ¶ 78. In December 1998, Gwynn received $16,625 in commissions from the Merit Account, representing *96%* of his total commissions. SOF at ¶¶ 78. In May 2000, Gwynn received $17,700 in commissions from the Merit Account, representing *99%* of his total commissions. SOF at ¶¶ 78.

Based on the evidence, Fath opined that Gwynn was "controlling" the Merit Account:

| Q. | You mentioned I think in and out of trading. Can you tell the Panel what that is, and if there's evidence of that in this case? |
|---|---|
| Fath. | Well, there's ample evidence of that if you just look through the monthly statements. In-and-out trading is when you buy a stock – sell a stock and buy the same stock back again just for trading purposes. And again, that defeats the whole strategy of the investment objective of growth, just because of the commissions that are . . . eating up the account. |
| Q. | What's churning? |
| Fath. | Churning is where a broker who is controlling the account effects excessive transactions in the account in light of the investment objective of the account, and he does it to the detriment to the customer and for his own benefit for the ability to generate commissions for himself. |
| Q. | Okay. Based on the testimony you've heard from both sides, <u>is it evident</u> (tape inaudible) <u>who was controlling the account</u>? |
| Fath. | In my opinion, after looking at the documents and hearing the testimony, it's my opinion that <u>Mr. Gwynn was controlling the account</u>. |

SOF at ¶ 81 (emphasis supplied).

According to Fath, the excessive trading should have sent a signal *beginning in May 1998* that Sowell was controlling the Merit Account. In Fath's words:

[F]or a broker who's been in the business for a number of years, to have 80 percent of his commissions come from one customer, to me is <u>very uncommon and certainly one that would send up red flags the very first month that would occur, to see the type of trading and who's controlling the account.</u>

SOF at ¶ 82 (emphasis supplied).

### ii. Sowell's Testimony

Sowell's testimony supported Fath's conclusion that Gwynn controlled the Merit Account:

Q.      It says here that you approved all the trades that occurred in the account.

Sowell.    That's what it says.

Q.      Is that true?

Sowell.    <u>No. I mean, I never told [Gwynn] to buy any stock, to sell and to buy it, do anything with it.</u> The only stock that I asked him to buy, he couldn't get.

*    *    *

Q.      <u>Did he ever call you to discuss buying or selling certain stocks and wanting your okay before he did it</u>?

Sowell.    <u>No.</u>
                        *    *    *

Q.      Did Mr. Gwynn ever tell you the amount of commissions he made off the ccount?

Sowell.    No.
                        *    *    *

Q.      Did Mr. Gwynn ever tell you the number of times he turned over this account (tape inaudible) on an annual basis?

Sowell.    No.

Q.      Did anyone from Merit ever tell you?

PMB_304620_21/DGREENSPAN

Sowell.        No.

SOF at ¶ 83 (emphasis supplied).

### iii. Gwynn's Testimony

Gwynn did not dispute Fath's calculation of his month-to-month commissions, and agreed that most of his compensation for the years 1998 through 2001 was in fact generated by Sowell's Merit Account:

Q.        . . . Now, you having been the broker on the account, did Mr. Sowell's – did the commissions generated through Mr. Sowell's account account for a very large percentage of your gross commissions?

Gwynn.        Yes.

Q.        Okay. And as you sit here today, do you have any documents or information . . . to dispute [Fath's] calculation on a month-to-month basis?

Gwynn.        I don't think so.

Q.        So, it's fair to say, then, that for three years, most of your compensation through Merit was generated by Mr. Sowell's account?

Gwynn.        He was my largest and most active client.

Q.        And far and away the largest and most active client.

Gwynn.        Yes.

SOF at ¶ 84.

iv. Evidence Regarding the Charter School Investments

The evidence at the Arbitration Hearing showed that Sowell invested a total of $275,000

in Novation/Charter/C3 from May 1, 1998 through July 24, 2000, as disclosed in the following

exhibits:

| Arbitration Exh. No. | Promissory Note Details |
|---|---|
| 43 | Full Recourse Promissory note for $50,000 dated May 19, 1998 by Gwynn for Novation, as Maker, and Sowell as Holder and Payee |
| 44 | Full Recourse Promissory Note for $100,000 dated July 1, 1998 by Gwynn for Novation, as Maker, and Sowell as Holder and Payee. |
| 45 | Full Recourse Promissory Note for $25,000 dated November 11, 1999 by Gwynn for Charter, as Maker, and Sowell as Payee |
| 46 | Amendment to November 11, 1999 Full Recourse Promissory Note, dated July 24, 2000 |
| 47 | Full Recourse Promissory Note for $25,000 dated April 27, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee |
| 48 | Amendment to April 27, 2000 Full Recourse Promissory Note, dated July 24, 2000 |
| 49 | Full Recourse Promissory Note for $25,000 dated July 24, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |
| 50 | Full Recourse Promissory Note for $25,000 dated July 24, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |
| 51 | Full Recourse Promissory Note for $25,000 dated July 24, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |

SOF at ¶¶ 86.

iv. Merit's History of Inadequate Supervision

The evidence at the Arbitration Hearing showed that in 1999, at the same time that

Gwynn and the Ryan Plaintiffs were churning Sowell's Merit Account and selling him

unregistered securities, Merit and Newton entered into an Acceptance, Waiver and Consent

("AWC") with the NASD.[4] SOF at ¶ 87. The AWC described Merit's "Supervision failures" as follows:

> During the period from about January, 1996 to about April, 1997, Merit Capital acting through Russell W. Newton its Registered Principal and Chairman, <u>failed to establish and maintain a system to supervise the activities of each registered representative</u> and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations with the Rules of this Association . . .

SOF at ¶ 88 (emphasis supplied). Pursuant to the AWC, Merit and Newton agreed to pay a $180,000 fine and to implement each recommendation made by an independent consultant that Merit had retained to review its procedures. SOF at ¶ 89.

Despite entry of the AWC, Merit's "supervision failures" continued. Despite the "red flags" later described by expert witness Fath, the Ryan Plaintiffs failed to supervise Gwynn as he sold Sowell unregistered securities and engaged in excessive trading in Sowell's Merit Account from May 1998 through May 2001. SOF at ¶¶ 82, 95. In fact, the Ryan Plaintiffs violated an SEC order by having Sandra Logay ("Logay") supervise Gwynn, despite the SEC's prior conclusion that it was "in the public interest to bar Logay from acting in a proprietary or supervisory capacity with any broker, dealer, or municipal securities dealer." SOF at ¶ 93, 95.

### 6. **AIG's Resumption of Plaintiffs' Defense**

On January 3, 2003, Attorney Gwynn's coverage counsel, John J. Nicgorski ("Nicgorski"), represented to AIG that "<u>various facts in the record</u> . . .<u>established</u> Sowell's account had not been discretionary, that the power of attorney had been revoked, and that <u>Sowell retained all discretion over all of his accounts with Merit</u>." SOF at ¶ 54 (emphasis supplied).

---

[4]Merit and Newton acknowledged that the AWC would become part of their permanent disciplinary records and could be considered in any future actions brought by the NASD against them, and that the AWC would be made available in response to public inquiries through the NASD's public disclosure program. SOF at ¶ 90.

The Ryan Plaintiffs similarly represented to AIG that "Sowell's account had never been a discretionary account." SOF at ¶ 55 (emphasis supplied).

The record of the Arbitration Hearing flatly contradicts Plaintiffs' representations to AIG (and to this Court) that various facts in the record "established" that Sowell had "retained all discretion" over his Merit Account. As set forth above, the evidence at the Arbitration Hearing actually shows that Plaintiffs had churned and "controlled" the Merit Account.[5] SOF at ¶¶ 73-84, 95.

Nevertheless, Plaintiffs demanded that AIG resume their defense, and AIG ultimately complied. SOF at ¶¶ 54-55, 61-62, 64-65, 69-72. On January 9, 2003, the third day of the Arbitration Hearing, AIG's attorney, Jeffrey A. King ("King"), advised Niegorski that AIG had offered to resume payment for Gwynn's defense. SOF at ¶¶ 61-62. King confirmed this discussion in a January 10, 2003 letter to Niegorski. SOF at ¶¶ 61-62. On January 13, 2003, King advised Niegorski that "although AIG is providing Mr. Gwynn with a defense, it has not

---

[5] Plaintiffs have attached to their respective complaints correspondence from Sowell's attorney, Frank Moskowitz of Berk & Moskowitz, in which he offered his own opinion that the Merit Account was "not a discretionary trading account." SOF at ¶¶ 66-67. Moskowitz further stated:

Although we recognize that our Statement of Claim alleged that it was, we believe the true facts are otherwise. Facts, not allegations, dictate coverage. Of course, since AIG has not had a representative attend the hearing, it has no knowledge of the facts of this case. AIG's knowledge is limited to the mere allegations in the Statement of Claim.

SOF at ¶ 68. Moskowitz was incorrect. Exclusion (s) of the Policy does not depend on whether the Merit Account was technically a discretionary or nondiscretionary account, but rather on whether Sowell's Claims "alleged" or "arose out of" Gwynn's exercise of "discretion or control" over the account. SOF at ¶ 13. Notably, although Moskowitz offered his opinion that the Merit Account was "not a discretionary trading account," he understandably did not concede that Gwynn did not exercise "authority or control" over the account, because such concession would have been fatal to his client's claim that Gwynn had "churned" his account. SOF at ¶¶ 66-68. See Rocco v. Painewebber, Inc., 739 F. Supp. 83, 86 (D. Conn. 1990).

changed its position with respect to coverage." SOF at ¶ 71 (emphasis supplied). Also on that date, attorney Maxine Polomski resumed Gwynn's defense. SOF at ¶ 72.

Meanwhile, on January 10, 2003, King advised the Ryan Plaintiffs' attorney, William B. Federman, that "while AIG has not changed its position on coverage for this claim at this time, it is offering to pay Merit's reasonable and necessary defense costs associated with the Sowell claim." SOF at ¶ 65 (emphasis supplied).

### 7.    Arbitration Award

The Panel found that Gwynn and the Ryan Plaintiffs had sold unregistered securities to Sowell and failed to inform him of serious conflicts of interest in connection with the Charter School Investments. SOF at ¶ 95. The Panel also found that Gwynn was not registered under the Investment Advisors Act of 1940 and was unable to verify that he was a "registered investment advisor" under state law. SOF at ¶ 95. The Panel concluded that Gwynn's conduct in preparing the "Financial Planning/Advisory Disclosure Agreement" and the "Financial Planning/Investment Advisor Agreement," entered into evidence as Exhibits "32" and "33," respectively, raised "serious questions of fraud and misrepresentation." SOF at ¶ 95.

The Panel found that Gwynn had engaged in excessive "in and out" trading in the Merit Account, approximately 1,596 trades in thirty-seven (37) months, from May 1998 to May 2001, deriving 80% of his gross income from those trades. SOF at ¶ 95. The Panel concluded that the Ryan Plaintiffs had failed to supervise Gwynn and that all of the Plaintiffs were liable for "churning" the Merit Account. SOF at ¶ 95.

In view of the Panel's findings, it is extraordinary that both the Ryan Plaintiffs and the Gwynn Plaintiffs represent in their respective pleadings to this Court that:

> Nothing in the [Arbitration] Award is predicated on or even refers to any claim or evidence that Sowell's account was discretionary or managed through a power of

> attorney, and in fact, the Award notes specifically that Respondents had asserted
> "Sowell exercised control over his account at Merit."

SOF at ¶ 96 (emphasis supplied). The statement that "Sowell exercised control over his account at Merit" is a quote from the section of the Arbitration Award *that merely recites Plaintiffs' own argument*, not from *the actual findings of the Panel*. By quoting *their own argument,* Plaintiffs give the misleading impression that the Panel found that *Sowell* had exercised control over his Merit Account, while the Panel actually found that *Gwynn* had exercised control over the account. SOF at ¶ 95.

## **SUMMARY OF ARGUMENT**

Sowell's allegations in his Statement of Claim and Amended Statement of Claim fall squarely within exclusions (s), (f), and (t) of the Policy. AIG therefore had no duty to defend and thus no duty to indemnify in connection with Sowell's Claims.

Accordingly, Conlin was indisputably correct in his January 24, 2002 letter advising Plaintiffs that exclusion (s) precluded coverage under the Policy. In denying coverage, it was unnecessary for Conlin to refer to Sowell's power of attorney since the allegations in Sowell's Statement of Claim and Amended Statement of Claim alone precluded coverage. Nevertheless, Conlin's gratuitous explanation did not, and could not, waive the Policy's exclusionary provisions, estop AIG from denying coverage, or constitute bad faith.

Although the Policy did not cover Sowell's Claims, AIG ultimately complied with Plaintiffs' demands to resume their defense. AIG's resumption of Plaintiffs' defense did not and could not constitute a waiver of the Policy's exclusionary provisions, or estop AIG from denying coverage. Furthermore, AIG did not as a matter of law act in bad faith by resuming Plaintiffs' defense and paying their uncovered claims, including a $1,000,000 payment to vacate the Arbitration Award.

PMB_304620_21/DGREENSPAN