Finally, Plaintiffs' argument that exclusion (s) did not apply because of the invalidity of the power of attorney and because the Sowell Account was not established as a "discretionary" account ignores the fact that Sowell *actually proved* the allegations in his Statement of Claim and Amended Statement of Claim.

## ARGUMENT

I.  THE POLICY SPECIFICALLY EXCLUDES THE CLAIMS THAT SOWELL ALLEGED IN HIS STATEMENT OF CLAIM AND AMENDED STATEMENT OF CLAIM; THUS, AIG HAD NO DUTY TO DEFEND OR INDEMNIFY

As set forth below, Sowell's allegations in his Statement of Claim and Amended Statement of Claim fell squarely within exclusions (s), (f) and (t) of the Policy. Accordingly, exclusions (s), (f), and (t) each independently excluded coverage, and AIG had no duty to defend and thus no duty to indemnify.

a.  The Allegations in Sowell's Statement of Claim and Amended Statement of Claim Fell Squarely Within the Policy's Exclusions and AIG Thus Had No Duty To Defend

1.  Exclusion (s)

Exclusion (s) of the Policy precludes coverage for "any Claim":

alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority **or** control with regard to management or disposition of assets . . . .

SOF at ¶ 13 (emphasis supplied). In both his Statement of Claim and Amended Statement of Claim, Sowell alleged that he had signed a power of attorney giving Gwynn "discretionary control" over his Merit Account, that Gwynn had not consulted with him before making trading decisions, and that Gwynn had "unquestionably controlled" his Merit Account. SOF at ¶¶ 28-30.

Sowell further alleged that Gwynn had "treated his discretionary power over the account as a license to churn." SOF at ¶ 29. "Churning" occurs "when a securities broker or dealer excessively trades in a customer's account for the purpose of increasing commissions." Rocco v.

Painewebber, Inc., 739 F. Supp. 83, 85 (D. Conn. 1990). A churning claim requires a plaintiff to show:

> (1) that the trading in his account was excessive in light of his investment objectives; (2) that the broker exercised control over the account; and (3) that the broker acted with intent to defraud or with willful or reckless disregard for the interests of his client.

Id. at 86. (emphasis supplied). Therefore, by alleging that Gwynn had "churned" the Merit Account, Sowell also reiterated his claim that Gwynn had "controlled" the account, thus triggering exclusion (s) of the Policy.

Plaintiffs maintain that exclusion (s) does not apply because the Merit Account was not technically established as a "discretionary" account and was not managed through Sowell's power of attorney. This argument is a red herring because exclusion (s) does not depend on the existence of *either* a power of attorney *or* an account formally labeled as "discretionary." Rather, exclusion (s) applies, by its own terms, to claims such as Sowell's "alleging" that the insured has exercised "discretionary authority or control" with regard to the management or disposition of assets.

Furthermore, a broker can be found to have "controlled" and "churned" an account *regardless* of whether the account is technically a "discretionary account." This is because "[t]he requisite degree of control by the brokers [for a churning claim] may be supplied even if the account is "non-discretionary." Williamsport Firemen Pension Boards I and II v. E.F. Hutton & Co., Inc., 567 F. Supp. 140, 144 (M.D. Pa. 1983) (emphasis supplied):

> Between the purely non-discretionary account and the purely discretionary account there is a hybrid-type account . . . Such an account is one in which the broker has usurped actual control over a technically non-discretionary account. In such cases, the Courts have held that the broker owes his customer the same fiduciary duties as he would have had the account been discretionary from the moment of its creation. Indeed, even if there is a purely non-discretionary account, where the client routinely follows the recommendations of the broker,

PMB_304620_21/DGREENSPAN

the requisite degree of control by the broker can be established to set forth a claim of churning.

Id. (citations omitted) (emphasis supplied).

"[C]ourts will treat a technically non-discretionary account as though it were a discretionary account upon finding that a broker has seized actual control over the management of the account." In re Thomson McKinnon Securities, Inc., 191 B.R. 976, 984-85 (Bankr. S.D.N.Y. 1996) (emphasis supplied); see also Vogel v. A.G. Edwards & Sons, Inc., 801 S.W.2d 746, 756 (Mo. Ct. App. 1990) ("There are three distinct methods of showing a broker's control over an account. Control exists when a broker trades in a discretionary account, when a broker usurps control in a nondiscretionary account or when the customer routinely follows the broker's recommendations concerning the handling of a nondiscretionary account").

Thus, exclusion (s) may preclude coverage under the Policy regardless of whether an account is technically a discretionary account, and regardless of whether a power of attorney was used to effectuate trading in the account. The determining factor as to coverage of Sowell's Clams is that the Statement of Claim and Amended Statement of Claim alleged that Gwynn "controlled" and "churned" the Merit Account, thereby triggering exclusion (s) and precluding coverage under the Policy.

## 2.  Exclusion (f)

In both his Statement of Claim and Amended Statement of Claim, Sowell alleged that Gwynn deposited Sowell's stock certificates into the Merit Account on May 1, 1998, and thereafter "treated his discretionary power over the account as a license to churn." SOF at ¶¶ 27-29 (emphasis supplied).  Sowell also alleged that Plaintiffs induced his purchase of the Charter School Investments from May 1998 through December 2000. SOF at ¶¶ 31-37. Since these wrongful acts were alleged to have occurred prior to the Retroactive Date of August 23,

1999, and continuing thereafter, Sowell's Claims fell squarely within exclusion (f) of the Policy.

Exclusion (f) precludes coverage for "any Claim":

> <u>alleging</u>, arising out of, based upon **or** attributable to any Wrongful Act occurring <u>prior to the Retroactive Date or arising out of any subsequent interrelated Wrongful Act</u>.

SOF at ¶ 13 (emphasis supplied).

### 3. <u>Exclusion (t)</u>

Sowell also alleged in his Statement of Claim and Amended Statement of Claim that Gwynn was a controlling shareholder, officer, and director of Novation/Charter/C3. SOF at ¶ 33. Novation/Charter/C3 was an entity "other than the Broker/Dealer" as defined under the Policy. SOF at ¶¶ 10, 12. Accordingly, Sowell's allegations regarding the Charter School Investments (i.e., the loans to Novation/Charter/C3) fall squarely within exclusion (t) of the Policy. Exclusion (t) precludes coverage for "any Claim":

> t) <u>alleging</u>, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, <u>the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer</u> including but not limited to limited or general partnerships, including but not limited to Claims arising out [of] an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership.

SOF at ¶ 13 (emphasis supplied).

### 4. <u>Since The Allegations of the Statement of Claim and Amended Statement of Claim Fell Within the Policy's Exclusions, AIG Had No Duty to Defend</u>

In Connecticut, "an insurer's duty to defend is measured *solely* by whether the complaints against the insured allege facts that, if proven true, would present a claim within the scope of the policy's coverage." <u>Coregis Ins. Co. v. American Health Foundation, Inc.</u>, 241 F.3d 123, 127 (2d Cir. 2001) (emphasis supplied). In determining whether a complaint would present a claim within the scope of coverage, "the insurance policy must be construed as a whole, and all

of its relevant provisions are to be considered in connection with one another," *including the policy's exclusionary clauses*. Firestine v. Poverman, 388 F. Supp. 948, 951 (D.Conn. 1975).

Where, as here, "the allegations in the underlying action fall within the scope" of the policy's exclusions, an insurer has "no obligation to defend the defendant in the underlying action." Penn-America Ins. Co. v. LTJ Corp., No. CV 950468305S, 1996 WL 465744, *3 (Conn. Super. Jul. 23, 1996); see also Community Action for Greater Middlesex County, Inc. v. American Alliance Ins. Co., 757 A.2d 1074, 1080 (Conn. 2000) (insurer had no duty to defend where policy explicitly excluded from its coverage the conduct alleged in the complaint); Flint v. Universal Mach. Co., 679 A.2d 929, 935 (Conn. 1996) (allegations of complaint brought it within the policy exclusion and relieved insurer of duty to defend).

Thus, for purposes of AIG's duty to defend, it is *irrelevant* that Gwynn and the Ryan Plaintiffs *actually* exercised control over and churned the Merit Account, or that Sowell's Claims arose out of their interrelated wrongful acts occurring prior to the Retroactive Date, or that the Charter School Investments involved Gywnn's management of an entity other than Merit. The allegations of the Statement of Claim and Amended Statement of Claim *alone* are sufficient to trigger the Policy's exclusions and relieve AIG of the duty to defend.

Where an insurer establishes that the allegations of the underlying complaint fall within the policy's exclusionary provisions, the burden shifts to the insured to demonstrate an exception to the exclusion. Schilberg Integrated Metals Corp. v. Continental Cas. Co., 819 A.2d 773, 784 (Conn. 2003). Here, the Policy provides no relevant exceptions to exclusions (s), (f), and (t). Accordingly, the Court should find as a matter of law that AIG had no duty to defend Gwynn and the Ryan Plaintiffs in the Sowell Arbitration.

b.  Since AIG Had No Duty To Defend, It Had No Duty to Indemnify

"Because the duty to defend is significantly broader than the duty to indemnify, 'where there is no duty to defend, there is no duty to indemnify . . . .'" Barbarula ex rel. Estate of He v. Canal Ins. Co., 353 F. Supp.2d 246, 252 (D.Conn. 2004) (citing DaCruz v. State Farm Fire and Cas. Co., 846 A.2d 849, 858 (Conn. 2004);  (citations omitted)).  "*[N]o duty to defend necessarily means no duty to indemnify*."  Id. (emphasis supplied) (citing EAD Metallurgical, Inc. v. Aetna Casualty & Surety Co., 905 F.2d 8, 11 (2d Cir.1990)); see Heyman Associates v. Ins. Co. of the State of Penn., 231 Conn. 756, 769, n.17 (1995) (where defendants owed no duty to indemnify plaintiff for damages arising from fuel oil spill, they also owed no duty to defend plaintiff from claims arising from those damages).  Where the allegations in the underlying complaint fall squarely within the policy's coverage exclusions, the insurer has neither the duty to defend nor the duty to indemnify and is entitled to summary judgment on the basis of the exclusion.  See Cabrera v. United Coastal Ins. Co., No. CV 040833416S, 2005 WL 1971216, *11 (Conn. Super. Jul. 18, 2005).  Accordingly, the Court should find as a matter of law that AIG had no duty to indemnify Plaintiffs, as well as no duty to defend, with respect to Sowell's Claims and the Sowell Arbitration.

II.  CONLIN DID NOT AND COULD NOT HAVE CREATED COVERAGE BY REFERRING TO THE POWER OF ATTORNEY IN DENYING COVERAGE, AND HIS EXPLANATION DOES NOT AS A MATTER OF LAW CONSTITUTE BAD FAITH

Conlin's unnecessary reference to Sowell's power of attorney did not, and could not, waive the Policy's exclusionary provisions or estop AIG from denying coverage.  Furthermore, his gratuitous explanation cannot as a matter of law constitute bad faith.

a. Waiver and Estoppel

As an initial matter, it should be noted that AIG reserved all rights and defenses under the Policy in Conlin's October 15, 2001 letter, when Conlin advised that AIG had retained counsel for Plaintiffs but also advised that the Policy's exclusions, including (a), (b), (f), (r), and (s), could preclude coverage. SOF at ¶¶ 40-43. On January 24, 2002, when Conlin advised Plaintiffs that exclusion (s) of the Policy precluded coverage for Sowell's Claims, AIG specifically denied any waiver, stating: "This letter is not to be construed as a waiver of any policy provisions." SOF at ¶¶ 46, 49 (emphasis supplied).

Furthermore, "[i]t has been repeatedly held that the doctrines of waiver and estoppel cannot be used to extend the coverage of an insurance policy or create a primary liability but may only affect rights reserved therein." Masonicare Corp. v. Marsh USA, Inc., No. CV 030821900S, 2005 WL 941412, *1-2 (Conn. Super. Mar. 16, 2005) (citation omitted). "While an insurer may be estopped, by its conduct or knowledge or by statutes from insisting on a forfeiture, under no conditions can the coverage or restrictions on coverage be extended by waiver and estoppel." Id. (emphasis supplied).

In Heyman, the insured argued that the insurer had waived its right to deny coverage based on the policy's exclusions because the insurer had not denied coverage until four months after the insured had served notice of the claim. 231 Conn. at 762. The Connecticut Supreme Court disagreed:

> In the insurance context . . . it has been recognized that "a contract, under the guise of waiver, [may not] be reformed to create a liability for a condition specifically excluded by the specific terms of the policy." This limitation on the applicability of waiver to an insurance contract recognizes that because waiver requires the relinquishment of a known, and therefore existing, right within the insurance contract, a party cannot create through waiver coverage for a claim that the parties expressly had excluded from that contract.

Id. at 777 (emphasis supplied) (citations omitted).

In addition, "[i]nsurance contracts cannot be created by estoppel." <u>Linemaster Switch</u> <u>Corp. v. Aetna Life and Cas. Corp.</u>, WL 462270, *37 -38 (Conn. Super. 1995). In <u>Sentry</u> <u>Claims Service v. Botwick</u>, 2004 WL 1463004, *1 (Conn. Super. Jun. 8, 2004), the plaintiff insurer sought a declaration that it did not have a duty to defend and indemnify the defendant in the underlying action. The defendant responded that the insurer's "eleventh hour" attempt to withdraw from defending her was inequitable and should be barred under principles of laches and estoppel. <u>Botwick</u>, 2004 WL 1463004, *2.

The court rejected the insured's equitable argument, finding that the insurer's involvement in the underlying action for over a year did *not* obligate the insurer to continue to defend the insured, even "on the eve of trial." <u>Id.</u> Citing to <u>Heyman,</u> the court noted that a contract may not be reformed to create a liability for a condition specifically excluded by the specific terms of the policy. <u>Botwick</u>, 2004 WL 1463004, *4. The court thus concluded that the plaintiff was not equitably estopped from asserting the absence of a duty to either defend or indemnify the defendant. <u>Id.</u>

Thus, although Conlin unnecessarily referred to Sowell's power of attorney in his January 24, 2000 letter advising that exclusion (s) precluded coverage, he did not, and could not, waive the exclusionary provisions of the Policy or create coverage by estoppel.

### b. Bad Faith

Conlin also did not act in bad faith by his gratuitous explanation. Where an insurer takes a position against an insured, *even a position that is incorrect*, the insurer cannot be held to have acted in bad faith unless the position was "entirely unreasonable." <u>Hutchinson v. Farm Family</u> <u>Cas. Ins. Co.</u>, 273 Conn. 33, 45 (2005). In <u>Hutchinson</u>, the plaintiffs alleged that they had settled

- 26 -

a separate case based on their insurer's promise to cap a reduction of their policy's limits. Id. The insurer disputed making such a promise and refused to cap the deduction. Id. The plaintiffs alleged bad faith, and the case was ultimately submitted to arbitration. Id. In an appeal concerning the discoverability of certain documents, the Connecticut Supreme Court held:

> In the first issue, the defendant's attorneys currently take the position, not unreasonable on its face under existing insurance law, that the defendant is entitled ... to make that reduction. If the arbitrators were to either agree with that position or to determine that the position, although incorrect, was not an entirely unreasonable one, then they could not reasonably find that the defendant had taken the position in bad faith.

Id. (citations omitted) (emphasis supplied).

In R.E.O., Inc. v Travelers Companies, No. CV 950372522S, 1998 WL 285836 (Conn. Super. May 20, 1998), an insured alleged bad faith after its insurer refused to defend and indemnify against claims arising out of groundwater pollution. Id. at *13. *The insured ultimately proved that the insurer's coverage position was incorrect*, but nevertheless could not establish bad faith:

> At most, the [insureds] have established that the [insurer] was incorrect in its coverage analysis. The [insureds] have not, however, established that such analysis was accomplished with bad faith as they have failed to show that the [insured] consciously did a wrong because of dishonest purpose or moral obliquity.

Id. at **13-14 (citation omitted).

As set forth above, the allegations in Sowell's Statement of Claim and Amended Statement of Claim alone were sufficient to trigger the exclusionary provisions of the Policy. Thus, AIG's denial of coverage on January 24, 2002 was correct, *regardless* of whether the Merit Account was technically a discretionary account, or whether Gwynn did in fact exercise control over the account, or whether Gwynn's control over the account arose from the power of attorney or from some other means. If the insurer's *incorrect* position in Hutchinson and R.E.O.

was not unreasonable and thus could not constitute bad faith, than AIG's *correct* position on coverage similarly can not be deemed unreasonable, and Conlin's gratuitous reference to the power of attorney can not as a matter of law constitute bad faith.

Furthermore, where, as here, an insurance policy's terms expressly exclude coverage, the insurer does not owe a duty of good faith and fair dealing; thus, there can be no breach of the covenant of good faith and fair dealing. Patrons Mut. Ins. Co. v. Maguire, No. CV 950374329S, 1997 WL 162821, *4-5 (Conn. Super. Mar. 26, 1997). "Failure to pay a claim which it was not obligated to pay under the terms of the policy is clearly not bad faith." Sponzo v. Hartford Underwriters Ins. Group, No. CV 950543134, 1996 WL 155384, *3 (Conn. Super. Mar. 15, 1996) (emphasis supplied).

III.  AIG DID NOT CREATE COVERAGE OR ACT IN BAD FAITH BY RESUMING PLAINTIFFS' DEFENSE OR BY PAYING SOWELL TO HAVE THE ARBITRATION AWARD VACATED

a. AIG's Resumption of Plaintiffs' Defense and Continued Reservation of Rights

Although the Policy did not cover Sowell's Claims, AIG ultimately complied with Plaintiffs' demands to resume their defense. AIG retained Gwynn's prior counsel to represent Gwynn, and offered to pay the attorney's fees of the Ryan Plaintiffs' counsel. SOF at ¶¶ 62, 65, 72. For the same reasons as set forth above, AIG's resumption of Plaintiffs' defense, and ultimate payment of their uncovered claims, did not and could not constitute a waiver of the Policy's exclusionary provisions, and AIG is not estopped from denying coverage. See Masonicare; Heyman; Linemaster; Botwick.

In addition, AIG specifically reserved all rights and defenses under the Policy in the event that it should reevaluate its denial of coverage. When Conlin advised Plaintiffs on January 24, 2002 that coverage was denied, he also stated:

> <u>This letter is not to be construed as a waiver of any policy provisions.  In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy and at law as to allegations which are not covered under the terms of this policy and/or may be excluded from coverage under the terms of the policy.</u>

SOF at ¶¶ 46, 49 (emphasis supplied).

When AIG did later reevaluate its decision, AIG's attorney advised Gwynn's coverage counsel that "although AIG is providing Mr. Gwynn with a defense, <u>it has not changed its position with respect to coverage.</u>" SOF at ¶ 71 (emphasis supplied).  AIG similarly advised the Ryan Plaintiffs' attorney that "<u>while AIG has not changed its position on coverage for this claim at this time,</u> it is offering to pay Merit's reasonable and necessary defense costs associated with the Sowell claim." SOF at ¶ 65  (emphasis supplied).  By "not chang[ing] its position with respect to coverage," AIG continued to "reserve all rights and defenses under the [P]olicy and at law" as to allegations not covered or excluded from coverage.  SOF at ¶¶ 65, 71, 46, 49.

> b. <u>AIG Did Not Act in Bad Faith by Resuming Plaintiffs' Defense and Paying Their Uncovered Claims</u>

Since *failure to pay* a claim in the absence of liability is "clearly not bad faith," <u>see</u> <u>Sponzo</u>, 1996 WL 155384, at *3 (emphasis supplied), then *payment* in the absence of liability cannot be bad faith, and AIG thus did not as a matter of law act in bad faith by *resuming* Plaintiffs' defense and *paying $1,000,000* to vacate the Arbitration Award in connection with their *uncovered claims*.

> c. <u>AIG Did Not Damage Plaintiffs By Resuming Their Defense; Plaintiffs Concede that Gwynn Damaged Their Case *Before* AIG Resumed Their Defense</u>

Plaintiffs do not maintain that they were damaged by AIG's *resumption* of their defense and payment to vacate the Arbitration Award; rather, they claim that they were damaged because AIG's resumption of their defense and payment to Sowell was "belated." SOF at ¶ 99.

In support of their claim that AIG's defense was "belated," Plaintiffs allege that AIG "admitted it had a duty to defend" when it resumed Plaintiffs' defense on January 10, 2003. SOF at ¶ 100. However, the undisputed facts show that when AIG resumed Plaintiffs' defense, it specifically stated, through attorney King, that AIG had "not changed its position" with respect to coverage for Sowell's Claims. SOF at ¶¶ 65, 71.

Plaintiffs' claim that AIG's defense was "belated" hinges on whether AIG was obligated to provide a defense in the first instance. Since AIG never had *any* obligation to defend Plaintiffs or settle Sowell's Claims, it could not have done so "belatedly." Furthermore, AIG did not damage Plaintiffs by resuming their defense and ultimately settling with Sowell *after* the Arbitration Award was entered, *since by their own admissions Gwynn had already irretrievably damaged Plaintiffs' case.* SOF at ¶ 101.

IV. PLAINTIFFS' ARGUMENT IGNORES THAT (1) GWYNN ACTUALLY EXERCISED CONTROL OVER THE MERIT ACCOUNT, REGARDLESS OF WHETHER THE POWER OF ATTORNEY WAS "VALID" AND REGARDLESS OF WHETHER THE MERIT ACCOUNT WAS TECHNICALLY A "DISCRETIONARY ACCOUNT" AND (2) THE POLICY'S EXCLUSIONARY PROVISIONS WERE TRIGGERED NOT ONLY BY SOWELL'S ALLEGATIONS BUT BY THE ACTUAL FACTS AS ESTABLISHED AT THE ARBITRATION PROCEEDING

Plaintiffs' argument that exclusion (s) does not apply because of the invalidity of the power of attorney and because the Sowell Account was not established as a "discretionary" account ignores that Sowell *actually proved* the allegations in his Statement of Claim and Amended Statement of Claim, thus triggering several of the Policy's exclusions thereby precluding indemnification under the Policy.

     a.   The Facts Proved at the Arbitration Hearing Triggered Exclusions (s) , (f), (t), (a), (b), and (r) of the Policy

For the reasons explained above, the allegations of Sowell's Statement of Claim and Amended Statement of Claim *alone* were sufficient to trigger exclusions (s), (f), and (t) of the

Policy. *In addition*, the facts proven at the Arbitration Hearing also triggered these same exclusions, if they had not already been triggered by Sowell's allegations. The facts proven at the Arbitration Hearing also triggered additional exclusions of the Policy, including exclusions (a), (b) and (r).

## 1. Exclusion (s)

The evidence at the Arbitration Hearing established that Sowell's Claims "arose out of" or were "based upon or attributable" to Gwynn's exercise of "control" with regard to the management or disposition of Sowell's assets. Sowell's expert witness, Fath, testified that there had been "in and out trading" and that Gwynn had "controlled" the Merit Account. SOF at ¶ 81. Fath's testimony was supported by Sowell as well as by Gwynn himself, who did not dispute Fath's calculation that during the 37 months from May 1998 through May 2001, Gwynn made a total of *1,596 trades*, generating *$480,875* in commissions. SOF at ¶¶ 83-84. The Arbitration Panel found that Gwynn and the Ryan Plaintiffs had "churned" the Merit Account, SOF at ¶ 95, which was necessarily a finding that Gwynn and the Ryan Plaintiffs "exercised control" over the account. See, e.g., Rocco, 739 F. Supp. at 85. Thus, *the proven facts, in addition to Sowell's allegations*, triggered exclusion (s) of the Policy.

## 2. Exclusion (f)

At the Arbitration Hearing, Fath testified that the excessive number of "buys" and "sells" in the Merit Account occurred monthly from May 1998 through May 2001. SOF at ¶¶ 74-78. In addition, Gwynn solicited Sowell to invest in the Charter School Investments from August 1998 through December 2000. SOF at ¶¶ 31-37. Thus, the proven facts, as reflected in the

Arbitration Award, established that Sowell's Claims "arose out of" or were "based upon or attributable to" Gwynn and the Ryan Plaintiffs' interrelated wrongful acts that occurred prior to the Policy's "Retroactive Date" of August 23, 1999, or arose out of subsequent interrelated wrongful acts. SOF at ¶¶ 95, 13. Thus, as with exclusion (s), the proven facts, in addition to Sowell's allegations, triggered exclusion (f) of the Policy.

### 3. Exclusion (t)

Gwynn was a controlling shareholder, officer, and director of Novation/Charter/C3, which was an entity "other than the Broker/Dealer" as defined under the Policy. SOF at ¶ 12. The evidence established that Sowell's Claims regarding the Charter School Investments "arose out of," or were "attributable to," or "involved, directly or indirectly" the "formation, operation, administration, or management" of Novation/Charter/C3 by Gwynn. SOF at ¶ 13. Thus, the proven facts, in addition to Sowell's allegations, triggered exclusion (t) of the Policy.

### 4. Exclusion (a)

The evidence at the Arbitration Hearing also established that Gwynn gained a profit or advantage by excessively trading in Sowell's Merit Account. The Arbitration Panel specifically found that Gwynn and the Ryan Plaintiffs had churned the Merit Account. SOF at ¶ 95. Accordingly, the proven facts also triggered exclusion (a), which excluded claims:

> a) arising out of, based upon or attributable to the gaining in fact any profit or advantage to which the Insured was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts.

SOF at ¶ 13.

### 5. Exclusion (b)

Based on the evidence established at the Arbitration Hearing, the Arbitration Panel found that Gwynn and the Ryan Plaintiffs had sold unregistered securities, that Gwynn had failed to

PMB_304620_21/DGREENSPAN

register under the Investment Advisors Act of 1940, and that the Ryan Plaintiffs had knowingly facilitated the apparent violation of an SEC order. SOF at ¶ 95. Thus, the proven facts also triggered exclusion (b), which excluded coverage for claims:

> b) <u>arising out of, based upon or attributable to the committing in fact of: any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state</u>, territory, county, political division or municipality thereof, <u>or any rules or regulations promulgated thereunder;</u>

SOF at ¶ 13 (emphasis supplied).

### 6. Exclusion (r)

Exclusion (r) of the Policy precluded coverage for claims:

> r) with respect to coverage provided under Coverage B only, <u>alleging</u>, <u>arising out of,</u> <u>based upon</u> or <u>attributable</u> to any activity of, or service provided by, the Registered Representative <u>other than a covered Professional Service,</u> including but not limited to "selling away".

SOF at ¶ 13 (emphasis supplied).

As defined in the Policy, "Professional Services" are services "rendered in connection with an Approved Activity for or on the behalf of a customer or client of the Broker/Dealer pursuant to a written agreement between the Broker/Dealer and the customer or client." SOF at ¶ 12. An "Approved Activity" means a service or activity performed by the Registered Representative on behalf of the Broker/Dealer in connection with the purchase or sale of a specific security and for which "the Registered Representative has obtained all licenses required by the Broker/Dealer or applicable law or regulation." SOF at ¶ 12.

The Arbitration Panel found from the evidence presented that Gwynn was not registered under the Investment Advisors Act of 1940 and was unable to verify that he was a "registered investment advisor" under state law. SOF at ¶ 95. Gwynn's activities therefore did not constitute "Approved Activities," and thus could not constitute "Professional Services."

Accordingly, Sowell's Claims alleged, arose out of, or were based upon or were attributable to activities of, or services provided by, the Registered Representative "other than a covered Professional Service." Thus, the proven facts also triggered exclusion (r) of the Policy.

b. AIG Had No Duty To Indemnify Plaintiffs Based on the Evidence Adduced at the Sowell Arbitration and the Findings in the Arbitration Award

"The duty to indemnify depends upon the facts established at trial and the theory under which judgment is actually entered in the case." See DaCruz , 846 A.2d at 858. "[T]he duty to indemnify arises only if the evidence adduced at trial establishes that the conduct *actually was covered by the policy*." Barbarula, 353 F. Supp. 2d at 252 (emphasis supplied).

Here, the evidence adduced at the Arbitration Hearing and reflected in the Panel's findings establish that the Policy precluded coverage for the conduct giving rise to Sowell's Claims. Thus, in addition to the *allegations* in the Statement of Claim and Amended Statement of Claim precluding AIG's duty to defend and thus the duty to indemnify, the *proven facts* independently precluded AIG's duty to indemnify.

V.  SUMMARY JUDGMENT SHOULD BE ENTERED IN FAVOR OF DEFENDANTS ON ALL OF PLAINTIFFS' COUNTS

The Ryan Plaintiffs and the Gwynn Plaintiffs have each asserted the following counts in their respective pleadings:

I.   Breach of Duty to Defend
II.  Breach of Duty to Indemnify
III. Bad Faith
IV.  CUTPA/CUIPA Claims

The Gwynn Plaintiffs have asserted two additional counts:

V.  Intentional Infliction of Emotional Distress
VI. Negligent Infliction of Emotional Distress

For the reasons set forth above, the exclusionary provisions of the Policy precluded AIG's duty to defend or indemnify Plaintiffs. Where, as here, "[t]here is no question of a material fact that the allegations in the underlying action fall within the scope" of the policy's exclusions, an insurer's motion for summary judgment should be granted. Penn-America Ins. Co. v. LTJ Corp., 1996 WL 465744, *3 (Conn. Super. 1996); see also Community Action for Greater Middlesex County, Inc. v. American Alliance Ins. Co., 757 A.2d 1074, 1080 (Conn. 2000). Accordingly, summary judgment should be entered in favor of AIG on Counts I and II of the Ryan Plaintiffs' Amended Complaint and the Gwynn Plaintiffs' Second Amended Complaint.

In Vincenzi v. Nationwide Mut. Ins. Co., 1997 WL 80672 (Conn. Super. Feb. 7, 1997), the insured brought claims of breach of contract, bad faith, and CUIPA and CUTPA against its insurer. Principles of res judicata required a finding that there was no coverage under the policy. Id. The court held that since there was no coverage under the policy, *all* of the plaintiff's claims must fail. Id. Here, too, there was no coverage under the Policy, and as set forth above AIG did not as a matter of law act in bad faith in denying coverage, or by resuming Plaintiffs' defense and paying their uncovered claims. Accordingly, Plaintiffs' bad faith and CUIPA/CUTPA claims must fail. Summary judgment should be entered in AIG's favor on Counts III and IV.

Finally, summary judgment should be entered in AIG's favor on Counts V and VI. These counts are grounded on the incorrect proposition that AIG had a duty to defend and indemnify Plaintiffs against Sowell's Claims. Since AIG did not as a matter of law have a duty to defend or to indemnify under the Policy, these counts must fail as well.

## CONCLUSION

For the foregoing reasons, AIG as a matter of law has no duty to defend and no duty to indemnify under the Policy, and its actions cannot constitute bad faith or intentional or negligent infliction of emotional distress. Accordingly, summary judgment should be entered on behalf of AIG on each and every one of Plaintiffs' counts.

Respectfully Submitted,

DEFENDANTS/COUNTERPLAINTIFFS
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.
and AIG TECHNICAL SERVICES, INC.

BY THEIR ATTORNEYS,
Edwards Angell Palmer & Dodge LLP

By: _____

Mark B. Seiger
Fed. Bar No. ct05580
90 State House Square
Hartford, CT 06103-2715
Tel: (860) 525-5065
Fax: (860) 527-4198
Email: mseiger@eapdlaw.com

John D. Hughes
Massachusetts BBO # 243660
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 951-3373
Fax: (617) 439-4170
Email: jhughes@eapdlaw.com

Donna M. Greenspan
Florida Bar No.: 059110
One North Clematis Street, Suite 400
West Palm Beach, FL 33401
Tel: (561) 833-7700
Fax: (561) 655-8719
Email: dgreenspan@eapdlaw.com

## CERTIFICATION OF SERVICE

I hereby certify that on August 17, 2006, the foregoing Motion for Summary Judgment, Memorandum of Law, Statement of Facts and Appendix of Exhibits was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this document through the court's CM/ECF System.

Mark B. Seiger, Esq.. (ct05580)
Edwards Angell Palmer & Dodge LLP
90 State House Square, 9th Floor
Hartford, CT 06103
Phone: 860.525.5065
Fax: 806.527.4198
Email: mseiger@eapdlaw.com