UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES, INC., | ) ) ) | CASE NUMBER: 3:03 CV 00644 (CFD) |
| | ) | |
| Plaintiffs, | ) ) | |
| | ) | |
| v. | ) ) | |
| | ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., | ) ) ) | |
| | ) | |
| Defendants, | ) ) | |
| | ) | |
| DAVID W. GWYNN and RAQUEL GWYNN, | ) ) | |
| | ) | CASE NUMBER: |
| Plaintiffs, | ) | 3:03 CV 1154 (CFD) |
| v. | ) ) | |
| | ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | AUGUST 17, 2006 |

**LOCAL RULE 56(a)(1) STATEMENT OF UNDISPUTED MATERIAL FACTS
SUBMITTED BY DEFENDANTS NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA. AND AIG TECHNICAL SERVICES, INC.
IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56(a)(1) of the United States District Court for the District of

Connecticut, Defendants, National Union Fire Insurance Company of Pittsburgh, PA. and AIG

Technical Services, Inc. (collectively, "AIG" or "Defendants"), hereby submit this Statement of

Undisputed Material Facts in Support of its Motion for Summary Judgment against Plaintiffs,

Bruce Charles Ryan ("Ryan"), Russell William Newton ("Newton"), Robert Fitzpatrick

("Fitzpatrick"), and Merit Capital Associates, Inc. ("Merit") (collectively, "Ryan Plaintiffs"), and

Plaintiffs David W. Gwynn ("Gwynn") and Raquel Gwynn (collectively, "Gwynn Plaintiffs").

## **Undisputed Material Facts**

1.      AIG  issued to Merit a Securities Broker/Dealer's Professional Liability Insurance

Policy numbered 473-36-20, with original effective dates of August 23, 2000 to August 23, 2001

("Policy").  The Ryan Plaintiffs' Amended Complaint ("Ryan Complaint") at ¶ 15; the Gwynn

Plaintiffs' Second Amended Complaint ("Gwynn Complaint") at ¶ 12.  A true and correct copy

of the Policy is hereto attached as EXHIBIT A.  A true and correct copy of the Ryan Complaint

is hereto attached as EXHIBIT B.  A true and correct copy of the Gwynn Complaint is hereto

attached as EXHIBIT C.

2.      Pursuant to Endorsement #5 of the Policy, the effective ending date of the

Policy's coverage was changed from August 23, 2001 to September 23, 2001, thereby making

the Policy effective from August 23, 2000 to September 23, 2001.   EXHIBIT A, Policy at

ENDORSEMENT #5.

3.      At all times relevant hereto, Merit was a securities broker/dealer corporation

organized under Connecticut law with its principal place of business in Westport, Connecticut.

EXHIBIT B, Ryan Complaint at ¶¶ 4,9; EXHIBIT C, Gwynn Complaint at ¶¶ 8-9.

4.      At all times relevant hereto, Ryan was the President of Merit, and one of Merit's

two shareholders.  EXHIBIT B, Ryan Complaint at ¶ 10; EXHIBIT C, Gwynn Complaint at ¶

17.

5.      At all times relevant hereto, Newton was the Chairman and Chief Financial

Officer of Merit, and Merit's other shareholder.  EXHIBIT B, Ryan Complaint at ¶ 11; EXHIBIT

C, Gwynn Complaint at ¶ 17.

BOS_542808_4/JLEE

6.    At all times relevant hereto, Fitzpatrick was Merit's Compliance Officer and General Counsel.  EXHIBIT B, Ryan Complaint at ¶ 12; EXHIBIT C, Gwynn Complaint at ¶ 17.

7.    At all times relevant hereto, Gwynn functioned as Merit's Registered Representative.  EXHIBIT B, Ryan Complaint at ¶ 13; EXHIBIT C, Gwynn Complaint at ¶ 10.

8.    Under the Policy, Merit was insured as the "Broker/Dealer."  EXHIBIT B, Ryan Complaint at ¶ 16; EXHIBIT C, Gwynn Complaint at ¶ 13.

9.    The Policy insured Ryan, Newton, Fitzpatrick, and Gwynn, in their individual capacities as directors, officers, employees, and/or Registered Representatives of Merit. EXHIBIT B, Ryan Complaint at ¶ 16; EXHIBIT C, Gwynn Complaint at ¶ 13.

10.    The Policy states in part the following:

DECLARATIONS

ITEM 1.    BROKER/DEALER: MERIT CAPITAL
ASSOCIATES, INC.

*    *    *

ITEM 2.    POLICY PERIOD:
From: August 23, 200
To: August 23, 2001

*    *    *

ITEM 6.    RETROACTIVE DATE: August 23, 1999

EXHIBIT A, Policy at DECLARATIONS, p.1.

11.    The Policy states in part the following:

1. INSURING AGREEMENTS

A.    BROKER/DEALER    PROFESSIONAL    LIABILITY
INSURANCE (INCLUDING FAILURE TO SUPERVISE)

BOS_542808_4/JLEE

This policy shall pay on behalf of the Broker/Dealer Loss arising from a Claim . . . for any actual or alleged Wrongful Act committed by the Broker/Dealer:

1.      in the rendering or failure to render Professional Services by the Broker/Dealer; or

2.      in Failing to Supervise a Registered Representative in the rendering or failure to render Professional Services by such Registered Representative on the behalf of the Broker/Dealer; or

3.      in Failing to Supervise a Registered Representative in connection with an activity of the Registered Representative OTHER THAN the rendering or failure to render Professional Services by such Registered Representative on the behalf of the Broker/Dealer.

B.    REGISTERED     REPRESENTATIVE    PROFESSIONAL
        LIABILITY INSURANCE

This policy shall pay on behalf of a Registered Representative Loss arising from a Claim . . . for any actual or alleged Wrongful Act committed by the Registered Representative in the rendering or failure to render Professional Services on the behalf of the Broker/Dealer.

C.    DEFENSE,    INVESTIGATION    AND    SETTLEMENT
        (INCLUDED IN THE LIMITS OF LIABILITY)

1. Defense

The Insurer shall have the right and duty to defend, subject to and as part of the Limits of Liability, any Claim made against an Insured during the Policy Period or Discovery Period (if applicable) . . .

EXHIBIT A, Policy at SECURITIES BROKER/DEALERS PROFESSIONAL LIABILITY POLICY, p. 1.

12.    The Policy states in part the following:

2. DEFINITIONS

BOS_542808_4/JLEE

(a)    "Approved Activity" means a service or activity performed by the Registered Representative on behalf of the Broker/Dealer which:

    (1)    has been approved by the Broker/Dealer to be performed by the Registered Representative, and is

    (2)    in connection with the purchase or sale of a specific security, annuity or insurance product which has been approved by the Broker/Dealer to be transacted through the Registered Representative, and for which

    (3)    the Registered Representative has obtained all licenses required by the Broker/Dealer or applicable law or regulation.

(b)    "Broker/Dealer" means the Broker/Dealer designated in Item 1 of the Declarations and any Subsidiary thereof.

(c)    "Claim" means the following brought by an Insured's customer or client in such capacity:

    (1)    a written demand for monetary relief; or

    (2)    a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by:

        (i)    service of a complaint or similar pleading; or

        (ii)    receipt or filing of an arbitration demand or statement of claim.

*    *    *

(g)    "Interrelated Wrongful Act(s)" means Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from the same, related or common nexus of facts regardless of whether such Claims involved the same or different claimants, Insureds or legal causes of action. . . .

*    *    *

BOS_542808_4/JLEE

(i)     "Loss" means damages, judgments, settlements and Defense Costs . . .

Loss arising from Claim(s) alleging the same Wrongful Act or Interrelated Wrongful Acts shall be deemed a single Loss under this Policy. . . .

\*   \*   \*

(k)     "Professional Services" means the following services if rendered in connection with an Approved Activity for or on the behalf of a customer or client of the Broker/Dealer pursuant to a written agreement between the Broker/Dealer and the customer or client: . . .

(l)     "Registered Representative" means an individual who is registered with the National Association of Securities Dealers, Inc., including a registered principal, and who for compensation engages in the business of rendering Professional Services on behalf of the Broker/Dealer.

\*   \*   \*

(n)     "Wrongful Act" means any act, error or omission by the Broker/Dealer, or by any director, officer, partner or employee thereof, or by any Registered Representative, in their respective capacities as such.

EXHIBIT A, Policy at SECURITIES BROKER/DEALERS PROFESSIONAL LIABILITY POLICY, pp. 2-6.

13.    The Policy states in part the following:

4.    EXCLUSIONS

The insurer shall not be liable for Loss in connection with any Claim made against an Insured:

a)      arising out of, based upon or attributable to the gaining in fact any profit or advantage to which the Insured was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts;

b)      arising out of, based upon or attributable to the committing in fact of:  any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or

- 6 -

BOS_542808_4/JLEE

Canada, or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder;

\*   \*   \*

e)      alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the inception date of the first Securities Broker/Dealer's Errors and Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the Broker/Dealer designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim, or alleging, arising out of, based upon or attributable to any subsequent Interrelated Wrongful Act.

f)      alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act;

\*   \*   \*

r)      with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away";

s)      alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-loan investment company or variable annuities in which there is no initial or contingent sales charge or commission;

t)      alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims arising out [of] an

BOS_542808_4/JLEE

> Insured acting as a general partner of any limited
> partnership and/or managing general partner of any general
> partnership . . . .

EXHIBIT A, Policy at SECURITIES BROKER/DEALERS PROFESSIONAL LIABILITY
POLICY, pp. 6-9.

14.    On or about September 4, 2001, Michael A. Sowell ("Sowell") filed a Statement

of Claim before the National Association of Securities Dealers, Inc. ("NASD") against Merit,

Ryan, Newton, Fitzpatrick, and Gwynn, as well as against Gwynn Financial Services, Inc.

("GFS"), an entity controlled by Gwynn, and the wives of Ryan, Newton, Fitzpatrick, and

Gwynn.  EXHIBIT B, Ryan Complaint at ¶ 29; EXHIBIT C, Gwynn Complaint at ¶ 25.  A true

and correct copy of the Statement of Claim is hereto attached as EXHIBIT D.

15.    On or about May 1, 2002, Sowell filed an Amended Statement of Claim before

the NASD naming Source Capital Group, Inc. ("Source") as an additional respondent.  EXHIBIT

B, Ryan Complaint at ¶ 47; EXHIBIT C, Gwynn Complaint at ¶ 42.  A true and correct copy of

the Amended Statement of Claim is hereto attached as EXHIBIT E.

16.    The wives of Ryan, Newton, Fitzpatrick, and Gwynn were named in the

Statement of Claim and Amended Statement of Claim (collectively, "Statements of Claim")

because Arizona, where the Statements of Claim were filed, is a community property state.

EXHIBIT D at ¶ 10; EXHIBIT E at ¶ 11.

17.    In his Statements of Claim, Sowell alleged that in late 1997, he inherited assets of

his deceased mother, which he initially believed were worth a total of approximately $380,000.

EXHIBIT D, Statement of Claim at ¶ 17; EXHIBIT E, Amended Statement of Claim at ¶ 18.

18.    Sowell alleged that because he did not know how to manage his inherited funds,

he sought financial planning assistance from Gwynn.  EXHIBIT D, Statement of Claim at ¶ 18;

EXHIBIT E, Amended Statement of Claim at ¶ 19.

BOS_542808_4/JLEE

19.    Sowell alleged that Gwynn offered to prepare a retirement plan for Sowell and his wife, and to manage Sowell's financial portfolio. EXHIBIT D, Statement of Claim at ¶ 19; EXHIBIT E, Amended Statement of Claim at ¶20.

20.    Sowell alleged that in early February 1998, Gwynn met with Sowell and his wife to gather information for the retirement plan. EXHIBIT D, Statement of Claim at ¶ 19; EXHIBIT E, Amended Statement of Claim at ¶20.

21.    Sowell alleged that Gwynn prepared a retirement plan for Sowell and his wife, dated February 20, 1998, listing primary assets valued at $382,000 and a residence worth $130,000. EXHIBIT D, Statement of Claim at ¶ 21; EXHIBIT E, Amended Statement of Claim at ¶ 22.

22.    Sowell alleged that the retirement plan prepared for the Sowells by Gwynn emphasized the Sowells' need for an "efficient, diversified portfolio," and stated that the Sowells needed to "actively rebalance [their] investments throughout the planning horizon." EXHIBIT D, Statement of Claim at ¶ 22; EXHIBIT E, Amended Statement of Claim at ¶ 23.

23.    Sowell alleged that in addition to his inherited funds, Sowell's mother also left behind several stock certificates ("Stock Certificates") in her desk that had never been deposited with a brokerage firm. EXHIBIT D, Statement of Claim at ¶ 18; EXHIBIT E, Amended Statement of Claim at ¶ 19.

24.    Sowell alleged that in April 1998, Sowell gave the Stock Certificates to Gwynn. EXHIBIT D, Statement of Claim at ¶ 24; EXHIBIT E, Amended Statement of Claim at ¶ 25.

25.    Sowell alleged that at the time that he gave the Stock Certificates to Gwynn, Sowell was unaware of their true value, which was in excess of $1 million. EXHIBIT D, Statement of Claim at ¶ 24; EXHIBIT E, Amended Statement of Claim at ¶ 25.

BOS_542808_4/JLEE

26.    Sowell alleged that Gwynn never revised the Sowells' retirement plan to reflect the $1 million worth of Stock Certificates. EXHIBIT D, Statement of Claim at ¶ 25; EXHIBIT E, Amended Statement of Claim at ¶ 26.

27.    Sowell alleged that on May 1, 1998, Gwynn deposited Sowell's Stock Certificates as the initial deposit in Sowell's Merit Account No. LFW-00053-A5 ("Merit Account"). EXHIBIT D, Statement of Claim at ¶¶ 23-24; EXHIBIT E, Amended Statement of Claim at ¶¶ 24-25.

28.    According to Sowell's Statements of Claim:

When Mr. Sowell opened his account, he signed a power of attorney giving Respondents [including Gwynn] discretionary control of the account. Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell. As it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading decisions.

EXHIBIT D, Statement of Claim at ¶ 26; EXHIBIT E, Amended Statement of Claim at ¶27.

29.    According to Sowell's Statements of Claim:

Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell and treated his discretionary power over the account as a license to churn. Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by excessive, in-and-out trading in technology stocks. Mr. Gwynn also traded extensively on margin in Mr. Sowell's account. A review of Mr. Sowell's account statements reveals that Respondents utilized no meaningful investment strategy or plan.

EXHIBIT D, Statement of Claim at ¶ 27; EXHIBIT E, Amended Statement of Claim at ¶28.

30.    Sowell's Statements of Claim state that "Mr. Sowell's account was a discretionary account and was unquestionably controlled by Mr. Gwynn." EXHIBIT D, Statement of Claim at ¶ 87; EXHIBIT E, Amended Statement of Claim at ¶105.

BOS_542808_4/JLEE

31.     Sowell alleged that at Gwynn's request, Sowell made certain loans ("Charter School Investments") to Novation Financial Corporation ("Novation"). EXHIBIT D, Statement of Claim at ¶¶ 31-64; EXHIBIT E, Amended Statement of Claim at ¶¶ 32-65.

32.     Sowell alleged that Novation was a predecessor to Charter Financial Network, Inc. ("Charter"), now known as Charter 3, Inc. ("C3"). EXHIBIT D, Statement of Claim at ¶ 42; EXHIBIT E, Amended Statement of Claim at ¶ 43.

33.     Sowell alleged that Gwynn was, at all times relevant, a controlling shareholder, officer, and director of Novation, Charter, and C3. EXHIBIT D, Statement of Claim at ¶¶ 34, 45, 56; EXHIBIT E, Amended Statement of Claim at ¶¶ 35, 46, 57.

34.     Sowell alleged, under "Count One (Violation of A.R.S. § 44-1841) (The Charter School Investments)," that "[f]rom May 1998 through December 2000, Respondents [including each of the Plaintiffs] made, participated in or induced the unlawful sale of securities [i.e. the Charter School Investments] to Mr. Sowell." EXHIBIT D, Statement of Claim at ¶ 70; EXHIBIT E, Amended Statement of Claim at ¶ 88.

35.     Sowell alleged that "[o]n or about May 19, 1998, July 1, 1998, November 11, 1999, April 25, 2000, and July 21, 2000 Respondent Gwynn . . . issued Promissory Notes to Mr. Sowell." EXHIBIT D, Statement of Claim at ¶ 159; EXHIBIT E, Amended Statement of Claim at ¶ 177.

36.     Sowell alleged that Gwynn had assured him that the Charter School Investments were protected by the Promissory Notes. EXHIBIT D, Statement of Claim at ¶¶ 36, 40, 47, 49-50, 52, 58; EXHIBIT E, Amended Statement of Claim at ¶¶ 37, 41, 48, 50-51, 53, 59.

37.    Sowell alleged that he never received any money or stock in satisfaction of the Promissory Notes.   EXHIBIT D, Statement of Claim at ¶¶ 41, 54, 63; EXHIBIT E, Amended Statement of Claim at ¶¶ 42, 55, 64.

38.    Sowell alleged that as the result of the Plaintiffs' wrongful acts, Sowell's inheritance of over $1.4 million "disappeared."  EXHIBIT D, Statement of Claim at ¶ 14; EXHIBIT E, Amended Statement of Claim at ¶15.

39.    Sowell alleged that the Ryan Plaintiffs were liable for Gwynn's wrongful acts under theories of respondeat superior, failure to supervise, and as "control persons" of Gwynn, its Registered Representative.  EXHIBIT D, Statement of Claim at ¶¶ 71-72, 82-83, 92, 97, 107, 116-120, 124, 132, 140, 147; EXHIBIT E, Amended Statement of Claim at ¶¶ 89-90, 101, 110, 115, 125, 134-138, 142, 150, 158, 165.

40.    On October 15, 2001, Conlin sent a letter to Ryan.  A true and correct copy of the October 15, 2001 letter is hereto attached as EXHIBIT F.

41.    Conlin's October 15, 2001 letter acknowledged AIG's receipt of Sowell's Statement of Claim and advised that AIG had assigned separate law firms to represent Merit and Gwynn.  EXHIBIT F, October 15, 2001 Letter, pp. 1-3.

42.    Conlin's October 15, 2001 Letter indicated that several of the Policy's exclusions, including (a), (b), (f), (r), and (s), could potentially exclude coverage.  EXHIBIT F, October 15, 2001 Letter, pp. 3-7.

43.    Conlin's October 15, 2001 letter stated:

This letter is not to be construed as a waiver of any policy provision.  [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

BOS_542808_4/JLEE

EXHIBIT F, October 15, 2001 Letter, p. 7.

44.    On January 24, 2002, Conlin sent a letter to Gwynn.  A true and correct copy of

Conlin's January 24, 2002 letter to Gwynn is hereto attached as EXHIBIT G.

45.    Conlin's January 24, 2002 letter to Gwynn advised Gwynn that exclusion (s) of

the Policy precluded coverage for Sowell's Claims, and reiterated that AIG did not waive any

policy provisions but reserved all rights and defenses in the event that it reevaluated the claim.

EXHIBIT G, January 24, 2002 Letter to Gwynn, p. 1.

46.    Conlin's January 24, 2002 letter to Gwynn stated:

> During our investigation of this matter we uncovered the fact that Mr. Sowell signed a
> power of attorney dated March 7, 1998 giving [Gwynn] the "power to give an[d] place
> any and all orders."

> Accordingly, pursuant to exclusion (s) under your policy, coverage is not available for
> you in this matter.  Consequently, and as I advised Mr. Thomason, AIG would neither be
> indemnifying you nor paying for any defense costs incurred after January 12, 2002.  . . .

> If you have any information which would cause us to reevaluate this matter,
> please forward it to my attention as soon as possible and we will gladly review
> same.  This letter is not to be construed as a waiver of any policy provisions.  In
> the event facts and/or issues are brought to our attention which result in a
> reevaluation of this matter, [AIG] reserves all rights and defenses under the policy
> and at law as to allegations which are not covered under the terms of this policy
> and/or may be excluded from coverage under the terms of the policy. . . .

EXHIBIT G, January 24, 2002 Letter to Gwynn, p. 1.

47.    On January 24, 2002, Conlin sent a letter to Ryan.  A true and correct copy of the

January 24, 2002 Letter to Ryan is hereto attached as EXHIBIT H.

48.    Conlin's January 24, 2002 letter to Ryan advised Ryan that exclusion (s) of the

Policy precluded coverage for Sowell's Claims, and reiterated that AIG did not waive any policy

provisions but reserved all rights and defenses in the event that it reevaluated the claim.

EXHIBIT H, January 24, 2002 Letter to Ryan, p. 1.

BOS_542808_4/JLEE

49.    Conlin's January 24, 2002 letter to Ryan stated:

During our investigation of this matter we uncovered the fact that Mr. Sowell signed a power of attorney dated March 7, 1998 giving Mr. Gwynn the "power to give an[d] place any and all orders."

Accordingly, pursuant to exclusion (s) under your policy, coverage is not available for you in this matter. Consequently, AIG would neither be indemnifying you nor paying for any defense costs incurred after January 12, 2002. . . .

If you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same. This letter is not to be construed as a waiver of any policy provisions. In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy and at law as to allegations which are not covered under the terms of this policy and/or may be excluded from coverage under the terms of the policy. . . .

EXHIBIT H, January 24, 2002 Letter to Ryan, p. 1.

50.    On April 16, 2002, Angelina Palmieri of the AIG Claims Department ("Palmieri") sent a letter to Gwynn, copied to Ryan. A true and correct copy of the April 16, 2002 Letter is hereto attached as EXHIBIT I.

51.    Palmieri's April 16, 2002 letter to Gwynn advised Gwynn that AIG had closed Merit's claim file in the Sowell matter. EXHIBIT I, April 16, 2002 Letter.

52.    On May 17, 2002, Gwynn sent a letter to Conlin. A true and correct copy of the April 16, 2002 letter is hereto attached as EXHIBIT J.

53.    Gwynn's May 17, 2002 letter to Conlin objected to AIG's closure of Merit's claim file in the Sowell matter and informed Conlin that Gwynn was still in the process of accumulating the information "requested several months ago" by AIG. EXHIBIT J, May 17, 2002 Letter.

54.    The Gwynn Plaintiffs allege that on January 3, 2003, John J. Nicgorski ("Nicgorski") of Mohr Hackett Pederson Blakely & Randolph, P.C., counsel for Gwynn,

represented to AIG that "various facts in the record . . .established Sowell's account had not been discretionary, that the power of attorney had been revoked, and that Sowell retained all discretion over all of his accounts with Merit." The Gwynn Plaintiffs further allege that "Gwynn, through counsel, made a demand on [AIG] to resume the defense of [the Gwynn Plaintiffs], and to settle Sowell's claim within the policy limits. EXHIBIT C, Gwynn Complaint at ¶ 51.

55.     The Ryan Plaintiffs allege that they provided AIG with "information which showed that Sowell's account had never been a discretionary account." EXHIBIT B, Ryan Complaint at ¶ 41. The Ryan Plaintiffs further allege that on January 7, 2003, Gwynn "demanded coverage, a settlement within the Policy limits, and an immediate resumption of the defense by [AIG]." EXHIBIT B, Ryan Complaint at ¶ 58.

56.     On January 6, 2003, Nicgorski sent a letter to Conlin. A true and correct copy of the January 6, 2003 letter is hereto attached as EXHIBIT K.

57.     Nicgorski's January 6, 2003 letter advised Conlin that since the power of attorney signed by Sowell in connection with the Merit Account was not notarized, it was invalid under Arizona law. Thus, Nicgorski argued, the Merit Account was not discretionary. EXHIBIT K, January 6, 2003 Letter, p. 1.

58.     On January 7, 2003, the NASD commenced arbitration hearings concerning Sowell's Statements of Claim ("Sowell Arbitration"). EXHIBIT B, Ryan Complaint at ¶ 59; EXHIBIT C, Gwynn Complaint at ¶ 43.

59.     The Ryan Plaintiffs were represented in the Sowell Arbitration by counsel that they themselves had retained. EXHIBIT B, Ryan Complaint at ¶ 60; EXHIBIT C, Gwynn Complaint at ¶ 41.

BOS_542808_4/JLEE

60.    Gwynn represented himself in the Sowell Arbitration. EXHIBIT B, Ryan Complaint at ¶ 61; EXHIBIT C, Gwynn Complaint at ¶ 55.

61.    On January 10, 2003, Jeffrey King ("King") of Struckmeyer & Wilson, counsel for AIG, sent a letter to Nicgorski. A true and correct copy of the January 10, 2003 letter is hereto attached as EXHIBIT L.

62.    King's January 10, 2003 letter confirmed a January 9, 2003 telephone conversation between King and Nicgorski in which King conveyed AIG's offer to resume payment for Gwynn's defense. EXHIBIT L, King's January 10, 2003 Letter, p.1.

63.    King's January 10, 2003 letter noted that Gwynn had still not delivered the documents as he promised he would in his May 17, 2002 letter. EXHIBIT L, King's January 10, 2003 Letter, p.1.

64.    On January 10, 2003, King sent an email to attorney William Federman, counsel for the Ryan Plaintiffs in the Sowell Arbitration. A true and correct copy of the January 10, 2003 email is hereto attached as EXHIBIT M.

65.    King's January 10, 2003 email stated that "while AIG has not changed its position on coverage for this claim at this time, it is offering to pay Merit's reasonable and necessary defense costs associated with the Sowell claim." EXHIBIT M, King's January 10, 2003 Email.

66.    On January 10, 2003, Frank. W. Moskowitz ("Moskowitz") of Berk & Moskowitz, counsel for Sowell in the Sowell arbitration, sent a letter to Nicgorski. A true and correct copy of the January 10, 2003 email is hereto attached as EXHIBIT N.

67.    Moskowitz's January 10, 2003 letter stated Moskowitz's opinion that that the Merit Account "was not a discretionary trading account." EXHIBIT N, Moskowitz's January 10, 2003 Letter, p.3.

68.    Moskowitz's January 10, 2003 letter further stated:

Although we recognize that our Statement of Claim alleged that it was, we believe the true facts are otherwise. Facts, not allegations, dictate coverage. Of course, since AIG has not had a representative attend the hearing, it has no knowledge of the facts of this case. AIG's knowledge is limited to the mere allegations in the Statement of Claim.

EXHIBIT N, Moskowitz's January 10, 2003 Letter, p.3.

69.    On January 13, 2003, King sent a letter to Nicgorski. A true and correct copy of the January 13, 2003 letter is hereto attached as EXHIBIT O.

70.    King's January 13, 2002 letter confirmed that AIG would resume Gwynn's defense in the Sowell Arbitration. EXHIBIT O, January 13, 2002 Letter.

71.    King's January 13, 2003 letter stated that "although AIG is providing Mr. Gwynn with a defense, it has not changed its position with respect to coverage." EXHIBIT O, January 13, 2002 Letter.

72.    On January 13, 2003, attorney Maxine Polomski ("Polomski"), who had previously been appointed by AIG to represent Gwynn, resumed Gwynn's defense in the Sowell Arbitration. NASD Sowell Arbitration Award ("Arbitration Award") at p.1. A true and correct copy of the Arbitration Award is hereto attached as EXHIBIT P.

73.    During the Sowell Arbitration, securities industry expert Charles Abram Fath ("Fath") testified on Sowell's behalf before the Sowell Arbitration panel ("Arbitration Panel"). Sowell Arbitration hearing transcript ("Arbitration Transcript") at pp. 1249-66.   A true and correct copy of the relevant portions of the Arbitration Transcript is hereto attached as EXHIBIT Q.

74.    At the Sowell Arbitration, Fath explained that there was excessive trading activity in the Merit Account. Specifically, Fath testified as follows:

BOS_542808_4/JLEE

Fath:        The excessive activity that I saw in the account is certainly
             unsuitable for an individual with a growth investment objective.

Q:           Are there any particular months of activity in the account that you
             would like to highlight to the Panel as an example of the level of
             activity?

Fath.        Well, I mean, there was consistent activity really throughout the
             account. We could go through some – some months, and then we
             can look at some charts I've prepared.

             If you want to look at – we can start with December of '98 as an
             example. I think that was a statement we looked at earlier today …
             Just on the cover page you'll see that at the end of this month,
             December of '98, there is a debit balance of $209,000.

                              *      *      *

             Then if you'll skip over to page 3 of that monthly statement, if you
             just look down under the account activity, buys and sells that have
             taken place in the account. If you'll look down at the last, for
             instance, starting down on 12/9[/98], two lines up from the bottom,
             American Online is purchased.

             You see onto the next page, there's a series of purchase that are
             made in the account. If you'll drop down to the middle of this
             page, you'll see there's a number of sales that take place beginning
             on 12/16 that go on down. And then on the 19th, there's another
             series of purchases.

             So if you continue on to the – on page 5 you'll see the same thing.
             You – there's purchases and sales taking place of – a number of
             which all take place on the same day, which, as I look at this,
             would give me pause to think, are these discretionary transactions?
             Did Mr. Gwynn talk to Mr. Sowell about each and every one of
             these transactions because obviously he's bunching orders, and I
             think we saw an exhibit the other day, Exhibit No. 162 where he
             was sending in a fax saying: Buy all of these securities and charge
             this amount of commissions.

             From a supervisory point of view, one of the first things you would
             look at when you see crunched orders like that is, you know, did
             the broker really talk with the customer about each one of these
             transactions.

BOS_542808_4/JLEE

If you just go through these different months, you'll see repeatedly there's a whole slew of transactions on . . . different days. On one day there will be a bunch of buys. On another day there's be [sic] a bunch of sells. . .

\* \* \*

At the end of the – this month, on page 6, you can see, according to this statement, there were purchases of $793,000 and there were sales of $520,000

\* \* \*

Looking on page 6, again down at the bottom, you'll see, beginning with the purchase of . . . on January 11th, a whole series of purchases on the 11th. On the 13th, there's a whole series of sales. Then he buys back in some cases the various securities that he had sold earlier.

Any—I mean, this pattern of trading certainly is not appropriate for a growth investment objective. This is purely a trading account, just by looking at the number of buys and sells and the total cost of the purchases for each month.

Again, looking at page 9, it summarizes, it shows that during this month there was $1,313,278 worth of purchases and a sale of . . . $1,633,978 that were done during that month.

EXHIBIT Q, Arbitration Transcript at pp.1270-1273.

75.     In addition to this testimony, Fath presented a chart to the Arbitration Panel demonstrating the excessive number of monthly "buys" and "sells" in the Merit Account from May 1998, prior to the Policy's Retroactive Date of August 23, 1999, through to May 2001. Sowell Arbitration Exhibit 26, pp. 4-5. A true and correct copy of Sowell Arbitration Exhibit 26 is hereto attached as EXHIBIT R.

76.     An excerpt from Fath's chart, detailing Gwynn's trading in the Sowell Account from May 1998 through the to May 2001, is as follows:

BOS_542808_4/JLEE

| Month | Number of Trades | | | Cost of Purchases | Month End Equity | Debit Balance |
|---|---|---|---|---|---|---|
| | Buy | Sells | Total | | | |
| May 98 | - | 6 | 6 | -0- | 1,032,439 | -0- |
| Jun 98 | 3 | 2 | 5 | 25,278 | 1,196,030 | -0- |
| Jul 98 | 25 | 5 | 30 | 313,931 | 1,047,788 | -0- |
| Aug 98 | 6 | 9 | 15 | 66,124 | 778,647 | -0- |
| Sept 98 | 37 | 38 | 75 | 777,691 | 774,382 | -0- |
| Oct 98 | 25 | 17 | 42 | 432,912 | 790,397 | -0- |
| Nov 98 | 32 | 28 | 60 | 388,518 | 854,460 | -0- |
| Dec 98 | 42 | 31 | 73 | 793,044 | 1,009,153 | 209,001 |
| Jan 99 | 45 | 45 | 90 | 1,313,279 | 1,120,758 | -0- |
| Feb 99 | 24 | 14 | 38 | 525,417 | 1,007,312 | 309,667 |
| Mar 99 | 25 | 20 | 45 | 632,977 | 1,185,584 | 615,036 |
| Apr 99 | 22 | 27 | 49 | 959,746 | 1,206,145 | 288,110 |
| May 99 | 26 | 24 | 50 | 893,060 | 972,042 | 524,115 |
| Jun 99 | 24 | 17 | 41 | 666,642 | 997,646 | 664,039 |
| Jul 99 | 22 | 18 | 40 | 518,533 | 807,736 | 963,048 |
| Aug 99 | 29 | 34 | 63 | 663,600 | 730,601 | 812,961 |
| Sept 99 | 25 | 16 | 41 | 615,569 | 864,823 | 1,195,841 |
| Oct 99 | 12 | 20 | 32 | 337,824 | 1,043,643 | 1,032,340 |
| Nov 99 | 29 | 27 | 56 | 761,971 | 1,271,284 | 994,929 |
| Dec 99 | 21 | 27 | 48 | 899,385 | 1,835,672 | 1,117,389 |
| Jan 00 | 26 | 32 | 58 | 1,828,815 | 1,371,742 | 1,280,609 |
| Feb 00 | 15 | 18 | 33 | 443,742 | 1,573,264 | 1,145,187 |
| Mar 00 | 32 | 18 | 50 | 1,061,731 | 1,497,584 | 1,327,839 |
| Apr 00 | 51 | 35 | 86 | 1,791,832 | 1,053,146 | 1,362,564 |
| May 00 | 14 | 44 | 58 | 443,752 | 554,600 | 594,325 |
| Jun 00 | 22 | 18 | 40 | 746,120 | 725,030 | 629,565 |
| Jul 00 | 22 | 20 | 42 | 718,959 | 652,933 | 924,177 |
| Aug 00 | 30 | 16 | 46 | 926,015 | 923,865 | 1,590,490 |
| Sep 00 | 19 | 47 | 66 | 907,543 | 623,044 | 839,065 |
| Oct 00 | 15 | 23 | 38 | 442,759 | 422,224 | 600,548 |
| Nov 00 | 16 | 23 | 39 | 330,674 | 139,789 | 407,742 |
| Dec 00 | 20 | 40 | 60 | 387,137 | 42,753 | 95,175 |
| Jan 01 | 11 | 14 | 25 | 130,775 | 74,529 | 33,700 |
| Feb 01 | 11 | 10 | 21 | 108,451 | 41,679 | 29,439 |
| Mar 01 | 11 | 8 | 19 | 154,864 | 33,442 | 116,096 |

BOS_542808_4/JLEE