| Month | Number of Trades | | | Cost of Purchases | Month End Equity | Debit Balance |
|---|---|---|---|---|---|---|
| | Buy | Sells | Total | | | |
| Apr 01 | -0- | 8 | 8 | -0- | 30,576 | 23,713 |
| May 01 | 4 | 4 | 8 | 23,582 | -0- | -0- |
| | 793 | 803 | 1,596 | 22,032,252 | -0- | -0- |

EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 4-5.

77.   Fath's chart demonstrated to the Arbitration Panel the monthly and cumulative commissions that Gwynn had received as a result of the excessive trading in the Merit Account during the period between May 1998 and May 2001, as well as Gwynn's commissions from the Merit Account as a percentage of his total commissions during the same period. EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 2-3.

78.   An excerpt from Fath's chart, detailing Gwynn's commissions from trading in the Sowell Account from May 1998 through to May 2001, is as follows:

BOS_542808_4/JLEE

| Month | Commissions Monthly | Cumulative | Sowell's % of Gwynn's Gross Commission | Margin Charges Monthly | Cumulative |
|---|---|---|---|---|---|
| May 98 | $3,927 | $3,927 | 85% | -0- | -0 |
| Jun 98 | 6,285 | 10,212 | 73% | -0- | -0 |
| Jul 98 | 11,194 | 21,406 | 80% | -0- | -0 |
| Aug 98 | 3,053 | 24,459 | 30% | -0- | |
| Sept 98 | 13,535 | 37,994 | 85% | -0- | -0 |
| Oct 98 | 10,210 | 48,204 | 73% | -0- | -0 |
| Nov 98 | 10,950 | 59,154 | 87% | -0- | -0 |
| Dec 98 | 16,625 | 75,779 | 96% | -0- | -0 |
| Jan 99 | 23,920 | 99,699 | | 1,152 | 1,152 |
| Feb 99 | 7,665 | 107,364 | | 42 | 1,194 |
| Mar 99 | 12,465 | 119,829 | 52% | 2,545 | 3,739 |
| Apr 99 | 23,806 | 143,635 | 71% | 4,086 | 7,825 |
| May 99 | 15,075 | 158,710 | 77% | 2,238 | 10,063 |
| Apr 99 | 23,806 | 143,635 | 71% | 4,086 | 7,825 |
| May 99 | 15,075 | 158,710 | 77% | 2,238 | 10,063 |
| Jun 99 | 11,264 | 169,974 | 91% | 3,188 | 13,251 |
| Jul 99 | 9,396 | 179,370 | 87% | 4,769 | 18,020 |
| Aug 99 | 12,581 | 191,951 | 73% | 6,945 | 24,965 |
| Sept 99 | 9,640 | 201,591 | 75% | 5,793 | 30,758 |
| Oct 99 | 10,400 | 211,991 | 76% | 10,263 | 41,021 |
| Nov 99 | 16,515 | 228,506 | 77% | 8,677 | 49,698 |
| Dec 99 | 17,700 | 246,206 | 88% | 8,222 | 57,920 |
| Jan 00 | 27,128 | 273,334 | 80% | 10,154 | 68,074 |
| Feb 00 | 9,350 | 282,684 | 60% | 9,901 | 77,975 |
| Mar 00 | 16,717 | 299,401 | 86% | 11,575 | 89,550 |
| Apr 00 | 28,469 | 327,870 | 88% | 11,860 | 101,410 |
| May 00 | 17,700 | 345,570 | 99% | 10,582 | 111,992 |
| Jun 00 | 14,625 | 360,195 | 98% | 9,563 | 121,555 |
| Jul 00 | 13,250 | 373,445 | 89% | 8,579 | 130,134 |
| Aug 00 | 13,426 | 386,871 | 73% | 8,382 | 138,516 |
| Sep 00 | 22,424 | 409,295 | 96% | 15,031 | 153,547 |
| Oct 00 | 12,873 | 422,168 | 98% | 6,489 | 160,036 |
| Nov 00 | 13,410 | 435,578 | 95% | 4,723 | 164,759 |
| Dec 00 | 18,849 | 454,427 | 83% | 3,957 | 168,716 |

BOS_542808_4/JLEE

| Month | Commissions Monthly | Cumulative | Sowell's % of Gwynn's Gross Commission | Margin Charges Monthly | Cumulative |
|---|---|---|---|---|---|
| Jan 01 | 8,285 | 462,712 | 64% | 923 | 169,639 |
| Feb 01 | 7,275 | 469,987 |  | 442 | 170,081 |
| Mar 01 | 6,764 | 476,751 | 94% | 140 | 170,221 |
| Apr 01 | 2,408 | 479,159 | 39% | 506 | 170,727 |
| May 01 | 1,716 | 480,875 |  | 132 | 170,859 |

EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 2-3.

79. According to the figures listed in the chart produced by Fath, Gwynn made at least $179,370 in commissions from Sowell's Merit Account in the three months between the date that the Merit Account was first opened and the Policy's Retroactive Date of August 23, 1999. EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 2-3.

80. Fath's chart indicates that in the three months between the date that the Merit Account was first opened and the Policy's Retroactive Date of August 23, 1999, there were approximately 358 "buys" and 301 "sells," and Gwynn derived about 80% of his total commissions from the Merit Account alone. EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 4-5.

81. Fath testified before the Arbitration Panel as follows:

Q.   You mentioned I think in and out of trading. Can you tell the Panel what that is, and if there's evidence of that in this case?

Fath.   Well, there's ample evidence of that if you just look through the monthly statements. In-and-out trading is when you buy a stock – sell a stock and buy the same stock back again just for trading purposes. And again, that defeats the whole strategy of the investment objective of growth, just because of the commissions that are eating up the – eating up the account.

Q.   What's churning?

| | |
|---|---|
| Fath. | Churning is where a broker who is controlling the account effects excessive transactions in the account in light of the investment objective of the account, and he does it to the detriment to the customer and for his own benefit for the ability to generate commissions for himself. |
| Q. | Okay. Based on the testimony you've heard from both sides, is it evident (tape inaudible) who was controlling the account? |
| Fath. | In my opinion, after looking at the documents and hearing the testimony, it's my opinion that Mr. Gwynn was controlling the account. |

EXHIBIT Q, Arbitration Transcript at pp.1273-74.

82.   Fath testified before the Arbitration Panel as follows:

> [F]or a broker who's been in the business for a number of years, to have 80 percent of his commissions come from one customer, to me is very uncommon and certainly one that would send up red flags the very first month that would occur, to see the type of trading and who's controlling the account.

EXHIBIT Q, Arbitration Transcript at pp.1283-84.

83.   Sowell provided his own testimony during the Sowell Arbitration. During the Sowell Arbitration, Sowell testified as follows:

| | |
|---|---|
| Q. | It says here that you approved all the trades that occurred in the account. |
| Sowell. | That's what it says. |
| Q. | Is that true? |
| Sowell. | No. I mean, I never told David to buy any stock, to sell and to buy it, do anything with it. The only stock that I asked him buy, he couldn't get. |

\* \* \*

| | |
|---|---|
| Q. | Did he ever call you to discuss buying or selling certain stocks and wanting your okay before he did it? |
| Sowell. | No. |

BOS_542808_4/JLEE

\* \* \*

| | |
|---|---|
| Q. | Did Mr. Gwynn ever tell you the amount of commissions he made off the account? |
| Sowell. | No. |

\* \* \*

| | |
|---|---|
| Q. | Did Mr. Gwynn ever tell you the number of times he turned over this account (tape inaudible) on an annual basis? |
| Sowell. | No. |
| Q. | Did anyone from Merit ever tell you? |
| Sowell. | No. |
| Q. | Did Mr. Gwynn ever tell you the return on investment that you needed to break even on your investments in your Merit account? |
| Sowell. | No. |

EXHIBIT Q, Arbitration Transcript at pp. 892-95.

84. Gwynn provided the following testimony during the Sowell Arbitration:

| | |
|---|---|
| Q. | . . . Now, you having been the broker on the account, did Mr. Sowell's – did the commissions generated through Mr. Sowell's account account for a very large percentage of your gross commissions? |
| Gwynn. | Yes. |
| Q. | Okay. And as you sit here today, do you have any documents or information . . . to dispute [Fath's] calculation on a month-to-month basis? |
| Gwynn. | I don't think so. |
| Q. | So, it's fair to say, then, that for three years, most of your compensation through Merit was generated by Mr. Sowell's account? |
| Gwynn. | He was my largest and most active client. |
| Q. | And far and away the largest and most active client. |
| A. | Yes. |

EXHIBIT Q, Arbitration Transcript at p. 232.

85. According to a series of Promissory Notes made by Sowell to Novation/Charter/C3, Sowell's investments in those entities commenced on May 1, 1998, prior to the August 23, 1999 Retroactive Date, and continued through July 24, 2000, amounting to a total of $275,000. Sowell Arbitration Exhibits 43-51. A true and correct copy of the Sowell Arbitration Exhibits 43-51 is hereto attached as EXHIBIT S.

86. Details of the Promissory Notes made by Sowell to Novation/Charter/C3 between May 1, 1998 to July 24, 2000 are as follows:

| Arbitration Exh. No. | Promissory Note |
|---|---|
| 43 | Full Recourse Promissory note for $50,000 dated May 19, 1998 by Gwynn for Novation, as Maker, and Sowell as Holder and Payee |
| 44 | Full Recourse Promissory Note for $100,000 dated July 1, 1998 by Gwynn for Novation, as Maker, and Sowell as Holder and Payee. |
| 45 | Full Recourse Promissory Note for $25,000 dated November 11, 1999 by Gwynn for Charter, as Maker, and Sowell as Payee |
| 46 | Amendment to November 11, 1999 Full Recourse Promissory Note, dated July 24, 2000 |
| 47 | Full Recourse Promissory Note for $25,000 dated April 27, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |
| 48 | Amendment to April 27, 2000 Full Recourse Promissory Note, dated July 24, 2000 |
| 49 | Full Recourse Promissory Note for $25,000 dated July 24, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |
| 50 | Full Recourse Promissory Note for $25,000 dated July 24, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |
| 51 | Full Recourse Promissory Note for $25,000 dated July 24, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |

EXHIBIT S, Sowell Arbitration Exhibits 43-51.

87. The Arbitration Panel received evidence that on July 27, 1999, Merit and Newton submitted to the NASD a letter of Acceptance, Waiver and Consent ("AWC") in connection with an earlier NASD investigation into Merit's activities. Sowell Arbitration Exhibit 111. A true and correct copy of Sowell Arbitration Exhibit 111 is hereto attached as EXHIBIT T.

88. Through the AWC, Merit and Newton accepted and consented to the following findings of the NASD under the heading "Supervision failures":

> During the period from about January, 1996 to about April, 1997, Merit Capital acting through Russell W. Newton its Registered Principal and Chairman, failed to establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations with the Rules of this Association . . .

EXHIBIT T, Sowell Arbitration Exhibit 111 at pp. 3, 5-6.

89. Pursuant to the AWC, Merit and Newton consented to the imposition of a $180,000 fine, as well as to the implementation of corrective actions to be recommended by an independent consultant retained by Merit to review its procedures. EXHIBIT T, Sowell Arbitration Exhibit 111 at pp. 6-7.

90. According to the AWC, Merit and Newton acknowledged that the AWC would become part of their permanent disciplinary records and could be considered in any future actions brought by the NASD against them, and that the AWC would be made available in response to public inquiries through the NASD's public disclosure program. EXHIBIT T, Sowell Arbitration Exhibit 111 at p. 1.

91. On February 25, 2003, three-and-a-half years after Merit and Newton submitted the AWC, the NASD panel in the Sowell Arbitration entered an award in the amount of $1,125,000 ("Arbitration Award") jointly and severally against each of the Plaintiffs, as well as against GFS. EXHIBIT B, Ryan Complaint at ¶75; EXHIBIT C, Gwynn Complaint at ¶72; EXHIBIT P, Arbitration Award at p.7.

92. According to the Arbitration Award, the Arbitration Panel found Merit, Newton, Ryan, and Fitzpatrick "jointly and severally liable for failing to supervise Gwynn." EXHIBIT P, Arbitration Award at p. 7.

93. The Arbitration Panel found that Merit had ordered a certain Sandra Logay to supervise Gwynn despite the fact that an earlier January 28, 2000 SEC decision had "concluded '*it is in the public interest to bar Logay from acting in a proprietary or **supervisory capacity** with any broker, dealer, or municipal securities dealer.*'" EXHIBIT P, Arbitration Award at p.8 (emphasis in original).

94. The Arbitration Panel found that each of the Plaintiffs:

[K]nowingly facilitated the apparent violation of the SEC order . . . by ordering Sandra Logay to "visit" Respondent David Gwynn in Scottsdale, Arizona on October 17, 2000 [which] constituted supervisory activity. . . .

EXHIBIT P, Arbitration Award at p.8.

95. The Arbitration Award states the following:

After considering the pleadings, the testimony, and the evidence presented at the hearing, the undersigned arbitrators have decided in full and final resolution of the issues submitted for determination as follows:

1. The panel finds that Respondents [Merit, Fitzpatrick, Newton, Ryan, Gwynn, Raquel Gwynn and GFS] shall be and hereby are jointly and severally liable to claimant for selling unsuitable investments, selling unregistered securities, acting negligently, making negligent misrepresentations, breaching their fiduciary duties to claimant, breaching their contractual obligations to claimant, engaging in conduct falling below the securities industry standard of care, and showing an overall reckless indifference to claimant's interests.

2. The panel also finds that Respondents, and each of them, are jointly and severally liable for churning claimant's account.

3. The panel further finds that Respondents Merit, Newton, Ryan and Fitzpatrick, and each of them, are jointly and severally liable for failing to supervise Respondent Gwynn. The panel specifically finds that Respondent Fitzpatrick failed to alert Claimant to the excessive and inappropriate trading activity in his account, specifically the excessive trading, the trading was not consistent with Claimant's investment objectives, the high commissions, and the heavy use of margin.

4. The panel awards damages to Claimant in the total sum of $1,125,000.00.

5. In reaching its decision, the panel makes the following findings of fact concerning Respondent David Gwynn:

6. Respondent engaged in excessive trading, approximately 1,596 trades in thirty-seven (37) months from May 1998 to May 2001, coupled with the fact that Respondent derived approximately 80% of his gross income from Claimant's account over the same period of time;

7. Respondent engaged in excessive trading of the same securities (in and out trading, high frequency of trades in the same securities);

8. Respondent engaged in the churning of Claimant's account, resulting in a Looper turnover of 8.5, and a cost maintenance factor of approximately 25%.

9. Respondent engage in a pattern of unsuitable trading activity that was contrary to the stated investment objectives of Claimant, to wit; "long term growth."

10. Respondent, a registered representative, engaged in a variety of inappropriate activities including:

   i. Soliciting Claimant (his client) to raise large sums of money for highly speculative venture capital propositions;

   ii. Soliciting Claimant (his client) to purchase unregistered securities;

   iii. Failing to disclose serious conflicts of interest with Claimant when soliciting money for highly speculative venture capital propositions, including Respondent's own personal stake in the venture capital propositions and the fact that large sums of money raised from Claimant were to be paid directly to Respondent.

   iv. Respondent was not registered under the Investment Advisors Act of 1940 and was unable to verify that he was a "registered investment advisor" in the State of Arizona. Accordingly, Respondents' conduct in the preparation and dissemination of the documents identified a Claimant's Exhibits "32" ["Financial Planning/Advisory Disclosure Agreement"] and "33" ["Financial Planning/Investment

      Advisor Agreement"] raises serious questions of fraud and misrepresentation.

11. The panel also makes the following findings of fact concerning Respondents Merit, its principals Ryan and Newton, and its Compliance Director Fitzpatrick:

12. Each of said Respondents knowingly facilitated the apparent violation of the SEC order referred to in an SEC decision dated January 28, 2000 in SEC file No. 3-8969, identified as Claimant's Exhibit "113", by ordering Sandra Logay to "visit" Respondent David Gwynn in Scottsdale, Arizona on October 17, 2000. The SEC concluded *"it is in the public interest to bar Logay from acting in a proprietary or **supervisory capacity** with any broker, dealer, or municipal securities dealer."* ...

13. Incidental to the above finding, the panel finds that Respondent Merit's employee, Sandra Logay's "visit" to Respondent David Gwynn in Scottsdale, Arizona on October 17, 2000 constituted supervisory activity in violation of an SEC decision dated January 28, 2000 in SEC file No. 3-8969, identified as Claimant's Exhibit "113".

EXHIBIT P, Arbitration Award at pp. 6-8.

96. Plaintiffs allege that:

Nothing in the [Arbitration] Award is predicated on or even refers to any claim or evidence that Sowell's account was discretionary or managed through a power of attorney, and in fact, the Award notes specifically that Respondents had asserted "Sowell exercised control over his account at Merit."

EXHIBIT B, Ryan Complaint at ¶ 78; EXHIBIT C, Gwynn Complaint at ¶ 73.

97. AIG ultimately paid $1,000,000 to Sowell in exchange for a full and final adjudication of Sowell's claims against Plaintiffs and GFS. EXHIBIT B, Ryan Complaint at ¶ 88.

98. The Arbitration Award was vacated on September 9, 2003. Vacation of Arbitration Award. A true and correct copy of the Vacation of Arbitration Award is hereto attached as EXHIBIT U.

BOS_542808_4/JLEE

99.	Plaintiffs do not maintain that they were damaged by AIG's resumption of their defense and payment to vacate the Arbitration Award; rather, they claim that they were damaged because AIG's resumption of their defense and payment to Sowell as "belated." EXHIBIT B, Ryan Complaint at ¶ 71; EXHIBIT C, Gwynn Complaint at ¶ 68.

100.	In support of their claim that AIG's defense was "belated," Plaintiffs allege that AIG "admitted it had a duty to defend" when it resumed Plaintiffs' defense on January 10, 2003. EXHIBIT B, Ryan Complaint at ¶ 64; EXHIBIT C, Gwynn Complaint at ¶ 60.

101.	Plaintiffs maintain that Gwynn irretrievably damaged their respective cases by the time that Gwynn's counsel resumed his defense during the Sowell Arbitration. EXHIBIT B, Ryan Complaint at ¶¶ 58-59; EXHIBIT C, Gwynn Complaint at ¶¶ 61-63.