UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
BRUCE CHARLES RYAN, RUSSELL )
WILLIAM NEWTON, ROBERT FTIZPATRICK, )
and MERIT CAPITAL ASSOCIATES, INC., )
        Plaintiffs, )
  )     CIVIL ACTION NO.
v. )     3:03CV00644(CFD)
  )
NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA., and )
AIG TECHNICAL SERVICES, INC., )
        Defendants. )
_____)
DAVID W. GWYNN, and RAQUEL GWYNN )
  )
        Plaintiffs, )     CIVIL ACTION NO.
v. )     3:03CV01154(CFD)
  )
NATIONAL UNION FIRE INSURANCE )
COMPANY OF PITTSBURGH, PA., and )
AIG TECHNICAL SERVICES, INC., )
        Defendants. )     NOVEMBER 20, 2006

**THE RYAN PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

      Pursuant to Fed. R. Civ. P.  56 and Local Rule 56, plaintiffs, Bruce Charles Ryan, Russell

William Newton, Robert Fitzpatrick and Merit Capital Associates Inc. (hereinafter collectively

referred to as the "Ryan Plaintiffs") hereby submit this memorandum in opposition to the Motion

for Summary Judgment filed by defendants National Union Fire Insurance Company of

**ORAL ARGUMENT REQUESTED**

Pittsburgh, PA's ("NU") and AIG Technical Services, Inc.'s ("AIGTS") (hereinafter NU and AIGTS will be collectively referred to as "Defendants" or "AIG").  Plaintiffs have also filed herewith *The Ryan Plaintiffs' Local Rule 56(A) 2 Statement* and accompanying affidavit and documents.

## PRELIMINARY STATEMENT

The Ryan Plaintiffs bought a professional liability policy from AIG in 2000, paying approximately $70,000 for coverage of their securities broker dealer business. The Ryan Plaintiffs submitted a claim to AIG in September 2001 concerning a claim for an NASD arbitration brought by Michael Sowell, a former customer.  AIG initially agreed to defend the Ryan Plaintiffs and their broker David Gwynn.  In January 2002, after allegedly investigating, AIG denied coverage under the Policy and withdrew its defense, on a claim that a power of attorney executed by Sowell in 1998 made the account discretionary under Exclusion S to the policy.

Thereafter, in January 2003, without any request from the Ryan Plaintiffs, AIG unilaterally decided, in order to protect its own interest, to resume the defense, half way through the NASD arbitration hearing on the underlying claim.  AIG re-retained counsel for Gwynn and agreed to pay for the defense of the Ryan Plaintiffs without issuing any reservation of rights.  By then however, the defense of the Ryan Plaintiffs had been completely compromised by Gwynn's mishandled *pro se* defense during the first three days of the hearing.  That compromised defense resulted in an award of $1,125,000 against the Ryan Plaintiffs, Gwynn, Mrs. Gwynn, and Gwynn Financial (Gwynn's company), but AIG refused to take any responsibility for that award.   In April 2003, the Ryan Plaintiffs brought this action against AIG seeking *inter alia* a full defense

2

and indemnity rights under the policy.  In August 2003, AIG voluntarily paid $1,000,000 to

settle the underlying claim, without reservation of rights or any notice that the payment was

made subject to any right by AIG to later deny coverage and seek recoupment from the insureds.

Nevertheless, in the summer of 2005, two and a half years after the Ryan Plaintiffs brought this

action, AIG for the first time amended its defenses and asserted counterclaims to seek a

declaration from this Court that AIG's insurance policy, the policy that all parties have relied on

over the years, did not provide any defense or coverage rights for the Ryan Plaintiffs or the

Gwynn Plaintiffs.  AIG now seeks summary judgment claiming that the policy never afforded a

duty to defend or any coverage for Sowell's claims because of certain claimed exclusions,

including three exclusions which AIG never asserted as grounds to deny coverage or reserve its

rights in the past.  Further AIG asserts the novel and legally unsupported claim that it could not

by its actions and direct statements to its insureds, waive these exclusions, despite the admission

of its own Rule 30(b)(6) corporate witness that it routinely does waive exclusions for business

purposes.

   As set forth in greater detail herein, summary judgment should not enter for AIG, because

AIG's position is incorrect as a matter of law and because there are material issues of fact which

can only be decided at trial.  Under Connecticut law AIG had a duty to defend the Ryan

Plaintiffs and the Gwynn Plaintiffs based on the "face of the complaint" in the underlying

arbitration.  In further support of that duty, this Court should also look to the facts that AIG after

receiving and reviewing Sowell's claim twice agreed to provide a defense.  Further this Court

should find that the underlying claim was covered under the policy and that AIG has never met

its burden to demonstrate that any of the exclusions preclude coverage or the broader duty to

defend.  Finally, this Court should find that AIG has waived any right either to deny the duty to

defend or to provide coverage under the policy, because of AIG's voluntary decision to defend

the Ryan Plaintiffs and the Gwynn Plaintiffs in the middle of the underlying arbitration

proceeding and by its payment of the underlying claim without reservation of rights or notice to

the insureds that AIG intended to subsequently deny coverage and try to recoup its defense costs

and settlement payment on the underlying claim.

## FACTUAL BACKGROUND

Plaintiff Merit Capital Associates, Inc. ("Merit") was a securities broker/dealer,

performing stock trading operations for customers in various states in which it was licensed to do

business including Connecticut and Arizona.  *See Local Rule 56(A)(1) Statement of Undisputed*

*facts Submitted By Defendants National Union Fire Insurance Company of Pittsburgh, Pa. And*

*AIG Technical Services, Inc. In Support of their Motion For Summary Judgment* at ¶ 3

(Hereinafter "*Defendants Statement at* ").  Bruce Charles Ryan, Russell William Newton and

Robert Fitzpatrick (collectively referred to as the "Individual Ryan Plaintiffs"), were all officers

of Merit.  *Defendants Statement at* ¶ 4-6.   The professional activities of the Ryan Plaintiffs'

were regulated by the National Association of Securities Dealers ("NASD").  *See The Ryan*

*Plaintiffs' Local Rule 56(a) 2 Statement, Counter Statement of Material Facts Not in Dispute at*

¶ 1 (Hereinafter *Ryan Plaintiffs' Statement at"*  ).  David Gwynn ("Gwynn") was licensed by the

NASD to sell securities.  At relevant times, Gwynn worked as a Registered Representative for

Merit. *Ryan Plaintiffs' Statement at* ¶ 2.   Gwynn Financial is a company owned and controlled

by Gwynn and was used by him to provide financial planning services to certain of his

customers, including some individuals who had accounts at Merit.  *Ryan Plaintiffs' Statement at*
¶ 3.

In August 2000, Defendant National Union Fire Insurance Company of Pittsburgh, PA
("NU") issued a Securities Broker/Dealer Professional Liability Insurance Policy # 473-36-20 to
Merit for the period August 23, 2000 to August 23, 2001 (the "Policy").  *Defendants' Statement
at* ¶ 1, Exhibit A   In exchange for an additional premium, NU later extended the coverage period
of the Policy one month to September 23, 2001 while it considered Merit's application to renew
the coverage for another year.[1] *Defendants' Statement at* ¶ 2, Exhibit A.  The Policy covered all
of the Ryan Plaintiffs and the Gwynn Plaintiffs.  *Ryan Plaintiffs' Statement at* ¶ 5. Merit paid NU
a total in excess of $70,000 in premiums on the Policy.  *Ryan Plaintiffs' Statement at* ¶ 6.

A friend and long-time client of Gwynn was Michael A. Sowell ("Sowell").  Sowell had
done business with Gwynn both through Merit's brokerage accounts and otherwise for several
years. *Ryan Plaintiffs' Statement at* ¶ 7.  On or about September 4, 2001, Sowell commenced an
NASD arbitration against Merit and Gwynn (the "Sowell Arbitration") by filing a statement of
claim pursuant to the NASD arbitration rules (the "Sowell Claim").  *Ryan Plaintiffs' Statement
at* ¶ 8 and *Defendants' Statement at* ¶ 15, Exhibit D.   Sowell claimed that in 1998 he contacted
Gwynn for his assistance in creating a retirement plan.  Sowell also alleged he had provided
Gwynn with securities and/or funds for Gwynn to deposit in certain securities accounts,
including a trading account, at Merit (the "Merit Account").  *Ryan Plaintiffs' Statement at* ¶  9
and *Defendants Statement at* Exhibit D.    In the Sowell Claim, Sowell asserted claims against

---

[1] In its various counterclaims and defenses, AIG has previously asserted that the Ryan Plaintiffs fraudulently
induced it to extend coverage under the Policy for an additional month.  AIG has withdrawn these counterclaims and
has represented on the record in various depositions that it will withdraw its remaining defense based on this theory
of misrepresentation.

the Gwynn Plaintiffs, Merit and the Individual Ryan Plaintiffs and their wives. *Ryan Plaintiffs'*

*Statement at* ¶ 10 and *Defendants' Statement,* Exhibit D. Sowell alleged statutory and regulatory

violations against Gwynn for Gwynn's alleged conduct, including allegations of churning the

Merit Account, advising Sowell improperly, making inappropriate trades and committing fraud.

*Ryan Plaintiffs' Statement at* ¶  11 and *Defendants' Statement at* ¶ 39, Exhibit D. In addition,

much of Sowell's claim was addressed to separate business investments that Gwynn and Sowell

had planned apart form Merit and Sowell's account at Merit. *Id.* In his claim, Sowell sought to

hold Merit and the Individual Ryan Plaintiffs liable for Gwynn's conduct under theories, among

other things, of *respondeat superior*, breach of fiduciary duty, and breach of contract. *Id.* In

Count Seven of Sowell's claim, Sowell specifically alleges that the Ryan Plaintiffs were liable

for their failure to supervise Gwynn. *Ryan Plaintiffs' Statement at* ¶  13 and *Defendants'*

*Statement,* Exhibit D. The losses Sowell claims to have suffered began in 2000. *Ryan Plaintiffs'*

*Statement at* ¶ 15.

On September 21, 2001, Merit submitted notice of the Sowell Claim to its local

insurance broker seeking a defense and coverage. Merit's broker forwarded that notice to an NU

broker in New York. *Ryan Plaintiffs' Statement at* ¶ 16. After receiving notice of the claim, on

September 22nd, NU was represented by AIGTS in all subsequent aspects of the handling of the

Sowell Claim with regard to the Ryan Plaintiffs and the Gwynn Plaintiffs. *Ryan Plaintiffs'*

*Statement at* ¶ 17

In early October, 2001, based on the allegations contained on the face of the Sowell

Claim, AIG decided to provide a defense to the Ryan Plaintiffs. *Ryan Plaintiffs' Statement at*

¶18. AIG, through its claims analyst Brian Conlin ("Conlin"), issued a reservation of rights

letter to the Ryan Plaintiffs, which confirmed that AIG had retained an Arizona law firm to defend the Ryan Plaintiffs, subject to that reservation of rights. *Ryan Plaintiffs' Statement at ¶ 18.* Soon thereafter, AIG retained another law firm to defend the Gwynn Plaintiffs, [2] thereby acknowledging the existence of a conflict between the Gwynn Plaintiffs and the Ryan plaintiffs which necessitated separate counsel for the two groups of respondents to the Sowell claim. *Ryan Plaintiffs' Statement at ¶ 19.* AIG neglected to issue a reservation letter to the Gwynn Plaintiffs. *Ryan Plaintiffs' Statement at ¶ 20.* Shortly thereafter, AIG, through Conlin, confirmed its right and duty to defend the Gwynn Plaintiffs when it rejected Gwynn's request to hire a lawyer he knew to be experienced in NASD matters to represent his interests. Conlin for AIG specifically asserted it had the right to select counsel for the defense, a right it would only have if AIG admitted to having a duty to defend under the Policy. *Ryan Plaintiffs' Statement at ¶ 21.*

For the next two months, the Ryan Plaintiffs cooperated with AIG by providing Conlin with all the information he requested. *Ryan Plaintiffs' Statement at ¶ 22.* One document that the Ryan Plaintiffs provided to AIG was a power-of-attorney signed by Sowell. The power-of-attorney was not notarized or witnessed. *Ryan Plaintiffs' Statement at ¶ 23.* At AIG's request, the Ryan Plaintiffs explained that they understood that the power-of-attorney had been provided for Gwynn's use in the event Sowell was unreachable but as far as the Ryan Plaintiffs knew the power-of-attorney had never been used. *Ryan Plaintiffs' Statement at ¶ 24.* The Ryan Plaintiffs also explained that according to their records, Sowell's Merit Account had never been a discretionary account and that Merit had eliminated most discretionary accounts several years

---

[2] Although AIG provided the Ryan Plaintiffs and the Gwynn Plaintiffs with separate counsel because AIG determined that there was a conflict between the two groups of parties, AIG assigned the same claims analyst Brian Conlin, to oversee the Sowell Claim and Arbitration for both the Ryan Plaintiffs and the Gwynn Plaintiffs.

earlier. *Ryan Plaintiffs' Statement at* ¶ 25.   In addition, the Ryan Plaintiffs notified AIG, that Gwynn had advised Merit that Sowell had personally approved all trades. *Id.*  Further, Merit produced evidence that it had contacted Sowell about the activity of his Merit Account and that Sowell had never previously objected to the trading activity in his account. *Ryan Plaintiffs' Statement at* ¶ 26.   AIG asked Gwynn for information and documents.  Some of this information was supplied by Gwynn to the counsel AIG had appointed but Gwynn did not provide the information and documents AIG had requested directly to Conlin. *Ryan Plaintiffs' Statement at* ¶ 27.  Conlin never interviewed Gwynn or any of the Ryan Plaintiffs. *Ryan Plaintiffs' Statement at* ¶ 28.

In early 2002, without obtaining all relevant documents or completing a proper investigation, AIG notified the Ryan Plaintiffs and the Gwynn Plaintiffs that AIG was disclaiming coverage and withdrawing its defense under the Policy. *Ryan Plaintiffs' Statement at* ¶ 29 and *Defendants' Statement at* ¶ 45-49 and Exhibits G and H.   In written notices from Conlin to the Ryan Plaintiffs and Gwynn, AIG claimed that it was disclaiming coverage because it had decided that the Sowell Merit Account was a discretionary account based on the mere existence of the power-of-attorney--even though the Ryan Plaintiffs had already explained to AIG that the power-of-attorney was never used and the account was not discretionary. *Id.*  In discovery, Conlin admitted that he also based his conclusion that Sowell's account was discretionary on his mistaken assumption that 71% of Merit's trading accounts were discretionary accounts. *Ryan Plaintiffs' Statement at* ¶ 30.   This mistaken conclusion was based on Conlin's misreading of NU's underwriting file. *Id.*   In January 2002 after receiving the disclaimer letter from AIG, Bruce Ryan called Conlin and objected to AIG's decision to disclaim

coverage.  *Ryan Plaintiffs' Statement at* ¶  31-32.  Despite the Ryan Plaintiffs' objections, AIG refused to reconsider its decision.  AIG gave no reason for disclaiming coverage other than the alleged fact that the power-of-attorney made the account discretionary.  *Id.*

After AIG disclaimed coverage, the Ryan Plaintiffs made arrangements to hire AIG's appointed counsel, to continue their own defense.  Subsequently the Ryan Plaintiffs hired William Federman as replacement counsel.  *Ryan Plaintiffs' Statement at* ¶ 33.  The Gwynn Plaintiffs initially hired AIG's appointed counsel, Ted Thomason and his associate Maxine Polomski, to provide their defense but eventually found themselves unable to pay.  Thereafter, Gwynn, on behalf of himself and Gwynn Financial, proceeded *pro se* in the Sowell Claim and Mrs. Gwynn went unrepresented, largely because Gwynn did not realize that his wife was also a respondent to the arbitration claim.  *Ryan Plaintiffs' Statement at* ¶ 34.

In October 2002 Sowell's counsel wrote to William Federman with copies to Gwynn and Brian Conlin and advised that the Sowell arbitration had been postponed to January 7, 2003. *Ryan Plaintiffs' Statement at* ¶ 35.  He also advised AIG that the power of attorney signed by Sowell may have been superseded when Sowell subsequently completed an option form for Merit dated March 7, 1998, which indicated there was no power of attorney for his broker. *Ryan Plaintiffs' Statement at* ¶ 35, Exhibit 8.  Sowell through counsel also made a policy limit demand to settle and specifically advised AIG that Sowell was seeking damages in excess of the policy limits.  Despite the fact he received this letter, Conlin admitted that AIG never responded and further that AIG did not reopen its coverage file.  *Ryan Plaintiffs' Statement at* ¶ 35-36. Conlin never sought to investigate the new information provided by Sowell's counsel about the

possibility that the power-of-attorney had been rescinded or repudiated by Sowell. *Ryan Plaintiffs' Statement at* ¶ 36.

In a January 3, 2003 letter, Gwynn's specially retained coverage counsel, John Nicgorski, contacted AIG and threatened to settle with Sowell and assign Gwynn's bad faith claim against AIG under so called *Morris* or *Damron* agreements under Arizona law. *Ryan Plaintiffs' Statement at* ¶ 37. [3]  AIG claims it did not see this letter until January 6, 2003 and it then asked Arizona counsel from the firm of Struckmeyer and Wilson to review the matter. Conlin simply reported to Nicgorski, Gwynn's coverage counsel, that AIG was reviewing the matter. *Ryan Plaintiffs' Statement at* ¶ 39.

During the first three days of the Sowell arbitration hearing, beginning on January 7, 2003, Gwynn appeared pro se. *Ryan Plaintiffs' Statement at* ¶ 40.  By all accounts Gwynn severally compromised the defense for all of the respondents in the Sowell Arbitration. *Ryan Plaintiffs' Statement at* ¶ 41.  He was unprepared, repeatedly stated he did not know the proper procedure, repeatedly stated his insurer was not paying for a defense, produced a massive quantity of documents which had not been timely produced in the arbitration and which had never been seen by the Ryan Plaintiffs or their counsel Attorney Federman. *Id.*  Further Gwynn's appearance undermined his credibility. He looked extremely nervous, was sweating and pale. *Id.*  The Ryan Plaintiffs were represented in the arbitration by Attorney Federman, but

---

[3] Gwynn's counsel also pointed out that AIG's decision to revoke coverage based on the power of attorney was unsupportable because, Gwynn had never been shown the power of attorney by AIG, Sowell's counsel had noted the option trading form signed by Sowell may have revoked the power of attorney, other documents confirmed that Sowell maintained discretion over all accounts, and that Gwynn would confirm that the account was non-discretionary at all times.  Gwynn's counsel also noted that AIG had never investigated the claims by interviewing Gwynn and/or Sowell.  After receiving a copy of the power of attorney from AIG, Gwynn's counsel on January 6, 2003 advised AIG that the power of attorney was invalid under Arizona law because it was not notarized. *Ryan Plaintiffs' Statement at* ¶ 37-38

he did not have an expert witness because the Ryan Plaintiffs did not have the funds to retain an expert when AIG disclaimed its duty to defend. *Ryan Plaintiffs' Statement at* ¶ 42. Further, Federman has testified that his ability to defend was severally compromised by Gwynn's conduct. *Ryan Plaintiffs' Statement at* ¶ 43.

On January 9, 2003, three days after the arbitration had begun, Attorney Jeffrey A. King of Struckmeyer and Wilson advised Conlin that the firm had not yet had an opportunity to complete a coverage analysis. *Ryan Plaintiffs' Statement at* ¶ 44, Exhibit 13. He recommended, nevertheless, that AIG immediately provide a defense for Gwynn and Merit (the Ryan Plaintiffs). *Ryan Plaintiffs' Statement at* ¶ 45, Exhibit13. He based this recommendation on an analysis that providing a defense would bar Gwynn from entering into a *Damron* agreement and would make it more difficult for Gwynn to enter into a *Morris* agreement. *Id.* AIG admits that it was solely based on this advice from Attorney King that it decided to resume providing a defense for the Gwynn Plaintiffs and the Ryan Plaintiffs. *Ryan Plaintiffs' Statement at* ¶ 46.

Accordingly, on January 10, 2003, after three days of the arbitration had been completed, AIG advised Gwynn's coverage counsel that it would provide a defense for Gwynn. *Ryan Plaintiffs' Statement at* ¶ 47. AIG contacted its previously retained defense counsel Tim Thomason and Maxine Polomski. *Id.* Attorney Polomski advised Conlin that Mr. Thomason was unavailable to handle the matter. *Ryan Plaintiffs' Statement at* ¶ 48. Attorney Polomski was then a fourth year associate with no first chair trial experience and no expertise or experience in NASD arbitrations. *Ryan Plaintiffs' Statement at* ¶ 49. Mr. Conlin on behalf of AIG agreed that she could defend Gwynn. *Ryan Plaintiffs' Statement at* ¶ 50. AIG made no effort to insist that a partner or experienced litigator defend the Gwynn Plaintiffs. *Id.* Indeed,

when Polomski advised Conlin over that weekend, that she could not possibly review all the documents and prepare to defend the arbitration with only a weekend to get ready, Conlin advised her not to worry about that problem, since AIG did not expect her to succeed in the defense. *Ryan Plaintiffs' Statement at* ¶ 51. Although AIG had initially agreed in 2001 that the defense required an expert witness, AIG made no effort to retain an expert witness for the Gwynn Plaintiffs or the Ryan Plaintiffs in the arbitration. *Ryan Plaintiffs' Statement at* ¶ 52.

Late on Friday, January 10, 2003, Attorney King also contacted Attorney Federman and offered to provide a defense for the Ryan Plaintiffs. *Ryan Plaintiffs' Statement at* ¶ 53. When Federman advised him that it made no sense to bring in new counsel to defend the Ryan Plaintiffs at that stage of the Sowell Arbitration, King responded that AIG would pay for the defense of the Ryan Plaintiffs and advised that "AIG has not changed its position on coverage." King confirmed these comments in a brief e-mail. *Id.; Defendants' Statement* ¶ 64, Exhibit M. King however, never provided any letter confirming this position as he promised to provide to Federman. *Ryan Plaintiffs' Statement at* ¶ 54. AIG never explained or elaborated on what position it was taking on coverage. *Id.* Further, AIG did not provide any reservation of rights letter to either Gwynn or the Ryan Plaintiffs and did not ever state that it was maintaining its position that no coverage existed. *Ryan Plaintiffs' Statement at* ¶ 55. Moreover, AIG did not disclose that its reason for resuming the defense was solely to protect AIG from Gwynn entering into a *Damron* or *Morris* agreement under Arizona law. *Id.*

On January 10, 2003, AIG was provided with a detailed letter from one of Sowell's attorneys, Frank Moskowitz, explaining how badly Gwynn had performed in the first three days of the Sowell Arbitration hearing and pointing out the financial exposure facing Gwynn and the

Ryan Plaintiffs. *Ryan Plaintiffs' Statement at* ¶ 56; *Defendants' Statement* ¶ 66, Exhibit N.  That letter also explained that the evidence during the first three days of the Sowell Arbitration Hearing from Gwynn and Sowell rebutted any claim of the account being discretionary. *Id.*  AIG never responded to the points made in that letter. *Ryan Plaintiffs' Statement at* ¶ 57.  On January 13, 2006 after the arbitration had resumed Maxine Polomski advised Conlin that she did not believe there was a defense to the action and that AIG should attempt to settle the matter as soon as possible.  *Ryan Plaintiffs' Statement at* ¶ 58-59, Exhibit 16.   Polomski also forwarded two additional letters from Sowell's Counsel, Alan Baskin, which further emphasized the weakness of the defense in the first three days of the arbitration when Gwynn had proceeded without counsel.  *Ryan Plaintiffs' Statement at* ¶ 59, Exhibits 17-18.   Baskin also noted that on behalf of Sowell a major focus of the evidence had been offered to support Sowell's allegations of the Ryan Plaintiffs failure to properly supervise Gwynn.  *Id.*  Baskin also provided information that Sowell's expert would offer testimony for damages in the range of $1.2 million. *Id.*

There is no evidence that AIG took steps to respond to this information. *Ryan Plaintiffs' Statement at* ¶ 60.  AIG did not assist Polomski or Federman at the balance of the Sowell Arbitration hearing on January 13, 14 and 15, 2003.  *Ryan Plaintiffs' Statement at* ¶ 61.  AIG did not authorize the retention of any defense expert and did not try to locate any such expert.  *Ryan Plaintiffs' Statement at* ¶ 62.  AIG's representatives, including Conlin and his then supervisor Jonathan Weber, did not attend or closely monitor the Sowell Arbitration Hearing.  *Ryan Plaintiffs' Statement at* ¶ 64.  Indeed, the evidence from the record is that from January 13, 2003 onward, AIG did nothing to assist in the defense of its insureds.  *Ryan Plaintiffs' Statement at* ¶ 65.  Conlin stopped making entries in his computer file for this matter on January 13, 2003 and

13

AIG now claims the file was transferred at some point thereafter in January 2003, to its coverage department. *Ryan Plaintiffs' Statement at* ¶ 66. AIG, however, failed to advise its insureds or their counsel in the Sowell Arbitration, that Conlin and his claims handling group were no longer handling the file for AIG. *Id.*

On January 16, 2003 Attorney Federman advised Conlin and King in writing of the likelihood of an award for Sowell. *Ryan Plaintiffs' Statement at* ¶ 67, Exhibit 19. He pointed out that while he believed the case might previously have been settled for $240,000, he now thought that Sowell's counsel would want considerably more to settle. He advised that Sowell was seeking about $1.2 million in compensatory damages, plus punitive damages of $500,000 and additional amounts for fees and arbitration expenses. *Id.* Federman specifically advised AIG that;

> The mere entry of an award, no matter the dollar amount, can have a detrimental effect on the individual Respondents Ryan, Newton and Fitzpatrick's ability to continue in the securities industry and will negatively impact their securities licenses as well as directly affect Robert Fitzpatrick's license to practice law in the State of New York.

*Id.* Federman also asked whether AIG wanted to obtain tapes of, evidence or exhibits from or further information concerning the hearing. *Id.* AIG never responded to Federman's letter. *Ryan Plaintiffs' Statement at* ¶ 68.

On February 5, 2003, Federman again wrote to King and Conlin reiterating the potential irreparable harm to the individual insureds from the likely entry of an award against them and the necessity for AIG to try to settle the claim. *Ryan Plaintiffs' Statement at* ¶ 69, Exhibit 20. Federman reminded AIG that Sowell's counsel had made a policy limits settlement overture. *Id.*

AIG ignored this letter also and neither King nor Conlin responded to Federman. *Ryan Plaintiffs' Statement at* ¶ 70.

On February 25, 2003, the Sowell Arbitration panel entered an award against the Ryan Plaintiffs and the Gwynn Plaintiffs, jointly and severally, in the amount of $1,125,000 (the "Award"). *Ryan Plaintiffs' Statement at* ¶ 71; *Defendants' Statement* ¶ 72, Exhibit P. The arbitration panel's decision did not in any way turn on whether the Sowell Merit Account was discretionary or was under the control of the power-of-attorney. The panel expressly held the Ryan Plaintiffs liable for their failure to supervise Gwynn. *Ryan Plaintiffs' Statement at* ¶ 72

After the entry of the Award, the Ryan Plaintiffs, through Federman, repeatedly contacted AIG about a motion to vacate the award. *Ryan Plaintiffs' Statement at* ¶ 73. Similarly, Polomski tried to contact AIG with regard to a motion to vacate. *Id.* Neither Conlin nor King responded to Federman or Polomski. *Id.* Thereafter, Sowell moved to confirm the award in Arizona state court. *Ryan Plaintiffs' Statement at* ¶ 74. Even after Sowell's counsel moved to confirm the Award, AIG still failed to provide defense counsel for the Ryan Plaintiffs or the Gwynn Plaintiffs with any direction as to what steps could be taken to challenge the Award. *Ryan Plaintiffs' Statement at* ¶ 75. Instead, in early March 2003, King took steps with Attorney Donald Wilson to complete the coverage analysis Struckmeyer and Wilson had promised to complete for AIG by January 13, 2003. *Ryan Plaintiffs' Statement at* ¶ 76.

On March 5, 2003 coverage counsel for the Ryan Plaintiffs wrote to King advising him of the bad faith of AIG in not properly defending the Sowell Arbitration and demanding that AIG take some step to protect the Ryan Plaintiffs from the award. *Ryan Plaintiffs' Statement at* ¶ 77, Exhibit 21. On March 5 and March 6, 2003 Federman called repeatedly and wrote to Attorney

King seeking some direction for the defense including permission to appeal the Award. *Ryan Plaintiffs' Statement at* ¶ 78, Exhibit 22. On March 6, 2003 King responded to Federman that he had referred the issues to AIG. *Id.* On March 7, 2003 Struckmeyer and Wilson completed its coverage analysis and provided it via facsimile to Brian Conlin. *Ryan Plaintiffs' Statement at* ¶ 79, Exhibit 23. That analysis is significant since it notes that AIG may have waived any right to contest coverage by its actions. *Id.,* Exhibit 23 at ¶ 11. Indeed, during discovery AIG has admitted that it routinely waives exclusions in policies when AIG finds it expedient to do so for business purposes. *Ryan Plaintiffs' Statement at* ¶ 93.

As of March 14, 2003, AIG still had not authorized Federman or Polomski to appeal the Award or to defend against the Motion to Confirm the Award that Sowell's counsel had filed in Arizona state court. *Ryan Plaintiffs' Statement at* ¶ 80. Coverage counsel for the Ryan Plaintiffs notified Attorney King on that date that if AIG did not take some action to defend the underlying claim and settle and vacate the award, the Ryan Plaintiffs would have to pursue other legal remedies. *Ryan Plaintiffs' Statement at* ¶ 81, Exhibit 24. On March 24, 2003, Attorney King on AIG's behalf authorized Federman and Polomski to appeal the Award but he did not respond to inquiries about settling the Award. *Ryan Plaintiffs' Statement at* ¶ 82, Exhibit 25. On March 25, 2006, coverage counsel for the Ryan Plaintiffs wrote to King demanding that AIG mediate under the Policy. Attorney King did not respond to that demand. *Ryan Plaintiffs' Statement at* ¶ 83, Exhibit 26.

Based on AIG's inaction and in order to protect their rights, on April 9, 2003, the Ryan Plaintiffs commenced this action. *Ryan Plaintiffs' Statement at* ¶ 84-85, Exhibits 27 and 28. A few months after the Ryan Plaintiffs commenced this action, AIG approached Sowell in an

attempt to settle the Award. *Ryan Plaintiffs' Statement at* ¶ 86. In late August or early September, 2003, AIG paid Sowell $1,000,000 to settle his claim. *Ryan Plaintiffs' Statement at* ¶ 87, Exhibits 29 and 30. In return, Sowell agreed to allow the Arizona court to vacate the Award and AIG itself received a release from Sowell. *Id.* In paying to settle with Sowell, AIG issued no reservation of rights letter to the Ryan Plaintiffs or the Gwynn Plaintiffs and at that time gave no hint that the payment was under protest or was subject to any claims or defenses about the Policy. *Ryan Plaintiffs' Statement at* ¶ 88.

AIG knew, or should have known, that under NASD rules and regulations, even though the Award was vacated in the courts, the Ryan Plaintiffs were and are still required to report the nature of the Award in various NASD filings and must disclose the Award to various state and federal regulators. *Ryan Plaintiffs' Statement at* ¶ 89. Due to the Award, the Ryan Plaintiffs remain subject to regulatory investigations. *Ryan Plaintiffs' Statement at* ¶ 90. In fact, the Award and Sowell's Claim continue to be admissible in other NASD proceedings against the Ryan Plaintiffs. *Id.*

## **PLEADINGS**

In April 2003, the Ryan Plaintiffs brought this action against AIG alleging that AIG breached the duty to defend and to indemnify the Ryan Plaintiffs pursuant to a 2000-2001 insurance policy ("Policy"), acted in bad faith and violated the Connecticut Unfair Trade Practices Act. Subsequent to the Ryan Plaintiffs commencing their action, plaintiffs David Gwynn ("Gwynn"), his wife Raquel Gwynn and Gwynn Financial Services, Inc. (collectively

referred to as the "Gwynn Plaintiffs")[4] commenced a related action, *Gwynn et al v. National Union et el,* Docket Number 3:03 CV 01154 (CFD) (the "Gwynn Action").  After AIG settled with Sowell, the Ryan Plaintiffs amended their complaint on December 17, 2003 to reflect the fact that AIG had mitigated some of the potential damages in the case by settling with Sowell. On April 26, 2004, the Court consolidated the Gwynn Action with this action for all pre-trial purposes.

After filing a motion to dismiss on January 27, 2004, which this Court denied on August 30, 2004, the AIG Defendants filed their initial Answer and Special Defenses to the Ryan Plaintiffs action on October, 14, 2004.   At that time AIG asserted no counterclaims.   With leave of this Court, on September 16, 2005, AIG filed an amended Answer, Special Defenses and Counterclaims against the Ryan Plaintiffs.  AIG asserted in its Counterclaims that its decisions to insure and defend the Ryan Plaintiffs in 2001 were in some way induced by fraud of the Ryan Plaintiffs.   Further, AIG asserted that its decision to resume the defense of the Ryan Plaintiffs and the Gwynn Plaintiffs in January 2003 and AIG's decision to pay Sowell in August 2003 were also in some way induced by fraud of the Ryan Plaintiffs.  Specifically, AIG asserted five claims, fraud, negligent misrepresentation, breach of contract, breach of the implied covenant of good faith and fair dealing and unjust enrichment.

On February 6, 2006, AIG moved for permission to file its second amended defenses and amended counterclaims.  The new Counterclaims of AIG abandoned the prior claims for fraud, breach of contract and breach of the covenant of good faith and fair dealing.  AIG's new Counterclaims against the Ryan Plaintiffs asserted a claim for declaratory judgment that

---

[4] The Gwynn Plaintiffs subsequently dropped Gwynn Financial Services as a plaintiff to maintain complete diversity since Gwynn Financial and AIG are both organized under Delaware law.

retroactively there was no coverage under the Policy, rescission of the Policy based on a claimed

misrepresentation in a renewal application that was submitted in July or August of 2001, and

unjust enrichment as a result of AIG paying defense costs and the settlement of the Sowell

Claim.

The Ryan Plaintiffs moved to dismiss the unjust enrichment claim on May 5, 2006.[5]  On

August 8, 2006 AIG amended its counterclaims again. This time AIG dropped its claims of

Fraud and misrepresentation against the Ryan Plaintiffs.  Thus, the only operative Counterclaims

are the Claim seeking a retroactive declaration of no coverage and the claim for unjust

enrichment which remains subject to the Ryan Plaintiffs' pending motion to dismiss. [6]

## ARGUMENT

### I.    LEGAL STANDARD

Summary judgment is properly granted "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits…show that there is no genuine

issue of material fact and that the moving party is entitled to judgment as a matter of law."

Fed.R.Civ.P. 56(c).  The movant "bears the burden of establishing that no genuine issue of

material fact exists and that the undisputed facts establish [its] right to judgment as a matter of

law."  *Chicago Title Ins. Co. v. Kent School Corp.,* 361 F.Supp.2d 4, 6 (2005), *quoting,*

*Rodriguez v. City of New York,* 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citations omitted).  A

genuine issue of material fact exists in the event "evidence is such that a reasonable jury could

---

[5] That motion to dismiss is still pending before the Court.
[6] AIG still has a pending defense based upon misrepresentation, but Counsel for AIG has represented on the record during depositions that that defense will be withdrawn by AIG.

return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding on a motion for summary judgment, the court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.). "[O]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849 (1991). "Summary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." *Suarez v. Dickmont Plastics Corp.,* 229 Conn. 99, 111 (1994).

Based on the record before the Court, AIG has failed to meet its burden that no genuine issues of material fact exist. Thus, AIG's motion for summary judgment must be denied.

## II. UNDER THE CLEAR TERMS OF THE POLICY AIG HAD A DUTY TO DEFEND THE RYAN PLAINTIFFS AGAINST THE SOWELL CLAIMS.

### A. The Duty to Defend is Broader than Coverage

In its motion for Summary Judgment AIG asserts that because three exclusions apply to the facts of the underlying claim, it never had any duty to defend or cover the Ryan Plaintiffs. This analysis is wholly inconsistent with AIG's own conduct and legal analyses during the first five years of this legal dispute and is based on nearly willful misreading of the Policy and the underlying Sowell claim. Further, AIG ignores the guiding principals of Connecticut law that mandates that an insurer has duty of defense which is far broader than the duty to indemnify.

It is well settled that "an insurer's duty to defend [is] much broader in scope and application than its duty to indemnify, [and] … [t]he obligation of the insurer to defend does not

20

depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his compliant, stated facts which bring the injury within the coverage." *OSP, Inc. v. Aetna Casualty & Surety Co.,* 256 Conn. 343, 350-51 (2001); *Schwartz v. Stevenson,* 37 Conn. App. 581, 585 (1995).

"[A]n insurer's duty to defend . . . is determined by reference to the allegations contained in the [injured party's] complaint . . . The duty to defend an insured arises if the complaint states a cause of action which appears on its face to be within the terms of the policy coverage." *Lightowler v. Continental Ins. Co.,* 255 Conn. 639, 643 n. 7 (2001); *Imperial Casualty and Indemnity Co. v. State,* 246 Conn. 313, 324 (1998), *quoting, Hogle v. Hogle,* 167 Conn. 572, 576 (1975).

"Because the duty to defend has a broader aspect than the duty to indemnify and does not depend on whether the injured party will prevail against the insured; *Missionaries of the Co. of Mary, Inc. v. Aetna Casualty & Surety Co.,* 155 Conn. 104, 110 (1967); if an allegation of the complaint falls even *possibly* within the coverage, then the insurance company must defend the insured." (emphasis in the original) *Imperial Casualty and Indemnity Co. v. State,* 246 Conn. 313, 324 (1998), *quoting, West Haven v. Commercial Union Ins. Co.,* 894 F.2d 540, 544 (2d Cir. 1990), *quoting, West Haven v. Liberty Mutual Ins. Co.,* 639 F. Supp. 1012, 1017 (D.Conn. 1986); *see Schwartz v. Stevenson,* 37 Conn. App. 581 (1995).

"If the complaint states different causes of action or theories of recovery against the insured and one such cause is within the coverage of the policy, the insurer is bound to defend the whole suit." *Schurgest v. Schuman,* 156 Conn. 471, 490 (1968). Courts interpret broad

policy language in favor of imposing a duty to defend on the insurer. *Hartford Casualty Ins. Co. v. Litchfield Mutual Fire Ins. Co.,* 274 Conn. 457 (2005).

      **B.**    <u>**Sowell's Claims Fall Within Coverage under the Policy.**</u>

On the facts of this case it cannot be disputed that the allegations of the Sowell Claim fall squarely within the coverage of the Policy.   Section A of the "insuring agreements" section of the Policy is entitled "Broker/Dealer Professional Liability Insurance (Including Failure to Supervise).   Under this section, the Policy (emphasis supplied) specifically states that:

> This policy shall pay on behalf of the Broker/Dealer Loss arising from a Claim first made against the Broker/Dealer during the Policy Period or the Discovery Period (if applicable) and reported in writing to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act committed by the Broker/Dealer:
>
> 1) in the rendering or failure to render Professional Services by the Broker/Dealer; or
>
> 2) in **Failing to Supervise a Registered Representative in the rendering or failure to render Professional Services by such Registered Representative on the behalf of the Broker/Dealer;** or
>
> 3) in **Failing to Supervise a Registered Representative in connection with any activity of the Registered Representative OTHER THAN the rendering or failure to render Professional Services by such Registered Representative on the behalf of the Broker/Dealer.**

The Policy defines Failure to Supervise as:

> [f]ailure to create, implement, enact or enforce any applicable supervisory procedures required by law, common or statutory, regulation, governmental authority or regulatory authority or self-regulatory authority, including but not limited to the procedures established by the National Association of Securities Dealers as outlined in Section 3010 of the NASD, Inc. Manual, and any amendments thereto.

This express language provides coverage to the Ryan Plaintiffs in the event a claim of failure to supervise is levied against them.  Significantly, the Policy covers failures to supervise conduct of Merit's registered representative both in rending professional services on behalf of the broker dealer and for activity of the registered representative other than rendering profession services on behalf of the broker dealer.

From the out set, Sowell has alleged failure to supervise against the Ryan Plaintiffs. Indeed, Sowell includes an entire separate count, Count Seven, which incorporates all of the facts of the Sowell's claim and expressly alleges the Ryan Plaintiffs are liable for a failure to supervise Gwynn. *Ryan Plaintiffs' Statement at* ¶ 13; *Defendants' Statement at* Exhibit D ¶ 177-120.   AIG admits that this claim falls within the scope of the insuring agreement.  *Ryan Plaintiffs' Statement at* ¶ 96.  Similarly Sowell's Claim also included specific claims based on negligence and making unsuitable investments recommendations.  *Defendants' Statement at* Exhibit D.  All of these allegations fall within the scope of the insuring agreement and are grounds for affording a defense based on the four corners of Sowell's Claim.  Because the Policy applies to the failure to supervise count, the negligence count and unsuitable investment claim, AIG had a duty to defend the Ryan Plaintiffs for all the remaining counts of the Claim. *Schurgest,* 156 Conn. 471, 490 (1968).

In evaluating the duty to defend, this Court can also look to AIG's own conduct.  From October 2001, through AIG's retention of new counsel in this case in January 2006, AIG never asserted that it had no duty to defend the Ryan Plaintiffs based on the four corners of Sowell Claim.   Indeed, in October 2001 AIG agreed to defend the Ryan Plaintiffs and the Gwynn Plaintiffs based on the face of the Sowell Claim, which was supplied to AIG on October 11,

2001. *Ryan Plaintiffs' Statement at* ¶ 18 and *Defendants Statement at* ¶ 40, Exhibit F.  AIG never

told the Ryan Plaintiffs it had reversed its decision that the face of Sowell Claim required AIG to

supply a defense.  Instead, without regard to the requirements of Connecticut law, AIG purported

to withdraw its defense based on Conlin's investigation into the existence of the power-of-

attorney that Sowell had supplied to Gwynn in 1998. [7]  Thus, when AIG purported to disclaim

coverage, in its letters dated January 24, 2002, AIG did so based upon its claimed investigation. [8]

In Conlin's January 24, 2002 letter to Ryan, AIG specifically stated:

> **During our investigation** of this matter **we uncovered the fact** that Mr. Sowell signed a
> power of attorney dated March 7, 1998 giving Mr. Gwynn the "power to give an[d] place
> any and all orders."
>
> Accordingly, pursuant to exclusion (s) under your policy, coverage is not available for
> you in this matter.  Consequently, AIG would neither be indemnifying you nor paying for
> any defense costs incurred after January 12, 2002.  .  .  .

*Defendants' Statement at* ¶ 46, Exhibit H, p. 1 (emphasis supplied) and *Ryan Plaintiffs'*

*Statement at* ¶ 29.  At no time did AIG ever give any written notice to the Ryan Plaintiffs

or the Gwynn Plaintiffs which stated that AIG had no duty to defend based on the four

corners of Sowell's Claim.  Thus, this Court may properly infer that the face of the

Sowell Claim did impose a duty of defense on AIG.

---

[7] AIG never purported to determine which law applied although it clearly did not follow the four corners rule under Connecticut law pursuant to which the duty to defend is initially measured.  *Ryan Plaintiffs' Statement at* ¶ 97.  Because the Ryan Plaintiffs are based in Connecticut and because the Policy was issued to Merit a Connecticut based Broker Dealer, the Ryan Plaintiffs assert that Connecticut law governs coverage in this case. AIG has not disputed that assertion

[8] AIG also ignored its duty to properly investigate if it was entitled to withdraw a defense based on investigation.   Conlin was on notice of facts which challenged the applicability of the power-of-attorney, but never investigated those facts. Further he was on notice that Merit thought the account was non-discretionary but he never conducted interviews, obtained Gwynn's documents, sought legal counsel on whether the power-of-attorney was operative under Arizona law or did anything to investigate his incorrect conclusion that 71% of Merit's accounts were discretionary.   Under Connecticut law the insurer cannot rely on the face of the complaint to deny its duty to defend if it is on notice of facts which suggest the claim does fall with in the coverage.  *Hartford Casualty Insurance Co. v Litchfield Mutual Fire Insurance Co.*, 274 Conn. 457 (2005).

III.    **AIG FAILED TO PROVE THAT THE EXCLUSIONS DEFEAT ITS DUTY TO DEFEND UNDER POLICY**

AIG admits that the Policy's insuring provisions covered Sowell's Claim and Amended Claim, it contends however, that it may avoid coverage and its duty to defend based on certain policy exclusions.  Indeed, the linchpin of AIG's summary judgment motion is that the exclusions in the Policy apply to deny the Ryan Plaintiffs' coverage and therefore defeat the duty to defend.  AIG cannot prove that any exclusion applies to relieve its duty to defend.

"[W]hen an exclusion clause is relied upon to deny coverage, the insurer has the burden of demonstrating that the allegations of the complaint cast that pleading solely and entirely within the policy exclusions, and further, that the allegations *in toto,* are subject to no other interpretation." (Emphasis in the original.) *State of N.Y. v. Amro Realty Corp.,* 936, F.2d 1420, 1427 (2d Cir.1991), cited in *Berdon v. Chicago Title Ins. Co, Inc.,* Superior Court, judicial district of New Haven, at New Haven, Docket No. 304940, (April 23, 1996, *Burns, J.*). "[E]xclusions from insurance policy coverage are given strict constructions", *Kimmins Indus. Serv. Copr. v. Reliance Ins. Co.,* 19 F.3d 78, 81 (2d Cir. 1994) (citation omitted), and are "[g]iven the interpretation most beneficial to the insured." *M.H. Lipiner & Son, Inc., v. Hanover Ins. Co.,* 869 F.2d 686, 687 (2d Cir. 1989); *see generally Wentland v. American Equity Ins. Co.,* 267 Conn. 592 (2004).[9]

---

[9] "Under our law, the terms of an insurance policy are to be construed according to the general rules of contract construction ⋯ The determinative question is the intent of the parties, that is, what coverage the ⋯ [insured] expected to receive and what the [insurer] was to provide, as disclosed by the provisions of the policy ⋯ If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning ⋯ However, [w]hen the words of an insurance contract are, without violence, susceptible of two [equally reasonable] interpretations, that which will sustain the claim and cover the loss must, in preference, be adopted ⋯ This rule of construction favorable to the insured extends to exclusion

The Claim and Amended Claim comprise of fifteen counts, thirteen of which Sowell brought against the Ryan Plaintiffs, including Violation of A.R.S. §44-1841 (Count One); Violation of A.R.S. §44-1991 (Count Two); Churning (Count Three); Negligence (Count Four); Intentional Fraud and Fraud by Non-Disclosure (Count Five); Negligent Misrepresentation (Count Six); Negligent Supervision (Count Seven); Breach of Fiduciary Duty (Count Eight); Violations of NASD and NYSE Rules (Count Nine); Violation of A.R.S. §44-3241 (Count Ten); Violation of A.R.S. §44-1522 (Count Eleven); Punitive Damage (Count Twelve); and Breach of Contract (Count Thirteen). The numerous claims and allegations in the Claim and Amended Claim are so broad that AIG cannot demonstrate that the entire Claim and Amended Claim fit solely into one of the exclusions.

Indeed, AIG does not even attempt to meet its burden to prove the applicability of the cited exclusions to all elements of Sowell's Claim. No where in its Summary Judgment Memorandum does AIG purport to analyze each claim and each factual component of the Sowell Claim. Instead, AIG attempts to rely on a broad brush attempt to paint the entire Sowell Claim to fit its narrowly tailored exclusions. Not withstanding AIG's assertions, the exclusions do not apply to all of the separate causes of action and factual components of the claims and do not relieve AIG of its duty to defend.

clauses." (Citations omitted.) *Allstate Ins. Co. v. Barron,* 269 Conn. 394 (2004); *see Imperial Casualty & Indemnity Co. v. State,* 246 Conn. 313, 324-25 (1998); *Chicago Title Ins. Co. v. Kent School Corp.,* 361 F.Supp.2d 4 (2005).

### A.      Exclusion (s) of the Policy Does Not Defeat AIG's Duty to Defend.

Exclusion (s) of the Policy states:

> [t]he Insurer shall not be liable for Loss in connection with any Claim
> made against an Insured, alleging, arising out of, based upon or
> attributable to an Insured exercising discretionary authority or control with
> regard to management or disposition of assets; however, this exclusion
> shall not apply to any Insured's purchase or sale of no-load investment
> company or variable annuities in which there is no initial or contingent
> sales charge or commission.

The Claim and Amended Claim do not fall solely within this exclusion.   Although the Sowell

Claim does refer to the power-of-attorney in a few places and includes an allegation that

Sowell's Merit account was discretionary, it cannot be seriously contended that the entire Sowell

Claim is based on the account being discretionary.  There is no specific reference to discretionary

trading in Count Seven that asserts that the Ryan Plaintiffs are liable for failing to supervise

Sowell.  Similarly there is no specific reference to discretionary trading in the count which seeks

to hold all defendants liable for negligence, Count Four, of the Sowell Claim.  Further to the

extent Sowell's Claim includes an allegation in Count Nine that Gwynn recommended unsuitable

investments that claim clearly is not predicated on discretionary trading but rather turns on

Sowell choosing to invest in recommendations from Gwynn that did not fit the investment

objective previously identified by Sowell.

Further, AIG witnesses have admitted that an allegation of a discretionary account or

discretionary authority or control would not automatically be cause to deny coverage.  *Ryan*

*Plaintiffs' Statement* ¶ 94-96.  In addition, AIG admits that the Policy does not define what

constitutes a "discretionary account." *Ryan Plaintiffs' Statement* ¶ 94-96.  Based on AIG's

27

conduct, AIG cannot say with any certainty when this exclusion would apply to deny coverage. AIG's own interpretation of the exclusion is vague and open to multiple interpretations. Conlin initially testified that exclusion (s) required the actual exercise of discretionary control, where as Jonathan Weber claimed that the mere allegation of the existence of a discretionary account was sufficient to trigger exclusion (s). *Id.* This ambiguity must be resolved in the Ryan Plaintiffs' favor. *M.H. Lipiner & Son, Inc.,* 869 F.2d 686, 687 (2d Cir. 1989).

Furthermore, a discretionary account is a specific type of an account that a customer can open with a broker. It is defined as "[a]n account in which the customer gives the broker discretion, as to purchase and sales of securities or commodities, including selection timing and price to be paid or received." *Stevens v. Abbott, Proctor and Paint,* 288 F. Supp. 836, 839 n. 2 (D.C. Va. 1968). Sowell's Merit Account was not opened as a "discretionary account." *Ryan Plaintiffs' Statement* ¶ 25. In fact, Merit sent Sowell several notices to alert him that there was substantial activity in his Merit Account. Merit asked Sowell to countersign at least one notice and send it back to Merit to confirm that Sowell knew of and had approved the transactions in his account. Sowell did so. *Ryan Plaintiffs' Statement* ¶ 25, Exhibit 4. As AIG admits, the Ryan Plaintiffs provided this information to AIG prior to AIG denying coverage in January, 2002. *Ryan Plaintiffs' Statement* ¶ 22. Under Connecticut law AIG was charged with a duty to investigate facts which despite the allegations of the claim clearly would establish coverage. *See Hartford Casualty Insurance Co.,* 274 Conn. 457 (2005). But AIG must concede it never investigated the facts raised by the Ryan Plain tiffs which contradicted the parts of the Sowell claim that characterized the account as discretionary.

AIG next tries to manipulate the definition of a "discretionary account" to mean "churning" to avoid its duty to defend. "Churning is a synonym for overtrading, and simply refers to the excessive rate of turnover in a controlled account for the purpose of increasing the amount of commissions." *Smith v. Petrou,* 705 F. Supp. 183, 187 (S.D.N.Y. 1989), *quoting, Armstrong v. McAlpin,* 699 F.2d 79, 19 (2d Cir. 1983) (citations omitted); *see also Newburger, Loeb & Co. v. Gross,* 563 F.2d 1057, 1069 (2d Cir. 1977), *cert denied,* 434 U.S. 1035 (1978). "Churning is a type of fraud that is defined as excessive trading in an account controlled by the broker, for the primary purpose of generating commissions, in contravention of an investor's expressed investment goals." *Nilsen v. Prudential-Bache Securities,* 761 F.Supp. 279, 289 (S.D.N.Y. 1991) (internal quotations omitted). Based on this definition, churning occurs when a broker takes control and overtrades an account without permission. As noted, a "discretionary account" is a specific type of account where the customer actually permits the broker to trade based on her discretion. Thus, "churning" does not automatically equate to a discretionary account. In point of fact, AIG's argument that "churning" an account automatically means that there is a discretionary account only serves to highlight that there are multiple interpretations of discretionary that are not resolved when reading this exclusion.

Furthermore, exclusion (s) does not state that any claims of "churning" are excluded from coverage. Indeed, the exclusion is silent as to a "churning" claim. AIG's corporate witness admitted that AIG routinely does defend churning claims. *Ryan Plaintiffs' Statement* ¶ 95. Obviously exclusion (s) cannot exclude all churning claims on a theory that churning involves "control" if AIG regularly defends churning claims. Thus, AIG cannot rely on exclusion (s) to deny coverage based on a claims of churning.

AIG also cannot deny coverage under exclusion (s) based on the power of attorney Sowell executed providing Gwynn with the power to make trades without seeking Sowell's permission, in the event Sowell was away on vacation.  Sowell's own counsel denied the power of attorney was applicable and noted it may have been revoked or superseded by Sowell's subsequent actions.  *Ryan Plaintiffs' Statement* ¶ 35.  Gwynn and the Ryan Plaintiffs advised AIG from the outset and the uncontradicted testimony at the Arbitration was that the power of attorney was **never** used by Gwynn and was never executed properly.  A power of attorney that may or may not have been executed properly and was never used is not enough to trigger exclusion (s).

Moreover, the Ryan Plaintiffs' clear intent in obtaining the Policy was to protect against claims of failure to supervise.  If the Court were to accept AIG's tortured reading of exclusion (s), the Policy would be moot.  The clear intent of the Ryan Plaintiffs entering into the Policy was to afford them protection from claims of failure to supervise.  Pursuant to AIG's interpretation of exclusion (s), any time a broker, unbeknownst to his or her employer, took control over an account the Policy would not protect the company for failure to supervise.  Such a broad reading of the exclusion is without merit.

Based on the ambiguities revolving around the definition of "discretionary account" AIG's duty to defend was not extinguished by exclusion (s).  Further, AIG cannot meet its burden to prove each element of Sowell's Claim clearly falls within exclusion (s) to eliminate any possibility of coverage and the duty to defend.

**B.    Exclusion (f) Does Not Defeat AIG's Duty To Defend.**

AIG never relied upon exclusion (f) to deny coverage in any notice ever given to the

Ryan Plaintiffs. Now years after the fact, AIG tries to claim that the facts at issue in Sowell's

claim predate the Policy period.

Exclusion (f) of the Policy states:

> "[t]he Insurer shall not be liable for Loss in connection with any Claim
> made against an Insured, arising out of, based upon or attributable to any
> Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of
> the Declarations or arising out of any subsequent Interrelated Wrongful
> Act.

"Loss" under the Policy means "[d]amages, judgments, settlements and Defense Costs…

The Policy defines Wrongful Act and Interrelated Wrongful Act as:

> "Wrongful Act" means any act, error or omission by the Broker/Dealer,
> any director, officer, partner or employee thereof, or by any Registered
> Representative, in their respective capacities as such.

> "Interrelated Wrongful Act(s)" means Wrongful Acts which are the same,
> related or continuous, or Wrongful Acts which arise from the same,
> related or common nexus of facts regardless of whether such Claims
> involve the same or different claimants, Insureds or legal causes of action.
> Further, and without limiting the aforementioned, the following Claims
> shall automatically be deemed to allege Interrelated Wrongful Acts:

> 1.    Claims in connection with securities of any entity (or affiliated
> entities) which become(s) the subject of any bankruptcy, insolvency,
> receivership, liquidation or reorganization proceeding, or

> 2.    Claims in connection with securities purchased in connection with
> an offering (or series of offerings) of securities issued by the same entity
> or affiliated entities.

The Retroactive Date was August 23, 1999 and the Sowell Claim clear allege that the

relationship between Gwynn and Sowell started before that date.  Yet when AIG received the

Sowell Claim it agreed to defend the Ryan Plaintiffs and at no time through AIG's settlement

31

with Sowell did AIG ever assert that all of Sowell's claims were barred by the Retroactive Date or that the Retroactive Date was a basis to deny AIG's duty to defend.

Clearly many of the activities and actions of Gwynn which are the subject of Sowell's claim occurred after the Retroactive Date. Some of Sowell's claims are not identified as having started prior to the retroactive date such as the claims of Negligence, Failure to Supervise and recommending unsuitable trades. Further Sowell's Claims actually allege that Sowell's Merit account peaked in value as of the end of 1999 and early 2000, at which time Sowell did not have losses but had actually made several hundreds of thousands of dollars as a result of his trading activities with Gwynn. *Defendants' Statement,* Exhibit D ¶ 29-30. Thus, there was no Loss for Sowell prior to 2000. Based on the Amended Claim, it was not until April, 2000 that the Sowell Merit Account experienced any Loss [Amended Claim pgs. 10 para. 29-30]. As of April, 2000, the Policy was in full force and effect. Thus AIG's belated attempt to fashion an escape from its duty to defend under exclusion (f) must fail. The acts at issue which caused Loss under the Policy occurred within the Policy period and are not excluded from coverage.

### C.     Exclusion (t) Does Not Defeat AIG's Duty to Defend.

At no time prior to settling with Sowell did AIG ever deny coverage under exclusion (t). Further, during that period AIG never used exclusion (t) to deny its duty to defend. Moreover, AIG has never reserved its right to bring a claim of no coverage under exclusion (t). Thus, AIG has waived any right it may have had to deny coverage under that exclusion. *See Hydro Systems, Inc. v. Continental Ins. Co.,* 929 F.2d 472, 476 (9th Cir. 1991). Despite this, AIG has also failed to demonstrate that all of the allegations in Sowell's Claim falls within this exclusion.

Exclusion (t) of the Policy states:

> "[t]he Insurer shall not be liable for Loss in connection with any Claim made against an Insured, alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims[10] arising out an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership.

The plain meaning of this exclusion is to exclude coverage in the event an Insured is sued based on his or her position with a company *other than* the Broker/Dealer.  The Amended Claim makes certain allegations regarding companies, other than Merit, that Sowell and Gwynn invested in together, including Novation Financial Corporation, Charter Financial Network, Inc. and Charter 3, Inc.  *Defendants' Statement,* Exhibit D. The Amended Claim alleges that all of these companies were owned and operated by Gwynn not the Ryan Plaintiffs.  *Defendants' Statement*, Exhibit D at ¶ 32, 45 and 56.  Thus, the exclusion does not apply to the Ryan Plaintiffs based on the allegations of the Amended Claim.  Further, given the very limited nature of this exclusion it plainly does not apply to all of the allegations Sowell makes about Gwynn's activities in his capacity as a merit broker or with regards to Sowell's Merit account.  Thus there is no way exclusion (t) can defeat AIG's duty to defend.

---

[10] Under the Policy,

"Claim" means the following brought by an Insured's customer or client in such capacity:
    (1)  a written demand for monetary relief; or
    (2)  a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by:
        (i)       service of a complaint or similar pleading; or
        (ii)      receipt or filing of an arbitration demand or statement of claim.

IV.    **WHETHER AIG WAIVED ITS RIGHT TO BRING CLAIMS OF NON-COVERAGE IS A GENUINE ISSUE OF MATERIAL FACT THAT PRECLUDES SUMMARY JUDGMENT**

Under, Connecticut law, waiver is the "intentional relinquishment of a known right." *Town of Andover v. Harford Accident and Indemnity Co.,* 153 Conn. 439, 444 (1966).[11]  Waiver can be either express or may consist of acts or conduct " 'from which waiver may be implied.' " *Andover v. Harford Accident & Indemnity Co.,* 153 Conn. 439, 445 (1966) "An insurer waives its right to disclaim based upon a breach of a policy condition if it has knowledge of the facts giving rise to the disclaimer, but elects to continue its defense." *National Union Fire Ins. Co. v. Mastroni,* 754 F. Supp. 269, 272 (D. Conn. 1990), *citing Arton v. Liberty Mutual Ins. Co.,* 163 Conn. 127 (1972).  An insurer waives its right to raise non-coverage defenses not revealed to the insured when the claim is originally denied.  *See Hydro Systems, Inc. v. Continental Ins. Co.,* 929 F.2d 472, 476 (9th Cir. 1991).  "An example of a situation where waiver arises is when an insurer settles a case 'voluntarily and with knowledge of facts indicating noncoverage…" *Scognamiglio v. Liberty Mutual Fire Ins. Co.,* 2005 WL 2434322 (Conn. Super. September 7, 2005, *Jennings, J.*), *quoting, Employers Mut. Liability Ins. Co. v. Sears Roebuck,* 621 F.2d 746 (5th Cir. 1980).

Whether or not AIG waived its right to bring its claims of non-coverage due to its conduct in handling the Claim and Amended Claim involves genuine issues of material fact. On the record before this Court, however, there is overwhelming evidence of a waiver by AIG which Plaintiffs expect to be able to prove at trial.

---

[11] In *Andover v. Harford Accident & Indemnity Co.,* 153 Conn at 445 (the court found that the insurance company waived any right to avoid its duty to defend when "the [insurance] company, after receipt of the obviously late notice from the town, caused an attorney to file a general appearance without a disclaimer or reservation of its rights and actually proceeded with the defense...)

**A.      AIG's January 24, 2002 Denial Of Coverage Based On Exclusion (S)**

From October, 2001 through January, 2002, AIG, through Conlin, was investigating the Sowell Claim. *Ryan Plaintiffs' Statement* ¶ 18-19; *Defendants' Statement*, Exhibit D.  During the investigation, Conlin focused much of his attention on the allegations contained in the Sowell Claim.  *Id.*  After completing the investigation, AIG determined that the Sowell Claim was not covered under the Policy and denied the Ryan Plaintiffs coverage ("Denial Letter").  *Id. Defendants' Statement* ¶ 45-49, Exhibits G and H.  The sole basis for AIG's denial of coverage was exclusion (s) of the Policy -- that the Sowell Merit Account was a discretionary account. AIG **never** notified the Ryan Plaintiffs that coverage was being denied for any reason other than exclusion (s).  When AIG resumed coverage they did **not** provide the Ryan Plaintiffs or the Gwynn Plaintiffs with a new reservation of rights letter.  Thus, as of January, 2003, the Ryan Plaintiffs had no idea that AIG had any claims of non-coverage or on what those claims for non-coverage were based

**B.      AIG Failed To Provide A Reservation Of Rights After Denying Coverage**

> To be effective, a reservation of rights which had been asserted by the insurer must clearly and unambiguously inform the insured of the insurer's position.  The adequacy of the reservation is determined, not by the insurer's subjective intent, but by whether the reservation "fairly informs" the insured of the insurer's position.  An insurer that agrees to pay a claim with either constructive or actual knowledge of the applicable facts, and without reserving the right to assert a claim of fraud for nondisclosure in the insurance application, waives or is estopped from asserting these defenses unless it has specifically reserved its right to do so.

*St. Katherine Ins. Co. v. Shay,* 1996 WL 477058 * 1 (9th Cir. 1996) (internal citations omitted); *see generally* 44 Am.Jur.2d *Insurance* § 1426, pp. 373-74 (1982) ( "[A] reservation of rights ... to

be effective, must be communicated to the insured. Such notice of a reservation of the insurer's rights must fairly inform the insured of the insurer's position....")[12].  AIG failed to reserve any rights to bring non-coverage claims against the Ryan Plaintiffs.  Thus, its claims should be precluded.

AIG **never** sent the Ryan Plaintiffs a reservation of rights letter when it decided to resume coverage in the middle of the Sowell Arbitration in January, 2003.  The Ryan Plaintiffs concede there was a reservation of rights letter dated October 15, 2001.  However, AIG disclaimed coverage after it sent that reservation of rights letter and refused to provide the Ryan Plaintiffs with any coverage for almost a year after that date.  Thus, the October, 2001 reservation of rights letter was voided by AIG's subsequent denial of coverage.  AIG never sent a new letter explaining under what terms AIG was defending in January 2003 and in no way clarified what rights it was reserving at that time.

###  C.  AIG Waived Rights When It Voluntarily Settled The Sowell Claim

An insurer waives its rights to bring claims against an insured when it settles a case "voluntarily and with knowledge of facts indicating non coverage ···" *Employers Mutual Liability Ins. Co. v. Sears Roebuck,* 621 F.2d 746 (5th Cir. 1980) *see American Re-insurance Corp. v. Doyle,* 266 F.2d 574, 575 (2d Cir. 1959) (once an insurer authorizes a settlement it "[i]s estopped from later asserting non-liability under its policy").  An insurer is precluded from reimbursement of defense costs and/or settlement costs if the reservation of rights letter fails to notify the insured that the insurer has such rights.  *see Ranger Ins. Co. v. Avemco Ins. Co.,* 1999

---

[12] *See also Transamerica Ins. Group v. Beem,* 652 F.2d 663 (6th Cir. 1981) (insurer failed to provide a supplemental reservation of rights letter after providing a defense to insured); *D.E.M. v. Allickson,* 555 N.W. 2d 596, 599 (N.D. 1996).  *Willis Corroon Corp. v. Home Ins. Co.,* 203 F.3d 449, 452 (7th Cir. 2000) (the insurer can protect itself from being estopped from raising defenses to an insured's claims by filing a declaratory judgment action).

WL 1421657 (D. Conn Dec. 3, 1999); *see United Nat'l Ins. Co. v. SST Fitness Corp.,* 309 F.3d

914, 919 (6th Cir. 2002) (defense costs only recoverable if specifically stated in reservation of

rights letter); *see United Nat'l Ins. Co. v. SST Fitness Corp.,* 309 F.3d 914, 919 (6th Cir. 2002)

(defense costs only recoverable if specifically stated in reservation of rights letter). [13]

　　　　AIG voluntarily and unilaterally settled Sowell's Claims after the Ryan Plaintiffs

commenced this action.  At that time AIG had retained litigation counsel in this action, and had

Struckmeyer and Wilson available to review all issues pertaining to coverage.  Neither before

nor after settling Sowell's claims, did AIG send any notification to the Ryan Plaintiffs or the

Gwynn Plaintiffs that it would seek reimbursement of any defense costs and/or the $1,000,000

settlement.[14]  Without such a notice, AIG is precluded by law from seeking recovery of that

money from the Ryan Plaintiffs and the Gwynn Plaintiffs.  AIG is also precluded from making

any claims of non-coverage.

### D.　　AIG Failed To Bring A Timely Declaratory Judgment Action

　　　　"[T]o preserve its rights to bring a declaratory judgment claim, [an insurer] should

'defend under a reservation of its right to contest coverage under the various avenues which

would subsequently be open to it for that purpose.' An alternative means of protection would be

a declaratory judgment action to determine its obligation to defend."  *Patterson v. American Mut.*

---

[13] *See Chicago Title Ins. Co. v. Kent School Corp.,* 36 1F.Supp.2d 4 (2005) (court found that insurer was not released from duty to defend simply based on payment of policy limit).

[14] Numerous courts have held that an insurer waived and was estopped from raising any valid coverage defense because the insurer failed to file a proper reservation of rights letter or to bring a declaratory judgment action. *Beckwith Machinery Co. v. Travelers Indemnity Co.,* 638 F. Supp. 1179, 1187 (W.D.Pa. 1986)(defendant estopped from raising coverage defenses after providing plaintiff with coverage for thirteen months then disclaiming coverage);  *Aetna Life and Casualty Co. v. McCabe,*556 F. Supp. 1342 (E.D.Pa. 1983); *Jones v. Robbins,* 258 F.Supp. 585 (E.D.Pa. 1966)*, aff'd,* 374 F.2d 1002 (3d Cir. 1967)(disclaimer of coverage more than two years after notice of claim); *New Amsterdam Casualty Co. v. Kelly,* 57 F. Supp. 209 (E.D.Pa. 1944)(disclaimer of coverage nine months after notice of claim).

*Liability Ins. Co.,* 304 F.Supp. 1088, 1091 (D. Conn 1969), *quoting, Missionaries of the Company of Mary, Inc. v. Aetna Casualty & Surety Co.,* 155 Conn. 104, 113 (1967).

   "[I]t is hornbook law that if an insurer assumes the insured's defense without sending the insured a reservation of rights letter or bringing a declaratory relief action, the insurer will later be precluded from denying coverage." *Beckwith Machinery Co. v. Travelers Indemnity Co.,* 638 F. Supp. 1179, 1187 (W.D.Pa. 1986), *citing,* 7C J. APPLEMAN, INSURANCE LAW AND PRACTICE, §4682 (Berdal ed. 1979).[15]  Some courts have even held that "[w]here an insurer waits to bring its declaratory judgment until after the underlying action has been resolved by judgment or settlement, the insurer's declaratory judgment is untimely as a matter of law." *Federal Ins. Co. v. Andersen, LLP,* 2005 WL 1838440 * 10 (N.D.Ill. Aug. 2, 2005) (internal quotations and citations omitted); *see Haley v. Continental Gas Co.,* 749 F. Supp. 560 (D.Vt. 1990), *aff'd,* 927 F.2d 593 (2d Cir. 1991) (A three-year delay is unreasonable as a matter of law).[16]

   AIG waited three (3) years to bring its declaratory judgment action as a counterclaim in this action from the time it resumed the defense in the middle of the Sowell Arbitration in January 2003.  In truth, AIG waited four (4) years to bring that action because AIG initially

---

[15]*See Beckwith Machinery Co. v. Travelers Indemnity Co.,* 638 F. Supp. 1179, 1187 (W.D.Pa. 1986)(defendant estopped from raising coverage defenses after providing plaintiff with coverage for thirteen months then disclaiming coverage); *Aetna Life and Casualty Co. v. McCabe,*556 F. Supp. 1342 (E.D.Pa. 1983); *Jones v. Robbins,* 258 F.Supp. 585 (E.D.Pa. 1966), *aff'd,* 374 F.2d 1002 (3d Cir. 1967)(disclaimer of coverage more than two years after notice of claim); *New Amsterdam Casualty Co. v. Kelly,* 57 F. Supp. 209 (E.D.Pa. 1944)(disclaimer of coverage nine months after notice of claim).  In *Restoration Specialists, LLC v. First Specialty Ins. Corp.,* 403 F. Supp. 2d 650, 661 (N.D. Ill 2005), the court held that "[w]here an insurer has a duty to defend … and not only fails to seek a declaratory judgment regarding coverage but also waits more than a year before agreeing to defend the suit under a reservation of rights, the insurer is estopped from raising any policy defenses to coverage.

[16] Indeed, "[w]here an insurer has a duty to defend … and not only fails to seek a declaratory judgment regarding coverage but also waits more than a year before agreeing to defend the suit under a reservation of rights, the insurer is estopped from raising any policy defenses to coverage." *Restoration Specialists, LLC v. First Specialty Ins. Corp.,* 403 F. Supp. 2d 650, 661 (N.D. Ill. 2005).

disclaimed coverage four (4) years ago in January 2002. AIG's conducted violated its own

policy. AIG did nothing to either preserve its rights to bring a declaratory judgment action or to

put the Ryan Plaintiffs on notice that AIG was reserving its rights to bring such an action. As a

matter of law, AIG was required to provide the Ryan Plaintiffs with notice that it had claims of

non-coverage and for reimbursement. AIG failed to supply any notice. Thus the Court should

find that AIG has waived its rights to recoup either defense costs or its settlement with Sowell.

At a minimum, AIG's conduct in handling the Claim raises genuine issues of material fact that

must be left to the trier of fact on whether a waiver of AIG's rights exists.


**V.      THE EVIDENCE AT THE ARBITRATION HEARING IS IRRELEVANT FOR
         PURPOSES OF DETERMING WHETHER AIG HAD A DUTY TO DEFEND.**

In determining a duty to defend, the Court looks to the underlying complaint. *Imperial*

*Casualty and Indemnity Co.,* 246 Conn. 313, 324 (1998). "It is irrelevant to the existence of the

duty to defend whether or not the complaint is groundless and whether or not the insurer will

eventually be able to establish that it has no duty to indemnify the insured." *Firestine v.*

*Poverman,* 388 F.Supp. 948, 950 (D.Conn. 1975).

Therefore, AIG's arguments that certain exclusions applied based on the evidence and

findings at the Arbitration is contrary to law. Furthermore, as noted *supra.,* the Award entered as

a direct result of AIG's utter failure to provide a proper defense. Thus, any findings at the

arbitration have no bearing on whether AIG had a duty to defend. Indeed, because AIG

completely undermined the defense of the Sowell Arbitration, it would illogical and unfair to

now reward AIG by using the findings from that flawed proceeding. Connecticut law supports

that approach. An insurer cannot contest its duty to indemnify where it has failed to defend

regardless of the findings in the underlying proceeding. *See EDO Corp. v. Newark Ins. Co.,* 898

F. Supp. 952, 963 fn 9 (D. Conn. 1995); *Firestine v. Poverman,* 388 F. Supp. 948, 950 (D. Conn.

1975).   Here the same rule should apply because AIG failed to defend for a year before the

Sowell Arbitration and did not resume its defense, even as ineffectually as it did until half the

arbitration was completed, AIG cannot now use the findings to try to defeat coverage or its duty

to defend.

## VI.    AIG HAD A DUTY TO INDEMNIFY THE RYAN PLAINTIFFS

"In contrast to the duty to defend, the duty to indemnify is narrower: while the duty to

defend depends only on the allegations made against the insured, the duty to indemnify depends

upon the facts established at trial and the theory under which judgment is actually entered in the

case." (Internal quotation marks omitted.) *Board of Education v. St. Paul Fire & Marine Ins.*

*Co.,* 261 Conn. 37, 48-49 (2002).

If the Court finds that there is even a possibility that AIG had a duty to defend the Ryan

Plaintiffs, AIG's motion for summary judgment on its duty to indemnify must be denied.  *See*

*Hartford Accident & Indemnity Co. v. Williamson,* 153 Conn. 345 (1966).  As noted herein it is

settled law that insurer which breaches its duty to defend, cannot thereafter contest liability to

indemnify the insured for the full extent of any judgment entered against the insured.  *See EDO*

*Corp. v. Newark Ins. Co.,* 898 F. Supp. 952, 963 fn 9 (D. Conn. 1995); *Firestine v. Poverman,*

388 F. Supp. 948, 950 (D. Conn. 1975).  Simply put, an insurer looses the right to contest its

liability to indemnify the insured if it breaches its duty of defense.  *Id.*

Further, the Award makes a finding that the Ryan Plaintiffs failed to supervise Gwynn.

The Policy specifically covered the Ryan Plaintiffs for a claim of failure to supervise.

*Defendants' Statement*, Exhibit D Section A (insuring provisions of the Policy).  AIG cannot

defend itself against this fact to avoid its duty to indemnify.  Based on the clear language of the

Policy, AIG had a duty to indemnify.

### A.      There Are No Findings In The Award That Would Preclude Coverage Under Exclusions (s) and (t)

As noted *supra*, the Amended Claim made allegations that do not fall within the confines

of exclusions (s) and (t) therefore those exclusions do not preclude coverage.  In addition, the

Award made no finding that there was a discretionary account or that the Ryan Plaintiffs were

involved in any conduct relating to companies other than Merit.  Thus, there are no findings in

the Award that would support non-coverage based on exclusions (s) and (t).

### B.      There Are No Findings In The Award That Would Preclude Coverage Under Exclusion (a)

Exclusion (a) of the Policy states:

> "[t]he Insurer shall not be liable for Loss in connection with any Claim
> made against an Insured, arising out of, based upon or attributable to the
> gaining in fact any profit or advantage to which the Insured was not
> legally entitled, including but not limited to any actual or alleged
> commingling of funds or accounts."

There is no finding that the Ryan Plaintiffs gained any profit from Sowell. Summary judgment

based on this exclusion should be denied.

### C.      There Are No Findings In The Award That Would Preclude Coverage Under Exclusion (b)

Exclusion (b) of the Policy states:

> "[t]he Insurer shall not be liable for Loss in connection with any Claim made against an Insured, arising out of, based upon or attributable to the committing in fact of: any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder.

There is no finding or allegation that the Ryan Plaintiffs knowingly committed in fact any criminal or deliberately fraudulent act or willfully violated any law of the United States. This exclusion does not preclude coverage.

> **D.     There Are No Findings In The Award That Would Preclude Coverage Under Exclusion (r)**

Exclusion (r) of the Policy states:

> "[t]he Insurer shall not be liable for Loss in connection with any Claim made against an Insured, with respect to coverage provided under Coverage B only, alleging, arising out of based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away".

The Policy defines Professional Services as "[t]he following services if rendered in connection with an Approved Activity for or on the behalf of a customer or client of the Broker/Dealer pursuant to a written agreement between the Broker/Dealer and the customer or client (1) purchase or sale of securities, including investment companies . . . ." Approved Activity is defined as

> "[a] service or activity performed by the Registered Representative on behalf of the Broker/Dealer which: (1) has been approved by the Broker/Dealer to be preformed by the Registered Representative, and is (2) in connection with the purchase or sale of a specific security, annuity or insurance produced which has been approved by the Broker/Dealer to be transacted through the Registered Representative, and for which (3) the Registered Representative has obtained all licenses required by the Broker/Dealer or applicable law or regulation.

There is no finding to support non-coverage based on this exclusion.  In fact, the specific finding that the Ryan Plaintiffs failed to supervise Gwynn contradicts that they had approved any of Gwynn's conduct.  Specifically, the Ryan Plaintiffs notified Gwynn that Gwynn did not have permission to act on behalf of Merit with respect to his conduct involving other companies, such as Novation, Charter and C3.  Based on the findings in the Award, summary judgment should be denied.

## VII.  THE GENUINE ISSUES OF MATERIAL FACT INVOLVING AIG'S BAD FAITH PRECLUDE SUMMARY JUDGMENT.

"To prove a claim for bad faith under Connecticut law, the plaintiffs [are] required to prove that the defendants engaged in conduct design[ed] to mislead or to deceive ⋯ or a neglect or refusal to fulfill some duty or home contractual obligation not prompted by an honest mistake as to one's rights or duties ⋯ [B]ad faith is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity ⋯ it contemplates a state of mind affirmatively operating with furtive design or ill will ⋯ Moreover, [b]ad faith is an indefinite term that contemplates a state of mind affirmatively operating with some design or motive of interest or ill will." (Internal quotation marks omitted.) *Elm Street Builders, Inc. v. Enterprise Park Condominium Assn., Inc.,* 63 Conn. App. 657, 667-68 (2001), *quoting, Chapman v. Norfolk & Dedham Mutual Fire Ins. Co.,* 39 Conn. App. 306, 320, *cert. denied,* 235 Conn. 925 (1995).  "Summary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions."  *Suarez v. Dickmont Plastics Corp.,* 229 Conn. 99, 111 (1994).

The Ryan Plaintiffs' bad faith claim is based on AIG's course of conduct beginning in late 2001 and continuing  through AIG's baseless assertion of fraud claims against the Plaintiffs in this litigation during 2005 and early 2006.   These bad faith claims involve evidence of AIG's motives and intent with respect to its decisions and conduct in handling the Sowell Claim and show that AIG always acted out of its own interest and with complete disregard for the rights and interests of the Ryan Plaintiffs and the Gwynn Plaintiffs.  The factual circumstances which will evidence this bad faith include but are not limited to AIG's refusal to provide the Ryan Plaintiffs with a defense for *over a year* and then suddenly, three days after the Sowell Arbitration commenced, resuming coverage of the defense; failure to direct and advise the Ryan Plaintiffs' counsel after resuming the defense; allowing Gwynn to spoil the defense by appearing for three days without counsel and then supplying an inexperienced junior associate to appear for Gwynn; failure to disclose to the Ryan Plaintiffs that the sole reason for resuming defense was to avoid Gwynn entering into  an agreement assigning Gwynn's bad faith claims against AIG to Sowell (Morris/Damron Agreements);  failure to settle the Sowell Claim within the Policy limits prior to the Award entering; refusing to respond to the Award; not directing or authorizing defense counsel to respond in a timely fashion to the Award; settling the underlying claim without disclosing that AIG secretly intended to try to recoup its costs and settlement payment from the Ryan Plaintiffs; and fabricating false fraud claims as means to defend this action.

### A.    **Whether AIG's resumption of the Ryan Plaintiffs' defense three days after the Arbitration Hearing commenced constitutes bad faith is a genuine issue of material fact.**

For over a year AIG maintained its position to deny coverage to the Ryan Plaintiffs in the Sowell Arbitration solely based on exclusion (s).  Throughout that year, the Ryan Plaintiffs

struggled to find and retain defense counsel. Financially, the Ryan Plaintiffs were unable to

retain an expert to refute Sowell's expert, Fath's[17], reports and later testimony. By the time AIG

resumed the Ryan Plaintiffs' defense, the Arbitration Hearing had already commenced and

Gwynn had testified *pro se* because AIG denied him coverage. Gwynn, lacking the expertise of

counsel, was utterly incapable of defending himself. In fact, based on Gwynn's in artful

presentations, clumsy questioning, late production of documents, and uncounseled testimony the

Ryan Plaintiffs and the Gwynn Plaintiffs had little if any chance to successfully defend

themselves against an award. AIG's conduct in waiting over a year to resume its defense and

then, after the game was over, resuming the defense raises issues of bad faith.


### B.    If AIG Had No Duty to Defend its Defense Was Provided in Bad Faith

AIG now claims it had no duty to cover the Ryan Plaintiffs or the Gwynn Plaintiffs and

that it never had any duty to defend. If the Court were to agree with this contention, then the

Court must find that AIG acted in bad faith. AIG assumed the defense in January 2003 part way

through the Sowell Arbitration Hearing. It admits it did so for its own business reasons and on

the advice of its counsel. That advice was to avoid the potential agreement between Gwynn and

Sowell under the Morris or Damron doctrines.

Bur AIG had no right to defend and interfere in Gwynn's efforts to settle with Sowell, if

there was no coverage under the Policy. As AIG itself admits the policy plainly provides:

---

[17] AIG's reliance on Fath's testimony and reports is without merit. By the time AIG came back on the scene it was too late for the Ryan Plaintiffs to hire an expert to refute Fath's testimony. AIG also knew that the Ryan Plaintiff's could not afford to retain an expert after AIG denied coverage. Therefore, the Ryan Plaintiffs had no expert at the Arbitration and Fath's testimony and reports went to the arbitrator without contradicting expert testimony.

> C.    DEFENSE,    INVESTIGATION    AND    SETTLEMENT
> (INCLUDED IN THE LIMITS OF LIABILITY)
>
> 1. Defense
>
> The Insurer shall have the right and duty to defend, subject to and
> as part of the Limits of Liability, any Claim made against an
> Insured during the Policy Period or Discovery Period (if
> applicable) . . .

*Defendants' Statement* at ¶ 12.  Thus the right to defend is coupled with the duty to defend and

both right and duty only arise under the Policy.  If AIG is correct and it had no duty under the

Policy to indemnify or defend the Plaintiffs then it had no right to defend or interfere in the

defense of Gwynn and the Ryan Plaintiffs.

Here AIG clearly interfered in the defense for its own benefit and to the detriment of the

Ryan the Plaintiffs.   AIG resumed a defense at a time, it now maintains, it had no obligations

under the Policy, solely for the purpose of preventing Gwynn form making a deal with Sowell.

But AIG in doing so harmed the Ryan Plaintiffs.  The Ryan Plaintiffs could have avoided the

entire Sowell Arbitration and the Sowell Award, had Gwynn settled with Sowell.  AIG by

interfering with the defense prevented Sowell from settling and ending the arbitration process

before an Award entered against the Ryan Plaintiffs.   By so interfering in the defense AIG is

guilty of bad faith and this claim clearly precludes summary judgment for AIG

### C.    Whether AIG's Failure To Advise And Direct Counsel At The Arbitration Hearing Constitutes Bad Faith Is A Genuine Issue Of Material Fact.

Once AIG resumed the Ryan Plaintiffs' defense, it did nothing by way of directing or

advising the Ryan Plaintiffs' counsel.  The Ryan Plaintiffs' counsel sought AIG's authorization

to make a settlement offer during and after the Arbitration Hearing.  In fact, Attorney Polomski,

Gwynn's AIG appointed defense counsel, wrote to AIG to notify AIG that the Arbitration should be settled because once Gwynn testified *pro se* there was no defense for any of the parties. AIG said nothing. The Ryan Plaintiffs' counsel sought AIG's authorization to file an appeal after the Panel rendered its decision. AIG said nothing. The Ryan Plaintiffs' counsel sought AIG's authorization to object to the motion to confirm the Award. AIG said nothing. AIG remained on radio silence until the Ryan Plaintiffs commenced this action. AIG had numerous opportunities to intervene in the Arbitration Hearing and consistently did nothing. AIG's indifference and failure to act are sufficient to establish bad faith. *Rawlings,* 151 Ariz. 149, 161-62 (1986).

### D.    AIG's reason for resuming the defense is a genuine issue of material fact.

AIG misrepresents that the reason it resumed the defense was due to the Ryan Plaintiffs' and Gwynn Plaintiffs' demands. A fact that at the time AIG filed its summary judgment motion, the Ryan Plaintiffs' would have little undisputed evidence to refute. Subsequent to AIG filing summary judgment, AIG produced a letter from Attorney King, who was AIG's coverage counsel involved in the Sowell Claim. *Ryan Plaintiffs' Statement at* ¶44-46, Exhibit 13. In his letter, Attorney King advised AIG to resume the Ryan Plaintiffs' and the Gwynn Plaintiffs' defense to avoid Gwynn from entering into a *Morris* or *Damron* Agreement with Sowell. *Id***.** AIG failed to notify the Ryan Plaintiffs' about the risk AIG perceived from a *Morris* or *Damron* Agreement—even though AIG had assigned the same claims analyst to the Gwynn Plaintiffs and the Ryan Plaintiffs, Conlin. If Gwynn had assigned his bad faith claim to Sowell, Sowell may have dropped his claims against the individual Ryan Plaintiffs. Thus, AIG failed to disclose knowledge and information that could have protected certain insureds the Ryan Plaintiffs from

having an award entered against them personally.  AIG failed to disclose this information to the

Ryan Plaintiffs to protect AIG's interests over the interests of its insureds.  This conduct clearly

constitutes Bad Faith by AIG and is evidence to defeat summary judgment.


        **E.**      **<u>Whether Or Not AIG's Failure To Settle The Sowell Claim Prior To The Entry Of The Award Constitutes Bad Faith Is A Genuine Issue Of Material Fact.</u>**

AIG could have settled within the Policy limits prior to the Award being entered.  Indeed,

counsel for both the Ryan Plaintiffs and the Gwynn Plaintiffs consistently contacted AIG about

settling within the Policy limits during the Arbitration Hearing.  AIG sat back and waited.  At

every stage of the Arbitration, prior to the hearing commencing, during the hearing, prior to the

Award being rendered and prior to the Award being confirmed, the Ryan Plaintiffs and the

Gwynn Plaintiffs sought authorization to settle from AIG.  Time and time again, AIG did

nothing.  In point of fact, AIG's claims analyst, Conlin, notified Attorney Polomski, the Gwynn

Plaintiffs' AIG appointed defense counsel, that she would be unable to prevail at the Arbitration.

Yet, AIG never authorized settlement.

It was only after the Ryan Plaintiffs brought this action that AIG finally intervened and

settled Sowell's claims.  At that point it was too late.  Under the NASD rules, of which AIG was

and is aware, the Award is now admissible in all subsequent NASD proceedings involving the

individual Ryan Plaintiffs.  Thus, just as AIG uses the unsupported findings in the Award to try

to convince this Court to find that there was no coverage, the Ryan Plaintiffs struggle to defend

themselves against the Award in subsequent NASD proceedings.

AIG had an opportunity to settle within the Policy limits all the while believing that the Ryan Plaintiffs and the Gwynn Plaintiffs would not prevail.  Rather than protect its insureds, AIG sat back and allowed the Award to enter and cause irreparable damage to the Ryan Plaintiffs.  Such conduct is bad faith.[18]

Because "[s]ummary judgment procedure is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions", *Suarez,* 229 Conn. 99, 111 (1994), AIG's motion for summary judgment on this count should be denied.[19]

---

[18] "Where the insured is clearly liable and the insurer refuses to make a settlement, thus protecting the insured from a possible judgment for damages in excess of the amount of the insurance, the refusal must be made in good faith and upon reasonable grounds for the belief that the amount required to effect a settlement is excessive." *Bartlett v. Travelers' Ins. Co.,* 117 Conn. 146, 183 (1933); *see also, Brockstein v. Nationwide Mutual Ins. Co.,* 417 F. 2d 703 (2d Cir. 1969)

[19] The Ryan Plaintiffs' CUTPA/CUIPA count relies on the same factual allegations as their bad faith claim.  "In a CUIPA or CUTPA claim, the insurer's liability is ordinarily based on its conduct in settling or failing to settle the insured's claim and on its claims settlement policies in general. The factual inquiry focuses, not on the nature of the loss and the terms of the insurance contract, but on the conduct of the insurer ⋯ In a CUIPA and CUTPA claim, the insurer's duty stems not from the private insurance agreement, but from a duty imposed by statute." *Heyman Associates No. 1 v. Ins. Co. of PA,* 231 Conn. 756, 790 (1995).  The same genuine issues of material fact surrounding the CUTPA/CUIPA count preclude summary judgment.

## VIII.  <u>CONCLUSION</u>

Based on the foregoing, AIG's motion for summary judgment should be denied.


**PLAINTIFFS, BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES INC.,**

By_____/s/ Stephanie A. McLaughlin_____
       Peter M. Nolin (ct06223)
       Stephanie A. McLaughlin (ct22774)
       **Sandak Hennessey & Greco LLP**
       707 Summer Street
       Stamford, CT  06901
       (203) 425-4200
       (203) 325-8608 (fax)
       pnolin@shglaw.com
       smclaughlin@shglaw.com

**CERTIFICATE OF SERVICE**

     I hereby certify that on November 20, 2006, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

              _____/s/ Stephanie A. McLaughlin__
              Stephanie A. McLaughlin