## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

_____
BRUCE CHARLES RYAN, RUSSELL                     )
WILLIAM NEWTON, ROBERT FTIZPATRICK,             )
and MERIT CAPITAL ASSOCIATES, INC.,             )
        **Plaintiffs,**          )
                               )    **CIVIL ACTION NO.**
**v.**                                          )    **3:03CV00644(CFD)**
                               )
**NATIONAL UNION FIRE INSURANCE**               )
**COMPANY OF PITTSBURGH, PA., and**             )
**AIG TECHNICAL SERVICES, INC.,**               )
        **Defendants.**         )
_____)
**DAVID W. GWYNN, and RAQUEL GWYNN**            )
                               )
        **Plaintiffs,**          )    **CIVIL ACTION NO.**
**v.**                                          )    **3:03CV01154(CFD)**
                               )
**NATIONAL UNION FIRE INSURANCE**               )
**COMPANY OF PITTSBURGH, PA., and**             )
**AIG TECHNICAL SERVICES, INC.,**               )
        **Defendants.**         )    **November 20, 2006**

### THE RYAN PLAINTIFFS' LOCAL RULE 56(A) 2 STATEMENT

      Pursuant to Fed. R. Civ. P. 56 and Local Rule 56, plaintiffs, Bruce Charles Ryan, Russell

William Newton, Robert Fitzpatrick and Merit Capital Associates Inc. (hereinafter collectively

referred to as the "Ryan Plaintiffs") hereby submit this Local Rule 56(a) 2 Statement in

opposition to the Motion for Summary Judgment filed by defendants National Union Fire

Insurance Company of Pittsburgh, PA's ("NU") and AIG Technical Services, Inc.'s ("AIGTS")

(hereinafter NU and AIGTS will be collectively referred to as "Defendants" or "AIG").

**A.**      **Response to AIG's Statement of Undisputed Material Facts:**

The Ryan Plaintiffs pursuant to local rule 56 hereby provide their responses to the *Local Rule 56(A)(1) Statement Of Undisputed Material Facts Submitted By Defendants National Union Fire Insurance Company Of Pittsburgh, Pa. And AIG Technical Services, Inc. In Support Of Their Motion For Summary Judgment* (hereinafter "Defendants Statement"), as follows:

1.      AIG  issued to Merit a Securities Broker/Dealer's Professional Liability Insurance Policy numbered 473-36-20, with original effective dates of August 23, 2000 to August 23, 2001 ("Policy").  The Ryan Plaintiffs' Amended Complaint ("Ryan Complaint") at ¶ 15; the Gwynn Plaintiffs' Second Amended Complaint ("Gwynn Complaint") at ¶ 12.  A true and correct copy of the Policy is hereto attached as EXHIBIT A.  A true and correct copy of the Ryan Complaint is hereto attached as EXHIBIT B.  A true and correct copy of the Gwynn Complaint is hereto attached as EXHIBIT C.

**RESPONSE: ADMITTED**

2.      Pursuant to Endorsement #5 of the Policy, the effective ending date of the Policy's coverage was changed from August 23, 2001 to September 23, 2001, thereby making the Policy effective from August 23, 2000 to September 23, 2001.   EXHIBIT A, Policy at ENDORSEMENT #5.

**RESPONSE: ADMITTED**

3.      At all times relevant hereto, Merit was a securities broker/dealer corporation organized under Connecticut law with its principal place of business in Westport, Connecticut. EXHIBIT B, Ryan Complaint at ¶¶ 4,9; EXHIBIT C, Gwynn Complaint at ¶¶ 8-9.

**RESPONSE: ADMITTED**

2

4.      At all times relevant hereto, Ryan was the President of Merit, and one of Merit's

two shareholders.  EXHIBIT B, Ryan Complaint at ¶ 10; EXHIBIT C, Gwynn Complaint at ¶

17.

**RESPONSE: ADMITTED**

5.      At all times relevant hereto, Newton was the Chairman and Chief Financial

Officer of Merit, and Merit's other shareholder.  EXHIBIT B, Ryan Complaint at ¶ 11; EXHIBIT

C, Gwynn Complaint at ¶ 17.

**RESPONSE: ADMITTED**

6.      At all times relevant hereto, Fitzpatrick was Merit's Compliance Officer and

General Counsel.  EXHIBIT B, Ryan Complaint at ¶ 12; EXHIBIT C, Gwynn Complaint at ¶ 17.

**RESPONSE: ADMITTED**

7.      At all times relevant hereto, Gwynn functioned as Merit's Registered

Representative.  EXHIBIT B, Ryan Complaint at ¶ 13; EXHIBIT C, Gwynn Complaint at ¶ 10.

**RESPONSE: DENIED.  Although the Ryan Plaintiffs admit Gwynn was a registered**

**representative of Merit, in many of the alleged dealings between Gwynn and Sowell Gwynn**

**was not functioning as a registered representative of Merit.**

8.      Under the Policy, Merit was insured as the "Broker/Dealer."  EXHIBIT B, Ryan

Complaint at ¶ 16; EXHIBIT C, Gwynn Complaint at ¶ 13.

**RESPONSE: ADMITTED**

9.      The Policy insured Ryan, Newton, Fitzpatrick, and Gwynn, in their individual

capacities as directors, officers, employees, and/or Registered Representatives of Merit.

EXHIBIT B, Ryan Complaint at ¶ 16; EXHIBIT C, Gwynn Complaint at ¶ 13.

**RESPONSE: ADMITTED**

    10.    The Policy states in part the following:

DECLARATIONS

    ITEM 1.    BROKER/DEALER: MERIT CAPITAL ASSOCIATES, INC.

*   *   *

    ITEM 2.    POLICY PERIOD:
From: August 23, 2000
To: August 23, 2001

*   *   *

    ITEM 6.    RETROACTIVE DATE: August 23, 1999

EXHIBIT A, Policy at DECLARATIONS, p.1.

**RESPONSE: ADMITTED except to the extent endorsement 5 extended the Policy period.**

    11.    The Policy states in part the following:

1.  INSURING AGREEMENTS

    A.    BROKER/DEALER PROFESSIONAL LIABILITY INSURANCE (INCLUDING FAILURE TO SUPERVISE)

This policy shall pay on behalf of the Broker/Dealer Loss arising from a Claim . . . for any actual or alleged Wrongful Act committed by the Broker/Dealer:

    1.    in the rendering or failure to render Professional Services by the Broker/Dealer; or

    2.    in Failing to Supervise a Registered Representative in the rendering or failure to render Professional Services by such Registered Representative on the behalf of the Broker/Dealer; or

    3.    in Failing to Supervise a Registered Representative in connection with an activity of the Registered

4

Representative OTHER THAN the rendering or failure to render Professional Services by such Registered Representative on the behalf of the Broker/Dealer.

B.  REGISTERED REPRESENTATIVE PROFESSIONAL LIABILITY INSURANCE

This policy shall pay on behalf of a Registered Representative Loss arising from a Claim . . . for any actual or alleged Wrongful Act committed by the Registered Representative in the rendering or failure to render Professional Services on the behalf of the Broker/Dealer.

C.  DEFENSE, INVESTIGATION AND SETTLEMENT (INCLUDED IN THE LIMITS OF LIABILITY)

1. Defense

The Insurer shall have the right and duty to defend, subject to and as part of the Limits of Liability, any Claim made against an Insured during the Policy Period or Discovery Period (if applicable) . . .

EXHIBIT A, Policy at SECURITIES BROKER/DEALERS PROFESSIONAL LIABILITY POLICY, p. 1.

**RESPONSE: ADMITTED**

12.    The Policy states in part the following:

2.  DEFINITIONS

(a)  "Approved Activity" means a service or activity performed by the Registered Representative on behalf of the Broker/Dealer which:

(1)  has been approved by the Broker/Dealer to be performed by the Registered Representative, and is

(2)  in connection with the purchase or sale of a specific security, annuity or insurance product which has been approved by the Broker/Dealer to be transacted through the Registered Representative, and for which

5

(3)    the Registered Representative has obtained all licenses required by the Broker/Dealer or applicable law or regulation.

(b)    "Broker/Dealer" means the Broker/Dealer designated in Item 1 of the Declarations and any Subsidiary thereof.

(c)    "Claim" means the following brought by an Insured's customer or client in such capacity:

(1)    a written demand for monetary relief; or

(2)    a civil or arbitration proceeding for monetary or non-monetary relief which is commenced by:

(i)    service of a complaint or similar pleading; or

(ii)    receipt or filing of an arbitration demand or statement of claim.

\*   \*   \*

(g)    "Interrelated Wrongful Act(s)" means Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from the same, related or common nexus of facts regardless of whether such Claims involved the same or different claimants, Insureds or legal causes of action. . . .

\*   \*   \*

(i)    "Loss" means damages, judgments, settlements and Defense Costs . . .

Loss arising from Claim(s) alleging the same Wrongful Act or Interrelated Wrongful Acts shall be deemed a single Loss under this Policy. . . .

\*   \*   \*

(k)    "Professional Services" means the following services if rendered in connection with an Approved Activity for or on

6

the behalf of a customer or client of the Broker/Dealer pursuant to a written agreement between the Broker/Dealer and the customer or client: . . .

(l)   "Registered Representative" means an individual who is registered with the National Association of Securities Dealers, Inc., including a registered principal, and who for compensation engages in the business of rendering Professional Services on behalf of the Broker/Dealer.

\*   \*   \*

(n)   "Wrongful Act" means any act, error or omission by the Broker/Dealer, or by any director, officer, partner or employee thereof, or by any Registered Representative, in their respective capacities as such.

EXHIBIT A, Policy at SECURITIES BROKER/DEALERS PROFESSIONAL LIABILITY POLICY, pp. 2-6.

**RESPONSE: ADMITTED**

13.   The Policy states in part the following:

4.   EXCLUSIONS

The insurer shall not be liable for Loss in connection with any Claim made against an Insured:

a)   arising out of, based upon or attributable to the gaining in fact any profit or advantage to which the Insured was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts;

b)   arising out of, based upon or attributable to the committing in fact of: any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder;

\*   \*   \*

e)  alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the inception date of the first Securities Broker/Dealer's Errors and Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the Broker/Dealer designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim, or alleging, arising out of, based upon or attributable to any subsequent Interrelated Wrongful Act.

f)  alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act;

*   *   *

r)  with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away";

s)  alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-loan investment company or variable annuities in which there is no initial or contingent sales charge or commission;

t)  alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims arising out [of] an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership . . . .

EXHIBIT A, Policy at SECURITIES BROKER/DEALERS PROFESSIONAL LIABILITY POLICY, pp. 6-9.

**RESPONSE: ADMITTED**

14.    On or about September 4, 2001, Michael A. Sowell ("Sowell") filed a Statement of Claim before the National Association of Securities Dealers, Inc. ("NASD") against Merit, Ryan, Newton, Fitzpatrick, and Gwynn, as well as against Gwynn Financial Services, Inc. ("GFS"), an entity controlled by Gwynn, and the wives of Ryan, Newton, Fitzpatrick, and Gwynn.  EXHIBIT B, Ryan Complaint at ¶ 29; EXHIBIT C, Gwynn Complaint at ¶ 25.  A true and correct copy of the Statement of Claim is hereto attached as EXHIBIT D.

**RESPONSE: ADMITTED**

15.    On or about May 1, 2002, Sowell filed an Amended Statement of Claim before the NASD naming Source Capital Group, Inc. ("Source") as an additional respondent.  EXHIBIT B, Ryan Complaint at ¶ 47; EXHIBIT C, Gwynn Complaint at ¶ 42.  A true and correct copy of the Amended Statement of Claim is hereto attached as EXHIBIT E.

**RESPONSE: ADMITTED, but the Ryan Plaintiffs deny that Source was properly joined in the NASD proceeding commenced by Sowell.**

16.    The wives of Ryan, Newton, Fitzpatrick, and Gwynn were named in the Statement of Claim and Amended Statement of Claim (collectively, "Statements of Claim") because Arizona, where the Statements of Claim were filed, is a community property state. EXHIBIT D at ¶ 10; EXHIBIT E at ¶ 11.

**RESPONSE: ADMITTED**

17.     In his Statements of Claim, Sowell alleged that in late 1997, he inherited assets of his deceased mother, which he initially believed were worth a total of approximately $380,000. EXHIBIT D, Statement of Claim at ¶ 17; EXHIBIT E, Amended Statement of Claim at ¶ 18.

**RESPONSE: ADMITTED**

18.     Sowell alleged that because he did not know how to manage his inherited funds, he sought financial planning assistance from Gwynn.  EXHIBIT D, Statement of Claim at ¶ 18; EXHIBIT E, Amended Statement of Claim at ¶ 19.

**RESPONSE: ADMITTED**

19.     Sowell alleged that Gwynn offered to prepare a retirement plan for Sowell and his wife, and to manage Sowell's financial portfolio.  EXHIBIT D, Statement of Claim at ¶ 19; EXHIBIT E, Amended Statement of Claim at ¶20.

**RESPONSE: ADMITTED**

20.     Sowell alleged that in early February 1998, Gwynn met with Sowell and his wife to gather information for the retirement plan.  EXHIBIT D, Statement of Claim at ¶ 19; EXHIBIT E, Amended Statement of Claim at ¶20.

**RESPONSE: ADMITTED**

21.     Sowell alleged that Gwynn prepared a retirement plan for Sowell and his wife, dated February 20, 1998, listing primary assets valued at $382,000 and a residence worth $130,000.  EXHIBIT D, Statement of Claim at ¶ 21; EXHIBIT E, Amended Statement of Claim at ¶ 22.

**RESPONSE: ADMITTED**

22.     Sowell alleged that the retirement plan prepared for the Sowells by Gwynn emphasized the Sowells' need for an "efficient, diversified portfolio," and stated that the Sowells needed to "actively rebalance [their] investments throughout the planning horizon." EXHIBIT D, Statement of Claim at ¶ 22; EXHIBIT E, Amended Statement of Claim at ¶ 23.

**RESPONSE: ADMITTED**

23.     Sowell alleged that in addition to his inherited funds, Sowell's mother also left behind several stock certificates ("Stock Certificates") in her desk that had never been deposited with a brokerage firm. EXHIBIT D, Statement of Claim at ¶ 18; EXHIBIT E, Amended Statement of Claim at ¶ 19.

**RESPONSE: ADMITTED**

24.     Sowell alleged that in April 1998, Sowell gave the Stock Certificates to Gwynn. EXHIBIT D, Statement of Claim at ¶ 24; EXHIBIT E, Amended Statement of Claim at ¶ 25.

**RESPONSE: ADMITTED**

25.     Sowell alleged that at the time that he gave the Stock Certificates to Gwynn, Sowell was unaware of their true value, which was in excess of $1 million. EXHIBIT D, Statement of Claim at ¶ 24; EXHIBIT E, Amended Statement of Claim at ¶ 25.

**RESPONSE: ADMITTED**

26.     Sowell alleged that Gwynn never revised the Sowells' retirement plan to reflect the $1 million worth of Stock Certificates. EXHIBIT D, Statement of Claim at ¶ 25; EXHIBIT E, Amended Statement of Claim at ¶ 26.

**RESPONSE: ADMITTED**

27.    Sowell alleged that on May 1, 1998, Gwynn deposited Sowell's Stock Certificates

as the initial deposit in Sowell's Merit Account No. LFW-00053-A5 ("Merit Account").

EXHIBIT D, Statement of Claim at ¶¶ 23-24; EXHIBIT E, Amended Statement of Claim at ¶¶

24-25.

**RESPONSE: ADMITTED**

28.    According to Sowell's Statements of Claim:

When Mr. Sowell opened his account, he signed a power of attorney giving Respondents [including Gwynn] discretionary control of the account. Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell. As it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading decisions.

EXHIBIT D, Statement of Claim at ¶ 26; EXHIBIT E, Amended Statement of Claim at ¶27.

**RESPONSE: ADMITTED**

29.    According to Sowell's Statements of Claim:

Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell and treated his discretionary power over the account as a license to churn. Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by excessive, in-and-out trading in technology stocks. Mr. Gwynn also traded extensively on margin in Mr. Sowell's account. A review of Mr. Sowell's account statements reveals that Respondents utilized no meaningful investment strategy or plan.

EXHIBIT D, Statement of Claim at ¶ 27; EXHIBIT E, Amended Statement of Claim at ¶28.

**RESPONSE: ADMITTED**

30.    Sowell's Statements of Claim state that "Mr. Sowell's account was a

discretionary account and was unquestionably controlled by Mr. Gwynn." EXHIBIT D,

Statement of Claim at ¶ 87; EXHIBIT E, Amended Statement of Claim at ¶105.

**RESPONSE: ADMITTED**

31.     Sowell alleged that at Gwynn's request, Sowell made certain loans ("Charter School Investments") to Novation Financial Corporation ("Novation").   EXHIBIT D, Statement of Claim at ¶¶ 31-64; EXHIBIT E, Amended Statement of Claim at ¶¶ 32-65.

**RESPONSE: ADMITTED**

32.     Sowell alleged that Novation was a predecessor to Charter Financial Network, Inc. ("Charter"), now known as Charter 3, Inc. ("C3").  EXHIBIT D, Statement of Claim at ¶ 42; EXHIBIT E, Amended Statement of Claim at ¶ 43.

**RESPONSE: ADMITTED**

33.     Sowell alleged that Gwynn was, at all times relevant, a controlling shareholder, officer, and director of Novation, Charter, and C3.  EXHIBIT D, Statement of Claim at ¶¶ 34, 45, 56; EXHIBIT E, Amended Statement of Claim at ¶¶ 35, 46, 57.

**RESPONSE: ADMITTED**

34.     Sowell alleged, under "Count One (Violation of A.R.S. § 44-1841) (The Charter School Investments)," that "[f]rom May 1998 through December 2000, Respondents [including each of the Plaintiffs] made, participated in or induced the unlawful sale of securities [i.e. the Charter School Investments] to Mr. Sowell."  EXHIBIT D, Statement of Claim at ¶ 70; EXHIBIT E, Amended Statement of Claim at ¶ 88.

**RESPONSE: ADMITTED**

35.     Sowell alleged that "[o]n or about May 19, 1998, July 1, 1998, November 11, 1999, April 25, 2000, and July 21, 2000 Respondent Gwynn . . . issued Promissory Notes to Mr. Sowell."  EXHIBIT D, Statement of Claim at ¶ 159; EXHIBIT E, Amended Statement of Claim at ¶ 177.

**RESPONSE: ADMITTED**

36.     Sowell alleged that Gwynn had assured him that the Charter School Investments were protected by the Promissory Notes.  EXHIBIT D, Statement of Claim at ¶¶ 36, 40, 47, 49-50, 52, 58; EXHIBIT E, Amended Statement of Claim at ¶¶ 37, 41, 48, 50-51, 53, 59.

**RESPONSE: ADMITTED**

37.     Sowell alleged that he never received any money or stock in satisfaction of the Promissory Notes.   EXHIBIT D, Statement of Claim at ¶¶ 41, 54, 63; EXHIBIT E, Amended Statement of Claim at ¶¶ 42, 55, 64.

**RESPONSE: ADMITTED**

38.     Sowell alleged that as the result of the Plaintiffs' wrongful acts, Sowell's inheritance of over $1.4 million "disappeared."  EXHIBIT D, Statement of Claim at ¶ 14; EXHIBIT E, Amended Statement of Claim at ¶15.

**RESPONSE: ADMITTED**

39.     Sowell alleged that the Ryan Plaintiffs were liable for Gwynn's wrongful acts under theories of respondeat superior, failure to supervise, and as "control persons" of Gwynn, its Registered Representative.  EXHIBIT D, Statement of Claim at ¶¶ 71-72, 82-83, 92, 97, 107, 116-120, 124, 132, 140, 147; EXHIBIT E, Amended Statement of Claim at ¶¶ 89-90, 101, 110, 115, 125, 134-138, 142, 150, 158, 165.

**RESPONSE: ADMITTED**

40.     On October 15, 2001, Conlin sent a letter to Ryan.  A true and correct copy of the October 15, 2001 letter is hereto attached as EXHIBIT F.

**RESPONSE: ADMITTED**

41.    Conlin's October 15, 2001 letter acknowledged AIG's receipt of Sowell's Statement of Claim and advised that AIG had assigned separate law firms to represent Merit and Gwynn.  EXHIBIT F, October 15, 2001 Letter, pp. 1-3.

**RESPONSE: ADMITTED**

42.    Conlin's October 15, 2001 Letter indicated that several of the Policy's exclusions, including (a), (b), (f), (r), and (s), could potentially exclude coverage. EXHIBIT F, October 15, 2001 Letter, pp. 3-7.

**RESPONSE: ADMITTED**

43.    Conlin's October 15, 2001 letter stated:

This letter is not to be construed as a waiver of any policy provision.  [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

EXHIBIT F, October 15, 2001 Letter, p. 7.

**RESPONSE: ADMITTED**

44.    On January 24, 2002, Conlin sent a letter to Gwynn.  A true and correct copy of Conlin's January 24, 2002 letter to Gwynn is hereto attached as EXHIBIT G.

**RESPONSE: ADMITTED**

45.    Conlin's January 24, 2002 letter to Gwynn advised Gwynn that exclusion (s) of the Policy precluded coverage for Sowell's Claims, and reiterated that AIG did not waive any policy provisions but reserved all rights and defenses in the event that it reevaluated the claim. EXHIBIT G, January 24, 2002 Letter to Gwynn, p. 1.

**RESPONSE: ADMITTED except that the Ryan Plaintiffs deny that AIG had previously notified Gwynn of any reservation of rights on its duty to defend.**

46.     Conlin's January 24, 2002 letter to Gwynn stated:

During our investigation of this matter we uncovered the fact that Mr. Sowell signed a power of attorney dated March 7, 1998 giving [Gwynn] the "power to give an[d] place any and all orders."

Accordingly, pursuant to exclusion (s) under your policy, coverage is not available for you in this matter.  Consequently, and as I advised Mr. Thomason, AIG would neither be indemnifying you nor paying for any defense costs incurred after January 12, 2002. . . .

If you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same.  This letter is not to be construed as a waiver of any policy provisions.  In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy and at law as to allegations which are not covered under the terms of this policy and/or may be excluded from coverage under the terms of the policy. . . .

EXHIBIT G, January 24, 2002 Letter to Gwynn, p. 1.

**RESPONSE: ADMITTED**

47.     On January 24, 2002, Conlin sent a letter to Ryan.   A true and correct copy of the January 24, 2002 Letter to Ryan is hereto attached as EXHIBIT H.

**RESPONSE: ADMITTED**

48.     Conlin's January 24, 2002 letter to Ryan advised Ryan that exclusion (s) of the Policy precluded coverage for Sowell's Claims, and reiterated that AIG did not waive any policy provisions but reserved all rights and defenses in the event that it reevaluated the claim.

EXHIBIT H, January 24, 2002 Letter to Ryan, p. 1.

**RESPONSE: ADMITTED**

49.     Conlin's January 24, 2002 letter to Ryan stated:

During our investigation of this matter we uncovered the fact that Mr. Sowell signed a power of attorney dated March 7, 1998 giving Mr. Gwynn the "power to give an[d] place any and all orders."

Accordingly, pursuant to exclusion (s) under your policy, coverage is not available for you in this matter.  Consequently, AIG would neither be indemnifying you nor paying for any defense costs incurred after January 12, 2002.  . . .

If you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same.  This letter is not to be construed as a waiver of any policy provisions.  In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy and at law as to allegations which are not covered under the terms of this policy and/or may be excluded from coverage under the terms of the policy. . . .

EXHIBIT H, January 24, 2002 Letter to Ryan, p. 1.

**RESPONSE: ADMITTED**

50.     On April 16, 2002, Angelina Palmieri of the AIG Claims Department ("Palmieri") sent a letter to Gwynn, copied to Ryan.  A true and correct copy of the April 16, 2002 Letter is hereto attached as EXHIBIT I.

**RESPONSE: ADMITTED**

51.     Palmieri's April 16, 2002 letter to Gwynn advised Gwynn that AIG had closed Merit's claim file in the Sowell matter.  EXHIBIT I, April 16, 2002 Letter.

**RESPONSE: ADMITTED**

52.     On May 17, 2002, Gwynn sent a letter to Conlin.  A true and correct copy of the April 16, 2002 letter is hereto attached as EXHIBIT J.

**RESPONSE: ADMITTED**

53.     Gwynn's May 17, 2002 letter to Conlin objected to AIG's closure of Merit's claim file in the Sowell matter and informed Conlin that Gwynn was still in the process of

accumulating the information "requested several months ago" by AIG.  EXHIBIT J, May 17, 2002 Letter.

**RESPONSE: ADMITTED**

54.     The Gwynn Plaintiffs allege that on January 3, 2003, John J. Nicgorski ("Nicgorski") of Mohr Hackett Pederson Blakely & Randolph, P.C., counsel for Gwynn, represented to AIG that "various facts in the record . . .established Sowell's account had not been discretionary, that the power of attorney had been revoked, and that Sowell retained all discretion over all of his accounts with Merit."  The Gwynn Plaintiffs further allege that "Gwynn, through counsel, made a demand on [AIG] to resume the defense of [the Gwynn Plaintiffs], and to settle Sowell's claim within the policy limits.  EXHIBIT C, Gwynn Complaint at ¶ 51.

**RESPONSE: ADMITTED**

55.     The Ryan Plaintiffs allege that they provided AIG with "information which showed that Sowell's account had never been a discretionary account."  EXHIBIT B, Ryan Complaint at ¶ 41.  The Ryan Plaintiffs further allege that on January 7, 2003, Gwynn "demanded coverage, a settlement within the Policy limits, and an immediate resumption of the defense by [AIG]."  EXHIBIT B, Ryan Complaint at ¶ 58.

**RESPONSE: ADMITTED**

56.     On January 6, 2003, Nicgorski sent a letter to Conlin.  A true and correct copy of the January 6, 2003 letter is hereto attached as EXHIBIT K.

**RESPONSE: ADMITTED**

57.      Nicgorski's January 6, 2003 letter advised Conlin that since the power of attorney signed by Sowell in connection with the Merit Account was not notarized, it was invalid under

Arizona law. Thus, Nicgorski argued, the Merit Account was not discretionary. EXHIBIT K, January 6, 2003 Letter, p. 1.

**RESPONSE: ADMITTED**

58.    On January 7, 2003, the NASD commenced arbitration hearings concerning Sowell's Statements of Claim ("Sowell Arbitration"). EXHIBIT B, Ryan Complaint at ¶ 59; EXHIBIT C, Gwynn Complaint at ¶ 43.

**RESPONSE: ADMITTED**

59.    The Ryan Plaintiffs were represented in the Sowell Arbitration by counsel that they themselves had retained. EXHIBIT B, Ryan Complaint at ¶ 60; EXHIBIT C, Gwynn Complaint at ¶ 41.

**RESPONSE: ADMITTED**

Gwynn represented himself in the Sowell Arbitration. EXHIBIT B, Ryan Complaint at ¶ 61; EXHIBIT C, Gwynn Complaint at ¶ 55.

**RESPONSE: ADMITTED**

60.    On January 10, 2003, Jeffrey King ("King") of Struckmeyer & Wilson, counsel for AIG, sent a letter to Nicgorski. A true and correct copy of the January 10, 2003 letter is hereto attached as EXHIBIT L.

**RESPONSE: ADMITTED**

61.    King's January 10, 2003 letter confirmed a January 9, 2003 telephone conversation between King and Nicgorski in which King conveyed AIG's offer to resume payment for Gwynn's defense. EXHIBIT L, King's January 10, 2003 Letter, p.1.

**RESPONSE: The Ryan Plaintiffs can neither admit nor deny this statement because there is no evidence of the telephone conversation from either King or Nicgorski and the letter is hearsay evidence as to what did or did not occur in said telephone call.**

62.    King's January 10, 2003 letter noted that Gwynn had still not delivered the documents as he promised he would in his May 17, 2002 letter.  EXHIBIT L, King's January 10, 2003 Letter, p.1.

**RESPONSE: ADMITTED**

63.    On January 10, 2003, King sent an email to attorney William Federman, counsel for the Ryan Plaintiffs in the Sowell Arbitration.  A true and correct copy of the January 10, 2003 email is hereto attached as EXHIBIT M.

**RESPONSE: ADMITTED**

64.    King's January 10, 2003 email stated that "while AIG has not changed its position on coverage for this claim at this time, it is offering to pay Merit's reasonable and necessary defense costs associated with the Sowell claim."  EXHIBIT M, King's January 10, 2003 Email.

**RESPONSE: ADMITTED**

65.    On January 10, 2003, Frank. W. Moskowitz ("Moskowitz") of Berk & Moskowitz, counsel for Sowell in the Sowell arbitration, sent a letter to Nicgorski.  A true and correct copy of the January 10, 2003 email is hereto attached as EXHIBIT N.

**RESPONSE: ADMITTED**

66.    Moskowitz's January 10, 2003 letter stated Moskowitz's opinion that that the Merit Account "was not a discretionary trading account."  EXHIBIT N, Moskowitz's January 10, 2003 Letter, p.3.

**RESPONSE: ADMITTED**

    67.    Moskowitz's January 10, 2003 letter further stated:

> Although we recognize that our Statement of Claim alleged that it was, we believe
> the true facts are otherwise.  Facts, not allegations, dictate coverage.  Of course,
> since AIG has not had a representative attend the hearing, it has no knowledge of
> the facts of this case.  AIG's knowledge is limited to the mere allegations in the
> Statement of Claim.

EXHIBIT N, Moskowitz's January 10, 2003 Letter, p.3.

**RESPONSE: ADMITTED**

    68.    On January 13, 2003, King sent a letter to Nicgorski.  A true and correct copy of

the January 13, 2003 letter is hereto attached as EXHIBIT O.

**RESPONSE: ADMITTED**

    69.    King's January 13, 2002 letter confirmed that AIG would resume Gwynn's

defense in the Sowell Arbitration.  EXHIBIT O, January 13, 2002 Letter.

**RESPONSE: ADMITTED**

    70.    King's January 13, 2003 letter stated that  "although AIG is providing Mr. Gwynn

with a defense, it has not changed its position with respect to coverage."  EXHIBIT O, January

13, 2002 Letter.

**RESPONSE: ADMITTED**

    71.    On January 13, 2003, attorney Maxine Polomski ("Polomski"), who had

previously been appointed by AIG to represent Gwynn, resumed Gwynn's defense in the Sowell

Arbitration.  NASD Sowell Arbitration Award ("Arbitration Award") at p.1.  A true and correct

copy of the Arbitration Award is hereto attached as EXHIBIT P.

**RESPONSE: ADMITTED**

72.     During the Sowell Arbitration, securities industry expert Charles Abram Fath ("Fath") testified on Sowell's behalf before the Sowell Arbitration panel ("Arbitration Panel"). Sowell Arbitration hearing transcript ("Arbitration Transcript") at pp. 1249-66.   A true and correct copy of the relevant portions of the Arbitration Transcript is hereto attached as EXHIBIT Q.

**RESPONSE: The Ryan Plaintiffs admit that Fath so testified but deny that testimony is relevant or admissible on this motion.**

73.     At the Sowell Arbitration, Fath explained that there was excessive trading activity in the Merit Account.  Specifically, Fath testified as follows:

| | |
|---|---|
| Fath: | The excessive activity that I saw in the account is certainly unsuitable for an individual with a growth investment objective. |
| Q: | Are there any particular months of activity in the account that you would like to highlight to the Panel as an example of the level of activity? |
| Fath. | Well, I mean, there was consistent activity really throughout the account.  We could go through some – some months, and then we can look at some charts I've prepared. |

If you want to look at – we can start with December of '98 as an example.  I think that was a statement we looked at earlier today … Just on the cover page you'll see that at the end of this month, December of '98, there is a debit balance of $209,000.

\* \* \*

Then if you'll skip over to page 3 of that monthly statement, if you just look down under the account activity, buys and sells that have taken place in the account.  If you'll look down at the last, for instance, starting down on 12/9[/98], two lines up from the bottom, American Online is purchased.

You see onto the next page, there's a series of purchase that are made in the account.  If you'll drop down to the middle of this

page, you'll see there's a number of sales that take place beginning on 12/16 that go on down. And then on the 19th, there's another series of purchases.

So if you continue on to the – on page 5 you'll see the same thing. You – there's purchases and sales taking place of – a number of which all take place on the same day, which, as I look at this, would give me pause to think, are these discretionary transactions? Did Mr. Gwynn talk to Mr. Sowell about each and every one of these transactions because obviously he's bunching orders, and I think we saw an exhibit the other day, Exhibit No. 162 where he was sending in a fax saying: Buy all of these securities and charge this amount of commissions.

From a supervisory point of view, one of the first things you would look at when you see crunched orders like that is, you know, did the broker really talk with the customer about each one of these transactions.

If you just go through these different months, you'll see repeatedly there's a whole slew of transactions on . . . different days. On one day there will be a bunch of buys. On another day there's be [sic] a bunch of sells. . .

                    \*     \*     \*

At the end of the – this month, on page 6, you can see, according to this statement, there were purchases of $793,000 and there were sales of $520,000

                    \*     \*     \*

Looking on page 6, again down at the bottom, you'll see, beginning with the purchase of . . . on January 11th, a whole series of purchases on the 11th. On the 13th, there's a whole series of sales. Then he buys back in some cases the various securities that he had sold earlier.

Any—I mean, this pattern of trading certainly is not appropriate for a growth investment objective. This is purely a trading account, just by looking at the number of buys and sales and the total cost of the purchases for each month.

> Again, looking at page 9, it summarizes, it shows that during this month there was $1,313,278 worth of purchases and a sale of . . . $1,633,978 that were done during that month.

EXHIBIT Q, Arbitration Transcript at pp.1270-1273.

**RESPONSE: The Ryan Plaintiffs admit that Fath so testified but deny that testimony is relevant or admissible on this motion.**

74.     In addition to this testimony, Fath presented a chart to the Arbitration Panel demonstrating the excessive number of monthly "buys" and "sells" in the Merit Account from May 1998, prior to the Policy's Retroactive Date of August 23, 1999, through to May 2001. Sowell Arbitration Exhibit 26, pp. 4-5.  A true and correct copy of Sowell Arbitration Exhibit 26 is hereto attached as EXHIBIT R.

**RESPONSE: The Ryan Plaintiffs admit that Fath so testified but deny that testimony is relevant or admissible on this motion.**

75.     An excerpt from Fath's chart, detailing Gwynn's trading in the Sowell Account from May 1998 through the to May 2001, is as follows:

| Month | Number of Trades | | | Cost of Purchases | Month End Equity | Debit Balance |
|---|---|---|---|---|---|---|
|  | **Buy** | **Sells** | **Total** | | | |
| May 98 | - | 6 | 6 | -0- | 1,032,439 | -0- |
| Jun 98 | 3 | 2 | 5 | 25,278 | 1,196,030 | -0- |
| Jul98 | 25 | 5 | 30 | 313,931 | 1,047,788 | -0- |
| Aug 98 | 6 | 9 | 15 | 66,124 | 778,647 | -0- |
| Sept 98 | 37 | 38 | 75 | 777,691 | 774,382 | -0- |
| Oct 98 | 25 | 17 | 42 | 432,912 | 790,397 | -0- |
| Nov 98 | 32 | 28 | 60 | 388,518 | 854,460 | -0- |
| Dec 98 | 42 | 31 | 73 | 793,044 | 1,009,153 | 209,001 |

| Month | Number of Trades | | | Cost of Purchases | Month End Equity | Debit Balance |
|---|---|---|---|---|---|---|
| | Buy | Sells | Total | | | |
| Jan 99 | 45 | 45 | 90 | 1,313,279 | 1,120,758 | -0- |
| Feb 99 | 24 | 14 | 38 | 525,417 | 1,007,312 | 309,667 |
| Mar 99 | 25 | 20 | 45 | 632,977 | 1,185,584 | 615,036 |
| Apr 99 | 22 | 27 | 49 | 959,746 | 1,206,145 | 288,110 |
| May 99 | 26 | 24 | 50 | 893,060 | 972,042 | 524,115 |
| Jun 99 | 24 | 17 | 41 | 666,642 | 997,646 | 664,039 |
| Jul 99 | 22 | 18 | 40 | 518,533 | 807,736 | 963,048 |
| Aug 99 | 29 | 34 | 63 | 663,600 | 730,601 | 812,961 |
| Sept 99 | 25 | 16 | 41 | 615,569 | 864,823 | 1,195,841 |
| Oct 99 | 12 | 20 | 32 | 337,824 | 1,043,643 | 1,032,340 |
| Nov 99 | 29 | 27 | 56 | 761,971 | 1,271,284 | 994,929 |
| Dec 99 | 21 | 27 | 48 | 899,385 | 1,835,672 | 1,117,389 |
| | | | | | | |
| Jan 00 | 26 | 32 | 58 | 1,828,815 | 1,371,742 | 1,280,609 |
| Feb 00 | 15 | 18 | 33 | 443,742 | 1,573,264 | 1,145,187 |
| Mar 00 | 32 | 18 | 50 | 1,061,731 | 1,497,584 | 1,327,839 |
| Apr 00 | 51 | 35 | 86 | 1,791,832 | 1,053,146 | 1,362,564 |
| May 00 | 14 | 44 | 58 | 443,752 | 554,600 | 594,325 |
| Jun 00 | 22 | 18 | 40 | 746,120 | 725,030 | 629,565 |
| Jul 00 | 22 | 20 | 42 | 718,959 | 652,933 | 924,177 |
| Aug 00 | 30 | 16 | 46 | 926,015 | 923,865 | 1,590,490 |
| Sep 00 | 19 | 47 | 66 | 907,543 | 623,044 | 839,065 |
| Oct 00 | 15 | 23 | 38 | 442,759 | 422,224 | 600,548 |
| Nov 00 | 16 | 23 | 39 | 330,674 | 139,789 | 407,742 |
| Dec 00 | 20 | 40 | 60 | 387,137 | 42,753 | 95,175 |
| | | | | | | |
| Jan 01 | 11 | 14 | 25 | 130,775 | 74,529 | 33,700 |
| Feb 01 | 11 | 10 | 21 | 108,451 | 41,679 | 29,439 |
| Mar 01 | 11 | 8 | 19 | 154,864 | 33,442 | 116,096 |
| Apr 01 | -0- | 8 | 8 | -0- | 30,576 | 23,713 |
| May 01 | 4 | 4 | 8 | 23,582 | -0- | -0- |
| | 793 | 803 | 1,596 | 22,032,252 | -0- | -0- |
| | | | | | -0- | -0- |

EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 4-5.

**RESPONSE: The Ryan Plaintiffs admit that Fath so testified but deny that testimony is relevant or admissible on this motion.**

76.     Fath's chart demonstrated to the Arbitration Panel the monthly and cumulative commissions that Gwynn had received as a result of the excessive trading in the Merit Account during the period between May 1998 and May 2001, as well as Gwynn's commissions from the Merit Account as a percentage of his total commissions during the same period.  EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 2-3.

**RESPONSE: DENIED**

77.     An excerpt from Fath's chart, detailing Gwynn's commissions from trading in the Sowell Account from May 1998 through to May 2001, is as follows:

| Month | Commissions | | Sowell's % of Gwynn's Gross Commission | Margin Charges | |
|-------|---------|------------|------------|---------|------------|
|       | Monthly | Cumulative |            | Monthly | Cumulative |
| May 98 | $3,927 | $3,927 | 85% | -0- | -0 |
| Jun 98 | 6,285 | 10,212 | 73% | -0- | -0 |
| Jul 98 | 11,194 | 21,406 | 80% | -0- | -0 |
| Aug 98 | 3,053 | 24,459 | 30% | -0- | |
| Sept 98 | 13,535 | 37,994 | 85% | -0- | -0 |
| Oct 98 | 10,210 | 48,204 | 73% | -0- | -0 |
| Nov 98 | 10,950 | 59,154 | 87% | -0- | -0 |
| Dec 98 | 16,625 | 75,779 | 96% | -0- | -0 |
| Jan 99 | 23,920 | 99,699 | | 1,152 | 1,152 |
| Feb 99 | 7,665 | 107,364 | | 42 | 1,194 |
| Mar 99 | 12,465 | 119,829 | 52% | 2,545 | 3,739 |
| Apr 99 | 23,806 | 143,635 | 71% | 4,086 | 7,825 |
| May 99 | 15,075 | 158,710 | 77% | 2,238 | 10,063 |
| Apr 99 | 23,806 | 143,635 | 71% | 4,086 | 7,825 |
| May 99 | 15,075 | 158,710 | 77% | 2,238 | 10,063 |
| Jun 99 | 11,264 | 169,974 | 91% | 3,188 | 13,251 |
| Jul 99 | 9,396 | 179,370 | 87% | 4,769 | 18,020 |
| Aug 99 | 12,581 | 191,951 | 73% | 6,945 | 24,965 |
| Sept 99 | 9,640 | 201,591 | 75% | 5,793 | 30,758 |
| Oct 99 | 10,400 | 211,991 | 76% | 10,263 | 41,021 |
| Nov 99 | 16,515 | 228,506 | 77% | 8,677 | 49,698 |

| Month | Commissions | | Sowell's % of Gwynn's Gross Commission | Margin Charges | |
|---|---|---|---|---|---|
| | Monthly | Cumulative | | Monthly | Cumulative |
| Dec 99 | 17,700 | 246,206 | 88% | 8,222 | 57,920 |
| | | | | | |
| Jan 00 | 27,128 | 273,334 | 80% | 10,154 | 68,074 |
| Feb 00 | 9,350 | 282,684 | 60% | 9,901 | 77,975 |
| Mar 00 | 16,717 | 299,401 | 86% | 11,575 | 89,550 |
| Apr 00 | 28,469 | 327,870 | 88% | 11,860 | 101,410 |
| May 00 | 17,700 | 345,570 | 99% | 10,582 | 111,992 |
| Jun 00 | 14,625 | 360,195 | 98% | 9,563 | 121,555 |
| Jul 00 | 13,250 | 373,445 | 89% | 8,579 | 130,134 |
| Aug 00 | 13,426 | 386,871 | 73% | 8,382 | 138,516 |
| Sep 00 | 22,424 | 409,295 | 96% | 15,031 | 153,547 |
| Oct 00 | 12,873 | 422,168 | 98% | 6,489 | 160,036 |
| Nov 00 | 13,410 | 435,578 | 95% | 4,723 | 164,759 |
| Dec 00 | 18,849 | 454,427 | 83% | 3,957 | 168,716 |
| | | | | | |
| Jan 01 | 8,285 | 462,712 | 64% | 923 | 169,639 |
| Feb 01 | 7,275 | 469,987 | | 442 | 170,081 |
| Mar 01 | 6,764 | 476,751 | 94% | 140 | 170,221 |
| Apr 01 | 2,408 | 479,159 | 39% | 506 | 170,727 |
| May 01 | 1,716 | 480,875 | | 132 | 170,859 |

EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 2-3.

**RESPONSE: The Ryan Plaintiffs admit that Fath so testified but deny that testimony is relevant or admissible on this motion.**

78.     According to the figures listed in the chart produced by Fath, Gwynn made at least $179,370 in commissions from Sowell's Merit Account in the three months between the date that the Merit Account was first opened and the Policy's Retroactive Date of August 23, 1999.  EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 2-3.

**RESPONSE: The Ryan Plaintiffs admit that Fath so testified but deny that testimony is relevant or admissible on this motion.  The Ryan Plaintiffs also deny that AIG has correctly**

**calculated the time period as stated since a correct calculation would appear to be 15 months not 3 months**

79.     Fath's chart indicates that in the three months between the date that the Merit Account was first opened and the Policy's Retroactive Date of August 23, 1999, there were approximately 358 "buys" and 301 "sells," and Gwynn derived about 80% of his total commissions from the Merit Account alone.  EXHIBIT R, Sowell Arbitration Exhibit 26, pp. 4-5.

**RESPONSE: The Ryan Plaintiffs admit that Fath so testified but deny that testimony is relevant or admissible on this motion.  The Ryan Plaintiffs also deny that AIG has correctly calculated the time period as stated since a correct calculation would appear to be 15 months not 3 months**

80.     Fath testified before the Arbitration Panel as follows:

Q.          You mentioned I think in and out of trading.  Can you tell the Panel what that is, and if there's evidence of that in this case?

Fath.       Well, there's ample evidence of that if you just look through the monthly statements.  In-and-out trading is when you buy a stock – sell a stock and buy the same stock back again just for trading purposes.  And again, that defeats the whole strategy of the investment objective of growth, just because of the commissions that are eating up the – eating up the account.

Q.          What's churning?

Fath.       Churning is where a broker who is controlling the account effects excessive transactions in the account in light of the investment objective of the account, and he does it to the detriment to the

customer and for his own benefit for the ability to generate commissions for himself.

Q.      Okay.  Based on the testimony you've heard from both sides, is it evident (tape inaudible) who was controlling the account?

Fath.   In my opinion, after looking at the documents and hearing the testimony, it's my opinion that Mr. Gwynn was controlling the account.

EXHIBIT Q, Arbitration Transcript at pp.1273-74.

**RESPONSE: The Ryan Plaintiffs admit that Fath so testified but deny that testimony is relevant or admissible on this motion.**

81.     Fath testified before the Arbitration Panel as follows:

[F]or a broker who's been in the business for a number of years, to have 80 percent of his commissions come from one customer, to me is very uncommon and certainly one that would send up red flags the very first month that would occur, to see the type of trading and who's controlling the account.

EXHIBIT Q, Arbitration Transcript at pp.1283-84.

**RESPONSE: The Ryan Plaintiffs admit that Fath so testified but deny that testimony is relevant or admissible on this motion.**

82.     Sowell provided his own testimony during the Sowell Arbitration.  During the Sowell Arbitration, Sowell testified as follows:

Q.      It says here that you approved all the trades that occurred in the account.

Sowell. That's what it says.

Q.      Is that true?

Sowell.      No.  I mean, I never told David to buy any stock, to sell and to buy it, do anything with it.  The only stock that I asked him buy, he couldn't get.

\*   \*   \*

Q.      Did he ever call you to discuss buying or selling certain stocks and wanting your okay before he did it?

Sowell.      No.

\*   \*   \*

Q.      Did Mr. Gwynn ever tell you the amount of commissions he made off the account?

Sowell.      No.

\*   \*   \*

Q.      Did Mr. Gwynn ever tell you the number of times he turned over this account (tape inaudible) on an annual basis?

Sowell.      No.

Q.      Did anyone from Merit ever tell you?

Sowell.      No.

Q.      Did Mr. Gwynn ever tell you the return on investment that you needed to break even on your investments in your Merit account?

Sowell.      No.

EXHIBIT Q, Arbitration Transcript at pp. 892-95.

83.     Gwynn provided the following testimony during the Sowell Arbitration:

Q.      . . . Now, you having been the broker on the account, did Mr. Sowell's – did the commissions generated through Mr. Sowell's account account for a very large percentage of your gross commissions?

Gwynn.     Yes.

Q.      Okay.  And as you sit here today, do you have any documents or information . . . to dispute [Fath's] calculation on a month-to-month basis?

30

Gwynn.        I don't think so.

Q.            So, it's fair to say, then, that for three years, most of your compensation through Merit was generated by Mr. Sowell's account?

Gwynn.        He was my largest and most active client.

Q.            And far and away the largest and most active client.

A.            Yes.

EXHIBIT Q, Arbitration Transcript at p. 232.

**RESPONSE: The Ryan Plaintiffs admit that Sowell and Gwynn so testified but deny that testimony is relevant or admissible on this motion.**

84.    According to a series of Promissory Notes made by Sowell to Novation/Charter/C3, Sowell's investments in those entities commenced on May 1, 1998, prior to the August 23, 1999 Retroactive Date, and continued through July 24, 2000, amounting to a total of $275,000.  Sowell Arbitration Exhibits 43-51.  A true and correct copy of the Sowell Arbitration Exhibits 43-51 is hereto attached as EXHIBIT S.

**RESPONSE: ADMITTED**

85.    Details of the Promissory Notes made by Sowell to Novation/Charter/C3 between May 1, 1998 to July 24, 2000 are as follows:

| Arbitration Exh. No. | Promissory Note |
|---|---|
| 43 | Full Recourse Promissory note for $50,000 dated May 19, 1998 by Gwynn for Novation, as Maker, and Sowell as Holder and Payee |
| 44 | Full Recourse Promissory Note for $100,000 dated July 1, 1998 by Gwynn for Novation, as Maker, and Sowell as Holder and Payee. |
| 45 | Full Recourse Promissory Note for $25,000 dated November 11, 1999 by Gwynn for Charter, as Maker, and Sowell as Payee |

| 46 | Amendment to November 11, 1999 Full Recourse Promissory Note, dated July 24, 2000 |
| 47 | Full Recourse Promissory Note for $25,000 dated April 27, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |
| 48 | Amendment to April 27, 2000 Full Recourse Promissory Note, dated July 24, 2000 |
| 49 | Full Recourse Promissory Note for $25,000 dated July 24, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |
| 50 | Full Recourse Promissory Note for $25,000 dated July 24, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |
| 51 | Full Recourse Promissory Note for $25,000 dated July 24, 2000 by Gwynn for Charter, as Maker, and Sowell as Payee. |

EXHIBIT S, Sowell Arbitration Exhibits 43-51.

**RESPONSE: ADMITTED**

86.     The Arbitration Panel received evidence that on July 27, 1999, Merit and Newton submitted to the NASD a letter of Acceptance, Waiver and Consent ("AWC") in connection with an earlier NASD investigation into Merit's activities.  Sowell Arbitration Exhibit 111.  A true and correct copy of Sowell Arbitration Exhibit 111 is hereto attached as EXHIBIT T.

**RESPONSE: ADMITTED**

87.     Through the AWC, Merit and Newton accepted and consented to the following findings of the NASD under the heading "Supervision failures":

> During the period from about January, 1996 to about April, 1997, Merit Capital acting through Russell W. Newton its Registered Principal and Chairman, failed to establish and maintain a system to supervise the activities of each registered representative and associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations with the Rules of this Association . . .

EXHIBIT T, Sowell Arbitration Exhibit 111 at pp. 3, 5-6.

**RESPONSE: ADMITTED**

88.    Pursuant to the AWC, Merit and Newton consented to the imposition of a $180,000 fine, as well as to the implementation of corrective actions to be recommended by an independent consultant retained by Merit to review its procedures.  EXHIBIT T, Sowell Arbitration Exhibit 111 at pp. 6-7.

**RESPONSE: ADMITTED**

89.  According to the AWC, Merit and Newton acknowledged that the AWC would become part of their permanent disciplinary records and could be considered in any future actions brought by the NASD against them, and that the AWC would be made available in response to public inquiries through the NASD's public disclosure program.  EXHIBIT T, Sowell Arbitration Exhibit 111 at p. 1.

**RESPONSE: ADMITTED**

90.  On February 25, 2003, three-and-a-half years after Merit and Newton submitted the AWC, the NASD panel in the Sowell Arbitration entered an award in the amount of $1,125,000 ("Arbitration Award") jointly and severally against each of the Plaintiffs, as well as against GFS. EXHIBIT B, Ryan Complaint at ¶75; EXHIBIT C, Gwynn Complaint at ¶72; EXHIBIT P, Arbitration Award at p.7.

**RESPONSE: ADMITTED**

91.  According to the Arbitration Award, the Arbitration Panel found Merit, Newton, Ryan, and Fitzpatrick "jointly and severally liable for failing to supervise Gwynn."  EXHIBIT P, Arbitration Award at p. 7.

**RESPONSE: ADMITTED**

The Arbitration Panel found that Merit had ordered a certain Sandra Logay to supervise Gwynn despite the fact that an earlier January 28, 2000 SEC decision had "concluded '*it is in the public interest to bar Logay from acting in a proprietary or* **supervisory capacity** *with any broker, dealer, or municipal securities dealer.*'" EXHIBIT P, Arbitration Award at p.8 (emphasis in original).

**RESPONSE: ADMITTED**

92. The Arbitration Panel found that each of the Plaintiffs:

[K]nowingly facilitated the apparent violation of the SEC order . . . by ordering Sandra Logay to "visit" Respondent David Gwynn in Scottsdale, Arizona on October 17, 2000 [which] constituted supervisory activity. . . .

EXHIBIT P, Arbitration Award at p.8.

**RESPONSE: ADMITTED**

93.   The Arbitration Award states the following:

After considering the pleadings, the testimony, and the evidence presented at the hearing, the undersigned arbitrators have decided in full and final resolution of the issues submitted for determination as follows:

1.   The panel finds that Respondents [Merit, Fitzpatrick, Newton, Ryan, Gwynn, Raquel Gwynn and GFS] shall be and hereby are jointly and severally liable to claimant for selling unsuitable investments, selling unregistered securities, acting negligently, making negligent misrepresentations, breaching their fiduciary duties to claimant, breaching their contractual obligations to claimant, engaging in conduct falling below the securities industry standard of care, and showing an overall reckless indifference to claimant's interests.

2.   The panel also finds that Respondents, and each of them, are jointly and severally liable for churning claimant's account.

3.     The panel further finds that Respondents Merit, Newton, Ryan and Fitzpatrick, and each of them, are jointly and severally liable for failing to supervise Respondent Gwynn.  The panel specifically finds that Respondent Fitzpatrick failed to alert Claimant to the excessive and inappropriate trading activity in his account, specifically the excessive trading, the trading was not consistent with Claimant's investment objectives, the high commissions, and the heavy use of margin.

4.     The panel awards damages to Claimant in the total sum of $1,125,000.00.

5.     In reaching its decision, the panel makes the following findings of fact concerning Respondent David Gwynn:

6.     Respondent engaged in excessive trading, approximately 1,596 trades in thirty-seven (37) months from May 1998 to May 2001, coupled with the fact that Respondent derived approximately 80% of his gross income from Claimant's account over the same period of time;

7.     Respondent engaged in excessive trading of the same securities (in and out trading, high frequency of trades in the same securities);

8.     Respondent engaged in the churning of Claimant's account, resulting in a Looper turnover of 8.5, and a cost maintenance factor of approximately 25%.

9.     Respondent engage in a pattern of unsuitable trading activity that was contrary to the stated investment objectives of Claimant, to wit;  "long term growth."

10.    Respondent, a registered representative, engaged in a variety of inappropriate activities including:

    i.     Soliciting Claimant (his client) to raise large sums of money for highly speculative venture capital propositions;

    ii.    Soliciting Claimant (his client) to purchase unregistered securities;

    iii.   Failing to disclose serious conflicts of interest with Claimant when soliciting money for highly speculative venture capital propositions, including Respondent's own

35

personal stake in the venture capital propositions and the fact that large sums of money raised from Claimant were to be paid directly to Respondent.

iv.    Respondent was not registered under the Investment Advisors Act of 1940 and was unable to verify that he was a "registered investment advisor" in the State of Arizona. Accordingly, Respondents' conduct in the preparation and dissemination of the documents identified a Claimant's Exhibits "32" ["Financial Planning/Advisory Disclosure Agreement"] and "33" ["Financial Planning/Investment Advisor Agreement"] raises serious questions of fraud and misrepresentation.

11.    The panel also makes the following findings of fact concerning Respondents Merit, its principals Ryan and Newton, and its Compliance Director Fitzpatrick:

12.    Each of said Respondents knowingly facilitated the apparent violation of the SEC order referred to in an SEC decision dated January 28, 2000 in SEC file No. 3-8969, identified as Claimant's Exhibit "113", by ordering Sandra Logay to "visit" Respondent David Gwynn in Scottsdale, Arizona on October 17, 2000. The SEC concluded *"it is in the public interest to bar Logay from acting in a proprietary or **supervisory capacity** with any broker, dealer, or municipal securities dealer."* …

13.    Incidental to the above finding, the panel finds that Respondent Merit's employee, Sandra Logay's "visit" to Respondent David Gwynn in Scottsdale, Arizona on October 17, 2000 constituted supervisory activity in violation of an SEC decision dated January 28, 2000 in SEC file No. 3-8969, identified as Claimant's Exhibit "113".

EXHIBIT P, Arbitration Award at pp. 6-8.

**RESPONSE: ADMITTED**

94.    Plaintiffs allege that:

Nothing in the [Arbitration] Award is predicated on or even refers to any claim or evidence that Sowell's account was discretionary or managed through a power of attorney, and in fact, the Award notes specifically that Respondents had asserted "Sowell exercised control over his account at Merit."

EXHIBIT B, Ryan Complaint at ¶ 78; EXHIBIT C, Gwynn Complaint at ¶ 73.

**RESPONSE: ADMITTED**

95.    AIG ultimately paid $1,000,000 to Sowell in exchange for a full and final adjudication of Sowell's claims against Plaintiffs and GFS.  EXHIBIT B, Ryan Complaint at ¶ 88.

**RESPONSE: ADMITTED**

96.    The Arbitration Award was vacated on September 9, 2003.  Vacation of Arbitration Award.  A true and correct copy of the Vacation of Arbitration Award is hereto attached as EXHIBIT U.

**RESPONSE: ADMITTED**

97.    Plaintiffs do not maintain that they were damaged by AIG's resumption of their defense and payment to vacate the Arbitration Award; rather, they claim that they were damaged because AIG's resumption of their defense and payment to Sowell as "belated."  EXHIBIT B, Ryan Complaint at ¶ 71; EXHIBIT C, Gwynn Complaint at ¶ 68.

**RESPONSE: DENIED**


98.    In support of their claim that AIG's defense was "belated," Plaintiffs allege that AIG "admitted it had a duty to defend" when it resumed Plaintiffs' defense on January 10, 2003. EXHIBIT B, Ryan Complaint at ¶ 64; EXHIBIT C, Gwynn Complaint at ¶ 60.

 **RESPONSE: ADMITTED**

99.    Plaintiffs maintain that Gwynn irretrievably damaged their respective cases by the time that Gwynn's counsel resumed his defense during the Sowell Arbitration. EXHIBIT B, Ryan Complaint at ¶¶ 58-59; EXHIBIT C, Gwynn Complaint at ¶¶ 61-63.

**RESPONSE: ADMITTED**

100.    In support of their claim that AIG's defense was "belated," Plaintiffs allege that AIG "admitted it had a duty to defend" when it resumed Plaintiffs' defense on January 10, 2003. EXHIBIT B, Ryan Complaint at ¶ 64; EXHIBIT C, Gwynn Complaint at ¶ 60.

 **RESPONSE: ADMITTED**


101.    Plaintiffs maintain that Gwynn irretrievably damaged their respective cases by the time that Gwynn's counsel resumed his defense during the Sowell Arbitration. EXHIBIT B, Ryan Complaint at ¶¶ 58-59; EXHIBIT C, Gwynn Complaint at ¶¶ 61-63.

**RESPONSE: ADMITTED**


**B.**    **The Ryan Plaintiffs Counter Statement of Material Facts Not In Dispute**


1.    The professional activities of the Ryan Plaintiffs' were regulated by the National Association of Securities Dealers ("NASD").  Affidavit of Robert Fitzpatrick ("Fitzpatrick Affidavit") at ¶ 1.  The Fitzpatrick Affidavit with all attached exhibits is being simultaneously filed with the Ryan Plaintiffs' Rule 56(a)(2) Statement and Memorandum in Opposition to Summary Judgment.

2.     David Gwynn ("Gwynn") was licensed by the NASD to sell securities.  At relevant times, Gwynn worked as a Registered Representative for Merit.  Fitzpatrick Affidavit at ¶ 2.

3.     Gwynn Financial was a company owned and controlled by Gwynn and was used by him to provide financial planning services to certain of his customers, including some individuals who had accounts at Merit.  Fitzpatrick Affidavit at ¶ 3.

4.     In exchange for an additional premium, NU later extended the coverage period of the Policy one month to September 23, 2001 while it considered Merit's application to renew the coverage for another year.  Fitzpatrick Affidavit at ¶ 4.

5.     The Policy covered all of the Ryan Plaintiffs and the Gwynn Plaintiffs. Fitzpatrick Affidavit at ¶ 5.

6.     Merit paid NU a total in excess of $70,000 in premiums on the Policy.  Fitzpatrick Affidavit at ¶ 6.

7.     Michael A. Sowell ("Sowell") was customer of Gwynn's and Sowell had done business with Gwynn both through Merit's brokerage accounts and otherwise for several years. Fitzpatrick Affidavit at ¶  7.

8.     On or about September 4, 2001, Sowell commenced an NASD arbitration against Merit and Gwynn (the "Sowell Arbitration") by filing a statement of claim pursuant to the NASD arbitration rules August 31, 2001 (the "Sowell Claim").   Fitzpatrick Affidavit at ¶ 8; Defendants' Statement at Exhibit D, Sowell Statement of Claim.

9.     Sowell claimed that in 1998 he contacted Gwynn for his assistance in creating a retirement plan and Pursuant to his conversations with Gwynn, Sowell provided Gwynn with

securities and/or funds for Gwynn to deposit in certain securities accounts, including a trading account, at Merit (the "Merit Account").  Fitzpatrick Affidavit at ¶ 9; Defendants' Statement at Exhibit D, Sowell Statement of Claim at ¶ 14-24.

10.    In the Sowell Claim, Sowell asserted claims against the Gwynn Plaintiffs, Merit and the Individual Ryan Plaintiffs and their wives.   Fitzpatrick Affidavit at ¶ 10; Defendants' Statement at Exhibit D, Sowell Statement of Claim at ¶ 5-10.

11.    In the Sowell Claim, he alleged statutory and regulatory violations against Gwynn for Gwynn's alleged conduct, including allegations of churning the Merit Account, advising Sowell improperly, making inappropriate trades and committing fraud and much of Sowell's claim was addressed to separate business investments that Gwynn and Sowell had planned apart from Merit and Sowell's account at Merit. Fitzpatrick Affidavit at ¶ 11; Defendants' Statement at Exhibit D, Sowell Statement of Claim.

12.    In Count Four, Sowell specifically alleges negligence including negligence in failing to properly advise Sowell on facts pertaining to his account and investments.  Fitzpatrick Affidavit at ¶ 12; Defendants' Statement at Exhibit D, Sowell Statement of Claim at ¶ 94-98.

13.    In Count Seven of Sowell's claim, Sowell specifically alleges that the Ryan Plaintiffs were liable for their failure to supervise Gwynn. Fitzpatrick Affidavit at ¶ 13; Defendants' Statement at Exhibit D, Sowell Statement of Claim at ¶ 117-120.

14.    In Count Nine Sowell expressly alleged violation of NASD rules as a result of recommendation of investments to Sowell that were not suitable.  Fitzpatrick Affidavit at ¶ 14; Defendants' Statement at Exhibit D, Sowell Statement of Claim at ¶ 129.

15.     The losses Sowell claims to have suffered began in 2000.  Fitzpatrick Affidavit at ¶ 15; Defendants' Statement at Exhibit D at ¶ 29-30.

16.     On September 21, 2001, Merit, seeking defense and coverage, submitted notice of the Sowell Claim to its local insurance broker, who forwarded that notice to an NU broker in New York.  Fitzpatrick Affidavit at ¶ 16.

17.     After receiving notice of the claim, on September 22nd, NU was represented by AIGTS in all subsequent aspects of the handling of the Sowell Claim with regard to the Ryan Plaintiffs and the Gwynn Plaintiffs.  Fitzpatrick Affidavit at ¶ 17.

18.     In early October, 2001, based on the allegations contained on the face of the Sowell Claim, AIG decided to provide a defense to the Ryan Plaintiffs and AIG, through its claims analyst Brian Conlin ("Conlin"), issued a reservation of rights letter to the Ryan Plaintiffs, which confirmed that AIG had retained an Arizona law firm to defend the Ryan Plaintiffs, subject to that reservation of rights.  Fitzpatrick Affidavit at ¶ 18; Defendants Statement at ¶40, Exhibit F.

19.     Soon thereafter, AIG retained another law firm to defend the Gwynn Plaintiffs thereby acknowledging the existence of a conflict between the Gwynn Plaintiffs and the Ryan plaintiffs which necessitated separate counsel for the two groups of respondents to the Sowell claim.   Fitzpatrick Affidavit at ¶ 19.

20.     AIG neglected to issue a reservation letter to the Gwynn Plaintiffs.  Fitzpatrick Affidavit at ¶ 20.

21.     AIG, through Conlin, confirmed its right and duty to defend the Gwynn Plaintiffs when he rejected Gwynn's request to hire a lawyer he knew to be experienced in NASD matters

to represent his interests and Conlin specifically asserted AIG had the right to select counsel for the defense, a right it would only have if AIG admitted to having a duty to defend under the Policy.  Fitzpatrick Affidavit at ¶ 21; Defendants' Statement ¶ 11, Exhibit A Policy.

22.    For the next two months, the Ryan Plaintiffs cooperated with AIG by providing Conlin with all the information he requested.   Fitzpatrick Affidavit at ¶ 22.

23.    One document that the Ryan Plaintiffs provided to AIG was a power-of-attorney signed by Sowell, but that power-of-attorney was not notarized or witnessed.  Fitzpatrick Affidavit at ¶ 23.

24.    At AIG's request, the Ryan Plaintiffs advised Conlin that they understood that the power-of-attorney had been provided for Gwynn's use in the event Sowell was unreachable but as far as the Ryan Plaintiffs knew the power-of-attorney had never been used.  Fitzpatrick Affidavit at ¶ 24.

25.    The Ryan Plaintiffs also advised Conlin that according to their records, Sowell's Merit Account had never been a discretionary account and that Merit had eliminated most discretionary accounts several years earlier.  In addition, the Ryan Plaintiffs notified Conlin, that Gwynn had advised Merit that Sowell had personally approved all trades.  Fitzpatrick Affidavit at ¶ 25.

26.    Merit provided AIG with evidence that it had contacted Sowell about the activity of his Merit Account and that Sowell had never previously objected to the trading activity in his account.  Fitzpatrick Affidavit at ¶ 26.

27.    Conlin asked Gwynn for information and documents and some of this information was supplied by Gwynn to the counsel AIG had appointed for him but Gwynn did not provide

the information and documents AIG had requested directly to Conlin.  Fitzpatrick Affidavit at ¶ 27.

28.    Conlin never interviewed Gwynn, Sowell, or any of the Ryan Plaintiffs. Fitzpatrick Affidavit at ¶ 28.

29.    In early 2002, Conlin notified the Ryan Plaintiffs and the Gwynn Plaintiffs that AIG was disclaiming coverage and withdrawing its defense under the Policy because AIG had decided that the Sowell Merit Account was a not covered discretionary account based on the existence of the power-of-attorney.  Conlin denied coverage prior to completing his investigation and prior to obtaining all relevant documents involved in the claim.  Fitzpatrick Affidavit at ¶ 29; Defendants' Statement ¶ 45-49 Exhibits G and H.

30.    Conlin also based his conclusion the Sowell's account was discretionary on his assumption that 71% of Merit's trading accounts were discretionary accounts, which assumption was based on his misreading of NU's underwriting file.  Fitzpatrick Affidavit at ¶ 30.

31.    In January 2002 after receiving the disclaimer letter from AIG, Bruce Ryan called Conlin and objected to AIG's decision to disclaim coverage.  Fitzpatrick Affidavit at ¶ 31.

32.    AIG gave no reason for disclaiming coverage other than alleged fact that the power-of-attorney made the account discretionary.  Fitzpatrick Affidavit at ¶ 32.

33.    After AIG disclaimed coverage, the Ryan Plaintiffs made arrangements to hire AIG's appointed counsel, to continue their own defense and subsequently in the summer of 2002, the Ryan Plaintiffs hired William Federman as replacement defense counsel.  Fitzpatrick Affidavit at ¶ 33.

34.     The Gwynn Plaintiffs initially hired AIG's appointed counsel, Ted Thomason and his associate Maxine Polomski, to provide their defense but eventually found themselves unable to pay and thereafter, Gwynn, on behalf of himself and Gwynn Financial, proceeded *pro se* in the Sowell Claim and Mrs. Gwynn went unrepresented, largely because Gwynn did not realize that his wife was also a respondent to the arbitration claim.   Fitzpatrick Affidavit at ¶ 34.

35.      In a letter dated October 24, 2002 Sowell's counsel wrote to William Federman with copies to Gwynn and Brian Conlin; in that letter counsel advised that the Sowell arbitration had been postponed to January 7, 2003 and that the power of attorney signed by Sowell may have been superseded when Sowell subsequently completed an option form for Merit dated March 7, 1998, which indicated there was no power of attorney for his broker.   Sowell through counsel also made a policy limit demand to settle and specifically advised AIG that Sowell was seeking damages in excess of the policy limits.  Fitzpatrick Affidavit at ¶ 35.

36.     Despite the fact he received this letter, Conlin admitted that AIG never responded, that AIG did not reopen its coverage file, and that AIG never sought to investigate the new information provided by Sowell's counsel about the possibility that the power of attorney had been rescinded or repudiated by Sowell.  Fitzpatrick Affidavit at ¶ 36.

37.      In a January 3, 2003 letter, Gwynn's specially retained coverage counsel, contacted AIG and threatened to settle with Sowell and assign Gwynn's bad faith claim against AIG under either so called *Morris* or *Damron* agreements under Arizona law.  In that letter Gwynn's counsel also pointed out that AIG's decision to revoke coverage based on the power of attorney was unsupportable because, Gwynn had never been shown the power of attorney by AIG, Sowell's counsel had noted the option trading form signed by Sowell may have revoked the

power of attorney, other documents confirmed that Sowell maintained discretion over all accounts, and that Gwynn would confirm that the account was non-discretionary at all times. Gwynn's counsel also noted that AIG had never investigated the claims by interviewing Gwynn and/or Sowell.  Fitzpatrick Affidavit at ¶ 37, Exhibit 10.

38.     After receiving a copy of the power of attorney from AIG, Gwynn's counsel on January 6, 2003 advised AIG that the power of attorney was invalid under Arizona law because it was not notarized.  Fitzpatrick Affidavit at ¶ 38; Defendants' Statement at ¶ 56-57, Exhibit K.

39.      AIG asked Arizona counsel from the firm of Struckmeyer and Wilson to review the matter.  AIG reported to Gwynn's coverage counsel that it was reviewing the matter. Fitzpatrick Affidavit at ¶ 39, Exhibit 11.

40.      During the first three days of the Sowell arbitration hearing, beginning on January 7, 2003, Gwynn appeared *pro se*.  Fitzpatrick Affidavit at ¶ 40.

41.     By all accounts Gwynn severally compromised the defense for all of the respondents in the Sowell Arbitration in that he was unprepared, repeatedly stated he did not know the proper procedure, repeatedly stated his insurer was not paying for a defense, produced a massive quantity of documents which had not been timely produced in the arbitration and which had never been seen by the Ryan Plaintiffs or their counsel Attorney Federman.   Further Gwynn's appearance undermined he credibility in that He looked extremely nervous, was sweating and pale.   Fitzpatrick Affidavit at ¶ 41.

42.     The Ryan Plaintiffs were represented in the arbitration by Attorney Federman, but he did not have an expert witness because the Ryan Plaintiffs did not have the funds to retain an expert when AIG disclaimed its duty to defend.  Fitzpatrick Affidavit at ¶ 42.

43. Federman's ability to defend was severally compromised by Gwynn's conduct during the first three days of his Sowell Arbitration. Fitzpatrick Affidavit at ¶ 43.

44. On January 9, 2003, three days after the arbitration had begun, Attorney Jeffrey A. King of Struckmeyer and Wilson advised Conlin that the firm had not yet had an opportunity to complete a coverage analysis. Fitzpatrick Affidavit at ¶ 44, Exhibit 13.

45. King recommended to Conlin, that AIG immediately provide a defense for Gwynn and Merit (the Ryan Plaintiffs) and he based this recommendation on an analysis that providing a defense would bar Gwynn from entering into a *Damron* agreement and would make it more difficult for Gwynn to enter into a *Morris* agreement. Fitzpatrick Affidavit at ¶ 45, Exhibit 13.

46. It was based solely on this advice from attorney King that AIG decided to resume providing a defense for the Gwynn Plaintiffs and the Ryan Plaintiffs. Fitzpatrick Affidavit at ¶ 46.

47. On January 10, 2003, after three days of the arbitration had been completed, AIG advised Gwynn's coverage counsel that it would provide a defense for Gwynn. AIG contacted its previously retained defense counsel Tim Thomason and Maine Polomski. Fitzpatrick Affidavit at ¶ 47.

48. On January 10, 2003, Attorney Polomski advised Conlin that Mr. Thomason was unavailable to handle the matter. Fitzpatrick Affidavit at ¶ 48.

49. On January 10, 2003, Ms Polomski was then a fourth year associate with no first chair trial experience and no expertise or experience in NASD arbitrations. Fitzpatrick Affidavit at ¶ 49.

50.     Mr. Conlin on behalf of AIG agreed that Polomski could defend Gwynn, and AIG made no effort to insist that a partner or experienced litigator defend the Gwynn Plaintiffs. Fitzpatrick Affidavit at ¶ 50.

51.     On or about January 11 or 12, when Polomski advised Conlin that she could not possibly review all the documents and prepare to defend the arbitration with only a weekend to get ready, Conlin advised her not to worry about that problem, because AIG did not expect her to succeed in her defense anyway.  Fitzpatrick Affidavit at ¶ 51.

52.     AIG had initially agreed in 2001 that the defense required an expert witness, AIG made no effort to retain an expert witness for the Gwynn Plaintiffs or the Ryan Plaintiffs in the arbitration.  Fitzpatrick Affidavit at ¶ 52.

53.      Late on Friday, January 10, 2003, Attorney King also contacted Attorney Federman and offered to provide a defense of the Ryan Plaintiffs.  When Federman advised him that it made no sense to bring in new counsel to defend the Ryan Plaintiffs at that stage of the Sowell Arbitration, King responded that AIG would pay for the defense of the Ryan Plaintiffs and advised that "AIG has not changed its position on coverage."  King confirmed these comments in a brief e-mail.  Fitzpatrick Affidavit at ¶ 53; Defendants' Statement ¶ 64, See Exhibit M.

54.     King never provided any letter confirming AIG's position to Federman and AIG never explained or elaborated on what position it was taking on coverage.  Fitzpatrick Affidavit at ¶ 54.

55.     In January 2003, AIG did not provide any reservation of rights letter to either Gwynn or the Ryan Plaintiffs, did not state that it was maintaining its position that no coverage

existed, and did not disclose that its reason for resuming the defense was solely to protect AIG

from Gwynn entering into a *Damron* or *Morris* agreement under Arizona law.  Fitzpatrick

Affidavit at ¶ 55.

      56.     On January 10, 2003 AIG was provided with a detailed letter from one of

Sowell's counsel Frank Moskowitz explaining how badly Gwynn had performed in the first three

days of the Sowell Arbitration hearing and pointing out the financial exposure facing Gwynn and

the Ryan Plaintiffs.  That letter also explained that the evidence during the first three days of the

Sowell Arbitration Hearing from Gwynn and Sowell rebutted any claim of the account being

discretionary.  Fitzpatrick Affidavit at ¶ 56; Defendants' Statement at ¶ 66-68.

      57.      AIG never responded to the points made in Moskowitz' letter dated January 10,

2003.  Fitzpatrick Affidavit at ¶ 57.

      58.      On January 13, 2006 after the arbitration had resumed Maxine Polomski advised

Conlin in a letter that she did not believe there was a defense to the action and that AIG should

attempt to settle the matter as soon as possible.  Fitzpatrick Affidavit at ¶ 58.

      59.     On January 13, 2006, Polomski also forwarded two additional letters from

Sowell's Counsel, Alan Baskin, dated January 11 and 12, 2003, which further emphasized the

weakness of the defense in the first three days of the arbitration when Gwynn had proceeded

without counsel [Fitzpatrick Affidavit at ¶ 59, Exhibit 16].  In those letters, Baskin also noted

that on behalf of Sowell a major focus of the evidence had been offered to support Sowell's

allegations of the Ryan Plaintiffs failure to properly supervise Gwynn, and Baskin also provide

information that Sowell's expert would offer testimony for damages in the range of $1.2 million.

Fitzpatrick Affidavit at ¶ 60, Exhibits 17 and 18.

60.     AIG took no steps to respond to this information from Polomski and Baskin in the letters it was provided on January 13, 2003.  Fitzpatrick Affidavit at ¶ 61.

61.     AIG did not assist Polomski or Federman at the balance of the Sowell Arbitration hearing on January 13, 14 and 15, 2003.  Fitzpatrick Affidavit at ¶ 62.

62.     AIG did not authorize the retention of any defense expert and did not try to locate any such expert. Fitzpatrick Affidavit at ¶ 63.

63.     AIG never advised he Ryan plaintiffs or the Gwynn Plaintiffs that while AIG was providing a defense it did not intend to participate in the defense in anyway and that it would not initiate or participate in settlement negotiations.  Fitzpatrick Affidavit at ¶ 64.

64.     AIG's representatives, including Conlin and his then supervisor Jonathan Weber, did not attend or closely monitor the Sowell Arbitration Hearing.  Fitzpatrick Affidavit at ¶ 65.

65.     From January 13, 2003 through March 23, 2006, AIG did nothing to assist in the defense of its insureds.  Fitzpatrick Affidavit at ¶ 66.

66.     Conlin stopped making entries in his computer file for this matter on January 13, 2003 and AIG now claims the file was transferred at some point thereafter in January 2003 to its coverage department, but AIG failed to advise its insureds or their counsel in the Sowell Arbitration, that Conlin and his claims handling group were no longer handling the file for AIG. Fitzpatrick Affidavit at ¶ 67.

67.     By letter dated January 16, 2003 Attorney Federman advised Conlin and King of the likelihood of an award for Sowell.  He stated to AIG that while he believed the case might previously have been settled for $240,000, he now thought that Sowell's counsel would want considerably more to settle. He advised AIG that Sowell was seeking about $1.2 million in

compensatory damages, plus punitive damages of $500,000 and additional amounts for fees and

arbitration expenses.  Federman specifically advised AIG that;

> The mere entry of an award, no matter the dollar amount, can have a
> detrimental effect on the individual Respondents Ryan, Newton and
> Fitzpatrick's ability to continue in the securities industry and will
> negatively impact their securities licenses as well as directly affect Robert
> Fitzpatrick's license to practice law in the State of New York.

Federman also asked whether AIG wanted to obtain tapes of, evidence or exhibits from or further

information concerning the hearing.  Fitzpatrick Affidavit at ¶ 68, Exhibit 19.

68.    AIG never responded to Federman's letter dated January 16, 2003.  Fitzpatrick

Affidavit at ¶ 69.

69.    By letter dated February 5, 2003, Federman advised King and Conlin of the

potential irreparable harm to Ryan, Newton, and Fitzpatrick from the likely entry of an award

against them and the necessity for AIG to try to settle the claim.  Federman also advised AIG

that Sowell's counsel had made a policy limits settlement overture. Fitzpatrick Affidavit at ¶ 70,

Exhibit 20.

70.    Neither King nor Conlin responded to Federman's letter dated February 5, 2003.

Fitzpatrick Affidavit at ¶ 71.

71.    On February 25, 2003, the Sowell Arbitration panel entered an award against the

Ryan Plaintiffs and the Gwynn Plaintiffs, jointly and severally, in the amount of $1,125,000 (the

"Award"). Fitzpatrick Affidavit at ¶ 72; Defendants' Statement ¶ 72, Exhibit P.

72.    The arbitration panel's decision did not in any way turn on whether the Sowell

Merit Account was discretionary or was under the control of the power-of-attorney and the

arbitration panel expressly held the Ryan Plaintiffs liable for their failure to supervise Gwynn. Fitzpatrick Affidavit at ¶ 73.

73.     After the entry of the Award, the Ryan Plaintiffs, through Federman, and the Gwynn Plaintiffs, through Polomski, repeatedly contacted AIG about a motion to vacate or other response to the award, but neither Conlin nor King timely responded. Fitzpatrick Affidavit at ¶ 74.

74.     By early March 2003, Sowell's counsel had moved to confirm the award in Arizona state court. Fitzpatrick Affidavit at ¶ 75.

75.     Even after Sowell's counsel moved to confirm the Award, AIG still failed to provide defense counsel for the Ryan Plaintiffs or the Gwynn Plaintiffs with any direction as to what steps could be taken to challenge the Award. Fitzpatrick Affidavit at ¶ 76.

76.     In early March 2003, attorney King took steps with Attorney Donald Wilson to complete the coverage analysis Struckmeyer and Wilson had promised to complete for AIG by January 13, 2003. Fitzpatrick Affidavit at ¶ 77.

77.     On March 5, 2003 coverage counsel for the Ryan Plaintiffs wrote to King advising him of the bad faith of AIG in not properly defending the Sowell Arbitration and demanding that AIG take some steps to defend the Ryan Plaintiffs, to settle Sowell's claim and vacate the Award. Fitzpatrick Affidavit at ¶ 78, Exhibit 21.

78.     On March 5 and March 6, 2003 Federman called repeatedly and wrote to Attorney King seeking some direction for the defense including permission to appeal the Award. On March 6, 2003 King responded that he had referred the issues to AIG. Fitzpatrick Affidavit at ¶ 79, Exhibit 22.

79.     On March 7, 2003, Struckmeyer and Wilson completed its coverage analysis and provided it via facsimile to Brian Conlin.  Fitzpatrick Affidavit at ¶ 80, Exhibit 23.

80.     As of March 14, 2003, AIG still had not authorized Federman or Polomski to appeal the Award or to defend against the Motion to Confirm the Award that Sowell's counsel had filed in Arizona state court and AIG had taken no steps toward settling or vacating the Award.  Fitzpatrick Affidavit at ¶ 81.

81.     On March 14, 2003, coverage counsel for the Ryan Plaintiffs notified Attorney King that if AIG did not take some action to defend the underlying claim and vacate the award, the Ryan Plaintiffs would have to pursue other legal remedies.  Fitzpatrick Affidavit at ¶ 82, Exhibit 24.

82.     On March 24, 2003 Attorney King on AIG's behalf authorized Federman and Polomski to appeal the Award, but did not address any other issues regarding resolving or settling the Sowell Claim.  Fitzpatrick Affidavit at ¶ 83, Exhibit 25.

83.     On March 25, 2006, coverage counsel for the Ryan Plaintiffs wrote to Donald Wilson of Struckmeyer and Wilson demanding mediation under the Policy.  Fitzpatrick Affidavit at ¶ 84, Exhibit 26.

84.     Attorney Wilson did not respond to that demand until he sent a letter by regular mail on April 8, 2003 when he advised the Ryan Plaintiffs that he had referred the issue to AIG and questioned the basis for the demand for mediation, not withstanding his knowledge that the Policy clearly provided for mediation.  Fitzpatrick Affidavit at ¶ 85, Exhibit 27.

85.     The Ryan Plaintiffs coverage counsel notified Wilson on or after April 11, that the Ryan Plaintiffs had commenced this action on April 9, 2003.  Fitzpatrick Affidavit at ¶ 86, Exhibit 28.

86.      In the summer of 2003 and after the Ryan Plaintiffs had commenced this action, AIG approached Sowell in an attempt to settle the Award.  Fitzpatrick Affidavit at ¶ 87.

87.     In late August or early September, 2003, AIG paid Sowell $1,000,000 to settle Sowell's claim, and in return,  Sowell agreed to allow the Arizona court to vacate the Award and AIG itself received a release from Sowell.  Fitzpatrick Affidavit at ¶ 88, Exhibits 29 and 30.

88.     In paying to settle with Sowell, AIG issued no reservation of rights letter to the Ryan Plaintiffs or the Gwynn Plaintiffs and at that time gave indication to the Ryan Plaintiffs that the payment was under protest or was subject to any claims or defenses about the Policy. Fitzpatrick Affidavit at ¶ 89.

89.      AIG knew, or should have known, that under NASD rules and regulations, even though the Award was vacated in court, the Ryan Plaintiffs were and are still required to report the nature of the Award in various NASD filings and must disclose the Award to various state and federal regulators.  Fitzpatrick Affidavit at ¶ 90.

90.     Due to the Award, the Ryan Plaintiffs remain subject to regulatory investigation. Further, the Award and Sowell's Claim continue to be admissible in other NASD proceedings against the Ryan Plaintiffs.  Fitzpatrick Affidavit at ¶ 91.

91.     After agreeing to pay defense costs for the Ryan Plaintiffs and the Gwynn Plaintiffs, AIG has now asserted claims against the Ryan Plaintiffs seeking to recoup all legal

fees AIG paid in defense of the Sowell claim from the Ryan Plaintiffs.  Fitzpatrick Affidavit at ¶ 92.

92.     After voluntarily settling the Sowell claim and Paying Sowell $1,000,000, AIG has now asserted claims against the Ryan Plaintiffs seeking to recoup the $1,000,000 settlement payment from the Ryan Plaintiffs.  Fitzpatrick Affidavit at ¶ 93.

93.     AIG makes a practice of waiving exclusions to coverage when it believes it is in its business interest to do so.  Fitzpatrick Affidavit at ¶ 94.

94.     AIG admits that Sowell's Arbitration Claim does state various theories of liability which are within the coverage provided by the Policy.  Fitzpatrick Affidavit at ¶ 95.

95.     Generally, AIG provides defense and coverage for claims of churning under the Policy.  Fitzpatrick Affidavit at ¶ 96.

96.     AIG concedes that many of Sowell's claims fall within the scope of the insuring agreement of the Policy.   Fitzpatrick Affidavit at ¶ 97.

97.     In determining its rights and duties to the Ryan Plaintiffs and the Gwynn Plaintiffs in the period from September 2001 through March 2003, AIG never determined whether it was applying Connecticut law or Arizona law, and seemed to wholly ignore the possibility that such a determination might impose different duties on AIG.  Fitzpatrick Affidavit at ¶ 98.

98.     AIG admits that "discretionary" is not defined in the Policy.  Conlin initially testified for exclusion (s) to preclude coverage there had to be the actual exercise of discretionary control.  Weber testified that the mere allegation of the existence of a discretionary account was sufficient to trigger exclusion (s).  Fitzpatrick Affidavit at ¶ 99.

99.     AIG had an internal policy that required review by its coverage group and the commencement of a declaratory judgment action when AIG chose to withdraw a defense from its insured after having agreed to provide a defense.  Fitzpatrick Affidavit at ¶ 100.

100.    AIG did not review its decision to revoke its agreed upon defense of the Ryan Plaintiffs and Gwynn Plaintiffs with its coverage group in January 2002, and AIG did not commence a coverage action at the time it decided to revoke that defense.  Fitzpatrick Affidavit at ¶ 101.

> **PLAINTIFFS, BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES INC.,**
>
> By_____/s/ Stephanie A. McLaughlin_____
>       Peter M. Nolin (ct06223)
>       Stephanie A. McLaughlin (ct22774)
>       **Sandak Hennessey & Greco LLP**
>       707 Summer Street
>       Stamford, CT  06901
>       (203) 425-4200
>       (203) 325-8608 (fax)
>       pnolin@shglaw.com
>       smclaughlin@shglaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2006, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

_____/s/ Stephanie A. McLaughlin___
Stephanie A. McLaughlin