UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES, INC., | ) ) ) ) | CASE NUMBER: 3:03 CV 00644 (CFD) |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., | ) ) ) ) | |
| Defendants, | ) ) | |
| DAVID W. GWYNN and RAQUEL GWYNN, | ) ) | CASE NUMBER: |
| Plaintiffs, | ) ) | 3:03 CV 1154 (CFD) |
| v. | ) ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., | ) ) ) ) | |
| Defendants. | ) | January 23, 2007 |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS**

Defendants, National Union Fire Insurance Company of Pittsburgh, PA. and AIG Technical Services, Inc. (collectively, "AIG" or "Defendants"), hereby submit this Reply in support of their Motion for Summary Judgment on All Counts against Plaintiffs, Bruce Charles Ryan ("Ryan"), Russell William Newton ("Newton"), Robert Fitzpatrick ("Fitzpatrick"), and Merit Capital Associates, Inc. ("Merit") (collectively, the "Ryan Plaintiffs"), and Plaintiffs David W. Gwynn ("Gwynn") and Raquel Gwynn (collectively, the "Gwynn Plaintiffs"). There are no genuine issues as to any material facts, and AIG is entitled to judgment as a matter of law.

# ARGUMENT

When the Court reviews the allegations of the Statement of Claim and Amended Statement of Claim ("Sowell's Claims") under the relevant provisions of the Policy, it will become evident that several Policy exclusions precluded coverage for Sowell's Claims. Even though AIG nevertheless paid Plaintiffs' defense costs and $1 million to vacate the Arbitration Award, those actions *did not create coverage where previously none existed under the Policy*.

1. <u>Exclusions (s) and (f) Each Separately Precluded Coverage For The *Entirety* of Sowell's Claims Based *Solely* on the *Allegations* of the Statement of Claim and Amended Statement of Claim</u>

Plaintiffs argue that not all of the allegations in Sowell's Claims fit within the Policy's exclusions. This is incorrect. Exclusions (s) and (f), each on their own, precluded coverage for the *entirety* of Sowell's Claims. Furthermore, exclusions (s) and (f) each precluded coverage based *solely* on the *allegations* of the Statement of Claim and Amended Statement of Claim.[1]

### a) "Alleging"

Plaintiffs would have this Court ignore the fact that exclusions (s) and (f) preclude coverage based *solely* on the *allegations* of the underlying claim. However, Connecticut's highest court has instructed that

> <u>[E]ach and every sentence, clause, and word of a contract of insurance should be given operative effect</u>. Since it must be assumed that each word contained in an insurance policy is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction.

<u>Buell Indus., Inc. v. Greater New York Mut. Ins. Co</u>., 259 Conn. 527, 539 (2002) (citation omitted) (emphasis supplied).

---

[1] Nevertheless, as set forth in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment, Sowell *actually proved* the allegations in his Statement of Claim and Amended Statement of Claim.

The Second Circuit has similarly held: "Like any other contract, effect must be given to all [the] provisions [of an insurance policy]." Mazzaferro v. RLI Ins. Co., 50 F.3d 137, 140 (2d Cir. 1995). "Every provision is to be given effect, if possible, and <u>no word or clause eliminated as meaningless, or disregarded as inoperative</u>, if any reasonable meaning consistent with the other parts of the policy can be given to it." Id. (citation omitted). "Every clause or word is deemed to have some meaning." Id.

Accordingly, effect must be given to the word "alleging" in exclusions (s) and (f). These exclusions preclude coverage based *solely* on the *allegations* of the underlying claim.[2]

### b) "Arising Out of"

Exclusions (s) and (f) also each contain the phrase "arising out of." "[T]he phrase 'arising out of' has been held by Connecticut courts to signify a causal relationship between the alleged injury and an incident, occurrence or circumstance." Town of Manchester v. Vermont Mut. Ins. Co., No. CV044004859, 2006 WL 164886, at *2 (Conn. Super. Jan. 3, 2006). "[T]he term 'arising out of' in Connecticut law is to be given a very broad interpretation." Id. at *3.

In United Services Automobile Association v. Kaschel, 84 Conn. App. 139 (2004), the insured sought coverage under a homeowners policy for his failure to render aid to a victim following an automobile accident. The policy contained an exclusion for claims "arising out of" the use of motor vehicles owned or operated by an insured. The trial court concluded that the allegations of failure to aid in count two of the complaint were independent of the driver's use of his automobile and thus were not excluded from coverage under the homeowners policy.

In reversing, the Kaschel court noted:

---

[2] Exclusion (t) also precluded coverage based solely on the allegations of the underlying claim, as discussed in Defendants' Memorandum of Law in Support of their Motion for Summary Judgment.

> [I]t is generally understood that for liability for an accident or an injury to be said to 'arise out of' the 'use' of an automobile for the purpose of determining coverage under the appropriate provisions of a liability insurance policy, it is sufficient to show only that the accident or injury 'was connected with,' 'had its origins in,' 'grew out of,' 'flowed from,' or 'was incident to' the use of the automobile, in order to meet the requirement that there be a causal relationship between the accident or injury and the use of the automobile.

Kaschel, 84 Conn. App. 139, 145 (2004) (citing Hogle v. Hogle, 167 Conn. 572, 577 (1975)) (emphasis supplied).

The court held that the motor vehicle accident was the "**operative event**" giving rise to the injuries alleged in count two, and therefore those injuries were "connected with," "had their origins in," "grew out of," "flowed from" or were "incident to" to the use of the vehicle. Id. at 146. Accordingly, pursuant to Hogle, Kaschel held that any injuries sustained as a result of the insured's failure to render aid "arose out of" the insured's use of his motor vehicle, and were thus excluded from coverage. Id. The fact that the insured exited his vehicle to check on the victim before leaving the scene without rendering assistance did not establish "the insufficiency of the causal nexus" between the alleged injuries and the use of the vehicle for coverage to exist. Id.

In Gen. Star Indemn. Co. v. Millington, No. CV0101839085, 2006 WL 1680985 (Conn. Super. May 31, 2006), the insurer sought to deny coverage for a claim of negligent police supervision and training after a bystander was killed as the result of a high-speed police chase. The policy contained an exclusion for injuries "arising out of" the use of an automobile.

Based on the "broad reading" of "arising out of" exclusionary provisions in accordance with Hogle and Kaschel, the court agreed with the insurer that there were no issues of material fact and that all of the claims in the three underlying cases were clearly excluded from coverage. Millington, 2006 WL 1680985, at *4. The court held:

> In all cases an automobile collision resulting from the police chase was the <u>operative event of the injury sustained</u>. *Kaschel* specifically applies the exclusion to the claims of failure to render aid. <u>The reasoning applies equally to the claims of negligent supervision and negligent training. If there was not a motor vehicle accident there would not and could not be any claims based upon negligent supervision and training</u>, which claims clearly "flowed from" and "had their origins in" the motor vehicle collisions. There are no facts pleaded which establish a claim that the injuries could have resulted wholly from the independent failures to train or supervise in the absence of the motor vehicle collisions.

Id. (emphasis supplied). The court also found that the claim of emotional distress by the deceased bystander's mother, who witnessed her daughter's death, also "arose out of" the injury to her daughter by the vehicle, and thus was similarly excluded from coverage by the automobile exclusion. Id.

In Nationwide Mut. Fire. Ins. Co. v. Spittle, No. CV 054013252, 2006 WL 1530173, at *2 (Conn. Super. May 19, 2006), an insured caused serious burns to the plaintiff in an underlying negligence action after carelessly throwing a gasoline container that had been accidentally ignited while the insured was pouring gasoline into a faulty automobile. The insurer denied coverage based on an exclusion for bodily injury "arising out of" the ownership, maintenance, use or entrustment to others of any automobile. Id. at *3.

Agreeing with the insurer, the Spittle court rejected the insured's "attempts to distinguish the pouring of the gasoline into the [automobile] and the throwing of the burning gasoline into two occurrences, thus separating the latter from any relation to the [automobile]." Id. The court held that the alleged injury "arose out of" the use of an automobile, and the exclusion thus precluded coverage. Id.[3]

---

[3] Generally, courts in other jurisdictions apply "arising out of" exclusions to bar all claims that would not have been asserted "but for" the conduct proscribed by the exclusion. The court examining the exclusion inquires whether there would have been a basis for the plaintiff's suit in the absence of the underlying conduct proscribed in the exclusions. Fuller v. First Fin. Ins. Co., 448 Mass. 1, 6-7, 858 N.E.2d. 288, 292 (Dec. 14, 2006).

c) <u>Exclusion (s)</u>

Exclusion (s) precludes liability:

> for Loss in connection with any Claim made against an Insured . . . <u>alleging</u>, <u>arising out of</u>, based upon or attributable to an Insured exercising discretionary authority or <u>control</u> with regard to management or disposition of assets. . . . .

(Emphasis supplied).

Here, all of Sowell's Claims "alleged," "arose out of," or were based upon or attributable to Plaintiffs' exercise of discretionary authority or "control" *with regard to the management or disposition of assets in Account no. LFW-00053-A5 (the "Merit Account")*.[4]  The Statement of Claim and Amended Statement of Claim alleged that Gwynn exercised control over Sowell's Merit Account by making excessive, inappropriate, and unauthorized trades[5] and by directing Sowell to use assets from his Merit Account to invest in unregistered securities in Gwynn's own companies (the "Charter School Investments").[6]

Gwynn's control over the Merit Account indisputably was the "**operative event**" of all of Sowell's injuries.  Thus, exclusion (s) precludes coverage for *all* of Sowell's Claims, including those against the Ryan Plaintiffs.  As in <u>Millington</u>, if Gwynn had not exercised control over the Merit Account, "there would not and could not be any claims based upon negligent supervision and training, which claims clearly 'flowed from' and 'had their origins'" in Gwynn's control over the Merit Account.  Sowell's injuries could not have resulted "wholly

---

[4] The Gwynn Plaintiffs concede that Sowell's Claims "alleged, several times, that Gwynn managed his account at Merit as a discretionary account." Gwynn Plaintiffs' Response, p.18. The Ryan Plaintiffs similarly concede that Sowell's Claims include "an allegation that Sowell's Merit account was discretionary." Ryan Plaintffs' Response., p.27.
[5] As detailed in Defendants' Motion for Summary Judgment, Gwynn made 1,596 trades in the Merit Account in 37 months, generating hundreds of thousands of dollars of commissions.
[6] The Charter School Investments were loans, never repaid, to Gwynn's own companies.

from the independent failures to train or supervise in the absence of" Gwynn's exercise of control over the Merit Account. Millington, 2006 WL 1680985, *4.

Accordingly, the allegations of Sowell's Claims, on their own, triggered exclusion (s) and entirely precluded coverage.[7] A different conclusion would not give effect to the Policy's exclusionary provisions, nor meaning to the word "alleges" or the phrase "arising out of." See e.g., Mazzaferro v. RLI Ins. Co., 50 F.3d 137 (2d Cir. 1995); Buell Indus., Inc. v. Greater New York Mut. Ins. Co., 259 Conn. 527 (2002),

Nevertheless, the Gwynn Plaintiffs claim that the testimony of an AIG representative, Jonathan Weber, is an "admission" that "at least some of Sowell's allegations were covered by the policy." Gwynn Plaintiffs' Response Opposition to Defendants' Motion for Summary Judgment ("Gwynn Plaintiffs' Response"), pp. 23-24 (citing Weber's deposition at page 180).[8] The Gwynn Plaintiffs mischaracterize Weber's testimony.

The referenced testimony actually consists of the following colloquy:

Q: You would agree with me, sir, that the claims alleged or some of the claims alleged in Mr. Sowell's statement of claim are in fact covered <u>under the policy's insuring agreement</u>, correct?

A. <u>Yes</u>.

September 26, 2006 deposition of Jonathan Weber (emphasis supplied). Clearly, Weber agreed only that Sowell's Claims fell under the Policy's *insuring agreement* (which AIG does not

---

[7] The Ryan Plaintiffs argue that under AIG's interpretation of exclusion (s), "any time a broker, unbeknownst to his or her employer, took control over an account the Policy would not protect the company for failure to supervise." Ryan Plaintiffs' Memorandum, p. 30. That is not accurate. Exclusion (s), for example, does not apply to the purchase of no-load mutual funds or variable annuities in which there is not an initial or contingent sales charge or commission, even when the broker has discretionary authority.

[8] The Gwynn Plaintiffs cite to "Exhibit F at 180." Exhibit F is defined in the Gwynn Plaintiffs' Index as "Excerpts from Deposition Transcript of Jonathan Weber, September 25, 2006." However, the transcript from Weber's September 25, 2006 deposition does not include page 180, which is actually included in the transcript from Weber's September **26**, 2006 deposition.

dispute) -- <u>not</u> that the Policy's exclusionary provisions did not encompass and exclude all of Sowell's Claims.[9]

### Exclusion (f)

Exclusion (f) precludes liability "for Loss in connection with any Claim made against an Insured . . . <u>alleging</u>, <u>arising out of</u>, based upon or attributable to any <u>Wrongful Act</u> occurring prior to the Retroactive Date or <u>arising out of</u> any <u>subsequent interrelated Wrongful Act</u>." (Emphasis supplied). Plaintiffs concede that the Retroactive Date was August 23, 1999. [Ryan Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Ryan Plaintiffs' Response"), p. 31].

The Policy defines "Interrelated Wrongful Act(s)" as:

Wrongful Acts[10] which are the same, related or continuous or Wrongful Acts which <u>arise from the same, related or common nexus of facts regardless of whether such Claims involve the same or different claimants, Insureds or legal causes of action</u>.

(Emphasis supplied).

---

[9] The Ryan Plaintiffs inexplicably spend three (3) pages of their Response arguing that Sowell's Claims fall within the Policy's insuring agreement before acknowledging that AIG does not dispute that the claims fall under the insuring agreement. Ryan Plaintiffs' Response, pp. 22-24. However, the Sowell Claims do <u>not</u> "fall squarely within the **coverage** of the Policy," (emphasis supplied), as stated by the Ryan Plaintiffs, since the Policy's exclusionary provisions preclude such coverage. A policy exclusion always and necessarily removes from coverage a claim that might otherwise constitute a covered claim. <u>Cont'l Cas. Co. v. Canadian Universal Ins. Co.</u>, 924 F.2d 370, 377 (1st Cir. 1991) (an exclusion operates to relieve insurer of liability for what otherwise would be its coverage for wrongful acts under an insurance policy); <u>Andover Newton Theological School, Inc. v. Cont'l Cas. Co.</u>, 930 F.2d 89, 95 (1st Cir. 1991) ("[The insurer] does not deny that discriminatory acts are 'wrongful acts' within the meaning of the policy. Coverage for wrongful acts, however, is limited by a specific exclusion . . ."). That is the very nature of an exclusion, of course: it excludes from coverage something that might otherwise be covered. <u>Cont'l Cas. Co.</u>, 924 F.2d at 377; <u>see</u> <u>also,</u> <u>Shelter Mut. Ins. Co. v. Ballew</u>, 203 S.W. 3d 789, 795 (Mo. App. Ct. 2006) ("An exclusion provision in an insurance policy, by definition, excludes risk").

[10] The Policy defines a "Wrongful Act" as any error or omission by the Broker/Dealer, any director, officer, partner or employee thereof, or by any Registered Representative in their respective capacities as such.

The Ryan Plaintiffs claim that "[s]ome of Sowell's claims are not identified as having started prior to the retroactive date such as the claims of Negligence, Failure to Supervise and recommending unsuitable trades." Ryan Plaintiffs' Response, p. 32.  However, the Wrongful Acts alleged in the Statement of Claim and Amended Statement of Claim all "arose from" the "same, related or common nexus of facts" – i.e., Gwynn's exercise of control over the Merit Account.  Thus, all of the Wrongful Acts underlying Sowell's Claims were Interrelated Wrongful Acts as defined by the Policy.  Furthermore, the Policy specifies in its definition of Loss: "Loss arising from Claim(s) alleging . . . Interrelated Wrongful Acts shall be deemed a single Loss under this policy."

Sowell clearly alleged that these Interrelated Wrongful Acts began prior to the Retroactive Date of August 23, 1999 and continued thereafter.  He alleged that on May 1, 1998, he deposited his inherited stock certificates into the Merit Account, and Gwynn engaged in excessive, unauthorized, and inappropriate trading in the Merit Account until 2001, when the account lost virtually all its value.  SOF at ¶¶ 27-30; Amended Statement of Claim, ¶ 29-30.  Sowell further alleged that "[f]rom May 1998 through December 2000, Gwynn and the Ryan Plaintiffs made, participated in or induced the unlawful sale of securities [i.e., the Charter School Investments] to Mr. Sowell," using funds from the Merit Account.  SOF at ¶ 34; Amended Statement of Claim, ¶ 32.  In addition, Sowell alleged that the Ryan Plaintiffs did not properly supervise Gwynn as he exercised control over the Merit Account.  SOF at ¶¶ 39.

Thus, all of Sowell's Claims "alleged," "arose out of," or were based upon or attributable to Wrongful Acts occurring prior to the Retroactive Date, or subsequent interrelated Wrongful Acts.  Under the Policy, they are a single Loss.  Accordingly, exclusion (f) was a further basis for precluding coverage for all of Sowell's Claims.

## 2. The Parole Evidence Rule Precludes Evidence of How AIG and Its Counsel (according to Plaintiffs) Interpreted the Policy

Under Connecticut law, "the terms of an insurance policy are to be construed according to the general rules of contract construction." Buell Indus., Inc. v. Greater New York Mut. Ins. Co., 259 Conn. 527, 538 (2002). "The determinative question is the intent of the parties, that is, what coverage . . . the [plaintiff] expected to receive and what the defendant was to provide, as disclosed by the provisions of the policy." Id. at 538-39 (citations omitted) (emphasis supplied).

Plaintiffs do not argue that the exclusionary provisions of the Policy are ambiguous. Instead, Plaintiffs argue that the actions of AIG and its counsel show that *AIG's interpretation of the Policy is ambiguous* and that the Policy's provisions *cannot* say what they in fact clearly *do* say.[11] However, by asking this Court to interpret the unambiguous terms of a policy based on extrinsic evidence, Plaintiffs ignore the basic principles of construing any written contract, including an insurance policy.

In Connecticut, "[i]f the words of an insurance policy are plain and unambiguous, the established rules for the construction of contracts apply; the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning; and courts cannot indulge in a forced construction, ignoring provisions or so distorting them as to accord a meaning other than that intended by the parties." Finkel v. St. Paul Fire and Marine Ins. Co., No. 3:00CV1194 (AHN), 2002 WL 1359672, at *3 (D. Conn. June 6, 2002). Although "ambiguities are to be construed against the insurer, when the language is plain no such construction is to be applied." Heyman Assocs v. Ins. Co. of the State of Pennsylvannia, 231 Conn. 756, 770 (1995)

---

[11] The Ryan Plaintiffs also argue that the phrase "discretionary account" is ambiguous because it is not a defined term under the Policy. Ryan Plaintiffs' Memorandum, pp. 27-30. However, as discussed more fully in section 4 of this Reply, the Policy's exclusionary provisions do not require or even refer to a "discretionary account."

(emphasis supplied). "The question is not what intention existed in the minds of the parties <u>but what intention is expressed in the language used</u>." Finkel, 2002 WL 1359672, at *3 (emphasis supplied).

Plaintiffs do not accord the language of the Policy its "natural and ordinary meaning." Id. Instead, *Plaintiffs ask this Court to interpret the Policy in light of the way that AIG and its counsel (according to Plaintiffs) interpreted the Policy*. Thus, Plaintiffs ask this Court to consider evidence outside the four corners of the Policy in interpreting its unambiguous provisions.

However, the parol evidence rule <u>precludes</u> the use of evidence outside the four corners of an integrated contract to vary or contradict that contract's terms. Heyman, 231 Conn. at 780 (1995). "Parol evidence offered solely to vary or contradict the written terms of an integrated contract is, therefore, <u>legally irrelevant</u>." Western World Ins. Co. v. Peters, 989 F. Supp. 188, 193 (D. Conn. 1997) (emphasis supplied). "In short, <u>although parole evidence can be used to resolve an ambiguity in a contract, it clearly cannot be used to create one</u>." Id. (emphasis supplied). Moreover, "<u>words do not become ambiguous simply because lawyers or laymen contend for different meanings</u>." R.T. Vanderbilt Co., Inc. v. Cont'l Cas. Co., 273 Conn. 448, 463 (2005) (emphasis supplied). "[A]mbiguity is not demonstrated by the mere fact that the parties advance different interpretations of the language in question." Israel v. State Farm Mut. Auto. Ins. Co., 239 F.3d 127, 133 (2d Cir. 2000).

Thus, all of Plaintiffs' proffered evidence concerning the way that AIG and its counsel allegedly interpreted the Policy in an inconsistent manner <u>is legally irrelevant</u>. It can be used neither to support Plaintiffs' interpretation of the Policy nor to demonstrate ambiguity in the Policy's provisions. The only relevant evidence is the Statement of Claim and the Amended

Statement of Claim, and the Policy itself, which show that the "natural and ordinary meaning" of the exclusionary provisions precludes coverage for Sowell's Claims.[12]

### 3. AIG Did Not and Could Not Have Waived the Exclusionary Provisions to Create Coverage Where None Existed Under the Policy

In Connecticut, "[w]hile an insurer may be estopped, by its conduct or knowledge or by statutes from insisting on a forfeiture, under no conditions can the coverage or restrictions on coverage be extended by waiver and estoppel." Masonicare Corp. v. Marsh USA, Inc., No. CV 030821900S, 2005 WL 941412, at *1-2 (Conn. Super. Mar. 16, 2005) (citation omitted). Plaintiffs invite this Court to contradict the Masonicare court by following other jurisdictions that recognize an exception to the principle that waiver and estoppel cannot create coverage. Ryan Plaintiffs' Memorandum, p.25.

However, Connecticut's highest court has *already* rejected creating such an exception:

> In the insurance context, moreover, it has been recognized that "a contract, under the guise of waiver, [may not] be reformed to create a liability for a condition specifically excluded by the specific terms of the policy." 16B J. & J. Appleman, supra, § 9090, pp. 584-85. This limitation on the applicability of waiver to an insurance contract recognizes that because waiver requires the relinquishment of a known, and therefore existing, right within the insurance contract, a party cannot create through waiver coverage for a claim that the parties expressly had excluded from that contract.

Heyman Assocs No. 1 v. Ins. Co. of the State of Pennsylvania, 231 Conn. 756, 777, 653 A.2d 122, 134 (1995) (citing Appleman, Insurance Law and Practice § 9081 (1981) (emphasis supplied). This Court must follow the established substantive law of Connecticut and hold that

---

[12] AIG attempted to avoid unnecessary and expensive discovery in this case by seeking to stay the out-of-state depositions until the Court had the opportunity to review the summary judgment motion and compare the allegations of the Statement of Claim and Amended Statement of Claim to the exclusionary provisions of the Policy. Plaintiffs, however, rejected that simplified approach.


AIG did not and could not have waived the Policy's exclusions.[13]  See, Phillips v. Scott, F.Supp.2d 70, 76 (D. Conn. 2006) (in cases of diversity, federal courts must apply the substantive law of the forum state) (citing Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941)).

The Ryan Plaintiffs attempt to distinguish Heyman in various unavailing ways.  They argue that in Heyman, the insurer sought a declaratory judgment and there was a brief lapse between the time that the insured notified the insurer of its claims and the time that coverage was denied.  They also attempt to create an issue of fact by disputing AIG's position that it provided Gwynn, as well as the Ryan Plaintiffs, with a reservation of rights.  Ryan Plaintiffs' Memorandum, p. 26, n.8.  However, none of these alleged distinctions have any affect on Heyman's holding that "a party cannot create through waiver coverage for a claim that the parties expressly had excluded from that contract." 231 Conn. at 777 (emphasis supplied).[14]

4. Exclusion (s) Does Not Require a "Discretionary Account" *or* Power of Attorney

Plaintiffs do not attempt to dispute the obvious fact that Sowell's Claims all arose from Gwynn's exercise of control over Sowell's Merit account.  Instead, Plaintiffs persist in perpetuating the fiction that exclusion (s) would not apply unless: (i) the Merit Account was

---

[13] The Ryan Plaintiffs rely on a case that is older than Heyman and issued from a lower Connecticut court.  Ryan Plaintiffs' Memorandum, p.25 (citing National Cas. Ins. Co. v. Stella, 26 Conn. App. 462 (1992)).

[14] Plaintiffs also argue that AIG waived the Policy's exclusions when it paid Sowell $1 million in *August 2003* to have the Arbitration Award vacated.  However, Plaintiffs take the position that they were damaged when the Arbitration Award was entered in *February 2003*, on the grounds that once the Arbitration Award was entered, it had to be reported on their CRDs.  Thus, even under the erroneous theory that AIG could and did waive the Policy's exclusions in August 2003, *it had not yet made such alleged waive*r at the time that Plaintiffs were allegedly damaged in February 2003.

established as a "discretionary account"; or (ii) Gwynn held a valid power of attorney over the Merit Account. The Ryan Plaintiffs maintain:

> Although the Sowell Claim does refer to the power-of-attorney in a few places and includes an allegation that Sowell's Merit account was discretionary, it cannot be seriously contended that the entire Sowell Claim is based on the <u>account</u> being discretionary.

Ryan Plaintffs' Response., p.27 (emphasis supplied).

However, exclusion (s) does not require or even mention *either* a "discretionary account" *or* a "power of attorney." In short, exclusion (s) does <u>not</u> set forth the ***mechanism*** by which the insured obtains control over the account. Rather, it precludes liability where it is alleged, as in Sowell's Claims, that an insured has exercised "*discretionary authority or control with regard to management or disposition of assets*." (Emphasis supplied).

The Ryan Plaintiffs acknowledge that "churning" means excessive trading in an account "controlled by the broker." Ryan Plaintiffs' Response, p. 29. The Ryan Plaintiffs concede that "churning occurs when a broker takes control and overtrades an account without permission." Ryan Plaintiffs' Response, p. 29. Thus, if churning has occurred, it means that the broker has exercised control with regard to the management or disposition of assets in the account, and exclusion (s) therefore precludes coverage.

The Ryan Plaintiffs attempt to avoid this irrefutable conclusion by misstating Defendants' argument. The Ryan Plaintiffs state: "AIG next tries to manipulate the definition of a 'discretionary account' to mean 'churning' . . . AIG's argument [is] that 'churning' an account automatically means that there is a discretionary account . . ." Ryan Plaintiffs' Response, p. 29.

However, in its memorandum of law in support of its motion for summary judgment ("AIG's Memorandum), Defendants actually stated that:

> . . . a broker can be found to have "controlled" and "churned" an account *regardless* of whether the account is technically a "discretionary account." This is because "[t]he requisite degree of control by the brokers [for a churning claim] may be supplied <u>even if the account is "non-discretionary</u>." Williamsport Firemen Pension Boards I and II v. E.F. Hutton & Co., Inc., 567 F. Supp. 140, 144 (M.D. Pa. 1983) (emphasis supplied):
>
> . . . .
>
> "[C]ourts will treat a technically non-discretionary account as though it were a discretionary account upon finding that a broker has seized actual control over the management of the account." In re Thomson McKinnon Securities, Inc., 191 B.R. 976, 984-85 (Bankr. S.D.N.Y. 1996) (emphasis supplied); see also Vogel v. A.G. Edwards & Sons, Inc., 801 S.W.2d 746, 756 (Mo. Ct. App. 1990) ("There are three distinct methods of showing a broker's control over an account. Control exists when a broker trades in a discretionary account, when a broker usurps control in a nondiscretionary account or when the customer routinely follows the broker's recommendations concerning the handling of a nondiscretionary account").

AIG's Memorandum, p.20.

Sowell's Claims alleged (as the Arbitration Panel later found) that Gwynn exercised control over the Merit Account. It is *irrelevant* whether the Merit Account was set up as a discretionary or nondiscretionary account.

### 5. AIG Did Not Have a "Duty to Investigate" Before Denying Coverage

Plaintiffs claim that AIG had a duty to investigate Sowell's Claims before denying coverage because they had denied the effectiveness of the power of attorney and had "contradicted the parts of the Sowell Claim that characterized the account as discretionary." Ryan Plaintiffs' Response, p.28. As set forth above, however, it is irrelevant whether the Merit Account was set up as a discretionary or nondiscretionary account, and whether Gwynn had used a power of attorney to obtain control over the Merit Account.

To support their claim, the Ryan Plaintiffs point to the self-serving correspondence that Sowell's attorney sent in connection with his (ultimately successful) attempt to reach into AIG's

pocket. However, Sowell's *Amended* Statement of Claim -- just like his Statement of Claim -- alleged that Gwynn had exercised control over the Merit Account.[15] As set forth above, exclusions (s), (f), and (t) each precluded coverage based *solely* on the *allegations* of the underlying claim.

6. Plaintiffs Did Not Provide AIG with *Both* Powers of Attorney and the Trading Authorization Signed By Sowell, Which Were Never Cancelled and Did *Not* Require Notarization to Be Valid

Discovery in this case has revealed that Gwynn actually had Sowell sign *two* separate powers of attorney, plus a *trading authorization,* which were never cancelled and never provided to AIG during the underlying arbitration. On December 12, 2001, Merit's General Counsel, Plaintiff Robert Fitzpatrick, sent a "Full Power of Attorney" to Conlin, stating that he had "done a thorough search of our archived paperwork" and had found "the" power of attorney that Conlin had requested. See Affidavit of Counsel in Support of Defendants' Reply in Support of Motion for Summary Judgment On All Counts ("Affidavit") at ¶ 2 and Exhibit A attached thereto. A year later, on December 18, 2002, Sowell's attorney, Frank Moskowitz, sent a fax to Gwynn's coverage counsel, John Nicgorski. See Affidavit at ¶ 3 and Exhibit B attached thereto. Moskowitz's December 18, 2002 letter attached a copy of the Full Power of Attorney that Fitzpatrick had previously sent to Conlin. Id. Moskowitz also attached a "Power of Attorney" and a "Trading Authorization," which, like the "Full Power of Attorney," were signed by Sowell and dated March 7, 1998. Id.

---

[15] Even if Sowell had amended his statement of claim again to remove his allegations regarding the power of attorney (which he did not), he could not have removed his allegations regarding Gwynn's control of the Merit Account without delivering a fatal blow to his claims against Plaintiffs. In fact, in his Proposed Findings of Fact at the Arbitration Hearing, ¶3, Sowell made clear that while the Merit Account may not have been established as a "discretionary trading account," Gwynn nevertheless "exercised *de facto* control over the account."

The Trading Authorization gave Gwynn authority over the Merit Account, as follows:

> To give and place any and all orders including, but not exclusively, orders to purchase, sell (including short sales) exchange, trade in stocks, calls and/or commodities or contracts for the future delivery of any such commodities or any options on such commodities or futures contracts on margin or otherwise. . . .

Id.

The Power of Attorney, the Full Power of Attorney, and the Trading Authorization all stated that the authority granted by the particular document would be fully effective "until [Gwynn] actually receives written notice of revocation of this power of attorney signed by [Sowell]." Id. (emphasis supplied).

On January 3, 2003, Nicgorski advised Conlin that Gwynn had retained him as coverage counsel. See Affidavit at ¶ 4 and Exhibit C. Nicgorski stated: "You base the denial of coverage on a power of attorney document provided to you by General Counsel, Robert Fitzpatrick." Id., Exhibit C at p. 2. Incredibly, despite the fact that during the prior month, Moskowitz had faxed Nicgorski both powers of attorney *plus* the trading authorization, Nicgorski continued: "You did not even provide the Insured with a copy of this document. Id. As such, we are unable to fully analyze on which language you base the denial of coverage and defense." Id.

In correspondence dated January 6, 2003, Conlin told Nicgorski: "As per your request, I am faxing you a copy of the power of attorney signed by Mr. Sowell." Plaintiffs continued to keep Conlin in the dark about the additional power of attorney and the trading authorization. Instead, also on January 6, 2003, Nicgorski responded:

> Due to the limited amount of time I have to analyze this power of attorney, that the power of attorney you rely upon for your denial of coverage is not notarized, since it is the requirement in Arizona, it was never effective in Arizona in any event. See A.R.S. § 14-5501(D)(4).

However, the cited statute, A.R.S. § 14-5501(D)(4), only applied to powers of attorney "[f]rom and after August 1, 1998." (Emphasis supplied). Thus, the notarization requirement *did not apply to the powers of attorney, or the trading authorization, that Sowell signed on March 7, 1998*. It is undisputed that Sowell never provided Gwynn with any written notice in which he revoked the Power of Attorney, the Full Power of Attorney, or the Trading Authorization.[16] Accordingly, Plaintiffs' argument that "the" power of attorney was legally ineffective is not only irrelevant for the reasons set forth above; it is also incorrect.

## CONCLUSION

The Policy's exclusions precluded coverage for the *entirety* of Sowell's Claims, based *solely* on the *allegations* of the Statement of Claim and Amended Statement of Claim. The Parole Evidence Rule precludes evidence of how AIG and its counsel (according to Plaintiffs) interpreted the Policy. As a matter of law, AIG did not and could not have waived the Policy's exclusions to create coverage where none existed under the Policy.

"It is the function of the court to construe the provisions of the contract of insurance." Western World Ins. Co. v. Peters, 989 F. Supp. 188, 190 (D. Conn.1997) (citation omitted). For the reasons set forth above, summary judgment should be entered in favor of AIG on each and every one of Plaintiffs' counts.

---

[16] Plaintiffs maintain only that Sowell answered "no" on an option client information form to the question "Does anyone have power of attorney." Plaintiffs have offered no authority, nor could they, to support the position that this was an effective written notice of revocation of the two powers of attorney and the trading authorization.

Respectfully Submitted,

DEFENDANTS/COUNTERPLAINTIFFS
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.
and AIG TECHNICAL SERVICES, INC.

BY THEIR ATTORNEYS,
Edwards Angell Palmer & Dodge LLP


By: /s/ David S. Samuels

Mark B. Seiger
Fed. Bar No. ct05580
David S. Samuels
Fed. Bar No. ct24460
90 State House Square, 9th Floor
Hartford, CT  06103-2715
Tel:  (860) 525-5065
Fax: (860) 527-4198
Email: mseiger@eapdlaw.com

John D. Hughes
Massachusetts BBO # 243660
111 Huntington Avenue
Boston, MA 02199
Tel:  (617) 951-3373
Fax:  (617) 439-4170
Email: jhughes@eapdlaw.com

Donna M. Greenspan
Florida Bar No.: 059110
One North Clematis Street, Suite 400
West Palm Beach, FL  33401
Tel: (561) 833-7700
Fax:   (561) 655-8719
Email: dgreenspan@eapdlaw.com

**CERTIFICATION OF SERVICE**

    I hereby certify that on the 23rd day of January, 2007 the foregoing Defendants' Reply in Support of Their Motion for Summary Judgment on All Counts was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this document through the court's CM/ECF System.

                                                  /s/ David S. Samuels
                                                  David S. Samuels