UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM | ) | |
| NEWTON, ROBERT FITZPATRICK, and | ) | CASE NUMBER: |
| MERIT CAPITAL ASSOCIATES, INC., | ) | 3:03 CV 00644 (CFD) |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA., and | ) | |
| AIG TECHNICAL SERVICES, INC., | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| DAVID W. GWYNN and RAQUEL GWYNN, | ) | |
| | ) | CASE NUMBER: |
| Plaintiffs, | ) | 3:03 CV 1154 (CFD) |
| v. | ) | |
| | ) | |
| NATIONAL UNION FIRE INSURANCE | ) | |
| COMPANY OF PITTSBURGH, PA., and | ) | |
| AIG TECHNICAL SERVICES, INC., | ) | |
| | ) | |
| Defendants. | ) | June 1, 2007 |

## DEFENDANTS' RESPONSE TO GWYNN PLAINTIFFS' RULE 56(a) COUNTERSTATEMENT OF UNDISPUTED FACTS[1]

Defendants, National Union Fire Insurance Company of Pittsburgh, PA. and AIG

Technical Services, Inc., now known as AIG Domestic Claims, Inc. (collectively, "National

---

[1] Defendants contend that it is procedurally improper under Local Rule 56a for the party *opposing* summary judgment to file its own Statement of *Undisputed* Facts. Accordingly, Defendants moved to strike the Ryan Plaintiffs' Counterstatement of Undisputed Facts ("Counterstatement"). The magistrate judge denied Defendants' motion, and Defendants have filed Objections pursuant to Federal Rule of Civil Procedure 72. Defendants' Objections are currently pending before the Court. In its ruling, the magistrate provided for 30 days, or until May 24, 2007, for Defendants to respond to the Ryan Plaintiffs' Counterstatement. By filing this Response, Defendants do not waive their objections to the procedural irregularities in the Ryan Plaintiffs' Counterstatement, and maintain that they should not be in the position of having to either file this Response or risk being deemed to have admitted the Ryan Plaintiffs' Counterstatement.

Union" or "AIG" or "Defendants"), through their undersigned attorneys, respond to Gwynn

Plaintiffs' Rule 56a Counterstatement of Undisputed Facts as follows:

1.  At all relevant times, co-plaintiff Merit Capital Associates Inc. was a securities broker/dealer, located in Westport, Connecticut, which was registered with the National Association of Securities Dealers ("NASD"). Merit had business operations in various other states, including Arizona. [Exhibit A, Gwynn Plaintiffs' August 11, 2005 Second Amended Complaint ("Gwynns' Complaint") at ¶¶ 8-9.]

RESPONSE:     Admitted.

2.  From at least 1986, plaintiff David Gwynn ("Gwynn") was licensed by the NASD to sell securities. [Exhibit. A, Gwynns' Complaint, at ¶ 10.]

RESPONSE:     Admitted.

3.  At all relevant times, Gwynn functioned as a Registered Representative of Merit, primarily in the State of Arizona. [Exhibit. A, Gwynns' Complaint, at ¶ 11.]

RESPONSE:     Admitted.

4.  National Union issued a Securities Broker/Dealer's Professional Liability Insurance Policy to Merit, No. 473-36-20 (the "policy"). A copy of the Policy is attached hereto as Exhibit B.

RESPONSE:     Admitted.

5.  The Policy covers Merit as the insured "Broker/Dealer", but also includes Gwynn within the definition of "insured.." [Policy, Exhibit B at p. 1]

RESPONSE:     Denied. Defendant National Union issued the Policy to Plaintiff Merit. However, the mere issuance of the Policy does not automatically entitle Merit and its employees to insurance coverage.  Rather, the Policy affords coverage only pursuant to its terms and conditions.  Specifically, the Policy states that AIG "shall not be liable for Loss in connection with any Claim made against an Insured":

a)  arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts;

b)  arising out of, based upon or attributable to the committing in fact of:  any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder;

\*     \*     \*

e)    alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the inception date of the first Securities Broker/Dealer's Errors and Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the Broker/Dealer designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim, or alleging, arising out of, based upon or attributable to any subsequent Interrelated Wrongful Act;

f)    alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act;

*    *    *

r)    with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away";

s)    alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-load investment company shares or variable annuities in which there is no initial or contingent sales charge or commission;

t)    alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims arising out of an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership . . . .

Defendants' Statement of Undisputed Facts ("SOF") at ¶13.

6.    The term "discretionary account" is not defined in the Policy. [Defendants' Responses to Gwynn Plaintiffs' First Request for Admissions (hereafter, "Defendants' Admissions"), Exhibit C at p.3,¶7.]

RESPONSE:    Admitted.

7.    Under the terms of the Policy, National Union:

**shall have the right and duty to defend**, subject to and as part of the Limits of Liability, any Claim made against an insured during the policy Period or discovery Period (if applicable) and reported in

writing to the insurer pursuant to the terms of this policy **for any actual or alleged Wrongful Act** for which coverage is afforded by this policy, **even if any of the allegations of the Claim are groundless, false or fraudulent.**

[Policy, Exhibit B at p. 1 (emphasis supplied)]

RESPONSE:          Admitted that under the Policy, as stated above, National Union "shall have the right and duty to defend … any Claim made against an insured … **for which coverage is afforded by this policy**."  Gwynn Plaintiffs' Counterstatement, Exhibit B at p.1 (emphasis added).  Further, the Policy specifically excludes coverage for "any Claim made against an Insured":

    a)    arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts;

    b)    arising out of, based upon or attributable to the committing in fact of:  any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder;

*     *     *

    e)    alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the inception date of the first Securities Broker/Dealer's Errors and Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the Broker/Dealer designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim, or alleging, arising out of, based upon or attributable to any subsequent Interrelated Wrongful Act;

    f)    alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act;

*     *     *

    r)    with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away";

    s)    alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any

Insured's purchase or sale of no-load investment company shares or variable annuities in which there is no initial or contingent sales charge or commission;

t)      alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims arising out of an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership . . . .

SOF ¶13.

8.      The Policy also provides coverage to the spouse of any insured "for a claim arising solely out of his or her status as the spouse of an individual insured, including a claim that seeks damages recoverable from marital community property, [or] property jointly held by the individual insured and the spouse." [Policy, Exhibit B at p. 6.]

RESPONSE:      Denied.  The Policy provides coverage, if any, only pursuant to all of the terms and conditions of the Policy,

9.      Michael Sowell filed a Statement of Claim ("the Statement") in a NASD arbitration proceeding in September 2001. [Exhibit D.]

RESPONSE:      Admitted.

10.      The Statement identified plaintiffs David and Raquel Gwynn as Respondents. The claim against Raquel Gwynn was based solely on her status as David Gwynn's spouse, and not for anything she herself was alleged to have done. Sowell's demand for relief included recovery from the marital community property of the Gwynn plaintiffs. [Exhibit D at ¶ 10.]

RESPONSE:      Admitted.

11.      Sowell made numerous allegations in the Statement, including allegations that he provided David Gwynn with a power of attorney that transformed his account into a "discretionary account" and that Gwynn made trades without authorization based on that power of attorney ("power of attorney"). [Exhibit D at ¶ 26, 27, 87.]

RESPONSE:      Admitted that Sowell alleged that Gwynn made trades without authorization.  Denied that Sowell alleged that the power of attorney "transformed" his account into a discretionary account or that Gwynn made trades without authorization based on the power of attorney.  SOF ¶¶ 28-29, Exhibit D (Statement of Claim at ¶¶26-27) and Exhibit E (Amended Statement of Claim at ¶¶27-28).

12.    Defendants assigned Brian Conlin to be the Claims Analyst for this file. [Defendants' Admissions, Exhibit C, at p. 2, ¶ 1.]

RESPONSE:    Admitted.

13.    When Conlin was assigned to the file, he had been employed at AIG for only four months. [Transcript of the June 16, 2005 Deposition of Brian Conlin ("Conlin Transcript"), Exhibit E, at pp. 6-7.]

RESPONSE:    Admitted.  However, Conlin had 3 years of prior insurance experience before joining AIG.  Conlin Deposition at 16-17.  Relevant portions of the Conlin Deposition Transcript are attached as Exhibit BB to the Supplemental Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment ("Supplemental Appendix"), filed concurrently herewith.

14.    At first, AIG agreed to provide a defense to the Gwynn plaintiffs and the co-plaintiffs. The decision to do so was made jointly by Conlin with one of his superiors, Raymond Tiburzi, who was an Assistant Vice President. [Transcript of the September 25, 2006 Deposition of Jonathan Weber ("Weber Transcript II"), Exhibit F, at p. 33.]

RESPONSE:    Admitted.

15.    In analyzing Sowell's claim, AIG did not rely solely on the "four corners" of Sowell's Statement of Claim, but rather, it "undertook some investigation of the coverage issues." [Weber Transcript II, Exhibit F, at p. 113.]

RESPONSE:    Admitted that AIG "undertook some investigation of the coverage issues." Denied as to the remainder.  Plaintiffs mischaracterize Weber's deposition testimony. Indeed, on the very page of the Weber deposition transcript cited by Plaintiffs in support of the statement above, Weber specifically testified that "in fact on the four corners of the original claim filed by Mr. Sowell, AIG agreed to provide a defense and a reservation of rights."  Gwynn Plaintiff's Counterstatement, Exhibit F at 113.

16.    Conlin assigned two different law firms in Arizona to represent the various parties. The Phoenix firm of Mariscal, Weeks, McIntyre and Friedlander was retained to represent David Gwynn. [Exhibit I, at p. 2.]

RESPONSE:    Admitted.

17.    Mariscal Weeks ("the firm") prepared and filed an Answer to Sowell's Statement of Claim. [Exhibit G.] With respect to Sowell's allegations of discretionary trading activity, the firm alleged as follows:

26.    Mr. Sowell was at all times directing his account. Mr. Sowell performed his own research and made his own investment decisions.

27.    Mr. Sowell was at all times aware of, and directing, the activity in his account.

28.    Mr. Sowell had control over this account. Mr. Sowell made frequent recommendations about his account, and directed every aspect of his investments.

[Exhibit G at pp. 6-7.]

RESPONSE:    Denied as these are only partial excerpts of the allegations.  Gwynn Plaintiffs' Counterstatement, Exhibit G at 6-7.

18.    Conlin would occasionally record activity concerning his handling of this claim on a computer-generated document known as "Toolkit Notes." [Conlin Transcript, Exhibit E at pp. 47-48; Exhibit H.]

RESPONSE:    Admitted that Conlin recorded activity concerning his handling of this claim in "Toolkit Notes."  Denied that he did so "occasionally."  Gwynn Plaintiffs' Counterstatement, Exhibit E at 47-48.

19.    Conlin's entry for October 16, 2001 contains the following summary of a conversation Conlin had with Robert Fitzpatrick, Merit's counsel and compliance officer:

>    [Fitzpatrick] admitted that [Sowell] had signed a power of attorney granting [Gwynn] the ability to trade in the account for purposes when [Sowell] was indisposed or out of the country. [Fitzpatrick] advises that [Sowell] did not maintain a discretionary account with [Merit] because [Fitzpatrick] knew it would not be covered under the policy if he did.

[Exhibit H at p. AIGTS 0031.]

RESPONSE:    Admitted.

20.    Conlin was deposed on June 16, 2005, and two subsequent occasions. On the first date, he was asked about the statement Fitzpatrick made to him on October 16, 2001. He testified that if, as Fitzpatrick claimed, a power of attorney was executed by Sowell to give Gwynn the ability to make a trade in the event Sowell was indisposed or out of the country in times of volatile markets, and that the power of attorney had never been exercised by Gwynn, then exclusion (s) of the Policy would not be applicable. [Conlin Transcript, Exhibit E, at pp. 110-111.]

RESPONSE:    Denied.  During his deposition on June 16, 2005, in response to counsel's question, Conlin testified:

>    It would say to me that the exclusion would be -- would not be applicable; however, when I have at my disposal a statement of claim where the claimant says that he had discretionary control over the account, without knowing the coverage issues that may be involved for Merit Capital, that leads -- that's pretty clear to me that he was exercising discretionary or at least claimant alleges, Mr. Sowell alleged that Mr. Gwynn exercised discretionary control over his account.

Exhibit A, Conlin Deposition at 110-112 (emphasis added), Exhibit BB to the Supplemental Appendix.

Furthermore, during his continued deposition on August 25, 2005, Conlin testified that the mere allegation of discretionary trading, such as in Sowell's Claims, as well as the actual exercise of discretionary control, was sufficient to trigger exclusion (s), precluding coverage under the Policy. Conlin Deposition at 311, 448, 549, 737, and 744, Exhibit BB to the Supplemental Appendix.

21.    Conlin admitted that the statements identified in the preceding paragraph, if accurate, "would be a defense under the policy and to the complaint," and that further, such a statement would be inconsistent with the applicability of exclusion (s). [Conlin Transcript, Exhibit E, at pp. 176-179.]

RESPONSE: Denied. Although Conlin made the quoted statement, it was not in response to the statement identified in the preceding paragraph. Conlin Deposition at 110-111 and 176-179, Exhibit BB to the Supplemental Appendix.

22.    On October 15, 2001, Conlin sent a letter to Bruce Ryan. [Exhibit L] In that letter, he referenced Sowell's allegations that Gwynn made trades without authorization pursuant to a power of attorney, quoted the language of exclusion (s), and then wrote the following:

Please advise if any trading in this account was done pursuant to a written discretionary agreement or any other similar authority. If it is determined that discretionary trading occurred in this account there will be no coverage subject to the above restrictions.

[Exhibit I at p. 5.]

RESPONSE: Admitted that the October 15, 2001 letter from Conlin to Ryan, attached as Exhibit I to the Gwynn Plaintiffs' Opposition, contains the language quoted above. The letter further states:

This letter is not to be construed as a waiver of any policy provision. [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy. This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit I at p. 7.

23.    Thereafter, Conlin received a "narrative" from Merit as he had requested. He was advised that Sowell had signed a letter in October 2000 in which he indicated that he was aware of the amount of activity in his account, and he approved all the trades. [Exhibit E, Conlin Transcript at pp. 68-69; Exhibit J.]

RESPONSE: Admitted that Plaintiffs told Conlin that Sowell had signed such a letter, but as the arbitrators found and Sowell testified, he in fact was not aware of the amount of activity in his account and did not approve all the trades. See SOF ¶ 95; Sowell Deposition at 63.

Relevant portions of the Sowell Deposition Transcript are attached as Exhibit CC to the Supplemental Appendix.

24.     On October 5, 2000, Sowell sent a letter to Fitzpatrick in which he stated that he "[was] aware of the significant amount of activity" in his account, and "[had] approved of all the trades that [had] occurred in the account." [Exhibit K.]

RESPONSE:        Admit that Plaintiffs claim that Sowell signed the October 5, 2000 letter, but as the arbitrators found and Sowell testified, he in fact was not aware of the amount of activity in his account and did not approve all the trades. SOF¶ 95;  Sowell Deposition at 63, Exhibit CC to the Supplemental Appendix.

25.     On November 9, 2001, Fitzpatrick wrote to Conlin, and included numerous documents, including the monthly statements from the Sowell account. The letter also stated that "[Sowell's] account was not a discretionary account. Any power of attorney would have expired prior to Merit Capital obtaining insurance in 1999." [Exhibit L.]

RESPONSE:        Admitted.  Plaintiffs began exercising control over and churning Sowell's account in May 1998.

26.     Conlin sent letters to Gwynn on November 7 [Exhibit M] and November 26, 2001 [Exhibit N]. Although each of these letters references a "coverage determination," there is no reference to any specific policy exclusion in either letter.

RESPONSE:        Denied.  The third sentence of the November 7, 2001 letter from Conlin to Gwynn explicitly states as follows:

Please be aware, that this letter is not to be construed as a waiver of any policy provision. [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

Similarly, the third sentence of the November 26, 2001 letter from Conlin to Gwynn explicitly states as follows:

Please be aware, that this letter is not to be construed as a waiver of any policy provision and [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

In addition, the November 7, 2001 letter forwarded AIG's "coverage determination at this time," referencing the October 15, 2001 letter to the Ryan Plaintiffs.  Further, the letter confirms an October 16, 2001 conversation between Conlin and Gwynn in which the power of attorney and discretionary nature of Sowell's account was discussed.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

27.    AIG did not send Gwynn notice of its "coverage determination" at any time prior to November 7, 2001. [Defendants' Admissions, Exhibit C, at p. 6, ¶ 18.]

RESPONSE:    Admitted.

28.    AIG did not send Gwynn a Reservation of Rights at any time before November 7, 2001. [Defendants' Admissions, Exhibit C, at p. 6, ¶ 20.]

RESPONSE:    Admitted.

29.    Fitzpatrick sent a letter to Conlin on December 12, 2001, which included as an attachment the power of attorney Sowell referenced in the Statement. Fitzpatrick stated that the Power of Attorney was never used, and never renewed at the end of the year, "as required by the rules." [Exhibit O].

RESPONSE:    Denied.  Sowell signed two powers of attorney, and Sowell does not specify in the Statement the particular power of attorney referenced.   SOF ¶¶ 28-29 and Exhibit D (Statement of Claim at ¶¶26-27) and Exhibit E (Amended Statement of Claim at ¶¶27-28).

30.    Conlin sent a "reservation of rights" letter to Ryan on October 15, 2001, which cites to numerous policy exclusions. [Exhibit I.] This letter is not addressed to Gwynn, nor is it copied to Gwynn. Defendants have failed to produce any evidence that Gwynn ever received a copy of this letter.

RESPONSE:  Denied. Conlin's November 7, 2001 letter to Gwynn "forwarded AIG's coverage determination at this time," referencing the October 15, 2001 letter to the Ryan Plaintiffs.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

31.    Mariscal, Weeks prepared a Litigation Plan ("the Plan") on December 19, 2001, which was forwarded to AIG. [Exhibit P.] The Plan references conversations with Gwynn in which he asserted that "[w]hile [Sowell's] account was opened as a managed account, [it] was not operated as a managed account. Rather... Sowell maintained control and discretion over the account at all times." [Exhibit P at p. AIGTS 1298]. Counsel warned AIG that "there is a likelihood of [Gwynn] having some exposure on this claim." [Exhibit P at p. AIGTS 1299.] They also proposed a number of investigative steps, including consulting with and engaging expert witnesses on the issues of liability and damages. [Exhibit P at p. AIGTS 1300; Transcript of the Deposition of Maxine Becker on September 20, 2006 ("Becker Transcript"), [Exhibit Q, at pp. 30-32.] AIG approved the proposed plan.

RESPONSE:    Admitted.  The Litigation Plan prepared by Mariscal, Weeks, attached as Exhibit P to the Gwynn Plaintiffs' Counterstatement, speaks for itself.

32.    It was Conlin's responsibility to review the Litigation Plan. [Conlin Transcript, Exhibit E, at pp. 148-49.]

RESPONSE:    Admitted.

33.    Conlin sent Gwynn a letter on January 12, 2002. [Exhibit R.] In that letter, Conlin cites exclusion (s) and no other exclusion [Exhibit R at p. 1], and asserts that "based on the information received to date, coverage would not be available" to Gwynn. The "information" Conlin referred to in the letter is the power of attorney, which led Conlin to conclude that "Sowell maintained a discretionary account with Merit." [Exhibit R at p. 2.]

RESPONSE:    Denied that Conlin did not cite to any other grounds for non-coverage in his January 12, 2002 letter.  In fact, the letter specifically states:

This letter is not to be construed as a waiver of any policy provision.  [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit R at p.2.   As to the remainder, the January 12, 2002 letter speaks for itself.

34.    The January 12 letter was followed by a letter on January 24, 2002. [Exhibit S.] In that letter, Conlin advised Gwynn that AIG would no longer provide a defense nor indemnify him for Sowell's claims. The only exclusion which Conlin cited in his letter denying coverage is exclusion (s). Conlin's letter again referenced the power of attorney as the sole basis for denying coverage. [Exhibit S at p. 1.]

RESPONSE:    Denied that Conlin did not cite to any other grounds for non-coverage in his January 24, 2002 letter.  In fact, the letter specifically states:

If you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same.  This letter is not to be construed as a waiver of any policy provision.  In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy and at law as to allegations which are not covered under the terms of this policy and/or may be excluded from coverage under the terms of the policy.

Gwynn Plaintiffs' Counterstatement, Exhibit S at p.1.   As to the remainder, the January 24, 2002 letter speaks for itself.

35.    Conlin also made a Toolkit Entry on January 24. In that entry, he stated that "[t]he durable power of attorney signed by Mr. Sowell gave Mr. Gwynn discretionary authority of the account and would preclude coverage." [Exhibit H at p. AIGTS 0038; Defendants' Admissions, Exhibit C, at p. 12, ¶ 46.]

RESPONSE:    Admitted.

36.   Conlin admitted in his June 16, 2005 deposition testimony that when he wrote his January 24 letter, he had received conflicting allegations as to whether exclusion (s) applied. [Conlin Transcript, Exhibit E, at pp. 197-98.]

RESPONSE:      Denied.  Conlin testified that he had received conflicting allegations as to "whether discretionary authority was ever exercised by David Gwynn" over the Sowell account.  Gwynn Plaintiffs Counterstatement, Exhibit E, at pp. 197-98.

37.   Conlin also testified that "a signed power of attorney, in and of itself, would not preclude coverage under exclusion S," [Defendants' Admissions, Exhibit B, at p. 14, ¶ 49], and that the statement contained in his January letters to Gwynn to that effect was inaccurate. [Conlin Transcript, Exhibit E, at pp. 201-02.]

RESPONSE:   Admitted and further admit that during Conlin's continued deposition on August 25, 2005, pp. 311, 448, 549, and May 23, 2006, pp.737, 744, he testified that the mere allegation of discretionary trading, such as in Sowell's Claims, as well as the actual exercise of discretionary control, was sufficient to trigger exclusion (s), precluding coverage under the Policy.  Conlin Deposition at 311, 448, 549, 737 and 744, Exhibit BB to the Supplemental Appendix.

38.   Conlin also testified as follows:

   a)      that the existence of a power of attorney is not sufficient to deny coverage pursuant to exclusion (s) [Conlin Transcript, Exhibit E, at 162-63; 201-02]; and

   b)      that the registered representative must actually exercise discretionary control over the account for exclusion (s) to apply [Conlin Transcript, Exhibit E, at pp. 43; 189-91.]

RESPONSE:   Admitted and further admit Conlin testified at his continued deposition that the mere allegation of discretionary trading, such as in Sowell's Claims, as well as the actual exercise of discretionary control, was sufficient to trigger exclusion (s), precluding coverage under the Policy.  Conlin Deposition at 311, 448, 549, 737 and 744, Exhibit BB to the Supplemental Appendix.  Further, the NASD Arbitration Panel found that Gwynn actually exercised discretion over Sowell's account by finding Gwynn liable for excessive trading and churning. SOF, Exhibit P (Arbitration Award, p.7).

39.   AIG has admitted that Conlin interpreted the Policy's provisions, including exclusions, "in conjunction with instructions given by his supervisors." [Defendants' Admissions, Exhibit C, at p. 10, ¶ 39.]

RESPONSE:      Admitted.

40.   AIG has also admitted that the withdrawal of a defense to Plaintiffs in January 2002 was done in violation of AIG's own internal procedures, which required review and approval by the coverage department. This was not done in this case.

[Weber Transcript, Exhibit F, at p. 74; Transcript of the Deposition of Marc Wieman on June 12, 2006 ("Wieman Transcript"), Exhibit T, at p. 100.]

RESPONSE:     Admitted.

41.   Further, Conlin's supervisors had a practice of citing every potential exclusion in a letter denying coverage, in part because it "made for more open communication" with the insured. [Transcript of the Deposition of Jonathan Weber on August 17, 2005 (Weber 1), Exhibit U, at p. 118; Wieman Transcript Exh. T at 22, 82-83. ]

RESPONSE:     Admitted.

42.   Marc Wieman, who was Conlin's supervisor through at least January 2002, testified that because he wanted "to make sure AIGTS preserved its rights to deny on any and all the grounds and would not waive its right to deny the claim based on some ground that we missed initially... It was [his] practice to make sure that every ground that was the basis for denial was cited in the letter." He also testified that "it would be unfair to surprise the insured by raising something later." [Wieman Transcript, Exhibit T, at pp. 22; 82-83.]

RESPONSE:     Admitted.

43.   Wieman also testified that "[he] would never send a letter out that merely had a catchall [because] it didn't put the insurer on any kind of notice." [Wieman Transcript, Exhibit T, at p. 86.]

RESPONSE:     Admitted.

44.   Conlin denied coverage to Plaintiffs based solely on the applicability of exclusion (s), [Weber Transcript If, Exhibit F, at p. 97.]

RESPONSE:     Denied that Conlin did not cite to any other grounds for denying coverage. In his January 12, 2002 letter he specifically states:

This letter is not to be construed as a waiver of any policy provision. [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy. This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit R at p.2.

Also, on October 15, 2001 Conlin wrote to the Ryan Plaintiff's stating:

This letter is not to be construed as a waiver of any policy provision. [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy. This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit I at p. 7.

Conlin wrote to Gwynn on November 7, 2001 and "forwarded a copy of AIG's coverage determination" at that time. The third sentence of the November 7, 2001 letter from Conlin to Gwynn explicitly states as follows:

> Please be aware, that this letter is not to be construed as a waiver of any policy provision. [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy. This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

Conlin then followed up with Gwynn on November 26, 2001. The third sentence of the November 26, 2001 letter from Conlin to Gwynn explicitly states as follows:

> Please be aware, that this letter is not to be construed as a waiver of any policy provision and [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

45.     AIG has admitted that an insurer "can waive an exclusion or any other part of the policy." [Transcript of the Deposition of Jonathan Weber on September 26, 2006, Weber Transcript III, Exhibit V, at p. 181.]

RESPONSE:     Objection. Defendants can neither admit nor deny this statement as written. This is a question of law and therefore not a statement of "material fact" pursuant to Local Rule 56(a).

46.     In January 2002, Conlin advised Mariscal Weeks that AIG would no longer be paying for the costs of defending Gwynn in the arbitration, and the firm withdrew. [Exhibit S.]

RESPONSE:     The January 24, 2002 letter from Conlin to Fitzpatrick, attached as Exhibit S to the Gwynn Plaintiffs' Opposition, speaks for itself.

47.     Conlin was copied on a letter from Frank Moskowitz, Sowell's counsel, on October 24, 2002. [Exhibit W.] Moskowitz attached a document captioned "Option Client Information Form and Agreement," in which Sowell answered "No" to the question of whether anyone had power of attorney over the account. [Exhibit W, last page.]

RESPONSE:     The October 24, 2002 letter from Moskowitz to Federman, attached as Exhibit W to the Gwynn Plaintiffs' Opposition, as well as the attachments to that letter, speak for themselves.

48.     In his toolkit entry of November 4, 2002, Conlin interpreted this information as "[Sowell] indicating that no one had discretionary authority over the account." [Exhibit H at p. AIGTS 0039.]

RESPONSE:     Admitted that Conlin received self-serving correspondence from Sowell's attorney in an attempt to trigger insurance coverage where none existed under the policy.

49.     Moskowitz testified at deposition that he sent this material to Conlin because he became aware of information brought to his attention after the Statements of Claim was filed "that needed to be looked into or investigated" concerning whether the account was, in fact, a managed or discretionary account and that "this isn't clear cut on whether or not the power of attorney was in effect or not in effect or whether this was a discretionary trading account or not." [Transcript of the Deposition of Frank Moskowitz on September 21, 2006 ("Moskowitz Transcript"), Exhibit X, at pp. 81-82, 94-95, 113.]

RESPONSE:     Admitted that Moskowitz took this position in an attempt to trigger coverage where none existed under the policy, but that the allegations in Sowell's Statement of Claim remained:

When Mr. Sowell opened his account, he signed a power of attorney giving Respondents [including Gwynn] discretionary control of the account.  Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell.  As it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading decisions.

Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell and treated his discretionary power over the account as a license to churn.  Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by excessive, in-and-out trading in technology stocks.  Mr. Gwynn also traded extensively on margin in Mr. Sowell's account.  A review of Mr. Sowell's account statements reveals that Respondents utilized no meaningful investment strategy or plan.

SOF ¶¶ 28-29, Exhibit D (Statement of Claim at ¶¶26-27) and Exhibit E (Amended Statement of Claim at ¶¶27-28).

50.     Moskowitz' October 24, 2002 letter also advised defendants that the arbitration would commence on January 7, 2003. He made a "policy limits demand to settle this matter," indicated he was willing to consider "mediating this matter," and warned that "by not accepting this offer, AIG is exposing its insureds to an excess judgment." [Exhibit W at p. 2.]

RESPONSE:     Admitted that Moskowitz sent the referenced letter on October 24, 2002.

51.     Gwynn retained John Nicgorski to represent him in his insurance coverage
dispute with AIG. On January 3, 2003, Nicgorski sent a letter to Conlin. [Exhibit
Y.]

RESPONSE:     Admitted.

52.     Nicgorski's January 3 letter to Conlin provided facts and information that led him
to conclude "that [Sowell's] account was non-discretionary." [Exhibit Y at p. 2.]
He also indicated that he was negotiating on Gwynn's behalf with Sowell's
counsel to execute a <u>Damron</u> or <u>Morris</u> agreement. He explained that these are
agreements available to an insured under Arizona law when an insurer has refused
to defend or indemnify the insured in connection with a claim. [Exhibit Y at pp.
2-3.] He requested that AIG "consider re-evaluation of [its] coverage position and
the immediate retention of defense counsel." [Exhibit Y at p. 3.] Finally, he
demanded that AIG "settle [Sowell's] claims within policy limits." [Exhibit Y at p.
4.]

RESPONSE:     Admitted that Nicgorski sent the referenced letter on January 3, 2003.
Denied that Gwynn did not exercise discretion and control over Sowell's account.  The
NASD Arbitration Panel found that Gwynn actually exercised discretion over Sowell's
account by finding Gwynn liable for excessive trading and churning.  SOF at Exhibit P
(Arbitration Award, p.7).  Further Sowell in fact was not aware of the amount of activity in
his account and did not approve all the trades. SOF ¶ 95.  Sowell Deposition at 63.  Exhibit
CC to the Supplemental Appendix.

53.     On January 6, 2003 Conlin sent Nicgorski a copy of the power of attorney.
[Exhibit Z.]

RESPONSE:     Admitted.

54.     Nicgorski responded that same date, indicating that the power of attorney was not
valid pursuant to Arizona law, as it was not notarized. He again demanded that
AIG attempt to resolve Sowell's claim within policy limits. [Exhibit AA.]

RESPONSE:     Admitted.

55.     After he received Nicgorski's January 3, 2003 letter, Conlin consulted with his
immediate superior, Jonathan Weber. Weber testified that after receiving
Nicgorski's letter, he "expected [defendants] were going to get sued." [Weber I,
Exhibit U, at p. 93.]

RESPONSE:     Admitted.

56.     AIG retained the Arizona firm of Struckmeyer & Wilson ("Struckmeyer") to
advise AIG in connection with policy coverage issues relating to Sowell's claims.
[Defendants' Admissions, Exhibit B, at p. 21-22, ¶ 85.]

RESPONSE:     Admitted.

57.   On January 9, 2003, Jeffrey King, an attorney at Struckmeyer, sent Conlin a letter. He further explained <u>Damron</u> and <u>Morris</u> agreements in that letter. He advised AIG as follows:

> In view of the fact that at least Mr. Gwynn is participating in the arbitration hearing without counsel... and in view of the fact that additional information has come to light since AIG issued its denial of coverage in January of 2002 concerning whether the account was truly discretionary at all times, our recommendation is that AIG <u>immediately</u> provide, at AIG's expense, defense counsel for both Merit and Gwynn at the arbitration. hearing.

> [Exhibit BB at p. 2 (emphasis in original).]

RESPONSE:        Admitted.

58.   King further advised that there were "multiple benefits" to AIG if it provided Gwynn with a defense: notice of any settlement negotiations; the possibility of mitigating both liability and damages "through the skills of competent counsel"; and to provide "more evidence," should AIG be sued by its insureds, "that it acted reasonably under the circumstances." [Exhibit BB at p. 2.]

RESPONSE:        Admitted.

59.   AIG re-appointed Mariscal, Weeks to represent Gwynn on January 9 or 10, 2003. By that time, three days of testimony had been taken at the hearing, and Gwynn had testified without being represented by counsel.

RESPONSE:        Admitted

60.   Frank Moskowitz, Sowell's trial counsel, testified that Gwynn had a "very difficult time" at the hearing. On its first day, he arrived with boxes of documents that had not previously been produced. After initially objecting to having these documents received as Exhibits at the hearing, Moskowitz ultimately stipulated to their admission, as he believed them to be "very detrimental to Mr. Gwynn in his purported defense." [Moskowitz Transcript, Exhibit X, at pp. 19, 24.] He was verbally admonished on several occasions by the Panel, in his attempt to make an opening statement. [Exhibit CC at p. 2.]

RESPONSE:        Admitted.

61.   Moskowitz stated that the stress of having to defend himself against Sowell's claims had an impact on Gwynn's physical condition, so much so that counsel worried that he might need to be hospitalized. [Moskowitz Transcript, Exhibit X, at p. 33.]

RESPONSE:        Admitted that Moskowitz made this speculative statement.

62.   Moskowitz also stated that the resumption of a defense for Gwynn at that point, after three days of testimony, was "likely too little, too late." [Exhibit CC at p. 1.]

RESPONSE:        Admitted that Moskowitz made this speculative statement.  Denied that the resumption of Gwynn's defense impacted his chances of successfully defending the claims against him.  The January 13, 2003 letter from Becker to Conlin, attached as Exhibit GG to the Gwynn Plaintiffs' Opposition, speaks for itself.  It further supports the assertion that it was Plaintiffs' excessive trading in and churning of Sowell's account, all while collecting $480,875 in commissions, that resulted in the judgment against Plaintiffs.  SOF ¶¶ 76, 78.

63.     Moskowitz made a demand to settle the claim for $950,000, which is an amount within policy limits. [Exhibit CC at p. 4.]

RESPONSE:        Admitted.

64.     Maxine Polomski Becker ("Becker") represented Gwynn for the remainder of the hearing. She explained the difficulties facing her after she was retained. She "spent the next two days getting up to speed on this arbitration." [Becker Transcript, Exhibit Q, at p. 41.] By the time AIG retained her firm, Gwynn had testified, Sowell's examination had begun, and Sowell's expert was scheduled to testify within the next few days:

> Mr. Gwynn arrived at my office [Friday evening, January 10] with documents, and I spent that evening reviewing documents, Friday night; met with Mr. Gwynn first thing Saturday morning, met with him all day, intermittently receiving faxes from [Sowell's] counsel; also received- also got in touch with Mr. Federman, who was representing the Ryan defendants, but mostly spent the day speaking with Mr. Gwynn and– trying to sort through the documents that he had brought to my office.... There were- well, there were many, many documents, and I had 48 hours, and there was no way to review all of the— the documents.

[Becker Transcript, Exhibit Q, at pp. 41-42.]

RESPONSE:        Admitted.

65.     At the time she took over Gwynn's defense, Becker was a third year associate who had never been a "first-chair lawyer" in a matter where the damages sought exceeded one million dollars, and had never first-chaired a binding arbitration. [Becker Transcript, Exhibit Q, at p. 88.] Moreover, AIG did not provide authority for the retention of expert witnesses, and Becker did not have other lawyers or paralegals assisting her. She characterized her retention as "a particularly unusual situation." [Id. at p. 83.]

RESPONSE:        Denied that Becker was a third year associate.  Becker Deposition at 8. Relevant portions of the Becker Deposition Transcript are attached as Exhibit EE to the Supplemental Appendix.  Denied that AIG did not allow the retention of an expert and admitted as to remainder.  Id. at 30.

66.     Becker advised Conlin that, under these circumstances, "this was a very difficult situation... we were walking in with a lot of strikes against us... I just wanted to make it clear to him that he understood the situation as I saw it." [Becker

Transcript, Exhibit Q, at pp. 133-34.] According to Becker, Conlin advised that he understood the situation, and said, in substance, "that he did not expect [her] to be able to go in there and- and remedy the situation, as it was."  [Id., at pp. 85, 133.]

RESPONSE:        Admitted.  Becker's statements further support the assertion that it was Plaintiffs' excessive trading in and churning of Sowell's account, all while collecting $480,875 in commissions, that resulted in the finding against Plaintiffs.  SOF ¶¶ 76, 78.

67.    As the arbitration proceeded, Nicgorski continued to make efforts to have AIG negotiate a settlement within policy limits. On January 10, 2003, he sent a letter to King and Conlin, which included a letter of the same date from Moskowitz to Nicgorski. [Exhibit DD.]

RESPONSE:        Admitted that on January 10, 2003, Nicgorski sent a letter to King and Conlin, which included a letter of the same date from Moskowitz to Nicgorski.  Gwynn Plaintiffs Counterstatement, Exhibit DD.

68.    Nicgorski again urged AIG to negotiate with Sowell's counsel and settle this matter, and his letter stated that "[d]espite the fact that claimants believe that the arbitrators are leaning in their favor, I believe that a reasonable settlement can be reached within policy limits." [Exhibit DD at p. 1]

RESPONSE:        Admitted that on January 10, 2003, Nicgorski sent a letter to King and Conlin, which included a letter of the same date from Moskowitz to Nicgorski.  Gwynn Plaintiffs Counterstatement, Exhibit DD.

69.    AIG made no effort to settle the claim at this time, and did not even authorize Becker to have any settlement discussions. [Becker Transcript, Exhibit Q at p.71; Defendants' Admissions, Exhibit C at p. 26.1108.]

RESPONSE:        Admitted.

70.    On January 13, 2003, King sent a letter to Nicgorski, in which he advised "that although AIG is providing Mr. Gwynn with a defense, it has not changed its position with respect to coverage." [Exhibit EE].

RESPONSE:        Admitted.

71.    Antonias Daskalakis, who had been designated by AIG as a Rule 30(b)(6) deposition witness, testified that AIG should have sent a letter to its insureds when it resumed their defense, updating and explaining its coverage position, in light of the fact that it had changed its mind in resuming the defense. [Transcript of the Deposition of Antonias Daskalakis ("Daskalakis Transcript"), Exhibit FF, at pp. 174-177.]

RESPONSE:        Denied.  Plaintiffs mischaracterize Daskalakis' testimony.  In the portions of Daskalakis' testimony cited by Plaintiffs, Daskalakis only observed that it is "customary practice" to update the coverage position as it evolves in writing.  Gwynn Plaintiffs Counterstatement, Exhibit FF, Daskalakis Deposition at 175.  Further, AIG made it clear that

"it has not changed its position with respect to coverage." Gwynn Plaintiffs Counterstatement, Exhibit EE.

72.    Jonathan Weber, a second 30(b)(6) designated by AIG to offer testimony, testified that AIG did not send a revised reservation of rights letter to its insureds in January 2003. [Weber Transcript II, Exhibit F, at p. 79; Weber Transcript III, Exhibit V, at p. 328.]

RESPONSE:    Admitted. Again, AIG made it clear that "it has not changed its position with respect to coverage." Gwynn Plaintiffs Counterstatement, Exhibit EE.

73.    Becker sent a letter to Conlin on January 13, 2003 [Exhibit GG], which included a copy of a January 12 letter from Alan Baskin, Moskowitz' co-counsel, to Polomski. [Exhibit HH.] Baskin's letter again made an offer to settle within policy limits. [Exhibit HH at p. 1.]

RESPONSE:    Admitted.

74.    Becker's letter contains the following statement:

> I have had an opportunity to meet with Mr. Gwynn and briefly review the matter. From this review, I would like to reiterate that, as we first reported to you, we do not believe there is a defense in this action. We strongly recommend that AIG make an effort to settle this matter as soon as possible.

RESPONSE:    Admitted. The January 13, 2003 letter from Becker to Conlin, attached as Exhibit GG to the Gwynn Plaintiffs' Opposition, speaks for itself. It further supports the assertion that it was Plaintiffs' excessive trading in and churning of Sowell's account, all while collecting $480,875 in commissions, that resulted in the judgment against Plaintiffs. SOF ¶¶ 76, 78.

75.    The arbitration hearing continued for three more days, and concluded on January 15. Sowell's expert witness, Chuck Fath, testified. AIG did not retain or pay for an expert witness to testify on Gwynn's behalf to contradict, explain, or mitigate Fath's testimony.

RESPONSE:    Admitted. Denied that AIG did not allow the retention of an expert and admitted as to remainder. Becker Deposition at 30, Exhibit EE to the Supplemental Appendix.

76.    The arbitration Panel required all parties to submit proposed findings of fact and conclusions of law. Counsel to Sowell submitted the following Proposed Finding of Fact:

> 20.   When Mr. Sowell opened his account, he also signed three different powers of attorney. None of these documents was notarized. Both Mr. Gwynn and Mr. Sowell testified that Mr. Sowell signed the powers of attorney so that Mr. Gwynn could make emergency decisions in the event [Mr. Gwynn] could not reach Mr. Sowell.

> Despite the powers of attorney, there is no evidence that this account
> was treated as a discretionary trading account pursuant to the
> procedures set forth in Merit's Supervisory Procedures Manual for
> such accounts. Likewise, there were several Exhibits admitted in
> evidence dated after the signing of the powers of attorney specifically
> stating that Mr. Sowell's account was not being managed pursuant to
> a power of attorney or discretionary trading activity.

[Exhibit JJ at p. 6; Moskowitz Transcript, Exhibit X, at pp. 154-55.]

RESPONSE:        Admitted that this is what Sowell's counsel submitted to the arbitration
Panel.  This expressly conflicts with Sowell's allegations in his Statements of Claim which
remain:

> When Mr. Sowell opened his account, he signed a power of attorney giving
> Respondents [including Gwynn] discretionary control of the account.  Mr. Gwynn
> told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make
> quick decisions and manage the account without having to bother Mr. Sowell.  As
> it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading
> decisions.
>
> Mr. Gwynn ignored his statements in the retirement plan regarding the need to
> create an "efficient, diversified portfolio" for Mr. Sowell and treated his
> discretionary power over the account as a license to churn.  Mr. Sowell's account
> was traded in a helter-skelter fashion, which was characterized by excessive, in-
> and-out trading in technology stocks.  Mr. Gwynn also traded extensively on
> margin in Mr. Sowell's account.  A review of Mr. Sowell's account statements
> reveals that Respondents utilized no meaningful investment strategy or plan.

SOF ¶¶ 28-29 and Exhibit D (Statement of Claim at ¶¶26-27) and Exhibit E
(Amended Statement of Claim at ¶¶27-28).

Further, Sowell's Statements of Claim state that "Mr. Sowell's was a discretionary
account and was unquestionably controlled by Mr. Gwynn." *Id*.

77.     On January 16, the day after the hearing ended, Federman sent a letter to King,
        which was copied to Conlin. [Exhibit KK.] Federman offered his opinion that an
        award in excess of policy limits would likely be entered against the Merit
        plaintiffs and Gwynn jointly and severally. He warned that "[t]he mere entry of an
        award, no matter the dollar amount," might have a detrimental effect on the
        livelihoods of Ryan, Newton and Fitzpatrick. [Exhibit KK at p. 2.]

RESPONSE:        Admitted that Federman sent King a letter on January 16, 2003 that
offered an opinion.  Denied that the entry of the award was the reason for any detrimental
effect on the livelihoods of Ryan, Newton and Fitzpatrick.  It was Plaintiffs' excessive
trading in and churning of Sowell's account, and failure to supervise on the part of Ryan,
Newton and Fitzpatrick, that resulted in the finding against Plaintiffs.  SOF ¶¶ 76, 78.

78.    AIG did not respond to this letter, and Federman sent another letter on February 5, 2003. [Exhibit LL.] He reiterated his belief that there was a "strong probability" that an award would be entered, and that it was "extremely important" to avoid entry of an award, which would "cause irreparable harm to each of [his clients] licenses and capacity to remain in the securities business." Federman again urged AIG to engage in settlement negotiations. [Exhibit LL at p. 1.]

RESPONSE:    Admitted that Federman sent King a letter on February 5, 2003 that offered an opinion.  Denied that the entry of the award was the reason for any detrimental effect on the livelihoods of Ryan, Newton and Fitzpatrick.  It was Plaintiffs' excessive trading in and churning of Sowell's account, and failure to supervise on the part of Ryan, Newton and Fitzpatrick, that resulted in the finding against Plaintiffs.  SOF ¶¶ 76, 78.

79.    The Panel entered its award on February 25, 2003. [Exhibit MM.] It found David and Raquel Gwynn, jointly and severally liable with the Merit Plaintiffs for Sowell's damages, which were calculated at $1,250,000. [Exhibit MM at pp. 6-7.]

RESPONSE:    Admitted.

80.    The Panel's award made no reference to Sowell's allegation that his account at Merit was a discretionary account. [Exhibit MM.]

RESPONSE:    Denied.  The NASD Arbitration Panel specifically found the Plaintiffs guilty of "churning" Sowell's account.  SOF at Exhibit P, page 7.  Further, as to the issue of coverage, it is entirely irrelevant whether the arbitration panel based its decision on whether the Sowell Merit Account was discretionary or was under the control of the power-of-attorney, as the Policy plainly excludes claims "*alleging, arising out of, based upon or attributable* to an Insured exercising discretionary authority or control with regard to management or disposition of assets," among others.  SOF, Exhibit A (Policy at p.6-9) (emphasis added).  According to Sowell's Statements of Claim:

When Mr. Sowell opened his account, he signed a power of attorney giving Respondents [including Gwynn] discretionary control of the account.  . . . .  As it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading decisions.

In addition:

Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell and treated his discretionary power over the account as a license to churn.  Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by excessive, in-and-out trading in technology stocks.  Mr. Gwynn also traded extensively on margin in Mr. Sowell's account.

SOF ¶¶ 28-29 and Exhibit D (Statement of Claim at ¶¶26-27) and Exhibit E (Amended Statement of Claim at ¶¶27-28).

81. On March 6, 2003, King sent a letter to Conlin in which recommended "that AIG open settlement negotiations as soon as possible. Even if exclusion (s) does apply, this is not a case that [defendants] should walk away from completely." [Exhibit NN.]

RESPONSE:     The March 6, 2003 letter from King to Conlin, attached as Exhibit NN to the Gwynn Plaintiffs' Opposition, speaks for itself.

82. The following day, Struckmeyer's Donald Wilson sent a letter to Conlin. [Exhibit OO.] It states, in relevant part, as follows:

> The sole basis for the denial of coverage to both Merit Capital Associates and its employee, David Gwynn, is exclusion (s) of the policy... No other basis for the denial of coverage is stated in correspondence either to Merit... or... Gwynn. Even though the reservation- of- rights correspondence identified other potential provisions in the policy which might apply... the only basis for the actual denial of coverage... is exclusion (s). By not including any additional basis for the denial of coverage in the denial letters, one could argue that [defendants have] waived all other coverage and policy defenses. Therefore, whether coverage exists for any claim against your insured will depend primarily, if not entirely, upon the applicability of exclusion (s) and whether this was a discretionary account.

[Exhibit OO at p. 11.]

RESPONSE:     The March 7, 2003 letter from Wilson to Conlin, attached as Exhibit OO to the Gwynn Plaintiffs' Opposition, speaks for itself.

83. The letter also stated that "the Arbitration Panel "made no finding whatsoever with respect to whether the account was or was not discretionary, and thus, the "Award is not dispositive on the question of whether the account was discretionary and therefore subject to exclusion (s)." [Exhibit OO at p. 13.]

RESPONSE:     The March 7, 2003 letter from Wilson to Conlin, attached as Exhibit OO to the Gwynn Plaintiffs' Opposition, speaks for itself.

84. Wilson advised AIG to "give serious consideration to filing a declaratory judgment action as soon as possible" in order to "resolve all factual disputes and coverage issues." [Exhibit OO at p. 14]

RESPONSE:     The March 7, 2003 letter from Wilson to Conlin, attached as Exhibit OO to the Gwynn Plaintiffs' Opposition, speaks for itself.

85. Nicgorski sent a letter to Wilson on April 9, 2003, advising him of the fact that the Merit Plaintiffs had filed this lawsuit. Nicgorski's letter then states:

> AIG has not clarified its position regarding coverage under the policy. Unless [Mr. Gwynn] receives some response from AIG clarifying its

position within five days of this correspondence, [Mr. Gwynn] will proceed with the appeal [of the arbitration award] under the assumption that AIG will provide full indemnification for the award.

[Exhibit PP at p. 1.] Defendants did not respond in writing to this letter, nor did they clarify their position regarding coverage.

RESPONSE:        The April 9, 2003 letter from Nicgorski to Wilson, attached as Exhibit PP to the Gwynn Plaintiffs' Opposition, speaks for itself.  Denied that AIG did not clarify its position regarding coverage.  AIG made it clear that "it has not changed its position with respect to coverage."  Gwynn Plaintiffs Counterstatement, [Exhibit EE].

86.    The Gwynn Plaintiffs filed their Complaint in this matter on or about July 2, 2003.

RESPONSE:        Admitted.

87.    On or about August 8, 2003, defendants paid the policy limit of $1,000,000 to settle Sowell's claims. In exchange, they received a Release running from Sowell to defendants, and Sowell's covenant not to sue either the Merit Plaintiffs or the Gwynn Plaintiffs. [Exhibit QQ.]

RESPONSE:        Admitted.

88.    AIG has admitted that it never placed Plaintiffs on notice, at the time it resolved Sowell's claims, that it reserved the right to recoup that indemnity payment from them. [Weber Transcript II, Exhibit F, at p. 35.]

RESPONSE:        Denied.  At the time AIG resolved Sowell's claims Plaintiffs, were aware that AIG had reserved its rights under the policy.

On October 15, 2001 Conlin wrote to the Ryan Plaintiff's stating:

This letter is not to be construed as a waiver of any policy provision.  [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit I at p. 7.

Conlin wrote to Gwynn on November 7, 2001 and "forwarded a copy of AIG's coverage determination" at that time.  The third sentence of the November 7, 2001 letter from Conlin to Gwynn explicitly states as follows:

Please be aware, that this letter is not to be construed as a waiver of any policy provision. [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

Conlin then followed up with Gwynn on November 26, 2001.  The third sentence of the November 26, 2001 letter from Conlin to Gwynn explicitly states as follows:

> Please be aware, that this letter is not to be construed as a waiver of any policy provision and [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

In his January 12, 2002 letter to Gwynn Conlin specifically states:

> This letter is not to be construed as a waiver of any policy provision.  [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit R at p.2.

89.     Defendants did not issue a reservation of rights letter to either the Ryan Plaintiffs or the Gwynn Plaintiffs at any time prior to settling Sowell's claim, and never indicated to Plaintiffs or their counsel that the settlement payment was being made under protest, or subject to any policy exclusions or defenses.

RESPONSE:          Denied.  At the time AIG resolved Sowell's claims, Plaintiffs were aware that AIG had reserved its rights under the policy.

On October 15, 2001 Conlin wrote to the Ryan Plaintiff's stating:

> This letter is not to be construed as a waiver of any policy provision.  [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit I at p. 7.

Conlin wrote to Gwynn on November 7, 2001 and "forwarded a copy of AIG's coverage determination" at that time.  The third sentence of the November 7, 2001 letter from Conlin to Gwynn explicitly states as follows:

> Please be aware that this letter is not to be construed as a waiver of any policy provision. [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

Conlin then followed up with Gwynn on November 26, 2001.  The third sentence of the November 26, 2001 letter from Conlin to Gwynn explicitly states as follows:

> Please be aware, that this letter is not to be construed as a waiver of any policy provision and [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.

Gwynn Plaintiffs' Counterstatement, Exhibit M, p.1.

In his January 12, 2002 letter to Gwynn Conlin specifically states:

> This letter is not to be construed as a waiver of any policy provision.  [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

Gwynn Plaintiffs' Counterstatement, Exhibit R at p.2.

Respectfully Submitted,

DEFENDANTS/COUNTERPLAINTIFFS
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.
and AIG TECHNICAL SERVICES, INC.

BY THEIR ATTORNEYS,
Edwards Angell Palmer & Dodge LLP


By: /s/ David S. Samuels
    Mark B. Seiger
    Fed. Bar No. ct05580
    David S. Samuels
    Fed. Bar. No. ct24460
    90 State House Square
    Hartford, CT  06103-2715
    Tel:  (860) 525-5065
    Fax: (860) 527-4198
    Email:  mseiger@eapdlaw.com
    Email:  dsamuels@eapdlaw.com

    John D. Hughes
    BBO # 243660
    111 Huntington Avenue
    Boston, MA 02199
    Tel:  (617) 239-0100
    Fax:  (617) 227-4420
    Email: jhughes@eapdlaw.com

    Donna M. Greenspan
    Florida Bar No.: 059110
    One North Clematis Street
    Suite 400
    West Palm Beach, FL  33401
    Tel: (561) 833-7700
    Fax:  (561) 655-8719
    Email:  dgreenspan@eapdlaw.com

## <u>CERTIFICATION</u>

I hereby certify that on June 1, 2007, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court 's electronic filing system or by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ David S. Samuels
David S. Samuels