# Exhibit BB

Conlin061605

1

```
 1
 2     UNITED STATES DISTRICT COURT
       DISTRICT OF CONNECTICUT
 3     - - - - - - - - - - - - - - - - -x
       BRUCE CHARLES RYAN, RUSSELL WILLIAM    :
 4     NEWTON, ROBERT FITZPATRICK, and        :
       MERIT CAPITOL ASSOCIATES,              :
 5              Plaintiffs,                    :
                                              :
 6                                            :
               -against-                      : Index No.
 7                                            : 3:03 CV 00644
                                                (CFD)
 8     NATIONAL UNION FIRE INSURANCE          :
       COMPANY OF PITTSBURGH, PA., and        :
 9     AIG TECHNICAL SERVICES, INC.,          :
                                              :
10              Defendants.                   :
       - - - - - - - - - - - - - - - - -x
11     DAVID GWYNN, RAQUEL GWYNN AND          :
       GWYNN FINANCIAL SERVICES, INC.,        :
12                                            :
               Plaintiffs,                    :
13                                            :
                                              :
14             -against-                      : Index No.
                                              : 3:03 CV 01154
15                                              (CFD)
       NATIONAL UNION FIRE INSURANCE          :
16     COMPANY OF PITTSBURGH, PA., and        :
       AIG TECHNICAL SERVICES, INC.,          :
17                                            :
               Defendants.                    :
18     - - - - - - - - - - - - - - - - -x
```

19          VIDEOTAPE DEPOSITION of BRIAN CONLIN, taken by

20     Plaintiffs Gwynn at the offices of Lewis, Brisbois,

21     Bisgaard & Smith, LLP, 199 Water Street, 25th Floor,

22     on Thursday, June 16, 2005, commencing at 10:00 a.m.,

23     before Debra DiBenedetto, a Shorthand (Stenotype)

24     Reporter and Notary Public within and for the State of

25     New York.

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500

Conlin061605

5      Q    What is -- is he still with AIGTS?

6      A    He is not.

7      Q    As of the time -- and do you know

8    when he left AIGTS, approximately?

9      A    I was there when he left.  I can't

10   tell you exactly how or even maybe a year ago, but

11   I honestly don't want to speculate.

12     Q    Was it after January 2003?

13     A    I believe so, yes.

14     Q    And do you know whether Mr. Weiman

15   accepted employment at another entity or

16   organization or corporation?

17     A    No.

18     Q    Did he retire?

19     A    I don't know.

20     Q    Okay. You don't know what he's

21   doing, correct?

22     A    I don't know what he's doing.

23     Q    When he left AIGTS did you know what

24   his title or responsibility was as of that time,

25   whatever date that may have been?

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500

15

1                     Conlin

2      A    I think he was an assistant

3    vice-president.

4      Q    And is that, in the hierarchy of

5    AIGTS, is that a higher position than mainstream

Page 14

Conlin061605

```
  6   director?
  7            A    It is.
  8            Q    In preparing -- withdrawn.
  9                 Prior to coming here today did you
 10   review any materials in the past two weeks or so
 11   in order to assist you in preparing for this
 12   deposition?
 13            A    I did look at some documents.
 14            Q    And do you know whether the
 15   documents you looked at were included within
 16   production of materials made to counsel in this
 17   case?
 18            A    No.
 19            Q    Did you look at documents that were
 20   not produced to counsel in this case?
 21            A    I don't know that.
 22            Q    Did you notice whether any of the
 23   materials you reviewed had exhibit stickers
 24   indicating they were used as exhibits at
 25   depositions?
```

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500

16

```
  1                        Conlin
  2            A    Could you repeat that question.
  3            Q    Certainly.  Do you know whether the
  4   exhibits -- withdrawn.
  5                 -- whether the documents you looked
```

Page 15

Conlin061605

6      at had exhibit stickers on them suggesting that

7      they were introduced as exhibits during various

8      depositions in this case?

9              A     No.

10             Q     Have you read the transcripts of any

11     of the depositions that have been prepared to

12     date?

13             A     No.

14             Q     Have you looked at them or glanced

15     through them or skimmed through any of the

16     deposition transcripts that have been produced to

17     date?

18             A     No.

19             Q     Prior to beginning your employment

20     at AIGTS can you tell me what your job was

21     immediately before that?

22             A     I worked at Blackwood Insurance

23     Services.

24             Q     Where is that located?

25             A     It's now located in River Edge, New

17

1                          Conlin

2      Jersey.  At the time it was in Hicksville.

3              Q     How long did you work for that --

4      Blackwater, you said it was?

5              A     Blackwood.

6              Q     Blackwood. How long did you work for
                          Page 16

Conlin061605

 7   Blackwood?

 8       A    About three years.

 9       Q    In what capacity?

10       A    I was an insurance investigator.

11       Q    With respect to your position as

12   claims analyst at AIGTS and when you began in

13   particular as Claims Analyst IV, were you assigned

14   particular product lines?

15                 MR. HAWKINS:  I don't think he

16            began as Claims Analyst IV.

17       Q    I'm sorry, you're correct, let me

18   restate question.  You began as Claims Analyst II,

19   correct?

20       A    Yes.

21       Q    When you began as a Claims

22   Analyst II were you assigned to particular product

23   lines or liability issues, by way of example, fire

24   insurance, automobile insurance?

25       A    I was not assigned those type of

18

 1                    Conlin

 2   lines, but I was given different lines of

 3   insurance.

 4       Q    As a Claims Analyst II, can you tell

 5   me the types of lines of insurance you were given

 6   to perform your functions?

Conlin061605

7       A    Security broker dealer policies.

8       Q    Any others?

9       A     Insurance agents and brokers,

10   insurance company E and O, errors and omissions

11   policies.  Mortgage bankers and brokers.  When I

12   began at AIGTS as a Claims Analyst II, I think

13   those are the type of policies that I reviewed.

14       Q    Okay, how about as Claims

15   Analyst III?  I'm not going to ask you to repeat

16   them, but as Claims Analyst III did the types of

17   policies you reviewed include errors and omissions

18   policies with respect to security brokers and

19   dealers?

20       A    Yes.

21       Q    Prior to your employment at AIGTS

22   had you had any experience investigating or

23   analyzing claims having to do with E and O

24   policies for security brokers or dealers?

25       A    No.

19

1               Conlin

2       Q    Now, Mr. Conlin, forgive me,

3   normally I start the depositions by going through

4   some ground rules, so I'm go to do that now, if

5   that's okay with you.

6             Have you been deposed before?

7       A    No.

Conlin061605

10          Q      Who conveyed to you -- well,

11    withdrawn.

12                 Are you saying that it was your not

13    your final decision to make at that time?

14          A      Yes.

15          Q      Who conveyed to you from AIGTS that

16    that would be the decision?

17          A      I don't recall but I believe it was

18    Marc Weiman.

19          Q      Okay. Do you recall it being anybody

20    other than Mr. Weiman?

21          A      I don't recall that.

22          Q      Okay. And you had no discussions

23    with anyone other than Mr. Weiman, correct?

24          A      I don't recall.

25          Q      Can you tell me -- withdrawn.


FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor, New York, N.Y.  10018  (212)
869-1500

25

1                          Conlin

2                 I may have already asked you, did

3    you say that you recommended to Mr. Weiman that

4    that course of action be taken, namely that the

5    defense be withdrawn?

6          A      I don't -- what I said was that I

7    recommended, I believe that coverage was not

8    afforded.

9          Q      Pursuant to the terms of the policy?

10         A      Yes.

Conlin061605

```
11          Q     Did you tell Mr. Weiman all of the

12    reasons why you believed that coverage was not

13    afforded as of that time?

14          A     Yes.

15          Q     What were the reasons you cited to

16    Mr. Weiman?

17          A     I advised him that given the receipt

18    of the power of attorney, that I believe that the

19    discretionary exclusion would exclude coverage for

20    this case.

21          Q     Okay. Were there any other reasons

22    that you cited to Mr. Weiman to justify a decision

23    to exclude coverage in this case?

24          A     Well, there are other reasons why I

25    thought other than the power of attorney, the
```

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500
□

26
```
1                           Conlin

2     existence of the power of attorney, that coverage

3     was excluded.

4           Q     What were those other reasons, as

5     you -- let me make sure that question is clear --

6     as you communicated them to Mr. Weiman as you --

7     first of all -- withdrawn.

8                 Did you communicate the other

9     reasons to Mr. Weiman?

10          A     I don't recall specifically what I
```
                           Page 25

Conlin061605

11    said to Mr. Weiman.

12        Q    what do you recall being the other

13    reasons, in your own mind, that enabled you to

14    recommend that coverage be no longer afforded at

15    that period of time?

16        A    I reviewed the underwriting file,

17    which indicated that the insureds, Merit Capital,

18    had, if I recall the percentage correctly,

19    71 percent of accounts were discretionary

20    accounts.  And the existence of the power of

21    attorney.

22        Q    were there any -- I'm sorry, I

23    didn't mean to cut you off.

24        A    That led me to believe that coverage

25    was excluded by exclusion S.

27

1                        Conlin

2        Q    Have you given me all the reasons in

3    your own mind that led you to believe that

4    coverage should not be afforded under the terms of

5    the policy in January of 2002?

6        A    I don't know whether I'm giving you

7    all of the reasons that were in my mind as of

8    January of 2002, but as I sit here now, those are

9    the reasons that I recall.

10        Q    In reviewing any of the documents,

11    whatever documents you may have reviewed before

Conlin061605

12    today, did you see any other reasons that, did

13    anything strike your recollection as to another

14    reason why you would recommend that coverage no

15    longer be afforded?

16         A    Could you repeat that question?

17         Q    Absolutely.  You said you reviewed

18    some documents before appearing here today,

19    correct?

20         A    I glanced at them, I didn't --

21         Q    Whatever level of review you may

22    have used, did anything you saw in those documents

23    refresh your recollection about other reasons why

24    you may have recommended a declination of coverage

25    in January of 2002?


FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500
▯

                                                    28

1                         Conlin

2         A    As I sit here now, those are the

3    reasons that I can recall.

4         Q    And did you actually review the

5    underwriting file itself or did you rely on

6    someone else's review of the underwriting file?

7         A    I did look at the underwriting file.

8         Q    And so, the opinion that -- well did

9    the underwriting file include Merit Capital's

10    application for E and O insurance?

11         A    I believe it did, yes.

Conlin061605

12          Q      And something in that file, you saw

13     something in that file that led you to believe

14     that Merit Capital had, at the time the

15     application was being prepared or the document was

16     prepared, had 71 percent of its accounts as

17     discretionary accounts, correct?

18          A      Yes.

19          Q      Now, at the time that you

20     recommended to Mr. Weiman that AIGTS was within

21     its rights to cease providing a defense, did you

22     have any information in your file contrary to the

23     assertion in Mr. Sowell's statement of claim or

24     contrary to the power of attorney or contrary to

25     the underwriting file that the account was not

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500
☐

29

1                          Conlin

2      discretionary?

3          A      I did not as I recall, tell

4      Mr. Weiman to cease, recommend to him to cease

5      defend.  I told Mr. Weiman that based on the

6      information I now had at my disposal, that I

7      believe coverage was not afforded.

8          Q      In your own mind you came to the

9      conclusion that coverage need not be provided,

10     correct?

11          A      Coverage was not afforded under the

12     policy.

Page 28

Conlin061605

13    January of 2002?

14         A    No.

15         Q    Okay. Now, at the time you spoke to

16    Mr. Weiman did you have information from your

17    investigation up to that point that was contrary

18    or contradictory to the assertion that the account

19    was a discretionary account?

20              MR. HAWKINS:  I'm going to

21              object to the form of the question.  I

22              think your question assumes that there

23              was only one conversation between the

24              witness and Mr. Weiman.

25              MR. DiNATALE:  That's a fair

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500
☐

31

1                         Conlin

2              objection.  Let me recharacterize

3              that.

4         Q    How many conversations between

5    September, if you can recall, between

6    September 2001 and January 2002, did you have with

7    Mr. Weiman on the question of providing coverage

8    or continued coverage to the claimants -- excuse

9    me, to the respondents, in the Sowell arbitration?

10        A    I don't recall.

11        Q    Do you recall whether it was more

12    than one?

13        A    I don't recall, I don't recall.
                    Page 30

Conlin061605

14        Q        Was it your practice to take notes

15    of any conversations you had with Mr. Weiman or

16    anybody else in his position?

17        A        Was it my practice to take notes of

18    conversations that I had with -- normally not.

19        Q        Okay.  Now, in whatever number of

20    conversations you may have had, up to and

21    including January of 2002, did you have

22    information from your investigation contrary or

23    contradictory to the assertion in Sowell's

24    statement of claim that the account was a

25    discretionary account?

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500
☐

                                              32
1                        Conlin

2        A        I don't recall.

3        Q        Okay. Was it your practice, if you

4    had such information, to discuss that with

5    Mr. Weiman?  In other words, to present evidence

6    contrary to the assertion that the account was

7    handled as a discretionary account?

8                        MR. HAWKINS:  I'm going to

9                object to the form of the question.

10        Q        You can answer.

11        A        Yes.

12        Q        And so, if that was your practice,

13    do you believe you would have done that practice

Page 31

Conlin061605

14    with respect to Mr. Weiman, in other words, offer

15    him any evidence contrary to the notion that the

16    account was handled as a discretionary account.

17                    MR. HAWKINS:  Object to the

18                form of the question.

19        A    Yes.

20        Q    Now, did you personally conduct an

21    investigation once you were assigned to handle

22    this claim, to determine and acquire all

23    information with respect to the issue of whether

24    this account was a discretionary account?

25        A    Yes.

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500
▯

                                                        33

1                        Conlin

2            Q    Can you tell me what you did in

3    connection with that investigation?

4            A    I looked, reviewed the underwriting

5    file, I requested in writing and verbally a copy

6    of the power of attorney that was mentioned in the

7    statement of claim.  I reviewed the statement of

8    claim.  And of course, the policy.

9            Q    Did you -- withdrawn.

10                As of September, 2001 at AIGTS, were

11    there written policies or procedures that you were

12    aware of indicating what the scope of an

13    investigation would be with respect to determining

14    coverage issues when a claim has been made against

Conlin061605

15    an AIG insured?

16           A    No.

17           Q    As far as you are aware in September

18    of 2001, were there any written policies or

19    procedures in effect that would assist the claims

20    analyst in determining the appropriate type of

21    investigation to undertake in determining coverage

22    specifically with respect to an E and O policy for

23    security brokers or dealers?

24           A    No.

25           Q    Was it your practice, your personal

34

1                          Conlin

2    practice in September of 2001 in determining

3    coverage to limit your investigation to the

4    allegations of a complaint or as, in this case, a

5    statement of claim in an arbitration?

6           A    No.

7           Q    Between September, 2001 and January,

8    2002, this could be answered yes or no as I don't

9    want to intrude on any privileges, did you consult

10   with counsel with respect to determining a

11   coverage issue, whether in-house or retained?

12   That's just yes or no as I don't want to breach

13   any potential privileges.

14           A    I don't recall.

Page 33

Conlin061605
15          Q      Okay.   Do you recall whether or not

16    between September 2001 and January 2002, you

17    consulted with counsel, again yes or no, either

18    in-house or retained, to determine whether that

19    would be any choice of law issues involved in

20    determining the applicability of the power of

21    attorney?

22          A      No.

23          Q      Okay. Now, am I correct that on or

24    about --

25                       MR. DiNATALE:   Could you read


FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500
☐

                                                    35
1                        Conlin

2               back my last question and the answer.

3                        (Requested portion of record

4                        read back by the reporter.)

5          Q      Now, Mr. Conlin, am I correct that

6    on or about January 10th of 2003, AIGTS changed

7    its position from the year before and agreed to,

8    to pay the costs of defense both to the Merit

9    plaintiffs and David Gwynn and Gwynn Financial

10   Services?

11         A      I don't think I understand that

12   question.

13         Q      Certainly, let me rephrase it.

14                       Did there come a point in time when

15   AIGTS reversed its position and offered to pay the
                              Page 34

Conlin061605

21    about these exclusions you then reference a

22    conversation you had with Mr. Fitzpatrick,

23    correct?  That begins at page 33, I'm sorry.

24        A    Yes.

25        Q    One of the things you asked

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)

869-1500
▯

                                                          109
1                         Conlin

2    Mr. Fitzpatrick is whether Mr. Sowell had a

3    discretionary account, correct?

4        A    I did.

5        Q    And he admitted to you that the

6    client had signed the power of attorney, correct?

7        A    Yes.

8        Q    For purposes -- excuse me, to grant

9    the broker the ability to trade in the account

10   when the insured was either indisposed or out of

11   the country, is that correct?

12       A    That's what he told me.

13       Q    That's what he said?

14       A    That's what he said, yes.

15       Q    And he also told you that the

16   client, meaning Mr. Sowell, did not maintain a

17   discretionary account with the insured, correct?

18       A    He did tell me that.

19       Q    Now, in making a determination in

20   January of 2002 that exclusion S would apply, did

                         Page 107

Conlin061605
21    the information given to you by Mr. Fitzpatrick

22    constitute pertinent data in your investigation?

23                   MR. HAWKINS:  Object to form.

24        A    It was something that I considered

25    in determining, it was one of many pieces of


                    FINK & CARNEY
              REPORTING AND VIDEO SERVICES
        39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500



                                                    110
 1                        Conlin

 2    information that I considered.

 3        Q    Did you give it any credence?

 4                   MR. HAWKINS:  Object to form.

 5        A    I'm not sure what you mean.

 6        Q    Did you -- let me rephrase the

 7    question.

 8                   Was the information you cite for

 9    Mr. Fitzpatrick in this note as you reviewed this

10    file and investigated the claim, consistent or

11    inconsistent with the applicability of

12    exclusion S?

13        A    If Mr. Sowell signed a power of

14    attorney granting David Gwynn authority to trade

15    the account, then whether the fact he actually had

16    an account that was designated as a discretionary

17    account was not something that I thought would

18    affect or preclude me from -- let me rephrase.

19    Would not be something that would change my

20    coverage opinion.

21        Q    Let me pose to you a hypothetical --
                        Page 108

Conlin061605

22    withdrawn.  Not hypothetical.

23              I want you to assume

24    Mr. Fitzpatrick's statements, as summarized in

25    your key note as follows are true.  I'm not asking

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500

111

1                        Conlin

2    you to accept that but just assume that.  That

3    Mr. Sowell exercised, signed the power of attorney

4    sometime in March of '98; that Mr. Sowell and

5    Mr. Gwynn both testified that the purpose of that

6    was to give Mr. Gwynn the ability to make a trade

7    in the event that Mr. Sowell was either indisposed

8    or out of the country in times of volatile

9    markets; and assume further that the power of

10   attorney was not once exercised by Mr. Gwynn.

11   Assuming those facts, assuming those facts to be

12   true -- I'm not asking you to accept that -- as

13   you evaluate and investigate this claim, does that

14   say to you that exclusion S is applicable?

15                        MR. HAWKINS:  Object to the

16              form of the question.

17        A     It would say to me that the

18   exclusion would be -- would not be applicable;

19   however, when I have at my disposal a statement of

20   claim where the claimant says that he had

21   discretionary control over the account, without

Page 109

Conlin061605

22    knowing the coverage issues that may be involved

23    for Merit Capital, that leads -- that's pretty

24    clear to me that he was exercising discretionary

25    or at least claimant alleges, Mr. Sowell alleged

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500

112

1                        Conlin

2    that Mr. Gwynn exercised discretionary control

3    over his account.

4          Q     Do you always accept the allegations

5    in a complaint with respect to determining

6    coverage issues or is that just a starting point?

7          A     I -- that's a starting point;

8    however, I take the statements as contained in the

9    complaint as Mr. Sowell's contention of what

10   happened from his perspective.

11         Q     And that's an allegation, correct?

12         A     It's his allegation as to what

13   occurred.

14         Q     And in your experience people

15   sometimes make allegations in statements of claims

16   or in complaints that are ultimately found not to

17   be true, correct?

18         A     As matter of opinion, yes.

19         Q     And did you ever come to learn how

20   many trades Mr. Sowell acknowledges and the

21   documents show was made in his account during the

22   period of time he had an account with Merit?
                    Page 110

Conlin061605

23          A     No, I don't recall.

24          Q     Do you recall the number being in

25    excess of 1500?


FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500


                                                    113
1                          Conlin

2          A     I don't recall.

3          Q     If that were in fact the case,

4    assume for a moment there were 1500 trades

5    executed in approximately three years, and on not

6    a single occasion was a power of attorney

7    exercised -- withdrawn -- and not a single

8    occasion did Mr. Gwynn make a trade without first

9    consulting with Mr. Sowell, is that consistent or

10   inconsistent with the applicability of the

11   exclusion S?

12                    MR. HAWKINS:  Objection to

13              form?

14         A     If Mr. Gwynn consulted with

15   Mr. Sowell prior -- I'm getting a little confused.

16   If the rep consulted with --

17                    MR. HAWKINS:  You want the

18              question read back?

19                    THE WITNESS:  Sure.

20                    MR. DiNATALE:  Would you read

21              it back, please, rather than having me

22              rephrase it.

                    Page 111

Conlin061605

FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500

122

1                          Conlin

2     reference to the E and O policy application that

3     talks about 71 percent discretionary accounts,

4     correct?

5          A     I'd have to take a look at the

6     underwriting application, but assuming that 7G

7     refers to the underwriting application.

8          Q     Let me show you the application

9     which is Exhibit 167.  For the record 167 is Bates

10    stamp numbers 203 through 207.  And 7G, I believe,

11    tell me if I'm wrong, Mr. Conlin, is on page 205,

12    on the bottom, Bates stamp number there?

13         A     That's true.

14         Q     Tell me when you're done with your

15    review.

16                    (Application was marked as

17                    Deposition Exhibit No. 167 for

18                    identification, as of this date.)

19         A     What exactly did you --

20    BY MR. DiNATALE:

21         Q     You said you needed to look at the

22    underwriting policy to determine if this note

23    which is 166 refers to the section of the policy

24    that talks about the percentage discretionary

25    accounts.

Conlin061605
FINK & CARNEY
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212)
869-1500

                                                        123
    1                         Conlin

    2                    MR. HAWKINS:  Objection to the

    3              form.  Did you mean underwriting

    4              application?

    5          Q    The underwriting application, I'm

    6     sorry.

    7          A    This note seems to refer to the

    8     application.

    9          Q    And you thought this particular

   10     note, which indicates that in your review of the

   11     application, 71 percent of the accounts was

   12     discretionary, was significant enough to retain in

   13     the file, correct?

   14          A    Yes.

   15          Q    Now, I want you to take a red pen

   16     and put a circle around section 7G, if you will.

   17          A    On this copy?

   18          Q    On your copy, on the actual, yeah.

   19     Now, looking at that section 7G, I want to you

   20     look at it again and tell me whether you think

   21     that that says 71 percent or whether there's an

   22     arithmetic symbol and then one percent after that?

   23          A    I think that says 71 percent.

   24          Q    Okay. You don't think it says less

   25     than one percent?

Conlin061605
REPORTING AND VIDEO SERVICES
39 West 37th Street, 6th Floor,  New York, N.Y.  10018  (212) 869-1500
[]

124

1                          Conlin

2          A     Assuming that's an arithmetic

3     symbol, wouldn't it mean greater than one percent?

4          Q     Might.  Let me ask you this then:

5     Do you think that means greater than one percent?

6          A     I don't.

7          Q     You still think it says 71 percent,

8     correct?

9          A     I do.  And the reason I say that is

10    there's no other symbols in this document that I

11    see, and when filling out an underwriting

12    application you would assume that specificity is

13    important, and greater than one percent does not

14    really provide you with a lot of information.

15    It's very vague.

16          Q     An underwriter can certainly or a

17    claims analyst can certainly request more

18    information if it's vague, correct?

19          A     I didn't consider it to be vague.

20          Q     Let's move on then to your Toolkit

21    entry for October 17th.  That occupies two pages,

22    35 and 36.  Take a moment to read that note.

23          A     I finished it.

24          Q     And that references a conversation

25    you had with Mr. Gwynn on October 16th, correct?

Conlin061605
39 West 37th Street, 6th Floor, New York, N.Y. 10018 (212)
869-1500

125

1                          Conlin

2          A     It does.

3          Q     Now, among the items in that

4    conversation was a request on Mr. Gwynn's part

5    that AIG retain the firm of Lewis, L-e-w-i-s, and

6    Roca, R-o-c-a, to represent him in connection with

7    this matter, is that correct?

8          A     That is correct.

9          Q     Did you ask Mr. Gwynn why he wanted

10   representation by that particular firm?

11         A     I don't recall.

12         Q     Did Mr. Gwynn tell you that he had

13   had that firm represent him in a successful

14   arbitration in which he was a claimant that

15   resulted in an award of in excess of $700,000?

16         A     I don't recall that.

17         Q     AIG denied the request to have

18   Lewis & Roca represent Mr. Gwynn, correct?

19         A     Correct.

20         Q     Do you know why?

21         A     If I recall correctly, Lewis & Roca

22   was not -- I'm speculating now.

23         Q     We don't want to you speculate.  If

24   you have a recollection, that's fine, but I don't

25   want you to guess.

depo Brian Conlin 8-25-05 (2)

303

1

2    UNITED STATES DISTRICT COURT
     DISTRICT OF CONNECTICUT
3    - - - - - - - - - - - - - - - - - -x
     BRUCE CHARLES RYAN, RUSSELL WILLIAM     :
4    NEWTON, ROBERT FITZPATRICK, and         :
     MERIT CAPITOL ASSOCIATES,               :
5              Plaintiffs,                    :
                                             :
6                                            :
               -against-                     : Index No.
7                                            : 3:03 CV 00644
                                               (CFD)
8    NATIONAL UNION FIRE INSURANCE           :
     COMPANY OF PITTSBURGH, PA., and         :
9    AIG TECHNICAL SERVICES, INC.,           :
                                             :
10             Defendants.                   :
     - - - - - - - - - - - - - - - - - -x
11   DAVID GWYNN, RAQUEL GWYNN AND           :
     GWYNN FINANCIAL SERVICES, INC.,         :
12                                           :
               Plaintiffs,                    :
13                                           :
                                             :
14             -against-                     : Index No.
                                             : 3:03 CV 01154
15                                             (CFD)
     NATIONAL UNION FIRE INSURANCE           :
16   COMPANY OF PITTSBURGH, PA., and         :
     AIG TECHNICAL SERVICES, INC.,           :
17                                           :
               Defendants.                   :
18   - - - - - - - - - - - - - - - - - -x

19         CONTINUED VIDEOTAPED DEPOSITION of BRIAN

20   CONLIN, taken by Plaintiffs Gwynn at the offices of

21   Lewis, Brisbois, Bisgaard & Smith, LLP, 199 Water

22   Street, 25th Floor, on Thursday, August 25, 2005,

23   commencing at 10:00 a.m., before Debra DiBenedetto, a

24   Shorthand (Stenotype) Reporter and Notary Public

25   within and for the State of New York.

304

1

2    A P P E A R A N C E S:

depo Brian Conlin 8-25-05 (2)

310

1                        Conlin
2    what I was going to introduce at any point today
3    as Exhibit 190. When I hand you documents today,
4    Mr. Conlin, if you would be so kind, I have copies
5    for your counsel, please pass them along to him,
6    okay, makes it easier.
7              Exclusion S appears on Page 9.
8                   MR. DiNATALE:  While the
9              witness is looking I guess the record
10             should reflect that the Bates numbers
11             for Exhibit 190 are AIGTS 0043 through
12             68.
13        Q    Have you had a chance to review the
14   language of the exclusion?
15        A    I have.
16        Q    What would you change with respect
17   to the substance of your testimony from your first
18   deposition with respect to that?
19        A    Yeah, as I read this and I see, it
20   says "Alleging, arising out of, based upon or
21   attributable to an insured exercising
22   discretionary authority or control with regard to
23   management or disposition of assets," it would
24   seem to me reading that exclusion and the first
25   part of that exclusion that I read, an allegation

311

1                        Conlin
2    of an insured exercising discretionary authority

Page 7

depo Brian Conlin 8-25-05 (2)

3    or control with regard to management or

4    disposition of assets would not be covered subject

5    to this further part of the exclusion which says

6    it shall not apply to an insured's purchase or

7    sale of no load investment company or variable

8    annuities.

9         Q    Are you saying that the mere

10   allegation of trading in a discretionary account

11   would suffice to trigger that exclusion?

12         A    That's what I read that to say.

13        Q    When I asked you those questions at

14   your first deposition you did have an opportunity

15   to read the actual exclusion before you answered

16   those questions, correct?

17        A    I think I did, yeah.

18        Q    And you would recall in particular

19   there was Exhibit 43, which was a letter to you

20   from Mr. Nicgorski dated January 3rd, 2003 which

21   cited the language of the exclusion, do you

22   remember that?

23        A    Can I take a look at the letter, I'm

24   sure you're right.

25        Q    Right here, here's Exhibit 43 and

□

                                                    312

1                      Conlin

2    just to help you along, he begins citing the

3    exclusion at the very bottom of the first page of

4    the letter.  Do you recall my showing you that

5    letter during your deposition?

6         A    Yeah, I think you did, yes.

7         Q    And do you recall having an

                      Page 8

depo Brian Conlin 8-25-05 (2)

8    opportunity to the read the language of the

9    exclusion in that letter?

10        A    I'm sure I did.

11        Q    And do you recall my asking you

12    several times during your deposition whether or

13    not your interpretation of that exclusion, your

14    interpretation of the exclusion would require not

15    merely the allegation of trading in a

16    discretionary account or the existence of a

17    discretionary account but the actual trading of a

18    discretionary account, do you recall that?

19        A    Yes.

20        Q    And do you recall being asked that

21    question several times during the course of your

22    deposition on June 16th, 2005?

23        A    Yes.

24        Q    Did anybody tell you -- withdrawn.

25             Did you come to learn that Jonathan

313

1                        Conlin

2    Weber was deposed I think a week ago yesterday?

3        A    I didn't know when he was deposed, I

4    knew it was he was being deposed.

5        Q    Regardless of the date was it

6    brought to your attention that Mr. Weber was being

7    deposed?

8        A    I think, yes, I'm aware that he was

9    deposed.

10        Q    Did anybody tell you -- and if the

11    instruction came with counsel you could simply

depo Brian Conlin 8-25-05 (2)

12   arbitration or hearing?

13        A    That I was continuing to handle, the

14   answer would be yes.

15        Q    So if you were to continue to handle

16   the file as of the date of this submission, which

17   for the record is January 13th, 2003 according to

18   the document, if you had been handling the

19   document on that date your practice would have

20   been to ask Ms. Polomski to forward to you copies

21   of all pleadings, is that correct?

22        A    Yes.

23        Q    I want to direct your attention to

24   page 5 of this particular exhibit.  In particular

25   paragraphs 4 and 5.  Want you to read those


447

1                        Conlin

2   paragraphs to yourself.  Do you recall in

3   particular reviewing whether you saw those

4   portions of this particular Exhibit 49?

5        A    No, I don't.

6        Q    Do you recall ever receiving a

7   document from your -- from -- withdrawn.

8             Do you recall ever receiving a

9   document prepared and filed by the firm of

10   Mariscal Weeks which has language to the effect of

11   Mr. Sowell was at all times directing his account?

12        A    No.

13        Q    That he was at all times aware of

14   and directing the activity in his account?

15        A    No.

16        Q    Did you recall discussing with

                         Page 124

depo Brian Conlin 8-25-05 (2)

17    anybody whether any such allegations were

18    consistent or inconsistent with your, with

19    Exclusion S?

20                    MR. HAWKINS:  Object to the

21              form of the question.

22        A    No.

23        Q    Did it matter to you as this hearing

24    was pending what evidence was being introduced at

25    the hearing either by Mr. Sowell or by any of the


448

1                        Conlin

2    respondents with respect to the allegation of

3    trading in a discretionary account?

4                    MR. HAWKINS:  Object to the

5              form of the question.

6        A    Assuming I was still handling it at

7    that time.  See, I don't know when it was

8    transferred.  I had a copy of a statement of

9    claim.  As I read the exclusion now it seems to

10   say that the mere allegation of, the mere

11   allegation of discretionary trading would trigger

12   the exclusion.  I didn't make the decision as to,

13   you know, the decision to deny coverage in this

14   case.  That would be something that was done by

15   someone other than I.  So, I don't know, I can't

16   tell you exactly what I was thinking at the time,

17   you know, but that's kind of.

18        Q    Well, you were aware of an

19   allegation in the statement of claim of trading a

20   discretionary account, correct?

Page 125

depo Brian Conlin 8-25-05 (2)
21        A      The allegations, yep.

22        Q      And you tell me that allegation is

23   sufficient to deny coverage under Exclusion S,

24   correct?

25        A      As I read it now, yes, yeah.


                                                                   449
1                          Conlin

2         Q      But at the time you nonetheless

3    asked for documents and other evidence from your

4    insureds to determine whether or not, in fact,

5    there was trading in a discretionary account,

6    correct?

7                        MR. HAWKINS:  Object to the

8                   form of the question.

9         A      I don't know precisely the reason, I

10   mean, whether it was trading in a discretionary

11   account or not was the reason we asked.  Someone

12   told me to ask for a copy of the power of attorney

13   so I did.

14        Q      But if the allegation -- well,

15   withdrawn.

16                      When you first testified here on

17   June 16th your interpretation of Exclusion S was

18   not simply the allegation nor simply the existence

19   of a discretionary account but actually the

20   trading in a discretionary account, correct?

21                        MR. HAWKINS:  Object to the

22                   form of the question.

23        A      As I read the exclusion that's what

24   I testified to.

25        Q      And today for the first time is your
                              Page 126

depo Brian Conlin 8-25-05 (2)

☐

548

1                          Conlin
2          Q     And in fact, the policy at issue in
3    this case was originally issued by AIG effective
4    August of 2000, correct?
5          A     Correct.
6          Q     So this clearly could not have been
7    the application upon which that policy was issued,
8    right?
9                      MR. HAWKINS:   Object to the
10                form of the question.
11         A     I think what you say seems to make
12   sense.
13         Q     And why is it, sir, that you never
14   asked Merit or anybody at Merit to explain the
15   71 percent?
16         A     I don't know whether I never did ask
17   them to explain the --
18         Q     Do you see any notes anywhere in
19   your Toolkit where you've got an explanation of
20   the 71 percent?
21         A     I don't.
22         Q     Do you see any correspondence in
23   anything you've been shown to date where you wrote
24   to Mr. Fitzpatrick and said, you know, you say
25   there's no discretionary accounts but your

☐

549

1                          Conlin
2    application says 71 percent?

Page 211

depo Brian Conlin 8-25-05 (2)

3      A    I don't see anything there.

4      Q    Why didn't you do that?

5      A    I'm not sure why.

6      Q    This was a major factor in your

7  decision making or your thought process since you

8  weren't the decision maker, of why there was no

9  applicable coverage in this case, correct?

10              MR. HAWKINS:  Object to the

11          form of the question.

12      A    I think there are two reasons that I

13  relied on, this is one of them but, also the

14  allegations in the statement of claim that the

15  discretionary trading took place in the account

16  and the power of attorney, those two things, so I

17  can't tell you precisely when Mr. --

18      Q    I'm sorry, I thought he was done but

19  --

20      A    Mr. Weiman or again, I'm not sure

21  ultimately whether he was told to deny coverage in

22  this case but assuming it's Mr. Weiman, what went

23  into his decision as to denial of coverage but

24  those are the two things that immediately come to

25  mind.

550

1                      Conlin

2      Q    Well, three things, right, it's

3  this, it's the statement of original claim that

4  said discretionary accounts and it's the power of

5  attorney, correct?

6      A    Those three things would be

7  relevant.

Page 212

depo Brian Conlin 8-25-05 (2)

8          Q      And I know you keep saying you never

9     made the decision but you, in fact, did reach a

10    conclusion that this is not, the claims by Mr.

11    Sowell are not covered under the policy, correct?

12          A      I don't think they're covered.

13          Q      So as the claims analyst you made

14    that determination?

15                         MR. HAWKINS:  Objection to the

16                  form.

17          A      I don't think they're covered, yeah.

18          Q      And what do you base that on?

19          A      The statement of claim and the

20    existence of a power of attorney.

21          Q      Not this, 71 percent?

22          A      That was something that I took into

23    consideration.

24          Q      So can you then tell me as somebody

25    who was charged with the duty of investigating

551

1                           Conlin

2     coverage as an analyst, why you never asked your

3     insured about this 71 percent?

4          A      No.

5          Q      You can't say why you never asked?

6          A      No, I can't, I don't know why

7     specifically, why I didn't ask.

8          Q      Is that appropriate investigatory

9     procedure?

10                         MR. HAWKINS:  Object to the

11                  form of the question.

Page 213

depo Brian Conlin 5-23-06 (2)

607

1

2                    UNITED STATES DISTRICT COURT

3                      DISTRICT OF CONNECTICUT

4
    ---------------------------------------X
5   BRUCE CHARLES RYAN, RUSSELL WILLIAM
    NEWTON, ROBERT FITZPATRICK, and
6   MERIT CAPITAL ASSOCIATES, INC.,
                            Plaintiffs,        Civil Action No.
7                                              3:03 CV00644(CFD)
                    vs.
8
    NATIONAL UNION FIRE INSURANCE
9   COMPANY OF PITTSBURGH, PA., and
    AIG TECHNICAL SERVICES, INC.,
10
                        Defendants.
11  ---------------------------------------X
    DAVID W. GWYNN, RAQUEL GWYNN and
12  GWYNN FINANCIAL SERVICES, INC.,
                            Plaintiffs,        Civil Action No.
13                  vs.                        3:03 CV01154(CFD)

14  NATIONAL UNION FIRE INSURANCE
    COMPANY OF PITTSBURGH, PA., and
15  AIG TECHNICAL SERVICES, INC.,

16                      Defendants.
    ---------------------------------------X
17

18                              May 23, 2006

19                              10:33 a.m.

20              CONTINUED VIDEOTAPED DEPOSITION
            of BRIAN T. CONLIN, held at the offices
21          of Edwards Angell Palmer & Dodge, LLP,
            750 Lexington Avenue, New York, New York,
22          pursuant to Notice, before ELIZABETH
            SANTAMARIA, a Notary Public of the State
23          of New York.

24  Reported by:
    ELIZABETH SANTAMARIA
25  JOB NO. 51535

[]

608

1

Page 1

depo Brian Conlin 5-23-06 (2)
5    on Page 23.  Take a moment to read those to

6    yourself.

7                    (Witness reviewed document.)

8            A.    61 and 62?

9            Q.    61 and 62.

10           A.    Yes.

11           Q.    Do you understand those paragraphs to

12   suggest that Gwynn Financial Services was not an

13   insured under this policy?

14           A.    That's what 61 says.

15           Q.    Do you agree with that statement?

16           A.    Without reading the statement of

17   claim again fully and without reviewing the policy

18   fully I don't know whether that's correct or not.

19           Q.    Take a look again at the agreed-to

20   litigation plan which references that Mariscal Weeks

21   is representing Gwynn Financial Services.  Do you

22   see that?

23           A.    I do.

24           Q.    Do you have any recollection after

25   receiving that document of contacting them and

☐

736

1                       Conlin

2    discussing with them or suggesting to them whether

3    Gwynn Financial Services was in fact an insured

4    under the policy?

5            A.    Do I recall contacting Mariscal Weeks

6    and informing them that Gwynn Financial Services

7    wasn't insured under the policy?

depo Brian Conlin 5-23-06 (2)
8          Q.     Not necessarily informing them, but

9     having that discussion with them as to whether Gwynn

10    Financial Services was or was not an insured under

11    the policy.

12         A.     I don't recall.

13         Q.     Do you have a recollection that in

14    fact that when you -- during the time period,

15    between September 2001 and January 2002, you did in

16    fact provide a defense or authorized a defense be

17    provided to Gwynn Financial Services?

18         A.     Do I recall that I authorized the

19    defense be provided?  I don't recall specifically

20    whether we authorized Gwynn Financial Services.

21         Q.     Let me see Exhibit 255 again.  I want

22    to direct your attention to Paragraph 27, beginning

23    on Page 18 through and including Paragraph 32 on

24    Page 19.

25         A.     28 through 32 did you say?


□

737


1                        Conlin

2          Q.     27 through 32.  Do you see that?

3          A.     Yes.

4          Q.     Do you understand those paragraphs to

5     allege that when Mr. Sowell alleged that there was

6     trading in a discretionary account, that that

7     allegation in and of itself sufficed to preclude

8     coverage under the policy?

9          A.     Yes.

10         Q.     Do you agree with that paraphrase

Page 118

depo Brian Conlin 5-23-06 (2)
11    that I just iterated to you?

12          A.    Do I agree whether that policy

13    language would do that?

14          Q.    Yes.

15          A.    Yes.

16          Q.    Did you ever articulate in writing,

17    either to Mr. Nolin's clients or to my client, that

18    the mere allegation of the existence of a

19    discretionary account or discretionary trading

20    activity sufficed to preclude coverage?

21          A.    I think I cited the policy language,

22    but did I specifically say that the mere allegation

23    would serve to preclude coverage?  I do not believe

24    I did that.

25          Q.    When you obtained a statement of

738

1                         Conlin

2    claim in this case, were you able to determine from

3    reading that document that Mr. Sowell alleged

4    trading in a discretionary account?

5          A.    Yes.

6          Q.    When you received the amended

7    statement of claim from Mr. Sowell, were you able to

8    ascertain from that document that there are

9    allegations of discretionary trading?

10         A.    Yes.

11         Q.    I want to discuss with you --

12    withdrawn.

13                    During the course of your handling

Page 119

depo Brian Conlin 5-23-06 (2)
14  this file, on various occasions you discussed this

15  claim with Mr. Weiman, correct?

16          A.     Yes.

17          Q.     Mr. Weber?

18          A.     Yes.

19          Q.     Mr. Tiburzi?

20          A.     Yes.

21          Q.     Mr. DiCarlo?

22          A.     I don't recall whether I spoke with

23  Mr. DiCarlo.

24          Q.     Leave him out of the equation.

25                 Ms. Wacik, W-A-C-I-K?

739

1                      Conlin

2          A.     I believe you are right.

3          Q.     Mr. Daskalakis, D-A-S-K-A-L-A-K-I-S?

4          A.     I didn't speak to him about the

5   handling of this claim while handling it.

6          Q.     There also came a point in time you

7   discussed this case with a Mr. -- I'm going to

8   butcher the pronunciation -- Leggotte,

9   L-E-G-G-O-T-T-E?

10         A.     His name is Leggotte.  I think you

11  are right.

12                I don't recall whether I spoke to

13  Mr. Leggotte about it.  As far as Ms. Wacik is

14  concerned, I only spoke to her about it as I recall

15  after it went to the coverage -- when it was

16  assigned to the coverage department.  That's my --

                    Page 120

depo Brian Conlin 5-23-06 (2)

1                        Conlin
2           A.      At that time, again, I was new to
3    the -- to financial institutions claims department
4    of AIG and I did, as I spoke about, rely on my
5    supervisor and I'm not sure at that point whether I
6    was confident enough and I don't recall specifically
7    what my understanding was of Exclusion S at that
8    time and I'm not sure whether I was at that time
9    confident enough in my own abilities to -- to
10   override or even raise the issue with my supervisor.
11          But, you know, that's kind of my, you
12   know, my thoughts on it.
13          Q.      Do you have a specific recollection
14   of coming to a conclusion in your own mind between
15   September 2001 and January 2002 that Sowell's
16   allegations of trading in a -- of discretionary
17   trading was sufficient to deny coverage?
18          A.      I don't recall.
19          Q.      Do you have any specific
20   recollection that -- specific recollection of
21   discussing with any of the people we referenced
22   earlier -- Weiman, Weber, Tiburzi, let's just start
23   with them.  Between September 2001 and January 2002,
24   do you have any specific recollection of discussing
25   with them whether the allegation of trading of

depo Brian Conlin 5-23-06 (2)

1                    Conlin
2      discretionary trading activity by Sowell would of
3      itself be sufficient to deny coverage?
4          A.      I know we discussed Exclusion S.   I
5      know I discussed with my supervisor on more than one
6      occasion Exclusion S.   I don't specifically recall
7      the contents or the specifics of those
8      conversations.
9          Q.      Do you recall testifying on June 16,
10     2005 upon questioning from me that not only do there
11     need to be allegations of trading, of discretionary
12     trading, but there actually had to be the exercise
13     of that power of attorney, the actual exercise of
14     discretion by the broker, in order to preclude
15     coverage?  Do you remember that testimony?
16         A.      Yes.
17         Q.      Are you -- is that still your
18     testimony today?
19         A.      Well, reviewing and viewing this
20     exclusion, I think the exclusion would serve to
21     exclude coverage based on an allegation of
22     discretionary control.
23         Q.      That wasn't your opinion on June 16,
24     2005, when you testified the first time, correct?
25         A.      When I read the exclusion during my

1                    Conlin
2      first day of testimony, I viewed it differently.
3          Q.      And so the record is clear, when you
                        Page 125

depo Brian Conlin 5-23-06 (2)

4    viewed it on June 16, 2005, you had been employed by

5    AIG for close to four years by that point, correct?

6          A.     Correct.

7          Q.     Do you have any reason to believe

8    that you viewed the exclusion differently between

9    September 2001 and January 2002 than the way you

10   testified on June 2005 that you viewed it?

11         A.     I really don't recall how I viewed it

12   in September of -- between September of '01 to

13   January of '02.

14         Q.     May I have that whole exhibit back,

15   please.

16         A.     (Witness handing document.)

17                MR. SEIGER:  If you could leave

18         those out, because I may use them.

19                MR. DI NATALE:  Sure.

20         Q.     Now let's go to 254, the first

21   exhibit I gave you.  I went away from it.  You are

22   also going to need to refer to Exhibit 163.

23                Just so you know, Mr. Conlin,

24   Exhibit 254 contains some previously redacted

25   material from your toolkit entry.  So to put it in

746

1                      Conlin

2    context, I think you are going to need your toolkit

3    entries, 163.

4          A.     Okay.

5          Q.     And I want to start with Page 0039 on

6    254.  And you should also refer to it on

                        Page 126