# Exhibit DD

Case 3:03-cv-00644-CFD     Document 298-11     Filed 06/01/2007     Page 1 of 12

5-11-05 Bruce Ryan

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRUCE CHARLES RYAN, RUSSELL WILLIAM
NEWTON, ROBERT FITZPATRICK, AND MERIT
CAPITAL ASSOCIATES, INC.,

        Plaintiffs        CIVIL ACTION NO.
VS.                              3:03 CV 00644 (CFD)

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA., AND
AIG TECHNICAL SERVICES, INC.,

        Defendants        MAY 11, 2005

DAVID W. GWYNN, RAQUEL GWYNN AND
GWYNN FINANCIAL SERVICES, INC.,

        Plaintiffs        CIVIL ACTION NO.
                                3:03 CV 1154 (CFD)
VS.

NATIONAL UNION FIRE INSURANCE        MAY 11, 2005
COMPANY OF PITTSBURGH, PA., AND
AIG TECHNICAL SERVICES, INC.,

        Defendants

DEPOSITION OF BRUCE RYAN

Paul Collard
Registered Diplomate Reporter

NIZIANKIEWICZ & MILLER REPORTING SERVICES
972 Tolland Street
East Hartford, Connecticut   06108-1533
(860) 291-9191

2

APPEARANCES:

    For the Plaintiffs Ryan, Newton, Fitzpatrick and Merit
        Capital Associates, Inc.:

        SANDAK, HENNESSEY & GRECO, LLP

Page 1

5-11-05 Bruce Ryan

10 this -- is this covered. And he assured me that it was as
11 long as I gave him something in writing and, you know, did
12 so within the 30 day window.
13    Q   You understand, Mr. Ryan, I'm not trying to be a
14 pain with regard to dates, but dates are very important. So
15 I have to ask you these questions.
16           MR. NOLIN: I object to the form of the
17      question. It's not a question. He can ask a question.
18    A   I appreciate that. I appreciate that.
19 BY MR. TONG:
20    Q   Mr. Ryan, other than your discussion with
21 Mr. Page, did you have any other discussions with anybody at
22 National Union Fire Insurance Company of Pittsburgh,
23 Pennsylvania or AIG Technical Services prior to your written
24 notice on September 21st, 2001?
25    A   Not that I recall.

168

1           (Ryan Exhibit 111 marked for identification).
2    A   I would like to add something to that.
3    Q   Sure.
4    A   I did speak to a Brian Conlin. I don't know when.
5    Q   Okay.
6    A   Where does he fit in the chronology? I
7 couldn't -- that would be guesswork for me. I don't know
8 how I could remember.
9    Q   How many times did you speak to Brian Conlin?
10   A   Once or twice.
11   Q   Okay. Do you recall, if we can try to parse it
12 out between the first time and the second time, do you
13 recall -- is it your testimony that you can't recall when
14 that would have happened?

Page 141

5-11-05 Bruce Ryan

15    A    Yes.

16    Q    Okay. Do you recall what you talked about the
17 first time you spoke with him?

18    A    I think -- what I remember of the conversations
19 with him was we talked about you'll be getting a letter, and
20 it had something to do with we would assign attorneys for
21 you, and that was the end of it. You know, basically that's
22 what he told me.

23        And if I talked to him a second time, which I may
24 have, it would have been concerning the denial of the claim
25 based upon the letter of discretion which was somehow

169

1 discovered.

2    Q    When you say "letter of discretion," what are you
3 talking about?

4    A    There was a letter of discretion that was somehow
5 found in Gwynn's files which was the bases for AIG to
6 withdraw defense and deny the claim.

7    Q    Was it a letter of discretion or was it a power of
8 attorney?

9    A    I don't remember. I think -- I'm not sure what it
10 was. It was a piece of paper. It probably was a power of
11 attorney, I guess.

12    Q    Okay. Just to be clear, you do recall speaking to
13 Brian Conlin, is that right?

14    A    Yes.

15    Q    You do not recall whether it was once or twice,
16 but it may have been, is that right?

17    A    Yeah.

18    Q    You do recall that the first time that you did
19 definitely have a conversation with him in which he

Page 142

5-11-05 Bruce Ryan

20  discussed a letter and the assignment of lawyers, is that
21  right?
22      A   Yes.
23      Q   But it's your testimony, just to be clear, sir,
24  that you are not sure whether you talked to him a second
25  time, is that right?

                                                          170

1       A   That's correct.
2       Q   And although you're not sure whether you talked to
3   him a second time, you may have discussed the denial of the
4   claim, is that right?
5       A   That's correct.
6       Q   And although you're not sure of having talked to
7   him a second time, that you may have discussed a letter of
8   discretion, is that right?
9       A   Yes.
10      Q   Okay.
11          Mr. Ryan, would you take a look at Exhibit 111,
12  Bates number RY06212.
13      A   Okay.
14      Q   Do you recall receiving this document?
15      A   No.
16      Q   Have you seen it before?
17      A   I can't recall.
18      Q   Okay.  Do you recall speaking with a Mr. Raymond
19  F. Tiburzi?
20      A   No.
21      Q   Have you ever spoken to Mr. Tiburzi?
22      A   I don't remember.
23      Q   Have you ever called Mr. Tiburzi?
24      A   I don't remember.

Page 143

Ryan Deposition 11-28-06

210

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

BRUCE CHARLES RYAN, RUSSELL WILLIAM )
NEWTON, ROBERT FITZPATRICK, and )
MERIT CAPITAL ASSOCIATES, INC., )
                     Plaintiffs, )
)
vs )
)
NATIONAL UNION FIRE INSURANCE COMPANY )
OF PITTSBURGH, PA, and AIG TECHNICAL )
SERVICES, INC., )  3:03CV00644(CFD)
                     Defendants. )

---

DAVID W. GWYNN and RAQUEL GWYNN, )
                     Plaintiffs, )
)
vs )
)
NATIONAL UNION FIRE INSURANCE COMPANY )
PITTSBURGH, PA, and AIG TECHNICAL )
SERVICES, INC., )  3:03CV1154(CFD)
                     Defendants. )

---

VOLUME II

---

Deposition of: BRUCE CHARLES RYAN

---

    Taken before Tina M. Davis, Stenographer and
Notary Public in and for the State of Connecticut,
pursuant to notice, at the offices of
EDWARDS ANGELL PALMER & DODGE, LLP,
90 State House Square, Hartford, Connecticut, on
Tuesday, November 28, 2006 scheduled to commence at
approximately 9:30 a.m.

Tina M. Davis, LSR
License No. 00221
Brandon Smith Reporting Service
44 Capitol Avenue
Hartford, CT 06106
(860) 549-1850

211

A P P E A R A N C E S :

Page 1

Ryan Deposition 11-28-06

8   word about this case at lunchtime.
9   BY MS. GREENSPAN:
10      Q.   Okay. So then the answer was no, that there was
11  nothing -- no discussion at lunch --
12      A.   Yes.
13      Q.   -- that refreshed your recollection?
14      A.   Okay.
15      Q.   Is that correct?
16      A.   That is correct.
17      Q.   Okay. Now, as you sit here today, do you know
18  whether you are out of pocket with respect to any fees
19  paid to Mr. Federman?
20           MR. NOLIN:  I object to the form.
21      A.   I'd have to -- no.  I can't say for certain
22  what -- I think that's all been enumerated in our claims
23  previously, so if you want to show me what I wrote down
24  there or what's there.  There was -- we had our
25  controller give us an accounting of things that we paid

319

1   for that we felt were responsibilities of AIG in the
2   process.
3       Q.   Okay. My question, though, is: As we sit here
4   today, do you know whether or not today you are out of
5   pocket with respect to any amounts paid to Mr. Federman?
6       A.   I don't know for certain, no.
7       Q.   Now, Mr. Federman was -- well, who chose
8   Mr. Federman as your attorney?
9       A.   My partner and myself, mostly my -- my choice.
10      Q.   Okay. By your partner, are you referring --

Page 99

Ryan Deposition 11-28-06

11    A.  Russ Newton.

12    Q.  Russ Newton.

13    Okay. Did AIG have anything to do with the

14 selection of Bill Federman as your attorney?

15    A.  No.

16    Q.  Did you feel that Bill Federman provided adequate

17 representation to you in the arbitration proceeding?

18    MR. DINATALE: I object to the form.

19    A.  I had -- we have used Mr. Federman on other

20 arbitrations prior to this. He's a competent attorney

21 in securities arbitration matters. And yes, I think he

22 did as well as he could given the fact that the

23 arbitration was prejudiced by Mr. Gwynn's pro se

24 appearance.

25    Q.  Okay. Other than Mr. Gwynn's pro se appearance,

320

1 is there anything else that you believe prejudiced

2 Bill Federman's representation of you in any way?

3    A.  His representation of me?

4    Q.  Correct.

5    A.  Well, we were unable to afford an expert witness

6 to defend us because the money was coming out of our

7 pocket.

8    I think things could -- with more money for legal

9 expense, we could have had a more fortified defense, if

10 you will.

11    Q.  Well, with Bill Federman as your attorney, I

12 understand you're saying that you felt he was prejudiced

13 in some way by Mr. Gwynn's pro se appearance and the

Page 100

Ryan Deposition 11-28-06

14  fact that you say you were unable to afford an expert
15  witness. Is there anything else that you know of that
16  hindered Mr. Federman's representation in any way?
17        MR. NOLIN: I object to the form.
18        MR. DINATALE: I join.
19     A.  I don't -- I can't think of anything, no.
20  BY MS. GREENSPAN:
21     Q.  Okay. So let's talk first about the expert
22  witness. You contend that you -- together with the
23  other defendants and with Merit you were unable to
24  afford an expert witness?
25     A.  That is correct.

321

1      Q.  Okay. How much were you earning at that time?
2      A.  $300,000.
3      Q.  And how much were the other individual defendants
4   earning at that time?
5      A.  Russ Newton, approximately, the same;
6   Bob Fitzpatrick, probably about 85- or $90,000.
7      Q.  And these are all annual salaries; correct?
8      A.  Correct.
9      Q.  Okay. And you said you were paying Bill Federman
10  somewhere around 150 to $200 an hour; is that correct?
11     A.  That is correct.
12     Q.  Okay. And how much would an expert witness have
13  cost?
14     A.  I'm not sure. My guess would be $30,000, maybe.
15     Q.  What is that based on?
16     A.  Just sort of general knowledge of what people

Page 101

Ryan Deposition 11-28-06

17  require for their time and -- well, someone had to sit
18  through an arbitration for seven days. That's a lot of
19  hours.
20  Q. The arbitration was a full seven days; is that
21  correct?
22  A. You know, I told you I was there in the
23  beginning, but I -- now that I recollect, I wasn't there
24  at the end. I went there -- I was there for the first
25  three or four days and then I missed the last -- it was

322

1  at least six or seven days, I think. I don't know
2  exactly how many days it was.
3  Q. Is it your -- when you base this amount, the
4  expert sitting through the arbitration, is that based on
5  your assumption that the expert would need to be in the
6  arbitration for the entire arbitration?
7  A. Well, I've been in arbitrations, and I believe
8  that the Plaintiff had an expert witness that sat
9  through the whole arbitration. And that's that amount
10  of time, times whatever their hourly rate is, and then
11  all the preparation they would do to be able to support
12  their stance.
13  Q. Okay.
14  A. Which I think 25-, $30,000 is probably the right
15  number. Maybe more. Some of them could be more than
16  that.
17  Q. Did you ever discuss an amount with Mr. Federman,
18  as far as his estimate of what an expert witness would
19  cost?

Page 102

Ryan Deposition 11-28-06

20 A. I don't -- I don't remember. We weren't going
21 there, because we weren't going to spend that money.
22 Q. With the salaries that you were drawing, even
23 $30,000 for an expert would come 10,000 a piece if you
24 split it each. Are you saying that you could not have
25 afforded, the three of you together, to afford an expert

323

1 witness?
2 A. That's a business decision. The answer is yes, I
3 couldn't afford it.
4 Q. You couldn't afford it?
5 A. Yes.
6 Q. Okay. Is it that you felt that you shouldn't
7 have to pay it, you felt that you -- and you felt that
8 you didn't need it, or you simply financially couldn't
9 afford it?
10         MR. NOLIN: I object to the form.
11         MR. DINATALE: I'll join.
12 A. As I said, it's a business decision not to expend
13 the money based upon, I don't know, perceived risks of
14 winning or losing the case. A number of things go into
15 that, not to mention the fact that you're out of pocket
16 this money, which you have to weigh -- one has to weigh
17 that against how much of an advantage that's going to
18 give you in producing a positive outcome.
19 BY MS. GREENSPAN:
20 Q. Now, at the time that you were going into the
21 arbitration and you determined your business decision
22 was that it was not worth it to spend the money to hire

Page 103

Ryan Deposition 11-28-06

23 an expert witness, do you recall what that was based on?

24 MR. NOLIN: I object to the form.

25 A. Mr. Federman is a competent attorney. I believe

324

1 he could handle the case. We didn't anticipate that
2 Gwynn would end up there pro se and ostensibly spoil
3 everything for us, as well as himself, by making wild
4 statements and contradictory statements and -- it was --
5 he was under a lot of stress at this arbitration
6 hearing, to the fact where Mr. Federman had made mention
7 that he thought he could have a heart attack or
8 something. And it was very, very -- you know, when
9 somebody is under that kind of stress, they just
10 can't -- I don't think he could think straight, if you
11 want to know the truth.
12 Q. And you realized that Gwynn was under this stress
13 for the first time when the arbitration started, is that
14 correct, when the proceedings started?
15 MR. DINATALE: Objection to form.
16 A. This was just a visible and noticeable -- you
17 know, he was sweating profusely; he was discombobulated.
18 He kept saying, "Well, I don't have anybody to defend
19 me. My insurance company won't pay for this."
20 He was just -- he was all over the place. It was
21 like he was -- he was a real target for the Plaintiff's
22 attorneys. And as I say, it compromised our case
23 tremendously. Now, I couldn't anticipate that, that it
24 was going to be so bad for us.
25 Q. Okay.