# Exhibit EE

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES, INC., Plaintiffs, v. NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and AIG TECHNICAL SERVICES, INC., Defendants. | No. CV 00644 (CFD) |
| DAVID W. GWYNN and RAQUEL GWYNN, Plaintiffs, v. NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, and AIG TECHNICAL SERVICES, INC., Defendants. | No. CV 01154 (CFD) |

VIDEOTAPED DEPOSITION OF MAXINE BECKER

Phoenix, Arizona

September 20, 2006

Prepared by:

CINDY MAHONEY, RPR
Certified Court Reporter
Certificate No. 50680

(Original)

Maxine.

MS. GREENSPAN: No.

10:27 MAXINE BECKER,

the witness herein, being first duly sworn, was examined and testified as follows:

MR. DiNATALE: Usual stipulations, Counsel?

MR. PLATI: I'm sorry?

10:27 MR. DiNATALE: Usual stipulations?

MS. GREENSPAN: Which stipulations are you referring to?

MR. DiNATALE: The usual kind of stipulations under the federal district court rules.

10:27 MS. GREENSPAN: You need to specify which stipulations you want us to --

MR. DiNATALE: I will look them up in a prior deposition transcript, and I'll get those to you. It's the ones we've been proceeding along for

10:27 the 16 or 17 depositions we've taken in this case.

EXAMINATION

Q BY MR. DiNATALE: Under our rules of practice in Connecticut, and under the federal rules as well, I believe you have the right to review a

10:27 transcript of your deposition, Ms. Becker, for the

purpose of making any errata or other corrections.

You can discuss that with -- with counsel, and let us know now or at the end of your deposition

whether you choose to exercise at that right; okay?

10:28 A Thank you.

Q Is Becker your married name?

A It is.

Q And what -- what was your last name prior to being married?

10:28 A Polomski.

Q Are you a practicing attorney?

A I am.

Q Where do you presently practice law?

A I practice at the law firm of Salmon,

10:28 Lewis & Weldon here in Phoenix.

Q How long have you been practicing at that firm?

A Just since February.

Q Prior to that, where were you practicing?

10:28 A I practiced at the Arizona Department of Water Resources.

Q What were the -- the dates of your employment with -- with that department?

A I worked for the Department of Water

10:28 Resources from the end of September of 2004 until

the end of February of '06.

Q Prior to that, where were you employed?

A I was employed at Mariscal, Weeks, McIntyre & Friedlander.

10:28 Q What were the dates of your employment with Mariscal Weeks?

A I began working at Mariscal Weeks in September of 1999 and concluded my employment there in -- at the end of September of 2004.

10:28 Q Was that your first job after graduating from law school?

A It was.

Q When did you graduate law school?

A In 1999.

10:29 Q And what law school did you graduate from?

A Arizona State University.

Q I'm sorry. Could you tell me again the dates of your employment at Mariscal Weeks?

A September -- I'm sorry. September 1999 to

10:29 September 2004.

Q Were you a partner, an associate, or some other capacity at Mariscal Weeks?

A I was an associate.

Q Did there come a time in 2001 when the

10:29 Mariscal Weeks firm was retained by AIG to represent

David Gwynn?

A Yes.

Q Were you -- was the firm also retained to represent Gwynn Financial Services?

10:29 A Yes.

10:29

Q Was the firm retained to represent Raquel Gwynn?

A Yes.

Q What was the nature of the representation that you were retained to perform?

When I say "you," I mean the firm of Mariscal Weeks.

A The firm was retained by AIG to represent the Gwynn defendants in a lawsuit that was filed by one of Mr. Gwynn's former clients, Michael Sowell.

10:30

Q Did the nature of that representation include investigating the allegations made by Mr. Sowell against Mr. Gwynn?

A Yes.

10:30

Q Did the nature of that representation at least initially include preparing a defense on behalf of Mr. Gwynn?

A Yes.

Q When you left the firm of Mariscal Weeks, did you take -- withdrawn.

10:30



I assume a file was opened once Mariscal Weeks was retained; correct?

A Yes.

Q When you left Mariscal Weeks, did you take any portion of that file with you?

10:30

A I did not.

10:53 Q And his company?

A -- and his wife.

Q Did -- did you have -- withdrawn.

Did Mr. Conlin discuss with you, following the submission of this plan, what facts or documents led you to the belief that the insured had some exposure on this claim?

A I don't recall that.

Q Do you recall Mr. Conlin asking you how much exposure you believed, or the firm believed, the insured may be subject to?

A I don't recall.

Q If you would look at your time sheets again.

A Sure.

Q You submitted this plan on December 19, 2001; correct?

A Oh, sorry. I have the wrong thing. Yes.

Q The plan was submitted on two -- on December 19, 2001; correct?

A According -- yes, according to my letter.

Q From that point to January 18, 2002, do the time sheets reflect an entry either by you, by Mr. Thomason of any conversation with Mr. Conlin?

A No.

Q Let's go back to the agreed-to litigation

plan, III, investigation and discovery.

Do you see that?

A Yes.

Q Number 4 references consultation and engagement of an expert witness.

Do you see that?

A I do.

Q And why did you and the firm come to the conclusion that the investigation and discovery phase of this matter should include consultation and the engagement of an expert witness?

A This was our -- our conclusion was this case needed an expert witness, that it needed -- in order to prepare appropriately, that we would need to engage the services of an expert who could review what occurred here and provide us with an opinion.

Q And did Mr. Conlin, or anybody at AIG, ever tell you that should not be part of the plan, that they would not fund a consultation and engagement of an expert witness?

A They did not.

Q If you look at the next reference, it says, "consult with expert on damages."

Do you see that?

A I do.

Q First question I guess is: What distinction are you making between engaging an expert witness in paragraph 4 and consulting with an expert on damages in paragraph 5?

10:55 A I believe it was just some inartful drafting, but I believe that -- that we were going to be engaging two different experts, one an expert on the damages, if any, that occurred here, and the other would be an expert on the standard of care as

10:55 to Mr. Gwynn's role as an investment advisor.

Q Okay. Why did you -- you've told us about why it was necessary to engage an expert on liability.

Why was it necessary, in your estimation,

10:56 to engage an expert on damages?

A Again, we want -- would want to have an -- because we believe this case needed an outside opinion as to -- to review the damages that the claimant was claiming in this case and provide us

10:56 with an opinion as to the validity of those requested damages.

Q Did you believe it was a necessary part of -- of conducting an effective defense of Mr. Gwynn and his company to engage the services of

10:56 these two expert witnesses?