UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES, INC., Plaintiffs, | ) ) ) ) ) | |
| v. | ) ) | CIVIL ACTION NO. 3:03CV00644(CFD) |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., Defendants. | ) ) ) ) ) ) | |
| DAVID W. GWYNN and RAQUEL GWYNN Plaintiffs, | ) ) | CIVIL ACTION NO. 3:03CV01154(CFD) |
| v. | ) ) | |
| NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC., Defendants. | ) ) ) ) ) | June 1, 2007 |

## DEFENDANTS' RESPONSE TO RYAN PLAINTIFFS' RULE 56a COUNTERSTATEMENT OF UNDISPUTED FACTS[1]

Defendants, National Union Fire Insurance Company of Pittsburgh, PA. and AIG

Technical Services, Inc., now known as AIG Domestic Claims, Inc. (collectively, "National

---

[1] Defendants contend that it is procedurally improper under Local Rule 56a for the party *opposing* summary judgment to file its own Statement of *Undisputed* Facts. Accordingly, Defendants moved to strike the Ryan Plaintiffs' Counterstatement of Undisputed Facts ("Counterstatement"). The magistrate judge denied Defendants' motion, and Defendants have filed Objections pursuant to Federal Rule of Civil Procedure 72. Defendants' Objections are currently pending before the Court. In its ruling, the magistrate provided for 30 days, or until May 24, 2007, for Defendants to respond to the Ryan Plaintiffs' Counterstatement. By filing this Response, Defendants do not waive their objections to the procedural irregularities in the Ryan Plaintiffs' Counterstatement, and maintain that they should not be in the position of having to either file this Response or risk being deemed to have admitted the Ryan Plaintiffs' Counterstatement.

Union" or "AIG" or "Defendants"), through their undersigned attorneys, respond to Ryan

Plaintiffs' Rule 56a Counterstatement of Undisputed Facts as follows:

1.      The professional activities of the Ryan Plaintiffs' were regulated by the National
        Association of Securities Dealers ("NASD").  Affidavit of Robert Fitzpatrick
        ("Fitzpatrick Affidavit") at 1.

RESPONSE:  Admitted.

2.      David Gwynn ("Gwynn") was licensed by the NASD to sell securities.  At relevant times,
        Gwynn worked as a Registered Representative for Merit. Fitzpatrick Affidavit at 2.

RESPONSE:  Admitted.

3.      Gwynn Financial was a company owned and controlled by Gwynn and was used by him
        to provide financial planning services to certain of his customers, including some
        individuals who had accounts at Merit. Fitzpatrick Affidavit at 3.

RESPONSE:   Admitted.

4.      In exchange for an additional premium, NU later extended the coverage period of the
        Policy one month to September 23, 2001 while it considered Merit's application to renew
        the coverage for another year. Fitzpatrick Affidavit at 4.

RESPONSE:   Denied.  The Policy was extended for one month as a courtesy, for an additional
premium.  SOF[2], Exhibit 1 (Policy, Endorsement No. 5).

5.      The Policy covered all of the Ryan Plaintiffs and the Gwynn Plaintiffs.  Fitzpatrick
        Affidavit at 5.

RESPONSE:   Denied. Defendant National Union issued the Policy to Plaintiff Merit Capital
Associates, Inc. ("Merit").  The mere issuance of the Policy does not automatically entitle Merit
and its employees to insurance coverage.  Rather, the Policy affords coverage only pursuant to its
terms and conditions.  Specifically, the Policy states that AIG "shall not be liable for Loss in
connection with any Claim made against an Insured":

        a)      arising out of, based upon or attributable to the gaining in fact any profit
                or advantage to which the Insured was not legally entitled, including but
                not limited to any actual or alleged commingling of funds or accounts;

        b)      arising out of, based upon or attributable to the committing in fact of:  any
                criminal or deliberately fraudulent act, or any willful violation of any law
                of the United States or Canada, or any state, territory, county, political

---

[2] "SOF" refers to the Statement of Undisputed Material Facts filed contemporaneously with Defendants' Motion for
Summary Judgment.

PMB_329726_9/DGREENSPAN

division or municipality thereof, or any rules or regulations promulgated thereunder;

\*   \*   \*

e)      alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the inception date of the first Securities Broker/Dealer's Errors and Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the Broker/Dealer designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim, or alleging, arising out of, based upon or attributable to any subsequent Interrelated Wrongful Act;

f)      alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act;

\*   \*   \*

r)      with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away";

s)      alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-load investment company or variable annuities in which there is no initial or contingent sales charge or commission;

t)      alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than a Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims arising out of an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership . . . .

SOF at ¶13

6.      Merit paid NU a total in excess of $70,000 in premiums on the Policy.  Fitzpatrick Affidavit at 6.

PMB_329726_9/DGREENSPAN

RESPONSE:   Admitted.

7.     Michael A. Sowell ("Sowell") was customer [sic] of Gwynn's and Sowell had done
       business with Gwynn both through Merit's brokerage accounts and otherwise for several
       years. Fitzpatrick Affidavit at 7.

RESPONSE:   Admitted.

8.     On or about September 4, 2001, Sowell commenced an NASD arbitration against Merit
       and Gwynn (the "Sowell Arbitration") by filing a statement of claim pursuant to the
       NASD arbitration rules August 31, 2001 [sic] (the "Sowell Claim"). Fitzpatrick Affidavit
       at 8; SOF, Exhibit D(Sowell Statement of Claim).

RESPONSE:   Defendants are unable to admit or deny the statement as presented.  However,
admitted that on or about August 31, 2001 or September 4, 2001, Sowell filed a Statement of
Claim with the NASD against Merit, Ryan, Newton, Fitzpatrick, and Gwynn, as well as against
Gwynn Financial Services, Inc. and the wives of Ryan, Newton, Fitzpatrick, and Gwynn.  SOF,
Exhibit D (Statement of Claim).

9.     Sowell claimed that in 1998 he contacted Gwynn for his assistance in creating a
       retirement plan and pursuant [sic] to his conversations with Gwynn, Sowell provided
       Gwynn with securities and/or funds for Gwynn to deposit in certain securities accounts,
       including a trading account, at Merit (the "Merit Account"). Fitzpatrick Affidavit at 9;
       SOF, Exhibit D (Sowell Statement of Claim at 14-24).

RESPONSE:   Admitted.

10.    In the Sowell Claim, Sowell asserted claims against the Gwynn Plaintiffs, Merit and the
       Individual Ryan Plaintiffs and their wives. Fitzpatrick Affidavit at 10; SOF, Exhibit D
       (Sowell Statement of Claim at 5-10).

RESPONSE:   Admitted.

11.    In the Sowell Claim, he alleged statutory and regulatory violations against Gwynn for
       Gwynn's alleged conduct, including allegations of churning the Merit Account, advising
       Sowell improperly, making inappropriate trades and committing fraud and much of
       Sowell's claim was addressed to separate business investments that Gwynn and Sowell
       had planned apart from Merit and Sowell's account at Merit. Fitzpatrick Affidavit at 11;
       SOF, Exhibit D (Sowell Statement of Claim).

RESPONSE:   Admitted that Sowell alleged statutory and regulatory violations against Gwynn
for Gwynn's alleged conduct, including allegations of churning the Merit Account, advising
Sowell improperly, making inappropriate trades and committing fraud.   Denied as to the
remainder.  Sowell's claim was also addressed to investments in Gwynn's businesses that were
paid for out of Sowell's Merit Account.  Sowell's claim was also addressed substantially to the
Ryan Plaintiffs and included allegations that the Ryan Plaintiffs were liable for Gwynn's
wrongful acts under theories of respondeat superior, failure to supervise, and as "control

persons" of Gwynn, their Registered Representative.   SOF at ¶39; *see also* SOF, Exhibit D (Statement of Claim at ¶¶ 71-72, 82-83, 92, 97, 107, 116-120, 124, 132, 140, 147); SOF, Exhibit E (Amended Statement of Claim at ¶¶ 89-90, 101, 110, 115, 125, 134-138, 142, 150, 158, 165).

12.   In Count Four, Sowell specifically alleges negligence including negligence in failing to properly advise Sowell on facts pertaining to his account and investments. Fitzpatrick Affidavit at 12; SOF, Exhibit D (Sowell Statement of Claim at 94-98).

RESPONSE:   Admitted.

13.   In Count Seven of Sowell's claim, Sowell specifically alleges that the Ryan Plaintiffs were liable for their failure to supervise Gwynn. Fitzpatrick Affidavit at 13; SOF, Exhibit D (Sowell Statement of Claim at 117-120).

RESPONSE:   Admitted.

14.   In Count Nine Sowell expressly alleged violation of NASD rules as a result of recommendation of investments to Sowell that were not suitable. Fitzpatrick Affidavit at 14; SOF, Exhibit D (Sowell Statement of Claim at 129).

RESPONSE:   Admitted.

15.   The losses Sowell claims to have suffered began in 2000. Fitzpatrick Affidavit at 15; SOF, Exhibit D (Sowell Statement of Claim at 29-30).

RESPONSE:   Denied.  The wrongful actions of the Ryan and Gwynn Plaintiff's began long before 2000.  The NASD Arbitration panel found that Gwynn engaged in excessive trading and churning beginning in May 1998, when Sowell alleged that he gave the stock certificates to Gwynn and opened his Merit account.  SOF,  Exhibit P (Arbitration Award, p.7).

16.   On September 21, 2001, Merit, seeking defense and coverage, submitted notice of the Sowell Claim to its local insurance broker, who forwarded that notice to an NU broker in New York. Fitzpatrick Affidavit at 16.

RESPONSE:   Denied.   NU doesn't have a broker.

17.   After receiving notice of the claim, on September 22nd, NU was represented by AIGTS in all subsequent aspects of the handling of the Sowell Claim with regard to the Ryan Plaintiffs and the Gwynn Plaintiffs. Fitzpatrick Affidavit at 17.

RESPONSE:   Admitted that after receiving notice of the claim, American International Group Technical Services ("AIGTS") notified Plaintiffs that it was working with National Union Fire Insurance Company of Pittsburgh, PA ("NUFIC"), and that it did work with and on behalf of NUFIC.  SOF, Exhibit F (October 15, 2001 Letter from Conlin to Ryan).

18.   In early October, 2001, based on the allegations contained on the face of the Sowell Claim, AIG decided to provide a defense to the Ryan Plaintiffs and AIG, through its

claims analyst Brian Conlin ("Conlin"), issued a reservation of rights letter to the Ryan Plaintiffs, which confirmed that AIG had retained an Arizona law firm to defend the Ryan Plaintiffs, subject to that reservation of rights. Fitzpatrick Affidavit at 18; Defendants Statement at 40, Exhibit F.

RESPONSE:  Admitted that on October 15, 2001, AIG, through its claims analyst Brian Conlin, issued a letter informing the Ryan Plaintiffs that AIG had assigned the law firm of Renaud Cook and Drury to defend the Ryan Plaintiffs against the Sowell Claim, requesting certain documents, and further stating:

> This letter is not to be construed as a waiver of any policy provision.  [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

SOF at ¶ 40 and Exhibit F (October 15, 2001 Letter from Conlin to Ryan).

> Denied as to the remainder.

19.    Soon thereafter, AIG retained another law firm to defend the Gwynn Plaintiffs thereby acknowledging the existence of a conflict between the Gwynn Plaintiffs and the Ryan plaintiffs which necessitated separate counsel for the two groups of respondents to the Sowell claim. Fitzpatrick Affidavit at 19.

RESPONSE:  Admitted that on October 15, 2001, AIG, through Conlin, issued a letter informing the Ryan Plaintiffs that AIG had assigned the law firm of Mariscal Weeks McIntyre & Friedlander to defend the Gwynn Plaintiffs against the Sowell Claim.  SOF at ¶40 and Exhibit F (October 15, 2001 Letter from Conlin to Ryan).  Denied that the existence of a conflict of interest necessitated separate counsel for the Gwynn Plaintiffs and the Ryan Plaintiffs. According to Conlin's testimony at Page 158 of his deposition transcript, upon which the statement in the Fitzpatrick Affidavit at 19 is entirely based, AIG retained separate counsel to represent the Gwynn Plaintiffs only "*in part*… because AIG perceived a *potential* conflict of interest with respect to representing Gwynn as compared to Merit."  Fitzpatrick Affidavit at 19; Conlin Deposition at 158 (emphasis added).

20.    AIG neglected to issue a reservation letter to the Gwynn Plaintiffs. Fitzpatrick Affidavit at 20.

RESPONSE:  Denied.  The testimony of Weber at Page 79 of Weber's deposition transcript, upon which the statement contained at Fitzpatrick Affidavit at 20 is entirely based, in no way supports the assertion that AIG *neglected* to issue a reservation letter to the Gwynn Plaintiffs.  In fact, on the very page cited by the Ryan Plaintiffs, Weber clarifies that it is *not* his testimony that: (1) he was "in fact supposed to issue such a letter," and (2) that he "didn't do so." Fitzpatrick Affidavit at 20; Weber Deposition at 79.

Further, on November 7, 2001, Defendants did issue a letter to Gwynn regarding their coverage position, reserving rights under the policy and forwarding Defendants' coverage determination. Conlin Deposition at 32-33. Relevant portions of the Conlin Deposition Transcript are attached as Exhibit BB to the Supplemental Appendix of Exhibits in Support of Defendants' Motion for Summary Judgment ("Supplemental Appendix"), filed concurrently herewith.

21.     AIG, through Conlin, confirmed its right and duty to defend the Gwynn Plaintiffs when he rejected Gwynn's request to hire a lawyer he knew to be experienced in NASD matters to represent his interests and Conlin specifically asserted AIG had the right to select counsel for the defense, a right it would only have if AIG admitted to having a duty to defend under the Policy. Fitzpatrick Affidavit at 21; SOF 11, Exhibit A Policy.

RESPONSE:  Denied.  Plaintiffs mischaracterize the portion of Conlin's deposition testimony upon which Plaintiffs' assertion is based.  Contrary to that assertion, Conlin specifically testified that he had no recollection of the reason behind Gwynn's specific request for representation by a particular attorney, nor did he recall why AIG rejected Gwynn's request.  Fitzpatrick Affidavit at 21; Conlin Deposition at 124-25.

22.     For the next two months, the Ryan Plaintiffs cooperated with AIG by providing Conlin with all the information he requested. Fitzpatrick Affidavit at 22.

RESPONSE:  Denied.  The Ryan Plaintiffs blatantly misrepresent the factual record.  On Pages 678-79 of Conlin's deposition transcript, upon which the statement contained at Fitzpatrick Affidavit at 22 is entirely based, Conlin testifies only that AIG received some, but not all, of the materials requested from the Ryan Plaintiffs during the relevant time period.  Fitzpatrick Affidavit at 21; Conlin deposition at 678-79.

23.     One document that the Ryan Plaintiffs provided to AIG was a power-of-attorney signed by Sowell, but that power-of-attorney was not notarized or witnessed. Fitzpatrick Affidavit at 23.

RESPONSE:  Admitted that the Ryan Plaintiffs provided AIG with a power-of-attorney signed by Sowell and dated March 7, 1998 that was not notarized or witnessed and did not need to be notarized or witnessed to be effective under Arizona law at the time that it was signed. Fitzpatrick Affidavit at 23.  Furthermore, the Ryan Plaintiffs never provided AIG with the second power of attorney or the trading authorization that were signed by Sowell and also dated March 7, 1998. Moskowitz Deposition, Exhibit 281 (December 18, 2002 Fax from, Moskowitz to Nicgorski), a true and correct copy of which is attached as Exhibit Y to the Supplemental Appendix.  Further, the NASD Arbitration Panel found that Gwynn *actually* exercised discretion over Sowell's account by finding Gwynn liable for excessive trading and churning.  SOF, Exhibit P (Arbitration Award, p.7).

24.     At AIG's request, the Ryan Plaintiffs advised Conlin that they understood that the power-of-attorney had been provided for Gwynn's use in the event Sowell was unreachable but as far as the Ryan Plaintiffs knew the power-of-attorney had never been used. Fitzpatrick Affidavit at 24.

RESPONSE:  Admitted that Fitzpatrick initially told Conlin on November 6, 2002 that Sowell had never signed a power of attorney.  Fitzpatrick Affidavit at 24; Conlin Deposition, Exhibit 174 (December 12, 2001 Letter from Fitzpatrick to Conlin), a true and correct copy of which is attached as Exhibit X to the Supplemental Appendix.  Further admitted that on December 12, 2002 Fitzpatrick stated in a letter to Conlin that Gwynn had never used the power of attorney and that it had not been "renewed." Fitzpatrick Affidavit at 24; Conlin Deposition, Exhibit 169 (November 7, 2001 Letter from Conlin to Gwynn), a true and correct copy of which is attached as Exhibit W to the Supplemental Appendix.

However, the Ryan Plaintiffs never advised Conlin that Sowell had actually signed two powers-of-attorney plus a trading authorizationMoskowitz Deposition, Exhibit 281 (December 18, 2002 Fax from, Moskowitz to Nicgorski), Exhibit Y to the Supplemental Appendix.  Moreover, the NASD Arbitration Panel found that Gwynn exercised *actual* discretionary authority over Sowell's account by finding Gwynn liable for excessive trading and churning.  SOF, Exhibit P (Arbitration Award) and Exhibit Q (Arbitration Transcript).  Denied as to the remainder.

25.    The Ryan Plaintiffs also advised Conlin that according to their records, Sowell's Merit Account had never been a discretionary account and that Merit had eliminated most discretionary accounts several years earlier. In addition, the Ryan Plaintiffs notified Conlin, that Gwynn had advised Merit that Sowell had personally approved all trades. Fitzpatrick Affidavit at 25.

RESPONSE:  Admitted that the Ryan Plaintiffs informed Conlin that Sowell "did not maintain a discretionary account with the insured," that "since 1998, Merit did not permit discretionary accounts," and that as of October 5, 2000, Sowell "approved of all the trades that have occurred in that account." Fitzpatrick Affidavit at 25.  However, despite these statements, as the NASD Arbitration Panel found, the evidence establishing that Gwynn exercised *actual* discretion and control over Sowell's account.  SOF, Exhibit P (Arbitration Award) and Exhibit Q (Arbitration Transcript).  Furthermore, Merit did not send a notice purportedly eliminating discretionary accounts until June 17, 1999, well over one year after Gwynn was alleged to have abused his discretionary authority, according to Sowell's Statements of Claim.  *See* Fitzpatrick Exhibit 311 (June 17, 1999 Internal Merit Memo), a true and correct copy of which is attached as Exhibit V to the Supplemental Appendix; SOF, Exhibit D (Statement of Claim) and Exhibit E (Amended Statement of Claim).

26.    Merit provided AIG with evidence that it had contacted Sowell about the activity of his Merit Account and that Sowell had never previously objected to the trading activity in his account. Fitzpatrick Affidavit at 26.

RESPONSE:  Admitted that Merit provided Conlin with certain letters addressed to Sowell about the activity in his Merit Account and that Sowell testified that Fitzpatrick had not returned his phone calls regarding his account and that he did not authorize the excessive trading in his account.  However, as Sowell's deposition testimony proves, Sowell did not feel that he was kept apprised by Gwynn and Merit regarding the activity in his account.  Sowell Deposition at 204.  Relevant portions of the Sowell Deposition Transcript are attached as Exhibit CC to the Supplemental Appendix.

27.  Conlin asked Gwynn for information and documents and some of this information was supplied by Gwynn to the counsel AIG had appointed for him but Gwynn did not provide the information and documents AIG had requested directly to Conlin. Fitzpatrick Affidavit at 27.

RESPONSE:  Admitted.

28.  Conlin never interviewed Gwynn, Sowell, or any of the Ryan Plaintiffs. Fitzpatrick Affidavit at 28.

RESPONSE:  Objection.  The "Fitzpatrick Affidavit" does not satisfy the requirements of Rule 56(a)3 in that it is not an "(1) ...affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  The affidavit offers no evidentiary support for the assertions it makes.  The affidavit instead relies upon Fitzpatrick's alleged personal knowledge in areas where he could not possibly have any.

29.  In early 2002, Conlin notified the Ryan Plaintiffs and the Gwynn Plaintiffs that AIG was disclaiming coverage and withdrawing its defense under the Policy because AIG had decided that the Sowell Merit Account was a not covered discretionary account based on the existence of the power-of-attorney. Conlin denied coverage prior to completing his investigation and prior to obtaining all relevant documents involved in the claim. Fitzpatrick Affidavit at 29; SOF at ¶¶44-49, Exhibit G (January 24, 2002 Letter from Conlin to Gwynn) and Exhibit –H (January 24, 2002 Letter from Conlin to Ryan).

RESPONSE:  Admitted that on January 24, 2002, AIG informed the Ryan Plaintiffs and the Gwynn Plaintiffs that:

> During our investigation of this matter we uncovered the fact that Sowell signed a power of attorney dated March 7, 1998 giving  Gwynn the "power to give an[d] place any and all orders."
>
> Accordingly, pursuant to exclusion (s) under your policy, coverage is not available for you in this matter.  Consequently, AIG would neither be indemnifying you nor paying for any defense costs incurred after January 12, 2002.  . . .
>
> If you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same.  This letter is not to be construed as a waiver of any policy provisions.  In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy and at law as to allegations which are not covered under the terms of "this" or "the" policy and/or may be excluded from coverage under the terms of the policy. . . .

SOF at ¶¶44-49, Exhibit G (January 24, 2002 Letter from Conlin to Gwynn) and Exhibit H (January 24, 2002 Letter from Conlin to Ryan).

Denied as to the remainder.

30.     Conlin also based his conclusion the Sowell's account was discretionary on his assumption that 71% of Merit's trading accounts were discretionary accounts, which assumption was based on his misreading of NU's underwriting file. Fitzpatrick Affidavit at 30.

RESPONSE:   Admitted that Conlin based his decision, *in part*, on a reasonable belief that 71% of Merit's trading accounts were discretionary accounts.  Conlin Deposition at 26-27, 123-24, Exhibit BB to Supplemental Appendix.

31.     In January 2002 after receiving the disclaimer letter from AIG, Bruce Ryan called Conlin and objected to AIG's decision to disclaim coverage. Fitzpatrick Affidavit at 31.

RESPONSE:   Denied.  This statement is based upon the Deposition of Bruce Ryan.  The Ryan Plaintiffs blatantly mischaracterize Ryan's testimony.  During Ryan's deposition, Ryan testified that he could only recall with certainty speaking to Conlin on one occasion, *prior* to the January 24, 2002 letter.  As to a possible second conversation between Ryan and Conlin, Ryan testified in his deposition as follows:

> Q:     But it's your testimony, just to be clear sir, that you are not sure whether you talked to [Conlin] a second time, is that right?

> A:     Yes.

Ryan Deposition at 169-70. Relevant portions of the Ryan Deposition Transcript are attached as Exhibit DD to the Supplemental Appendix

32.     AIG gave no reason for disclaiming coverage other than alleged fact that the power-of-attorney made the account discretionary. Fitzpatrick Affidavit at 32.

RESPONSE:   Denied.  In communicating its preliminary coverage determination, AIG specifically stated that in addition to its assertion of the Policy's Exclusion (s):

> In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy and at law as to allegations which are not covered under the terms of "this" or "the" policy and/or may be excluded from coverage under the terms of the policy. . . .

SOF at ¶¶44-49 and Exhibits G and H.

AIG further requested that "[i]f you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same."

*Id*.

AIG further stated: [t]his letter is not to be construed as a waiver of any policy provisions." *Id*.

33.     After AIG disclaimed coverage, the Ryan Plaintiffs made arrangements to hire AIG's appointed counsel, to continue their own defense and subsequently in the summer of 2002, the Ryan Plaintiffs hired William Federman as replacement defense counsel. Fitzpatrick Affidavit at 33.

RESPONSE: Admitted.

34.     The Gwynn Plaintiffs initially hired AIG's appointed counsel, Ted Thomason and his associate Maxine Polomski, to provide their defense but eventually found themselves unable to pay and thereafter, Gwynn, on behalf of himself and Gwynn Financial, proceeded pro se in the Sowell Claim and Mrs. Gwynn went unrepresented, largely because Gwynn did not realize that his wife was also a respondent to the arbitration claim. Fitzpatrick Affidavit at 34.

RESPONSE: Admitted that the Gwynn Plaintiffs initially hired AIG's appointed counsel Mariscal Weeks McIntyre & Friedlander to provide their defense. As to the remainder, Defendants object on grounds that the "Fitzpatrick Affidavit" does not satisfy the requirements of Rule 56(a)3 in that it is not an "(1) ...affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial." The affidavit offers no evidentiary support for the assertions it makes in this statement. The affidavit instead relies upon Fitzpatrick's alleged personal knowledge in areas where he could not possibly have any.

35.     In a letter dated October 24, 2002 Sowell's counsel wrote to William Federman with copies to Gwynn and Brian Conlin; in that letter counsel advised that the Sowell arbitration had been postponed to January 7, 2003 and that the power of attorney signed by Sowell may have been superseded when Sowell subsequently completed an option form for Merit dated March 7, 1998, which indicated there was no power of attorney for his broker. Sowell through counsel also made a policy limit demand to settle and specifically advised AIG that Sowell was seeking damages in excess of the policy limits. Fitzpatrick Affidavit at 35.

RESPONSE: Admitted that Moskowitz sent a letter to Federman dated October 24, 2002 suggesting that the power of attorneys signed by Sowell may have been superceded by a July 28, 1998 "Client Option Information Form and Agreement" on which Sowell checked off a box marked "No" in response to the question "Does anyone have power of attorney?" Fitzpatrick Affidavit at 35.

However, both powers-of-attorney signed by Sowell, as well as Sowell's signed trading authorization, explicitly state that they can only be cancelled by writing, a requirement unsatisfied by the "Client Option Information Form and Agreement." Moskowitz Deposition, Exhibit 281 (December 18, 2002 Fax from Moskowitz to Nicgorski), Exhibit Y to Supplemental Appendix. Further, regardless of how Plaintiffs seek to use documents to characterize the degree of control Gwynn had over Sowell's account, the NASD Arbitration Panel found that Gwynn exercised *actual* control and discretion over Sowell's account by finding Gwynn liable for excessive trading and churning. SOF, Exhibit P (Arbitration Award, p.7).

36.     Despite the fact he received this letter, Conlin admitted that AIG never responded, that AIG did not reopen its coverage file, and that AIG never sought to investigate the new information provided by Sowell's counsel about the possibility that the power of attorney had been rescinded or repudiated by Sowell. Fitzpatrick Affidavit at 36.

RESPONSE:   Denied.  Conlin stated only that Defendants' coverage position did not change upon receiving the option form because Sowell's Statement of Claim stated clearly that Gwynn exercised discretionary control.  Fitzpatrick Affidavit at 36; Conlin Deposition at 230-41. Further, AIG was under no obligation to respond to a communication entirely between Moskowitz, counsel for the claimant, and Federman, counsel for the insured.

Moreover, according to Sowell's Statements of Claim:

> When Mr. Sowell opened his account, he signed a power of attorney giving Respondents [including Gwynn] discretionary control of the account.  Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell.  As it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading decisions.

In addition:

> Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell and treated his discretionary power over the account as a license to churn.  Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by excessive, in-and-out trading in technology stocks.  Mr. Gwynn also traded extensively on margin in Mr. Sowell's account.  A review of Mr. Sowell's account statements reveals that Respondents utilized no meaningful investment strategy or plan.

SOF at ¶¶28-29 and Exhibit D (Statement of Claim at ¶ 27) and Exhibit E (Amended Statement of Claim at ¶28).  Moreover, Conlin had no obligation to "respond" to a letter from Moskowitz to Federman.

37.     In a January 3, 2003 letter, Gwynn's specially retained coverage counsel, contacted AIG and threatened to settle with Sowell and assign Gwynn's bad faith claim against AIG under either so called Morris or Damron agreements under Arizona law. In that letter Gwynn's counsel also pointed out that AIG's decision to revoke coverage based on the

power of attorney was unsupportable because, Gwynn had never been shown the power of attorney by AIG, Sowell's counsel had noted the option trading form signed by Sowell may have revoked the power of attorney, other documents confirmed that Sowell maintained discretion over all accounts, and that Gwynn would confirm that the account was non-discretionary at all times. Gwynn's counsel also noted that AIG had never investigated the claims by interviewing Gwynn and/or Sowell. Fitzpatrick Affidavit at 37, Exhibit 10.

RESPONSE:   Admitted that Gwynn's coverage counsel sent AIG a letter dated January 3, 2003. Denied as to the remainder. Nicgorski, Gwynn's coverage counsel received copies of not only the power of attorney, but also the full power of attorney and trading authorization as early as December 18, 2002.  Moskowitz Deposition, Exhibit 281 (December 18, 2002 Fax from, Moskowitz to Nicgorski), Exhibit Y to Supplemental Appendix.   However, Nicgorski did not provide forward those documents to AIG, but instead falsely suggested that he was unaware of the documents until Conlin forwarded them it to him on January 2, 2003.  *See* Fitzpatrick Affidavit at 37, Exhibit 10 (January 3, 2003 Letter from Nicgorski to Conlin); SOF, Exhibit K (January 6, 2003 Letter from Nicgorski to Conlin).

Further, both powers-of-attorney signed by Sowell, as well as Sowell's signed trading authorization, explicitly state that they can only be cancelled by writing, a requirement unsatisfied by the option trading form.  Moskowitz Deposition, Exhibit 281 (December 18, 2002 Fax from, Moskowitz to Nicgorski), Exhibit Y to Supplemental Appendix.

38.     After receiving a copy of the power of attorney from AIG, Gwynn's counsel on January 6, 2003 advised AIG that the power of attorney was invalid under Arizona law because it was not notarized. Fitzpatrick Affidavit at 38; SOF at ¶¶56-57 and Exhibit K.

RESPONSE:   Admitted that Gwynn's counsel stated that the power of attorney was invalid, citing A.R.S. §14-5501(D)(4), which was not retroactive and not in effect at the time that Sowell signed the power of attorney.

39.     AIG asked Arizona counsel from the firm of Struckmeyer and Wilson to review the matter. AIG reported to Gwynn's coverage counsel that it was reviewing the matter. Fitzpatrick Affidavit at 39, Exhibit 11.

RESPONSE:   Admitted that AIG asked the law firm of Struckmeyer and Wilson to review the matter and that on January 6, 2003, Conlin communicated to Nicgorski that AIG was reviewing the demands stated in Nicgorski's January 3, 2002 letter from to Conlin.  Fitzpatrick Affidavit, Exhibit 11.

40.     During the first three days of the Sowell arbitration hearing, beginning on January 7, 2003, Gwynn appeared pro se.  Fitzpatrick Affidavit at 40.

RESPONSE:   Admitted.

41.     By all accounts Gwynn severally [sic] compromised the defense for all of the respondents in the Sowell Arbitration in that he was unprepared, repeatedly stated he did not know the

proper procedure, repeatedly stated his insurer was not paying for a defense, produced a massive quantity of documents which had not been timely produced in the arbitration and which had never been seen by the Ryan Plaintiffs or their counsel Attorney Federman. Further Gwynn's appearance undermined he credibility in that he looked extremely nervous, was sweating and pale. Fitzpatrick Affidavit at 41.

RESPONSE:  Denied.  Excessive trading in and churning of Sowell's account that compromised the defense for all of the respondents.  SOF, Exhibit E (Amended Statement of Claim).  At the same time, the Plaintiffs collected $480,875 in commissions on Sowell's account.  SOF at ¶¶76, 78.  Further, the Ryan Plaintiffs were represented at arbitration by competent counsel.

42.     The Ryan Plaintiffs were represented in the arbitration by Attorney Federman, but he did not have an expert witness because the Ryan Plaintiffs did not have the funds to retain an expert when AIG disclaimed its duty to defend. Fitzpatrick Affidavit at 42.

RESPONSE:  Denied.  According to Ryan's deposition testimony, Ryan and his business associates Newton and Fitzpatrick were earning almost $700,000 annually at the time of the Sowell Arbitration, while the funds required to retain an expert would be approximately only $30,000.  Ryan Deposition at 320-22, Exhibit DD to Supplemental Appendix.  Ultimately, Ryan conceded that the Ryan Plaintiffs made an independent  "business decision" not to hire an expert witness for the Sowell Arbitration based on "the perceived risks of winning or losing the case."  Ryan Deposition at 323, Exhibit DD to Supplemental Appendix.

43.     Federman's ability to defend was severally [sic] compromised by Gwynn's conduct during the first three days of his Sowell Arbitration. Fitzpatrick Affidavit at 43.

RESPONSE:  Denied.  Excessive trading in and churning of Sowell's account compromised the defense for all of the respondents.  Sowell gave the Plaintiffs $1.4 million dollars to responsibly invest and they squandered almost all of it.  SOF at Exhibit E (Amended Statement of Claim at ¶31).  At the same time, the Plaintiffs collected $480,875 in commissions on Sowell's account.  SOF at ¶¶ 76, 78.  There was nothing that the Defendants did or could have done at the arbitration that could have changed these devastating facts.  Further, the Ryan Plaintiffs were represented at arbitration by competent counsel.

44.     On January 9, 2003, three days after the arbitration had begun, Attorney Jeffrey A. King of Struckmeyer and Wilson advised Conlin that the firm had not yet had an opportunity to complete a coverage analysis. Fitzpatrick Affidavit at 44, Exhibit 13.

RESPONSE:  Admitted that on January 9, 2003, King advised Conlin that his firm's coverage analysis was not complete.  Fitzpatrick Affidavit at 44, Exhibit 13.  Conlin first approached King for a coverage analysis on January 6, 2003, a mere *three days* after the date of Nicgorski's letter to Conlin seeking coverage on behalf of Gwynn.  *See* Weber Deposition, Exhibit 288 (March 7, 2003 Letter from Wilson to Conlin), a true and correct copy of which is attached as Exhibit Z to the Supplemental Appendix; Fitzpatrick at 37, Exhibit 10 (January 3, 2003 Letter from Nicgorski to Conlin).  In contrast, Gwynn waited almost *an entire year* after AIG's denial of coverage and reservation of rights letter dated January 24, 2002.  SOF, Exhibit G (January 24, 2002 Letter from Conlin to Gwynn).

45.    King recommended to Conlin, that AIG immediately provide a defense for Gwynn and
Merit (the Ryan Plaintiffs) and he based this recommendation on an analysis that
providing a defense would bar Gwynn from entering into a Damron agreement and would
make it more difficult for Gwynn to enter into a Morris agreement. Fitzpatrick Affidavit
at 45, Exhibit 13.

RESPONSE:  The letter from King to Conlin speaks for itself.

46.    It was based solely on this advice from attorney King that AIG decided to resume
providing a defense for the Gwynn Plaintiffs and the Ryan Plaintiffs. Fitzpatrick
Affidavit at 46.

RESPONSE:   Admitted that AIG resumed the defense based on advise from counsel that was
incorrect, as there was never a duty to defend based on the allegations of the Statement of Claim
and Amended Statement of Claim and the policy's exclusions .

47.    On January 10, 2003, after three days of the arbitration had been completed, AIG advised
Gwynn's coverage counsel that it would provide a defense for Gwynn. AIG contacted its
previously retained defense counsel Tim Thomason and Maine [sic] Polomski.
Fitzpatrick Affidavit at 47.

RESPONSE:   Denied.  Conlin hired the law firm of Mariscal Weeks McIntyre & Friedlander,
not its attorneys in their individual capacities, to defend Gwynn.

48.    On January 10, 2003, Attorney Polomski advised Conlin that Thomason was unavailable
to handle the matter. Fitzpatrick Affidavit at 48.

RESPONSE:   Denied.  Polomski testified that she had no specific recollection of any discussion
with Conlin on January 10, 2003.   Polomski Deposition at 38-39; Fitzpatrick Affidavit at 48.

49.    On January 10, 2003, Ms. Polomski was then a fourth year associate with no first chair
trial experience and no expertise or experience in NASD arbitrations. Fitzpatrick
Affidavit at 49.

RESPONSE:   Denied.  Plaintiffs mischaracterize the deposition testimony cited in support of
this assertion.  Neither Federman, Polomski, nor the Ryan Plaintiffs' 30(b)(6) deponent
mentioned specifically how many years experience Polomski had, while Polomski herself
testified that she had experience representing clients at arbitrations "as lead counsel."  Polomski
Deposition at 39; Fitzpatrick Affidavit at 48.

50.    Conlin on behalf of AIG agreed that Polomski could defend Gwynn, and AIG made no
effort to insist that a partner or experienced litigator defend the Gwynn Plaintiffs.
Fitzpatrick Affidavit at 50.

RESPONSE:   Denied.  Conlin hired the law firm of Mariscal Weeks McIntyre & Friedlander,
not its attorneys in their individual capacities, to defend Gwynn.

51.     On or about January 1 or 12, when Polomski advised Conlin that she could not possibly review all the documents and prepare to defend the arbitration with only a weekend to get ready, Conlin advised her not to worry about that problem, because AIG did not expect her to succeed in her defense anyway. Fitzpatrick Affidavit at 51.

RESPONSE:   Denied. Plaintiffs rely only on two pages of Polomski's depositon transcript in which, at most, Polomski testified that AIG did not have "high expectations" that she could "remedy the situation."  Polomski Deposition at 84-85; Fitzpatrick Affidavit at 51.  In reality, the "situation" could not be "remedied" because, as the NASD Arbitration Panel eventually found, Gwynn did in fact churn the Sowell account, engaged in excessive trading, and exercised discretionary authority over Sowell's investments.  SOF, Exhibit P (Arbitration Award, p.7).

52.     AIG had initially agreed in 2001 that the defense required an expert witness, AIG made no effort to retain an expert witness for the Gwynn Plaintiffs or the Ryan Plaintiffs in the arbitration. Fitzpatrick Affidavit at 52.

RESPONSE:   Denied.  Weber specifically testified that AIG would not have had involvement in deciding whether an expert was needed and if so, which one to use, since these were decisions for local counsel.  Weber Deposition at 208-09; Fitzpatrick Affidavit at 52.

53.     Late on Friday, January 10, 2003, Attorney King also contacted Attorney Federman and offered to provide a defense of the Ryan Plaintiffs. When Federman advised him that it made no sense to bring in new counsel to defend the Ryan Plaintiffs at that stage of the Sowell Arbitration, King responded that AIG would pay for the defense of the Ryan Plaintiffs and advised that "AIG has not changed its position on coverage." King confirmed these comments in a brief e-mail. Fitzpatrick Affidavit at 53; SOF 64, See Exhibit M.

RESPONSE:   Admitted that on January 10, 2003, King sent an email to attorney Federman confirming an earlier telephone conversation and stating that "while AIG has not changed its position on coverage for this claim at this time, it is offering to pay Merit's reasonable and necessary defense costs associated with the Sowell claim."  Fitzpatrick Affidavit at 53; SOF at ¶¶64-65 and Exhibit M.

54.     King never provided any letter confirming AIG's position to Federman and AIG never explained or elaborated on what position it was taking on coverage. Fitzpatrick Affidavit at 54.

RESPONSE:   Denied. Plaintiffs offer no evidentiary support for this assertion.  Rather, Plaintiffs merely cite to the actual January 10, 2003 email from King to Federman to state that the position taken in email was never confirmed or elaborated upon in writing.

55.     In January 2003, AIG did not provide any reservation of rights letter to either Gwynn or the Ryan Plaintiffs, did not state that it was maintaining its position that no coverage existed, and did not disclose that its reason for resuming the defense was solely to protect AIG from Gwynn entering into a Damron or Morris agreement under Arizona law. Fitzpatrick Affidavit at 55.

RESPONSE:   Admitted that in January 2003, AIG did not specify the reason why it was resuming their defense in the Sowell matter.  Denied as to the remainder.

56.     On January 10, 2003 AIG was provided with a detailed letter from one of Sowell's counsel Frank Moskowitz explaining how badly Gwynn had performed in the first three days of the Sowell Arbitration hearing and pointing out the financial exposure facing Gwynn and the Ryan Plaintiffs. That letter also explained that the evidence during the first three days of the Sowell Arbitration Hearing from Gwynn and Sowell rebutted any claim of the account being discretionary. Fitzpatrick Affidavit at 56; SOF, If 66-68.

RESPONSE:   Admitted that on January 10, 2003, AIG was provided with a self-serving letter from Sowell's counsel.  SOF, Exhibit N.  Denied that Sowell took a position that his account was not discretionary, since such a position would have fatally damaged Sowell's claim of churning, since discretion and control were necessary elements of that claim.

57.     AIG never responded to the points made in Moskowitz' letter dated January 10, 2003. Fitzpatrick Affidavit at 57.

RESPONSE:   Admitted that AIG did not respond to the settlement demand in the January 10, 2003 letter, which was not addressed to AIG.  Denied as to the remainder.

58.     On January 13, 2006 [sic] after the arbitration had resumed Maxine Polomski advised Conlin in a letter that she did not believe there was a defense to the action and that AIG should attempt to settle the matter as soon as possible. Fitzpatrick Affidavit at 58.

RESPONSE:   Admitted that Polmski sent a letter dated January 13, 2003 to Conlin, attached as Exhibit 16 to the Fitzpatrick Affidavit, stating that there was no defense because Gwynn had in fact churned and exercised control over Sowell's Merit Account.

59.     On January 13, 2006 [sic], Polomski also forwarded two additional letters from Sowell's Counsel, Alan Baskin, dated January 11 and 12, 2003, which further emphasized the weakness of the defense in the first three days of the arbitration when Gwynn had proceeded without counsel [Fitzpatrick Affidavit at 59, Exhibit 16]. In those letters, Baskin also noted that on behalf of Sowell a major focus of the evidence had been offered to support Sowell's allegations of the Ryan Plaintiffs failure to properly supervise Gwynn, and Baskin also provide information that Sowell's expert would offer testimony for damages in the range of $1.2 million. Fitzpatrick Affidavit at 1 60, Exhibits 17 and 18.

RESPONSE:   The letters dated January 11 and 12, 2003 from Baskin to Polomski, attached as Exhibits 17 and 18 to the Fitzpatrick Affidavit, speak for themselves.

60.     In those letters, Baskin also noted that on behalf of Sowell a major focus of the evidence had been offered to support Sowell's allegations of the Ryan Plaintiffs failure to properly supervise Gwynn, and Baskin also provide information that Sowell's expert would offer testimony for damages in the range of $1.2 million.

RESPONSE:   Admitted that Baskin sent the letters dated January 11 and 12, 2003 to Polomski, attached as Exhibits 17 and 18 to the Fitzpatrick Affidavit, and made certain statement as the advocate for his client, Sowell.

61.     AIG took no steps to respond to this information from Polomski and Baskin in the letters it was provided on January 13, 2003.  Fitzpatrick Affidavit at 61.

RESPONSE:   Denied.  AIG had made clear on January 13, 2003 via correspondence from King to Nicgorski that "it has not changed its position with respect to coverage."  SOF, Exhibit O (January 13, 2003 Letter from King to Nicgorski).  Further, AIG ultimately paid $1,000,000 to Sowell in exchange for a full and final release of Sowell's claims against Plaintiffs.  SOF, Exhibit B (Ryan Complaint at ¶88).

62.     AIG did not assist Polomski or Federman at the balance of the Sowell Arbitration hearing on January 13, 14 and 15, 2003. Fitzpatrick Affidavit at 62.

RESPONSE:   Denied.  AIG without obligation paid for Merit and Gwynn's defense through the balance of the arbitration.  SOF, Exhibit L (January 10, 2003 Letter from King to Nicgorski) and Exhibit M (January 10, 2003 Email from King to Federman).

63.     AIG did not authorize the retention of any defense expert and did not try to locate any such expert. Fitzpatrick Affidavit at 63.

RESPONSE:   Denied.  AIG would not have had involvement in deciding whether an expert was needed and if so, which one to use, since these were decisions for local counsel.  Exhibit --, Weber Deposition at 208-09; Fitzpatrick Affidavit at 63.  Further, Polomski testified that AIG never told her that AIG would not fund an expert.  Polomski Deposition at 30-32; Fitzpatrick Affidavit at 63.

64.     AIG never advised he [sic] Ryan plaintiffs or the Gwynn Plaintiffs that while AIG was providing a defense it did not intend to participate in the defense in anyway and that it would not initiate or participate in settlement negotiations. Fitzpatrick Affidavit at 64.

RESPONSE:   Denied.  Preliminarily, as Conlin testified, it is not the Defendants' role to direct the defense of its insured.  Conlin Deposition at 600-01; Fitzpatrick Affidavit at 63.  Further, both the Ryan Plaintiffs and the Gwynn Plaintiffs were aware that AIG had "not changed its position with respect to coverage."  SOF, Exhibit O (January 13, 2003 Letter from King to Nicgorski.  Therefore, they would have no reason to expect that AIG would participate in settlement negotiations.

65.     AIG's representatives, including Conlin and his then supervisor Jonathan Weber, did not attend or closely monitor the Sowell Arbitration Hearing. Fitzpatrick Affidavit at 65.

RESPONSE:   Admitted.

66.     From January 13, 2003 through March 23, 2006 [sic], AIG did nothing to assist in the defense of its insureds. Fitzpatrick Affidavit at 66.

RESPONSE:   Denied.  AIG without obligation paid for Merit and Gwynn's defense through the balance of the arbitration.  SOF, Exhibit L (January 10, 2003 Letter from King to Nicgorski) and Exhibit M (January 10, 2003 Email from King to Federman).  Further, AIG ultimately paid $1,000,000 to Sowell in exchange for a full and final release of Sowell's claims against Plaintiffs.  SOF, Exhibit B (Ryan Complaint at ¶88).

67.   Conlin stopped making entries in his computer file for this matter on January 13, 2003 and AIG now claims the file was transferred at some point thereafter in January 2003 to its coverage department, but AIG failed to advise its insureds or their counsel in the Sowell Arbitration, that Conlin and his claims handling group were no longer handling the file for AIG. Fitzpatrick Affidavit at 67.

RESPONSE:   Admitted that Conlin stopped making entries in his computer file after January 13, 2003 and that it was transferred to its coverage department.  Denied as to remainder.  After January 13, 2003 Conlin was still handling the file for AIG.  Fitzpatrick Affidavit at 80.

68.   By letter dated January 16, 2003 Attorney Federman advised Conlin and King of the likelihood of an award for Sowell. He stated to AIG that while he believed the case might previously have been settled for $240,000, he now thought that Sowell's counsel would want considerably more to settle. He advised AIG that Sowell was seeking about $1.2 million in compensatory damages, plus punitive damages of $500,000 and additional amounts for fees and arbitration expenses. Federman specifically advised AIG that:

The mere entry of an award, no matter the dollar amount, can have a detrimental effect on the individual Respondents Ryan, Newton and Fitzpatrick's ability to continue in the securities industry and will negatively impact their securities licenses as well as directly affect Robert Fitzpatrick's license to practice law in the State of New York.

Federman also asked whether AIG wanted to obtain tapes of, evidence or Exhibits from or further information concerning the hearing. Fitzpatrick Affidavit at 68, Exhibit 19.

RESPONSE:   Admitted that Federman sent the January 16 2003, attached as Exhibit 19 to the Fitzpatrick Affidavit.  Denied as to remainder.  Federman's belief as to what case might have settled for is speculative.  Further denied that the entry of the award had a detrimental effect on Ryan, Newton, and Fitzpatrick as a settlement would have had to have been reported to the NASD.  Further, Plaintiffs' prior and subsequent conduct negatively impacted their reputations and licenses.   It was Plaintiffs' excessive trading in and churning of Sowell's account, while collecting $480,875 in commissions, that resulted in the award against them.  SOF at ¶¶ 76, 78.

69.   AIG never responded to Federman's letter dated January 16, 2003. Fitzpatrick Affidavit at 69.

RESPONSE:   Admitted.  The January 16, 2003 letter was not addressed to AIG.

70.     By letter dated February 5, 2003, Federman advised King and Conlin of the potential
        irreparable harm to Ryan, Newton, and Fitzpatrick from the likely entry of an award
        against them and the necessity for AIG to try to settle the claim. Federman also advised
        AIG that Sowell's counsel had made a policy limits settlement overture. Fitzpatrick
        Affidavit at 70, Exhibit 20.

RESPONSE**:**  Admitted that Federman sent the February 5, 2003 letter.  Denied that the entry of
the award had a detrimental effect on Ryan, Newton, and Fitzpatrick as a settlement would have
had to have been reported to the NASD.  Further, Plaintiffs' prior and subsequent conduct
negatively impacted their reputations and licenses.   It was Plaintiffs' excessive trading in and
churning of Sowell's account, all while collecting $480,875 in commissions, that resulted in the
award entered against them.  SOF at ¶¶ 76, 78.

71.     Neither King nor Conlin responded to Federman's letter dated February 5, 2003.
        Fitzpatrick Affidavit at 71.

RESPONSE:   Denied.  AIG ultimately paid $1,000,000 to Sowell in exchange for a full and
final release of Sowell's claims against Plaintiffs.  SOF, Exhibit B (Ryan Complaint at ¶88).

72.     On February 25, 2003, the Sowell Arbitration panel entered an award against the Ryan
        Plaintiffs and the Gwynn Plaintiffs, jointly and severally, in the amount of $1,125,000
        (the "Award"). Fitzpatrick Affidavit at 72; Defendants' Statement  72, Exhibit P.

RESPONSE:   Admitted.

73.     The arbitration panel's decision did not in any way turn on whether the Sowell Merit
        Account was discretionary or was under the control of the power-of-attorney and the
        arbitration panel expressly held the Ryan Plaintiffs liable for their failure to supervise
        Gwynn. Fitzpatrick Affidavit at 73.

RESPONSE:   Denied.  The NASD Arbitration Panel specifically found the Plaintiffs guilty of
"churning" Sowell's account.  SOF, Exhibit P (Arbitration Award, p.7).  Further, as to the issue
of coverage, it is entirely irrelevant whether the arbitration panel based its decision on "whether
the Sowell Merit Account was discretionary or was under the control of the power-of-attorney,"
since the Policy plainly excludes claims "*alleging, arising out of, based upon or attributable* to
an Insured exercising discretionary authority or control with regard to management or disposition
of assets," among others.  SOF, Exhibit A (Policy at p.6-9) (emphasis added).

According to Sowell's Statements of Claim:

        When Mr. Sowell opened his account, he signed a power of attorney giving
        Respondents [including Gwynn] discretionary control of the account.  Mr. Gwynn
        told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make
        quick decisions and manage the account without having to bother Mr. Sowell.  As
        it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading
        decisions.

In addition:

> Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell and treated his discretionary power over the account as a license to churn. Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by excessive, in-and-out trading in technology stocks. Mr. Gwynn also traded extensively on margin in Mr. Sowell's account. A review of Mr. Sowell's account statements reveals that Respondents utilized no meaningful investment strategy or plan.

SOF at ¶¶28-29; Exhibit D (Statement of Claim) at ¶ 27 and Exhibit E (Amended Statement of Claim at ¶28)

74.    After the entry of the Award, the Ryan Plaintiffs, through Federman, and the Gwynn Plaintiffs, through Polomski, repeatedly contacted AIG about a motion to vacate or other response to the award, but neither Conlin nor King timely responded. Fitzpatrick Affidavit at 74.

RESPONSE:   Denied. AIG ultimately paid $1,000,000 to Sowell in exchange for a full and final release of Sowell's claims against Plaintiffs. SOF, Exhibit B (Ryan Complaint at ¶88).

75.    By early March 2003, Sowell's counsel had moved to confirm the award in Arizona state court. Fitzpatrick Affidavit at 75.

RESPONSE:   Admitted.

76.    Even after Sowell's counsel moved to confirm the Award, AIG still failed to provide defense counsel for the Ryan Plaintiffs or the Gwynn Plaintiffs with any direction as to what steps could be taken to challenge the Award. Fitzpatrick Affidavit at 76.

RESPONSE:   Denied. AIG provided authorization to pursue an appeal on or about March 24, 2003. Conlin Deposition, Exhibit 200 (March 24, 2003 Letter from King to Federman and Polomski), a true and correct copy of which is attached as Exhibit AA to the Supplemental Appendix.

77.    In early March 2003, attorney King took steps with Attorney Donald Wilson to complete the coverage analysis Struckmeyer and Wilson had promised to complete for AIG by January 13, 2003. Fitzpatrick Affidavit at 77.

RESPONSE:   Admitted.

78.    On March 5, 2003 coverage counsel for the Ryan Plaintiffs wrote to King advising him of the bad faith of AIG in not properly defending the Sowell Arbitration and demanding that AIG take some steps to defend the Ryan Plaintiffs, to settle Sowell's claim and vacate the Award. Fitzpatrick Affidavit at 78, Exhibit 21.

RESPONSE:  Admitted that coverage counsel for the Ryan Plaintiffs sent a letter on March 5, 2003.  Denied that AIG did not take steps to defend the Ryan Plaintiffs.  AIG without obligation paid for the Ryan Plaintiff's defense through the balance of the arbitration.  SOF, Exhibit M (January 10, 2003 Email from King to Federman).  Further, AIG ultimately paid $1,000,000 to Sowell in exchange for a full and final release of Sowell's claims against the Ryan Plaintiffs. SOF, Exhibit B (Ryan Complaint at ¶88).

79.    On March 5 and March 6, 2003 Federman called repeatedly and wrote to Attorney King seeking some direction for the defense including permission to appeal the Award. On March 6, 2003 King responded that he had referred the issues to AIG. Fitzpatrick Affidavit at 79, Exhibit 22.

RESPONSE:  Admitted that Federman contacted King about an appeal and that King contacted AIG, which provided authorization to pursue an appeal on or about March 24, 2003.  Conlin Deposition, Exhibit 200 (March 24, 2003 Letter from Conlin to Federman and Polomski), Exhibit AA to the Supplemental Appendix.

80.    On March 7, 2003, Struckmeyer and Wilson completed its coverage analysis and provided it via facsimile to Brian Conlin. Fitzpatrick Affidavit at 80, Exhibit 23.

RESPONSE:  Admitted.

81.    As of March 14, 2003, AIG still had not authorized Federman or Polomski to appeal the Award or to defend against the Motion to Confirm the Award that Sowell's counsel had filed in Arizona state court and AIG had taken no steps toward settling or vacating the Award. Fitzpatrick Affidavit at 81.

RESPONSE:  Admitted.  AIG provided authorization to pursue an appeal on or about March 24, 2003.  Conlin Deposition, Exhibit 200 (March 24, 2003 Letter from Conlin to Federman and Polomski), Exhibit AA to the Supplemental Appendix.  Denied as to remainder.  Authorization to appeal the award was a step toward settling or vacating the award.  Further, AIG ultimately paid $1,000,000 to Sowell in exchange for a full and final release of Sowell's claims against Plaintiffs.  SOF, Exhibit B (Ryan Complaint at ¶88).

82.    On March 14, 2003, coverage counsel for the Ryan Plaintiffs notified Attorney King that if AIG did not take some action to defend the underlying claim and vacate the award, the Ryan Plaintiffs would have to pursue other legal remedies. Fitzpatrick Affidavit at If 82, Exhibit 24.

RESPONSE:  Admitted that coverage counsel sent a letter on March 14, 2003.  Denied that AIG had not taken any action to defend the underlying claim and vacate the award.  AIG without obligation paid for the Ryan Plaintiffs' defense through the balance of the arbitration.  SOF, Exhibit M (January 10, 2003 Email from King to Federman).

83.    On March 24, 2003 Attorney King on AIG's behalf authorized Federman and Polomski to appeal the Award, but did not address any other issues regarding resolving or settling the Sowell Claim. Fitzpatrick Affidavit at 83, Exhibit 25.

RESPONSE:   Admitted that AIG provided authorization to pursue an appeal on or about March 24, 2003.  Denied as to the remainder.  In addition to informing counsel for the Gwynn Plaintiffs and the Ryan Plaintiffs that "the insureds are authorized by [AIG] to pursue an appeal of the arbitration award," King explicitly stated that "[i]n authorizing this appeal, [AIG] do[es] not waive any policy or coverage defenses."  Fitzpatrick Affidavit at 83, Exhibit 25 (emphasis added).

84.   On March 25, 2006 [sic], coverage counsel for the Ryan Plaintiffs wrote to Donald Wilson of Struckmeyer and Wilson demanding mediation under the Policy. Fitzpatrick Affidavit at 84, Exhibit 26.

RESPONSE:   Admitted.

85.   Attorney Wilson did not respond to that demand until he sent a letter by regular mail on April 8, 2003 when he advised the Ryan Plaintiffs that he had referred the issue to AIG and questioned the basis for the demand for mediation, not withstanding his knowledge that the Policy clearly provided for mediation. Fitzpatrick Affidavit at ¶85, Exhibit 27.

RESPONSE:   Admitted that Attorney Wilson sent a letter on April 8, 2003 advising that he had referred the issue to AIG.  Denied that he knew that the policy provided for mediation.  He specifically asked for the basis for the request to mediate coverage.  Fitzpatrick Affidavit at ¶85, Exhibit 27.

86.   The Ryan Plaintiffs coverage counsel notified Wilson on or after April 11, that the Ryan Plaintiffs had commenced this action on April 9, 2003. Fitzpatrick Affidavit at 86, Exhibit 28.

RESPONSE:   Admitted.

87.   In the summer of 2003 and after the Ryan Plaintiffs had commenced this action, AIG approached Sowell in an attempt to settle the Award. Fitzpatrick Affidavit at 87.

RESPONSE:   Admitted.

88.   In late August or early September, 2003, AIG paid Sowell $1,000,000 to settle Sowell's claim, and in return, Sowell agreed to allow the Arizona court to vacate the Award and AIG itself received a release from Sowell. Fitzpatrick Affidavit at 88, Exhibits 29 and 30.

RESPONSE:   Admitted.

89.   In paying to settle with Sowell, AIG issued no reservation of rights letter to the Ryan Plaintiffs or the Gwynn Plaintiffs and at that time gave indication to the Ryan Plaintiffs that the payment was under protest or was subject to any claims or defenses about the Policy. Fitzpatrick Affidavit at 89.

RESPONSE:   Admitted.

90.    AIG knew, or should have known, that under NASD rules and regulations, even though the Award was vacated in court, the Ryan Plaintiffs were and are still required to report the nature of the Award in various NASD filings and must disclose the Award to various state and federal regulators. Fitzpatrick Affidavit at 90.

RESPONSE:   Defendants are unable to admit or deny the statement as presented.  The "Fitzpatrick Affidavit" does not satisfy the requirements of Rule 56(a)3 in that it is not an "(1) ...affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  The affidavit offers no evidentiary support for the assertions it makes in this statement.  The affidavit instead relies upon Fitzpatrick's alleged personal knowledge in areas where he could not possibly have any.

91.    Due to the Award, the Ryan Plaintiffs remain subject to regulatory investigation. Further, the Award and Sowell's Claim continue to be admissible in other NASD proceedings against the Ryan Plaintiffs. Fitzpatrick Affidavit at 91.

RESPONSE:   Denied that the entry of the award had a detrimental effect on Ryan, Newton, and Fitzpatrick as any settlement would have had to have been reported to NASD as well.   To the extent that the Ryan Plaintiffs remain subject to regulatory investigation, it is due to Plaintiffs' failure to curb Gwynn's excessive trading in and churning of Sowell's account, all the while collecting $480,875 in commissions. SOF at ¶¶ 76, 78.  There was nothing that the Defendants did or could have done at the arbitration that could have changed these devastating facts. Admitted that the Award is admissible in other NASD proceedings.

92.    After agreeing to pay defense costs for the Ryan Plaintiffs and the Gwynn Plaintiffs, AIG has now asserted claims against the Ryan Plaintiffs seeking to recoup all legal fees AIG paid in defense of the Sowell claim from the Ryan Plaintiffs. Fitzpatrick Affidavit at 92.

RESPONSE:   Admitted that AIG has now asserted claims against the Ryan Plaintiffs seeking to recoup all legal fees AIG paid in defense of the Sowell claim, a right to which it has repeatedly reserved throughout its correspondence with the Ryan Plaintiffs.

On October 15, 2001, Conlin acknowledged receipt of Sowell's Statement of Claim and advised that AIG had retained separate law firms to represent Merit and Gwynn.  SOF at ¶¶ 40-41.  In his letter, Conlin indicated that several of the Policy's exclusions, including (a), (b), (f), (r), and (s), could potentially exclude coverage.  SOF at ¶ 42.  Conlin also stated:

> This letter is <u>not to be construed as a waiver of any policy provision</u>.  [<u>AIG</u>] <u>reserves all rights and defenses under the Policy, and at law</u>, as to allegations which are not covered under the terms of the Policy.  This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

SOF at ¶ 43 (emphasis supplied).

On January 24, 2002, Conlin advised both Gwynn and Ryan that exclusion (s) of the Policy precluded coverage for Sowell's claims, and reiterated that AIG did not waive any policy provision but reserved all rights and defenses in the event that it reevaluated the claim, stating:

> During our investigation of this matter we uncovered the fact that Mr. Sowell signed a power of attorney dated March 7, 1998 giving [Gwynn] the "power to give an[d] place any and all orders."
>
> Accordingly, pursuant to exclusion (s) under your policy, coverage is not available for you in this matter. Consequently, and as I advised Mr. Thomason, AIG would neither be indemnifying you nor paying for any defense costs incurred after January 12, 2002. . . .
>
> If you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same. This letter is not to be construed as a waiver of any policy provisions. In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy and at law as to allegations which are not covered under the terms of this policy and/or may be excluded from coverage under the terms of the policy. . . .

SOF at ¶¶ 44-49 (emphasis supplied).

93.     After voluntarily settling the Sowell claim and Paying Sowell $1,000,000, AIG has now asserted claims against the Ryan Plaintiffs seeking to recoup the $1,000,000 settlement payment from the Ryan Plaintiffs. Fitzpatrick Affidavit at 93.

RESPONSE:   Admitted that AIG has now asserted claims against the Ryan Plaintiffs seeking to recoup the $1,000,000 settlement payment, a right to which it has repeatedly reserved throughout its correspondence with the Ryan Plaintiffs.

On October 15, 2001, Conlin acknowledged receipt of Sowell's Statement of Claim and advised that AIG had retained separate law firms to represent Merit and Gwynn. SOF at ¶¶ 40-41. In his letter, Conlin indicated that several of the Policy's exclusions, including (a), (b), (f), (r), and (s), could potentially exclude coverage. SOF at ¶ 42. Conlin also stated:

> This letter is not to be construed as a waiver of any policy provision. [AIG] reserves all rights and defenses under the Policy, and at law, as to allegations which are not covered under the terms of the Policy. This includes the right to amend the foregoing Reservation of Rights in accordance with the policy provisions at any time.

SOF at ¶ 43 (emphasis supplied).

On January 24, 2002, Conlin advised both Gwynn and Ryan that exclusion (s) of the Policy precluded coverage for Sowell's claims, and reiterated that AIG did not waive any policy provision but reserved all rights and defenses in the event that it reevaluated the claim, stating:

> During our investigation of this matter we uncovered the fact that Mr. Sowell signed a power of attorney dated March 7, 1998 giving [Gwynn] the "power to give an[d] place any and all orders."

> Accordingly, <u>pursuant to exclusion (s) under your policy, coverage is not available for you in this matter</u>.  Consequently, and as I advised Mr. Thomason, AIG would neither be indemnifying you nor paying for any defense costs incurred after January 12, 2002.  .  .  .

> If you have any information which would cause us to reevaluate this matter, please forward it to my attention as soon as possible and we will gladly review same.  <u>This letter is not to be construed as a waiver of any policy provisions.  In the event facts and/or issues are brought to our attention which result in a reevaluation of this matter, [AIG] reserves all rights and defenses under the policy and at law as to allegations which are not covered under the terms of this policy and/or may be excluded from coverage under the terms of the policy</u>.  .  .  .

SOF at ¶¶ 44-49 (emphasis supplied).

94.    AIG makes a practice of waiving exclusions to coverage when it believes it is in its business interest to do so. Fitzpatrick Affidavit at 94.

RESPONSE:   Denied.  AIG has in specific instances voluntarily broadened coverage when it would help retain good relations with its insured.  Weber Deposition at 123-25 and 180-81; Fitzpatrick Affidavit at 94.

95.    AIG admits that Sowell's Arbitration Claim does state various theories of liability which are within the coverage provided by the Policy. Fitzpatrick Affidavit at 95.

RESPONSE:   Admitted.  Further admitted that, notwithstanding the statement above, Sowell's Arbitration Claim is clearly excluded from coverage under the Policy, which specifically states that AIG "shall not be liable for Loss in connection with any Claim made against an Insured":

a)    arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts;

b)    arising out of, based upon or attributable to the committing in fact of:  any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder;

\*   \*   \*

e)    alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the inception date of the first Securities Broker/Dealer's Errors and Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the Broker/Dealer designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim, or alleging, arising out of, based upon or attributable to any subsequent Interrelated Wrongful Act;

f)    alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act;

\*   \*   \*

r)    with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away";

s)    alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-load investment company shares or variable annuities in which there is no initial or contingent sales charge or commission;

t)    alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims arising out of an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership . . . .

SOF at ¶13.

96.    Generally, AIG provides defense and coverage for claims of churning under the Policy. Fitzpatrick Affidavit at 96.

RESPONSE:   Admitted.  Further admitted that claims of churning typically implicate Exclusion (b), which excludes coverage for the commission of fraud in fact.  Weber Deposition at 123-25 and 180-81; Fitzpatrick Affidavit at 94.  Thus, standing alone, a claim of churning might require

AIG to pay defense costs until fraudulent acts are shown to have been committed by the insured in fact. *Id*. Notwithstanding the statement above, Sowell's Statement of Claim implicated additional exclusions, specifically Exclusion (s), which excludes coverage for claims "alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets," without any requirement of a finding in fact.

According to Sowell's Statements of Claim:

> When Mr. Sowell opened his account, he signed a power of attorney giving Respondents [including Gwynn] discretionary control of the account. Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell. As it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading decisions.

In addition:

> Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell and treated his discretionary power over the account as a license to churn. Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by excessive, in-and-out trading in technology stocks. Mr. Gwynn also traded extensively on margin in Mr. Sowell's account. A review of Mr. Sowell's account statements reveals that Respondents utilized no meaningful investment strategy or plan.

SOF at ¶¶28-29; Exhibit D (Statement of Claim at ¶ 27) and Exhibit E (Amended Statement of Claim at ¶28).

Since Sowell's Statement of Claim is clearly a claim "alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets," coverage was excluded.

97.    AIG concedes that many of Sowell's claims fall within the scope of the insuring agreement of the Policy. Fitzpatrick Affidavit at 97.

RESPONSE:   Admitted. Further admitted that, notwithstanding the statement above, Sowell's Arbitration Claim is clearly excluded from coverage under the Policy, which specifically states that AIG "shall not be liable for Loss in connection with any Claim made against an Insured":

> a)     arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts;

> b)     arising out of, based upon or attributable to the committing in fact of:  any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state, territory, county, political

division or municipality thereof, or any rules or regulations promulgated thereunder;

\*    \*    \*

e)    alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the inception date of the first Securities Broker/Dealer's Errors and Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the Broker/Dealer designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim, or alleging, arising out of, based upon or attributable to any subsequent Interrelated Wrongful Act;

f)    alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act;

\*    \*    \*

r)    with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away";

s)    alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-load investment company share or variable annuities in which there is no initial or contingent sales charge or commission;

t)    alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims arising out [of] an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership . . . .

SOF at ¶13.

98.    In determining its rights and duties to the Ryan Plaintiffs and the Gwynn Plaintiffs in the period from September 2001 through March 2003, AIG never determined whether it was applying Connecticut law or Arizona law, and seemed to wholly ignore the possibility

that such a determination might impose different duties on AIG. Fitzpatrick Affidavit at 98.

RESPONSE:   Denied.  AIG obtained an opinion from coverage counsel.  Fitzpatrick Affidavit at 98.

99.     AIG admits that "discretionary" is not defined in the Policy. Conlin initially testified for exclusion (s) to preclude coverage there had to be the actual exercise of discretionary control. Weber testified that the mere allegation of the existence of a discretionary account was sufficient to trigger exclusion (s). Fitzpatrick Affidavit at 99.

RESPONSE:   Admitted.  The insurance policy speaks for itself and specifically states that AIG "shall not be liable for Loss in connection with any Claim made against an Insured":

a)      arising out of, based upon or attributable to the gaining in fact of any profit or advantage to which the Insured was not legally entitled, including but not limited to any actual or alleged commingling of funds or accounts;

b)      arising out of, based upon or attributable to the committing in fact of:  any criminal or deliberately fraudulent act, or any willful violation of any law of the United States or Canada, or any state, territory, county, political division or municipality thereof, or any rules or regulations promulgated thereunder;

*   *   *

e)      alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the inception date of the first Securities Broker/Dealer's Errors and Omissions policy or Securities Brokers Professional Liability Insurance policy issued to the Broker/Dealer designated in Item 1 of the Declarations by the Insurer and continuously renewed and maintained in effect thereafter to the inception date of this policy, if on or before such date any Insured knew or could have reasonably foreseen that such Wrongful Act could lead to a Claim, or alleging, arising out of, based upon or attributable to any subsequent Interrelated Wrongful Act;

f)      alleging, arising out of, based upon or attributable to any Wrongful Act occurring prior to the Retroactive Date stated in Item 6 of the Declarations or arising out of any subsequent interrelated Wrongful Act;

*   *   *

r)      with respect to coverage provided under Coverage B only, alleging, arising out of, based upon or attributable to any activity of, or service provided by, the Registered Representative other than a covered Professional Service, including but not limited to "selling away";

    s)      alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to management or disposition of assets; however, this exclusion shall not apply to any Insured's purchase or sale of no-load investment company shares or variable annuities in which there is no initial or contingent sales charge or commission;

    t)      alleging, arising out of, based upon or attributable to, or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the Broker/Dealer including but not limited to limited or general partnerships, including but not limited to Claims arising out of an Insured acting as a general partner of any limited partnership and/or managing general partner of any general partnership . . . .

SOF at ¶13.

100.    AIG had an internal policy that required review by its coverage group and the commencement of a declaratory judgment action when AIG chose to withdraw a defense from its insured after having agreed to provide a defense. Fitzpatrick Affidavit at 100.

RESPONSE:  Admitted.

101.    AIG did not review its decision to revoke its agreed upon defense of the Ryan Plaintiffs and Gwynn Plaintiffs with its coverage group in January 2002, and AIG did not commence a coverage action at the time it decided to revoke that defense. Fitzpatrick Affidavit at 101.

RESPONSE:  Admitted.

        

Respectfully Submitted,

DEFENDANTS/COUNTERPLAINTIFFS
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.
and AIG TECHNICAL SERVICES, INC.

BY THEIR ATTORNEYS,
Edwards Angell Palmer & Dodge LLP


By: /s/ David S. Samuels
    Mark B. Seiger
    Fed. Bar No. ct05580
    David S. Samuels
    Fed. Bar No. ct24460
    90 State House Square
    Hartford, CT  06103-2715
    Tel:  (860) 525-5065
    Fax: (860) 527-4198
    Email:  mseiger@eapdlaw.com
    Email:  dsamuels@eapdlaw.com

    John D. Hughes
    BBO # 243660
    111 Huntington Avenue
    Boston, MA 02199
    Tel:  (617) 239-0100
    Fax:  (617) 227-4420
    Email: jhughes@eapdlaw.com

    Donna M. Greenspan
    Florida Bar No.: 059110
    One North Clematis Street
    Suite 400
    West Palm Beach, FL  33401
    Tel: (561) 833-7700
    Fax:  (561) 655-8719
    Email:  dgreenspan@eapdlaw.com

PMB_329726_9/DGREENSPAN

## <u>CERTIFICATION</u>

I hereby certify that on June 1, 2007, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court 's electronic filing system or by mail on anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

/s/ David S. Samuels
David S. Samuels