UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRUCE CHARLES RYAN, et al<br>    Plaintiffs | : <br> : <br> : | |
| v. | : <br> : | 3:03-cv-0644 (CFD) |
| NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA, et al<br>    Defendants | : <br> : <br> : | |
| _____ | : | |
| DAVID W. GWYNN, et al<br>    Plaintiffs | : <br> : <br> : | |
| v. | : <br> : | 3:03-cv-1154 (CFD) |
| NATIONAL UNION FIRE INSURANCE<br>COMPANY OF PITTSBURGH, PA, et al<br>    Defendants | : <br> : <br> : | |

RULING ON MOTION FOR SUMMARY JUDGMENT

These two consolidated cases were brought by the officers and a former employee of Merit Capital Associates, Inc. ("Merit"), a securities broker/ dealer against their professional liability insurance provider, National Union Fire Insurance Company of Pittsburgh, PA ("National Union") and AIG Technical Services, Inc., both subsidiaries of American International Group, Inc. ("AIG"). They concern claims made by Michael Sowell, a client of Merit, concerning investments made on Sowell's behalf by David Gwynn, an employee of Merit. As detailed below, Sowell's investments with Merit performed poorly, and Sowell sought reimbursement and related damages from Merit.

In 2001, Sowell filed a claim with the National Association of Securities Dealers ("NASD") against Merit and Gwynn, an NASD registered agent of Merit. AIG disputed that its policy covered Sowell's claims and provided only a partial defense to the NASD arbitration.

Although AIG eventually settled Sowell's claims, Merit and its officers, Bruce Charles Ryan, Russell William Newton and Robert Fitzpatrick (collectively the "Ryan Plaintiffs") and Gwynn and his wife, Raquel Gwynn (the "Gwynn plaintiffs") brought this suit against National Union and AIG (collectively "AIG") alleging breach of the duty to defend, breach of the duty to indemnify, bad faith, and violations of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b, and the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-815. The Gwynn plaintiffs also allege intentional and negligent infliction of emotional distress.

AIG subsequently filed counterclaims seeking declaratory judgment of noncoverage, and alleging unjust enrichment.

Currently pending is AIG's motion for summary judgment on the claims of both the Gwynn and Ryan plaintiffs.

I.  Background[1]

    A.  Sowell's Claims against Gwynn and Merit

On September 4, 2001, Sowell filed a claim with the NASD, and on May 1, 2002 Sowell amended his statement of claim.

The amended statement of claim alleged that Sowell contacted Gwynn in late 1997 to

---

[1] The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs and other evidence submitted by the parties. They are undisputed unless otherwise indicated.

create a retirement plan for him.  According to the amended statement of claim, "Mr. Sowell expected that Mr. Gwynn would conservatively manage the account with a view towards providing [a] modest retirement income."

Sowell alleged that "he signed a power of attorney giving [Gwynn and Merit] discretionary control of the account. . . . Mr. Gwynn did not consult with Mr. Sowell before making trading decisions. . . .and treated his discretionary power over the account as a license to churn."

Sowell alleged that his account was mismanaged by Gwynn. It increased in value until early 2000, but by April 2000, the account began to decline in value.  By 2001, it had lost virtually all its value.

Sowell also alleged that he lost money "by investing in a charter school business controlled by Mr. Gwynn, who, upon learning about Mr. Sowell's significant inheritance, asked him to borrow $100,000 for Mr. Gwynn's use in his charter school business."  According to Sowell, Gwynn was a founding officer and director of the charter school businesses in which he asked Sowell to invest.  The amended statement of claim alleges that Sowell made investments in the charter school businesses in May and July 1998, November 1999, and April and July 2000.

For at least some of these investments, Sowell was given a document entitled "Private Placement Memorandum" in which Merit was identified as the "Placement Agent."

Sowell's amended statement of claim with the NASD included fifteen counts.  They were (1) violating Ariz. Rev. Stat. § 44-1841[2] by selling unregistered securities in the charter school

---

[2] Sowell's claims were brought under Arizona law because both he and Gwynn were residents of Arizona.

entities controlled by Gwynn; (2) violating Ariz. Rev. Stat. § 44-1991 by committing fraud in connection with the general management of Gwynn's Merit account and the charter school investments; (3) churning the Merit account; (4) negligence in recommending investments to Sowell, including the charter school investments; (5) common law intentional fraud and fraud by non-disclosure; (6) negligent misrepresentation regarding "Mr. Sowell's account and the charter school investments"; (7) negligent supervision of Gwynn by the other Ryan plaintiffs; (8) breach of fiduciary duty through the misrepresentations set forth in the previous counts; (9) violating NASD and New York Stock Exchange rules by making unsuitable investment recommendations, using "manipulative, deceptive and fraudulent devices or contrivances," and failing to properly supervise Gwynn; (10) violating Ariz. Rev. Stat. § 44-3241 by committing fraud in connection with the provision of investment advisory services; (11) violating Ariz. Rev. Stat. § 44-1522 by using a deception in connection with the sale of merchandise; (12) punitive damages; (13) breach of the Merit brokerage account contract; (14) breach of contract in connection with the charter school promissory notes; and (15) successor liability.

  B. <u>The Underlying Arbitration</u>

  On September 21, 2001, the Ryan plaintiffs submitted a claim to AIG for coverage of Sowell's claim against them. While AIG initially retained counsel to defend the plaintiffs, on January 24, 2002, AIG denied coverage under exclusion (s) of the policy, claiming that the Sowell account was "discretionary," and thus not within the policy. AIG withdrew funding of the plaintiffs' defense, but invited Gwynn and Merit to provide additional information related to coverage.

  On January 10, 2003, three days after the Sowell arbitration began (with Gwynn

appearing pro se), AIG advised Merit that "while AIG had not changed its position on coverage for this claim at this time, it is offering to pay Merit's reasonable and necessary defense costs associated with the Sowell claim." Thereafter, AIG resumed funding a defense for Gwynn and Merit.

On February 25, 2003, the Arbitration panel entered an award against the Ryan and Gwynn plaintiffs. The panel awarded Sowell $1.125 million, and held the Ryan and Gwynn plaintiffs jointly and severally liable. In August 2003, after the instant suit was filed, AIG agreed to pay Sowell one million dollars to settle the underlying claim, which was accepted by Sowell. AIG did not issue a separate reservation of rights letter at this point.

The plaintiffs here seek compensation for costs connected with the Sowell arbitration, damages related to regulatory proceedings initiated as a result of the Sowell arbitration award, and damage to the plaintiffs' reputations, earning potential, ability to conduct business and obtain certain licenses.

C.   The Policy

In 2000, the Ryan plaintiffs purchased professional liability policy #473-36-20 from AIG. The policy covered all the Ryan and Gwynn plaintiffs. The effective date of the Policy was August 23, 2000 to September 23, 2001. The policy also provided "retroactive" coverage for claims based on events occurring after August 23, 1999 (the "retroactive date"). The Policy provided that "[t]he insurer shall have the right and duty to defend, subject to and as part of the Limits of Liability, any Claim made against an Insured during the Policy Period or Discovery Period (if applicable)."

The Policy also provided that "[t]he insurer shall not be liable for Loss in connection with

any Claim[3] made against an insured" within a number of exclusions. At issue are exclusions (f), (s) and (t). Exclusion (f) applies to claims "alleging, arising out of, based upon or attributable to" wrongful acts occurring before the retroactive date or "any subsequent interrelated Wrongful Act." "Interrelated Wrongful Act(s)" are defined as "Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from the same, related or common nexus of facts." In turn, "Wrongful Acts" are defined as "any act, error or omission by the Broker/ Dealer, any director, officer, partner or employee thereof, or by any Registered Representative, in their respective capacities as such."

Exclusion (s) applies to claims "alleging, arising out of, based upon or attributable to an Insured exercising discretionary authority or control with regard to the management or disposition of assets." Exclusion (t) applies to claims "alleging, arising out of, based upon or attributable to or in any way involving, directly or indirectly, the formation, operation, administration or management by an Insured, in part or in whole, of any entity other than the broker/ dealer."

II.    Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000). The burden of showing that no

---

[3] "Claim" is defined as a customer's written demand for monetary relief; or a civil or arbitration proceeding for monetary or non-monetary relief.

genuine factual dispute exists rests upon the moving party. Carlton v. Mystic Transp., Inc., 202 F.3d 129, 133 (2d Cir. 2000) (citing Gallo v. Prudential Residential Servs., Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994)). Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." Carlton, 202 F.3d at 134. "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the jury. Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

III.    Discussion

    A.    Duty to Defend

The defendants argue that they had no duty to defend the plaintiffs in the NASD arbitration because Sowell's allegations fell within exclusions (s), (f) and (t).

"[A]n insurer's duty to defend is measured solely by whether the complaints against the insured allege facts that, if proven true, would present a claim within the scope of the policy's coverage." See Coregis Ins. Co. v. American Health Foundation, 241 F.3d 123, 127 (2d Cir. 2001) (applying Connecticut law and holding that there was no duty to defend lawsuits charging

that insured failed to repay loans allegedly obtained through fraudulent misrepresentations about financial health of the debtor where policy excluded coverage for any action "arising out of, based upon or related to" insolvency); Springdale Donuts, Inc. v. Aetna Cas. and Sur. Co., 247 Conn. 801, 807, 724 A.2d 1117, 1120 (Conn.1999) ("[I]t is well settled that an insurer's duty to defend, being much broader in scope and application than its duty to indemnify, is determined by reference to the allegations contained in the [underlying] complaint." (internal quotation marks omitted) (second alteration in original)); Firestine v. Poverman, 388 F. Supp. 948, 950 (D. Conn. 1975) ("It is irrelevant to the existence of a duty to defend whether or not the complaint is groundless and whether or not the insurer will eventually be able to establish that it has no duty to indemnify the insured.").

Conversely, "if the complaint alleges a liability which the policy does not cover, the insurer is not required to defend." Flint v. Universal Machine Co., 238 Conn. 637, 646-47, 679 A.2d 929 (1996). "To avoid the duty [to defend,] therefore[,] the insurer must demonstrate that the allegations in the underlying complaints are 'solely and entirely' within specific and unambiguous exclusions from the policy's coverage." Avondale Industries, Inc. v. Travelers Indem. Co., 887 F.2d 1200, 1204-05 (2d Cir. 1989) (citation omitted) (applying New York law).

Further, "an insurer may be obligated to provide a defense not only based on the face of the complaint but also if any facts known to the insurer suggest that the claim falls within the scope of coverage." Hartford Casualty Ins. Co. V. Litchfield Mutual Fire Ins. Co., 274 Conn. 457, 466-67 (2005). The 'four corners of the complaint' rule cannot be applied in a wooden fashion that "would render the duty to defend narrower than the duty to indemnify." Id. (internal quotation marks omitted).

    1.  The Policy Exclusions

      a.  Exclusion (s): discretionary control

  The Court agrees with the defendants that by its plain language exclusion (s) applies to claims alleging discretionary authority or control, and not merely to claims related to accounts formally established as discretionary accounts.  However, although Sowell's statement of claim alleges that Gwynn exercised such discretionary control, a number of the claims do not depend on the degree of control Gwynn exercised, and have no causal nexus to Gwynn's control of the account.[4]  These include the allegations regarding the charter school investments; that the plaintiffs made inappropriate investment recommendations; and that they committed fraud or negligent misrepresentation by, inter alia, failing to disclose the risks and costs associated with margin trading, the volatility of the stocks in Gwynn's account, and the amount of commissions they received, and by falsely marking unsolicited trades as solicited.

  Because the Sowell claim alleged distinct theories of liability that did not fall within exclusion (s), summary judgment cannot be granted based on this exclusion.

    2.  Exclusion (t): outside entity

  The allegations regarding the charter school investments largely fall within exclusion (t) because they are at least indirectly attributable to "the formation, operation, administration or management by an Insured . . . of an entity other than the Broker/Dealer."  However, only claims related to the charter school investments fall within this exclusion.

---

[4] The Court also notes that the plaintiffs have presented evidence sufficient to create a genuine issue of fact about whether Sowell's account was formally designated a discretionary account.

       3.    Exclusion (f): retroactive date

Gwynn's relationship with Sowell began around February 1998. Sowell's statement of claim suggests that Gwynn began committing wrongful acts almost immediately thereafter. However, it is impossible at this juncture to determine with certainty from the claim before the NASD whether alleged wrongful acts occurring after August 23, 1999 were "interrelated" with wrongful acts occurring before this point within the meaning of the policy.[5]

Further, the arbitration panel could have found that Gwynn's misconduct began only after the retroactive date of August 23, 1999, particularly since Sowell's claim alleged that his losses were sustained primarily after April 2000. Under these circumstances, the defendants would have had a duty to indemnify. Accordingly, the defendants had a corresponding duty to defend.

Thus, even taken together, exceptions (s), (f) and (t) did not apply to the entirety of Sowell's claims.[6] Accordingly, the defendants have not established that they are entitled to judgment as a matter of law, and the motion for summary judgment is denied as to the duty to defend. Cf. Security Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co., 264 Conn. 688, 712-713, 826 A.2d 107, 122-123 (Conn. 2003) (when a complaint alleges both covered and excluded items "[a]n insurer must bear the entire cost of defense when there is no reasonable

---

[5] The claim alleges that Sowell made charter school investments as early as May 1998. However, the claim does not specify when Gwynn was alleged to have committed much of the other wrongful conduct.

[6] The defendants argue that they have no duty to indemnify because of exclusions (a) (excluding coverage for claims related to unlawful profit or advantage), (b) (excluding coverage for criminal or deliberately fraudulent acts) and (r) (excluding coverage for activities other than covered professional services). However, they do not argue that these exclusions vitiated the duty to defend.

means of prorating the costs of defense between the covered and the not-covered items.")[7]

Because summary judgment is denied as to the duty to defend, and the defendants did not provide a full defense, summary judgment is also denied as to the remainder of the counts raised by the plaintiffs.

IV.     Conclusion

The motion for summary judgment [Dkt. # 202] is denied.

SO ORDERED this _31st__ day of March 2008 at Hartford, Connecticut.

_s/ Christopher F. Droney_
CHRISTOPHER F. DRONEY
UNITED STATES DISTRICT JUDGE

---

[7] The defendants do not argue that the cost of defending the NASD arbitration should have been prorated. On the record before the Court at this juncture, it is impossible to determine whether this case is one in which there is reasonable means of prorating the costs of defending not-covered claims.