UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BRUCE CHARLES RYAN, RUSSELL WILLIAM NEWTON, ROBERT FITZPATRICK, and MERIT CAPITAL ASSOCIATES, INC.,<br>    Plaintiffs,<br><br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC.,<br>    Defendants. | CIVIL ACTION NO.<br>3:03CV00644(CFD) |
| DAVID W. GWYNN and RAQUEL GWYNN<br>    Plaintiffs,<br>v.<br><br>NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., and AIG TECHNICAL SERVICES, INC.,<br>    Defendants. | CIVIL ACTION NO.<br>3:03CV01154(CFD)<br><br>April 14, 2008 |

## DEFENDANTS' MOTION FOR RECONSIDERATION AND INCORPORATED MEMORANDUM OF LAW

Defendants, National Union Fire Insurance Company of Pittsburgh, PA. and AIG Technical Services, Inc. (collectively, "AIG" or "defendants"), pursuant to Local Rule of Civil Procedure 7(c), hereby timely move this Court to reconsider its Ruling on Motion for Summary Judgment ("Ruling") entered on March 31, 2009. The Court has overlooked and thus failed to consider an aspect of the law presented by defendants which, if left unredressed, would result in clear error or cause manifest injustice.

ORAL ARGUMENT RESPECTFULLY REQUESTED

HFD 189278.1

**MEMORANDUM OF LAW**

**I. Introduction**

In its Ruling, the Court held that exclusion (s) applies to claims alleging discretionary authority or control, and not merely to claims related to accounts formally established as discretionary accounts. The Court found that Sowell's statement of claim alleged that Gwynn exercised such discretionary control over Sowell's Merit Account. The Court further found that exclusion (s) did not apply to Sowell's claims regarding the charter school investments, but found that these claims fell within exclusion (t) [outside entity].

The Court denied summary judgment, however, finding that a number of Sowell's claims did not fall within exclusion (s), exclusion (t), or exclusion (f). Those claims included Sowell's allegations that plaintiffs made inappropriate investment recommendations; and that they committed fraud or negligent misrepresentation by, inter alia, failing to disclose the risks and costs associated with margin trading, the volatility of the stocks in the Merit account,[1] and the amount of commissions they received, and by falsely marking unsolicited trades as solicited (collectively, "Surviving Claims").

The Court has overlooked that all of the Surviving Claims are part of a series of Interrelated Wrongful Acts that began, according to the statement of claim,[2] when the Merit account was first opened in May 1998, prior to the Retroactive Date of August 23, 1999. Exclusion (f), like exclusions (s) and (t), is triggered by virtue of a mere allegation. The Surviving Claims therefore all fall within exclusion (f) [retroactive date].

---

[1] The Ruling refers to Sowell's Merit Account alternately as "Sowell's account" and as "Gwynn's account."

[2] The Statement of Claim and Amended Statement of Claim are referred to here, collectively, as "statement of claim."

HFD 189278.1                                                                        2

The Court has also overlooked that the allegations regarding inappropriate investment recommendations relate to Gwynn's advising and inducing Sowell to write checks from the Merit account payable to Gwynn's illegal charter school entities. The claims regarding inappropriate investment recommendations are therefore also part of the charter school allegations, which the Court has found fall within exclusion (t) [outside entity]. Accordingly, the claims regarding inappropriate investment recommendation also fall within exclusion (t). In addition, the remaining Surviving Claims all relate to Gwynn's exercise of discretionary authority or control over the Merit account – which was the *sole account at issue* - and therefore fall within exclusion (s).

Therefore, the Surviving Claims identified by the Court all fall within exclusion (f) and, in addition, also fall within either exclusion (t) or (s).

## II. Exclusion (f) [Retroactive Date]

Exclusion (f) applies to claims "alleging, arising out of, based upon or attributable to" any "Wrongful Act" occurring prior to the Retroactive Date or "any subsequent interrelated Wrongful Act." Thus, exclusion (f) applies to:

- Sowell's claims alleging, arising out of, or based upon or attributable to plaintiffs' Wrongful Acts prior to the Retroactive Date of August 23, 1999; *and*

- Sowell's claims alleging, arising out of, or based upon or attributable to plaintiffs' subsequent Interrelated Wrongful Acts.

A "Wrongful Act" is defined as "any act, error or omission by the Broker/Dealer, or by any director, officer, partner or employee thereof, or by any Registered Representative, in their respective capacities as such." "Interrelated Wrongful Act(s)" are defined as "Wrongful Acts which are the same, related or continuous, or Wrongful Acts which arise from the same, related

or common nexus of facts."

As discussed below and in defendants' memoranda in support of their motion for summary judgment, the statement of claim shows that the Surviving Claims are part of a series of Interrelated Wrongful Acts that allegedly began when the Merit account was first opened in May 1998.

1. The Surviving Claims

The statement of claim contains the following allegations regarding the Surviving Claims:

   a. *Inappropriate Investment Recommendations [Count Four]*

The statement of claim alleged that Gwynn gave inappropriate investment advice by recommending that Sowell use funds from the Merit account to invest in Gwynn's illegal charter school entities. SOF[3] ¶34; EXHIBIT[4] D, Statement of Claim at ¶¶ 70, 95; EXHIBIT E, Amended Statement of Claim at ¶¶ 88, 113.

   b. *Failure to Disclose Risks and Costs Associated With Margin Trading [Count Two]*

The statement of claim alleged that Gwynn "never explained margin trading or its associated costs" and that plaintiffs "failed to advise Mr. Sowell of the risks and costs associated with margin trading." These claims arose from the allegation that Gwynn "traded extensively on margin in Mr. Sowell's account." EXHIBIT D, Statement of Claim, ¶¶ 27, 27(3), 76(g); EXHIBIT E, Amended Statement of Claim, ¶¶ 28, 28(3), 94(g).

---

[3] The reference to "SOF" refers to defendants' Local Rule 56(a)(2) Statement of Undisputed Facts filed contemporaneously with defendants' motion for summary judgment.
[4] The references to "Exhibits" refers to the Exhibits filed contemporaneously with defendants' motion for summary judgment.

### c. *Failure to Disclose Volatility of Stocks [Count Two]*

The statement of claim alleged that plaintiffs "failed to disclose the volatility of the stocks" that Gwynn purchased with Merit account funds. EXHIBIT D, Statement of Claim, ¶ 76(e); EXHIBIT E, Amended Statement of Claim, ¶ 94(e).

### d. *Amount of Commissions [Count Two]*

The statement of claim alleged that plaintiffs "failed to disclose to Mr. Sowell the amount of commissions they received . . . in his account" and that plaintiffs "failed to disclose to Mr. Sowell the amount of commissions they received and that as a result of the commissions and margin costs he was paying he needed to earn 25.44% in his account in order to break even." EXHIBIT D, Statement of Claim, ¶¶ 29 n.3, 76(h); EXHIBIT E, Amended Statement of Claim, ¶¶ 30 n.3, 94(h).

### e. *Falsely Marking Unsolicited Trades as Solicited*

The statement of claim alleged that plaintiffs "falsely marked solicited trades as 'unsolicited.'" EXHIBIT D, Statement of Claim at ¶¶ 26, 76(e), (i); EXHIBIT E, Amended Statement of Claim at ¶¶ 27, 94(e), (i).

2. <u>The Surviving Claims are Part of the Interrelated Wrongful Acts Alleged in the Statement of Claim</u>

The statement of claim alleged a series of Wrongful Acts that were the same, related or continuous, or arose from the same, related or common nexus of facts; i.e., Interrelated Wrongful Acts. The statement of claim alleged that these Interrelated Wrongful Acts began when the Merit account was opened in May 1998 and continued through 2001, by which point the account had lost virtually all of its value. As discussed below, the Surviving Claims are part of these Interrelated Wrongful Acts and therefore are within exclusion (f).

a. *Common Nexus of Facts*

The statement of claim alleged that in April 1998, Sowell gave Gwynn his deceased mother's stock certificates, and Gwynn deposited them "as the initial deposit in Mr. Sowell's Merit account." SOF ¶ 27; EXHIBIT D, Statement of Claim at ¶ 24; EXHIBIT E, Amended Statement of Claim at ¶ 25. Sowell alleged that he sought financial planning assistance from Gwynn because he did not know how to manage his inheritance or what to do with the stock certificates. SOF ¶ 18; EXHIBIT D, Statement of Claim at ¶ 18; EXHIBIT E, Amended Statement of Claim at ¶ 19. Sowell alleged that he did not graduate from college and was an unsophisticated investor. EXHIBIT D, Statement of Claim at ¶ 15; EXHIBIT E, Amended Statement of Claim at ¶ 16.

Sowell alleged that although Gwynn was "fully aware" of Sowell's "significant inheritance," Sowell was unaware of the true value of the stock certificates at the time that he gave them to Gwynn. SOF ¶ 25; EXHIBIT D, Statement of Claim at ¶¶ 35, 17, 24; EXHIBIT E, Amended Statement of Claim at ¶¶ 36, 18, 25. Sowell alleged that although he had believed that his inheritance amounted to about $380,000, the stock alone was actually worth in excess of $1 million. SOF ¶¶ 17, 25; EXHIBIT D, Statement of Claim at ¶¶ 17, 24; EXHIBIT E, Amended Statement of Claim at ¶¶ 18, 25.

The allegations of the statement of claim show that Sowell's lack of investment sophistication and unawareness of the size of his inheritance served as the catalyst for a series of Interrelated Wrongful Acts that siphoned gains from his account and eventually emptied out his Merit account.

*Interrelated Wrongful Acts*

Sowell's claims were based on a series of Wrongful Acts that all arose from the common

nexus of facts set forth above, and thus were Interrelated Wrongful Acts as defined by the Policy. As alleged in the statement of claim, these Interrelated Wrongful Acts began when the Merit account was first opened in May 1998. Thus it can only be concluded that Sowell's claims (including the Surviving Claims) alleged, arose out of, or were based upon or attributable to Wrongful Acts that occurred before the August 23, 1999 Retroactive Date or subsequent Interrelated Wrongful Acts. The alleged Interrelated Wrongful Acts (with the Surviving Claims noted in **bold**) are as follows:

i. *Improper Trading in the Merit Account*

With respect to trading in the Merit Account, the statement of claim alleged:

27. When Mr. Sowell opened his account, he signed a power of attorney giving Respondents discretionary control of the account. Mr. Gwynn told Mr. Sowell to sign the power of attorney so that Mr. Gwynn could make quick decisions and manage the account without having to bother Mr. Sowell. As it turned out, Mr. Gwynn did not consult with Mr. Sowell before making trading decisions.

[*The only logical inference of the above allegation, when combined with the allegations that follow, is that Gwynn began improperly trading in the Merit account shortly after the account was opened in May of 1998. Sowell's various allegations, taken in their totality, show no basis to conclude that the Interrelated Wrongful Acts did not commence until after the August 23, 1999 Retroactive Date -- fifteen months after the Merit account was opened*].

28. Mr. Gwynn ignored his statements in the retirement plan regarding the need to create an "efficient, diversified portfolio" for Mr. Sowell and treated his discretionary power over the account as a license to churn. Mr. Sowell's account was traded in a helter-skelter fashion, which was characterized by excessive, in-and-out trading in technology stocks. **Mr. Gwynn also traded extensively on margin in Mr. Sowell's account.** A review of Mr. Sowell's account statements reveals that Respondents utilized no meaningful investment strategy or plan. The following calculations demonstrate their gross mismanagement of Mr. Sowell's account:

(1) Respondents generated approximately $470,200 in commissions as a result of trades in Mr. Sowell's account.
(2) The annualized turnover rate in Mr. Sowell's account 8.27, which was blatantly excessive in light of Mr. Sowell's investment objectives and is conclusive evidence of churning.
(3) Although **Mr Gwynn never explained margin trading or its associated**

  **costs** to Mr. Sowell, Mr. Sowell paid $170,727 in margin interest.
(4)  The annualized cost to equity or break-even ratio in Mr. Sowell's account was 25.44%. In other words, as a result of the trading and margin costs he incurred, Mr. Sowell needed to earn 25.44% annually just to break even.
(5)  The account lost approximately $239,883, which does not include the monies (at least $175,000) Mr. Sowell lost as a result of his investments . . . in the charter school business controlled by Mr. Gwynn.

[*The retirement plan was given to Sowell in February of 1998. The only possible interpretation of these statistics accumulating the total misuse of the account between May of 1998 and the time when the money was all misappropriated or lost in 2001 is that the Interrelated Wrongful Acts occurred over the life of the account; that is, they began before the Retroactive Date and continued thereafter until the funds were gone.*]

29.  Remarkably, despite Respondents' mismanagement of Mr. Sowell's account, the account had some periods in which it benefited from the technology-driven bull market and recorded gains. In particular, the account's net worth was approximately $1.8 million on December 31, 1999, $1.37 million on January 31, 2000, $1.57 million on February 28, 2000 and $1.49 million on March 31, 2000. During this timeframe, Mr. Sowell asked Mr. Gwynn to sell at least half of his stock and put the profits in cash. Mr. Gwynn, however, refused to do so and continued his hyperactive trading of Mr. Sowell's account.

[*In a prior footnote to paragraph 26, Sowell alleged that in March 2000, despite referring in a letter to Sowell's retirement plan that had emphasized an "efficient, diversified portfolio," Gwynn nevertheless "continued to overtrade Mr. Sowell's account and ignored his recommendations and/or his perception of Mr. Sowell's investment objectives." Accordingly, for some period of time Gwynn was making enough profit on trades to offset and conceal his churning of the account, inappropriate commissions and loss of the charter school investment funds. As the Court noted, it was possible based on these allegations to conclude that the trading losses did not become so severe as to constitute an overall loss of funds until after the Retroactive Date. However, the allegations that Gwynn overtraded Sowell's account since its inception and "continued" to do so after March 2000 cannot be construed to state a claim for a course of interrelated wrongful conduct that did not begin until after the Retroactive Date*].

30.  From April until 2001, although it would experience some profitable periods, Mr. Sowell's account began a decline that culminated in its losing virtually all of its value. When Mr. Sowell attempted to reach Mr. Gwynn during this timeframe to discuss his account, Mr. Gwynn would rarely return his calls. On the infrequent occasions when Mr. Sowell spoke to Mr. Gwynn about his account, Mr. Gwynn assured Mr. Sowell that the account was fine and that you always "buy the dips." Mr. Gwynn also told Mr. Sowell not to watch the account.

  [In a footnote, Sowell alleged:
  ". . . Mr. Gwynn never told Mr. Sowell of the commissions Respondents earned,

HFD 189278.1          8

the turnover rate or the break-even ration. Likewise, because Mr. Sowell's account was a discretionary trading account, Mr. Sowell was not consulted regarding the trades placed by Mr. Gwynn."]

31.     As a result of Respondents conduct, Mr. Sowell's "retirement" savings, which had initially exceeded $1.4 million, are virtually non-existent. Had Respondents reasonably managed Mr. Sowell's account, made investments consistent with Mr. Sowell's objectives and constructed the "efficient, diversified portfolio" they promised, Mr. Sowell would have never suffered this fate. . . .

\* \* \*

94. . . .
   a. Respondents failed to disclose the risks of the trading methods Mr. Gwynn used in Mr. Sowell's account;
   b. **Respondents failed to disclose the volatility of the stocks Mr. Gwynn was purchasing for Mr. Sowell**;
   c. Respondents failed to disclose to Mr. Sowell that they were churning his account;
   d. **Respondents failed to advise Mr. Sowell of the risks and costs associated with margin trading;**
   e. **Respondents failed to disclose to Mr. Sowell the amount of commissions they received** and that as a result of the commissions and margin costs he was paying he needed to earn 25.44% in his account in order to break even;
   f. **Respondents falsely marked solicited trades as "unsolicited"** . . .

*[These allegations all describe a course of wrongful conduct that began in May of 1998 and continued until the funds were gone. The allegations of the statement of claim leave no room for any contrary conclusion].*

EXHIBIT D, Statement of Claim at ¶¶ 26-30, 76; EXHIBIT E, Amended Statement of Claim at ¶¶ 27-31, 94.

### ii.  *The Improper Charter School Investments*

The allegations regarding the improper charter school investments all arose from the same, related or common nexus of facts regarding Sowell's inheritance and plaintiffs' mismanagement and wrongful profiting from the Merit Account as did the allegations regarding improper trading set forth above. Accordingly, the Wrongful Acts alleged in connection with the charter school investments are all Interrelated Wrongful Acts; in addition, the Interrelated

HFD 189278.1                                                    9

Wrongful Acts regarding the charter school investments are also Interrelated Wrongful Acts with the Wrongful Acts alleged in connection with the improper trading of the Merit account.

The statement of claim specifically alleges that the Interrelated Wrongful Acts regarding the charter school investments began in May of 1998 -- long before the August 23, 1999 Retroactive Date. The statement of claim alleged that within days of opening the Merit account with the stock certificates in May of 1998, **Gwynn began to inappropriately advise Sowell to invest funds from the Merit account in Gwynn's unlawful charter school entities.** SOF ¶ 34, EXHIBIT D, Statement of Claim at ¶ 31, 70, 95; EXHIBIT E, Amended Statement of Claim at ¶ 32, 88, 113. In fact, Sowell alleged that "the very first check Mr. Sowell wrote from his Merit account was a $100,000 check to Mr. Gwynn's company." EXHIBIT D, Statement of Claim at ¶ 31; EXHIBIT E, Amended Statement of Claim at ¶ 32. Sowell alleged that Gwynn induced him to use funds from the Merit account to invest in the inappropriate charter school investments commencing in May 1998 and continuing through December 2000. SOF ¶34; EXHIBIT D, Statement of Claim at ¶ 70; EXHIBIT E, Amended Statement of Claim at ¶ 88. Sowell alleged that Gwynn falsely "assured" him that his charter school investments were "protected" by promissory notes that were issued on or about May 19, 1998, July 1, 1998, November 11, 1999, April 25, 2000, and July 21, 2000. SOF ¶¶ 35-36; EXHIBIT D, Statement of Claim at ¶¶ 150, 76(o); EXHIBIT E, Amended Statement of Claim at ¶¶ 177, 94(o). Sowell alleged that Gwynn was able to "lure more and more money" out of Sowell by, inter alia, "leading him to believe he had enough money in his Merit account to afford the charter school investments." EXHIBIT D, Statement of Claim at ¶¶ 31, 52; EXHIBIT E, Amended Statement of Claim at ¶¶ 32, 53.

3. <u>The Surviving Claims Fall Within Exclusion (f)</u>

As discussed above, Sowell alleged that when the Merit account was first opened in May 1998, Gwynn had discretionary control over the account, and he improperly exercised that control through 2001, when the account lost virtually all its value. Sowell also alleged that Gwynn improperly advised and induced him to use funds from the Merit account to invest in Gwynn's illegal charter school entities, beginning in May 1998 with the very first check from the Merit account and continuing through December 2000. Thus, all of the Wrongful Acts alleged in the statement of claim either occurred before the Retroactive Date of August 23, 1999 or were subsequent Interrelated Wrongful Acts.

Accordingly, each of the Surviving Claims:

- alleges, arises out of, or is based upon or attributable to plaintiffs' Wrongful Acts prior to the Retroactive Date of August 23, 1999; or

- alleges, arises out of, or is based upon or attributable to plaintiffs' subsequent Interrelated Wrongful Acts.

Thus, exclusion (f) [Retroactive Date] applies to all of the Surviving Claims. Each of Sowell's claims therefore falls within one or more of the Policy's exclusions and is precluded from coverage; accordingly, AIG had no duty to defend.

### III. Exclusions (t) and (s)

The Surviving Claims also all fall within either exclusion (t) or (s). As noted above, the allegations regarding inappropriate investment recommendations relate to Gwynn's advice to Sowell to use funds from the Merit account to invest in Gwynn's illegal charter school entities. The claims regarding inappropriate investment recommendations are therefore part of the charter school allegations, which the Court has found fall within exclusion (t) [outside entity].

Accordingly, the claims regarding inappropriate investment recommendation also fall within exclusion (t).

The remaining Surviving Claims include Sowell's allegations that plaintiffs committed fraud or negligent misrepresentation by, inter alia, failing to disclose the risks and costs associated with margin trading, the volatility of the stocks in the Merit account, and the amount of commissions they received, and by falsely marking unsolicited trades as solicited. As discussed below, the remaining Surviving Claims all fall within exclusion (s).

In its Ruling, the Court held that exclusion (s) applies to claims alleging discretionary authority or control, and not merely to claims related to accounts formally established as discretionary accounts. The Court found that Sowell's statement of claim alleged that Gwynn exercised such discretionary control over Sowell's Merit Account. The statement of claim alleged that the remaining Surviving Claims all arose from Gwynn's exercise of discretionary authority or control with regard to the management or disposition of assets in the Merit account.

Specifically, in connection with his allegations that Gwynn "never explained margin trading" and that plaintiffs "failed to advise Mr. Sowell of the risks and costs associated with margin trading," Sowell alleged that Gwynn "traded extensively on margin *in Mr. Sowell's account*." EXHIBIT E, Amended Statement of Claim, ¶¶ 28, 28(3), 94(g) (emphasis supplied). The statement of claim alleged that plaintiffs "failed to disclose the risks of the trading methods Mr. Gwynn used *in Mr. Sowell's account*." EXHIBIT E, Amended Statement of Claim, ¶ 94(d) (emphasis supplied). Sowell was referring to the Merit account (the only account at issue) when he alleged that plaintiffs "failed to disclose the volatility of the stocks *Mr. Gwynn was purchasing for Mr. Sowell*." EXHIBIT E, Amended Statement of Claim at ¶¶ 27, 94(e), (i) (emphasis supplied). Sowell alleged that plaintiffs "failed to disclose to Mr. Sowell the amount

of commissions they received . . . *in his account*." EXHIBIT E, Amended Statement of Claim, ¶¶30 n.3, 94(h) (emphasis supplied). Sowell's allegation that plaintiffs "falsely marked solicited trades as 'unsolicited'" referred to transactions in the Merit account. EXHIBIT E, Amended Statement of Claim at ¶¶ 27, 94(e), (i).

Thus, each of the remaining Surviving Claims alleges, arises out of, or is based upon or attributable to Gwynn's exercise of discretionary authority or control with regard to the management or disposition of assets in the Merit account. Accordingly, each of the remaining Surviving Claims falls within exclusion (s), and all of the Surviving Claims therefore fall within either exclusion (t) or (s).

Thus, similar to exclusion (f) above, exclusions (t) and (s) together apply to all of the Surviving Claims. Each of Sowell's claims falls within one or more of the Policy's exclusions, and AIG therefore had no duty to defend.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court reconsider its Ruling on Motion for Summary Judgment and find that AIG as a matter of law had no duty to defend. Defendants further request, for the reasons set forth in their memoranda of law in support of their motion for summary judgment, that the Court find that AIG had no duty to indemnify under the Policy and that its actions cannot constitute bad faith or intentional or negligent infliction of emotional distress, and enter summary judgment accordingly on behalf of AIG on each and every one of Plaintiffs' counts.

Respectfully Submitted,

DEFENDANTS/COUNTERPLAINTIFFS
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.
and AIG TECHNICAL SERVICES, INC.

BY THEIR ATTORNEYS,
Edwards Angell Palmer & Dodge LLP

By: /s/ Dennis O. Brown
Dennis O. Brown
Fed. Bar No. CT04598
90 State House Square, 9th Floor
Hartford, CT 06103-2715
Tel: (860) 525-5065
Fax: (860) 527-4198
Email: dbrown@eapdlaw.com

John D. Hughes
Massachusetts BBO # 243660
111 Huntington Avenue
Boston, MA 02199
Tel: (617) 951-3373
Fax: (617) 439-4170
Email: jhughes@eapdlaw.com

Donna M. Greenspan
Florida Bar No.: 059110
One North Clematis Street, Suite 400
West Palm Beach, FL 33401
Tel: (561) 833-7700
Fax: (561) 655-8719
Email: dgreenspan@eapdlaw.com

### CERTIFICATION OF SERVICE

I hereby certify that on April 14, 2008, the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this document through the court's CM/ECF System.

_____
Dennis O. Brown, Esq., (CT04598)
Edwards Angell Palmer & Dodge LLP
90 State House Square, 9th Floor
Hartford, CT 06103
Phone: Fax: 866.794.3484
Email: dbrown@eapdlaw.com