## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| BRUCE CHARLES RYAN, RUSSELL | : | |
| WILLIAM NEWTON, ROBERT | : | |
| FITZPATRICK, and MERIT CAPITAL | : | |
| ASSOCIATES, INC., | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Civil Action No. 3:03-CV-0644 (CFD) |
| | : | |
| NATIONAL UNION FIRE INSURANCE | : | |
| COMPANY OF PITTSBURGH, P.A., and | : | |
| CHARTIS CLAIMS INC., | : | |
| Defendants. | : | |
| _____ | : | |
| DAVID W. GWYNN and RAQUEL | : | |
| GWYNN, | : | |
| Plaintiffs | : | |
| | : | |
| v. | : | Civil Action No. 3:03-CV-1154 (CFD) |
| | : | |
| NATIONAL UNION FIRE INSURANCE | : | |
| COMPANY OF PITTSBURGH, P.A., and | : | |
| CHARTIS CLAIMS, INC., | : | |
| Defendants. | : | |
| _____ | : | |

### RULING ON CHALLENGES TO EXPERT WITNESSES

David and Raquel Gwynn (the "Gwynn Plaintiffs") offer Barry M. Levine as one of their

expert witnesses.  Levine is expected to testify regarding the long-term effects of the award in the

Sowell Arbitration on Mr. Gwynn's ability to obtain and maintain suitable employment.

National Union Fire Insurance Company of Pittsburgh and Chartis Claims, Inc. ("the

Defendants") move to preclude Levine's testimony claiming that it is not based on reliable

knowledge or experience, that his opinions are not based on complete or reliable facts, and that

he is not qualified to render expert testimony on the disclosed topics.

-1-

All of the plaintiffs offer James Schratz as an expert witness.  Schratz is expected to provide an opinion concerning the claims handling practice of AIG (now known as "Chartis Claims, Inc.").  The defendants move to preclude his testimony, claiming it is not based on reliable knowledge or experience, that his opinions are based on documents not disclosed in his expert report, that he seeks to offer impermissible opinion on a legal conclusion, that he attempts to offer an opinion on an "industry standard" that does not exist, and that his opinion is unreliable because he is "confused" regarding the standard he is applying.

Finally, the defendants offer Mary Calhoun as an expert witness.  Calhoun is expected to discuss whether the outcome of the Sowell arbitration would have been different had legal representation, paralegal support and/or expert witness retention been handled differently by the defendants.  The plaintiffs move to preclude her testimony[1], claiming that Calhoun is not qualified as an expert and that her opinions are based only on speculation.

## I.    Daubert Standard

In Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993), the Supreme Court held that the Federal Rules of Evidence impose a special obligation upon a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable."  509 U.S. at 589.  This concept was extended to include all expert testimony, not simply scientific experts, in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).  See 526 U.S. at 147 (citing Fed. R. Evid. 702).  Rule 702 of the Federal Rules of Evidence "establishes a standard of evidentiary reliability . . . [and] requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility."  Id. at 149 (quoting Daubert, 509 U.S. at 590–92) (internal quotation marks and

---

[1]It appears that only the so-called "Ryan Plaintiffs" move to exclude her testimony.

-2-

citations omitted).   This requirement seeks not only to "ensure the reliability and relevancy" of the expert's testimony, but also to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Id. at 152.

If the basis of an expert's testimony is called into question, it is the job of the trial judge to decide whether the "testimony has a reliable basis in the knowledge and experience of [the relevant] discipline."  Id. at 149 (citing Daubert, 509 U.S. at 592) (internal quotation marks omitted).  The court's inquiry is flexible, based on the nature of the case, the expert's particular expertise and the subject of his or her testimony.  Id. at 150.  "The expert's testimony must be grounded in an accepted body of learning or experience in the expert's field, and the expert must explain how the conclusion is so grounded."  Fed. R. Evid. 702 advisory committee's note 2000.

In making a finding as to admissibility, the trial judge has broad discretion to decide whether a proffered expert's method is appropriately reliable.  See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002).  Indeed, the U.S. Court of Appeals for the Second Circuit has stated that Federal Rule of Evidence 702 embodies a "liberal standard of admissibility for expert opinions."  Nimely v. City of N.Y., 414 F.3d 381, 395 (2d Cir. 2005). Moreover, as noted in Daubert, " [v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.

## II.  Barry Levine

Levine is an independent financial consultant who specializes in the conduct of individuals in the financial service industry.  The Gwynn Plaintiffs offer his testimony to assist in

determining the amount Gwynn could have reasonably been expected to earn from future employment but for the entry of the Sowell arbitration award.  Levine will also testify to the impact of Gwynn's self-representation on Gwynn's earning potential, both prior to and during the Sowell arbitration.[2]

A.      Is Levine an "Expert"?

The defendants argue that Levine is not an "expert" in the areas of income or the effect of self-representation on a "registered representative"[3] or Certified Financial Planner's earning potential.  "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004).  Lack of specific experience in a particular area is not determinative; rather, to find an "expert" unqualified, the court must find the expert's general experience insufficient to qualify the expert to testify about the issue in the case at hand.  See Pension Comm. of Univ. of Montreal v. Banc of Am. Sec., LLC, —F. Supp. 2d—, 2010 WL 648369, at *15 (S.D.N.Y. 2010).

According to Levine's resume, he has acted as an "expert analyst of financial derivative lawsuits" since 1993.  Levine has apparently taken part in approximately 100 active investigations, although the vast majority of these investigations have centered around issues of "conduct," rather than issues of "compensation."  As an expert analyst, Levine has previously estimated future earnings for a group of registered representatives based on a particular account, apparently calculating the future earnings in a manner very similar to the way in which he

---

[2] This latter determination is a non-numerical determination.

[3] Also referred to here as a "stock broker."

calculated potential earnings in this case.  (See Levine Dep. 37:15–39:24.)  This type of

calculation, however, appears to be the exception to Levine's common practice.  The Gwynn

Plaintiffs also provide a supplemental affidavit[4] from Levine in which Levine claims to have

reviewed the compensation information of a number of registered representatives throughout his

investigations.  Levine argues that through this review, he has kept his knowledge of

compensation "up to date."  In addition, Levine has testified at and prepared for a number of

NASD ("National Association of Securities Dealers") hearings.  Therefore, Plaintiffs argue, he

clearly has knowledge about preparation for an arbitration similar to the one here.

The Gwynn Plaintiffs also argue that Levine's personal experience in the financial

industry has given him knowledge in the areas of earnings potential and what is required to build

a broker's business.  From 1985 through 1993, Levine worked in the securities field.  He spent

only one year, however, at a broker/dealer firm.  The Gwynn Plaintiffs claim that at both Merrill

Lynch and L.F. Rothschild, Levine was either responsible for or had input in determining the

compensation for numerous registered representatives.  The plaintiffs also argue that Levine's

time spent in the financial industry gave him the knowledge of what a registered representative

must do to develop a client base.  The defendants argue that Levine's personal experiences in the

financial industry should be discounted because he has not been in active practice since the early

1990s.  However, that Levine is now a "professional expert" does not mean that his knowledge is

"stale," particularly because it appears that he has remained familiar with securities practices and

---

[4] The defendants object to Levine's supplemental affidavit as "untimely" and as an
attempt to "beef up" Levine's qualifications and "redo" his expert report.  Although the Court
notes these objections, the Court declines to discount Levine's supplemental affidavit.  The
defendants have had adequate opportunity to respond to the affidavit and have not demonstrated
any prejudice should the Court consider the affidavit.

industry conduct.  See Pension Comm. of Univ. of Montreal, 2010 WL 648369 at *15 (holding

that expert's auditing experience was not stale even though he has not performed an audit since

1996).

Levine has the sufficient knowledge and experience in the area of preparing for NASD

arbitrations and the process of garnering business as a stock broker necessary to act as an expert

on the effect that self-representation had on Gwynn's earning potential.  Although Levine

apparently has not assisted a *pro se* individual in preparing for arbitration, his general knowledge

and experience from conducting approximately 100 investigations allows him to opine with

regard to what is required to prepare for the arbitration.  Cf. id. (expert had performed

approximately 100 audits during his career, although only one was on a hedge fund; however,

there was no indication that the requirements substantially differed when a hedge fund was

audited).  Therefore, Levine is qualified to discuss the potential effect self-representation had on

Gwynn's earning potential.

Additionally, Levine's personal experience in the area of securities practices gives him a

sufficient knowledge base to discuss projected future earnings.  Throughout his approximately

100 investigations, Levine has apparently reviewed the salary information for a number of

registered representatives, thereby keeping his knowledge of projected salaries current.

Moreover, Levine has been personally involved in the financial sector with a variety of

experienced financial firms.  Thus, Levine has the background as to what such financial firms

look for when hiring their employees.  Additionally, Levine has previously calculated projected

earnings as an expert in a different claim; therefore, he has relevant experience in this field.

Although calculating lost or future earnings is not the direct focus of Levine's expertise, he has

sufficient knowledge to do so.  Therefore, Levine is also qualified as an expert for the purposes

of calculating lost earnings.

B.      Are Levine's Opinions Reliable?

        The defendants also claim that Levine's testimony should be precluded because his

opinions are based only on conjecture.  The defendants argue that Levine's conclusions about the

effect of self-representation are speculation and unreliable because Levine never asked Gwynn

how much time he devoted to representing himself.  Moreover, the defendants note then when

asked if he knew how many hours a registered representative would typically spend preparing for

trial, Levine answered only "I believe it takes some time."  However, when asked for the basis of

his belief, Levine asserted that he believed he had read in Gwynn's deposition testimony that

Gwynn had spent "some time" preparing for arbitration.  (See Levine Dep. 46:3–21.)  Levine's

expert report and the Gwynn deposition support this statement.  Levine's report notes that in

preparing for his analysis, Levine reviewed Gwynn's deposition testimony.  Moreover, Gwynn's

deposition specifically discusses the effort Gwynn put into self-representation.  In particular,

Gwynn testified that

> dealing with this claim situation from Mr. Sowell, caused me to drop everything
> about my ability to earn an income and instead focus on trying to defend my . . .
> home, my family, borrow money like crazy to pay for legal fees . . . .  And that
> takes time away from my ability to run the business.   If I don't have the ability to
> get out and see people . . . to do the day-to-day activities, to work with clients, to
> build my client base, to work the existing clients I have, then I'm out of business.

(See Gwynn Dep. 417.)   Levine also testified at his own deposition that, in reaching his

conclusion, he relied on his own personal experience of "being involved in the process that

registered [representatives] go through to generate revenue."  (Levine Dep. 46:22–24.)

Gwynn's testimony, coupled with Levine's own experience in the industry, is a sufficiently reliable basis on which Levine could conclude that "Gwynn's earnings during the period of self-representation would have been expected to be materially decreased . . . [and] would continue to be decreased by self-representation" due to the "front-loaded effort required to generate income."  The defendants' criticisms of Levine's analysis and conclusions go more to the weight that the jury should give Levine's testimony than to the reliability.  Therefore, these issues would more appropriately be raised on cross-examination.

The defendants also question the reliability of Levine's conclusions about Gwynn's expected salary.  Levine admitted that he did not consider the average income of "Certified Financial Planners" or registered representatives in Arizona or nationally; rather, in making his determination about Gywnn's potential financial earnings, Levine relied on Gwynn's past income and particular qualifications.  The Gwynn Plaintiffs claim that this type of calculation, relying on the particulars of Gwynn as an individual rather than on some national comparison, is more accurate.

Levine's apparent lack of knowledge about the typical salary of registered representatives does not render his testimony unreliable.  See Okraynets v. Metro. Transp. Auth., 555 F. Supp. 2d 420, 449–50 (S.D.N.Y. 2008) (discussing the testimony of two experts, one who looked at hours and wages of "average" worker and one who examined the particular individual's past job performance, and finding both conclusions regarding earnings to have been based on reasonable assumptions).  Here, Levine has testified at his deposition that he did not believe that Gwynn was the "average;" thereby offering an explanation as to why he did not feel the average salary was important.  Additionally, Levine examined Gwynn's earnings over a large period of time, not

simply focusing on the period during which he had the Sowell account.  Therefore, the

defendants' objection that Levine did not consider the amount of income relating to the Sowell

Arbitration is not dispositive.  Thus, the alleged flaws with Levine's methodology are issues

better addressed on cross-examination than by excluding Levine's testimony.

Therefore, the Court finds that Levine is qualified to testify to those opinions given in his

report.  The defendants' motion to preclude Levine's testimony is denied, without prejudice to

raising specific objections at trial.

**III.**   **James Schratz**

Schratz is a former Vice President of the Major Claims Unit at Fireman's Fund.  His

current focus is on the analysis and evaluation of proper claims handling techniques and

procedures.  The plaintiffs offer his testimony to provide an opinion regarding the claims

handling practices of AIG in this case.

A.   Testimony Based on Reliable Knowledge or Experience?

The defendants claim that Schratz's knowledge is "stale," "outdated," and "limited" and

thus not based on reliable knowledge or experience.  In support, the defendants note that

Schratz's claimed "knowledge and experience" is based on his tenure at Fireman's Fund, which

ended approximately 17 years ago.  Although Schratz has not handled a claim in an "insurer

capacity" since 1993, his knowledge is not automatically considered "stale."  See Pension

Comm. of Univ. of Montreal, 2010 WL 648369 at *15 (holding that expert's auditing experience

not stale even though he has not performed an audit since 1996).  Schratz began working at

Fireman's Fund in 1980 in the General Counsel's office.  After spending four years in the

General Counsel's office, Schratz joined the Claims Department.  He later became Vice

President of the Major Claims Unit at Fireman's Fund.  Throughout his tenure at Fireman's Fund Schratz reviewed and analyzed thousands of claims.  Additionally, through his career as an expert consultant, Schratz has worked with over 20 different insurance companies, reviewed thousands of claims files, and has kept abreast of important legal developments in the field.  Since 1993, Schratz has published numerous articles relating to insurance and the law.  Therefore, Schratz has kept his knowledge sufficiently current to not be considered "stale."

The defendants also claim that Schratz's knowledge is "outdated" and "unreliable."  The defendants argue that Schratz admits that practices at Fireman's Fund have changed since Schratz left.  However, in his deposition testimony Schratz only stated that he has seen claims against Fireman's Fund filed since he left and he believes that the claims handling has "gone downhill."  This statement does not declare that the practices have changed, but rather that the *quality* of the work at that particular company may have decreased.  More importantly, this statement is not sufficient to demonstrate that Schratz's knowledge is "unreliable."

Finally, the defendants argue that Schratz has had limited experience, working with less than one percent of the insurance companies.  This argument is based on Schratz's testimony that he has had experience with nearly 30 insurance companies out of the approximately 3600 in existence.  Although the defendants find fault with this "limited experience," as the plaintiffs point out, the defendants' own expert appears to have similarly "limited" experience.  Moreover, the defendants cite to no judicial decisions establishing that an expert must have worked with a set percentage of companies to have sufficient knowledge or background.  Therefore, Schratz has sufficient knowledge and skill in the area of claims handling necessary to qualify as an expert in claims handling.

B.    Offer Opinion Regarding "Industry Standard" that Does not Exist?

        The defendants argue that Schratz is offering opinions on standards that "do not exist."
They claim that because their expert, Susan Claflin, does not believe some of the practices
described by Schratz are "industry standards," then these practices are not industry standards as a
matter of law and Schratz's testimony is thus unreliable.  No party has produced evidence of a
definitive set of regulations or rules espousing the "industry standards." Additionally, Schratz's
opinions regarding industry standards are based on his years of experience in the insurance
industry and as a claims handling expert.  Therefore, the defendants' evidence of countervailing
testimony goes to the weight of Schratz's opinion, not his reliability.

C.    "Confusion" of Standards?

        Schratz's opinion is based on two different standards, each addressing a different finding.
The first inquiry addresses whether AIG "failed to meet the industry standards."  In analyzing
whether AIG failed to meet the industry standards, Schratz looked at the relevant practice in the
industry, or "what the industry does."  The second inquiry examines "bad faith" and the "breach
of the duty of good faith and fair dealing."  In analyzing whether AIG acted in "bad faith,"
Schratz determined whether the insurance company "gave as much consideration to the insurer's
interest as to its own."

        The defendants claim that, although these standards are apparently separate, Schratz
"repeatedly confuses the two."  The Court has reviewed Schratz's export report and finds that it
does not appear that there is "repeated confusion" of the standards.[5]  If, however, the defendants

_____

        [5] For example, in his expert report Schratz states that, while at Fireman's Fund, he had
reviewed files to determine if claims handlers had "properly investigated the claim and met or
exceeded the industry standard."  Schratz goes on to state that "[a]ccording to company policy

Case 3:03-cv-00644-CFD   Document 474   Filed 06/02/10   Page 12 of 16

find any of Schratz's statements contradictory, then that issue is best addressed through cross-examination.

The additional information provided to the Court demonstrates that Schratz's testimony regarding industry standards is sufficiently reliable.  In his report, he clearly sets out the practices he claims violated industry standards and explains what was incorrectly done in each instance.  He also grounds the statements in his considerable personal experience and knowledge.  Therefore, Schratz's testimony regarding whether AIG violated industry standards is sufficiently reliable.

D.    Impermissible Opinion Regarding Bad Faith?

The defendants argue that Schratz should not be permitted to testify about whether he believes AIG's actions constituted bad faith because it is an ultimate legal issue in the case and is therefore impermissible opinion.  The defendants also argue that Schratz's testimony regarding bad faith is unreliable because Schratz's standard for bad faith—whether the insurer gave as much consideration to the insured's interests as to its own—is not an accurate statement of Connecticut law.  Regardless of whether Schratz's testimony regarding bad faith would be an impermissible legal conclusion, cf. Fed. R. Evid. 704(a), the Court finds that the probative value of Schratz's testimony would be substantially outweighed by the danger of confusion of the issues and misleading the jury.  See Fed. R. Evid. 403.  The Court finds that the jury would likely be

---

and case law, the measurement I used in determining whether the claim had been properly investigated and handled was whether the insurance company gave as much consideration to the insured's interests as to its own."  The defendants argue that Schratz is there applying the "bad faith" standard to the question of whether Fireman's Fund violated "industry standards."  However, Schratz's job was to determine both if the claim was properly investigated *and* whether the claims handlers met industry standards.  It appears that with his second sentence, Schratz was clarifying how he would determine whether a claim was investigated properly.  He does not appear to be modifying or confusing the standard for bad faith with how to determine "industry standards."

-12-

confused by the differences between the testimony about Schratz's standard for bad faith and the applicable law on which the Court will instruct them.  Therefore, although Schratz is permitted to testify regarding whether AIG violated what he believes to be the industry standard for claims handling, Schratz is not permitted to testify about whether AIG's actions constituted "bad faith."[6] This ruling is made without prejudice to raising particular objections at trial.

Therefore, the defendants' motion to preclude Schratz's testimony is granted as to the issue of "bad faith," but denied as to whether AIG complied with "industry standards."

## IV.   Mary Calhoun

Mary Calhoun is a consultant in the area of securities arbitration who focuses on retail brokerage sales practices.  Calhoun is expected to testify about whether the outcome of the Sowell Arbitration would have likely been different had the plaintiffs been given additional legal representation, paralegal support, and/or expert witnesses.

### A.   Qualified as an Expert?

The plaintiffs argue that Calhoun does not qualify as an expert because she has no legal expertise, has not studied what evidence could or should have been presented, has no idea what the arbitration panel considered (other than what was stated on the record), and has not previously been called upon to render this type of opinion.   "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  United States v. Tin Yat

---

[6]The defendants also argue that Schratz's opinion regarding bad faith is based on documents not disclosed in his expert report, namely judicial decisions, an adjuster's letter to an insured, a mission statement, and claims manuals.  Because the Court finds that Schratz is precluded from offering an opinion on bad faith, the Court declines to address this argument.

<u>Chin</u>, 371 F.3d 31, 40 (2d Cir. 2004)

Calhoun has superior knowledge and experience in the area of securities arbitration. Calhoun has consulted in approximately 1300 securities arbitration cases and has testified approximately 200 times—particularly focusing on "retail brokerage sales practices" such as excessive trading and churning and damages.  She is also on the Board of Editors of <u>Securities Arbitration Commentator</u>, a publication that surveys securities arbitrations.  Calhoun is trained to serve as a NASD/FINRA[7] securities arbitrator and securities arbitration chairperson, and she has served as an arbitrator and as chairperson of an arbitration panel.  For three years she was also a member of the NASD/FINRA National Arbitration and Mediation Committee.  Although Calhoun testified at her deposition that this is the first time she has "opined" about the probable outcome of an arbitration, (<u>see</u> Calhoun Dep. 60:14–61:3), the lack of specific experience in a particular area is not determinative; rather, to find an "expert" unqualified, the court must find his or her general experience insufficient to testify about the issue in the case at hand.  See <u>Pension Comm. of Univ. of Montreal</u>, 2010 WL 648369, at *15.  Therefore, Calhoun's general experience makes her an expert in the area of securities arbitration, its process, and procedures.

B.      <u>Opinion Reliable?</u>

The Ryan Plaintiffs also argue that Calhoun's proposed testimony lacks reliability and should be precluded.  Specifically, the Ryan Plaintiffs assert that, although Calhoun "opines" on the potential outcome of the arbitration if counsel were provided, she was unaware of the assistance Gwynn had in preparing for arbitration and was therefore unaware of the evidence

---

[7] NASD stands for "National Association of Securities Dealers."  FINRA is the "Financial Industry Regulatory Authority."

counsel might have been able to produce if provided.  Additionally, although Calhoun did review the report of the arbitration panel and the transcript of the proceedings, she did not meet with or interview the panel members and is uncertain about the evidence they considered important or the evidence they considered to be the most credible.

Calhoun's failure to consider these other factors renders her opinion unreliable.  Cf. Innis Arden Golf Club v. Pitney Bowes, Inc., 629 F. Supp. 2d 175, 189 (D.Conn. 2009) (holding that expert's opinion was based on insufficient evidence when he failed to consider or investigate alternative causes).  Indeed, without considering or examining the possible changes counsel may have made or the effect of these changes, Calhoun is doing little more than speculating on what the potential result would be.  There is "too great an analytical gap" between the data that Calhoun analyzed and the opinion proffered.  See Fernandez v. Cent. Mine Equip. Co., 670 F. Supp. 2d 178, 183 (E.D.N.Y. 2009) (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).

In her deposition, Calhoun does note that she grounds her opinion in her expertise, stating that she based her opinion on the role of the panel in securities arbitration, the composition of this panel, and the panel's strong and "lengthy" opinion. (Calhoun Dep. 67:9–24.)   However, an additional flaw in Calhoun's analysis is that it is incapable of being tested or verified.  See Innis Arden Golf Club, 629 F. Supp. 2d at 190.  Although not all expert testimony is able to be scientifically verified or examined, this lack of verification, coupled with the insufficient basis and speculation on which Calhoun's opinion is based, further demonstrates that her opinion is unreliable.

Therefore, although Calhoun may testify as to the process and procedure of a securities arbitration, her opinion regarding the potential outcome of the arbitration is too unreliable.  Thus,

the plaintiffs' motion to exclude Calhoun's testimony is granted as to any testimony regarding any possible outcome of the arbitration.

**V.**     **Conclusion**

Therefore, the defendants' motion to exclude the testimony of Barry Levine [Dkt. # 421] is DENIED; the defendants' motion to exclude the testimony of James Schrartz [Dkt. # 422] is GRANTED IN PART and DENIED IN PART, as noted above; the plaintiffs' motion to exclude the testimony of Mary Calhoun [Dkt. # 428] is GRANTED IN PART AND DENIED IN PART, as noted above.

SO ORDERED this ____2nd____ day of June 2010, at Hartford, Connecticut.


 /s/Christopher F. Droney_____
**CHRISTOPHER F. DRONEY**
**UNITED STATES DISTRICT JUDGE**